Docket No: 21-13814-J

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

QUANIAH STEVENSON,

*Plaintiff-Appellant,*

v.

DELTA AIR LINES, INC.,

*Defendant-Appellee.*

# APPEAL FROM THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

———————————

# APPENDIX

———————————

Charlena L. Thorpe
INCORPORATING INNOVATION LLC WITH
CHARLENA THORPE, PATENT ATTORNEY
6340 Sugarloaf Parkway, Suite 200
Duluth, Georgia 30097
(770) 325-2741
charlena@incorporatinginnovation.com
*Counsel for Appellant*

# INDEX OF APPENDIX

**Docket/Tab#**

District Court Docket Sheet ........................................................................A

Order Granting Request To Proceed In Forma Pauperis ............................2 (Vol. 1)

Complaint    ...............................................................................3(Vol. 1)

Answer       ...............................................................................7(Vol. 1)

Guidelines For Discovery And Summary Judgment Practice ...................15(Vol. 1)

Emergency Motion For Extension Of Time. ............................................36(Vol. 1)

Order Reopening Discovery .....................................................................38(Vol. 1)

Motion To Compel Documents By Quaniah R. Stevenson .......................50(Vol. 1)

Consent Order Re Discover .......................................................................52(Vol. 1)

Second Motion To Compel Documents......................................................56(Vol. 1)

Objection To Magistrate's Order Entered October 10, 2019 .....................64(Vol. 1)

Order Re 64 Plaintiff's Objections To The Magistrate Judge's Order ........67(Vol. 1)

Motion For Summary Judgment.. ..............................................................88(Vol. 2)

Sealed Deposition Of Barbara Franz ........................................................89(Vol. 3)

Sealed Deposition Of Kelly Nabors...........................................................92(Vol. 4)

Sealed Deposition Of Lisa Blackmon.........................................................94(Vol. 1)

Original Response Re 88 Motion For Summary Judgment........................96(Vol. 1)

Supplemental Response To Motion For Summary Judgment ....................98(Vol. 5)

Reply Brief Re 88, 98 Supplemental Response..........................................99(Vol. 5)

Final Report And Recommendation .........................................................102(Vol. 5)

Objections To 102, Report And Recommendation...................................104(Vol. 5)

District Court Order :Adopting The Magistrate Judge's R&R 102, And Grants

Defendant's Motion For Summary Judgment 88 As To All Counts.........106(Vol. 5)

Notice Of Appeal ....................................................................................108(Vol. 5)

Transcript Of Proceedings Held On 2/18/2021 .......................................117(Vol. 5)

Transcript Of Proceedings Held On 3/28/2019 .......................................118(Vol. 5)

Transcript Of Proceedings Held On 3/1/2019 .........................................119(Vol. 5)

Certificate Of Service

# Dkt/Tab A

4months,APPEAL,CLOSED,LTW,TitleVII

# U.S. District Court
# Northern District of Georgia (Atlanta)
# CIVIL DOCKET FOR CASE #: 1:16-cv-02571-AT

Stevenson v. Delta Air Lines, Inc.
Assigned to: Judge Amy Totenberg
Case in other court: 11th Circuit, 21-13814-J
                USCA - 11th Circuit., 21-13814-JJ
Cause: 42:12101 et seq. Americans with Disabilities Act of 1990

Date Filed: 07/15/2016
Date Terminated: 09/29/2021
Jury Demand: Plaintiff
Nature of Suit: 445 Civil Rights:
Americans with Disabilities - Employment
Jurisdiction: Federal Question

**Plaintiff**

**Quaniah R. Stevenson**      represented by    **Charlena L. Thorpe**
Incorporating Innovation LLC with
Charlena Thorpe
Patent Attorney
Suite 200
6340 Sugarloaf Pkwy.
Duluth, GA 30097
678-644-9922
Fax: 888-898-3784
Email:
charlena.thorpe@charlenathorpe.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Delta Air Lines, Inc.**      represented by    **Benjamin Alexander Stone**
Munger & Stone
999 Peachtree Street, NE
Suite 2850
Atlanta, GA 30309
404-815-1884
Email: ben.stone@mungerandstone.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheandra Rashida Clark**
Delta Air Lines, Inc.
Hartsfield International Airport
P.O. Box 20574
Department 981
Atlanta, GA 30320-2574
404-715-3613
Fax: 404-715-2233

Email: sheandra.r.clark@delta.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/15/2016 | 1 | APPLICATION for Leave to Proceed in forma pauperis by Quaniah R. Stevenson. (Attachments: # 1 Complaint, # 2 Civil Cover Sheet)(bnw) (Entered: 07/18/2016) |
| 07/18/2016 | | Submission of 1 APPLICATION for Leave to Proceed in forma pauperis for IFP and Frivolity Determination to Magistrate Judge Linda T. Walker. (bnw) (Entered: 07/18/2016) |
| 08/18/2016 | 2 | ORDER GRANTING 1 Request to Proceed In Forma Pauperis and allowing this case to proceed as any other civil action. The Clerk is DIRECTED to send Plaintiff two copies of the USM 285 form, summons, and the initial disclosures form. Plaintiff is DIRECTED to complete both copies of the USM 285 form, summons, and the initial disclosures form, and to return one of each for the Defendant named in the complaint within 30 days from the entry date of this Order to the Clerk of Court. The Clerk is DIRECTED to resubmit this action to the undersigned if Plaintiff fails to comply. Upon receipt of the forms by the Clerk, the Clerk is DIRECTED to prepare a service waiver package for the Defendant. Signed by Magistrate Judge Linda T. Walker on 8/18/2016. (jtj) (Entered: 08/18/2016) |
| 08/18/2016 | 3 | COMPLAINT with Jury Demand filed by Quaniah R. Stevenson. (Attachments: # 1 Civil Cover Sheet) (jtj) Please visit our website at http://www.gand.uscourts.gov /commonly-used-forms to obtain Pretrial Instructions which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 08/18/2016) |
| 08/18/2016 | | Clerk's Certificate of Mailing as to Quaniah R. Stevenson re 2 Order, two copies of the USM 285 form, summons, and the initial disclosures form. Notice of street name change for the Atlanta courthouse included. (jtj) (Entered: 08/18/2016) |
| 09/15/2016 | | Clerk's Office received USM285 form and summons from Plaintiff. (jtj) (Entered: 09/16/2016) |
| 09/16/2016 | 4 | Plaintiff's Initial Disclosures by Quaniah R. Stevenson. (jtj) (Entered: 09/16/2016) |
| 09/19/2016 | 5 | REQUEST FOR WAIVER of Service mailed to Delta Air Lines, Inc. on 9/19/2016. If waiver not returned by 10/25/2016, prepare personal service package. (jtj) (Entered: 09/19/2016) |
| 10/21/2016 | 6 | WAIVER OF SERVICE Returned Executed by Delta Air Lines, Inc. Delta Air Lines, Inc. waiver mailed on 9/19/2016, answer due 11/18/2016. (jtj) (Entered: 10/24/2016) |
| 11/17/2016 | 7 | ANSWER to 3 COMPLAINT by Delta Air Lines, Inc.. Discovery ends on 4/17/2017. (Clark, Sheandra) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 11/17/2016) |
| 11/17/2016 | 8 | Certificate of Interested Persons and Corporate Disclosure Statement by Delta Air Lines, Inc. identifying Other Affiliate Delta Air Lines, Inc. and Pan American World Airways, Inc. - Unterstutzungskasse GMBH, Other Affiliate Montana Enterprises, Inc., Other Affiliate NW Red Baron LLC, Other Affiliate Northwest Airlines, LLC, Other Affiliate Delta Sky Club, Inc., Other Affiliate Delta Private Jets, Inc., Other Affiliate Tomisato Shoji KK Japan, Other Affiliate Monroe Energy, LLC, Other |

| | | |
|---|---|---|
| | | Affiliate MIPC, LLC, Other Affiliate Aero Assurance Ltd., Other Affiliate Comair Holdings, LLC, Other Affiliate DAL Global Services, LLC, Other Affiliate Delta Air Lines Dublin Limited, Other Affiliate Delta Air Lines Private Limited, Other Affiliate Epsilon Trading, LLC, Other Affiliate New Sky, Ltd., Other Affiliate Endeavor Air, Inc., Other Affiliate MLT Vacations, LLC, Other Affiliate Delta Gift Cards, Inc. for Delta Air Lines, Inc.. (Clark, Sheandra) (Entered: 11/17/2016) |
| 12/19/2016 | 9 | Initial Disclosures by Delta Air Lines, Inc..(Stone, Benjamin) (Entered: 12/19/2016) |
| 12/19/2016 | 10 | Proposed JOINT PRELIMINARY REPORT AND DISCOVERY PLAN filed by Delta Air Lines, Inc.. (Stone, Benjamin) (Entered: 12/19/2016) |
| 12/19/2016 | 11 | CERTIFICATE OF SERVICE *of Defendant's First Interrogatories to Plaintiff* by Delta Air Lines, Inc..(Stone, Benjamin) (Entered: 12/19/2016) |
| 12/19/2016 | 12 | CERTIFICATE OF SERVICE *of Defendant's First Request for Production of Documents to Plaintiff* by Delta Air Lines, Inc..(Stone, Benjamin) Reviewed on 12/21/2016 - Discovery E-filed in Violation of Local Rule 5.4 A (jkl). (Entered: 12/19/2016) |
| 02/28/2017 | 13 | NOTICE to Take Deposition of Quaniah R. Stevenson filed by Delta Air Lines, Inc. (Stone, Benjamin) (Entered: 02/28/2017) |
| 03/03/2017 | 14 | ORDER. Plaintiff is therefore ORDERED to file her Preliminary Report and Discovery Plan as required by Local Rule 16.2 within fourteen (14) days of the date of this Order. LR 16.2, NDGa. Plaintiff is further ORDERED to show cause why her case should not be dismissed for want of prosecution within fourteen (14) days of the date of this Order. Signed by Magistrate Judge Linda T. Walker on 3/3/2017. (dfb) (Entered: 03/03/2017) |
| 03/03/2017 | 15 | SCHEDULING ORDER and GUIDELINES FOR DISCOVERY AND SUMMARY JUDGMENT PRACTICE. Upon review of the 10 Joint Preliminary Report and Discovery Plan, the Magistrate Judge ORDERS that the time limits for adding parties, amending the pleadings, serving initial disclosures, and filing motions are as stated in the Fed.R.Civ.P. and District Court Local Rules. The Clerk is directed to submit this action by June 23, 2017, if the parties have not filed a Motion for Summary Judgment or Proposed Consolidated Pretrial Order. Signed by Magistrate Judge Linda T. Walker on 3/3/2017. (dfb) (Entered: 03/03/2017) |
| 03/03/2017 | 16 | NOTICE to Pro Se Plaintiff. Signed by Magistrate Judge Linda T. Walker on 3/3/2017. (dfb) (Entered: 03/03/2017) |
| 03/03/2017 | | Clerks Certificate of Mailing as to Quaniah R. Stevenson re 14 Order to Show Cause, 15 Scheduling Order, 16 Notice to Pro Se Plaintiff. Notice of street name change for the Atlanta courthouse included. (dfb) (Entered: 03/03/2017) |
| 03/03/2017 | | Clerks Certificate of Mailing as to Quaniah R. Stevenson (via CM/RRR 91 7199 9991 7032 5720 6415) re 14 Order to Show Cause. Notice of street name change for the Atlanta courthouse included. (dfb) (Entered: 03/03/2017) |
| 03/16/2017 | 17 | CERTIFICATE OF SERVICE of Plaintiff's Response to Defendant's Request for production of Documents, by Quaniah R. Stevenson. (jtj) (Entered: 03/17/2017) |
| 03/16/2017 | 18 | CERTIFICATE OF SERVICE of Plaintiffs' Response to Defendant's First and Continuing Interrogatories, by Quaniah R. Stevenson. (jtj) (Entered: 03/17/2017) |

| | | |
|---|---|---|
| 03/16/2017 | 19 | MOTION for Extension of Time to Show Cause why this case should not be dismissed re: 14 Order to Show Cause, by Quaniah R. Stevenson. (jtj) (Entered: 03/17/2017) |
| 03/22/2017 | 20 | RESPONSE in Opposition re 19 MOTION for Extension of Time to Show Cause why this case should not be dismissed re: 14 Order to Show Cause, filed by Delta Air Lines, Inc.. (Attachments: # 1 Exhibit A - E-mail Communications from Delta counsel to Plaintiff)(Stone, Benjamin) (Entered: 03/22/2017) |
| 03/28/2017 | 21 | Mail Returned as Undeliverable. Mail sent to Quaniah R. Stevenson re 14 Order to Show Cause. (jtj) (Entered: 03/30/2017) |
| 04/07/2017 | | Submission of 19 MOTION for Extension of Time to Show Cause why this case should not be dismissed to Magistrate Judge Linda T. Walker. (bnw) (Entered: 04/07/2017) |
| 04/12/2017 | 22 | MOTION to Dismiss *for failure to prosecute* with Brief In Support by Delta Air Lines, Inc.. (Attachments: # 1 Brief)(Stone, Benjamin) (Entered: 04/12/2017) |
| 04/19/2017 | 23 | RESPONSE in Opposition to 22 MOTION to Dismiss *for failure to prosecute*, filed by Quaniah R. Stevenson. (jtj) (Entered: 04/20/2017) |
| 04/21/2017 | 24 | REPLY BRIEF re 22 MOTION to Dismiss *for failure to prosecute* filed by Delta Air Lines, Inc.. (Stone, Benjamin) (Entered: 04/21/2017) |
| 04/21/2017 | | Submission of 22 MOTION to Dismiss *for failure to prosecute*, submitted to Magistrate Judge Linda T. Walker. (jtj) (Entered: 04/21/2017) |
| 05/08/2017 | 25 | ORDER DEEMING AS MOOT 19 Motion for Extension of Time to Respond to this Court's March 14, 2017 Show Cause Order. Plaintiff is ORDERED to respond to Defendant's requests for discovery on or before June 5, 2017. Plaintiff is also ORDERED to provide Delta's counsel with at least three dates between June 9 and June 30, 2017, that she will be available to sit for her deposition. Plaintiff shall provide these dates on or before May 23, 2017. Plaintiff is also ORDERED to provide the Court with a telephone where she can be reached on or before May 23, 2017. This Court also observes that Plaintiff still has not filed her Preliminary Report and Discovery Plan as required by the Local Rules and this Court's March 3, 2017 Order. Plaintiff is therefore ORDERED to file her Preliminary Report and Discovery Plan on or before May 23, 2017. Lastly, the Court again warns Plaintiff that this Court will interpret her failure to comply with this Order as her indication that she is not interested in prosecuting her case. As a result, this Court will recommend the dismissal of Plaintiff's lawsuit. Signed by Magistrate Judge Linda T. Walker on 5/08/2017. (jtj) (Entered: 05/08/2017) |
| 05/08/2017 | | Clerk's Certificate of Mailing as to Quaniah R. Stevenson re 25 Order. Notice of street name change for the Atlanta courthouse included. (jtj) (Entered: 05/08/2017) |
| 05/15/2017 | 26 | MOTION for Extension of Time to file dispositive motions with Brief In Support by Delta Air Lines, Inc.. (Attachments: # 1 Brief)(Stone, Benjamin) (Entered: 05/15/2017) |
| 05/23/2017 | 27 | PLAINTIFF'S PRELIMINARY REPORT AND DISCOVERY PLAN filed by Quaniah R. Stevenson. (jtj) (Entered: 05/24/2017) |
| 05/23/2017 | 28 | MOTION for Extension of Time re: 25 Order and Plaintiff's Change of Address, by Quaniah R. Stevenson. (jtj) (Entered: 05/24/2017) |

| | | |
|---|---|---|
| 05/23/2017 | 29 | RESPONSE to 25 Order regarding dates for deposition, filed by Quaniah R. Stevenson. (jtj) (Entered: 05/24/2017) |
| 06/05/2017 | | Submission of 26 MOTION for Extension of Time to file dispositive motions, submitted to Magistrate Judge Linda T. Walker. (jtj) (Entered: 06/05/2017) |
| 06/06/2017 | 30 | SUPPLEMENTAL BRIEF in Support of 22 MOTION to Dismiss for failure to prosecute, filed by Delta Air Lines, Inc. (Stone, Benjamin) (Entered: 06/06/2017) |
| 06/14/2017 | | Submission of 28 MOTION for Extension of Time re: 25 Order, submitted to Magistrate Judge Linda T. Walker. (jtj) (Entered: 06/14/2017) |
| 06/23/2017 | 31 | Notice of Filing Answer to 22 MOTION to Dismiss, filed by Quaniah R. Stevenson. (Attachments: # 1 Exhibit A) (jtj) (Entered: 06/26/2017) |
| 07/03/2017 | 32 | ORDER GRANTING 26 Motion for Extension of Time; The Defendant is granted an extension of time through July 31, 2017 to file its Motion for Summary Judgment. Signed by Magistrate Judge Linda T. Walker on 7/3/2017. (sap) (Entered: 07/03/2017) |
| 07/03/2017 | | Clerks Certificate of Mailing as to Quaniah R. Stevenson re 32 Order on Motion for Extension of Time. Notice of street name change for the Atlanta courthouse included. (sap) (Entered: 07/03/2017) |
| 07/25/2017 | 33 | MOTION for Summary Judgment with Brief In Support by Delta Air Lines, Inc.. (Attachments: # 1 Statement of Material Facts, # 2 Brief, # 3 Affidavit, # 4 Exhibit Minuscript of Deposition of Quaniah Stevenson (redacted), # 5 Exhibit Stevenson Dep., Exh. 7, # 6 Exhibit Stevenson Dep., Exh. 8, # 7 Exhibit Stevenson Dep., Exh. 9, # 8 Exhibit Stevenson Dep., Exh. 10, # 9 Exhibit Stevenson Dep., Exh. 11, # 10 Exhibit Stevenson Dep., Exh. 12, # 11 Exhibit Stevenson Dep., Exh. 13, # 12 Exhibit Stevenson Dep., Exh. 16, # 13 Exhibit Stevenson Dep., Exh. 17, # 14 Exhibit Stevenson Dep., Exh. 19 (redacted), # 15 Exhibit Stevenson Dep., Exh. 21)(Stone, Benjamin) --Please refer to http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.-- (Entered: 07/25/2017) |
| 07/25/2017 | 34 | Clerk's Notice to Plaintiff to Respond to 33 MOTION for Summary Judgment mailed to plaintiff. (jtj) (Entered: 07/25/2017) |
| 08/03/2017 | 35 | NOTICE of Appearance by Charlena L. Thorpe on behalf of Quaniah R. Stevenson (Thorpe, Charlena) (Entered: 08/03/2017) |
| 08/03/2017 | 36 | Emergency MOTION for Extension of Time to File Response to 33 Defendant's Motion For Summary Judgment, MOTION for Relief Defendant's Failure to Produce Evidence Pursuant to Fed. R. Civ. P. 25(a)(1)(A)(i & ii) and Fed. R. Civ. P. 26(e), Emergency MOTION for Extension of Time to Complete Discovery with Brief In Support by Quaniah R. Stevenson. (Thorpe, Charlena) (Entered: 08/03/2017) |
| 08/07/2017 | 37 | RESPONSE in Opposition to 36 Emergency MOTION for Extension, Reopen Discovery and MOTION to Exclude Evidence, filed by Delta Air Lines, Inc. (Stone, Benjamin) Modified on 8/7/2017 to edit docket text. (jtj) (Entered: 08/07/2017) |
| 08/23/2017 | | Submission of 36 Emergency MOTION for Extension of Time to File Response to 33 Defendant's Motion For Summary Judgment, MOTION for Relief, Emergency MOTION for Extension of Time to Complete Discovery, submitted to Magistrate Judge Linda T. Walker. (jtj) (Entered: 08/23/2017) |

| | | |
|---|---|---|
| 10/10/2017 | 38 | ORDER REOPENING discovery through and including November 8, 2017, for the limited purpose of permitting Plaintiff to take one deposition. Plaintiff's Response to Defendant's Motion for Summary Judgment will be due November 22, 2017. No further extensions of the discovery period or the time for Plaintiff to file a response to Defendant's summary judgment motion will be granted by this Court. Signed by Magistrate Judge Linda T. Walker on 10/10/2017. (jtj) (Entered: 10/11/2017) |
| 10/23/2017 | | ORDER finding as moot 28 Motion for Extension of Time. Signed by Magistrate Judge Linda T. Walker on October 21, 2017. (LTW) (Entered: 10/23/2017) |
| 11/15/2017 | | Minute Entry for proceedings held before Magistrate Judge Linda T. Walker: Telephone Conference held on 11/15/2017. Defendant requested the conference because of issues with discovery requests received from Plaintiff. The Court allowed oral arguments from the parties re the issues. The Court agreed with Defendants that Plaintiff's discovery requests were overly broad and advised the Plaintiff on narrowing the scope of her requests. The Court ORDERED that the parties develop a time frame for moving the case forward with regarding to the completion of discovery, the completion of depositions, motions for summary judgment and responses. The Court ORDERED the parties to file a consent order with the court inclusive of the dates and also advised that going forward, that if more time is needed, to let the court know. Court will await consent order from the parties. Hearing concluded. (slc) (Entered: 11/15/2017) |
| 11/27/2017 | | Submission of 33 Defendant's MOTION for Summary Judgment , submitted to Magistrate Judge Linda T. Walker. (jtj) (Entered: 11/27/2017) |
| 12/07/2017 | 39 | Minute Entry for proceedings held before Magistrate Judge Linda T. Walker: Telephone Conference held on 12/7/2017 to discuss the parties' proposed discovery schedule and potential mediation. (Received in Clerk's office on 12/12/17) (jpa) (Entered: 12/12/2017) |
| 12/15/2017 | 40 | ORDER REFERRING CASE to Magistrate Judge Walter E. Johnson for settlement. The Clerk is DIRECTED to administratively close the instant case for purposes of mediation. The parties may move to reopen the case at any time if they reach an impasse in settlement proceedings. Signed by Magistrate Judge Linda T. Walker on 12/15/2017. (jtj) (Entered: 12/18/2017) |
| 12/15/2017 | | ORDER WITHDRAWING 33 Motion for Summary Judgment and 22 Motion to Dismiss. Ordered by Magistrate Judge Linda T. Walker on 12/15/2017. (jtj) (Entered: 12/18/2017) |
| 12/15/2017 | | Civil Case Administratively Closed. Magistrate Judge Linda T. Walker terminated from case. (jtj) (Entered: 12/18/2017) |
| 12/26/2017 | 41 | ORDER scheduling Mediation. Mediation Hearing set for 1/26/2018 at 10:00 AM in ROME Courtroom 201 before Magistrate Judge Walter E. Johnson. Signed by Magistrate Judge Walter E. Johnson on 12/26/17. (klb) (Entered: 12/26/2017) |
| 01/26/2018 | 42 | Minute Entry for proceedings held before Magistrate Judge Walter E. Johnson: Mediation held on 1/26/2018. Case did not settle. (klb) (Entered: 01/26/2018) |
| 02/07/2018 | 43 | MOTION to Reopen Case, MOTION for Sanctions Against Defendant Delta Air Lines, Inc. for Failure to Participate in Mediation in Good Faith, MOTION to Reopen Discovery, with Brief In Support by Quaniah R. Stevenson. (Thorpe, Charlena) (Entered: 02/07/2018) |

| | | |
|---|---|---|
| 02/20/2018 | 44 | RESPONSE in Opposition re 43 MOTION to Reopen Case, MOTION for Sanctions, MOTION to Reopen Discovery filed by Delta Air Lines, Inc. (Stone, Benjamin) (Entered: 02/20/2018) |
| 03/13/2018 | | Submission of 43 MOTION to Reopen Case, MOTION for Sanctions Against Defendant Delta Air Lines, Inc. for Failure to Participate in Mediation in Good Faith, MOTION to Reopen Discovery to District Judge Amy Totenberg. (sap) (Entered: 03/13/2018) |
| 04/11/2018 | | Submission of 43 MOTION to Reopen Case, MOTION for Sanctions, and MOTION to Reopen Discovery to Magistrate Judge Linda T. Walker. (sap) (Entered: 04/11/2018) |
| 07/05/2018 | 45 | ORDER GRANTING the Plaintiffs' 43 Motion to Reopen Case, DENYING 43 Motion for Sanctions Against Defendant Delta Air Lines, Inc., and DENYING 43 Motion to Reopen Discovery. Discovery has already limped along for almost a year in this case, with various delays often occurring due to Plaintiff's lack of cooperation or diligence. Discovery shall proceed for through and including August 20, so that Plaintiff may conduct the limited discovery permitted by the Court's 38 Order and the Court's oral Order during the November 15, 2017 discovery conference. Any motions for summary judgment shall be due on September 19, 2018. Signed by Magistrate Judge Linda T. Walker on 7/5/2018. (sap) (Entered: 07/05/2018) |
| 08/09/2018 | | NOTICE of TELECONFERENCE Hearing: Discovery Hearing set for 8/13/2018 at 02:00 PM before Magistrate Judge Linda T. Walker. The court will initiate the call to the parties.(slc) (Entered: 08/09/2018) |
| 09/19/2018 | 46 | CONSENT ORDER. Assuming that the parties' successfully reach agreement regarding the Notice of Deposition and Request for Production of Documents, Plaintiff shall serve such revised Notice and Request no later than September 30, 2018. Delta shall respond to the document request no later than October 30, 2018. The deposition shall occur on a mutually agreed-upon date in November or December 2018. Delta shall be permitted to file its Motion for Summary Judgment no later than January 31, 2019. Plaintiff shall have until February 28, 2019 to respond to Delta's pending Motion for Summary Judgment. Delta shall have until March 25, 2019 to file its Reply in support of its Motion for Summary Judgment. 6. If the parties are unable to successfully reach agreement on the scope of the Notice and Request, they shall contact the Court for further direction. Signed by Magistrate Judge Linda T. Walker on 9/19/2018. (jtj) (Entered: 09/20/2018) |
| 10/02/2018 | | CASE REFERRED to Magistrate Judge Linda T. Walker. (jtj) (Entered: 10/02/2018) |
| 01/15/2019 | 47 | Consent MOTION for Extension of Time Complete Discovery and File and Respond to Dispositive Motions , MOTION for Protective Order with Brief In Support by Delta Air Lines, Inc.. (Attachments: # 1 Text of Proposed Order re Extension of Deadlines, # 2 Text of Proposed Order re Protective Order)(Stone, Benjamin) (Entered: 01/15/2019) |
| 01/24/2019 | 48 | ORDER GRANTING the Defendant's 47 Consent Motion for Extension of Time to Complete Discovery. Discovery hereby ends on February 28, 2019 and Motions for Summary Judgment are due on or before March 29, 2019. See Order for Additional Deadlines. Signed by Magistrate Judge Linda T. Walker on 1/24/2019. (sap) (Entered: 01/24/2019) |
| 01/24/2019 | 49 | CONSENT PROTECTIVE ORDER. Signed by Magistrate Judge Linda T. Walker on 1/24/2019. (sap) (Entered: 01/24/2019) |

| 02/28/2019 | | NOTICE of TELECONFERENCE Hearing: EMERGENCY Discovery Hearing set for 3/1/2019 at 03:00 PM before Magistrate Judge Linda T. Walker. The court will initiate the call to the parties.(slc) (Entered: 02/28/2019) |
|---|---|---|
| 02/28/2019 | 50 | MOTION for Extension of Time to Complete Discovery , MOTION to Compel Documents by Quaniah R. Stevenson. (Thorpe, Charlena) (Entered: 02/28/2019) |
| 03/01/2019 | 51 | Minute Entry for proceedings held before Magistrate Judge Linda T. Walker: Telephone Conference held on 3/1/2019. Parties appeared before the court for a discovery conference. The motion to compel was denied. The court agreed to an extension of time for limited discovery, which they will put in a proposed order and present to the court. Parties are advised to prepare a draft of today's proceedings within the proposed order and present it to the court by the end of the week of March 4, 2019. (Tape #FTR GOLD)(bdb) (Entered: 03/04/2019) |
| 03/26/2019 | | NOTICE of TELECONFERENCE Hearing: Status Conference set for 3/27/2019 at 11:00 AM before Magistrate Judge Linda T. Walker. (slc) (Entered: 03/26/2019) |
| 04/09/2019 | | Minute Entry for proceedings held before Magistrate Judge Linda T. Walker: Teleconference held on 03/28/2019. The parties appeared before the court via a teleconference regarding a discovery dispute. Defendant advised the court that Plaintiff is requesting access to an additional 700 documents. In lieu of providing the 700 documents, the court afforded Plaintiff the opportunity to take the deposition of Defendant's Senior Human Resource Officer, for a limited purpose. The parties were directed to provide the Court with a joint consent order governing, inter alia, the filing of dispositive motions. (slc) (Entered: 04/09/2019) |
| 04/22/2019 | 52 | CONSENT ORDER: Limited discovery consistent with this Order and the Court's prior Orders is extended for a period expiring sixty (60) days following the entry of this Order. The Court ORDERS that Delta produce the information specified herein within thirty (30) days of entry of this Order. Delta's Motion for Summary Judgment shall be due within thirty (30) days of the close of the discovery period. Plaintiff shall have thirty (30) days following the filing of Delta's Motion for Summary Judgment to respond. Delta shall have thirty (30) days following the filing of Plaintiff's Response to file its Reply. In light of this Order, Plaintiff's 50 Motion to Compel and to Extend Discovery is DISMISSED. Signed by Magistrate Judge Linda T. Walker on 4/22/2019. (bnp) (Entered: 04/23/2019) |
| 05/22/2019 | 53 | MOTION for Extension of Time produce information to Plaintiff with Brief In Support by Delta Air Lines, Inc.. (Stone, Benjamin) (Entered: 05/22/2019) |
| 05/23/2019 | | ORDER granting 53 Motion for Extension of Time. Signed by Magistrate Judge Linda T. Walker on May 23, 2019. (LTW) (Entered: 05/23/2019) |
| 06/24/2019 | 54 | Consent MOTION for Extension of Time to Complete Discovery with Brief In Support by Delta Air Lines, Inc.. (Attachments: # 1 Text of Proposed Order)(Stone, Benjamin) (Entered: 06/24/2019) |
| 06/24/2019 | 55 | CONSENT ORDER granting 54 Motion for Extension of Time to Complete Discovery. Discovery is extended through July 31, 2019. Delta's Motion for Summary Judgment shall be due on or before August 30, 2019. Plaintiff shall have until September 30, 2019 to respond to Delta's pending Motion for Summary Judgment. Delta shall have until October 30, 2019 to file its Reply in support of its Motion for Summary Judgment. Signed by Magistrate Judge Linda T. Walker on 6/24/2019. (bnp) |

| | | (Entered: 06/25/2019) |
|---|---|---|
| 07/31/2019 | 56 | Second MOTION to Compel Documents , MOTION for Extension of Time to Complete Discovery with Brief In Support by Quaniah R. Stevenson. (Thorpe, Charlena) (Entered: 07/31/2019) |
| 08/14/2019 | 57 | RESPONSE in Opposition re 56 Second MOTION to Compel Documents MOTION for Extension of Time to Complete Discovery filed by Delta Air Lines, Inc.. (Attachments: # 1 Exhibit A - Transcript of Deposition)(Stone, Benjamin) (Entered: 08/14/2019) |
| 08/19/2019 | | Submission of 56 Second MOTION to Compel Documents, MOTION for Extension of Time to Complete Discovery to Magistrate Judge Linda T. Walker. (bnp) (Entered: 08/19/2019) |
| 08/28/2019 | 58 | MOTION for Summary Judgment with Brief In Support by Delta Air Lines, Inc.. (Attachments: # 1 Statement of Material Facts, # 2 Brief, # 3 Affidavit Declaration of Kelly Nabors, # 4 Exhibit Minuscript of Deposition of Quaniah Stevenson (redacted), # 5 Exhibit Stevenson Dep., Exh. 7, # 6 Exhibit Stevenson Dep., Exh. 8, # 7 Exhibit Stevenson Dep., Exh. 9, # 8 Exhibit Stevenson Dep., Exh. 10, # 9 Exhibit Stevenson Dep., Exh. 11, # 10 Exhibit Stevenson Dep., Exh. 12, # 11 Exhibit Stevenson Dep., Exh. 13, # 12 Exhibit Stevenson Dep., Exh. 16, # 13 Exhibit Stevenson Dep., Exh. 17, # 14 Exhibit Stevenson Dep., Exh. 19 (redacted), # 15 Exhibit Stevenson Dep., Exh. 21, # 16 Exhibit Excerpts of Deposition of Kelly Nabors)(Stone, Benjamin) --Please refer to http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.-- (Entered: 08/28/2019) |
| 09/27/2019 | 59 | RESPONSE re 58 MOTION for Summary Judgment filed by Quaniah R. Stevenson. (Attachments: # 1 Affidavit DECLARATION OF QUANIAH STEVENSON)(Thorpe, Charlena) (Entered: 09/27/2019) |
| 09/27/2019 | 60 | AFFIDAVIT in Support re 58 MOTION for Summary Judgment filed by Quaniah R. Stevenson. (Thorpe, Charlena) (Entered: 09/27/2019) |
| 09/27/2019 | 62 | SEALED DEPOSITION of Delta Air Lines, Inc. (Kelly Nabors) taken on February 26, 2019 by Quaniah R. Stevenson. Sealed pursuant to 15 Order(bnp). (Additional attachment(s) added on 10/1/2019: # 1 Exhibits) (bnp). (Entered: 10/01/2019) |
| 09/30/2019 | 61 | NOTICE Of Filing by Quaniah R. Stevenson re 59 Response to Motion *of sealed, original copy of deposition of Kelly Nabors manually with Court on September 27, 2019, pursuant to Court Order re 15 at paragraph II(C))* (Thorpe, Charlena) (Entered: 09/30/2019) |
| 10/01/2019 | | Submission of 58 MOTION for Summary Judgment to Magistrate Judge Linda T. Walker. (bnp) (Entered: 10/01/2019) |
| 10/04/2019 | 63 | REPLY BRIEF re 58 MOTION for Summary Judgment filed by Delta Air Lines, Inc.. (Stone, Benjamin) (Entered: 10/04/2019) |
| 10/10/2019 | | -Set Aside at 67 Order- ORDER denying 56 Motion to Compel. Having read the deposition of Lisa Blackmon in its entirety, Plaintiff's Motion to Compel, and Defendant's response in opposition, Plaintiff's Motion to Compel is hereby DENIED. Signed by Magistrate Judge Linda T. Walker on October 10, 2019. (LTW) Modified on 1/9/2020 to add red text (bnp). (Entered: 10/10/2019) |

| | | |
|---|---|---|
| 10/10/2019 | | -Set Aside at 67 Order- ORDER denying as moot 56 Motion for Extension of Time to Complete Discovery. Signed by Magistrate Judge Linda T. Walker on October 10, 2019. (LTW) Modified on 1/9/2020 to add red text(bnp). (Entered: 10/10/2019) |
| 10/24/2019 | 64 | Objection to Magistrate's Order Entered October 10, 2019 and MOTION to Modify the Order re Order on Motion for Extension of Time to Complete Discovery, Order on Motion to Compel, with Brief In Support by Quaniah R. Stevenson. (Attachments: # 1 Exhibit Stevenson/Delta_000402, # 2 Exhibit Excerpts of Ms. Blackmons deposition) (Thorpe, Charlena) Modified on 10/25/2019 to edit event text (bnp). (Entered: 10/24/2019) |
| 10/28/2019 | 65 | RESPONSE in Opposition re 64 MOTION to Modify Order on Motion for Extension of Time to Complete Discovery, Order on Motion to Compel, filed by Delta Air Lines, Inc.. (Stone, Benjamin) (Entered: 10/28/2019) |
| 11/07/2019 | 66 | REPLY to Response to Motion re 64 MOTION to Modify Order on Motion for Extension of Time to Complete Discovery, Order on Motion to Compel, filed by Quaniah R. Stevenson. (Thorpe, Charlena) (Entered: 11/07/2019) |
| 11/12/2019 | | Submission of 64 Objection to Magistrate's Order Entered October 10, 2019 and MOTION to Modify Order on Motion for Extension of Time to Complete Discovery, Order on Motion to Compel to District Judge Amy Totenberg. (bnp) (Entered: 11/12/2019) |
| 01/08/2020 | 67 | ORDER re 64 Plaintiff's Objections to the Magistrate Judge's Order denying Plaintiff's Second Motion to Compel Documents and related Motion for Extension to Complete Discovery. The Court SETS ASIDE the Magistrate Judge's summary orders of October 10, 2019. Plaintiff's 56 Motion to Compel the production of information and documentation is GRANTED. As the Court has granted additional discovery, it GRANTS Plaintiff's 56 motion for an extension of time for completion of this discovery and DENIES AS PREMATURE Defendant's 58 Motion for Summary Judgment. Discovery is EXTENDED for a period of 35 days (re-commencing January 9, 2020) or such additional time beyond 35 days as determined reasonable (but still limited) by the Magistrate Judge based on her consultation with the parties' counsel. The scope of discovery shall be limited to the discovery and comparator issues discussed in this Order. Defendant may re-submit a Motion for Summary Judgment within 20 days of the conclusion of the extended discovery period. The Court REFERS this matter back to the Magistrate Judge for further proceedings and handling of all other details relating to the implementation of this Order, case management and discovery issues, and issuance of a report and recommendation on any renewed motion to summary judgment filed. Signed by Judge Amy Totenberg on 1/8/2020. (bnp) (Entered: 01/09/2020) |
| 01/09/2020 | | Submission of 67 Order to Magistrate Judge Linda T. Walker. (bnp) (Entered: 01/09/2020) |
| 02/13/2020 | 68 | Joint MOTION for Extension of Time to Complete Discovery by Quaniah R. Stevenson. (Attachments: # 1 Text of Proposed Order)(Thorpe, Charlena) (Entered: 02/13/2020) |
| 02/20/2020 | 69 | ORDER granting 68 Motion for Extension of Time to Complete Discovery. Discovery ends on 4/17/2020. The Court further ORDERS that Delta's Motion for Summary Judgment be due within 20 days of the conclusion of the extended discovery period. Signed by Magistrate Judge Linda T. Walker on 2/20/2020. (bnp) (Entered: |

| | | 02/24/2020) |
|---|---|---|
| 03/17/2020 | 70 | ORDER AND NOTICE FOR ALL CIVIL CASES ASSIGNED TO DOCKET OF JUDGE TOTENBERG. Signed by Judge Amy Totenberg on 3/17/2020. (bnp) (Entered: 03/17/2020) |
| 03/20/2020 | 71 | General Order 20-01 re: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 3/16/2020. (bnp) (Entered: 03/20/2020) |
| 04/02/2020 | 72 | Amended General Order 20-01 re COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 3/30/20. (mmc) (ADI) (Entered: 04/02/2020) |
| 05/04/2020 | 73 | SECOND AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 04/30/2020. (rvb) (ADI) (Entered: 05/04/2020) |
| 05/11/2020 | 74 | Joint MOTION for Extension of Time to Complete Discovery by Delta Air Lines, Inc.. (Attachments: # 1 Text of Proposed Order)(Stone, Benjamin) (Entered: 05/11/2020) |
| 05/12/2020 | 75 | CONSENT ORDER granting 74 Motion for Extension of Time to Complete Discovery. Discovery ends on 8/31/2020. The Court further ORDERS that Delta's Motion for Summary Judgment be due within 20 days of the conclusion of the extended discovery period. Signed by Magistrate Judge Linda T. Walker on 5/12/2020. (bnp) (Entered: 05/12/2020) |
| 05/27/2020 | 76 | THIRD AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 05/26/2020. (rvb) (ADI) (Entered: 05/27/2020) |
| 07/02/2020 | 77 | FOURTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 07/01/2020. (mmc) (ADI) (Entered: 07/02/2020) |
| 07/13/2020 | 78 | FIFTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 7/10/2020 (rvb) (ADI) (Entered: 07/13/2020) |
| 08/04/2020 | 79 | SIXTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 08/03/2020. (mmc) (ADI) (Entered: 08/04/2020) |
| 08/31/2020 | 80 | Joint MOTION for Extension of Time to Complete Discovery by Quaniah R. Stevenson. (Attachments: # 1 Text of Proposed Order)(Thorpe, Charlena) (Entered: 08/31/2020) |
| 09/01/2020 | | ORDER granting 80 Motion for Extension of Time to Complete Discovery. The deadline for completion of discovery is hereby extended through and including October 16, 2020. Accordingly, motions for summary judgment shall be due within |

| | | |
|---|---|---|
| | | twenty (20) days of the conclusion of the extended discovery period. Signed by Magistrate Judge Linda T. Walker on September 1, 2020. (LTW) (Entered: 09/01/2020) |
| 09/02/2020 | 81 | SEVENTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 9/1/2020. (rvb) (ADI) (Entered: 09/02/2020) |
| 09/29/2020 | 82 | EIGHTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONA VIRUS. Signed by Judge Thomas W. Thrash, Jr. on 09/28/2020. (rvb) (ADI) (Entered: 09/29/2020) |
| 10/16/2020 | 83 | Joint MOTION for Extension of Time to Complete Discovery by Quaniah R. Stevenson. (Attachments: # 1 Text of Proposed Order)(Thorpe, Charlena) (Entered: 10/16/2020) |
| 10/20/2020 | 84 | ORDER granting 83 Motion for Extension of Time to Complete Discovery. Discovery is extended through October 30, 2020. Delta's Motion for Summary Judgment is due within 20 days of the conclusion of the extended discovery period. Signed by Magistrate Judge Linda T. Walker on 10/20/20. (rlb) (Entered: 10/20/2020) |
| 10/30/2020 | 85 | Consent MOTION for Extension of Time to Complete Discovery with Brief In Support by Quaniah R. Stevenson. (Attachments: # 1 Text of Proposed Order)(Thorpe, Charlena) (Entered: 10/30/2020) |
| 11/04/2020 | 86 | ORDER granting 85 Motion for Extension of Time to Complete Discovery. Discovery ends on 12/15/2020. The Court ORDERS that the document production set forth in Paragraph 6 of the Joint Motion shall be the final discovery in this matter with no further discovery permitted. Delta's Motion for Summary Judgment is due within 30 days of the conclusion of the extended discovery period. Signed by Magistrate Judge Linda T. Walker on 11/4/20. (rlb) (Entered: 11/05/2020) |
| 12/09/2020 | 87 | NINTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 12/08/2020. (rvb) (ADI) (Entered: 12/09/2020) |
| 01/07/2021 | 88 | MOTION for Summary Judgment with Brief In Support by Delta Air Lines, Inc.. (Attachments: # 1 Statement of Material Facts, # 2 Brief, # 3 Affidavit Declaration of Kelley Nabors, # 4 Exhibit Minuscript Depostino of Quaniah Stevenson (redacted), # 5 Exhibit Stevenson Dep, Exh. 7, # 6 Exhibit Stevenson Dep, Exh. 8, # 7 Exhibit Stevenson Dep, Exh. 9, # 8 Exhibit Stevenson Dep, Exh. 10, # 9 Exhibit Stevenson Dep, Exh. 11, # 10 Exhibit Stevenson Dep, Exh. 12, # 11 Exhibit Stevenson Dep, Exh. 13, # 12 Exhibit Stevenson Dep, Exh. 16, # 13 Exhibit Stevenson Dep, Exh. 17, # 14 Exhibit Stevenson Dep, Exh. 19 (redacted), # 15 Exhibit Stevenson Dep, Exh. 21, # 16 Exhibit Excerpts of Deposition of Kelley Nabors)(Stone, Benjamin) --Please refer to http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.-- (Entered: 01/07/2021) |
| 01/28/2021 | 89 | SEALED DEPOSITION of BARBARA FRANZ taken on October 16, 2020 by Quaniah R. Stevenson. (Attachments: # 1 Exhibit Ex. 6- Investigation summary of Ms. Quaniah Stevenson, # 2 Exhibit Ex. 7 - Transcript of a conversation between Quaniah Stevenson and a Barbara Shaw, # 3 Exhibit Ex. 10 - Delta guideline for loss of control |

| | | |
|---|---|---|
| | | actions, # 4 Exhibit Ex. 11 - Delta Pass Protection Group Disciplinary Recommendations and Considerations, # 5 Exhibit Ex. 12 - Investigative summary for Delta employee Sidarious Johnson, # 6 Exhibit Ex. 13 - Delta's Pass Protection policies, # 7 Exhibit Ex. 14 - Georgia Department of Labor document that provides the reason that Delta provided for why Ms. Quaniah Stevenson was fired, # 8 Exhibit Ex. 17 - Memo from Kiha Jones to Barbara Franz regarding reason for terminationg Ms. Quaniah Stevenson, # 9 Exhibit Ex. 18 - Investigation summary of Delta employee David Ragan, # 10 Exhibit Ex. 19 - Investigation summary of Delta employee Richard Service, # 11 Exhibit Ex. 20 - Investigation record of Delta employee Sabrina Simmons, # 12 Exhibit Ex. 22 - Investigation summary for Delta employee David Bishton, # 13 Exhibit Ex. 23 - Internet page showing Mr. Robert Bishton as maraton runner who used David Bishton's travel benefits, # 14 Exhibit Ex. 24 - Internet printout showing the Madison marathon, which Mr. Robert Bishton participated in, included prize money for the marathon, # 15 Exhibit Ex. 27 - Travel of Caleb Boyett using Ms. Quaniah Stevenson's travel benefits)(Thorpe, Charlena) Modified on 2/19/2021 (rlb). (Entered: 01/28/2021) |
| 01/28/2021 | 90 | MOTION for Leave to File Matters Under Seal re: 89 Deposition,,,,,, *of Barbara Franz* by Quaniah R. Stevenson. (Attachments: # 1 Text of Proposed Order)(Thorpe, Charlena) (Entered: 01/28/2021) |
| 01/28/2021 | 91 | TENTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 01/27/2021. (rvb) (ADI) (Entered: 01/28/2021) |
| 01/28/2021 | 92 | SEALED DEPOSITION of KELLY NABORS taken on February 26, 2019 by Quaniah R. Stevenson. (Attachments: # 1 Exhibit Ex. 1 - A list of employees who have been investigated during Delta's pass travel audit and the description and outcome of those investigations, # 2 Exhibit Ex. 2 - HR letter recommending and stating reason for termination of Ms. Quaniah Stevenson, # 3 Exhibit Ex. 3 - portion of Delta pass travel policy that explains what is considered "business purposes", # 4 Exhibit Ex. 4 - Social media posts used by Delta in investigating Jovan Dias and Caleb Boyette, # 5 Exhibit Ex. 5 - Pass travel documents of Jovan Dias using Ms. Quaniah Stevenson's travel benefits, # 6 Exhibit Ex. 6 - Investigation summary of Ms. Quaniah Stevenson, # 7 Exhibit Ex. 7 - Transcript of a conversation between Quaniah Stevenson and a Barbara Shaw on Appeal of Delta's termination, # 8 Exhibit Ex. 8 - Fax to Delta From Jovan Dais, # 9 Exhibit Ex. 9 - Numerous accolades from Delta to Ms. Quaniah Stevenson, # 10 Exhibit Ex. 10 - Delta guidelines for travel companion violations, # 11 Exhibit Ex. 11 - Delta Pass Protection Group disciplinary recommendations and considerations, # 12 Exhibit Ex. 12 - Investigation summary for Delta employee Sidarious Johnson, # 13 Exhibit Ex. 13 - Delta document with reason for termination of Ms. Quaniah Stevenson, # 14 Exhibit Ex. 14 - Georgia Department of Labor document with reason that Delta provided for why Ms. Quaniah Stevenson was fired, # 15 Exhibit Ex. 15 - Social media post used by Delta in investigating Jovan Dias and Caleb Boyette, # 16 Exhibit Ex. 16 - Document used by Delta in investigating Jovan Dias and Caleb Boyette, # 17 Exhibit Employee journal for Ms. Quaniah Stevenson, # 18 Exhibit Letter of recommendation for termination of Ms. Quaniah Stevenson)(Thorpe, Charlena) Modified on 2/19/2021 (rlb). (Entered: 01/28/2021) |

| | | |
|---|---|---|
| 01/28/2021 | 93 | MOTION for Leave to File Matters Under Seal re: 92 Deposition,,,,,,, *of Kelly Nabors* by Quaniah R. Stevenson. (Attachments: # 1 Text of Proposed Order)(Thorpe, Charlena) (Entered: 01/28/2021) |
| 01/28/2021 | 94 | SEALED DEPOSITION of LISA BLACKMON taken on July 12, 2019 by Quaniah R. Stevenson. (Attachments: # 1 Exhibit Ex. 10 - Delta guidelines for travel companion violations, # 2 Exhibit Ex. 17 - Memo from Kiha Jones to Barbara Franz regarding reason for terminationg Ms. Quaniah Stevenson)(Thorpe, Charlena) Modified on 2/19/2021 (rlb). (Entered: 01/28/2021) |
| 01/28/2021 | 95 | MOTION for Leave to File Matters Under Seal re: 94 Deposition, *of Lisa Blackmon* by Quaniah R. Stevenson. (Attachments: # 1 Text of Proposed Order)(Thorpe, Charlena) (Entered: 01/28/2021) |
| 01/28/2021 | 96 | RESPONSE re 88 MOTION for Summary Judgment filed by Quaniah R. Stevenson. (Attachments: # 1 Exhibit E1 - Declaration of Stevenson, # 2 Exhibit 4- Declaration of Dias, SEALED-# 3 Exhibit 3 - Heather Cross Investigation Record, SEALED-# 4 Exhibit 2- Douglas Rehm Letter)(Thorpe, Charlena) Modified on 1/29/2021 to provisionally seal Exhibit 3 And 4 (bdb). Modified on 2/19/2021 (rlb). (Entered: 01/28/2021) |
| 02/03/2021 | 97 | MOTION for Leave to File Matters Under Seal re: 96 Response to Motion, *Exs. 3 and 4* by Quaniah R. Stevenson. (Attachments: # 1 Text of Proposed Order)(Thorpe, Charlena) (Entered: 02/03/2021) |
| 02/03/2021 | 98 | MOTION for Leave to File PLAINTIFF QUANIAH R. STEVENSONS SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS by Quaniah R. Stevenson. (Attachments: # 1 Exhibit 1 - Supplemental Declaration of Stevenson, # 2 Exhibit 2 - Supplemental Declaration of Jovan Dais)(Thorpe, Charlena) (Entered: 02/03/2021) |
| 02/09/2021 | | NOTICE of ZOOM TELECONFERENCE Hearing: Status Conference set for 2/18/2021 at 11:30 AM, before Magistrate Judge Linda T. Walker. Zoom Info - https://ganduscourts.zoomgov.com/j/1614738537 - Meeting ID: 161 473 8537 - Passcode: 995722 - One tap mobile 1-669-254-5252. (slc) (Entered: 02/09/2021) |
| 02/10/2021 | 99 | REPLY BRIEF re 88 MOTION for Summary Judgment , 98 MOTION for Leave to File PLAINTIFF QUANIAH R. STEVENSONS SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS filed by Delta Air Lines, Inc.. (Attachments: # 1 Exhibit A - Hill v. Delta decision)(Stone, Benjamin) (Entered: 02/10/2021) |
| 02/11/2021 | | Submission of 88 MOTION for Summary Judgment, to Magistrate Judge Linda T. Walker. (rlb) (Entered: 02/11/2021) |
| 02/16/2021 | | Submission of 93 MOTION for Leave to File Matters Under Seal re: 92 Deposition, *of Kelly Nabors*, 90 MOTION for Leave to File Matters Under Seal re: 89 Deposition, *of Barbara Franz*, 95 MOTION for Leave to File Matters Under Seal re: 94 Deposition, *of Lisa Blackmon*, to Magistrate Judge Linda T. Walker. (rlb) (Entered: 02/16/2021) |
| 02/18/2021 | | ORDER granting 95 Motion for Leave to File Matters Under Seal. Signed by Magistrate Judge Linda T. Walker on February 18, 2021. (LTW) Modified on 2/19/2021 (slc). (Entered: 02/18/2021) |

| 02/18/2021 | | ORDER granting 90 Motion for Leave to File Matters Under Seal. Signed by Magistrate Judge Linda T. Walker on February 18, 2021. (LTW) Modified on 2/19/2021 (slc). (Entered: 02/18/2021) |
|---|---|---|
| 02/18/2021 | | ORDER granting 93 Motion for Leave to File Matters Under Seal. Signed by Magistrate Judge Linda T. Walker on February 18, 2021. (LTW) Modified on 2/19/2021 (slc). (Entered: 02/18/2021) |
| 02/18/2021 | | ORDER granting 97 Motion for Leave to File Matters Under Seal. Signed by Magistrate Judge Linda T. Walker on February 18, 2021. (LTW) (Entered: 02/18/2021) |
| 02/18/2021 | | ORDER granting 98 Motion for Leave to File. Signed by Magistrate Judge Linda T. Walker on February 18, 2021. (LTW) (Entered: 02/18/2021) |
| 03/05/2021 | 100 | STATUS REPORT by Delta Air Lines, Inc.. (Stone, Benjamin) (Entered: 03/05/2021) |
| 03/10/2021 | 101 | ELEVENTH AMENDMENT TO GENERAL ORDER 20-01 RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 03/09/2021 (ddm) (ADI) (Entered: 03/10/2021) |
| 04/13/2021 | 102 | FINAL REPORT AND RECOMMENDATION re 3 Complaint, filed by Quaniah R. Stevenson Signed by Magistrate Judge Linda T. Walker on 4/12/21. (rlb) (Entered: 04/13/2021) |
| 04/13/2021 | | FINAL REPORT AND RECOMMENDATION recommending Defendant's 88 MOTION for Summary Judgment be GRANTED. Ruled on by Magistrate Judge Linda T. Walker on 4/12/21 within 102 R&R. (rlb) (Entered: 04/13/2021) |
| 04/13/2021 | 103 | ORDER for Service of 102 Final Report and Recommendation by Magistrate Judge Linda T. Walker. Each party may file written objections to the Report & Recommendation within 14 days of service. If no objections are filed, the Report & Recommendation may be adopted as the opinion and order of the District Court. Signed by Magistrate Judge Linda T. Walker on 4/12/21. (rlb) (Entered: 04/13/2021) |
| 04/27/2021 | 104 | OBJECTIONS to 102 , Report and Recommendation filed by Quaniah R. Stevenson. (Attachments: # 1 Exhibit 1 - Standing Order, # 2 Exhibit 2 - Email To Magistrate Judge requesting Oral Hearing)(Thorpe, Charlena) (Entered: 04/27/2021) |
| 04/30/2021 | 105 | REPLY to Objection to Report and Recommendation re 104 Objections to Report and Recommendation filed by Delta Air Lines, Inc.. (Stone, Benjamin) (Entered: 04/30/2021) |
| 05/03/2021 | | Submission of 102 FINAL REPORT AND RECOMMENDATION re 3 Complaint, filed by Quaniah R. Stevenson, to District Judge Amy Totenberg. (rlb) (Entered: 05/03/2021) |
| 09/29/2021 | 106 | ORDER: The Court ADOPTS the Magistrate Judge's R&R 102 , and GRANTS Defendant's Motion for Summary Judgment 88 as to all counts. The Clerk is DIRECTED to enter judgment for Delta and further DIRECTED to close the case. Signed by Judge Amy Totenberg on 9/29/21. (rlh) (Entered: 09/29/2021) |
| 09/29/2021 | 107 | CLERK'S JUDGMENT dismissing action. (rlh)--Please refer to http://www.ca11.uscourts.gov to obtain an appeals jurisdiction checklist-- (Entered: 09/29/2021) |

| | | |
|---|---|---|
| 09/29/2021 | | Civil Case Terminated. (rlh) (Entered: 09/29/2021) |
| 10/28/2021 | 108 | NOTICE OF APPEAL as to 106 Order on Motion for Summary Judgment, Order on Final Report and Recommendation by Quaniah R. Stevenson 107 Clerk's Judgment. Filing fee $505, receipt number AGANDC-11358829. Transcript Order Form due on 11/12/2021 (Thorpe, Charlena) Modified on 10/29/2021 to include document relationship (kac). Modified on 11/24/2021 (kac). (Entered: 10/28/2021) |
| 10/28/2021 | 109 | BILL OF COSTS by Delta Air Lines, Inc.. (Attachments: # 1 Exhibit A - Receipts) (Stone, Benjamin) (Entered: 10/28/2021) |
| 10/29/2021 | 110 | USCA Appeal Transmission Letter to 11th Circuit re: 108 Notice of Appeal filed by Quaniah R. Stevenson. (kac) (Entered: 10/29/2021) |
| 10/29/2021 | 111 | Transmission of Certified Copy of Notice of Appeal, Clerk's Judgment, Orders, Report and Recommendation, and Docket Sheet to US Court of Appeals re: 108 Notice of Appeal. (kac) (Entered: 10/29/2021) |
| 11/02/2021 | 112 | USCA Acknowledgment of 108 Notice of Appeal filed by Quaniah R. Stevenson. Case Appealed to USCA - 11th Circuit. USCA Case Number 21-13841-J. (kac) (Entered: 11/03/2021) |
| 11/12/2021 | 113 | TRANSCRIPT ORDER FORM for proceedings held on 3/1/2019, 3/28/2019, 2/18/2021 (Teleconference) before Magistrate Judge Linda T. Walker, re: 108 Notice of Appeal. Court Reporter: Jamie Green. (Thorpe, Charlena) Modified on 11/12/2021 to update text (pjm). (Entered: 11/12/2021) |
| 11/12/2021 | | Set Financial Arrangements due date deadline re: 108 Notice of Appeal. Financial Arrangements due on 11/26/2021. (pjm) Modified on 11/16/2021 (kac). (Entered: 11/12/2021) |
| 11/15/2021 | 114 | Costs Taxed in the amount of $2696.90 against Plaintiff (vs) (Entered: 11/15/2021) |
| 11/22/2021 | 115 | Court Reporter Acknowledgment re 113 Transcript Order Form, filed by Quaniah R. Stevenson. Case Appealed to 11th Circuit Case Number 21-13814-J. Transcript is required. Court Reporter: Shannon R. Welch, RMR, CRR. Satisfactory financial arrangements have not been made. (srw) (Entered: 11/22/2021) |
| 11/24/2021 | 116 | Court Reporter Acknowledgment re 113 Transcript Order Form, filed by Quaniah R. Stevenson. Case Appealed to 11th Circuit Case Number 21-13814-J. Transcript is required. Court Reporter: Shannon R. Welch, RMR, CRR. Satisfactory financial arrangements completed. Transcript due by 12/27/2021. (srw) (Entered: 11/24/2021) |
| 12/22/2021 | 117 | TRANSCRIPT of Telephone Conference via Zoom Proceedings held on 2/18/2021, before Judge Linda T. Walker. Court Reporter/Transcriber Shannon R. Welch, RMR, CRR. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory-court-reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/12/2022. Redacted Transcript Deadline set for 1/24/2022. Release of Transcript Restriction set for 3/22/2022. (Attachments: # 1 Notice of Filing) (srw) (Entered: 12/22/2021) |
| 12/22/2021 | 118 | TRANSCRIPT of Audio-Recorded Telephone Conference Proceedings held on 3/28/2019, before Judge Linda T. Walker. Court Reporter/Transcriber Shannon R. Welch, RMR, CRR. A full directory of court reporters and their contact information |

| | | |
|---|---|---|
| | | can be found at www.gand.uscourts.gov/directory-court-reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/12/2022. Redacted Transcript Deadline set for 1/24/2022. Release of Transcript Restriction set for 3/22/2022. (Attachments: # 1 Notice of Filing) (srw) (Entered: 12/22/2021) |
| 12/22/2021 | 119 | TRANSCRIPT of Audio-Recorded Telephone Conference Proceedings held on 3/1/2019, before Judge Linda T. Walker. Court Reporter/Transcriber Shannon R. Welch, RMR, CRR. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/directory-court-reporters. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Fed.R.App.P. 11 Certification due on 1/5/2022 Redaction Request due 1/12/2022. Redacted Transcript Deadline set for 1/24/2022. Release of Transcript Restriction set for 3/22/2022. (Attachments: # 1 Notice of Filing) (srw) (Entered: 12/22/2021) |
| 12/22/2021 | 120 | Notification of Transcript Filed in District Court re: 113 Transcript Order Form filed by Quaniah R. Stevenson. All transcripts for this request are now on file. (kac) (Entered: 12/22/2021) |
| 01/26/2022 | | Pursuant to F.R.A.P.11(c), the Clerk certifies that the record is complete for purposes of this appeal re: 108 Notice of Appeal. Case Appealed to USCA - 11th Circuit. USCA Case Number 21-13814-JJ. The entire record on appeal is available electronically. (kac) (Entered: 01/26/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/30/2022 14:40:30 | | |
| **PACER Login:** | clwthorpe | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:16-cv-02571-AT |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

# Dkt/Tab 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

QUANIAH R. STEVENSON,

      Plaintiff,

v.

                                   CIVIL ACTION NO.
                                   1:16-CV-2571-AT-LTW

DELTA AIRLINES, INC.,

      Defendant.

## **MAGISTRATE JUDGE'S ORDER**

Plaintiff Quaniah R. Stevenson, proceeding pro se, seeks leave to file this civil action in forma pauperis, without prepayment of fees and costs or security therefor, pursuant to 28 U.S.C. § 1915(a)(1). (Doc. 1). The affidavit of poverty indicates that Plaintiff is unable to pay the filing fee or incur the costs of these proceedings. Thus, the requirements of 28 U.S.C. § 1915(a)(1) have been satisfied, and Plaintiff's request to proceed in forma pauperis **IS HEREBY GRANTED**. Additionally, in light of the facts presented by Plaintiff, the Court cannot find that the instant action is entirely frivolous or malicious. See Neitzke v. Williams, 490 U.S. 319, 325 (1989). Therefore, **IT IS ORDERED** that, pursuant to 28 U.S.C. § 1915A, Plaintiff's civil action is **ALLOWED TO PROCEED** as any other civil action without prepayment of a filing fee.

The Clerk is hereby **DIRECTED** to send Plaintiff two copies of the USM 285 form, summons, and the initial disclosures form. Plaintiff is **DIRECTED** to complete both copies of the USM 285 form, summons, and the initial disclosures form, and to

return one of each for the Defendant named in the complaint within thirty (30) days from the entry date of this Order to the Clerk of Court. Plaintiff is warned that failure to comply in a timely manner could result in the dismissal of this civil action. The Clerk is **DIRECTED** to resubmit this action to the undersigned if Plaintiff fails to comply.

Upon receipt of the forms by the Clerk, the Clerk is **DIRECTED** to prepare a service waiver package for the Defendant. The service waiver package must include, a Notice of Lawsuit and Request for Waiver of Service of Summons (prepared by the Clerk), a Waiver of Service of Summons forms (prepared by the Clerk), an envelope addressed to the Clerk of Court with adequate first class postage for use by the Defendant for return of the waiver form, one (1) copy of Plaintiff's Complaint, one (1) copy of the initial disclosures form, and one (1) copy of this Order. The Clerk shall retain the USM 285 form and the summons.

Upon completion of the service waiver packages, the Clerk is **DIRECTED** to complete the lower portion of the Notice of Lawsuit and Request for Waiver forms and to mail the service waiver packages to the Defendant. The Defendant has a duty to avoid unnecessary costs of serving the summons. If Defendant fails to comply with the request for waive of service, that Defendant must bear the costs of personal service unless good cause can be shown for failure to return the Waiver of Service form.

In the event Defendant does not return the Waiver of Service form to the Clerk of Court within thirty-five (35) days following the date the service waiver package was mailed, the Clerk is **DIRECTED** to prepare and transmit to the U.S. Marshals Service,

AO 72A
(Rev.8/82)

a service package for Defendant.  The service package must include the USM 285 form, the summons, and one (1) copy of Plaintiff's Complaint.  Upon receipt of the service package, the U.S. Marshals Service is **DIRECTED** to personally serve the Defendant. The executed waiver form or the completed USM 285 form shall be filed with the Clerk.

Plaintiff is **DIRECTED** to serve upon the Defendant and/or its counsel a copy of every additional pleading or other document which is filed with the Clerk of the Court. Each pleading or other document filed with the Clerk shall include a certificate stating the date on which an accurate copy of that paper was mailed to the Defendant or its counsel.  This Court shall disregard any submitted papers which have not been properly filed with the Clerk or which do not include a certificate of service.

Plaintiff is also **REQUIRED** to **KEEP** the Court and the Defendant advised of his current address and telephone number at all times during the pendency of this action. **Plaintiff is admonished that the failure to do so may result in the dismissal of this action**.

**IT IS SO ORDERED**, this ___18___ day of August, 2016.

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

3

# Dkt/Tab 3

RECEIVED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUL 15 2016

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

QUANIAH R. STEVENSON,        )
                             )
        Plaintiff,           )      CIVIL ACTION FILE NO.
                             )
                             )      **1:16-CV-2571**
v.                           )
                             )
DELTA AIR LINES, INC.        )      **JURY TRIAL DEMANDED**
                             )
        Defendant.           )

## COMPLAINT FOR DAMAGES
## AND EQUITABLE RELIEF

COMES NOW, Plaintiff Quaniah R. Stevenson ("Plaintiff" or "Ms. Stevenson"), files this Complaint for Damages against Defendant Delta Air Lines ("Defendant"), showing this Honorable Court as follows:

## INTRODUCTION

This is an action for disability, gender, race, and age discrimination and retaliation under the American with Disabilities Act of 1990 ("ADA"), 42, U.S.C. 12101, *et. seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §1981, and the Age Discrimination in Employment Act, 29 U.S.C. §623 ("ADEA"). Plaintiff's disability claims are based on an actual or perceived

1

disability and based on Defendant's failure to reasonably accommodate same and

Defendant's decision to terminate her employment because of her disability.

## PARTIES

1.

Ms. Stevenson is a citizen of the United States and a resident of the State of

Georgia. Ms. Stevenson submits herself to the jurisdiction of this Court.

2.

Defendant Delta Air Lines, Inc. is a Georgia corporation doing business in

the Northern District of Georgia. Defendant may be served with process pursuant

to Rule 4 of the Federal Rules of Civil Procedure and other applicable law,

including, but not limited to, by delivering a copy of the Complaint and Summons

upon its registered agent for service of process, Corporation Service Company at

40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

3.

At all times relevant to this action, Ms. Stevenson was an employee within

the meaning of the Title VII, 42 U.S.C. §1981, ADA, and the ADEA.

4.

At all times relevant to this action, Defendant was an "employer" as defined

by Title VII, the ADEA, and the ADA.

2

5.

At all times material to this Complaint, Ms. Stevenson and Defendant were parties to a contract under which Ms. Stevenson agreed to work for Defendant and Defendant agreed to compensate Ms. Stevenson for her services.

## JURISDICTION AND VENUE

6.

This Court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1367(a), 29 U.S.C. §1132 and other applicable law.

7.

Venue is proper in this district under 28 U.S.C. §1391(b) and (c) because the unlawful employment practices occurred within the Northern District of Georgia.

8.

Defendant regularly conducts business within this State and District.

9.

Defendant is subject to the jurisdiction of this Honorable Court.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.

Ms. Stevenson has properly exhausted all administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity

3

Commission ("EEOC"). Ms. Stevenson received a Notice of Right to Sue from the EEOC within the last 90 days and has complied with all other conditions precedent to the institution of this lawsuit.

## **FACTUAL BACKGROUND**

11.

Ms. Stevenson is an African-American female over forty-years old. Ms. Stevenson suffers from impairments that substantially limits major life activities such as working, walking, and standing.

12.

Defendant hired Ms. Stevenson on August 1, 2007 as a Customer Service Agent. Defendant terminated Plaintiff's employment on or about July 28, 2015. At the time of her discharge, Ms. Stevenson was employed as International Ticketing Agent.

13.

Throughout the time period leading up to her discharge, Ms. Stevenson reported to Frank Cortes, Carol Kerr, and Mark Harris, Jim Baker.

14.

Ms. Stevenson diligently worked in her as an International Ticketing Agent.

4

15.

On March 2014, Plaintiff suffered an injury to her neck, shoulder and lower back while on the job that caused her to be out of work for eight months.

16.

As a result of this injury, Plaintiff was substantially limited in the major life activity of working. The injury caused and still causes debilitating neck, back and shoulder pain. It also causes severe migraines. At times Plaintiff is unable to stand, walk and lift objects.

17.

As a result of her injury, Plaintiff was prescribed a treatment plan that included, among other things, ongoing visits to the doctor for pain injections and other tests and services. Plaintiff communicated with her supervisors regarding her need for doctor's visits.

18.

Plaintiff returned to work from her injury in November 2014. Upon her return to work, Ms. Stevenson diligently performed her job duties and obtained positive business results. Indeed, Plaintiff received numerous recognition for her performance, including receiving an outstanding customer service employee award. She also received various letters praising her work.

19.

Although Ms. Stevenson consistently demonstrated his capacity to achieve Defendant's business objectives, Defendant subjected Ms. Stevenson to disparate treatment and retaliation because of his race, disability, gender, age and her complaints about discrimination based on these factors.

20.

Upon her return to work, Plaintiff's supervisors began treating her differently than her counterparts. Among other things, Plaintiff's supervisors held her to different standards and work rules; disciplined her more severely than her counterparts; unreasonably scrutinized her; chastised Ms. Stevenson for infractions she did not commit; and included inaccurate, false and/or misleading statements in her personnel file.

21.

For example, on more than one occasion, Plaintiff's supervisor Carol Kerr would stand over Plaintiff and accused her of engaging in infractions she did not commit. In particular, on one occasion, Ms. Kerr addressed Plaintiff in an aggressive and condensing way about the shoes she was wearing claiming that it violated Defendant's dress code policy. Plaintiff was taken back by Ms. Kerr's

suggestion since she had previously worn those same shoes throughout her entire employment without any concern from her supervisors.

22.

On another occasion, Plaintiff's supervisors would attack her while she was attending to a customer with allegations that she was not performing her duties properly and that she had again violated Defendant's dress code policy. Plaintiff's supervisor would even go as far as to interrupt Plaintiff while addressing a customer just to chastise and embarrass her in front of the customer. None of Plaintiff's counterparts were treated this way. At least one customer commented about Ms. Kerr's behavior and praised Plaintiff for the way she conducted herself despite the rude behavior from her supervisor.

23.

Moreover, given her neck, back, and shoulder pain, Ms. Stevenson would request a reasonable accommodation of being allowed to take short breaks or sitting while working so that she did not have to stand on her feet for an extended period. Ms. Kerr, knowing of Ms. Stevenson's condition, made it a point to have Ms. Stevenson stand on her feet longer than she did with the other agents thereby denying her request for a reasonable accommodation. Often time, Ms. Kerr would not that, if Ms. Stevenson could not stand, that she would need to be sent home.

7

None of Ms. Stevenson's Caucasian non-disabled counterparts had to endure such treatment and were freely allowed to take short breaks and/or work while sitting.

24.

Given the glaring differences in the way she was treated, Plaintiff's counterparts would pull her aside and inquire about why her supervisor treated her so harshly. Many noted that it was clear that the supervisor was engaged in a campaign of harassment, intimidation and bullying designed to tarnish and ultimately get rid of Ms. Stevenson.

25.

Such mistreatment aggravated Plaintiff's condition and caused her to suffer from severe depression.

26.

Plaintiff's depression had a substantial impact on her ability to work. In April 2015, she requested a reasonable accommodation of an adjusted work schedule. Plaintiff's supervisor initially denied that request. However, after submitting a complaint to HR and discussing the issue with Human Resources Manager Khia Jones, the requested accommodation was granted.

8

27.

In fact, approximately one month before her discharge, Plaintiff was required to go to the emergency room to address the debilitating pain from her injury and the severe depression caused by her supervisor's conduct. Plaintiff remained in the hospital overnight and was out of work for the next three days.

28.

After Plaintiff returned to work, Plaintiff's supervisor continued to interact with her in a condensing and abusive manner. As a result, Plaintiff's stress and depression levels increased, which caused Plaintiff's doctors to request that Defendant place Plaintiff on light duty.

29.

Shortly after being granted an adjusted work schedule, and while on instruction from her doctor to work on light duty, Plaintiff was summoned to Human Resources upon arriving to work in July 2015. Once she arrived at HR, she was advised that the Company was allegedly conducting an investigation into her use of Defendant's Companion/Buddy Rider flight policy.

30.

During the meeting with HR, Ms. Stevenson was subject to numerous questions requiring personal details about persons she allowed to use her flight

benefits. Prior to her complaint to HR, Ms. Stevenson had never been warned or otherwise questioned about her use of Defendant's flight benefits. Ms. Stevenson provided honest and truthful responses to all of Defendant's questions regarding her use of Defendant's Companion/Buddy Rider benefits.

31.

At the conclusion of the meeting, Ms. Stevenson was advised that her flight privileges were suspended pending the Company's investigation.

32.

The next day, Defendant's HR contacted Ms. Stevenson and advised that based on her research, including internet and social media postings, she made conclusions about Ms. Stevenson's use of Defendant's flight privileges. Ms. Stevenson again responded with truthful and honest answers.

33.

Thereafter, Ms. Stevenson's supervisor contacted her and attempted to get her to resign. When she refused because she had not done anything wrong, Defendant terminated her employment.

34.

Defendant claimed that it terminated Ms. Stevenson because of alleged policy violations. Defendant's claims in this regard is false. Moreover, Defendant

knew or should have known that the allegations of wrongdoing by Ms. Stevenson were false. Defendant could not have formed a reasonable and good faith belief as to the truth of same. In reality, Defendant used the alleged infractions to hide unlawful discrimination and retaliation.

35.

A number of Ms. Stevenson's Caucasian non-disabled counterparts have been engaged in the same or similar behavior as Ms. Stevenson alleged to have engaged in, but they were not disciplined as harshly as Ms. Stevenson.

36.

Prior to filing complaining to HR, Ms. Stevenson had never received a written or verbal reprimand; she was never formally counseled; nor was she otherwise disciplined about any the use of her flight privileges.

37.

Defendant's asserted reasons for Ms. Stevenson's termination are pretext for unlawful discrimination and retaliation.

38.

Even if Ms. Stevenson did have performance problems, Defendant applied its work rules, including discipline for similar infractions, in a discriminatory and retaliatory manner.

11

39.

Defendant held Ms. Stevenson to standards and work rules that were different than his Caucasian counterparts. Defendant also subjected Ms. Stevenson to unwarranted heightened scrutiny and wrote Ms. Stevenson up for conduct that other similarly situated employees routinely engaged in.

40.

Upon information and belief, similarly situated Caucasian co-workers who did not file complaints about unlawful treatment were not terminated for the same or similar infractions attributed to Ms. Stevenson that allegedly form the basis for her discharge.

41.

Rather than provide Ms. Stevenson with the same privileges and benefits of employment that were provided to similarly situated employees who did complain about unlawful employment practices, Defendant chose to terminated Plaintiff's employment because of his race, disability, age, gender and in retaliation for complaining about discrimination.

12

## COUNT I
## VIOLATIONS OF THE ADA

### 42.

Ms. Stevenson incorporates by reference herein all preceding Paragraphs of the Complaint.

### 43.

Defendant subjected Plaintiff to treatment that was disparate from other similarly situated non-disabled employees.

### 44.

Defendant failed to reasonably accommodate Plaintiff's actual or perceived disabilities.

### 45.

Defendants terminated Plaintiff's employment because of her actual or perceived disabilities.

### 46.

Defendant discriminated against Ms. Stevenson with respect to the terms and conditions of her employment, including disciplining her more harshly than her non-disabled counterparts for engaging in the same or similar infractions because of her disability.

13

47.

Any legitimate reason asserted by Defendant for Plaintiff's discharge is pretext for unlawful disability discrimination.

48.

Upon information and belief, Defendant replaced Ms. Stevenson with someone outside her protected class.

49.

Defendant, through its agents, acted willfully, wantonly, intentionally and in reckless and callous disregard of Plaintiff's federally protected rights.

50.

As a direct and proximate result of Defendant's conduct, Plaintiff is entitled to both equitable and monetary relief including, but not limited to, back pay, front pay or reinstatement, compensatory damages, pre-judgment interests, attorneys' fees and costs of litigation.

51.

Plaintiff is also entitled to punitive or liquidated damages.

52.

As a direct and proximate result of Defendant's conduct, Plaintiff has been deprived income in the form of wages as well as other benefits of employment.

14

## COUNT II
## RACE DISCRIMINATION IN VIOLATION OF
## TITLE VII AND 42 U.S.C 1981

### 53.

Ms. Stevenson incorporates by reference herein all preceding Paragraphs of the Complaint.

### 54.

Defendant subjected Plaintiff to treatment that was disparate from other similarly situated Caucasian employees.

### 55.

Defendant discriminated against Ms. Stevenson with respect to the terms and conditions of her employment, including disciplining her more harshly than her Caucasian counterparts for engaging in the same or similar infractions because of her race.

### 56.

Defendant terminated Ms. Stevenson's employment because of her race. Any legitimate reason asserted by Defendant for Plaintiff's discharge is pretext for unlawful race discrimination.

57.

Upon information and belief, Defendant replaced Ms. Stevenson with someone outside her protected class.

58.

Defendant, through its agents, acted willfully, wantonly, intentionally and in reckless and callous disregard of Plaintiff's federally protected rights.

59.

As a direct and proximate result of Defendant's conduct, Plaintiff is entitled to both equitable and monetary relief including, but not limited to, back pay, front pay or reinstatement, compensatory damages, pre-judgment interests, attorneys' fees and costs of litigation.

60.

Plaintiff is also entitled to punitive damages.

61.

As a direct and proximate result of Defendant's conduct, Plaintiff has been deprived income in the form of wages as well as other benefits of employment.

## COUNT II
## GENDER DISCRIMINATION
## IN VIOLATION OF TITLE VII

### 62.

Ms. Stevenson incorporates by reference herein all preceding Paragraphs of the Complaint.

### 63.

Defendant subjected Plaintiff to treatment that was disparate from other similarly situated male employees.

### 64.

Defendant discriminated against Ms. Stevenson with respect to the terms and conditions of her employment, including disciplining her more harshly than her male counterparts for engaging in the same or similar infractions because of her gender.

### 65.

Defendant terminated Ms. Stevenson's employment because of her gender. Any legitimate reason asserted by Defendant for Plaintiff's discharge is pretext for unlawful gender discrimination.

### 66.

17

Upon information and belief, Defendant replaced Ms. Stevenson with someone outside her protected class.

67.

Defendant, through its agents, acted willfully, wantonly, intentionally and in reckless and callous disregard of Plaintiff's federally protected rights.

68.

As a direct and proximate result of Defendant's conduct, Plaintiff is entitled to both equitable and monetary relief including, but not limited to, back pay, front pay or reinstatement, compensatory damages, pre-judgment interests, attorneys' fees and costs of litigation.

69.

Plaintiff is also entitled to punitive damages.

70.

As a direct and proximate result of Defendant's conduct, Plaintiff has been deprived income in the form of wages as well as other benefits of employment.

## COUNT II
## AGE DISCRIMINATION IN
## VIOLATION OF THE ADEA

72.

Ms. Stevenson incorporates by reference herein all preceding Paragraphs of the Complaint.

73.

Defendant subjected Plaintiff to treatment that was disparate from other similarly situated employers younger than 40.

74.

Defendant discriminated against Ms. Stevenson with respect to the terms and conditions of her employment, including disciplining her more harshly than her younger counterparts for engaging in the same or similar infractions because of her age.

75.

Defendant terminated Ms. Stevenson's employment because of her race. Any legitimate reason asserted by Defendant for Plaintiff's discharge is pretext for unlawful age discrimination.

76.

Upon information and belief, Defendant replaced Ms. Stevenson with someone outside her protected class.

77.

19

Defendant, through its agents, acted willfully, wantonly, intentionally and in reckless and callous disregard of Plaintiff's federally protected rights.

### 78.

As a direct and proximate result of Defendant's conduct, Plaintiff is entitled to both equitable and monetary relief including, but not limited to, back pay, front pay or reinstatement, compensatory damages, pre-judgment interests, attorneys' fees and costs of litigation.

### 79.

Plaintiff is also entitled to punitive or liquidated damages.

### 80.

As a direct and proximate result of Defendant's conduct, Plaintiff has been deprived income in the form of wages as well as other benefits of employment.

## **RETALIATORY DISCHARGE IN VIOLATION OF TITLE VII, THE ADA, AND THE ADEA**

### 81.

Ms. Stevenson incorporates by reference herein all preceding Paragraphs of the Complaint.

### 82.

Ms. Stevenson engaged in activity protected by Title VII, the ADA, ADEA and 42 U.S.C. §1981.  In particular, Ms. Stevenson complained to Defendant's Human Resources Department about discrimination and harassment by her supervisors.

83.

Defendant retaliated against Ms. Stevenson by terminating her employment because of her complaints of discrimination.

84.

Any legitimate reason asserted by Defendant for Plaintiff's discharge is pretext for unlawful discrimination and retaliation.

85.

Defendant's actions in terminating Ms. Stevenson's employment in retaliation for engaging in protected activity constitute unlawful retaliation in violation of Title VII, the ADA, ADEA, and 42 U.S.C §1981.

86.

Defendant's unlawful actions were intentional, willful, wanton, and oppressive.    Additionally, and in the alternative, Defendant's actions were undertaken with reckless disregard for Ms. Stevenson's federally protected rights.

87.

As a direct and proximate result of Defendant's conduct, Ms. Stevenson is entitled to both equitable and monetary relief including, but not limited to, back pay, front pay or reinstatement, compensatory damages, pre-judgment interests, attorneys' fees and costs of litigation.

88.

Ms. Stevenson is also entitled to punitive damages.

<b><u>PRAYER FOR RELIEF</u></b>

**WHEREFORE**, Ms. Stevenson demands a **TRIAL BY JURY** and that the following relief be granted:

a.    Declaratory judgment that Defendant violated Title VII, the ADA, ADEA, and 42 U.S.C.§1981;

b.    An injunction prohibiting the Defendant from engaging in unlawful employment practices in violation of Title VII, the ADA, ADEA, and 42 U.S.C. §1981;

c.    Full back pay from the date of Ms. Stevenson's unlawful discharge, taking into account all raises and benefits to which Ms. Stevenson would have been entitled but for her unlawful termination, including, but not limited to, all fringe benefits of employment;

22

d.   Compensatory damages in an amount to be determined by the enlightened conscience of the jury to compensate Ms. Stevenson for the mental, emotional and physical distress she has suffered as a result of Defendant's discriminatory and retaliatory conduct;

e.   Reinstatement of Ms. Stevenson's former position with Defendant or, in the alternative, front pay to compensate Ms. Stevenson for lost future wages and benefits;

f.   Reimbursement of Ms. Stevenson's out of pocket expenses incurred because of her unlawful discharge;

g.   Attorney's fees and costs of litigation;

h.   Prejudgment interest; and

i.   Any and all such further relief that this Court or the finder of fact deems equitable and just.

Respectfully submitted this 15th day of July, 2016.

Quaniah Stevenson, *Pro Se*
211 Crest Ridge Drive
Atlanta, Georgia 30344
Phone: (770) 572-2878
Email: quaniah2011@gmail.com

23

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

| To: | Quaniah R. Stevenson<br>3871 Redwine Road<br>Atlanta, GA 30344 | From: | Atlanta District Office<br>100 Alabama Street, S.W.<br>Suite 4R30<br>Atlanta, GA 30303 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 410-2015-05632 | Triet Bui,<br>Investigator | (404) 562-6948 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

APR 19 2016

Enclosures(s)

**Bernice Williams-Kimbrough,**
**District Director**

(Date Mailed)

cc:   Ryan D. Langel – Special Counsel
DELTA AIRLINES, INC.
1030 Delta Blvd
Atlanta, GA 30320

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Atlanta District Office**

100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
Atlanta Direct Dial: (404) 562-6821
FAX (404) 562-6909/6910

April 18, 2016

Quaniah Stevenson
3871 Redwine Road
Atlanta, GA 30344

> EEOC Charge Number:    410-2015-05632
> Respondent:            Quaniah R. Stevenson v. Delta Airlines, Inc.

Dear Ms. Stevenson:

Your charge of employment discrimination has been reviewed by EEOC in accordance with the Commission's processing procedures. This letter will serve as an explanation concerning our determination of the merits on the above-referenced charge of discrimination. The determination relies on the following information:

On August 12, 2015, you filed a charge of discrimination alleging that you were discriminated because of your disability in violation of Title I of the Americans with Disabilities Act of 1990, as amended, because of your age (41) in violation of the Age of Discrimination in Employment Act of 1967, as amended, because of your sex (female), and your race (African-American) in violation of Title VII of the Civil Rights Act of 1964, as amended.

Based upon the examination of the charge file information, we have determined that EEOC will discontinue further processing of your claim. Accordingly, you will have to file a private lawsuit if you want to continue to challenge the alleged discrimination. This practice is consistent with the Commission's Priority Charge Handling Procedures when the office has sufficient information from which to conclude that it is not likely that further investigation will result in a violation of the statutes we enforce.

Enclosed please find your **Dismissal and Notice of Rights and Information Sheet. If you want to pursue your charge further, you have the right to sue the employer named in your charge in U.S. District Court within ninety (90) days from the date you receive the enclosed notice.** Please read the documents carefully.

Sincerely,

Triet Bui
Investigator

# Dkt/Tab 7

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **QUANIAH R. STEVENSON,** | |
|     **Plaintiff,** | |
| **vs.** | **Civil Action** |
| | **No. 1:16-cv-2571-AT-LTW** |
| **DELTA AIR LINES, INC.,** | |
|     **Defendant.** | |

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendant Delta Air Lines, Inc. ("Delta" or "Defendant"), by its attorneys and pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure, answers Plaintiff Quaniah R. Stevenson's ("Stevenson" or "Plaintiff") Complaint ("Complaint") as follows:

### INTRODUCTORY PARAGRAPH

Defendant admits that Plaintiff purports to bring claims under the enumerated statutes. Defendant denies that it has violated any law with respect to Plaintiff and denies the remaining allegations in the Introductory Paragraph of Plaintiff's Complaint.

1.

Defendant is without sufficient knowledge or information to admit or deny the allegations in Paragraph No. 1 of Plaintiff's Complaint, and therefore denies same.

2.

Defendant denies that it is a Georgia corporation.  Defendant admits the remaining allegations in Paragraph No. 2 of Plaintiff's Complaint.

3.

Defendant denies the allegations in Paragraph No. 3 of Plaintiff's Complaint.

4.

Defendant admits the allegations in Paragraph No. 4 of Plaintiff's Complaint.

5.

Defendant denies the allegations in Paragraph No. 5 of Plaintiff's Complaint.

6.

Defendant admits that this Court has subject matter jurisdiction over this action.   Defendant denies the remaining allegations in Paragraph No. 6 of Plaintiff's Complaint.

7.

Defendant admit that venue is proper in this Court.  Defendant denies the remaining allegations in Paragraph No. 7 of Plaintiff's Complaint.

8.

Defendant admits the allegations in Paragraph No. 8 of Plaintiff's Complaint.

9.

Defendant admits that this Court has subject matter jurisdiction over this action.   Defendant denies the remaining allegations in Paragraph No. 9 of Plaintiff's Complaint.

10.

Defendant denies the allegations in Paragraph No. 10 of Plaintiff's Complaint.

11.

Defendant admits, upon information and belief, that Plaintiff is an African-American female who is over forty years of age.  Defendant is without knowledge or information sufficient to form a belief as to what, if any, impairments affect Plaintiff.  Defendant denies the remaining allegations in Paragraph No. 11 of Plaintiff's Complaint.

12.

Defendant admits that Plaintiff's date of employment with Delta was August 1, 2007 and that she was advised of her termination on or about July 28, 2015. Defendant denies the remaining allegations in Paragraph No. 12 of Plaintiff's Complaint.

13.

Defendant admits that, from time to time, Plaintiff reported directly or indirectly to Frank Cortes, Carol Kerr, Mark Harris and Jim Baker.  Defendant denies the remaining allegations in Paragraph No. 13 of Plaintiff's Complaint.

14.

Defendant denies the allegations in Paragraph No. 14 of Plaintiff's Complaint.

15.

Defendant admits that Plaintiff reported suffering an on-the-job injury to her shoulder and back in March 2014.   Defendant denies the remaining allegations in Paragraph No. 15 of Plaintiff's Complaint.

16.

Defendant is without knowledge or information sufficient to form a belief as to the current symptoms of Plaintiff's alleged condition, or her current health condition and physical abilities.  Defendant denies the remaining allegations in Paragraph No. 16 of Plaintiff's Complaint.

17.

Defendant denies that Plaintiff informed her supervisors that she had an appointment with a physician.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph No. 17 of Plaintiff's Complaint.

18.

Defendant admits that Plaintiff returned to work from her leave in November 2014.   Defendant denies the remaining allegations in Paragraph No. 18 of Plaintiff's Complaint.

19.

Defendant denies the allegations in Paragraph No. 19 of Plaintiff's Complaint.

20.

Defendant denies the allegations in Paragraph No. 20 of Plaintiff's Complaint.

21.

Defendant denies the allegations in Paragraph No. 21 of Plaintiff's Complaint.

22.

Defendant denies the allegations in Paragraph No. 22 of Plaintiff's Complaint.

23.

Defendant denies the allegations in Paragraph No. 23 of Plaintiff's Complaint.

24.

Defendant denies the allegations in Paragraph No. 24 of Plaintiff's Complaint.

25.

Defendant denies the allegations in Paragraph No. 25 of Plaintiff's Complaint.

26.

Defendant denies the allegations in Paragraph No. 26 of Plaintiff's Complaint.

27.

Defendant is without knowledge or information sufficient to form a belief as to the dates that Plaintiff was in the hospital or the condition for which she was treated.   Defendant denies the remaining allegations in Paragraph No. 27 of Plaintiff's Complaint.

28.

Defendant denies the allegations in Paragraph No. 28 of Plaintiff's Complaint.

29.

Defendant admits, that it investigated Plaintiff's use of non-revenue travel benefits and that it so advised Plaintiff in July 2015.   Defendant denies the remaining allegations in Paragraph No. 29 of Plaintiff's Complaint.

30.

Defendant admits that Plaintiff was questioned about the use of non-revenue travel benefits.  Defendant denies the remaining allegations in Paragraph No. 30 of Plaintiff's Complaint.

31.

Defendant admits the allegations in Paragraph No. 31 of Plaintiff's Complaint.

32.

Defendant admits that, following the meeting in which Plaintiff was questioned regarding the use of non-revenue pass travel benefits, she was contacted and asked follow-up questions.  Defendant denies the remaining allegations in Paragraph No. 32 of Plaintiff's Complaint.

33.

Defendant admits that, after a determination that Plaintiff's employment would be terminated, Plaintiff was given the opportunity to resign.  Defendant admits that, when Plaintiff declined to resign, her employment was terminated. Defendant denies the remaining allegations in Paragraph No. 33 of Plaintiff's Complaint.

34.

Defendant admits that Plaintiff was terminated for improper conduct, including conduct relating to the improper use of her pass benefits and violations of Delta's pass travel policies.  Defendant denies the allegations in Paragraph No. 34 of Plaintiff's Complaint.

35.

Defendant denies the allegations in Paragraph No. 35 of Plaintiff's Complaint.

36.

Defendant denies the allegations in Paragraph No. 36 of Plaintiff's Complaint.

37.

Defendant denies the allegations in Paragraph No. 37 of Plaintiff's Complaint.

38.

Defendant denies the allegations in Paragraph No. 38 of Plaintiff's Complaint.

39.

Defendant denies the allegations in Paragraph No. 39 of Plaintiff's Complaint.

40.

Defendant denies the allegations in Paragraph No. 40 of Plaintiff's Complaint.

41.

Defendant denies the allegations in Paragraph No. 41 of Plaintiff's Complaint.

42.

Defendant realleges its responses to each of the preceding Paragraphs of Plaintiff's Complaint.

43.

Defendant denies the allegations in Paragraph No. 43 of Plaintiff's Complaint.

44.

Defendant denies the allegations in Paragraph No. 44 of Plaintiff's Complaint.

45.

Defendant denies the allegations in Paragraph No. 45 of Plaintiff's Complaint.

46.

Defendant denies the allegations in Paragraph No. 46 of Plaintiff's Complaint.

47.

Defendant denies the allegations in Paragraph No. 47 of Plaintiff's Complaint.

48.

Defendant denies the allegations in Paragraph No. 48 of Plaintiff's Complaint.

49.

Defendant denies the allegations in Paragraph No. 49 of Plaintiff's Complaint.

50.

Defendant denies the allegations in Paragraph No. 50 of Plaintiff's Complaint.

51.

Defendant denies the allegations in Paragraph No. 51 of Plaintiff's Complaint.

52.

Defendant denies the allegations in Paragraph No. 52 of Plaintiff's Complaint.

53.

Defendant realleges its responses to each of the preceding Paragraphs of Plaintiff's Complaint.

54.

Defendant denies the allegations in Paragraph No. 54 of Plaintiff's Complaint.

55.

Defendant denies the allegations in Paragraph No. 55 of Plaintiff's Complaint.

56.

Defendant denies the allegations in Paragraph No. 56 of Plaintiff's Complaint.

57.

Defendant denies the allegations in Paragraph No. 57 of Plaintiff's Complaint.

58.

Defendant denies the allegations in Paragraph No. 58 of Plaintiff's Complaint.

59.

Defendant denies the allegations in Paragraph No. 59 of Plaintiff's Complaint.

60.

Defendant denies the allegations in Paragraph No. 60 of Plaintiff's Complaint.

61.

Defendant denies the allegations in Paragraph No. 61 of Plaintiff's Complaint.

62.

Defendant realleges its responses to each of the preceding Paragraphs of Plaintiff's Complaint.

63.

Defendant denies the allegations in Paragraph No. 63 of Plaintiff's Complaint.

64.

Defendant denies the allegations in Paragraph No. 64 of Plaintiff's Complaint.

65.

Defendant denies the allegations in Paragraph No. 65 of Plaintiff's Complaint.

66.

Defendant denies the allegations in Paragraph No. 66 of Plaintiff's Complaint.

67.

Defendant denies the allegations in Paragraph No. 67 of Plaintiff's Complaint.

68.

Defendant denies the allegations in Paragraph No. 68 of Plaintiff's Complaint.

69.

Defendant denies the allegations in Paragraph No. 69 of Plaintiff's Complaint.

70.

Defendant denies the allegations in Paragraph No. 70 of Plaintiff's Complaint.

71.

Defendant states there is no Paragraph No. 71 in Plaintiff's Complaint.

72.

Defendant realleges its responses to each of the preceding Paragraphs of Plaintiff's Complaint.

73.

Defendant denies the allegations in Paragraph No. 73 of Plaintiff's Complaint.

74.

Defendant denies the allegations in Paragraph No. 74 of Plaintiff's Complaint.

75.

Defendant denies the allegations in Paragraph No. 75 of Plaintiff's Complaint.

76.

Defendant denies the allegations in Paragraph No. 76 of Plaintiff's Complaint.

77.

Defendant denies the allegations in Paragraph No. 77 of Plaintiff's Complaint.

78.

Defendant denies the allegations in Paragraph No. 78 of Plaintiff's Complaint.

79.

Defendant denies the allegations in Paragraph No. 79 of Plaintiff's Complaint.

80.

Defendant denies the allegations in Paragraph No. 80 of Plaintiff's Complaint.

81.

Defendant realleges its responses to each of the preceding Paragraphs of Plaintiff's Complaint.

82.

Defendant denies the allegations in Paragraph No. 82 of Plaintiff's Complaint.

83.

Defendant denies the allegations in Paragraph No. 83 of Plaintiff's Complaint.

84.

Defendant denies the allegations in Paragraph No. 84 of Plaintiff's Complaint.

85.

Defendant denies the allegations in Paragraph No. 85 of Plaintiff's Complaint.

86.

Defendant denies the allegations in Paragraph No. 86 of Plaintiff's Complaint.

87.

Defendant denies the allegations in Paragraph No. 87 of Plaintiff's Complaint.

88.

Defendant denies the allegations in Paragraph No. 88 of Plaintiff's Complaint.

89.

Defendant denies each and every allegation of the Complaint that is not expressly admitted above.

## **PRAYER FOR RELIEF**

In response to the "WHEREFORE" paragraphs of Plaintiff's Complaint, Defendant admits that Plaintiff seeks the relief enumerated therein, but denies that Plaintiff has stated a cognizable claim that would entitle her to any relief whatsoever.

## **AFFIRMATIVE DEFENSES**

## **FIRST DEFENSE**

To the extent Plaintiff's claims are based on acts that occurred prior to any applicable statute of limitations, Plaintiff's claims are time-barred.

## SECOND DEFENSE

Defendant acted in good faith with respect to its obligations under Title VII, the ADA and the ADEA, therefore, Plaintiff's claims are barred.

## THIRD DEFENSE

Some or all of Plaintiff's claims under the ADA are barred because Defendant has complied with any reasonable accommodation obligation it had under the ADA.

## FOURTH DEFENSE

Some or all of Plaintiff's claims are barred because Defendant fully met its obligations to explore a reasonable accommodation for Plaintiff, but Plaintiff did not identify or request any feasible accommodation, there was no accommodation that would be reasonable under the circumstances, and/or any potential accommodation would impose an undue hardship.

## FIFTH DEFENSE

Defendant avers that even if some impermissible motive were a factor in any employment decision concerning Plaintiff, a claim that Defendant expressly denies, the same decision(s) would have been reached for legitimate business reasons.

## SIXTH DEFENSE

Plaintiff's claims are barred by the doctrine of after-acquired evidence.

## SEVENTH DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, under the doctrines of waiver, estoppel, ratification, and acquiescence.

## NINTH DEFENSE

To the extent Plaintiff failed to mitigate her alleged damages, her recovery, if any, must be reduced accordingly.

## TENTH DEFENSE

Plaintiff is not entitled to have matters of law tried to a jury.

WHEREFORE, Defendant respectfully submits that Plaintiff's Complaint should be dismissed in its entirety with prejudice and that Defendant should be awarded its costs, attorneys' fees, and any other relief this Court deems appropriate.

Respectfully submitted,


s/Benjamin A. Stone
Georgia Bar No. 683850


MUNGER & STONE, LLP
999 Peachtree Street, N.E.
Suite 2850
Atlanta, Georgia 30309
Telephone: (404) 815-0933
Facsimile:  (404) 815-4687


s/Sheandra R. Clark
Georgia Bar No. 127802


DELTA AIR LINES, INC.
Department 981
1030 Delta Boulevard
Atlanta, GA 30354-1989
Telephone: (404) 715-3613
Facsimile: (404) 715-2233

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **QUANIAH R. STEVENSON,** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No.** |
| | **1:16-cv-2571-AT-LTW** |
| **DELTA AIR LINES, INC.,** | |
| **Defendant.** | |

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 17, 2016, I electronically filed DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT with the Clerk of Court using the CM/ECF system, and that I have served the foregoing on Plaintiff by first class mail, addressed as follows:

> Quaniah R. Stevenson
> 211 Crest Ridge Drive
> Atlanta, GA 30344

> s/Sheandra R. Clark
> Georgia Bar No. 127802

# Dkt/Tab 15

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

QUANIAH R. STEVENSON,

    Plaintiff,

v.

                                       CIVIL CASE NO.
                                       1:16-CV-2571-AT-LTW

DELTA AIR LINES, INC.,

    Defendant.

## SCHEDULING ORDER AND GUIDELINES FOR DISCOVERY AND SUMMARY JUDGMENT PRACTICE

    Upon review of the information contained in the Joint Preliminary Report and Discovery Plan form completed and filed by the parties, the Magistrate Judge **ORDERS** that the time limits for adding parties, amending the pleadings, serving initial disclosures, and filing motions are as stated in the Federal Rules of Civil Procedure and District Court Local Rules. The deadline for completing discovery is **April 17, 2017**, and this case having been initiated in this Court on **July 15, 2016**, will be set for trial after any and all dispositive motions have been ruled on.[1]

## I. GUIDELINES FOR DISCOVERY PRACTICE

---

[1]The information that follows in this Court's guidelines provides the rules and practices to which counsel and parties should adhere in conducting discovery. Additional questions regarding the rules and practice before this Court can be obtained by inquiring of the magistrate judge's courtroom deputy or law clerk how the magistrate judge wants things done.

AO 72A
(Rev.8/82)

These guidelines are furnished for the convenience of counsel and the Court to promote the just, speedy and economical disposition of cases.

**A.    General Matters**

Attorneys and *pro se* litigants appearing in this Court in civil litigation must observe three sets of rules:

> The Federal Rules of Civil Procedure
> The District Court Local Rules and Instructions Regarding Pretrial Proceedings
> The rules and practices of the Magistrate Judge assigned to your case

**B.    <u>Discovery Practice</u>**

1.    **General Principles of Discovery**. Counsel and *pro se* litigants should be guided by courtesy, candor and common sense, and conform to the Federal Rules of Civil Procedure, the Local Rules, and applicable orders in conducting discovery.   In particular, counsel and *pro se* litigants should have in mind the restrictions on the scope of discovery stated in Rule 26(b) and the good faith obligations implicit in Rule 26(g). Direct and informal communication between counsel is encouraged to facilitate discovery and resolve disputes.   In this regard, the Court refers counsel and parties to the guidance offered by the district court for the Central District of California in <u>O'Connor v. Boeing North American, Inc.</u>, 185 F.R.D. 272 (C.D. Cal. 1999):

> The Court would like to take this opportunity to address the parties and their counsel, to stress that "[t]he discovery system depends absolutely on good faith and common sense from counsel.  The courts, sorely pressed by demands to try cases promptly and to rule thoughtfully on potentially case dispositive motions, simply do not have the resources to police closely the operation of the discovery process.   The whole system of [c]ivil adjudication would be ground to a virtual halt if the courts were forced to

2

intervene in even a modest percentage of discovery transactions. That fact should impose on counsel an acute sense of responsibility about how they handle discovery matters. They should strive to be cooperative, practical and sensible, and should turn to the courts (or take positions that force others to turn to the courts) only in extraordinary situations that implicate truly significant interests."

Id. at 284.

2.      **Timeliness**. The time limits specified in the rules and applicable orders must observed. If additional time is required, a continuance must be sought in advance by order of the Court. (See § 4 below).

3.      **Discovery Cut-Off**. Discovery cut-off dates are the last date for filing discovery responses and supplements, unless otherwise specified by court order. To be timely, therefore, discovery requests must be served sufficiently in advance (usually thirty (30) days) of the deadline for responses to be made within the discovery cut-off date. See LR 26.2A, N.D. Ga.

4.      **Extensions of Discovery Period**. Requests for extension of the discovery period or deadlines within the discovery period must be made in accordance with LR 26.2B, N.D. Ga. All requests for extensions of time must state: (1) the original (and if applicable, current) date from which the extension is being sought; (2) the number of previous requests for extensions, if any; (3) whether these previous requests were granted or denied; and (4) whether the adversary consents, and if not, the reasons given by the adversary for refusing to consent. NOTE: An agreed upon or consent motion to the extend the discovery period or deadlines therein should be clearly designated as a

CONSENT motion, and a proposed consent order should be filed along with the consent motion.

5.    **Supplementing Discovery Responses**.    Rule 26(e) requires that initial disclosures and earlier discovery responses be supplemented if the disclosure or response was incorrect or is incomplete or to the extent the disclosure or response relates to potential expert or other witnesses.  The Court strongly encourages counsel and *pro se* litigants to ensure that, prior to close of discovery, all prospective witnesses are identified in the initial or supplemental disclosures.  Failure to comply with the duty to supplement may result in exclusion of evidence or witnesses in consideration of dispositive motions and at trial.

6.    **Motions to Compel or for Protective Orders**.

a. Pre-Motion Conference.  Counsel or *pro se* litigants are required to confer, by telephone or in person, in good faith before bringing a discovery dispute to the Court. See Fed. R. Civ. P. 26(c) and 37; LR 37.1A, N.D. Ga.  The duty to confer is NOT satisfied by sending a written document, such as a letter, email or fax, to the adversary, UNLESS repeated attempts to confer by telephone or in person are met without success due to the conduct of the adversary.  If counsel or *pro se* litigants are unable to informally resolve the discovery dispute, they should arrange a telephone conference with the Court through the Court's law clerk or courtroom deputy.[2]  If the differences

_____

[2] Counsel and *pro se* litigants should be aware that there may be some delay in setting up the telephone conference due to the necessity of scheduling the presence of a court reporter.  Also, if the issue upon which the dispute rests is complex, the Court

4

cannot be resolved during the conference with the Court, the Court will direct further proceedings. Motions to compel or for a protective order should ordinarily not be filed without a prior conference with the Court.

b. Memoranda. In the event that memoranda are submitted, they should comply with LR 37.1, N.D. Ga., and be brief, focus on the facts of the particular dispute, and avoid discussion of general discovery principles. The Court cautions against the inclusion of (and will disregard) any generalized recitation of "historical" discovery disputes between the parties or any "finger pointing" or disparaging remarks directed at opposing counsel or the opposing party.

c. Sanctions. If sanctions are sought, include a declaration and the appropriate documentation to support the amount requested.

d. Consent Protective/Confidentiality Orders. In lieu of filing with the clerk, the original and a duplicate of such consent orders may be submitted to the Court in chambers. NOTE: The Court will not sign a protective or confidentiality order that permits the parties to automatically file pleadings or materials under seal with the clerk. Any sealed pleadings or materials must be accompanied by a specific court order providing for the sealed filing of that pleading or the materials.

**7.    Reference to Guidelines**

The Court will be guided by these guidelines in resolving discovery disputes and imposing sanctions.

---

may request that prior to the conference the parties jointly submit a short (two (2) double spaced pages or less) letter providing an overview of the contested issue(s).

AO 72A
(Rev.8/82)

## II.  GUIDELINES FOR SUMMARY JUDGMENT PRACTICE AND PRETRIAL ORDER:

A.    Any motions for summary judgment must be filed by **May 17, 2017**, and if no motions for summary judgment are filed, the Proposed Consolidated Pretrial Order will be due on **June 16, 2017**.

B.    Pursuant to Local Rule 56.1B, the party moving for summary judgment must attach to the motion a statement of material facts to which the movant contends there is no genuine issue to be tried.  Each fact must be numbered, and there should be only one sentence per number.  A citation to the record must follow each numbered fact.  Also, statements in the form of issues, questions, or legal conclusions (rather than material facts) will not be considered by the Court.  The statement of material facts to which the movant contends there is no genuine issue to be tried shall not exceed twenty-five (25) pages.

    The non-moving party shall file a response to the moving party's "Statement of Undisputed Material Facts."  In the response, the non-moving party shall respond to each numbered fact by number, admitting or denying the fact, and providing citations to the record to support any denial as well as an explaining the reason for the denial of the fact.  The Court will deem as admitted those facts in the moving party's statement that the non-moving party does not controvert with citations to the record in its response to that statement.  <u>See</u> L.R. 56.1(B)(2) N.D. Ga.  The non-movant's statement of additional material facts which the non-movant contends are material and present a genuine issue for trial shall not exceed twenty-five (25) pages.

C.    A sealed, original copy of any deposition that is referred to by either party in

6

support of, or in opposition to, a motion for summary judgment shall be manually filed with the Court. Additionally, the parties are encouraged to electronically file a copy of the minuscript of any such deposition in conjunction with their summary judgment filing. The Court requests that complete depositions including the exhibits introduced during the deposition, rather than portions of depositions be filed with the Court, so that the context of the testimony can be considered.

D.     Absent **prior** written permission by the Court, no party may file a brief in support of a motion or a response to a motion exceeding twenty-five (25) double-spaced pages in length, and no party may file a reply brief exceeding fifteen (15) double-spaced pages. A motion requesting an increase in the page length for a brief must be filed along with a proposed order, prior to the due date for the brief. The text of a brief, including footnotes, may not be printed in a format producing more than ten (10) characters per inch. See L.R. 7.16(D) N.D. Ga.

E.     Absent **prior** written permission by the Court, no party may file a sur-reply brief in support of a motion or a response to a motion. A party seeking permission of the Court to file a sur-reply must file a motion for a sur-reply, a proposed order, and the proposed sur-reply.

F.     Because "[i]t should be the party's responsibility to direct the Court's attention separately to each portion of the record which supports each of the party's distinct arguments," every factual statement made in the parties' briefs should be followed by a citation to the record. Dickson v. Amoco Performance Products, Inc., 845 F. Supp. 1565, 1570 (N.D. Ga. 1994). These citations should include specific page or paragraph

7

numbers, where appropriate. Citations should not be made to the parties' statement of material facts or response thereto.

G.      "All documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment shall be clearly identified for the court." L.R. 56.1B.(3).  If exhibits and/or affidavits are manually filed in support of the motion or response, they should be clearly tabbed.

H.      If a motion for summary judgment is filed, the Consolidated Pretrial Order will be due thirty (30) days after the District Court's final ruling on the motion for summary judgment, if there are matters left to be tried.

IT IS ORDERED that the parties are directed to adhere to the above deadlines. Any motions requesting extensions of time must be made prior to the existing deadline and will be granted **only** in cases where the circumstances on which the request is based did not exist or the attorney(s) could not have anticipated that such circumstances. Failure to comply with this order, may result in the imposition of sanctions, including the dismissal of this action.

The Clerk is directed to submit this action by **June 23, 2017**, if the parties have not filed a Motion for Summary Judgment or Proposed Consolidated Pretrial Order.

So **ORDERED** this 3 day of March, 2017.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)

# Dkt/Tab 36

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| Quaniah R. Stevenson | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil No.: 1:16-CV-2571-AT-LTW |
| Delta Air Lines, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF QUANIAH R. STEVENSON'S EMERGENCY MOTION FOR LEAVE TO FILE EMERGENCY MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO EXTEND TIME TO RESPOND TO DEFENDANT DELTA AIR LINES, INC.'S MOTION FOR SUMMARY JUDGMENT AND TO RE-OPEN DISCOVERY TO DEPOSE DEFENDANT, FOR VIOLATING Fed. R. Civ. P. 26(a)(1)(A)(i & ii), OR IN THE ALTERNATIVE TO EXCLUDE DEENDANT'S EVIDENCE**

Plaintiff Quaniah Stevenson respectfully moves this Court for leave to move this Court to (1) extend time to respond Defendant Delta Air Lines, Inc.'s Motion For Summary Judgment and (2) re-open discovery to depose Defendant for violating Fed. R. Civ. P. 26(a)(1)(A)(i & ii), or in the alternative to (3) exclude, pursuant to Fed. R. Civ. P. 37(c), all evidence submitted in Defendant's Motion For Summary Judgment because Defendant did not disclose such evidence pursuant to Fed. R. Civ. P. 25(a)(1)(A)(i & ii) and Fed. R. Civ. P. 26(e).

Plaintiff has represented herself *pro se* to date. This motion is necessitated by Defendant's abuse of Fed. R. Civ. P. 26(a)(1)(A)(i & ii) for failing to disclose required information that Defendant **_asserted for the first time_** on July 25, 2017, with its Motion For Summary Judgment.  Defendant did not provide this evidence in its initial disclosure as required by Fed. R. Civ. P. 25(a)(1)(A)(i & ii) nor did Defendant supplement its initial disclosure as required by Fed. R. Civ. P. 26(e).

Fed. R. Civ. P. 26(a)(1)(A)(i & ii) provides in pertinent part

> (1) Initial Disclosure.
>
> (A) In General. Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, **_without awaiting a discovery request_**, provide to the other parties:
>
> (i) the name and, if known, the address and telephone number **of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses**, unless the use would be solely for impeachment;
>
> (ii) **a copy—or a description by category and location—of all documents**, electronically stored information, and tangible things **that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses**, unless the use would be solely for impeachment;

Defendant never provided such information until it filed its Motion For Summary Judgment.

Rule 37(c) provides:

> (c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.
>
> (1) Failure to Disclose or Supplement. **If a party fails to provide information or identify a witness a<u>s required by Rule 26(a) or (e)</u>, the party <u>is not allowed to use that information or witness to supply evidence</u> on a motion**, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Defendant is not justified in failing to disclose this information. This failure certainly is harmful to Plaintiff, a *pro se* plaintiff. Because Defendant never provided or supplemented its initial disclosure as required under Fed. R. Civ. P. 37(c), **Fed. R. Civ. P. 37(c)**(1) ***mandates*** that Defendant cannot use that information on a motion. <u>See</u> Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party **is not allowed to use that information** or witness to supply evidence on a motion, at a hearing, or at a trial"). <u>See also</u>, <u>United States v. Procter & Gamble Co.</u>, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed. 1077 (1958) (holding that Rules 26 to 37, the discovery-deposition provisions of the Federal Rules, were intended to insure **"proper litigation", by making the "trial <u>less a game of blindman's buff</u> and more a fair contest with <u>the basic issues and facts disclosed to the fullest practicable extent</u>."**)

Furthermore, Federal Rules of Civil Procedure 26(e) provides:

(e) Supplementing Disclosures and Responses.

(1) In General. A party who has made a disclosure under Rule 26(a)—**or who has responded to an interrogatory**, request for production, or request for admission—**must supplement or correct** its disclosure or response:

(A) **in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect**, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing;

Defendant's multiple failures to provide or supplement its initial disclosure as required by the federal rules has significantly prejudiced Plaintiff.

In view of the forgoing. Plaintiff moves this Court for leave to move this Court to (1) extend time for Plaintiff to respond to Defendant Delta Air Lines, Inc.'s Motion For Summary Judgment by sixty (60) days from the date of Defendant's deposition **AND** (2) re-open discovery to depose Defendant for violating Fed. R. Civ. P. 26(a)(1)(A)(i & ii), or in the alternative to (3) exclude, pursuant to Fed. R. Civ. P. 37(c), all evidence submitted in Defendant's Motion For Summary Judgment because Defendant did not disclose such evidence pursuant to Fed. R. Civ. P. 25(a)(1)(A)(i & ii) and Fed. R. Civ. P. 26(e). The sixty (60) day extension of time and deposition request is necessitated by Defendant's late disclosure of evidence so that Plaintiff's new counsel may review the new

evidence and depose Defendant on the new evidence.   Plaintiff respectfully requests that this motion for leave further serve as Plaintiff's motion for the underlying relief.   Upon the Court ordering a deposition of Deposition, Plaintiff shall serve a 30(b)(6) deposition notice on Defendant.

Respectfully submitted this 3rd day of August, 2017.

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

**Counsel certifies that the brief has been prepared with one of the font and point selections approved by the court in LR 5.1C.  Counsel further certifies that counsel attempted to meet and confer with Defendant's counsel prior to serving this emergency motion.

I certify that I have served **PLAINTIFF QUANIAH R. STEVENSON'S EMERGENCY MOTION FOR LEAVE TO FILE EMERGENCY MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO EXTEND TIME TO RESPOND TO DEFENDANT DELTA AIR LINES, INC.'S MOTION FOR SUMMARY JUDGMENT AND TO RE-OPEN DISCOVERY TO DEPOSE DEFENDANT, FOR VIOLATING Fed. R. Civ. P. 26(a)(1)(A)(i & ii), OR IN THE ALTERNATIVE TO EXCLUDE DEENDANT'S EVIDENCE** via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: August 3, 2017          By: /s/ Charlena Thorpe
                                   Charlena Thorpe

# Dkt/Tab 38

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

QUANIAH R. STEVENSON,

     Plaintiff,

v.

                              CIVIL ACTION NO.
                              1:16-CV-2571-AT-LTW

DELTA AIR LINES, INC.,

     Defendant.

## MAGISTRATE JUDGE'S ORDER

This case is presently before the Court on Plaintiff Quaniah R. Stevenson's ("Plaintiff") Emergency Motion to Extend Time to Respond to Defendant's Motion for Summary Judgment and to Re-open Discovery to Depose Defendant, or in the Alternative, to Exclude Defendant's Evidence. (Doc. 36).

Plaintiff filed this employment discrimination action on August 18, 2016, while proceeding pro se. In Plaintiff's Complaint, she alleges that Defendant discriminated against her on the basis of her race and her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"), her disability in violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12101 et      ("the ADA"), and her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. ("the ADEA") when it terminated her. Plaintiff also claims that her termination amounted to unlawful retaliation for her

AO 72A
(Rev.8/82)

complaints of discrimination and harassment in violation of Title VII, Section 1981, the ADA, and the ADEA.

Plaintiff remained pro se during the course of discovery in this case and was relatively uncommunicative. Defendant avers that during discovery, Plaintiff refused to produce documents in response to Defendant's discovery requests and initially failed to respond to Defendant's Notice of Deposition. (Doc. 20-1, Ex. A). Accordingly, on May 8, 2017, this Court ordered Plaintiff to respond to Defendant's discovery requests and to provide dates in which she would be available to sit for her deposition. (Doc. 25, at 3).

On July 25, 2017, Defendant filed its Motion for Summary Judgment. (Doc. 33). Approximately one week later, counsel for Plaintiff entered an appearance in this case. (Doc. 35). On that same day, Plaintiff's new counsel filed an Emergency Motion to Extend Time to Respond to Defendant's Motion for Summary Judgment and to Re-open Discovery to Depose Defendant, or in the Alternative, to Exclude Defendant's Evidence. (Doc. 36). Therein, Plaintiff seeks either (1) to exclude all evidence submitted in Defendant's Motion for Summary Judgment because Defendant failed to disclose the evidence presented; or (2) additional time to respond to Defendant Delta Air Lines, Inc.'s Motion for Summary Judgment and to reopen discovery and depose Defendant. Plaintiff argues that Defendant asserted certain evidence for the first time in connection with its summary judgment filing which should be excluded because Defendant did not produce such evidence in its Initial Disclosures as required by Fed. R. Civ. P. 26(e). In

AO 72A
(Rev.8/82)

response, Defendant points out that it served its Initial Disclosures and that within its Initial Disclosures, it identified the only witnesses it relied upon to support its Motion for Summary Judgment as well as the categories of documents upon which it intended to rely in this case.

Plaintiff fails to show that Defendant's summary judgment evidence should be excluded. Rule 37(c)(1) provides that if a party fails to provide information or identify a witness in its Initial Disclosures, the party is not allowed to use that information or witness to supply evidence on a motion unless that failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). Here, Defendant filed and served its Initial Disclosures on December 19, 2016. (Doc. 9). Defendant identified several potential witnesses who had knowledge of the factual issues at stake in the case as well as categories of documents which may be relevant to the disputed facts alleged with particularity in the pleadings. (Doc. 9, at 7, 8). As Defendant also points out, Plaintiff does not specify what evidence Defendant presented in connection with its Motion that was not disclosed in its Initial Disclosures. Under these circumstances, this Court cannot conclude that the evidence upon which Defendant relies to support its summary judgment motion should be excluded.

In light of the fact, however, that Plaintiff's counsel has just entered the case and there is a summary judgment motion pending, the Court will reopen discovery through and including November 8, 2017, for the limited purpose of permitting Plaintiff to take one deposition. Plaintiff's Response to Defendant's Motion for Summary Judgment will

AO 72A
(Rev.8/82)

be due November 22, 2017. No further extensions of the discovery period or the time

for Plaintiff to file a response to Defendant's summary judgment motion will be granted

by this Court.

**SO ORDERED**, this 10th day of October, 2017.

s/Linda T. Walker
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

4

# Dkt/Tab 50

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

Quaniah R. Stevenson　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff,　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　vs.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　Civil No.: 1:16-CV-2571-AT-LTW
Delta Air Lines, Inc.　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendants.　　)
　　　　　　　　　　　　　　　　　)

## PLAINTIFF QUANIAH R. STEVENSON'S MOTION FOR EXTENSION OF THE DISCOVERY PERIOD AND MOTION TO COMPEL

Plaintiff Quaniah Stevenson respectfully moves this Court for leave to move this Court (1) to extend the discovery period pursuant to LR 26.2B, N.D. Ga. and the rules and practices of the Magistrate Judge (i.e., Doc. No. 15, paragraph I(B)(4)) and (2) to compel Defendant to comply with discovery pursuant to LR 3 7 .1, N.D. Ga. and the rules and practices of the Magistrate Judge.

Regarding Plaintiff's motion to extend the discovery period, Plaintiff states that the extension is needed to resolve discovery issues that have arisen since the deposition of Defendant on February 26, 2019.  Defendant agreed to produce certain documents (discussed in greater detail below in conjunction with Plaintiff's motion to compel).  However, during the deposition of Defendant, it was discovered that these documents were not produced.  Plaintiff has attempted to

resolve the issue with Defendant prior to the expiration of the close of discovery but given the limited amount of time between the deposition and the close of discovery (i.e., 2 days), the parties have not been able to due to time to resolve the issues.    Plaintiff's counsel called Defendant's counsel and also emailed Defendant's counsel to no avail.   Plaintiff's counsel also called the Magistrate Judge's Courtroom Deputy, and has scheduled a telephone conference for March 1, 2019, one day after the close of discovery.

Pursuant to LR 26.2B, N.D. Ga. and the rules and practices of the Magistrate Judge (i.e., Doc. No. 15, paragraph I(B)(4)), Plaintiff states the following:

(1) the current date from which the extension is being sought is February 28, 2019;

(2) there have been two (2) previous requests for extensions;

(3) these previous requests were granted; and

(4) Defendant has not consented nor opposed the extension as Plaintiff has not heard from Defendant's counsel.

Regarding Plaintiff's motion to compel Defendant to comply with discovery, Plaintiff notes that the rules and practices of the Magistrate Judge (i.e., Doc. No. 15, paragraph I(B)(6)(a)) provides, "Motions to compel . . . should ***ordinarily not*** be filed without a prior conference with the Court."   As set forth above with

respect to Plaintiff's motion to extend the time for completion of discovery, the motion is needed to resolve discovery issues that have arisen since the deposition of Defendant on February 26, 2019, and there is insufficient time for a conference as Plaintiff must file the present motion to preserve Plaintiff's rights.   As mentioned above, Plaintiff's counsel called Defendant's counsel and also emailed Defendant's counsel to no avail.   Plaintiff's counsel also called the Magistrate Judge's Courtroom Deputy, and has scheduled a telephone conference for March 1, 2019, one day after the close of discovery.

Plaintiff also notes the Magistrate Judge's admonition at Doc. No. 15, paragraph I(B)(6)(b):

> In the event that memoranda are submitted, they should comply with LR 3 7 .1, N.D. Ga., and be brief, focus on the facts of the particular dispute, and avoid discussion of general discovery principles.· The Court cautions against the inclusion of (and will disregard) any generalized recitation of "historical" discovery disputes between the parties or any "finger pointing" or disparaging remarks directed at opposing counsel or the opposing party

According, the present motion is concise and to the point.

First, Plaintiff certifies that counsel has in good faith conferred or attempted to confer with Defendant in an effort to obtain the discovery without court action.

Second, Plaintiff served on Defendant the following Document Requests:

**REQUEST FOR PRODUCTION NO. 8**

All documents related to Delta Air Lines, Inc.'s Delta Pass Protection Group investigation of [V. Bailey].

**REQUEST FOR PRODUCTION NO. 12**

For any investigation of an individual whom was in Plaintiff's Department (Department 125) that have allegedly violated the employee travel benefits for business travel or loss or control during 2013 and through 2015, for each such investigation, any written record or report regarding the investigation and documents sufficient to show the type of violation(s) and the disciplinary actions taken for the violation(s) and, for each such investigation, documents sufficient to show the employee's race, gender, disability (if known), and age.   To satisfy this request, Plaintiff may produce any written record or report made regarding the investigation and a spreadsheet that reflects for each such investigation, the type of violation(s) at issue, the disciplinary actions taken for the violation(s), the employee's race, gender, disability (if known), and age.

**REQUEST FOR PRODUCTION NO. 13**

For any investigation of an individual whom was in Plaintiff's Department (Department 125) that had violated the employee travel benefits for business travel or loss or control but was not terminated during 2013 and through 2015 and for each such individual that was not terminated, any written record or report regarding the investigation and documents sufficient to show (1) an identity of the person, (2) the person's age, race, disability status, and gender, (3) the type of violation(s); and (4) the disciplinary action taken. **To satisfy this request, Plaintiff may produce <u>any written record or report made regarding the investigation</u> and a spreadsheet that reflects for each such investigation, (1)**

an identity of the person, (2) the person's age, race, disability status, and gender, (3) the type of violation(s); and (4) the disciplinary action taken.

Regarding Document Requests Nos. 12 and 13, it is noted that the parties agreed that if the documents for Department 125 were insufficient, the parties would renegotiate these discovery requests.  To that end, the parties ultimately agreed that Defendant would provide a summary document with the requested information for a broader group of employees – namely "**all individuals, in all positions and in all stations that were investigated for business travel with passes or loss of control of passes during the 2013-15 time-period**".

Defendant's counsel summarized the parties' agreement in an email as follows:

> Despite the over-inclusive production here . . . **you have requested a final production of an additional spreadsheet showing all individuals, in all positions and in all stations that were investigated for business travel with passes or loss of control of passes during the 2013-15 time-period**. . . . [I]n a further showing of good faith, **Delta is willing to produce the information you have requested** based on your acknowledgement that the production will be the final document sought by Plaintiff.
>
> Specifically, with the agreement that Plaintiff will not seek any further documents beyond what Delta has produced, **Delta will provide Plaintiff with an updated spreadsheet containing the information set forth in the first 14 columns of the spreadsheet produced to you on December 13, 2018** -- **for all individuals at Delta investigated for loss of control or business use of travel passes for 2013-15**. This will include all positions and all stations.  (As we

> discussed, it will not include the information contained in the
> final 4 columns of the December 13 spreadsheet -- relating to
> extended absences or reasonable accommodation requests.)

However, the summary document that Defendant produced had missing information (namely information regarding the findings of the investigation), for the most important comparators – ***numerous white male and female employees*** that ***were not fired*** for conduct ***much more culpable and egregious*** than Plaintiff's ***alleged*** infraction.  Plaintiff agreed to the summary documents on good faith that the summary document would accurately reflect the underlying records.  However, it is clear that the summary document does not.

Accordingly, Plaintiff respectfully moves this Court to order Defendant to produce the underlying documents and/or an accurate summary document.  However, because Defendant has shown that it has conducted discovery in bad faith and breached the parties' agreement, to ensure the integrity of the discovery process and decide this case on facts and the search for the truth, Plaintiff would prefer the Court to order the production of the underlying documents.

***Importantly***, a known male employee under the age of 40, S. Johnson, whom investigation falls within the scope of the discovery requests was ***not*** included in the summary document.  Defendant's counsel contends that Mr. Johnson's investigation was not classified as a "business travel or loss or control"

case.  However, a review of Mr. Johnson case (the documents were obtained through another document request), clearly establish that Mr. Johnson's case is a "loss of control" or "business purpose" violation and should have been identified in the summary document.  Accordingly, Plaintiff is concerned that all the requested information pursuant to Document Requests No. 12 and 13 has not been provided in the summary document based on Defendant's bias interpretation of whether the case is a "loss of control" or "business purpose" case.

Accordingly, because Defendant has clearly shown that it is concealing evidence that is damaging to Defendant and violates the parties agreement, Plaintiff moves that this Court to order Defendant to produce ***all documents*** (not a summary document) concerning investigation of travel benefits violation during the 2013-15 time-period so that Plaintiff can determine if those investigation are based on "loss of control" or potential "business purpose" violation.  As discussed above, this order is needed to ensure the integrity of the discovery process and to decide this case on facts and the search for the truth.

Finally regarding Requests No. 8, Defendant responded that "Delta will produce the requested documents". However, Defendant has not produced all the documents relating to the investigation of V. Bailey, which allegedly was the reason for investigating Plaintiff. Particularly, Defendant has not included the

documents relating to the disciplinary actions taken for other employees investigated in relation to V. Bailey.  Importantly, it was discovered during the deposition on February 26, 2019, that one male employee under the age of 40, S. Johnson, that was investigated in relation to V. Bailey was **_not fired_** for conduct **_much more culpable and egregious_** than Plaintiff's **_alleged_** infraction.  Defendant conveniently did not produce these disciplinary documents of S. Johnson nor the other employees investigated with relation to V. Bailey, whom would be comparators and it is now known through the deposition that **almost all** of these employees were **_not_** terminated.

Pursuant to the above, Plaintiff respectfully moves this Court to order Defendant to produce the underlying documents relating to the investigation of "all individuals, in all positions and in all stations that were investigated for business travel with passes or loss of control of passes during the 2013-15 time-period" with a documents sufficient to identify age, race, and gender.  Plaintiff respectfully requests that this motion for leave further serve as Plaintiff's motion for the underlying relief.

Respectfully submitted this 28th day of February, 2019.

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

**Counsel certifies that the brief has been prepared with one of the font and point selections approved by the court in LR 5.1C.  Counsel further certifies that counsel attempted to meet and confer with Defendant's counsel prior to serving this motion.

I certify that I have served **PLAINTIFF QUANIAH R. STEVENSON'S MOTION FOR EXTENSION OF THE DISCOVERY PERIOD AND MOTION TO COMPEL** via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: February 28, 2019        By: /s/ Charlena Thorpe
                                        Charlena Thorpe

# Dkt/Tab 52

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **QUANIAH R. STEVENSON,** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No.** |
| **DELTA AIR LINES, INC.,** | **1:16-cv-2571-AT-LTW** |
| **Defendant.** | |

**CONSENT ORDER**

On March 1 and March 28, 2019, this Court held telephonic hearings regarding discovery and dispositive motions in this matter.  At the Court's direction, the parties thereafter met and conferred regarding the production by Defendant Delta Air Lines, Inc. ("Delta") of certain additional information and documents and regarding the schedule for the submission of dispositive Motions.

Thereafter, the parties submitted this Consent Order, which the Court has reviewed and finds to be consistent with the direction given by the Court during the March 1 and 28, 2019 telephonic hearing.

Accordingly, the Court hereby ORDERS an extension of time for limited discovery consistent with this Order and the Court's prior Orders for a period expiring sixty (60) days following the entry of this Order.

The Court further ORDERS that Delta produce the following information within thirty (30) days of entry of this Order:

1.     Any disciplinary or termination documents relating to travel pass violations for the individuals investigated for providing buddy passes to Vendell Bailey;

2.     The identity of individuals investigated for business travel or loss of control violations of Delta's travel pass policy during 2013-15 who were within areas overseen by then Senior Manager of Human Resources, ACS (Barbara Franz) or Manager of Human Resources, ACS (Kiha Jones).  In addition to providing the identity of such individuals, Delta shall also provide the following fields of information insofar as they are maintained on such individuals within its investigation database: Employee Number, Employee Name, Division, Department, Station, Race Code, Gender, Date of Birth, Date File Received in Equal Opportunity, Termination, Date, Infraction Description, Additional Description, Disposition, PPG Disposition, Medical Leave of Absence more than 30 days since 2013, Accommodation Requested, Date Opened and Accommodation Approved.  Once such individuals are

identified, Delta and Plaintiff shall meet and confer regarding

the production of any Pass Protection Group investigative

memos and disciplinary documents on such individuals and, if

they are unable to reach agreement, shall bring the matter to the

attention of the Court;

3. The identity of individuals who were terminated for business

travel or loss of control violations of Delta's travel pass policy

during 2013-15 and whose terminations were overturned by

Delta's Equal Opportunity Department.  In addition to

providing the identity of such individuals, Delta shall also

provide the following fields of information insofar as they are

maintained on such individuals within its investigation

database: Employee Number, Employee Name, Division,

Department, Station, Race Code, Gender, Date of Birth, Date

File Received in Equal Opportunity, Termination, Date,

Infraction Description, Additional Description, Disposition,

PPG Disposition, Medical Leave of Absence more than 30 days

since 2013, Accommodation Requested, Date Opened and

Accommodation Approved.  Once such individuals are

identified, Delta and Plaintiff shall meet and confer regarding

the production of any Pass Protection Group investigative memos and disciplinary documents on such individuals and, if they are unable to reach agreement, shall bring the matter to the attention of the Court;

4.   Delta shall attempt to determine the reason(s) that Sidarius Johnson was not included on the spreadsheet previously produced to Plaintiff and shall advise Plaintiff of the search terms and any other search methodology utilized to compile the spreadsheet previously produced and being produced under the terms of this Order.

5.   Plaintiff shall be permitted to take a limited deposition of Lisa Blackmon for the sole purpose of determining what role Ms. Blackmon plays generally in terminations at Delta and what role she played in the termination of Plaintiff.

The Court further ORDERS that Delta's Motion for Summary Judgment shall be due within thirty (30) days of the close of the discovery period.

The Court further ORDERS that Plaintiff shall have thirty (30) days following the filing of Delta's Motion for Summary Judgment to respond to that motion.

The Court further ORDERS that Delta shall have thirty (30) days following the filing of Plaintiff's Response to Delta's Motion for Summary Judgment to file its Reply in support of its Motion for Summary Judgment.

The Court further ORDERS that, in light of this Order, Plaintiff's Motion to Compel and to Extend Discovery [Dkt. No. 50] is DISMISSED.

SO ORDERED: this 22 day of April 2019

_____
UNITED STATES MAGISTRATE JUDGE

WE STIPULATE AND CONSENT
TO THE FOREGOING:

/s/ Charlena Thorpe
Georgia Bar No. 760954

6340 Sugarloaf Parkway
Suite 200
Duluth, GA 30097
Tel: (770) 325-2741
Fax: (770) 325-274

s/Benjamin A. Stone
Georgia Bar No. 683850

MUNGER & STONE, LLP
999 Peachtree Street, N.E.
Suite 2850
Atlanta, Georgia 30309
Telephone: (404) 815-0933
Facsimile: (404) 815-4687

# Dkt/Tab 56

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| Quaniah R. Stevenson | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil No.: 1:16-CV-2571-AT-LTW |
| Delta Air Lines, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF QUANIAH R. STEVENSON'S MOTION FOR EXTENSION OF THE DISCOVERY PERIOD AND MOTION TO COMPEL

Plaintiff Quaniah Stevenson respectfully moves this Court for leave to move this Court (1) to extend the discovery period pursuant to LR 26.2B, N.D. Ga. and the rules and practices of the Magistrate Judge (i.e., Doc. No. 15, paragraph I(B)(4)) and (2) to compel Defendant to comply with discovery pursuant to LR 3 7 .1, N.D. Ga. and the rules and practices of the Magistrate Judge.

Regarding Plaintiff's motion to extend the discovery period, Plaintiff states that the extension is needed to resolve discovery issues that have arisen since the deposition of Lisa Blackmon on July 12, 2019, and the production of documents by Defendant on July 24, 2010 pursuant to the Court's Order entered on April 22, 2019 (see Doc. No. 52).  Defendant continues to hide evidence that is relevant in this case.

1

As mentioned above, pursuant to the Court's Order entered on April 22, 2019, Defendant made Lisa Blackmon available on July 12, 2019, "for the sole purpose of determining what role Ms. Blackmon plays generally in terminations at Delta and what role she played in the termination of Plaintiff."  The Court order this deposition during the teleconference hearing on March 28, 2019, after reviewing a document produced by Defendant (i.e., Stevenson/Delta_000402 attached hereto) that appeared to show that Ms. Blackmon was the final decision maker. During the deposition it was confirmed that Ms. Blackmon is the ultimate decision maker in all disciplinary action involving firing.  For example, during the Deposition, Ms. Blackmon testified:

```
 3      Q.   All right.  Let's turn to those disciplinary actions
 4   resulting in termination.  What is your role in those
 5   disciplinary actions?
 6      A.   My role in terminations is very limited.  I -- prior
 7   to an employee being notified of the decision I do a final
 8   review to ensure the process has been followed.
 9      Q.   And what do you review?
10      A.   I review the information that has been put together
11   for the decision to be made.
12      Q.   And when you review the information what are you
13   looking for?
14      A.   I'm looking to make sure that the documents, the
15   standard documents that we have as part of our process are in
16   place, that there is a reason for the termination, that we have
17   done a fact-finding, given the employee an opportunity to
18   respond to any concerns or issues and that a decision has been
19   made by the business leaders, and that business leaders and HR
20   are aligned on that decision.
21      Q.    You mentioned that you are reviewing for standard
22   documents; what do you mean by that?
23      A.    There's usually a summary that we require that gives
24   an overview of the reason why the employee is being terminated,
25   basic information who the employee is, the amount of time that
0018
 1   they've been with the company, the location for which they're
```

2

```
 2    working in their department, a statement from the employee, any
 3    investigative notes that may be part of the process.
 4         Q.   And you mentioned that you also look at the reason
 5    for the termination, and what are you reviewing with respect to
 6    that, what are you trying to decide with respect to that?
 7         A.   I'm just looking to make sure that there is a reason
 8    there and that that reason is supported by the documentation
 9    that we have put together.
10         Q.   So you're analyzing the documents to determine if the
11    reason for the termination is supported by the documents?
12         A.   I'm not sure what you mean by analyzing.
13         Q.   Or reviewing.  What do you understand analyzing to
14    mean?
15         A.   That I am going through the documents at a very in-
16    depth level to evaluate and make a decision.
17         Q.   You mentioned that you are looking to make sure that
18    the reason is supported by the documents; so what does that
19    entail?
20         A.   I'm looking to make sure that we've stated clearly
21    why the person is being terminated and that we have
22    documentation in the file that supports that.
23         Q.   And why do you do that?
24         A.   To ensure that we have completed our process
25    thoroughly.
0019
 1         Q.   And why is that important?
 2         A.   We want to ensure that we are doing the right thing
 3    for our employees.  We take employment decisions very seriously
 4    with someone's employment.
 5         Q.   And what is "doing the right thing," what does that
 6    mean?
 7         A.   That we are following our process.
```

As another example, during the Deposition, Ms. Blackmon testified (as this is relevant because it was testified during the deposition that Ms. Blackmon delegated her authority for Ms. Stevenson case):

```
Q.    Why does Delta have you review termination decisions?
14         A.   Just part of our standard process.
15         Q.   And why is that?
16         A.   Another level of check and balance to ensure the
17    process has been completed.
18         Q.   Would you ever sign a document that you have not
19    personally considered the underlying facts?
20         A.   No.  I would not, but there are times when I would
21    give my authority to someone to do that review on my behalf and
22    sign.
23         Q.   And you wouldn't give them your permission, if you
24    will, to do that unless you felt that they did what you would
```

```
25   in fact do; is that correct?
0031
 1        A.   I would give them my authority to do what I do, yes.
 2        Q.   And by them -- and you're saying they would sign your
 3   name; is that what you're saying?
 4        A.   Yes.
 5        Q.   And by that person signing your name, you're
 6   confident that they have done or that that signature reflects
 7   your standard of signing, if you will?
 8        A.   Yes.  Anyone that I would give authority to, to do
 9   that, if they had any concerns about that those would either be
10   raised to me before that was done or either they would raise to
11   someone who was acting on my behalf if I were not available or
12   present to do so.
```

## As yet another example, during the Deposition, Ms. Blackmon testified:

```
17        Q.   So from what I understand your testimony -- prior to
18   informing an employee of the termination decision, the people
19   that report to you, you review those recommendations and my
20   question is, have you ever not agreed with a termination
21   recommendation?
22        A.   I'm sure that that has occurred at some point; I just
23   don't recall the specific situation.
24        Q.   But it does happen and the process is designed so
25   that that could happen?
0032
 1        A.   It's certainly possible.
 2        Q.   And under what circumstances may that be?
 3        A.   Maybe there is something that I see that I call into
 4   question or I have a question about something that is either in
 5   the fact-finding summary or if I see any sort of inconsistency
 6   then I would inquire.
 7        Q.   I think that leads to my next question.  **If you did
 8   not agree with a termination could the employee be terminated?**
 9        A.   In those situations typically we would have a
10   conversation and gain alignment so it would be that we would
11   talk through whatever the question was and resolve that.
12   **Certainly possible, someone may not be terminated,** but
13   oftentimes by the time we get to that step that kind of
14   information has already been resolved.
15        Q.   Has there ever been an instance where a
16   recommendation has been made and once you've reviewed it --
17        A.   Uh-huh.
18        Q.   -- have you had the people that made the
19   recommendation change their mind or --
20        A.   I don't recall a situation like that.
21        Q.   Uh-huh.  But it's designed to happen, I mean, it
22   could happen?
23        A.   It's possible, I just don't recall.
24        Q.   Right.  There is no restrictions in Delta's
```

```
25  guidelines that would prevent that from happening; correct?
0033
 1       A.   A decision being reversed?
 2       Q.   Right.  By you?
 3       A.   That is possible.
```

Based on the above testimony for Ms. Blackmon (also attached hereto), it is clear that Ms. Blackmon is the ultimate decision maker for disciplinary actions. Accordingly, Plaintiff is entitled to information related to individuals investigated for business travel or loss of control violations of Delta's travel pass policy during 2013-15 who were within areas overseen by Ms. Blackmon.

Regarding the documents that Defendant was required to produced pursuant to the Court's Order entered on April 22, 2019, Defendant has not produced the most relevant documents.  More specifically, the Court's Order required Defendant to "identi[fy] [] individuals investigated for business travel or loss of control violations of Delta's travel pass policy . . . [and] provide the following fields of information insofar as they are maintained on such individuals within its investigation database:  . . . .**Infraction Description, Additional Description, Disposition, PPG Disposition** . . . .".  (See Doc. No. 52.)  Defendant produced the documents bates labeled Delta/Stevenson_002587-2602, attached hereto.

Importantly, out of about 332 entries in the spreadsheet produced, only about 28 are for white employees and for ***almost all*** **the white employees** the column for

"**Infraction Description" and "Additional Description"** are BLANK (see Delta/Stevenson_002587-2602, attached hereto).  Defendant agreed to provide the underlying documents of the individual identified in the spreadsheet as the Court's Order contemplates.  (See Doc. No. 52 (providing "Once such individuals are identified, Delta and Plaintiff shall meet and confer regarding the production of any Pass Protection Group investigative memos and disciplinary documents on such individuals . . . .")).  However, the Defendant has not produced the underlying documents for the white employees that where indicated as "cleared" on the spreadsheet.

Based on the above, it is clear that Defendant is hiding the ball with respect to the white employees – the spreadsheet does not include the "**Infraction Description" and "Additional Description" for these white employees that were cleared** (see Delta/Stevenson_002587-2602, attached hereto) **and there are no underlying documents for almost all of these employees; if there is a document it is incomplete where the substantive portions are missing.**  Thus, Plaintiff cannot determine if these white employees are comparators.  Accordingly, Plaintiff respectfully requests that the Court compel Defendant to produce these documents or provide a witness that can testify regarding these white employees.

Plaintiff has attempted to resolve the issue with Defendant prior to the expiration of the close of discovery but given the limited amount of time between the production of the documents by Defendant (as mentioned above, Defendant produced the document seven days before the close of discover) and the close of discovery, Plaintiff has not been able to address these issue.  In fact, because of the limited period of time, Plaintiff respectfully request more time to review the documents for completeness and compliance with the Court's Order.

Prior to filing this Motion, Plaintiff's counsel called Defendant's counsel and also emailed Defendant's counsel regarding Ms. Blackmon but could not reach agreement regarding the Defendant producing additional documents.  Plaintiff's counsel also called the Magistrate Judge's Courtroom Deputy but has not heard back from the Court.

Pursuant to LR 26.2B, N.D. Ga. and the rules and practices of the Magistrate Judge (i.e., Doc. No. 15, paragraph I(B)(4)), Plaintiff states the following:

(1) the current date from which the extension is being sought is February 28, 2019 to allow time for the Court to hear the matters addressed in this motion and set a new deadline if the Court compels Defendant to produce the requested documents;

(2) there have been four (4) previous requests for extensions;

(3) these previous requests were granted; and

(4) Defendant has not consented nor opposed the extension but has stated that if there was no extension Defendant would not object to any Motion To Compel as untimely.

Regarding Plaintiff's motion to compel Defendant to comply with discovery, Plaintiff notes that the rules and practices of the Magistrate Judge (i.e., Doc. No. 15, paragraph I(B)(6)(a)) provides, "Motions to compel . . . should ***ordinarily not*** be filed without a prior conference with the Court."  As set forth above with respect to Plaintiff's motion to extend the time for completion of discovery, the motion is needed to resolve discovery issues that have arisen since the deposition of Ms. Blackmon and the document produced by Defendant, and there is insufficient time for a conference **as Plaintiff must file the present motion to preserve Plaintiff's rights**.  As mentioned above, Plaintiff's counsel called and emailed Defendant's counsel and could not reach a resolution.  Plaintiff's counsel also called the Magistrate Judge's Courtroom Deputy.

As discussed above, Plaintiff respectfully requests that the Court compel Defendant to produce all the documents related to the disciplinary actions taken for the individual identified in Delta/Stevenson_002587-2602 or provide a witness to testify regarding the disciplinary actions taken.  Furthermore, Plaintiff is entitled to

information related to individuals investigated for business travel or loss of control violations of Delta's travel pass policy during 2013-15 who were within areas overseen by Ms. Blackmon.

Plaintiff respectfully requests that this motion for leave further serve as Plaintiff's motion for the underlying relief.

Respectfully submitted this 31st day of July, 2019.

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth, GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

**Counsel certifies that the brief has been prepared with one of the font and point selections approved by the court in LR 5.1C.  Counsel further certifies that counsel attempted to meet and confer with Defendant's counsel prior to serving this motion.

I certify that I have served **PLAINTIFF QUANIAH R. STEVENSON'S MOTION FOR EXTENSION OF THE DISCOVERY PERIOD AND MOTION TO COMPEL** via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: July 31, 2019          By: /s/ Charlena Thorpe
                                    Charlena Thorpe

# Dkt/Tab 64

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| Quaniah R. Stevenson | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil No.: 1:16-CV-2571-AT-LTW |
| Delta Air Lines, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF QUANIAH R. STEVENSON'S'S OBJECTION TO MAGISTRATE'S ORDER ENTERED OCTOBER 10, 2019 DENYING PLAINTIFF'S MOTION TO COMPEL AND MOTION TO EXTEND DISCOVERY AND MOTION TO MODIFY THE ORDER

Plaintiff Quaniah R. Stevenson brought this action against Defendant Delta Air Lines, Inc. for violations of the American with Disabilities Act (ADA), race discrimination, gender discrimination, age discrimination, and retaliatory discharge.

In her complaint, Ms. Stevenson, whom is over the age of 40, states that she suffered an injury while on the job at Delta in March 2014.  This work injury caused her to be out of work for eight (8) months.  Prior to this time, Ms. Stevenson had been successfully employed with Delta since August 1, 2007.

However, upon returning to work in November 2014, as alleged in her complaint, Ms. Stevenson was subjected to retaliation and harassment because of

1

her disability and because she exercised her rights under the ADA. The harassment that Ms. Stevenson suffered is set forth in detail in Plaintiff's complaint at paragraphs 20-28, for example. Delta's harassment caused Ms. Stevenson to suffer depression and contributed to pain caused by her work related injury, which resulted in her taking leave including an overnight stay in the hospital.

On July 28, 2015, Delta terminated Ms. Stevenson's employment alleging that Ms. Stevenson violated the company's employee travel benefits (e.g. Delta's "Pass Travel", "Travel Passes", or "Buddy Passes"). Ms. Stevenson contends that this reason for her termination is pretext for Delta's unlawful harassment, discrimination, and retaliation.

On October 10, 2019, the Magistrate denied Plaintiff's motion to compel discovery and motion to extend discovery (ECF No. 56). Pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. Pro. 72, Plaintiff respectfully objects to the Magistrate's order and respectfully moves the District Court Judge to vacate or modify the Magistrate's orders as contrary to law or clearly erroneous.

28 U.S.C. § 636(b) provides:

> (b)(1) Notwithstanding any provision of law to the contrary—
>
> (A) a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the

2

pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. **A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law**.

Still further, Fed. R. Civ. Pro. 72 provides:

(a) Nondispositive Matters. When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision. **A party may serve and file objections to the order** within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. **The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.**

In the Magistrate's Order entered on April 22, 2019 (ECF No. 52), the Magistrate ordered Defendant to produce the following information:

The identity of individuals investigated for business travel or loss of control violations of Delta's travel pass policy during 2013-15 who were within areas overseen by then Senior Manager of Human Resources, ACS (Barbara Franz) or Manager of Human Resources, ACS (Kiha Jones). In addition to providing the identity of such individuals, Delta shall also provide the following fields of information insofar as they are maintained on such individuals within its investigation database: Employee Number, Employee Name, Division, Department, Station, Race Code, Gender, Date of

Birth, Date File Received in Equal Opportunity, Termination, Date, Infraction Description, Additional Description, Disposition, PPG Disposition, Medical Leave of Absence more than 30 days since 2013, Accommodation Requested, Date Opened and Accommodation Approved. **Once such individuals are identified, Delta and Plaintiff shall meet and confer regarding the production of any Pass Protection Group investigative memos and disciplinary documents on such individuals and, if they are unable to reach agreement, shall bring the matter to the attention of the Court**.

Defendant provided a chart providing such information and voluntarily agreed to produce the above-identified documents (i.e., investigative memos and disciplinary documents) for each individual within the scope of the April 22, 2019 Order.

As set forth in Plaintiff's Motion to Compel (ECF No. 56), regarding the documents that Defendant was required to produced pursuant to the Court's Order entered on April 22, 2019, Defendant has not produced the most relevant documents. More specifically, the Court's Order required Defendant to "identi[fy] [] individuals investigated for business travel or loss of control violations of Delta's travel pass policy . . . [and] provide the following fields of information insofar as they are maintained on such individuals within its investigation database: . . . .**Infraction Description, Additional Description, Disposition, PPG Disposition** . . . .". (See Doc. No. 52.) Defendant produced the documents bates labeled

4

Delta/Stevenson_002587-2602 (marked Confidential pursuant to a protective order), which were submitted to the Magistrate.

Importantly, out of about 332 individuals identified, only about 28 are for white employees and for **_almost all_** **the white employees** the column for "**Infraction Description" and "Additional Description**" are BLANK (see Delta/Stevenson_002587-2602).   As mentioned above, Defendant agreed to provide the underlying documents of the individual identified in the spreadsheet as the Court's Order contemplates.   (See Doc. No. 52 (providing "Once such individuals are identified, Delta and Plaintiff shall meet and confer regarding the production of any Pass Protection Group investigative memos and disciplinary documents on such individuals . . . .")).   However, Defendant has not produced the underlying documents for the white employees that where indicated as "cleared" on the spreadsheet.   These documents are relevant. Plaintiff is entitled to the information/documents regarding these white employees that were allowed to keep their jobs for the same or more egregious conduct/circumstances than the alleged conduct by Plaintiff that were the alleged grounds for her termination.

Accordingly, Plaintiff moved the Court to compel Defendant to produce these documents and extend the discovery period until this matter was resolved. The Magistrate's Order dated October 10, 2019, is completely silent on this portion

of Plaintiff Motion to Compel.  Plaintiff respectfully moves the District Court Judge to order Defendant to produce the documents identified in the order or other documents that will provide the missing information.

Still further, the Magistrate's Order (ECF No. 52) provided:

> Plaintiff shall be permitted to take a limited deposition of Lisa Blackmon for the sole purpose of determining what role Ms. Blackmon plays generally in terminations at Delta and what role she played in the termination of Plaintiff.

As shown in Stevenson/Delta_000402 (attached hereto), Lisa Blackmon was listed as the person that made the ultimate decision to fire Plaintiff.  The Court ordered this deposition during the teleconference hearing on March 28, 2019 (a transcript of this hearing has been requested by Plaintiff), because Stevenson/Delta_000402 showed that Ms. Blackmon was the final decision maker and Plaintiff wanted information and documents related to individuals investigated for business travel or loss of control violations of Delta's travel pass policy during 2013-15 who were within areas overseen by Lisa Blackmon.

Pursuant to the Court's Order entered on April 22, 2019, Defendant made Lisa Blackmon available on July 12, 2019, "for the sole purpose of determining what role Ms. Blackmon plays generally in terminations at Delta and what role she played in the termination of Plaintiff."

As set forth in Plaintiff's Motion to Compel (ECF No. 56), during the

deposition it was confirmed that Ms. Blackmon is the ultimate decision maker for

Plaintiff in all disciplinary action involving firing.   For example, during the

Deposition, Ms. Blackmon testified:

```
 3       Q.   All right.  Let's turn to those disciplinary actions
 4   resulting in termination.  What is your role in those
 5   disciplinary actions?
 6       A.   My role in terminations is very limited.  I -- prior
 7   to an employee being notified of the decision I do a final
 8   review to ensure the process has been followed.
 9       Q.   And what do you review?
10       A.   I review the information that has been put together
11   for the decision to be made.
12       Q.   And when you review the information what are you
13   looking for?
14       A.   I'm looking to make sure that the documents, the
15   standard documents that we have as part of our process are in
16   place, that there is a reason for the termination, that we have
17   done a fact-finding, given the employee an opportunity to
18   respond to any concerns or issues and that a decision has been
19   made by the business leaders, and that business leaders and HR
20   are aligned on that decision.
21       Q.   You mentioned that you are reviewing for standard
22   documents; what do you mean by that?
23       A.   There's usually a summary that we require that gives
24   an overview of the reason why the employee is being terminated,
25   basic information who the employee is, the amount of time that
0018
 1   they've been with the company, the location for which they're
 2   working in their department, a statement from the employee, any
 3   investigative notes that may be part of the process.
 4       Q.   And you mentioned that you also look at the reason
 5   for the termination, and what are you reviewing with respect to
 6   that, what are you trying to decide with respect to that?
 7       A.   I'm just looking to make sure that there is a reason
 8   there and that that reason is supported by the documentation
 9   that we have put together.
10       Q.   So you're analyzing the documents to determine if the
11   reason for the termination is supported by the documents?
12       A.   I'm not sure what you mean by analyzing.
13       Q.   Or reviewing.  What do you understand analyzing to
14   mean?
15       A.   That I am going through the documents at a very in-
16   depth level to evaluate and make a decision.
17       Q.   You mentioned that you are looking to make sure that
18   the reason is supported by the documents; so what does that
```

7

```
19  entail?
20       A.   I'm looking to make sure that we've stated clearly
21  why the person is being terminated and that we have
22  documentation in the file that supports that.
23       Q.   And why do you do that?
24       A.   To ensure that we have completed our process
25  thoroughly.
0019
 1       Q.   And why is that important?
 2       A.   We want to ensure that we are doing the right thing
 3  for our employees.  We take employment decisions very seriously
 4  with someone's employment.
 5       Q.   And what is "doing the right thing," what does that
 6  mean?
 7       A.   That we are following our process.
```

As another example, during the Deposition, Ms. Blackmon testified (as this is relevant because it was testified during the deposition that Ms. Blackmon delegated her authority for Ms. Stevenson case):

```
Q.   Why does Delta have you review termination decisions?
14       A.   Just part of our standard process.
15       Q.   And why is that?
16       A.   Another level of check and balance to ensure the
17  process has been completed.
18       Q.   Would you ever sign a document that you have not
19  personally considered the underlying facts?
20       A.   No.  I would not, but there are times when I would
21  give my authority to someone to do that review on my behalf and
22  sign.
23       Q.   And you wouldn't give them your permission, if you
24  will, to do that unless you felt that they did what you would
25  in fact do; is that correct?
0031
 1       A.   I would give them my authority to do what I do, yes.
 2       Q.   And by them -- and you're saying they would sign your
 3  name; is that what you're saying?
 4       A.   Yes.
 5       Q.   And by that person signing your name, you're
 6  confident that they have done or that that signature reflects
 7  your standard of signing, if you will?
 8       A.   Yes.  Anyone that I would give authority to, to do
 9  that, if they had any concerns about that those would either be
10  raised to me before that was done or either they would raise to
11  someone who was acting on my behalf if I were not available or
12  present to do so.
```

8

As yet another example, during the Deposition, Ms. Blackmon testified:

```
17       Q.   So from what I understand your testimony -- prior to
18  informing an employee of the termination decision, the people
19  that report to you, you review those recommendations and my
20  question is, have you ever not agreed with a termination
21  recommendation?
22       A.   I'm sure that that has occurred at some point; I just
23  don't recall the specific situation.
24       Q.   But it does happen and the process is designed so
25  that that could happen?
0032
 1       A.   It's certainly possible.
 2       Q.   And under what circumstances may that be?
 3       A.   Maybe there is something that I see that I call into
 4  question or I have a question about something that is either in
 5  the fact-finding summary or if I see any sort of inconsistency
 6  then I would inquire.
 7       Q.   I think that leads to my next question.  If you did
 8  not agree with a termination could the employee be terminated?
 9       A.   In those situations typically we would have a
10  conversation and gain alignment so it would be that we would
11  talk through whatever the question was and resolve that.
12  Certainly possible, someone may not be terminated, but
13  oftentimes by the time we get to that step that kind of
14  information has already been resolved.
15       Q.   Has there ever been an instance where a
16  recommendation has been made and once you've reviewed it --
17       A.   Uh-huh.
18       Q.   -- have you had the people that made the
19  recommendation change their mind or --
20       A.   I don't recall a situation like that.
21       Q.   Uh-huh.  But it's designed to happen, I mean, it
22  could happen?
23       A.   It's possible, I just don't recall.
24       Q.   Right.  There is no restrictions in Delta's
25  guidelines that would prevent that from happening; correct?
0033
 1       A.   A decision being reversed?
 2       Q.   Right.  By you?
 3       A.   That is possible.
```

The above excerpts of Ms. Blackmon's deposition are attached hereto.

The Magistrate's Order dated October 10, 2019, merely provides, "Having

read the deposition of Lisa Blackmon in its entirety, Plaintiff's Motion to Compel,

and Defendant's response in opposition, Plaintiff's Motion to Compel is hereby DENIED". Respectfully, the Magistrate provides no reasoning for her decision. However, this is holding is contrary to the law. See e.g., Godwin v. Wellstar Health Sys., Inc.; 615 Fed. Appx. 518, No. 14-11637, (11th Cir. 2015) (unpublished); see also, Staub v. Proctor Hospital, 562 U.S. 411 (2011). There are numerous relevant factual issues regarding Ms. Blackmon and information and documents related to individuals investigated for business travel or loss of control violations of Delta's travel pass policy during 2013-15 who were within areas overseen by Lisa Blackmon also are relevant. Plaintiff is entitled to these documents.

For the reasons set forth above, Plaintiff respectfully moves the Court to order Defendant to produce all the underlying documents for the individuals identified in the spreadsheet and the relevant Blackmon documents. Plaintiff further respectfully moves the Court to extend the discovery period to resolve these outstanding matters. Finally, Plaintiff respectfully moves this Court to withdraw the summary judgment pleadings until these discovery issues are addressed or allow Plaintiff to submit a supplemental responsive document after the District Court's ruling since the outstanding motion to compel had not been decided when Plaintiff's responsive pleading was due. See e.g., See, e.g, Smith v. Fla. Dep't of

Corr., 713 F.3d 1059, 1064 (11th Cir. 2013) ("Summary judgment is premature

when a party is not provided a reasonable opportunity to discover information

essential to his opposition."); See also, Snook v. Trust Co. of Ga. Bank of

Savannah, 859 F.2d 865 (11th Cir. 1988).

Respectfully submitted this 24th day of October, 2019.

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax: 770-325-2741

*Attorney for Plaintiff*

**Counsel certifies that the brief has been prepared with one of the font and point selections
approved by the court in LR 5.1C. Counsel further certifies that counsel attempted to meet and
confer with Defendant's counsel prior to serving this motion.

I certify that I have served **PLAINTIFF QUANIAH R. STEVENSON'S'S

OBJECTION TO MAGISTRATE'S ORDER ENTERED OCTOBER 10,

2019 DENYING PLAINTIFF'S MOTION TO COMPEL AND MOTION TO

EXTEND DISCOVERY AND MOTION TO MODIFY THE ORDER** via the

Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: October 24, 2019          By: /s/ Charlena Thorpe
                                           Charlena Thorpe



**DELTA**

Internal Memorandum

Date:  July 20, 2015

To:         Barbara Franz, Senior Manager – Human Resources, ACS

From:      Kiha Jones, Manager – Human Resources, ACS

Subject:   Recommendation for Termination of Employment

Employee:               Quaniah Stevenson #689688, CSA, ATL/125

Date of Employment:     08/01/2007 (7 years and 11 months)

Current Status:          Suspended – 07/10/2015

Previous Disciplinary Action:
None

Summary:

As a part of the ongoing PPG audits the travel of Agent, Quaniah Stevenson companion and
buddy pass riders were reviewed. During the investigation it was determined that Ms.
Stevenson lost control of her pass benefits. Social media substantiated that Ms. Stevenson's
companion and a buddy rider travelled for business using non-revenue privileges.

Due to Ms. Stevenson's violation of pass travel benefits, Airport Customer Service (ACS)
recommends termination of her employment.

Recommendation:

I agree with ACS, Ms. Stevenson should be asked to resign.  If she refuses, her employment
should be terminated.

Agreement:

_____                    7/20/15
Senior Manager – Human Resources, ACS              Date

_____                    7-27-15
Director – Human Resources, ACS                    Date

Stevenson/Delta_000402

Lisa Blackmon

Page 17

1  opinion?
2     A. Uh-huh. Yes.
3     Q. All right. Let's turn to those disciplinary actions
4  resulting in termination. What is your role in those
5  disciplinary actions?
6     A. My role in terminations is very limited. I -- prior
7  to an employee being notified of the decision I do a final
8  review to ensure the process has been followed.
9     Q. And what do you review?
10    A. I review the information that has been put together
11 for the decision to be made.
12    Q. And when you review the information what are you
13 looking for?
14    A. I'm looking to make sure that the documents, the
15 standard documents that we have as part of our process are in
16 place, that there is a reason for the termination, that we have
17 done a fact-finding, given the employee an opportunity to
18 respond to any concerns or issues and that a decision has been
19 made by the business leaders, and that business leaders and HR
20 are aligned on that decision.
21    Q. You mentioned that you are reviewing for standard
22 documents; what do you mean by that?
23    A. There's usually a summary that we require that gives
24 an overview of the reason why the employee is being terminated,
25 basic information who the employee is, the amount of time that

Page 18

1  they've been with the company, the location for which they're
2  working in their department, a statement from the employee, any
3  investigative notes that may be part of the process.
4     Q. And you mentioned that you also look at the reason
5  for the termination, and what are you reviewing with respect to
6  that, what are you trying to decide with respect to that?
7     A. I'm just looking to make sure that there is a reason
8  there and that that reason is supported by the documentation
9  that we have put together.
10    Q. So you're analyzing the documents to determine if the
11 reason for the termination is supported by the documents?
12    A. I'm not sure what you mean by analyzing.
13    Q. Or reviewing. What do you understand analyzing to
14 mean?
15    A. That I am going through the documents at a very in-
16 depth level to evaluate and make a decision.
17    Q. You mentioned that you are looking to make sure that
18 the reason is supported by the documents; so what does that
19 entail?
20    A. I'm looking to make sure that we've stated clearly
21 why the person is being terminated and that we have
22 documentation in the file that supports that.
23    Q. And why do you do that?
24    A. To ensure that we have completed our process
25 thoroughly.

Page 19

1     Q. And why is that important?
2     A. We want to ensure that we are doing the right thing
3  for our employees. We take employment decisions very seriously
4  with someone's employment.
5     Q. And what is "doing the right thing," what does that
6  mean?
7     A. That we are following our process.
8     Q. And what is your process with relation to termination
9  -- strike that. What other specific processes that you're making
10 sure in place when you are doing the things that you said
11 you're doing?
12    A. The process would mean we want to ensure what issue
13 or concern that we're dealing with that I think we start there
14 and then we make sure that our employee has an opportunity to
15 respond to that. That there has been a fact-finding done to
16 understand what, what has happened, why it's happened. So
17 that's what I mean when I'm talking about process.
18    Q. Uh-huh.
19    A. And then had the individuals who are responsible for
20 making those decisions to review that information and come to a
21 decision.
22    Q. Uh-huh. Is there any other reason you do those
23 things that you mentioned? You mentioned that you do it to
24 make sure you're following your process, to make sure you're
25 doing the right thing and that the process is done thoroughly;

Page 20

1  is there any other reasons you do it?
2     A. No.
3     Q. Do you do it because you want to ensure that
4  employees are punished similarly for similar offenses?
5     A. Can you repeat the question.
6     Q. Do you do the review that you mentioned to ensure
7  that employees are punished similarly for similar offenses?
8     A. I think our process is to, is designed to ensure that
9  we evaluate every individual situation as such, meaning all the
10 circumstances for that specific situation, specific to that
11 individual. So I think that's really what we're trying to do.
12    Q. Uh-huh. Do you have, you mentioned during your
13 duties, one of the things you do is making sure plans are in
14 place and strategies, etc., does that entail ensuring that
15 similar infractions, if you will, by employees are treated
16 similarly?
17    A. That was not what I was referring to whenever I was
18 talking about my strategy responsibilities.
19    Q. Uh-huh.
20    A. Those are very different.
21    Q. Uh-huh.
22    A. That's making decisions around how we're driving the
23 business relative to people on a large scale. With termination
24 decisions those are very individual and we want to ensure that
25 we are looking at those as such, meaning considering all the

Lisa Blackmon

Page 29

1 one person making the decision. There are multiple individuals
2 in place to review and weigh in on that decision.
3     MS. THORPE:   Objection, nonresponsive. Could you
4 read --
5     MR. STONE:    It was not nonresponsive.
6     MS. THORPE:   -- the question again. Yes, it was.
7 She did not answer my question.
8     MR. STONE:    I strongly disagree with that
9 statement.
10     MR. THORPE:   Can you read the question again?
11         (Record read.)
12 BY MS. THORPE:
13     Q.   That's a yes-or-no question.
14     A.   Yes.
15     Q.   Yes, there is something you can do or yes, there
16 isn't something you could do?
17     A.   Yes, there is something that I could do.
18     Q.   Okay. And what's that?
19     A.   Ensuring that whenever I review the files that I am
20 reviewing them without any additional information that would --
21 or any knowledge of those specific demographic information,
22 age, sex, race, those sorts of things, and also ensuring that
23 individuals below me on the team -- We have had multiple folks
24 to review that information as well so it is not one person
25 making a decision solely.

Page 30

1     Q.   Uh-huh. Thank you.
2     A.   You're welcome.
3     Q.   So are you saying that in all the documents that you
4 reviewed there is no reference to anyone's age or sex or
5 gender or nationality or disability status?
6     A.   I don't have access to that information in my review.
7     Q.   So listen to the question carefully and answer that
8 for me.
9     MS. THORPE:   Could you repeat the question for me?
10         (Record read.)
11     THE WITNESS:   Yes.
12 BY MS. THORPE:
13     Q.   Why does Delta have you review termination decisions?
14     A.   Just part of our standard process.
15     Q.   And why is that?
16     A.   Another level of check and balance to ensure the
17 process has been completed.
18     Q.   Would you ever sign a document that you have not
19 personally considered the underlying facts?
20     A.   No. I would not, but there are times when I would
21 give my authority to someone to do that review on my behalf and
22 sign.
23     Q.   And you wouldn't give them your permission, if you
24 will, to do that unless you felt that they did what you would
25 in fact do; is that correct?

Page 31

1     A.   I would give them my authority to do what I do, yes
2     Q.   And by them -- and you're saying they would sign your
3 name; is that what you're saying?
4     A.   Yes
5     Q.   And by that person signing your name, you're
6 confident that they have done or that that signature reflects
7 your standard of signing, if you will?
8     A.   Yes  Anyone that I would give authority to, to do
9 that, if they had any concerns about that those would either be
10 raised to me before that was done or either they would raise to
11 someone who was acting on my behalf if I were not available or
12 present to do so
13     Q.   Uh-huh. Has a termination of an employee ever been
14 recommended and you have not agreed to that recommendation?
15     A.   At the final, at the final step in the process; is
16 that what you're asking?  I'm sorry
17     Q.   So from what I understand your testimony -- prior to
18 informing an employee of the termination decision, the people
19 that report to you, you review those recommendations and my
20 question is, have you ever not agreed with a termination
21 recommendation?
22     A.   I'm sure that that has occurred at some point; I just
23 don't recall the specific situation
24     Q.   But it does happen and the process is designed so
25 that that could happen?

Page 32

1     A.   It's certainly possible.
2     Q.   And under what circumstances may that be?
3     A.   Maybe there is something that I see that I call into
4 question or I have a question about something that is either in
5 the fact-finding summary or if I see any sort of inconsistency
6 then I would inquire.
7     Q.   I think that leads to my next question. If you did
8 not agree with a termination could the employee be terminated?
9     A.   In those situations typically we would have a
10 conversation and gain alignment so it would be that we would
11 talk through whatever the question was and resolve that.
12 Certainly possible, someone may not be terminated, but
13 oftentimes by the time we get to that step that kind of
14 information has already been resolved.
15     Q.   Has there ever been an instance where a
16 recommendation has been made and once you've reviewed it --
17     A.   Uh-huh.
18     Q.   -- have you had the people that made the
19 recommendation change their mind or --
20     A.   I don't recall a situation like that.
21     Q.   Uh-huh. But it's designed to happen, I mean, it
22 could happen?
23     A.   It's possible, I just don't recall.
24     Q.   Right. There is no restrictions in Delta's
25 guidelines that would prevent that from happening; correct?

Lisa Blackmon

Page 33

1  A.  A decision being reversed?
2  Q.  **Right.  By you?**
3  A.  That is possible.
4  Q.  **I mean, you have that authority; correct?**
5  A.  I have the authority to ask the question and go back
6  and have conversations around any sort of concern.  The leaders
7  in the business make the decisions around employment.  HR
8  consults and --
9  Q.  **Uh-huh.**
10  A.  -- certainly agrees to that but we do so collectively
11  --
12  Q.  **Uh-huh.**
13  A.  -- but the full ownership of the decision lies with
14  the business leaders.
15  Q.  **Uh-huh.  If you feel that the decision does not**
16  **comport with Delta's guideline,; what happens?**
17  A.  We have conversation about that with the appropriate
18  parties.
19  Q.  **And why is that?**
20  A.  Because we need to have agreement on, on why we're
21  seeing it differently.
22  Q.  **Uh-huh.  Right.  And what if they're still in**
23  **disagreement; then what happens?**
24  A.  Then we would take that to our next level in our
25  leadership chain to work through that and resolve that.

Page 34

1  Q.  **So if you disagreed, if you will, with the**
2  **recommendation and you couldn't get agreement, then it would be**
3  **taken to a higher level; is that correct?**
4  A.  I would talk with the business, a higher level
5  business leader
6  Q.  **And why is that?**
7  A.  Because we would be working together to get
8  resolution and we work collectively as a group and so that
9  would be the next step in the process  If we have gotten the
10  leaders who had the firsthand knowledge and experience, if they
11  were taking one position and there was a concern about
12  something and that couldn't be resolved, we would go to the
13  next in line in their chain
14  Q.  **You said their chain, in your chain or their**
15  **chain?**
16  A.  Theirs
17  Q.  **And so I don't think that answers my question.  If**
18  **you -- the decision -- if you could make a -- have an agreement**
19  **with the person that made the recommendation because it was not**
20  **consistent with Delta's policy, for example, where do you go?**
21  A.  To their next level leader
22  Q.  **Uh-huh.  And where would you go after that, if there**
23  **were still no agreement?**
24  A.  I've never had that happen
25  Q.  **Uh-huh.  Typically you all come to an agreement.**

Page 35

1  A.  Yes.
2  Q.  **But you all, the process doesn't stop until you all**
3  **have come to an agreement --**
4  A.  Yes.
5  Q.  **-- I assume?**
6  A.  Yes.
7  Q.  **Okay.  Okay.  So we've talked generally about your**
8  **role in termination, let's talk about your role in termination**
9  **in this particular case.  As you recall, as you did mention**
10  **you're sitting here today because your name appeared on a**
11  **document related to the plaintiff in this case.  What role did**
12  **you play with respect to Ms. Stevenson's, the plaintiff in this**
13  **case, termination?**
14  A.  May I see the document in order to answer the
15  question?
16  Q.  **Sure.  You did mention that you reviewed the**
17  **document; correct?**
18  A.  Prior to today?
19  Q.  **Uh-huh.  In preparation for the deposition.**
20  A.  Yes.
21  Q.  **Uh-huh.  And before viewing the document, is there --**
22  **could you answer the question?**
23  A.  Sorry, can you repeat the question?
24  Q.  **Before reviewing this document, can you answer that**
25  **question?**

Page 36

1  A.  Can you repeat that question?
2  Q.  **Uh-huh.  I can.**
3  A.  Thank you.
4  MS. THORPE:   Can you repeat the question, please?
5  (Record read.)
6  MS. THORPE:   Thank you.
7  THE WITNESS:   So in the document that I reviewed in
8  preparation for this deposition, that was not my signature
9  on the termination letter and that was signed by someone
10  who had my authority to do so.  So when -- in this
11  particular case I did not review that termination.
12  BY MS. THORPE:
13  Q.  **But you had someone under your authority to review**
14  **it?**
15  A.  Yes.
16  Q.  **And who was that person?**
17  A.  Nicole Elkins.
18  Q.  **Can you spell that?**
19  A.  The first or the last name?
20  Q.  **The last.**
21  A.  E-L-K-I-N-S.
22  Q.  **Did you confer with Nicole about the case?**
23  A.  I don't recall.
24  Q.  **What do you understand that Nicole did in reviewing**
25  **this recommendation?**

# Dkt/Tab 67

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

QUANIAH R. STEVENSON,                    :
                                         :
    Plaintiff,                           :
                                         :        CIVIL ACTION NO.
    v.                                   :        1:16-cv-2571-AT-LTW
                                         :
DELTA AIR LINES, INC.,                   :
                                         :
    Defendant.                           :
                                         :

## ORDER

Plaintiff's Objections to the Magistrate Judge's Order denying Plaintiff's Second Motion to Compel Documents and related Motion for Extension to Complete Discovery are currently before the Court.  (*See*, Doc. 56 (Plaintiff's underlying motion), the Magistrate Judge's two Text Orders of October 10, 2019, that summarily denied Plaintiffs' motions, and Doc. 64, Plaintiff's Objections.) The Court has reviewed the record and both parties' briefs in connection with the pending Objections and underlying Motions.

Pursuant to Fed. R. Civ. P. 72(a), a Magistrate Judge's discovery rulings constitute a final ruling subject to the Rule's "clear erroneous" or "contrary to law" standard of review.  See generally, *Barron v. EverBank*, 2019 WL 1996697 (N.D.

Ga., March 15, 2019) (Totenberg, J.)  The Court appreciates that the Magistrate Judge in this case has dutifully and patiently steered this case through a variety of discovery challenges.  Plaintiff here, however, properly raises a material objection to the summary ruling denying Plaintiff's motion to require Delta to provide fully responsive information and documents for the roughly 28 white employees Delta identified in a spreadsheet as having been investigated for business travel or loss violations -- and in particular, those who were designated as "cleared" on the spreadsheet.   (See discussion in Plaintiff's brief, Doc. 64 at 4-5.)    Plaintiff represents that the spreadsheet's "infraction description" and "additional description" columns for such employees is blank.  Defendant does not dispute this, though Defendant denies that any documents were withheld and asserts that some of the 28 white employees were actually black.[1] The Court is not prepared to jump into the factual details of whether each and every document required was provided or described. However, Plaintiff correctly notes that the parties had by Consent Order (Doc. 52) agreed "to meet and confer regarding the production of any Pass Protection Group investigative memos and disciplinary documents on that such individuals."  There is no indication from the filings that any conference

---

[1]  Plaintiff also moves to compel Defendant to produce all documents related to the disciplinary actions taken for an individual identified in Delta/Stevenson_002587-2602 or to provide a witness to testify regarding the disciplinary actions taken.

concerning this discovery matter yielded a resolution. Nor does the Court have before it verifiable information that Defendant provided all of the requisite information for the 28 potential comparator white employees – i.e., how or why they were cleared or the factual basis upon which they were cleared or provided a less severe sanction.

The most crucial disparate treatment evidence in a retaliation or disparate treatment employment discrimination case may come from review of evidence of an employer's clearing or taking minimal disciplinary action against other employees for similar conduct. This evidence, in turn, would be essential to Plaintiff's response to Defendant's Motion for Summary Judgment. Additionally, documents or information concerning the investigation of these employees' conduct would have permitted Plaintiff to clarify Delta's handling of Plaintiff's termination as compared to other employees.

Under the circumstances presented, the Court must find clear error in the Magistrate Judge's summary orders of October 10, 2019. Accordingly, the Court **SETS ASIDE** the October 10, 2019 orders. Plaintiff's Motion to Compel (Doc. 56) the production of information and documentation concerning the 28 employees and all documents related to the disciplinary actions taken for an individual identified in Delta/Stevenson_002587-2602 is **GRANTED**. If Plaintiff requests an

additional deposition concerning this and related documentation and personnel matters and practices, she may do so, subject to this additional limitation: Plaintiff's counsel must elect to either depose Ms. Blackmon (not to exceed 90 minutes) or alternatively, may elect to depose Delta Manager Kiha Jones and/or Senior Manager Barbara Franz (depositions of Jones and Franz collectively not to exceed 4 hours in total). Finally, as the Court has granted additional discovery, it **GRANTS** Plaintiff's motion for an extension of time for completion of this discovery (Doc. 56) and **DENIES AS PREMATURE** Defendant's Motion for Summary Judgment (Doc. 58). Accordingly, discovery is **EXTENDED** for a period of 35 days (re-commencing January 9, 2020) or such additional time beyond 35 days as determined reasonable (but still limited) by the Magistrate Judge based on her consultation with the parties' counsel. The scope of discovery shall be limited to the discovery and comparator issues discussed in this Order. In short, this Order requires Delta's good faith provision of information consistent with the terms of this Order but should not be viewed by Plaintiff as an invitation to vastly expand discovery. Defendant may re-submit a Motion for Summary Judgment within 20 days of the conclusion of the extended discovery period.

The Court **REFERS** this matter back to the Magistrate Judge for further proceedings and handling of all other details relating to the implementation of this

Order, case management and discovery issues, and issuance of a report and recommendation on any renewed motion to summary judgment filed.

It is **SO ORDERED** this 8th day of January, 2020.

_____
**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**

# Dkt/Tab 88

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **QUANIAH R. STEVENSON,** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No.** |
| | **1:16-cv-2571-AT-LTW** |
| **DELTA AIR LINES, INC.,** | |
| **Defendant.** | |

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Fed. R. Civ. P. 56 and LR 56 (N.D. Ga.), Defendant Delta Air Lines, Inc. ("Delta") respectfully moves for Summary Judgment with respect to all Counts of Plaintiff's Complaint.  In support of its Motion, Delta respectfully submits herewith Defendant's Statement of Undisputed Material Facts and Defendant's Brief in Support of its Motion for Summary Judgment (along with attached exhibits).

For the reasons set forth in the accompanying Brief, Delta respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's Complaint.

Respectfully Submitted,

s/ Benjamin A. Stone
Georgia Bar No. 683850

MUNGER & STONE LLP
999 Peachtree Street, NE
Suite 2850
Atlanta, GA 30309
Tel:  (404) 815-1884
Fax: (404) 815-4687
ben.stone@mungerandstone.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **QUANIAH R. STEVENSON,** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No.** |
| | **1:16-cv-2571-AT-LTW** |
| **DELTA AIR LINES, INC.,** | |
| **Defendant.** | |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 7th day of January, 2021 filed the foregoing

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT with the Clerk of

Court using the CM/ECF system which will automatically send e-mail notification

of such filing to Plaintiff's counsel:  Charlena Thorpe.


s/ Benjamin A. Stone
Georgia Bar No. 683850

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**QUANIAH R. STEVENSON,**

      **Plaintiff,**

**vs.**

                                   **Civil Action No.**
                                   **1:16-cv-2571-AT-LTW**

**DELTA AIR LINES, INC.,**

      **Defendant.**

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and LR 56.1 (N.D. Ga.), Defendant Delta Air Lines, Inc. ("Delta") respectfully submits this Statement of Undisputed Facts as to which there is no genuine issue to be tried:

**A.**   **Stevenson's Employment with Delta**

1.     In 2007, Stevenson was hired by Delta as a Ready Reserve (*i.e.*, part-time) Customer Service Agent at Delta.  (Deposition of Quaniah Stevenson ("Stevenson Dep."), p. 67)

2.     Stevenson worked at Delta's ticket counter, at Delta's gates, and in the "arrivals area," at the Atlanta Hartsfield-Jackson International Airport. (Stevenson Dep., p. 102)

3.     Stevenson was counseled and disciplined for her attendance and job performance during her employment.  (Stevenson Dep., pp. 108-16 and Exhs. 9-11)

**B.     Delta's Travel Pass Policies**

4.     As a valuable privilege of Delta employment, Delta provides its employees and certain of their family members and a designated travel companion with free and reduced-rate travel (also known as "Travel Passes").  (Stevenson Dep., pp. 99-100; Declaration of Kelly Nabors ("Nabors Dec."), ¶ 2)

5.     Delta also provides its employees with an additional pass travel benefit known as "buddy passes" -- which allows an employee to provide reduced-rate transportation to friends or family members who are not their designated travel companion.  (Nabors Dec., ¶ 3)

6.     Delta has written policies regarding its pass travel benefits, and periodically issues reminders to employees of the importance of complying with the policies regarding pass travel.  (Stevenson Dep., p. 99 and Exh. 8; Nabors Dec., ¶ 4)

7.     Among other things, Delta expressly prohibits the use of travel passes for anything other than leisure travel -- and specifically forbids their use for business travel.  (Stevenson Dep., pp. 100-01 and Exh. 8, p. 1 and Exh. 13, p. 1)

8.     Business travel is an important source of revenue for Delta and for that reason Delta does not allow business travelers to utilize Delta passes and requires business travelers to buy a ticket on Delta.  (Nabors Dec., ¶ 5)

9.     The prohibition on the use of travel passes for business travel is a well-known rule at Delta and was well-known to Stevenson.  (Id.; Stevenson Dep., p. 101)

10.     Delta's Travel Policy states:

Any employee or pass rider who uses their pass travel privileges for personal business or other purposes not specifically permitted in this document…. or who violates any other provision of this document, will subject the responsible employee and the pass rider to disciplinary action, up to and including suspension of pass travel privileges and termination of employment.

(Stevenson Dep., Exh. 8, p. 1)

11.     Delta's written policies reiterate that business travel is expressly prohibited. (Stevenson Dep., Exh. 8, p. 2 (stating that travel for business activity is "prohibited")).

12.     Delta also requires that its employees keep "control" of their passes and the passes of their designated companions -- including by ensuring that the employee is aware of the travel being undertaken by their designated companion and that the pass travel is not for business or any other improper purposes. (Nabors Dec., ¶ 6)

3

13.     Stevenson was aware that Delta employees are responsible for overseeing and maintaining control of the use of their travel passes and ensuring that their non-employee travel companions comply with these Delta policies relating to travel passes.  (Stevenson Dep., p. 101; Nabors Dec., ¶ 6)

**C.**     **Delta's Fly Right Campaign**

14.     In approximately 2014, it came to Delta's attention that some of its employees were misusing their travel passes by, among other things, offering them for sale, using them for business purposes or allowing their designated travel companion to use them for business purposes.  (Nabors Dec., ¶ 7; Stevenson Dep., Exh. 12)

15.     In April 2014, Delta issued a Memo and set of Frequently Asked Questions to its employees that again reminded them of the rules and regulations surrounding the use of pass travel, including that such passes cannot be used for business purposes because such actions "are clear violations of the pass policy" and that employees are "responsible for knowing how [their] pass travel privileges are used" by their designated travel companions.  (Stevenson Dep., p. 101 and Exh. 12)

16.     Delta's April 2014 communication to its employees expressly stated "[d]on't share your passes with anyone who intends to use pass travel for business purposes."  (Stevenson Dep., Exh. 13, p. 1, Q. 3)

17.    Delta's April 2014 communication also expressly reminded employees that pass travel abuse could result in termination of employment. (Stevenson Dep., Exh. 13, p. 1, Q. 4 and p. 2, Q. 10)

18.    Delta's April 2014 communication also informed employees that Delta was beginning an initiative known as the *Fly Right* campaign that was designed to ensure that pass travel abuse is stopped.  (Id.; Nabors Dec., ¶ 8)

19.    Delta established a new group, known as the Pass Protection Group, "to work to proactively identify cases of possible abuse and investigate them thoroughly."  (Id.)

**D.    The Pass Protection Group Review of Stevenson's Travel Pass Records**

20.    Delta's Pass Protection Group utilized a set of objective criteria or parameters to determine which employees would have their travel pass usage reviewed -- focusing on those employees and travel companions who had very high travel pass usage and those employees who shared "buddy passes" with individuals who had received buddy passes from a substantial number (at least 5) Delta employees.  (Nabors Dec., ¶ 9; Deposition of Kelly Nabors ("Nabors Dep."), pp. 159-60, 168)

21.    In 2015, as part of the audit and based on objective criteria, Delta's Pass Protection Group was investigating the pass travel of all employees who had shared "buddy passes" with an individual named Vendell Bailey ("Bailey") who

had received buddy passes from a number of different Delta employees including Stevenson.  (Nabors Dec., ¶ 10 and Exh. C; Stevenson Dep., p. 155)

22.   Because Stevenson was one of the individuals who had provided travel passes to Bailey, Stevenson's travel pass records (like others who had provided passes to Bailey) were fully and carefully reviewed during the investigation.  (Nabors Dec., ¶10)

23.   In the course of the review of Stevenson's travel pass records, the Pass Protection Group identified information that showed that Stevenson's designated travel companion, Jovan Dais ("Dais") was traveling frequently, and to numerous disparate locations, in a way that reflected possible business travel. (Nabors Dec., ¶ 11 and Exh. A)

24.   According to Delta records, Dais traveled frequently both during the week and during the weekends, at various times, often for short duration, to locations that included Los Angeles, Phoenix, New York, Houston, St. Louis, Pittsburgh, Dallas, New Orleans, Washington, D.C., San Francisco, New York, Orlando, Salt Lake City, Burlington, Vt., Cincinnati, Las Vegas and Detroit. (Nabors Dec. ¶ 11 and Exh. A, p. 1; Stevenson Dep., Exh. 17)

25.   Further review of public and on-line records by the Pass Protection Group (including public postings by Dais) reflected that Dais was a producer and artist in the music business, and that on at least one of his trips using Stevenson's

travel passes (a one-night trip to Los Angeles, California on Saturday June 6, 2015), Dais made the trip with a music artist with whom he worked, Caleb Boyett ("Boyett") for the purpose of Boyett engaging in a concert performance. (Nabors Dec., ¶ 12 and Exh. B; Stevenson Dep., pp. 186-87)

26.     Specifically, the records showed that, using Stevenson's travel passes, Dais traveled with Boyett to Los Angeles on June 6, 2015, where Boyett performed in the show that night, and then they flew out the following day. (Nabors Dec., ¶ 12 and Exh. B; Stevenson Dep., Exh. 17)

27.     The on-line records reflecting this consisted of, among other things, a poster reflecting that Boyett (who was known in the business by his artist's name, Jino) was performing at the concert. (Stevenson Dep., p. 187 and Exh. 16, p. 5)

28.     The on-line records also consisted of a Twitter "tweet" by Mr. Boyett (that was re-tweeted by Dais) stating that Mr. Boyett was in Los Angeles on June 6, 2015 (the date that Dais traveled on Plaintiff's travel passes) with Dais and "headed to my show in Bakersfield [California] with [another music artist] @Tyga" (Stevenson Dep., Exh. 16, p. 1)

29.     The on-line records also consisted of pictures of Dais and Mr. Boyett being photographed at the concert. (Stevenson Dep., Exh. 16, p. 10; Nabors Dec., ¶ 12 and Exh. B and Exh. C, p. 3)

30.     Delta records also reflected that Dais and his work-partner, Boyett, had traveled together with Dais using Stevenson's travel pass benefits on at least one other occasion (a trip to Houston, Texas).  (Nabors Dec., ¶ 12)

31.     Delta records further reflected that Dais had paid Boyett's fees associated with Boyett traveling on Delta passes.  (Id.)

### E.     The Interview Of Stevenson And The Termination Decision

32.     Based on the information gathered by a review of documents, the Pass Protection Group decided to interview Stevenson to address the information indicating that her travel benefits were being used by Mr. Dais for his music business.  (Nabors Dec., ¶ 13 and Exh. C, p. 1; Stevenson Dep., pp. 149-50)

33.     Stevenson was interviewed by a team that included member of Delta's Pass Protection Group (Mehret Tafesse), a member of Human Resources (Kiha Jones), and a Performance Leader (Francisco Cortes).  (Nabors Dec., ¶ 13 and Exh. C, p. 1; Stevenson Dep., pp. 149-50)

34.     During her interview, Stevenson was asked a series of questions about the use of her travel passes, including about the use of her passes by Dais.  (Stevenson Dep., p. 160 and Nabors Dep., ¶ 14 and Exh. C)

35.     Stevenson provided information that Delta concluded was not forthcoming and that Delta concluded confirmed the improper use of travel passes.  (Nabors Dec., ¶¶ 14 and 16 and Exh. C)

36.    Stevenson's interview was memorialized in a lengthy and detailed memo written by Delta's Pass Protection Group member Mehret Tafesse, a true and correct copy of which is attached as Exh. C to Nabors Declaration.  (Nabors Dec., ¶ 14 and Exh. C)

37.    As reflected in the Memo written by Tafesse, Stevenson confirmed that Dais was her boyfriend and travel companion, and that he was a music producer.  (Nabors Dec., ¶ 14 and Exh. C, p. 1)

38.    As reflected in the Memo written by Tafesse, even though she stated she made the travel arrangements for Dais on her travel passes, Stevenson stated she was unable to identify a large majority of the locations where he had traveled in the recent past.  (Nabors Dec., ¶ 14 and Exh. C, p. 1)

39.    As reflected in the Memo written by Tafesse, when Stevenson was asked whether she had ever traveled with her companion and boyfriend Dais, she initially stated yes -- that they had traveled together multiple times and that they had recently traveled to a funeral together in Los Angeles -- but then when Stevenson was told Delta's records reflected that Stevenson and Dais had *never* traveled together, she retracted her prior statement and contradicted herself by denying that she had just said that she had traveled with Dais to a funeral. However, she continued to maintain (in contravention of Delta's travel records)

that she and Dais had traveled together in the past (although she did not identify where).  (Nabors Dec., ¶ 14 and Exh. C, p. 2)

40.    When Stevenson was told that public records reflected that Dais and Boyett had traveled together to Los Angeles for the concert performance, Stevenson initially stated she did not know anything about that.  She then acknowledged that at least Boyett (who she referred to as Dais' "friend") was performing in the concert.  (Nabors Dec., ¶ 14 and Exh. C, p. 2)

41.    Tafesse's memo summarizing the interview of Stevenson, along with the other information gathered in connection with the investigation, was reviewed by Delta Airport Customer Service Performance Leader Mark Harris -- who recommended to Station Manager Kelly Patton that Ms. Stevenson's employment be terminated as she was "not forthcoming regarding her current companion and his travel;" as "she could not provide his place of travel;" and as "[r]esearch by [Equal Opportunity] indicates her companion used non-revenue benefits for business purposes."  (Nabors Dec., ¶ 15 and Exh. D)

42.    Station Manager Patton agreed with Performance Leader Harris' recommendation.  (Nabors Dec., ¶ 16)

43.    Thereafter, Delta Senior Manager - Human Resources, Barbara Franz, also reviewed the investigation materials and also concurred with the termination decision.  (Nabors Dec., ¶ 16)

44.     After her employment was terminated, Stevenson appealed her termination and claimed for the first time that Dais had traveled to California on the weekend of June 6, 2015 for a "graduation ceremony" for one of his children. (Stevenson Dep., pp. 231-32, 233 and Exh. 21)

45.     While this explanation was illogical given the 24-hours that Mr. Dais was in California (having flown in on Saturday June 6, attended the concert that evening, and having flown out on Sunday June 7), Delta nonetheless gave Stevenson the opportunity to produce any documents supporting this "graduation" explanation.  (Id.)

46.     Stevenson could produce no document supporting any such graduation to Delta.  (Stevenson Dep., p. 235) Ms. Stevenson was not the only individual terminated for misuse of travel benefits.

47.     Since the formation of the Pass Protection Group in 2014, numerous employees (including Caucasian, White, Hispanic and other employees, both male and female employees, and numerous individuals under the age of 40) have been terminated.  This includes individuals who have made no allegation of discrimination, and no allegation that they suffer from any disability.   (Nabors Dec., ¶ 17)

**F.**     **Facts Related to Stevenson's 2014 Work Injury And Her Full Release to Return to Work**

48.     In 2014, Stevenson injured her shoulder, neck and back when a luggage bag fell on her.  (Stevenson Dep., pp. 25, 207, 213-14)

49.     Stevenson was released to full duty work without any restrictions in October 2014 and was never again restricted from performing any of her work assignments at Delta.  (Stevenson Dep., p. 222-24)

50.     Other than seeking time-off after her 2014 injury that was granted, Stevenson never asked for any accommodation relating to her work-related injury.  (Stevenson Dep., pp. 89-94, 222 and Exh. 7)

51.     Plaintiff did, at one time (at the suggestion of her Performance Leader Carol Kerr) seek an adjustment to her shift to address some personal problems that she was having related to her car and an aunt who had recently passed away -- and her request was granted.  (Id.)

52.     Plaintiff made no other accommodation request -- and no request relating to her 2014 work-related injury -- as she had no limitations related to that injury.  (Stevenson Dep., pp. 223-24)

53.     Plaintiff made no complaints about any discriminatory conduct covered by Title VII, the ADA, the ADEA or § 1981.  (Stevenson Dep., pp. 127-45)

Respectfully Submitted,

s/ Benjamin A. Stone
Georgia Bar No. 683850

MUNGER & STONE LLP
999 Peachtree Street, NE
Suite 2850
Atlanta, GA 30309
Tel:  (404) 815-1884
Fax: (404) 815-4687
ben.stone@mungerandstone.com

s/Sheandra R. Clark
Georgia Bar No. 127802

DELTA AIR LINES, INC.
Department 981
1030 Delta Boulevard
Atlanta, GA 30354-1989
Telephone: (404) 715-3613
Facsimile: (404) 715-2233
sheandra.r.clark@delta.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D of the Local Rules for the United States District

Court for the Northern District of Georgia, I hereby certify that the foregoing has

been prepared in Times New Roman, 14-point font, as permitted by Local Rule

5.1B

<u>s/ Benjamin A. Stone</u>
Georgia Bar No. 683850

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **QUANIAH R. STEVENSON,** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No.** |
| | **1:16-cv-2571-AT-LTW** |
| **DELTA AIR LINES, INC.,** | |
| **Defendant.** | |

## CERTIFICATE OF SERVICE

This is to certify that I have this  7th day of January, 2021 filed the foregoing DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to Plaintiff's counsel:  Charlena Thorpe.


s/ Benjamin A. Stone
Georgia Bar No. 683850

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **QUANIAH R. STEVENSON,** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No. 1:16-cv-2571-AT-LTW** |
| **DELTA AIR LINES, INC.,** | |
| **Defendant.** | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Quaniah Stevenson ("Plaintiff" or "Stevenson") is a former Customer Service Agent at Delta Air Lines, Inc. ("Delta" or "Defendant"). In this lawsuit, she contends that Delta terminated her employment in 2015 because of her race, sex, age and alleged disability in violation of Title VII, the ADEA and the ADA. Her claim is properly subject to summary judgment.

Delta provides free and reduced-rate travel privileges to its employees as a valuable privilege of Delta employment. In addition to the employee and certain eligible family members, each employee can designate up to one travel companion who then also has free Delta travel utilizing the employee's pass privileges.

Among other things, Delta's written policies regarding pass travel state that an employee and his or her designated companion shall use passes only for

pleasure travel and absolutely shall not use passes for any business purposes.  An employee and his or her designated companion traveling for any business purposes must buy a ticket to travel on Delta.

Delta also requires that each employee keep "control" of his or her passes and the passes of their designated companion -- including by ensuring that the employee is aware of all travel in which a designated companion is using the employee's pass privileges and ensuring that the pass is not being used for business travel or any other improper purposes.  Delta's written policies state that misuse of travel passes (including any use of such passes for business travel) subjects an employee to discipline up to termination at Delta.

Stevenson admits that she aware of these rules.  Her employment was terminated after Delta found that she had not kept control of her passes; that her designated companion (who was a producer in the music business) had used his companion passes for business travel in direct violation of the rules; and that Stevenson had not been truthful to Delta about it during its investigation of these events.  Stevenson has no evidence that Delta's decision was because of her race, sex, gender and/or alleged disability, and her claims fail as a matter of law.  Accordingly, Delta respectfully requests that the Court grant summary judgment in this case.

## STATEMENT OF UNDISPUTED FACTS

**A.**   **Stevenson's Employment with Delta**

In 2007, Stevenson was hired by Delta as a Ready Reserve (*i.e.*, part-time) Customer Service Agent at Delta.  (Deposition of Quaniah Stevenson ("Stevenson Dep."), p. 67)  She worked at Delta's ticket counter, at Delta's gates, and in the "arrivals area," at the Atlanta Hartsfield-Jackson International Airport.  (Stevenson Dep., p. 102)[1]

**B.**   **Delta's Travel Pass Policies**

As a valuable privilege of Delta employment, Delta provides its employees and certain of their family members and a designated travel companion with free and reduced-rate travel (also known as "Travel Passes").  (Stevenson Dep., pp. 99-100; Declaration of Kelly Nabors ("Nabors Dec."), ¶ 2)  Delta also provides its employees with an additional pass travel benefit known as "buddy passes" -- which allows an employee to provide reduced-rate transportation to friends or family members who are not their designated travel companion.  (Nabors Dec., ¶ 3)

Delta has written policies regarding its pass travel benefits, and periodically issues reminders to employees of the importance of complying with the policies regarding pass travel.  (Stevenson Dep., p. 99 and Exh. 8; Nabors Dec., ¶ 4)

---

[1] While Plaintiff alleges in her Complaint that she was a highly performing employee, the undisputed facts show that she was repeatedly counseled and disciplined for her attendance and job performance during her employment. (Stevenson Dep., pp. 108-16 and Exhs. 9-11)

Among other things, Delta expressly prohibits the use of travel passes for anything other than leisure travel -- and specifically forbids their use for business travel. (Stevenson Dep., pp. 100-01 and Exh. 8, p. 1 and Exh. 13, p. 1)   Business travel is an important source of revenue for Delta, and for that reason Delta does not allow business travelers to utilize Delta passes. (Nabors Dec., ¶ 5)   Business travelers must buy a ticket on Delta.  (Id.)

This is a well-known rule at Delta and was admittedly well-known to Stevenson.  (Id.; Stevenson Dep., p. 101)  Among other things, on the very first page of Delta's Pass Travel Policy, it states in bold print:

> Any employee or pass rider who uses their pass travel privileges for personal business or other purposes not specifically permitted in this document…. or who violates any other provision of this document, will subject the responsible employee and the pass rider to disciplinary action, up to and including suspension of pass travel privileges and termination of employment.

(Stevenson Dep., Exh. 8, p. 1)  The written policies reiterate that business travel is expressly prohibited. (Stevenson Dep., Exh. 8, p. 2 (stating that travel for business activity is "prohibited")).

Delta also requires that its employees keep "control" of their passes and the passes of their designated companions -- including by ensuring that the employee is aware of the travel being undertaken by their designated companion and that the pass travel is not for business or any other improper purposes.  (Nabors Dec., ¶ 6)  Stevenson testified that she was fully aware that Delta employees are responsible

for overseeing and maintaining control of the use of their travel passes and ensuring that their non-employee travel companions comply with these Delta policies relating to travel passes.  (Stevenson Dep., p. 101; Nabors Dec., ¶ 6)

## C.   Delta's Fly Right Campaign

In approximately 2014, it came to Delta's attention that some of its employees were misusing their travel passes by, among other things, offering them for sale, using them for business purposes or allowing their designated travel companion to use them for business purposes.  (Nabors Dec., ¶ 7; Stevenson Dep., Exh. 12)  Accordingly, in April 2014, Delta issued a Memo and set of Frequently Asked Questions to all of its employees worldwide that again reminded them of the rules and regulations surrounding the use of pass travel, including that such passes cannot be used for business purposes because such actions "are clear violations of the pass policy" and that employees are "responsible for knowing how [their] pass travel privileges are used" by their designated travel companions.  (Stevenson Dep., p. 101 and Exh. 12)

Delta's April 2014 communication to all employees expressly stated "[d]on't share your passes with anyone who intends to use pass travel for business purposes."  (Stevenson Dep., Exh. 13, p. 1, Q. 3)  It also expressly reminded employees that pass travel abuse could result in termination of employment. (Stevenson Dep., Exh. 13, p. 1, Q. 4 and p. 2, Q. 10)

Delta's April 2014 memo also informed employees that Delta was beginning an initiative known as the *Fly Right* campaign that was designed to ensure that pass travel abuse is stopped.  (Id.; Nabors Dec., ¶ 8)  Delta established a new group, known as the Pass Protection Group, "to work to proactively identify cases of possible abuse and investigate them thoroughly."  (Id.)

## D.   **The Pass Protection Group Review of Stevenson's Travel Pass Records**

Delta's Pass Protection Group utilized a set of objective criteria or "parameters" to determine which employees would have their travel pass usage reviewed -- focusing on those employees and travel companions who had very high travel pass usage and those employees who shared "buddy passes" with individuals who had received buddy passes from a substantial number (at least 5) Delta employees.  (Deposition of Kelly Nabors ("Nabors Dep.,") [on file at Dkt. No. 62], pp. 159-60, 168)

In 2015, as part of the audit and based on objective criteria, Delta's Pass Protection Group was investigating the pass travel of all employees who had shared "buddy passes" with an individual named Vendell Bailey ("Bailey"). (Nabors Dec., ¶ 10 and Exh. C; Stevenson Dep., p. 155)  Bailey had received buddy passes from a number of different Delta employees including Stevenson. (Id.)

Because Stevenson was one of the individuals who had provided travel passes to Bailey, Stevenson's travel pass records (like others who had provided passes to Bailey) were fully and carefully reviewed during the investigation. (Nabors Dec., ¶ 10)  In the course of that review, the Pass Protection Group identified information that showed that Stevenson's designated travel companion, Jovan Dais ("Dais") was traveling frequently, and to numerous disparate locations, in a way that reflected possible business travel.  (Nabors Dec., ¶ 11 and Exh. A) Dais traveled frequently both during the week and during the weekends, at various times and to various locations, often for short duration (frequently 1 or 2 days). His travel included Los Angeles, Phoenix, New York, Houston, St. Louis, Pittsburgh, Dallas, New Orleans, Washington, D.C., San Francisco, New York, Orlando, Salt Lake City, Burlington, Vt., Cincinnati, Las Vegas and Detroit. (Nabors Dec. ¶ 11 and Exh. A, p. 1; Stevenson Dep., Exh. 17)

Further review of public and on-line records by the Pass Protection Group (including public postings by Dais) reflected that Dais was a producer and artist in the music business, and that on at least one of his trips using Stevenson's travel passes (a one-night trip to Los Angeles, California on June 6, 2015), Dais made the trip with a music artist with whom he worked, Caleb Boyett ("Boyett") for the purpose of Boyett engaging in a concert performance.  (Nabors Dec., ¶ 12 and Exh. B; Stevenson Dep., pp. 186-87)  Specifically, the records showed that, using

7

Stevenson's travel passes, Dais traveled with Boyett to Los Angeles on Saturday June 6, 2015, where Boyett performed in the show that night, and then they flew out the following day.[2]  (Nabors Dec., ¶ 12 and Exh. B; Stevenson Dep., Exh. 17) The records also reflected that Dais and his work-partner, Boyett, had traveled together with Dais using Stevenson's travel pass benefits on at least one other occasion (a trip to Houston, Texas).  (Id.)  The records further reflected that Dais had paid Boyett's fees associated with Boyett traveling on Delta passes.  (Id.)

**E.   The Interview Of Stevenson And The Termination Decision**

Based on the information gathered by a review of documents, the Pass Protection Group decided to interview Stevenson to address the information indicating that her travel benefits were being used by Mr. Dais for his music business.  Stevenson was interviewed by a team that included member of Delta's Pass Protection Group (Mehret Tafesse), a member of Human Resources (Kiha Jones), and a Performance Leader (Francisco Cortes).  (Nabors Dec., ¶ 13 and Exh. C, p. 1; Stevenson Dep., pp. 149-50)

---

[2] The records consisted of, among other things, a poster reflecting that Boyett (who was known in the business by his artist's name, Jino) was performing at the concert.  (Stevenson Dep., p. 187 and Exh. 16, p. 5)  The records also consisted of a Twitter "tweet" by Mr. Boyett (that was re-tweeted by Dais) stating that Mr. Boyett was in Los Angeles on June 6, 2015 (the date that Dais traveled on Plaintiff's travel passes) with Dais and "headed to my show in Bakersfield [California] with [another music artist] @Tyga"  (Stevenson Dep., Exh. 16, p. 1) The records also consisted of pictures of Dais and Mr. Boyett being photographed at the concert.  (Stevenson Dep., Exh. 16, p. 10; Nabors Dec., Exh. C, p. 3)

During her interview, Stevenson was asked a series of questions about the use of her travel passes, including about the use of her passes by Dais.  (Stevenson Dep., p. 160 and Nabors Dep., ¶ 14 and Exh. C)  Stevenson provided information that Delta concluded was not forthcoming and that Delta concluded confirmed the improper use of travel passes.  (Nabors Dec., ¶¶ 14 and 16 and Exhs. C and D)

Stevenson's interview was memorialized in a lengthy and detailed memo written by Delta's Pass Protection Group member Mehret Tafesse.  (Nabors Dec., ¶ 14  and Exh. C)  As reflected in the Memo written by Tafesse, among other things:

- Stevenson confirmed that Dais was her boyfriend and travel companion, and that he was a music producer.  (Nabors Dec., Exh. C, p. 1)

- Despite these facts, and even though she stated she made the travel arrangements for Dais on her travel passes, Stevenson stated she was unable to identify a large majority of the locations where he had traveled in the recent past.  (Nabors Dec., Exh. C, p. 1)

- When Stevenson was asked whether she had ever traveled with her companion and boyfriend Dais, she initially stated yes -- that they had traveled together multiple times and that they had recently traveled to a funeral together in Los Angeles.  However, when Stevenson was told Delta's records reflected that Stevenson and Dais had *never* traveled together, she retracted her prior statement and contradicted herself by denying that she

had just said that she had traveled with Dais to a funeral.  However, she continued to maintain (in contravention of Delta's travel records) that she and Dais had traveled together in the past (although she did not identify where).  (Nabors Dec., Exh. C, p. 2)[3]

- When Stevenson was told that public records reflected that Dais and Boyett had traveled together to Los Angeles for the concert performance, Stevenson initially stated she did not know anything about that.  She then acknowledged that at least Boyett (who she referred to as Dais' "friend") was performing in the concert.  (Nabors Dec., Exh. C, p. 2)[4]

---

[3] It is undisputed that -- despite being travel companions -- Plaintiff and Dais *never* traveled together (obviously begging the question of why Plaintiff would designate someone she does not travel with as a "travel companion").  (Stevenson Dep., p. 169, 171)  During her deposition, Plaintiff at first denied stating to the interviewers that she and Dais had traveled together.  (Stevenson Dep., pp. 169-71)  But she then admitted that she could not recall the precise conversation, and indeed admitted that she did raise the topic of traveling to a funeral.  (Stevenson Dep., p. 171)  The summary of the interview reflects clearly that the Plaintiff did, indeed, raise the topic of the funeral -- and did so for the sole purpose of falsely claiming that she and Dais had traveled together to attend a funeral.  (Nabors Dec., Exh. C, p. 2; Nabors Dep., pp. 101-02)  There is no other logical explanation (and Plaintiff provides none) for why she would have raised the topic of a funeral at this meeting -- and Delta found this statement (as well as Plaintiff's claims that Dais had not used the benefits for business purposes) to be false.  (Nabors Dep., pp. 101-02)

[4] During her deposition, Plaintiff was asked about her statements at the interview and what she told the interviewers about Dais' travel using her passes.  Plaintiff offered a host of different and internally-inconsistent versions of what she told Delta in that interview.  She testified, at various points, that she told Delta that she did not know what Dais was doing in California because she did not ask him; that she did ask him, and that he was there for a concert; that she did ask him, and he

Tafesse's memo summarizing the interview of Stevenson, along with the other information gathered in connection with the investigation, was reviewed by Delta Airport Customer Service Performance Leader Mark Harris -- who recommended to Station Manager Kelly Patton that Ms. Stevenson's employment be terminated as she was "not forthcoming regarding her current companion and his travel;" as "she could not provide his place of travel; and as "[r]esearch by [Equal Opportunity] indicates her companion used non-revenue benefits for business purposes."  (Nabors Dec., ¶ 15  and Exh. D)

Station Manager Patton agreed with Performance Leader Harris' recommendation.  (Nabors Dec., ¶ 16)  Thereafter, Delta Senior Manager - Human Resources, Barbara Franz, also reviewed the investigation materials and also concurred with the termination decision.  (Id.)

After her employment was terminated, Stevenson appealed her termination and claimed for the first time that Dais had traveled to California on the weekend of June 6, 2015 for a "graduation ceremony" for one of his children.  (Stevenson Dep., pp. 231-32, 233 and Exh. 21)  While this explanation was illogical given the 24-hours that Mr. Dais was in California (having flown in Saturday June 6, attended the concert that evening, and having flown out on Sunday June 7), Delta

---

was not there for a concert but to visit his daughter; that she did know, and that he was there for the concert; and numerous other accounts about what she said, and did not say, at the interview.  (Stevenson Dep., pp. 173-85)

nonetheless gave Stevenson the opportunity to produce any documents supporting this "graduation" explanation.  (Id.)  Stevenson could produce no document supporting any such graduation to Delta.  (Stevenson Dep., p. 235)

## F.   **Facts Related to Stevenson's 2014 Work Injury And Her Full Release to Return to Work**

Because Stevenson asserts in her Complaint that she suffered a work-related injury that constituted a disability, and contends that Delta thereafter violated the ADA in its treatment of her, Delta briefly summarizes the facts regarding her alleged disability.

In 2014, Stevenson injured her shoulder, neck and back when a luggage bag fell on her.  (Stevenson Dep., pp. 25, 207, 213-14)  She was released to full duty work without any restrictions in October 2014 and was never again restricted from performing any of her work assignments at Delta.  (Stevenson Dep., p. 222-24) Other than seeking time-off after her 2014 injury that was granted, Stevenson never asked for any accommodation relating to her work-related injury. (Stevenson Dep., pp. 89-94, 222 and Exh. 7)[5]

---

[5] Plaintiff did, at one time (at the suggestion of her Performance Leader Carol Kerr) seek an adjustment to her shift to address some personal problems that she was having related to her car and an aunt who had recently passed away -- and her request was granted.  (Id.)  However, she made no other accommodation request -- and no request relating to her 2014 work-related injury -- as she had no limitations related to that injury.  (Stevenson Dep., pp. 223-24)  While Plaintiff alleged in her Complaint that she made an accommodation request to have an adjusted work schedule or limited standing and breaks, she testified on deposition that this is

## <u>ARGUMENT AND CITATION OF AUTHORITY</u>

**A.** **<u>Stevenson's Claims That She Was Unlawfully Discriminated Against And Terminated Because Of Her Race, Sex, Age And/Or Alleged Disability Status Set Forth In Counts I, II, III, And IV Of Her Complaint Should Be Dismissed.</u>**

Stevenson's ADA, ADEA, Title VII and Section 1981 discrimination claims are governed by the familiar <u>McDonnell-Douglas</u> burden-shifting framework.  <u>See</u> <u>Trask v. Sec'y, Dept. of Veteran Affairs</u>, 822 F.3d 1179, 1192 (11th Cir. 2016)(quoting <u>Burke-Fowler v. Orange Cty.</u>, 447 F.3d 1319, 1323 (11th Cir. 2006)). <u>See</u> <u>also</u> <u>Stinson v. Public Serv. Tel. Co.</u>, 486 Fed. Appx. 8, 9-10 (11th Cir. 2012) (employment claims under § 1981 are governed by the same legal standards that apply to claims under Title VII).  Under this framework, the plaintiff is first required to establish a *prima facie* case of discrimination.  <u>Cornell v. Brennan</u>, 2019 U.S. App. LEXIS 17715, at *2-3 (11th Cir. June 13, 2019) (citing, *inter alia*, <u>Alvarez v. Royal Atl. Developers, Inc.</u>, 610 F.3d 1253, 1264 (11th Cir. 2010)).   In order to make out a *prima facie* case of discriminatory termination, it is "black letter" law that a plaintiff must show that she (1) is a member of a protected class; (2) was qualified for the position from which she was terminated; (3) was terminated; and (4) was treated less favorably that substantially similar employees outside his protected class.  <u>Lewis v. City of Union City</u>, 918 F.3d 1213, 1221 (11th

_____

incorrect and that she did not make any such accommodation request.  (Stevenson Dep., p. 223-24)

Cir. 2019).  When attempting to set forth a *prima facie* case using comparables, "the plaintiff and the employee(s) they identify as a comparator must be similarly situated in all material respects."  Lewis, 918 F.3d at 1229 (11th Cir. 2019). See also Trask, 822 F.3d at 1192.

If the plaintiff establishes a *prima facie* case, then the defendant must carry the "exceedingly light" burden of articulating a legitimate, nondiscriminatory explanation for the decision.  Id. (citations omitted); Meeks. v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994).  If it does so, the plaintiff must offer evidence that the alleged reasons for the employer's actions are a pretext for illegal discrimination.  Id.; Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1143 (11th Cir. 1983).

Here, Stevenson cannot prove even a *prima facie* case of discrimination. The only "adverse employment action" that she can even theoretically challenge in this lawsuit is her termination from Delta.[6]  And she cannot satisfy the third prong

_____

[6] Other than her termination, the only "discipline" that Stevenson received at any time after 2010 (and that would even theoretically be within the 180-day or 4-year limitations period for the claims asserted by Plaintiff) were minor workplace counselings.  (Stevenson Dep., pp. 108-16 and Exh. 9).  It is black-letter law that such minor workplace counselings are not "adverse employment actions" that are subject to challenge under Title VII, the ADEA, the ADA or § 1981.  See e.g., Clark v. Potter, 232 Fed. Appx. 895, 897 (11th Cir. 2007)(letter of warning that had no effect on the plaintiff's employment was not an adverse employment action); Austin v. City of Montgomery, 196 Fed. Appx. 747, 753 (11th Cir. 2006)(counseling memos not adverse employment actions); Summerlin v. M&H Valve Co., 167 Fed. Appx. 93, 97 (11th Cir. 2006)(a reprimand that does not "have

of the *prima facie* case because she admittedly cannot point to any evidence of

unlawful discrimination, including any "similarly situated" individual outside of

her protected classification who was treated more favorably than her.  (Stevenson

Dep., pp. 205-06)  Stevenson cannot identify anyone, of any race, age or sex, who

Delta found to have lost control of their passes and allowed them to be used for

business travel, and who Delta then found to be untruthful during an investigation,

who was not treated the same.  (Id.)  See Brown v. Bd. of Regents of the Univ.

Sys. of Ga., 2016 U.S. Dist. LEXIS 183830 (N.D. Ga. Feb. 12, 2016) (because

plaintiff failed to raise a genuine issue of material fact as to whether similarly

---

an impact on an important condition of employment, such as salary, title, position,
or job duties," is not an adverse employment action).

  Further, while Plaintiff does not assert any hostile work environment claim in her
Complaint, even if she did, the events she alleges would also not remotely create a
hostile work environment.  While Plaintiff complains that her supervisor, Ms. Kerr,
twice counseled her about her uniform -- and one time told her to step aside
because she was working too slowly during a busy "irregular operation" at Delta
(Stevenson Dep., pp. 116-23), such minor events do not remotely approach any
"hostile work environment" under the law.  See e.g., Cheatham v. DeKalb Cty.,
2015 U.S. Dist. LEXIS 176004, at *31 (N.D. Ga. Dec. 10, 2015) (even a
suspension threat coupled with other conduct not sufficiently severe and pervasive
to constitute a hostile work environment).  Finally, even if any of the events about
which Plaintiff complains were adverse employment actions or harassment,
Plaintiff has absolutely no evidence that any of them were based on any protected
characteristic or violated the law in any way.

situated employees from outside of his protected class were treated more favorably, summary judgment was granted on discrimination claim).[7]

Even if Stevenson could establish a *prima facie* case, Delta has certainly met its "exceedingly light" burden of articulating a legitimate, nondiscriminatory reason for its actions -- specifically its conclusions about Stevenson's failure to maintain control of her travel benefits in a way that permitted her travel companion to use them for business purposes and its determination that she was not truthful in the investigation. Stevenson has no evidence to demonstrate that this is pretextual and that race, gender, age, disability status or any other protected classification was the true reason.

Stevenson's claim of discrimination is not really a discrimination claim at all. Her real claim is that, in her opinion (and despite the evidence to the contrary), Dais was not using his passes for his business -- and that Delta should have simply

---

[7] Discovery in this case has taken place over more than 4 years. During that time, Plaintiff has requested and received thousands of pages of documents from Delta in connection with her efforts to identify any similarly situated individual outside of Plaintiff's protected classes who was not terminated. Plaintiff has identified no such individual and, instead, has received information confirming that Delta has terminated individuals of all races, ages, and disability statuses for travel pass violations. Most recently, the Court permitted Plaintiff to obtain more than two dozen additional files of white employees that were investigated for travel pass violations but received discipline less than termination. [Dkt. No. 67] Delta produced the records which established, again, that none of these individuals engaged in the wide array of travel pass misconduct in which Plaintiff engaged.

agreed with her when she said this was "pleasure travel."  (Stevenson Dep., pp. 188-91)

Of course, Stevenson's purported opinion or disagreement with Delta's conclusions is ***not*** the relevant question in this (or any) discrimination lawsuit.  As the controlling law makes clear, the only issue is whether Delta concluded in good faith that Dais was using his passes for business travel connected with his music business and concluded that Plaintiff had lost control of her travel passes and lied to Delta about it.  The evidence is undisputed that Delta reached precisely this conclusion.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)  ("federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.") (citations omitted); Owusu-Ansah v. Coca-Cola Co., 2011 U.S. Dist. LEXIS 160029, at *22 (N.D. Ga. June 17, 2011) (Johnson, M.J.) (citing Elrod and holding that an employee's denial that he engaged in misconduct was "irrelevant, as defendant's decision maker in this case.... believed that he had ..."); Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) ("[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good

faith *believed* plaintiff's performance to be unsatisfactory."); <u>Moakler v. Furkids, Inc.</u>, 374 F. Supp. 3d 1306, 1318 (N.D. Ga. 2019) (same).

Moreover, while the correctness of Delta's good faith conclusions is not the issue in this lawsuit, there is also no dispute that Delta was absolutely correct in its determinations that Dais was using Stevenson's travel benefits for travel in connection with his music business.  First, Stevenson admitted in her deposition, among other things, that Dais owned a music production company (Another Dais Productions); that he worked with artists including Boyett; and that Dais and Mr. Boyett traveled together "frequently" when Mr. Dais was using her travel passes. (Stevenson Dep., pp. 77, 80-83, 186, 194-95)  Stevenson also admitted that she knew that Mr. Dais was taking Boyett, to "go to shows" and "go to concerts" and that he was "performing in this show" on June 15.  (Stevenson Dep., p. 188)

Stevenson also admitted that (with her knowledge) Dais had used her travel benefits for other business purposes connected with his music business.  For instance, Stevenson acknowledged that Mr. Dais would travel with another R&B artist (Keyshia Cole) when he was in the process of building his career and would use Stevenson's travel passes to fly back and forth to the tour bus to leave and re-join the tour.  (Stevenson Dep., pp. 198-202)

Again, even if Stevenson had not made these admissions -- there is no dispute that Delta concluded (after a detailed investigation) that Dais was using the

passes for business, and that Stevenson had lost control and lied about it.  And,

Stevenson is far from the only individual for whom Delta reached this conclusion -

- as Delta did terminated numerous other employees, including male, white and

under-40, as part of the Pass Audit Process.  (Nabors Dec., ¶ 17)

For each of these independent reasons, summary judgment is warranted on

Stevenson's discrimination claims.

**B.**     **Stevenson's Retaliation Claim Set Forth In Count V Of Her Complaint Should Also Be Dismissed.**

Stevenson also claims in this lawsuit that she was terminated because she

complained to Delta about discrimination and harassment.  (Complaint, ¶ 82)

Retaliation claims under Title VII, the ADEA, the ADA and § 1981 are

similarly analyzed.  See Bryant v. Jones, 575 F.3d 1281, 1301 (11th Cir. 2009).  To

establish a *prima facie* case, a plaintiff must show that: "(1) [s]he engaged in

statutorily protected activity; (2) [s]he experienced an adverse employment action;

and (3) there is a causal connection between the protected activity and the alleged

adverse action."  Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1257-58

(11th Cir. 2012).  "Only after the plaintiff makes this prima facie case of

discriminatory retaliation does the burden shift to the defendant to rebut the

presumption of retaliation by producing legitimate reasons for the adverse

employment action."  Drago v. Jenne, 453 F.3d 1301, 1305 (11th Cir. 2006).

Here, Plaintiff's retaliation claim does not get out of the *prima facie* starting blocks. First and most obviously, Stevenson admitted that she made no complaints about any discriminatory conduct covered by Title VII, the ADA, the ADEA or § 1981. (Stevenson Dep., pp. 127-45) Instead, Stevenson was able to identify only two complaints she made to Delta (both years before her termination), and neither of them asserted any violation of any anti-discrimination law.[8] (Id.)

Second, even if one of the complaints made by her had been protected under the law, there is no evidence suggesting that either complaint was causally related to her termination in any way. They were both years before her termination, and certainly were not close in time to her termination, in a way that would suggest any causal connection. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001) (stating the temporal proximity between the employer's knowledge of protected activity and an adverse employment action must be "very close" to be sufficient evidence in itself to establish a *prima facie* case).

Finally, even assuming Stevenson could establish a *prima facie* case, as set forth above, Defendant has articulated a legitimate, non-discriminatory reason for its actions and Stevenson can do nothing to rebut it.

---

[8] The only complaints that Plaintiff made were a complaint about an allegedly unfair piece of discipline that she received in 2010 (five years before she was fired) and a complaint about another employee allegedly "lying" about her. (Stevenson Dep., pp. 127-45) Neither of these Complaints suggested any violation of any anti-discrimination law. (Id.)

**C.** **Stevenson's ADA Reasonable Accommodation Claim In Count I Of Her Complaint Is Also Subject To Dismissal.**

Stevenson also alleges in her Complaint that Delta failed to reasonably accommodate her in violation of the ADA. The premise of this claim is apparently that Stevenson requested breaks or time where she would not be required to stand -- and that Delta denied such requests. (Complaint, ¶ 23)

Stevenson's reasonable accommodation claim here fails for a host of reasons. First, Stevenson admittedly made no request for reasonable accommodation relating to her injury (other than a request for leave, which was granted). (Stevenson Dep., pp. 89-94, 222 and Exh. 7) Stevenson's failure to even request such an accommodation bars her claim. See Warren v. Volusia Cnty., Florida, 188 F. App'x 859, 863 (11th Cir. 2006) ("An employee's failure to request a reasonable accommodation is fatal to the prima facie case; the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.") (internal citations and quotation marks omitted).

Second, and independently, even if she had asked for an accommodation, Stevenson needed no accommodation to perform the essential functions of her position. As of October 2014, she had been released to return to work without restrictions. (Stevenson Dep., pp. 104-05 and Exh. 19) An accommodation is "reasonable" under the ADA if necessary to enable the employee to perform the essential functions of the job. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1259-

21

60 (11th Cir. 2001); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835

(11th Cir. 1998).  Because Stevenson required no accommodation to perform her

job functions, her reasonable accommodation claim fails.  See Hickmon v. TECO

Energy, 2012 U.S. Dist. LEXIS 2339 (M.D. Fla. Jan. 9, 2012).

For all of the above reasons, Defendant Delta respectfully requests that the

Court enter Summary Judgment on all claims in this matter.

Respectfully Submitted,

s/ Benjamin A. Stone
Georgia Bar No. 683850

MUNGER & STONE LLP
999 Peachtree Street, NE
Suite 2850
Atlanta, GA 30309
Tel:  (404) 815-1884
Fax: (404) 815-4687
ben.stone@mungerandstone.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D of the Local Rules for the United States District

Court for the Northern District of Georgia, I hereby certify that the foregoing has

been prepared in Times New Roman, 14-point font, as permitted by Local Rule

5.1B

<u>s/ Benjamin A. Stone</u>
Georgia Bar No. 683850

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **QUANIAH R. STEVENSON,** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No.** |
| | **1:16-cv-2571-AT-LTW** |
| **DELTA AIR LINES, INC.,** | |
| **Defendant.** | |

## CERTIFICATE OF SERVICE

This is to certify that I have this 7th day of January, 2021 filed the foregoing DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to Plaintiff's counsel: Charlena Thorpe.

s/ Benjamin A. Stone
Georgia Bar No. 683850

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

QUANIAH R. STEVENSON,

     Plaintiff,

vs.

DELTA AIR LINES, INC.,

     Defendant.

Civil Action No.
**1:16-cv-2571-AT-LTW**

**DECLARATION OF KELLEY NABORS**

     I, Kelley Nabors, declare under penalty of perjury that the following facts

are within my personal knowledge and are true.

     1.    My name is Kelley Nabors. At all times referenced below, I worked

for Delta Air Lines, Inc. ("Delta") as a Manager in Delta's Equal Opportunity

Department.

     2.    As a valuable privilege of Delta employment, Delta provides its

employees and certain of their family members and a designated travel companion

with free and reduced-rate travel (also known as "Travel Passes").

     3.    Delta also provides its employees with an additional pass travel

benefit known as "buddy passes" which allows an employee to provide reduced-

rate transportation to friends or family members who are not their designated travel

companion.

4.     Delta has written policies regarding its pass travel benefits, and periodically issues reminders to employees of the importance of complying with the policies regarding pass travel.

5.     Among other things, Delta expressly prohibits the use of travel passes for anything other than leisure travel -- and specifically forbids their use for business travel.  Business travel is an important source of revenue for Delta and for that reason Delta does not allow business travelers to utilize Delta passes and requires business travelers to buy a ticket on Delta.  The prohibition on the use of travel passes for business travel is a well-known rule at Delta.

6.     Delta also requires that its employees keep "control" of their passes and the passes of their designated companions, including by ensuring that the employee is aware of the travel being undertaken by their designated companion and that the pass travel is not for business or any other improper purposes.  Delta employees are responsible for ensuring that their non-employee travel companions comply with these Delta and the other Delta policies relating to travel passes.

7.     In approximately 2014, it came to Delta's attention that some of its employees were misusing their travel passes by, among other things, offering them for sale, using them for business purposes or allowing their designated travel companion to use them for business purposes. As a result, in April 2014, Delta issued a Memo and set of Frequently Asked Questions to its employees that again

2

reminded them of the rules and regulations surrounding the use of pass travel, including that such passes cannot be used for business purposes because such actions "are clear violations of the pass policy" and that employees are "responsible for knowing how [their] pass travel privileges are used" by their designated travel companions.

8.     Delta's April 2014 communication also informed employees that Delta was beginning an initiative known as the Fly Right campaign that was designed to ensure that pass travel abuse is stopped. Delta established a new group, known as the Pass Protection Group, "to work to proactively identify cases of possible abuse and investigate them thoroughly."

9.     Delta's Pass Protection Group utilized a set of objective criteria or parameters to determine which employees would have their travel pass usage reviewed -- focusing on those employees and travel companions who had very high travel pass usage and those employees who shared "buddy passes" with individuals who had received buddy passes from a substantial number (at least 5) Delta employees.

10.     In 2015, as part of the audit and based on objective criteria, Delta's Pass Protection Group was investigating the pass travel of all employees who had shared "buddy passes" with an individual named Vendell Bailey ("Bailey") who had received buddy passes from a number of different Delta employees including

3

Stevenson.  Because Stevenson was one of the individuals who had provided travel passes to Bailey, Stevenson's travel pass records (like others who had provided passes to Bailey) were fully and carefully reviewed during the investigation.

11.    In the course of the review of Stevenson's travel pass records, the Pass Protection Group identified information that showed that Stevenson's designated travel companion, Jovan Dais ("Dais") was traveling frequently, and to numerous disparate locations, in a way that reflected possible business travel.  A true and correct copy of Mr. Dais' travel pass records from January 2014 to June 2015 are attached hereto as Exhibit A, and as is apparent from those records, Dais traveled frequently both during the week and during the weekends, at various times, often for short duration, to locations that included Los Angeles, Phoenix, New York, Houston, St. Louis, Pittsburgh, Dallas, New Orleans, Washington, D.C., San Francisco, New York, Orlando, Salt Lake City, Burlington, Vt., Cincinnati, Las Vegas and Detroit.

12.    Further review of public and on-line records by the Pass Protection Group (including public postings by Dais attached hereto as Exhibit B) reflected that Dais was a producer and artist in the music business, and that on at least one of his trips using Stevenson's travel passes (a one-night trip to Los Angeles, California on June 6, 2015), Dais made the trip with a music artist with whom he

worked, Caleb Boyett for the purpose of Boyett engaging in a concert performance. Specifically, the records showed that, using Plaintiffs travel passes, Mr. Dais traveled with Mr. Boyett to Los Angeles on Friday June 6, 2015, performed in the show that day, and then they flew out the following day. The records also reflected that Mr. Dais and his work-partner, Mr. Boyett, had traveled together using Plaintiffs travel pass benefits on at least one other occasion (a trip to Houston, Texas). The records further reflected that Mr. Dais had paid Mr. Boyett's fees associated with Mr. Boyett traveling on Delta passes.

13.     Based on the information gathered by a review of the Delta records and on-line documents, Ms. Stevenson was thereafter interviewed to address the records that indicated, among other things, that her travel benefits were being used by her travel companion (Mr. Dais) for his music business.  The interview of Ms. Stevenson was conducted by a member of Delta's Pass Protection Group (Mehret Tafesse), a member of Human Resources (Kiha Jones), and a Delta Performance Leader (Francisco Cortes).

14.     The interview was memorialized in a lengthy and detailed memo, written by meeting attendee and Pass Protection Group member Mehret Tafesse. A true and correction copy of that memo is attached hereto as Exhibit C.

15.     Tafesse's memo summarizing the interview of Stevenson, along with the other information gathered in connection with the investigation, was reviewed

by Delta Airport Customer Service Performance Leader Mark Harris, who then recommended to Station Manager Kelly Patton that Ms. Stevenson's employment be terminated. A true and correct copy of that recommendation is attached hereto as Exhibit D.

16.     Station Manager Patton agreed with Performance Leader Harris' recommendation and thereafter, Delta Senior Manager - Human Resources, Barbara Franz, also reviewed the investigation materials and also concurred with the termination decision. Based on the finding that Ms. Stevenson had not maintained control over her travel passes used by her companion, Mr. Dais, and had allowed them to be improperly used for business purposes and had not been forthcoming in the interview, Ms. Stevenson's employment with Delta was terminated.

17.     Ms. Stevenson was not the only individual terminated for misuse of travel benefits. Since the formation of the Pass Protection Group in 2014, numerous employees (including Caucasian, White, Hispanic and other employees, both male and female employees, and numerous individuals under the age of 40) have been terminated. This includes individuals who have made no allegation of discrimination, and no allegation that they suffer from any disability.

Executed this Fourth day of January, 2021.

6

**KELLEY NABORS**

# EXHIBIT A

**Sluss, Ansley**

| | |
|---|---|
| From: | Langel, Ryan D |
| Sent: | Saturday, January 02, 2016 2:42 PM |
| To: | Sluss, Ansley |
| Subject: | FW: Flight History |

See below.

Ryan D. Langel
Special Counsel
Delta Air Lines, Inc. — Law Department

CONFIDENTIALITY NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this message in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. Our transmission of this message does not constitute a waiver of the attorney-client or the attorney work product privilege.

-----Original Message-----
From: esc@delta.com [mailto:esc@delta.com]
Sent: Saturday, January 02, 2016 2:42 PM
To: Langel, Ryan D
Subject: Flight History

*** DO NOT REPLY TO THIS EMAIL ***

Last 24 Months Flight History For DAIS,JOVAN J

| Depart Date | Flt # | ORIG | DEST | Pass/Charge Type | Total Charges |
|---|---|---|---|---|---|
| 06/08/2015 | 1446 | PHX | ATL | Domestic | 0.00 |
| 06/07/2015 | 0730 | LAX | PHX | Domestic | 0.00 |
| 06/06/2015 | 1755 | ATL | LAX | Domestic | 0.00 |
| 03/11/2015 | 1554 | LAX | ATL | Domestic | 0.00 |
| 03/05/2015 | 1094 | ATL | LAX | Domestic | 0.00 |
| 01/16/2015 | 1554 | LAX | ATL | Domestic | 0.00 |
| 01/13/2015 | 2355 | ATL | LAX | Domestic | 0.00 |
| 12/07/2014 | 5130 | HPN | ATL | Transoceanic | 0.00 |
| 12/06/2014 | 5146 | ATL | HPN | Transoceanic | 0.00 |
| 12/04/2014 | 1617 | HOU | ATL | Domestic | 0.00 |
| 12/03/2014 | 1064 | ATL | HOU | Domestic | 0.00 |
| 11/25/2014 | 1554 | LAX | ATL | Domestic | 0.00 |
| 11/18/2014 | 2055 | ATL | LAX | Domestic | 0.00 |
| 10/27/2014 | 1080 | STL | ATL | Domestic | 0.00 |
| 10/26/2014 | 1423 | ATL | STL | Domestic | 0.00 |
| 10/25/2014 | 1554 | LAX | ATL | Domestic | 0.00 |
| 10/22/2014 | 2355 | ATL | LAX | Domestic | 0.00 |
| 10/13/2014 | 1549 | HOU | ATL | Domestic | 0.00 |
| 10/04/2014 | 0754 | PIT | ATL | Domestic | 0.00 |



DEFENDANT'S EXHIBIT

1

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/02/2014 | 1365 | ATL | PIT | Domestic | 0.00 |
| 09/15/2014 | 1454 | LAX | ATL | Domestic | 0.00 |
| 09/09/2014 | 0110 | ATL | LAX | Domestic | 0.00 |
| 09/07/2014 | 1810 | DFW | ATL | Domestic | 0.00 |
| 09/06/2014 | 1711 | ATL | DFW | Domestic | 0.00 |
| 08/31/2014 | 1654 | LAX | ATL | Priority | 0.00 |
| 08/24/2014 | 6437 | SFO | LAX | Domestic | 0.00 |
| 08/21/2014 | 1255 | ATL | LAX | Domestic | 0.00 |
| 08/18/2014 | 0176 | DFW | ATL | Domestic | 0.00 |
| 08/15/2014 | 1810 | ATL | IAH | Domestic | 0.00 |
| 08/15/2014 | 0775 | MSY | ATL | Domestic | 0.00 |
| 08/13/2014 | 1325 | LAX | MSY | Domestic | 0.00 |
| 08/12/2014 | 1060 | MCO | LAX | Domestic | 0.00 |
| 07/28/2014 | 0986 | ATL | LGA | Domestic | 0.00 |
| 07/28/2014 | 0672 | CLE | ATL | Domestic | 0.00 |
| 07/22/2014 | 0629 | ATL | DTW | Domestic | 0.00 |
| 07/14/2014 | 1354 | LAX | ATL | Domestic | 0.00 |
| 07/08/2014 | 1435 | ATL | LAX | Domestic | 0.00 |
| 07/01/2014 | 1454 | LAX | ATL | Domestic | 0.00 |
| 06/23/2014 | 4794 | PHX | LAX | Domestic | 0.00 |
| 06/23/2014 | 1772 | ATL | PHX | Domestic | 0.00 |
| 06/19/2014 | 2234 | LAX | ATL | Domestic | 0.00 |
| 06/17/2014 | 0081 | ATL | LAX | Domestic | 0.00 |
| 06/13/2014 | 2234 | LAX | ATL | Domestic | 0.00 |
| 06/10/2014 | 1169 | MIA | LAX | Domestic | 0.00 |
| 06/07/2014 | 1982 | LGA | MIA | Domestic | 0.00 |
| 06/05/2014 | 1286 | ATL | LGA | Domestic | 0.00 |
| 06/04/2014 | 4569 | BUR | SLC | Domestic | 0.00 |
| 06/04/2014 | 1222 | SLC | ATL | Transoceanic | 0.00 |
| 06/02/2014 | 2255 | ATL | LAX | Domestic | 0.00 |
| 06/01/2014 | 0386 | RIC | ATL | Domestic | 0.00 |
| 05/31/2014 | 2399 | ATL | RIC | Domestic | 0.00 |
| 05/30/2014 | 1818 | MCO | ATL | Domestic | 0.00 |
| 05/27/2014 | 0883 | LAX | MCO | Domestic | 0.00 |
| 05/14/2014 | 2204 | LAX | SLC | Transoceanic | 0.00 |
| 05/14/2014 | 1222 | SLC | ATL | Transoceanic | 0.00 |
| 05/05/2014 | 1577 | MSY | LAX | Priority | 0.00 |
| 05/03/2014 | 4667 | LAX | LAS | Domestic | 0.00 |
| 04/24/2014 | 3303 | IAH | CVG | Transoceanic | 0.00 |
| 04/24/2014 | 2469 | CVG | ATL | Transoceanic | 0.00 |
| 04/22/2014 | 1142 | ATL | HOU | Domestic | 0.00 |
| 04/16/2014 | 1554 | LAX | ATL | Domestic | 0.00 |
| 04/05/2014 | 2355 | ATL | LAX | Priority | 0.00 |
| 04/04/2014 | 1654 | LAX | ATL | Domestic | 0.00 |
| 03/29/2014 | 1076 | ATL | LAX | Domestic | 0.00 |
| 03/25/2014 | 1969 | LAX | ATL | Priority | 0.00 |
| 03/24/2014 | 0110 | ATL | LAX | Domestic | 0.00 |
| 03/20/2014 | 1254 | LAX | ATL | Domestic | 0.00 |
| 02/24/2014 | 1555 | ATL | LAX | Domestic | 0.00 |
| 02/21/2014 | 1354 | LAX | ATL | Priority | 0.00 |
| 02/17/2014 | 2355 | ATL | LAX | Domestic | 0.00 |
| 02/16/2014 | 1654 | LAX | ATL | Priority | 0.00 |

01/23/2014  4986  HPN  ATL  Domestic          0.00
01/21/2014  5366  ATL  HPN  Domestic          0.00

Last 24 Months Imputed Trip History For DAIS,JOVAN J

Trip Date  Flt #  ORIG  DEST  Payment  Imputed Wage  Imputed Val  Eff Date  Report Date
---------  -----  ----  ----  -------  ------------  -----------  --------  -----------

# EXHIBIT B



Search Twitter 🔍    Have an account? Log in ∨

**JOVAN D...**
@jovandais

| TWEETS | FOLLOWING | FOLLOWER | |
|--------|-----------|----------|---|
| 5,389 | 1,729 | 7,411 | ⚲ **Follow** |

| FAVORITES | LISTS | | | |
|-----------|-------|--------|------------------|----------------|
| 3 | 1 | Tweets | Tweets & replies | Photos & videos |

## JOVAN DAIS
@jovandais

booking/features: nodaisoff@gmail.com

📍 GODS GREEN EARTH
🔗 facebook.com/mrdais
🕐 Joined December 2008

📷 553 Photos and videos




**JOVAN DAIS** @jovandais · Jun 12
Baby girl getting better behind the wheel... riding with my oldest listening to who else???... instagram.com/p/32Yvg4LTYF/


**JOVAN DAIS** @jovandais · Jun 8
S/O 2 my daughter @iamaleacea for being fearless abt going after her dreams.... thnxx 2 @v103atlanta... instagram.com/p/3rtczjrTRU/

**JOVAN DAIS** retweeted
#SLICK @BIGOOH · Jun 7
" We Done Came a Long Way, ---> Still We Got So Far 2 Go ‼" - @jovandais instagram.com/p/3pVQCgM-qO/

**JOVAN DAIS** retweeted
JIN© @jusjino · Jun 6
ON SOME L.A. SHIT WITH @jovandais Top Down On The Highway Headed to my Show in Bakersfield with @tyga... instagram.com/p/3nD2qLuP55/


**JOVAN DAIS** @jovandais · Jun 6
We out!!! @jusjino @jspoolz #goingback2cali #dutycalls #beecherboys #nodaisoff instagram.com/p/3mGswnLTTy/

**JOVAN DAIS** @jovandais · May 31
On Set with @theggsband new video "On & On" coming soon!! Thanxx 2 @nachishairsalon leimaje... instagram.com/p/3XeNVqrTW3/


DEFENDANT'S EXHIBIT
Stevenson
No. 16 63917

6/15/2015

JOVAN DAIS (@jovandais) | Twitter

 JOVAN DAIS @jovandais · May 27
REPOST FROM @iamaleacea:
"Make sure yall come out , new music , new show , new outfits , this...
instagram.com/p/3MHD3iLTQO/

 JOVAN DAIS @jovandais · May 26
inkchink getting it in!!!! @theggsband video shoot for "On & On"
@bemoremedia #theggsband #beecherboys
instagram.com/p/3KB0pXrTWT/

 JOVAN DAIS @jovandais · May 24
On the set with @bemoremedia shooting "i
know" ~~off @jusjino new album!!! "Jus Jino"~~
hosted by...
instagram.com/p/3Fqd1OrTQ8/

 JOVAN DAIS @jovandais · May 20
REPOST FROM @jusjino:
"Abt last nite!!! S/O 2 everyone tht came out to  @ctrlatl 2  represent
wit... instagram.com/p/27gr-zrTSR/



6/15/2015    JOVAN DAIS (@jovandais) | Twitter



#beecherboys #nodaisoff instagram.com/p/2uZn_ArTUF/

JOVAN DAIS retweeted
#HotRunsIndy Hot 963 @Hot963 · May 14
#NP @JSPOOLZ feat @wizkhalifa @jovandais SMOKIN GOOD On
The #NEWAT10 with @CoachRedd & @Bswift317
3

JOVAN DAIS retweeted
JIN© @jusjino · May 14
They Build To Destroy.... But I Was Built To Last... Ft. @jovandais
#JusJino #NoDaisOff #BeecherBoys instagram.com/p/2qq41LHP78/
1

JOVAN DAIS @jovandais · May 14
REPOST FROM @jusjino:
"They Build To Destroy.... But I Was Built To Last... Ft. @jovandais
#JusJino... instagram.com/p/2q-QE6rTSt/

## New to Twitter?

Sign up now to get your
own personalized
timeline!

You may also like ·

Refresh


jullenews.it
@julleitalia


T-Town Pro...
@ttownprod

Blogs Daddy
@BlogsDaddy

MONEY CA...
@_MoneyCarlo


a bad think
@abadthink



## Trends

#qanda
#iamdefensesquad
#PSYCasaCorazon
#MagnaCarta
Jeremy Corbyn
#AstonDmSpree
Jack Grealish
#MondayMotivation



ethiopian_p    Log out

## #beecherboys

522 posts




 jusjino     FOLLOW




6/15/2015                    Instagram



37 likes                      1w

jusjino Tonight I'm opening for @kinggoldchains in California! #NODAISOFF #BEECHERBOYS #JUSJINO #LastKings

ro_akin Congrats bro !

ayyodezi congrats Caleb !! 🙌🏾🙌🏾🙌🏾

buckcitynow Yea nigga get it remember you the headliner

guitarboymusic1 Yeazirrrrr Docta!!!! @jusjino

an_jelllo Do work kid 💯

demetriasampsonbolar Who's up next? Not you youngin. You up NOW!

santimars_ Congrats man

missjamaica300 Definitely need a mixtape ! Been listening to it all week 👊🏾 #proud & congrats homie

ABOUT US    SUPPORT    BLOG    PRESS    API    JOBS    PRIVACY    TERMS          © 2015 INSTAGRAM

JOVAN DAIS (@jovandais) | Twitter

Gilas Cadets
#WorldMeatFreeDay

© 2015 Twitter   About
Help   Ads Info

6/15/2015        Instagram

ethiopian_p    Log out

# #beecherboys

522 posts

 

jusjino    **FOLLOW**

 

6/15/2015               Instagram





52 likes               1w

jusjino ON SOME L.A. SHIT WITH @therealjovandais Top Down On
The Highway Headed to my Show in Bakersfield with @kinggoldchains
#NODAISOFF #BEECHERBOYS #JUSJINO #LastKings

isisrahgawd Bruh u got more hair then me[]

Add a comment...

ABOUT US    SUPPORT    BLOG    PRESS    API    JOBS    PRIVACY    TERMS           © 2015 INSTAGRAM

6/15/2015    Jovan Dais on Instagram: "On the set with @jusjino @bemoremedia #New music "Jus Jino" 3.16.15 #californiavideoshoot #jusjino #beecherboys #noda'...

ethiopian_p    Log out

therealjovandais    [ FOLLOW ]



16 likes                                                                    14w

therealjovandais On the set with @jusjino @bemoremedia #New music "Jus Jino" 3.16.15 #californiavideoshoot #jusjino #beecherboys #nodaisoff

Add a comment...

ABOUT US    SUPPORT    BLOG    PRESS    API    JOBS    PRIVACY    TERMS          © 2015 INSTAGRAM

6/15/2015       Jovan Dais on Instagram: "See ya boi @jusjino live!! current sxsw dates more added soon!! #jusjino #beecherboys #nodaisoff #VelvWorks"



therealjovandais See ya boi @jusjino live!! current sxsw dates more added soon!! #jusjino #beecherboys #nodaisoff #VelvWorks

kiyanatakemeaway LIT!!!! 👌, I'm coming

thequeenraquellee @skr~efracta~dau

Add a comment...

6/15/2015     Jovan Dais on Instagram: "See ya boi @jusjino live!! current sxsw dates more added soon!! #jusjino #beecherboys #nodaisoff #VelvWorks"

ethiopian_p... Log-out

 therealjovandais

FOLLOW





# SXSW 2015

**Thursday, March 19th 12PM - 6PM**
#LightTheTorch
KRAVE 302 E. 6th St.

**Friday, March 20th 6PM - 2AM**
#HipHopNHipsters
Victory Grill 1104 E. 11th St.

**Friday, March 20th 7PM - 2AM**
#ZoolyGvng Official SXSW Stage
405 Club 405 E. 7th St.

**Saturday, March 21st 9PM - 3AM**
#TrapHouseParty
Location TBA



14 likes

13w

# EXHIBIT C

July 6, 2015


Pass Protection Group Audit
Investigation Summary

Re: Quaniah Stevenson
Employee number: 689688
DOH: 08/01/07
Station/Dept. ATL/125

Present for interview:
Francisco Cortes – Performance Leader
Kiha Jones – HR Manager
Mehret Tafesse – PPG (writer)


**Background:**
Quaniah was being interviewed because she shares buddy pass rider Vendell Bailey with other
Delta employees Ernest Adams (DTW/120), Brady Nicholson (DTW/120), Candice Dubois
(ATL/125), and Sirdarius Johnson (ATL/125).

Quaniah was asked to verify everyone who is in her PPR:

- Quinten Stevenson- Quaniah said he is her father, she was able to verify his DOB and
  where he traveled.
- Tassie-Carter-Stevenson-Tow- Quaniah said Tassie is her mother, she was able to verify
  her DOB and where she traveled.
- Joann Stevenson- Quaniah said Joann is her step mother and is married to her father
  Quinten. She was able to verify where Joann traveled.
- Jovan Dais- Quaniah's current companion add on 08/01/11. When asked how long she
  has known Jovan, Quaniah said about 15 years. Quaniah stated that Jovan is her
  boyfriend. When asked where he lives, Quaniah said 2360 Barrington Trace Circle,
  Camp Creek area.
- When asked where Jovan works, Quaniah said Jovan is a musician and works for
  Another Days Worldwide.
- Our research shows, Jovan address 2360 Barrington Trace circle is used as home and
  business address. Jovan business is spelled as Anotha Dais Worldwide. Anotha Dais is
  music production, studio rentals, recording services-sound & video, and equipment
  rentals.
- When asked places Jovan traveled, Quaniah said LAX, PHX, and MIA. When asked
  when the last time Jovan traveled, Quaniah said about 3 weeks ago to California.
- When asked who books Jovan's flights, Quaniah said she does. When asked if she books
  all of his flights, Quaniah said sometimes she books his flights at his house on his
  computer and the computer could save her password.
- Our research shows Jovan traveled to LAX, PHX, HPN, HOU, STL, PIT, DFW, IAH,
  MSY, SFO, MCO, LGA, SLC, BUR, CVG, LAS, and DTW.

- When asked if they have traveled together, Quaniah said yes. When asked when they traveled together, Quaniah said they traveled to LAX for a funeral. Explained to Quaniah that she and her family traveled to LAX using S1 family emergency pass on April 16, 2015 returning on April 20, 2015. Jovan traveled to LAX March 5 and June 6, 2015. Quaniah then said she never said they traveled together. Kiha Jones HR manager said to Quaniah that she just mentioned they traveled together in April for the funeral. Quaniah said they have traveled together but not for the funeral. When asked again when they traveled together, Quaniah said they traveled together before in the past.
- Our records does not show Quaniah and Jovan traveling together since he has been added to her companion pass.
- When asked the purpose of Jovan traveling to LAX frequently, Quaniah said Jovan children live in LA. Quaniah also said they both have family who lives in LA.
- When asked Jovan's Twitter and Instagram post on June 6, 2015 about being in Cali for a performance at Baskerville, CA opening up for the rapper Tiger, Quaniah said she didn't know anything about that. Quaniah said Jovan was not performing and it was his friend that was performing at Baskerville, CA.
- Our research shows Jovan and his friend/artist Caleb Boyett traveled on June 6, 2015 to perform at a show in Baskerville, CA. We have Instagram pictures and videos that shows both of them going to perform at this event. Jovan and Caleb also traveled in March to LAX and PHX together. They traveled in September of 2014 to LAX as well. Every time they travel together, Jovan pays for the buddy pass taxes for Caleb.
- Christopher Blanding- Quaniah's previous companion from 07/31/09 to 07/30/11. Quaniah said Christopher is a friend of hers who lives in Miami, FL. When asked where Christopher works, Quaniah said he is a music producer.

Buddy Passes:

- Andre Grimes- traveled from MSP to MOT (Minot, North Dakota) connection through ATL in February 2015. Quaniah said he is a friend of hers. Quaniah said he traveled from ATL to South Dakota.
- Caleb Boyett- traveled on two buddy passes. In October 2014, Caleb traveled from HOU to ATL to LAX and in September 2014, Caleb traveled from ATL to LAX. Both times he traveled with Quaniah's companion Jovan. Jovan paid for the buddy pass taxes.
- Quaniah stated that Caleb is both of their friend. When asked why Jovan paid for Caleb taxes, Quaniah said Caleb is young. Caleb is 22 years old born in 1993. Caleb also traveled to LAX with Jovan in June 2015 but on another DL employee Adebowale Davies (ATG/345). Jovan paid for his taxes again.
- Oscar Dais- traveled from HPN to ATL in December 2014. Quaniah said Oscar is Jovan's father. Jovan also paid for Oscar buddy pass taxes.
- Rodney Turner- traveled from DFW to ATL in August 2014. Quaniah said Rodney is her friend Tawanga husband. Quaniah said he traveled from DC or Ohio.
- Dianne Munroe- traveled from ATL to HPN in October 2014. Quaniah said Dianne is her father friend. She was able to verify where Dianne traveled.
- Sean Fenton- traveled from LAX to ATL in August 2014. Quaniah said Sean is Jovan's friend. Quaniah was able to verify where Sean traveled.
- Vendell Bailey- has traveled on four other Delta employees buddy passes in 2012. Quaniah was not able to verify who Vendell is but she did verify where she traveled. Vendell traveled from DTW to ATL in September 2012.

**Findings:**

- Quaniah was not truthful and forthcoming about her current companion pass rider Jovan Dias. Quaniah was not able to verify all the places Jovan traveled. Quaniah also stated that she and Jovan traveled together in 2015 and previous years.
- Our records does not show Quaniah and her companion Jovan traveling together in 2015 and in previous years.
- Our research shows, Jovan owns Anotha Dais Worldwide. The address is 2360 Barrington Trace circle is used as home and business address. Anotha Dais is music production, studio rentals, recording services-sound & video, and equipment rentals.
- Our research also shows Jovan traveled to LAX, PHX, HPN, HOU, STL, PIT, DFW, IAH, MSY, SFO, MCO, LGA, SLC, BUR, CVG, LAS, and DTW. Quaniah verified three places he traveled which is LAX, PHX, and MIA.
- Jovan posted on Twitter and Instagram on June 6, 2015 about being in Cali for a performance at Baskerville, CA opening up for the rapper Tiger, Quaniah said she didn't know anything about that. Quaniah said Jovan was not performing and it was his friend that was performing at Baskerville, CA.
- Our research shows Jovan and his friend/artist Caleb Boyett traveled on June 6, 2015 to perform at a show in Baskerville, CA. We have Instagram pictures and videos about both of them going to perform at this event. Jovan and Caleb also traveled in March to LAX and PHX together. They traveled in September of 2014 to LAX too. Every time they travel together, Jovan pays for the buddy pass taxes for Caleb.
- Caleb Boyett- traveled on two buddy passes. In October 2014 Caleb traveled from HOU to ATL to LAX and in September 2014 Caleb traveled from ATL to LAX. Both times, he traveled with Quaniah's companion Jovan. Jovan paid for the buddy pass taxes. Quaniah stated that Caleb is both of their friend. When asked why Jovan paid for Caleb taxes, Quaniah said Caleb is young. Caleb is 22 years old born in 1993. Caleb also traveled to LAX with Jovan in June 2015 but on another DL employee Adebowale Davies (ATG/345). Jovan paid for his taxes again.
- Quaniah said she doesn't remember buddy pass rider Vendell Bailey who traveled on four other Delta employees buddy passes.

# EXHIBIT D

**△ DELTA** ✈

Delta Air Lines, Inc.

# MEMO

To:      Kelly Patton, Station Manager – ACS/125
         Atlanta Worldport – Concourse E
From:    Mark Harris, Performance Leader – ACS/125
         Atlanta Worldport – Concourse E
Date:    July 16, 2015
Subject: Recommendation for Termination of Employment
         Quaniah Stevenson, EE#689688, CSA - ATL/E-Ticket counter

I am recommending termination of employment for PT Agent, Quaniah Stevenson for violation of pass travel policies. Ms. Stevenson was not forthcoming regarding her current companion and his travel. During the investigation led by Equal Opportunity (EO), she could not provide his places of travel. Research by EO indicates her companion used non-revenue benefits for business purposes as his Twitter and Instagram pages substantiated travel and the dates matched our Delta flight records.

Ms. Stevenson was given the opportunity to provide documentation to support her statement regarding her companions' travel being paid by his employer/vendors, however, no data was submitted.

Research also shows a buddy rider travelled twice with her companion for business purposes as social media confirmed the travel.


Since Ms. Stevenson's date of employment, August 07, 2007, she has received warning(s) on the following occasion(s):

04/03/2015     Journal Entry- Attendance/Reliability
03/07/2015     Journal Entry- Coaching- Uniform Guidelines

Due to Ms. Stevenson's violation of pass travel policies, I am recommending termination of her employment with Delta Air Lines.


Mark Harris, Performance Leader – ACS/125
Atlanta Worldport, Concourse E

I concur with this recommendation for termination.



Kelly Patton, Station Manager - ACS/125
Atlanta Worldport - Concourse E

**Page 3**

```
 1              UNITED STATES DISTRICT
            NORTHERN DISTRICT OF GEORGIA
 2               ATLANTA DIVISION
 3
 4   QUANIAH R. STEVENSON,
 5          Plaintiff(s),      CIVIL ACTION FILE
 6   vs.                       NO:1:16-CV-2571-AT-LTW
 7
     DELTA AIR LINES, INC.,
 8
            Defendant(s).
 9
    _____
10
11              DEPOSITION OF
12          QUANIAH RENETRA STEVENSON
13
14              June 29, 2017
15                9:50 a.m.
16
17
                2850 First Union Plaza
18              999 Peachtree Street, NE
                  Atlanta, Georgia
19
20
21
22          Mari B. Temple, RPR, CMRS
          Certified Court Reporter #2844
23
24
25
```

```
 1              INDEX TO EXAMINATIONS
 2                                          PAGE
 3   EXAMINATION BY MR. STONE                 5
 4
 5
 6              INDEX TO EXHIBITS
 7   NUMBER       DESCRIPTION               PAGE
 8   DEFENDANT
 9   Exhibit 1    Petition for Bankruptcy    19
10   Exhibit 2    Statement of Financial     20
                  Affairs
11
     Exhibit 3    Interrogatory Responses    23
12
     Exhibit 4    Document Request           34
13                Responses
14   Exhibit 5    Delta Employment           67
                  Application
15
     Exhibit 6    The Way We Fly at Delta    87
16
     Exhibit 7    Accommodation Request      89
17
     Exhibit 8    Delta Travel Pass          99
18                Policies
19   Exhibit 9    Topics Discussed with     108
                  Employee
20
     Exhibit 10   Counseling and Discipline 124
21
     Exhibit 11   Counseling and Discipline 124
22
     Exhibit 12   Memorandum to Delta       145
23                Colleagues Worldwide
24   Exhibit 13   Frequently Asked          146
                  Questions
25
```

**Page 2**

```
 1   APPEARANCES OF COUNSEL:
 2   In Propria Persona:
 3        QUANIAH R. STEVENSON
          1744 Cambridge Avenue
 4        Atlanta, Georgia  30337
 5
     On Behalf of the Defendant(s):
 6
          BENJAMIN A. STONE, ESQUIRE
 7        Munger & Stone,, LLP
          2850 First Union Plaza
 8        999 Peachtree Street, NE
          Atlanta, Georgia  30309
 9        (404) 815-1884
          ben.stone@mungerandstone.com
10
11   Also Present:
12        Sheandra Clark
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1   Exhibit 14   Written Statement         185
 2   Exhibit 15   E-mail                    185
 3   Exhibit 16   Social Media              195
                  Communications
 4
     Exhibit 17   E-mail                    203
 5
     Exhibit 18   Medical Record            213
 6
     Exhibit 19   Medical Record            215
 7
     Exhibit 20   Medical Record            217
 8
     Exhibit 21   Appeal Log                229
 9
     Exhibit 22   EEOC Charge               238
10
     Exhibit 23   Right to Sue Letter       239
11
12
     (original Exhibits 1 through 23 were attached to the
13   original transcript.)
14
15
16
17
18
19
20
21
22
23
24
25
```

**Elizabeth Gallo**
COURT REPORTING, LLC

Page 5

```
 1          Deposition of QUANIAH RENETRA STEVENSON
 2                     June 29, 2017
 3
 4               QUANIAH RENETRA STEVENSON,
 5    being first duly sworn, was examined and testified
 6    as follows:
 7                     EXAMINATION
 8    BY MR. STONE:
 9          Q     There is no judge here, obviously.
10    Ms. Stevenson, there's a judge, obviously, if any
11    issues arise.
12                Have you ever had your deposition taken
13    before?
14          A     I never had -- never did one.
15          Q     You've never done one before.
16          A     (No response, indicating.)
17          Q     Okay.  You are Quaniah Stevenson, of
18    course; correct?
19          A     Yes.
20          Q     Do you -- have you ever been known by any
21    other name?
22          A     Most people call me Q, QU, they just
23    say Q.  Some people say Niah.  I have a kid name
24    that I don't want to say that my family calls me.
25          Q     A nickname.
```

Page 6

```
 1          A     Yes.  But my main name is Q or Quaniah.
 2          Q     Have you ever been known by any other
 3    legal name?
 4          A     Oh, no.
 5          Q     You've never changed your name before.
 6          A     No, sir.
 7          Q     Do you have a middle name?
 8          A     Renetra.
 9          Q     Spell that for me.
10          A     R-E-N-E-T-R-A.
11          Q     All right.  You told me a moment ago
12    you've never given a deposition before?
13          A     No.  I've never -- yeah, I don't know.
14          Q     Let me give you a couple of guidelines
15    that I think will make the day go quickly hopefully
16    and smoothly today.  All right?
17          A     Okay.
18          Q     You understand, first of all, that our
19    court reporter just gave you an oath; correct?
20          A     Yes, yes.
21          Q     You understand that that's the same oath
22    that you would take if you were giving testimony in
23    federal court.
24          A     Yes, yes.
25          Q     And you understand there are penalties,
```

Page 7

```
 1    including criminal penalties, associated with
 2    providing false information in this deposition while
 3    you're under oath.
 4          A     Uh-huh.
 5          Q     Correct?
 6          A     Yes, sir.
 7          Q     I'm guessing you have a general idea of
 8    what's going to happen today, insofar as you know
 9    I'm going to ask you a series of questions; correct?
10          A     Yes.
11          Q     And you're going to provide me, as you've
12    promised to do, truthful answers; correct?
13          A     Yes.
14          Q     A couple of other things that will make
15    the day go easier today.
16                First of all, let me, as I'm asking you a
17    question, finish the question completely before you
18    start to give the answer.
19          A     Okay.
20          Q     All right?  That will, among other things,
21    make life much easier for --
22          A     For Mari.
23          Q     -- our court reporter here.  Yes, exactly.
24                Second of all, if I ask you a question,
25    please give an answer with a verbal response, a yes,
```

Page 8

```
 1    a no, a -- if it's necessary, a narrative response
 2    to whatever question I'm asking.
 3          A     Okay.
 4          Q     All right?  That will also make it easier
 5    for the court reporter, because it's very hard for
 6    her to take down uh-huhs and huh-uhs.
 7          A     Okay.
 8          Q     All right?
 9          A     Yes.
10          Q     And then the third thing, and this kind of
11    goes with the first point I was making, do your very
12    best not to interrupt me, and I'll do my very best
13    not to interrupt you as you're giving the answer.
14          A     Yes, sir.
15          Q     All right.  Perfect.
16                Last point, if at any point during the
17    course of the day, and it might happen from time to
18    time, I ask you a question that you don't
19    understand, you tell me that, and I will do my very
20    best to make sure that you understand exactly what
21    I'm asking.  All right?
22          A     Yes, sir.
23          Q     All right.  If you give an answer, I'm
24    going to assume you understand my question.
25          A     Yes, sir.
```

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                  June 29, 2017

Page 9

1    Q    So if there's any doubt in your mind, you
2  ask me for clarification.  Okay?
3    A    Yes, sir.
4    Q    All right.  Ms. Stevenson, is there any
5  reason that your memory or your ability to testify
6  here is impaired in any way?
7    A    It's not impaired.
8    Q    All right.  Is there any reason why you
9  can't give full and complete and accurate testimony
10 here today?
11   A    No.
12   Q    All right.  Are you on any medications
13 right now?
14   A    Not regularly.
15   Q    Have you taken any medication in the last
16 24 hours?
17   A    No, no.
18   Q    So there's no medication that's affecting
19 your memory or --
20   A    No.
21   Q    -- your ability to testify.
22        When you say not regularly, tell me, are
23 there medications that you take from time to time?
24   A    Yes, sir.
25   Q    What are those medications?

Page 10

1    A    Amitriptyline.
2    Q    And what is that?
3    A    Do you want me to spell it?
4    Q    No, no, no.  I want you to tell me what
5  the medication does for you.
6    A    My mood, depression.
7    Q    All right.  And how often do you take
8  that?
9    A    Just if I'm -- I guess they call it -- if
10 I'm having a mood swing or feeling down.
11   Q    All right.  How often roughly have you
12 taken it in the last month, if at all?
13   A    Maybe once.
14   Q    Okay.  And who prescribes that to you?
15   A    Dr. Cherukupally.
16   Q    Okay.
17   A    Yeah.
18   Q    And when was the last time you saw
19 Dr. Cherukupally?
20   A    I cannot remember.
21   Q    Has it been more than a year?
22   A    A little less than a year because she left
23 that practice.
24   Q    Is there any other medication that you
25 take on a regular or irregular basis?

Page 11

1    A    No.
2    Q    All right.
3    A    No.
4    Q    And when was the last time you got a
5  prescription for amitryptyline?
6    A    I do not know.
7    Q    So the prescription you have is at least a
8  year or more old?
9    A    It's a little less than a year possibly.
10 I can double-check for you.
11   Q    All right.  Got it.
12        Do you drink alcohol?
13   A    No.  I do have a glass of wine
14 occasionally, holiday time.  I do not drink.
15   Q    You've not had any alcohol in the last
16 24 hours.
17   A    No.
18   Q    Okay.  Did you do anything, Ms. Stevenson,
19 to prepare for this deposition today?
20   A    I just kind of maybe read over a few
21 documents that you sent to me; documents that I
22 submitted in the courts.  Other than that --
23   Q    Nothing?
24   A    No, sir.
25   Q    All right.

Page 12

1    A    Just -- nothing at all, just --
2    Q    What specific documents did you review to
3  get ready for the deposition?  What were these few
4  documents?
5    A    Just the things that you've mailed to me;
6  things that I filed in the court.
7    Q    Like what?  Can you give me an example?
8    A    I guess like my interrogatories maybe;
9  some of my complaints when everything initially
10 transpired.  That's pretty much it.
11   Q    Are these -- did you look at any documents
12 that you have -- that either I haven't given to you
13 or you haven't given to me?
14   A    No.
15   Q    Everything that you've looked at is either
16 material that you've sent to me or I've sent to you?
17   A    Absolutely.
18   Q    All right.
19   A    Last night.
20   Q    Okay.  And how much time did you spend
21 looking at those documents?
22   A    Probably 30 minutes.
23   Q    Do you have any of those documents with
24 you?
25   A    No, sir.

Page 13

1    Q    All right.  They're at your house?
2    A    Yes, sir.
3    Q    All right.  I know that you have been a
4  party to some legal proceedings before, for example,
5  a bankruptcy; correct?
6    A    Yes.  Yes, sir.
7    Q    Other than a bankruptcy, have you been a
8  party to any other legal proceeding?  Any other
9  lawsuit, any divorce, anything like that?
10   A    I've never been married.
11   Q    Okay.
12   A    I've been through like eviction.  Is that
13  the same thing?  I -- I'm just trying to make
14  sure --
15   Q    Yes.  That would count as a legal
16  proceeding.
17   A    I've been through judgments if I owed on
18  rent.
19   Q    Yeah.
20   A    Traffic tickets, I don't know if that
21  applies.
22   Q    Sure.
23   A    Speeding.
24   Q    Yep.
25   A    When you say legal, are you talking

Page 14

1  arrests for anything or legal or --
2    Q    I was talking about lawsuits.  And
3  eviction proceedings would include that.  I have not
4  asked you about arrests yet.  But I will.
5    A    Oh.
6    Q    Have you been arrested?
7    A    Yes, I have been before.
8    Q    When was the last time you were arrested?
9    A    To answer accurately, I don't remember the
10  year.  It was for a speeding ticket that went
11  unpaid.  And --
12   Q    Got it.
13   A    -- they released me in like four hours or
14  so.
15   Q    Give me your best estimate of the year.
16   A    Oh, my gosh, maybe '07 or '08, yeah,
17  because it was -- yeah, it was unpaid ticket.  And I
18  missed court, and they made me pay the ticket, and
19  they released me.
20   Q    Got it.
21        Other than that arrest, that single
22  arrest, have you ever been arrested at any other
23  time in your life?
24   A    I have, tickets, I -- yeah, just --
25   Q    Unpaid tickets?

Page 15

1    A    Yeah, speeding ticket was -- the same --
2  it was the same thing, just unpaid speeding ticket.
3    Q    Got it.
4        And so before the arrest you just told me
5  about that occurred in '07 or '08, when was the time
6  before that that you were arrested?  How long ago?
7    A    Probably -- it probably occurred after
8  that, maybe like -- I don't know.  I don't know the
9  exact year.  It might have occurred after '08, maybe
10  2010 possibly.  It might have happened later than
11  that.  I just know it was all the same thing.  It
12  was all dealing with speeding -- traffic violations.
13  It was --
14   Q    So the only thing that you -- the only
15  things that you've ever been arrested for in your
16  life is for unpaid speeding tickets?
17   A    Yes, and like -- yeah, tickets, just
18  either parking or a speeding type ticket that dealt
19  with -- I remember that was -- I had missed court on
20  the ticket, and I was ordered to just pay the
21  ticket.  And the judge just said from here on out,
22  just always make sure if you show up -- just make
23  sure you show up to court for your tickets, and this
24  will never -- won't happen.
25   Q    Has it -- have you only been arrested two

Page 16

1  times?
2    A    I think it's been twice for that, for the
3  same type of situation, which was always a traffic
4  violation.
5    Q    You've never been arrested for any other
6  reason.
7    A    No, no.
8    Q    Were these both in the city of Atlanta?
9    A    One, if I remember correct, happened --
10  gosh, this was so long ago.  Stone Mountain.
11   Q    Okay.
12   A    Yeah.  I remember Stone Mountain.  The
13  other was -- I think it was East Point.
14   Q    All right.
15   A    I don't know if East Point and College
16  Park is the same, because I was at the little
17  courthouse over in the Main Street area.  So people
18  kind of get it -- it's either College Park or East
19  Point.  But they have a courthouse over there, so
20  that's where I was.  I paid the ticket, which was a
21  bench thing because I didn't show up for the -- it
22  was a -- I was sick.  It was the speeding.  And I
23  ended up -- yeah, they released me that same day.
24  They released me that same day.
25   Q    So you've never spent the night in prison?

Page 17

1    A    Never.  Never in my -- never.
2    Q    Have you ever -- other than the two
3  arrests that you've told me about, and your eviction
4  proceedings --
5    A    Yes, sir.
6    Q    -- and your bankruptcy, have you ever been
7  involved in any other criminal or civil legal
8  proceeding?
9    A    Never been in a criminal at all.  The only
10  civil that I remember that I think is on my credit
11  report was a judgment for old rent -- rental that I
12  stayed.
13        And the judge at that time ruled for me
14  and ordered -- deducted something per the leasing
15  person that I owed, which was the owner of the
16  townhouse.  And ordered them not to proceed any
17  further and said, You all just work it out of the
18  court.  They dismissed it and said work it out.  And
19  the judge lowered the balance for me.
20    Q    Any other legal proceeding that you've
21  been involved in?
22    A    No.
23    Q    Have you ever applied for any -- I know
24  you applied for some unemployment benefits.
25        Have you ever applied for any other

Page 18

1  governmental benefits, Social Security benefits --
2    A    Food stamps --
3    Q    -- food stamps.
4    A    -- does that apply?
5    Q    Yes.
6    A    Yes, sir.
7    Q    When did you apply for food stamps?
8    A    I do not remember the actual date, but I
9  think it probably was after I was terminated, which
10  probably --
11    Q    From Delta?
12    A    Yes, sir.
13    Q    Okay.
14    A    Which probably occurred around August --
15    Q    Yeah.
16    A    -- of 2015.
17        But I have had stamps before that, like if
18  my hours or something dropped, and my income -- if I
19  wasn't making enough, you qualify for it.  So I have
20  had them like on and off ongoing.  But once I was
21  terminated, they gave me the maximum amount because
22  they saw that I had -- the income.
23    Q    And are you still receiving food stamps?
24    A    Yes, sir.
25    Q    Still the maximum amount?

Page 19

1    A    Actually, they just cut some of my amount.
2  I'm not receiving the maximum.  I'm receiving I
3  think like 150 or something, 153.  I think that's
4  it.
5    Q    And that's per --
6    A    It's per -- you just get it once a month.
7    Q    Right.
8    A    Yes, sir.
9    Q    All right.  Let me show you just a couple
10  of documents.  I'm not going to ask you a lot of
11  questions about them.
12        (Exhibit 1 was marked for identification.)
13  BY MR. STONE:
14    Q    The first thing I'm going to show you is
15  your voluntary petition for bankruptcy in this case.
16  And I'm just going to ask you to take a quick look
17  at it.  I'll show you a series of documents today.
18  And each time I show you a document, I'm going to
19  mark it with a little sticker and a number.
20        So that's No. 1?
21    A    Yes, sir.
22    Q    So I'm showing you what's Exhibit No. 1.
23        And my question to you is, is that your
24  petition for bankruptcy that you filed in bankruptcy
25  court here in Georgia?

Page 20

1    A    You mean like is this what the attorney at
2  that time gave me?  Because I did a Chapter 13
3  first.  And then the attorney I had at the time
4  advised, You don't have anything to -- really to
5  work with.  So she said, I'm telling you, I suggest
6  you do a 7.  I didn't want to do a 7 because I was
7  trying to keep my car at the time.  And she said,
8  You -- please do a 7.  That will help you better.
9  So it went from a 13 to a 7.
10    Q    All right.  I'm going to show you that --
11  on page 1 --
12    A    Oh, there it is.
13    Q    You'll see that it's a Chapter 13
14  bankruptcy.  And this is a petition that was filed
15  by you --
16    A    Yes.
17    Q    -- or on your behalf by your attorney in
18  district court.  I'm just asking you to confirm that
19  for me.
20    A    Oh, yes, yes.
21    Q    All right.  And then I'm going to show you
22  one other document related to your bankruptcy.
23        (Exhibit 2 was marked for identification.)
24        (Discussion off the record.)
25

Page 21

```
 1   BY MR. STONE:
 2       Q    So the next thing I'm going to show you is
 3   what's been marked as Exhibit 2.  And ask if that's
 4   a statement of financial affairs that was filed on
 5   your behalf.  Take your time and take a look at it
 6   and make sure you recognize it.
 7       A    Would this have been -- because there was
 8   so many papers --
 9       Q    Sure.
10       A    -- Attorney Stone, would this have been
11   what my Chapter 13 attorney would have filed.
12   Because I went between two attorneys for the 7 and
13   the 13.
14       Q    (Indicating.)
15       A    This would be the paperwork that they
16   filed?
17       Q    Yeah.  You can see at the top here.  This
18   is something, first of all, that was filed in your
19   Chapter 13 bankruptcy.
20       A    December.
21       Q    See where it says Chapter 13?
22       A    Uh-huh.
23       Q    And you see it was filed December of 2015.
24       A    Right.  That was right around the time.
25       Q    Right.
```

Page 22

```
 1       A    Am I okay to look?
 2       Q    Oh, you're more than okay.  I expect you
 3   to.  And make sure you recognize it as your
 4   statement of financial affairs.
 5           (Comment by Reporter.)
 6           (Discussion off the record.)
 7   BY MR. STONE:
 8       Q    And then answer my question, which is is
 9   that the statement of financial affairs that was
10   filed --
11       A    Yeah.
12       Q    -- on your behalf?
13           And I assume it is your practice, and that
14   you would have, consistent with that practice, told
15   the truth in all of your filings in the bankruptcy
16   court; correct?
17       A    Yes, sir.
18       Q    All right.  So when you file something,
19   and it's under oath, you're very careful to make
20   sure that it's truthful; correct?
21       A    Yes, sir.
22       Q    All right.  And I think you told me this,
23   but just to be sure, I'm right you have never filed
24   for disability benefits with the Social Security
25   Administration.
```

Page 23

```
 1       Am I correct on that?
 2       A    I haven't filed for me.  But I helped my
 3   mother because my -- I've recently been filing --
 4   trying to help my mom out --
 5       Q    Yes.
 6       A    -- because she has some things going on
 7   that I'm trying to get taken care of for her because
 8   she's elderly.
 9       Q    But you, for yourself, have never sought
10   Social Security benefits for yourself.
11       A    No.  I don't -- I -- no, I know I wouldn't
12   qualify anyway.
13       Q    All right.  Fair enough.
14           (Exhibit 3 was marked for identification.)
15   BY MR. STONE:
16       Q    Let me show you what's been marked as
17   Exhibit No. 3.  And ask if you recognize those as
18   your responses to the interrogatories --
19       A    I looked at this.
20       Q    -- that Delta sent you?  Yes?
21       A    That Delta sent me?
22       Q    That I sent you on --
23       A    Oh.
24       Q    -- on behalf of Delta.
25       A    Yes.  This looks like what you sent me,
```

Page 24

```
 1   yes, sir.
 2       Q    Well, let's be clear, these are actually
 3   your responses, so this is what you would have sent
 4   me.
 5       A    Sent you, yes, sir.
 6       Q    All right.  And you recognize it as such;
 7   correct?
 8       A    Yes, sir.
 9       Q    And when you responded to Delta's
10   interrogatories, did you tell the truth?
11       A    Yes, sir.
12       Q    All right.  And you said you reviewed this
13   yesterday for a little while; correct?
14       A    Just for about 30 minutes.
15       Q    And is everything in this response still
16   accurate and complete?  Take as much time as you
17   need to answer that question.
18       A    It's correct.
19       Q    All right.  Let me -- hang on to that
20   document because I'm going to ask you some questions
21   about it.
22           Turn to page 3 of Exhibit 3 for me.  All
23   right.  And you'll see there I'm looking now at your
24   response to Interrogatory No. 6.
25           Do you see that?
```

Page 25

1    A    Yes.
2    Q    Okay.  And these are the healthcare
3  providers who have provided services to you for the
4  last ten years; correct?
5    A    Yes --
6    Q    All right.
7    A    -- or I have a -- do I have to put my
8  gynecologist in here?
9    Q    Well, it called for all of your healthcare
10 providers.
11   A    Oh, okay.
12   Q    So let's talk -- we'll talk about that in
13 a minute.
14        Okay.  Let me identify, first of all, the
15 people that have been listed here.  You first
16 indicate Dr. Kelley from Peachtree Orthopaedics;
17 correct?
18   A    Yes.
19   Q    And is Peachtree Orthopaedics and
20 Dr. Kelley, is that who treated you for your
21 shoulder injury when the bag fell?
22   A    Yes, it -- but it's not just shoulder.
23 It's my shoulder, neck and back.
24   Q    But your --
25   A    -- and kind of -- he is, I think, a neck

Page 26

1  specialist and then -- yeah.  He's a neck
2  specialist, but he treated all of it, yeah.
3    Q    I didn't mean to be as narrow as that.
4        Your orthopedic injury suffered when you
5  had a fall of a bag; correct?
6    A    Yes, yeah, when --
7    Q    And that was in 2013; correct?
8    A    Was it '13 or was it '14?  Gosh, I'm not
9  accurate on the year.  It was '13 or '14, but I know
10 exactly it happened on March the 20th.  And I do
11 know it happened March, the 20th or the 21st, when
12 my supervisor had to take me down to on-site
13 therapy.
14   Q    Okay.  All right.  Well, we'll look at
15 some documents in a little while that will clarify
16 that.
17   A    Okay.
18   Q    But that's what Dr. Kelley at Peachtree
19 Orthopaedics was treating you for; correct?
20   A    Yes, sir.
21   Q    And then you just told me a moment ago
22 that Dr. -- I'm going to mispronounce it, but
23 Cherukupally?
24   A    She.
25   Q    She is treating you or did treat you --

Page 27

1    A    Did.
2    Q    -- for a psychologist.
3    A    Did.
4    Q    You're no longer seeing her?
5    A    No, she left that practice.
6    Q    Are you currently seeing any other
7  psychologist?
8    A    I am not.  I have recently been trying to
9  get a new person that I have not yet reached out to.
10   Q    Okay.  Have you identified somebody to
11 reach out to?
12   A    I do have a name.  I'll be honest, I -- I
13 can get that to you later.  I do not have it with
14 me.  I don't remember.
15   Q    But you've not seen that person, whoever
16 it is.
17   A    No.
18   Q    And I think you told me that it's been
19 probably a year since you saw Dr. Cherukupally?
20   A    Maybe a little less than a year.  I can't
21 say accurately, but it has been a while since I last
22 saw her.
23   Q    And how long did she treat you for?
24   A    Probably maybe six months.
25   Q    Okay.

Page 28

1    A    It may be a little less than that.
2    Q    How many times did you --
3    A    She has done -- she has done surgery --
4  what do you call it, an outpatient procedure on me
5  as well.
6    Q    What outpatient procedure did she do on
7  you?
8    A    It was dealing with my initial -- what I
9  deal with my neck and my shoulder.
10   Q    Okay.  So she's treating you for more than
11 your psychological issues.
12   A    Yeah.  She did do -- she has done that as
13 well.
14   Q    All right.  Is she a psychologist by
15 training or is she a --
16   A    I never asked her.
17   Q    All right.
18   A    When she would treat me and talk with me,
19 she just kind of knew a lot of things that I was
20 going -- going through with.  And per her, I guess,
21 medical findings, she decided that she wanted to
22 place me on what she placed me on.
23   Q    When did she place you on amitriptyline?
24   A    I do not know the date.  I can't remember
25 the date, because it's been a while since I saw her.

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                                June 29, 2017

Page 29

1    Q    Give me your best estimate.

2    A    Oh, gosh, maybe right around -- let me

3  see.  Maybe October or September 2016.  I did try to

4  go back and see her.  But when I went back, that's

5  when I found out that she had left the practice.

6    Q    I got it.

7         And how many times have you taken

8  amitriptyline in your life?

9    A    Just only once she had prescribed it and

10  thought that that would be something that would be

11  best for what she -- where she thought I was at the

12  time.

13    Q    I asked a poor question.

14         How many times have you physically taken a

15  pill?

16    A    I cannot answer accurately because I never

17  counted.

18         You want an estimate?

19    Q    (No response, indicating.)

20    A    I don't know.  Again, just when I'm -- if

21  I feel depressed or in a mood, it just kind of helps

22  me, you know.

23    Q    Five times?  Have you taken it five times

24  in your life, approximately?

25    A    I've taken it more than five times.  Maybe

Page 30

1  eight times.

2    Q    Okay.  That's good enough.

3         Other than Dr. Cherukupally, have you seen

4  any other person for any psychological conditions?

5    A    Actually, Dr. Clavo, who's on here, I --

6  he kind of had the same kind of conversations that

7  Cherukupally had with me and -- how do you say it?

8  He kind of -- what's the word I'm looking for?  He

9  was in agreeance with what she had prescribed, based

10  off of what he talked about with me.

11    Q    Any other doctor, other than that, that

12  you've ever seen for any psychological condition in

13  your life?

14    A    I actually -- not at this time.  I can't

15  remember.

16    Q    Is there anything I could do to help you

17  remember or refresh your recollection?

18    A    No.  I -- I'll just say no.

19    Q    So you can't recall ever seeing anybody

20  else for any psychological condition.

21    A    I cannot.

22    Q    All right.  And other than what you just

23  described that Dr. Clavo talked to you about, did

24  Dr. Clavo talk to you about any other or treat you

25  for any other condition?

Page 31

1    A    He also -- he knew about my injury or

2  whatever.  He talked to me about it.  But he's never

3  done any procedures or nothing like that.  So we

4  just more so talked about the depression and the

5  things that I was kind of going through with and --

6    Q    Is Dr. Clavo a psychologist?

7    A    I never asked him if he is.  He just read

8  the notes per Dr. Cherukupally.  And he just kind of

9  emphasized what she -- what that doctor talked about

10  with me.

11    Q    How many times did you see Dr. Clavo?

12    A    Once.

13    Q    Okay.  Other than the three doctors that

14  are listed in this response to Interrogatory No. 6,

15  Dr. Kelley, Dr. Cherukupally and Dr. Clavo, who else

16  have you seen for any healthcare condition in the

17  last ten years?

18    A    Oh, Dr. Melinda Miller-Thrasher.

19    Q    She's your OB/GYN?

20    A    Yes.

21    Q    Who else?

22    A    Dr. Thrasher.  I've been to the ER.  I

23  just don't know the doctors' names, because they

24  change the doctors so much.

25    Q    Yeah.

Page 32

1    A    None at this time.

2    Q    All right.  How many times have you been

3  to the ER?

4    A    I can't say accurately, but maybe twice in

5  the past maybe say year.

6    Q    Okay.

7    A    Maybe twice possibly.

8    Q    All right.  What ER did you go to?

9    A    I normally go to -- what's this --

10  Crawford Long Emory, yes, sir.

11    Q    And why did you go to the ER in the last

12  year?

13    A    I actually was having some chest pains

14  during one situation, chest pains, anxiety, which is

15  actually what the doctor -- when I just kind of

16  started explaining everything to her she said,

17  You're having an anxiety attack.

18    Q    All right.  And that was within the last

19  year?

20    A    Yes, sir.

21    Q    All right.  Did she prescribe anything for

22  you?

23    A    She prescribed a Valium.

24    Q    One Valium?

25    A    Well, she gave me -- they gave me that

Page 33

1  there that particular evening, and then she
2  prescribed me some.  I did not fill those.
3      Q    All right.  Did you stay overnight in the
4  ER?
5      A    Just through the morning.  But, yeah, they
6  didn't keep me in there.
7           And, oh, I just don't remember.  I
8  actually -- I think a year, year and a half, prior
9  they kept me for three days.
10     Q    All right.
11     A    I forgot about that.  They kept me for
12  three days at Emory, because the cardiologist wanted
13  to run some extensive stuff on my heart, because I
14  was anxiety and having chest pains.
15     Q    That was about a year ago, so 2016,
16  roughly?
17     A    It might have been around then.
18     Q    That's your --
19     A    I have no problem -- I can try to find
20  that.
21     Q    But your best estimate was about a year
22  ago?
23     A    Yes, sir, about a year and a half ago,
24  year, year and a half ago.
25     Q    Sometime in 2016.

Page 34

1      A    Yes, sir.
2      Q    Any other trips to the ER, the --
3      A    None that I can think of right now.  It's
4  been a lot.
5      Q    Okay.
6           (Exhibit 4 was marked for identification.)
7  BY MR. STONE:
8      Q    Let me show you what's been marked as
9  Exhibit No. 4, if I can back, Ms. Stevenson.
10          (Discussion off the record.)
11 BY MR. STONE:
12     Q    And I'm showing you Exhibit No. 4.
13          And I'm going to ask you, first of all, is
14  that your responses to Delta's document request in
15  this case?
16     A    Yes.
17     Q    Yes?
18     A    Yes, sir.
19     Q    Who prepared the Exhibit No. 3, the
20  interrogatory responses, and this Exhibit No. 4 for
21  you?
22     A    This one?  Who --
23     Q    Both 3 and 4, who prepared those?
24     A    Am I allowed to?  Can --
25     Q    You're not only allowed to, you have to.

Page 35

1  You have to tell me who -- you have to answer my
2  question.
3      A    The person -- am I allowed -- can I say --
4  am I allowed to say a name?
5      Q    You're allowed to say -- you're allowed to
6  give a truthful answer to the question.
7      A    Oh, okay.  Well, a paralegal person.
8      Q    Okay.  And who is -- what is that person's
9  name?
10     A    Gary.
11     Q    What's Gary's last name?
12     A    Pernice.
13     Q    Pernice?
14     A    P-E-R-N-I-C-E.
15     Q    All right.  And who is Mr. Pernice?
16     A    He's a paralegal --
17     Q    All right.
18     A    -- from what I've been told.
19     Q    Is he at some law firm?
20     A    I do know that -- per what he has told me,
21  he helps prepare for various attorneys in the
22  Atlanta area.
23     Q    He works on his own?
24     A    I never asked him.  I just know he did
25  state he works for a lot of attorneys and helps them

Page 36

1  prepare cases.
2      Q    Okay.  How did you come in contact with
3  Mr. Pernice?
4      A    I was referred to him actually by a lady.
5  To this day I do not even know the lady.  I just
6  kind of met her in passing during all of my
7  bankruptcy stuff.  And her, just kind of knowing
8  some of the things that I've been going through with
9  trying to get my job and stuff back, she'll, I'll
10  refer somebody so you that I think can help you, you
11  know.
12     Q    And that -- it was Mr. Pernice?
13     A    It was -- she referred me to him.
14     Q    And how many times have you spoken to
15  Mr. Pernice about your -- about this case?
16     A    I have not counted the times.  I've spoken
17  to him on and off quite a few times.  We do go
18  through periods where -- because he is extremely,
19  extremely busy working with your colleagues, he --
20  we may go months, you know, and not talk, and I just
21  handle everything myself.
22          So I don't know -- I can't say, oh, I
23  talked to him ten times, because I never count.  I
24  just -- when I can reach him, I can reach him, or
25  when he reaches out to me, he'll -- apologizes and

Page 37

1  says, Hey, I've been -- you know, we had a heck of a
2  case going on.  I had to do this; I had to do that.
3  He catches me up on everything.  And then he'll go,
4  Okay.  Where are we?  And then we get right to it.
5      Q    So he's providing you periodic legal
6  advice in the case?
7      A    He can't provide me legal advice because
8  he's not an attorney.  But I know he's a paralegal
9  based off what he's -- I'm just stating what he
10  stated to me; that, you know, he's a paralegal, he
11  works for various firms in Atlanta, and he assists
12  attorneys with gathering information and putting
13  cases together.  That's what he --
14      Q    If he's not providing you legal advice,
15  why are you talking to him?  What is he giving you?
16      A    I don't understand that question.
17      Q    Sure.
18      A    Well --
19      Q    What do you all talk about?
20      A    If I write something up, because I am
21  pro se, he may correct me and say, That's quite --
22  that's not quite how -- that's not the verbiage or
23  something like that, because I'm not an attorney.
24  I, you know --
25      Q    So he's giving you advice on the filings

Page 38

1  that you're making in the case.
2      A    Sometimes if I write something or -- and I
3  run it by him, he'll say, you know, Well, I can't
4  give you legal advice, but no, that's not the
5  correct thing to say.
6      Q    All right.
7      A    Because I don't -- I don't know law like
8  that.
9      Q    Have you talked to him more than ten times
10  about this case?
11      A    Again, I don't -- I don't think I have.
12  Because, again, we go -- during this whole process,
13  it's been a lot of long periods of time where I have
14  not talked to him for three months or two months at
15  a time.  And I just kind of been feeling my way
16  through, I guess -- what is the word I'm thinking --
17  the legal -- well, the information that he's given
18  me, and I just try to word it as best I can, as
19  educational as I can --
20      Q    But did he --
21      A    -- pro se.
22      Q    He drafted Exhibit No. 4; correct?  You
23  didn't draft that.
24      A    I -- well, I gave him the facts.  I guess
25  the things that I have been receiving or going

Page 39

1  through with.  And I write things up.  I actually
2  write up, and he'll -- I'll go over it with him, and
3  then he may scratch out and say no.
4      Q    Well, for example, this -- you're not an
5  attorney.  I assume you don't know how to do general
6  objections to document requests; correct?  He gave
7  you all this language, correct, on page 1 of
8  Exhibit 4?
9      A    That's a fair -- what's the wording I
10  guess I'm trying --
11      Q    That's a fair statement?
12      A    That's fair that you said that.
13      Q    Fair enough.
14      All right.  Did Mr. Pernice -- did he
15  write your complaint as well in the case?
16      A    You mean my initial when I filed it?
17      Q    (No response, indicating.)
18      A    He didn't write the complaint.  I actually
19  wrote the complaint.  But I went over everything,
20  and it was redrafted; is that correct to say, per
21  him.
22      Q    Okay.  Did he type it up or did you?
23      A    How did that go?  No, he sent it to me.
24      Q    All right.
25      A    Yeah.  It was --

Page 40

1      Q    All right.
2      A    It was e-mailed, yeah.
3      Q    He e-mailed -- he wrote it and e-mailed it
4  to you?
5      A    I think he either -- to answer it honestly
6  because I -- it was either e-mailed -- I think it
7  was e-mailed, or did I meet with him and he gave it
8  to me, and it was like I had to go file it.
9      Q    Got it.
10      A    But answering you honestly, I wrote it up,
11  and he went through it and was like --
12      Q    This isn't how you do a complaint.  Let me
13  show you how?
14      A    Yes, sir.
15      Q    All right.  I'm going to ask you some
16  questions now about documents that you have in your
17  possession.
18      A    Okay.
19      Q    And whether you've given us everything
20  that you have at this point or you still have some
21  material to give us.
22      A    Yes, sir.
23      Q    So have you given us all of your tax
24  returns?
25      A    Did you get the most recent one that I

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                      June 29, 2017

Page 41

1    filed?
2          I think -- the only one that I think I
3    have not given to you is 2012.  And I think I had
4    e-mailed you -- it's because 2012, my income tax
5    preparer, for some crazy reason, she always -- she
6    and he.  This is two different people I go between
7    to do my taxes.  She -- for some reason, 2012 she
8    ended up leaving Jackson Hewitt at that time, and I
9    never got a copy.  She usually likes give me all of
10   the copy of 2013, 2014, 2015, 2016, like all my
11   things that she -- the taxes that she's done.
12         But that particular one, there was
13   something to the effect, I no longer am at Jackson
14   Hewitt.  You're going to have to just call them.
15   Some kind of way the software or something that they
16   were using on the computer.  And because she had
17   left the firm, she never was able to generate that
18   particular one.  But she said it was as easy as --
19   all I would have had to do is just go to Jackson
20   Hewitt.  She said they easily just print it out.
21       Q    But you haven't had a chance to do that
22   yet?
23       A    Yeah.  Well, what it is, is I want to
24   say -- I remember her saying, I think, it was -- at
25   that time we had that conversation, it was a --

Page 42

1        Q    Stop.  I'm not -- I'm asking you a very
2    simple question.
3        A    Oh, okay.
4        Q    You haven't given us your 2012 return.
5        A    No.
6        Q    Have you gone to Jackson Hewitt to get it
7    yet?
8        A    I have not done that.
9        Q    Why not?
10       A    I just have not gotten it because of all
11   the things that I'm dealing with, Ben, a lot.  I
12   can't --
13       Q    Do you keep a diary of communications that
14   you've had with Delta?
15       A    I do not keep a diary.  I just -- when
16   they have sent me stuff, or when you sent me stuff,
17   I just -- well, I don't have a packet like that, but
18   I have like a folder.  I just -- I just put it all
19   and just keep it --
20       Q    Have you given us everything that's in
21   that folder?
22       A    Yes.  I think I've given you everything in
23   there, with the exception of the 2012 ones that I
24   just have not went to Jackson Hewitt and got.  I
25   haven't, what do you call it, kept anything from

Page 43

1    you.  I have nothing to hide.
2        Q    You've copied that entire folder and given
3    it to me, yes or no?
4        A    Well, there's not nothing to copy.  It's
5    just everything that I submit, like to the court or
6    whatever, and everything in discovery, especially
7    the most recent things I've sent to you, that is
8    all, I think, I have at this point.
9        Q    Do you have e-mail -- do you keep e-mails?
10       A    Yeah, I do.  I keep my e-mails sometimes.
11       Q    Have you gone through your e-mails to look
12   for your communications from Delta at this point, or
13   you haven't done that yet?
14       A    I don't think Delta has -- Delta has
15   directly sent me e-mails.  Usually Delta just -- you
16   all mail stuff to me.  It usually has been mailed.
17       Q    All right.  Have you checked to see if you
18   have any e-mails from Delta?
19       A    Recently?
20       Q    At all, any e-mails at all from Delta.
21       A    Since I have not been there.
22       Q    Right, or before that time.
23       A    Yeah.  My e-mail -- because I know they
24   can't send me anything, because I don't have a Delta
25   e-mail -- well, that Delta e-mail.  I do have an

Page 44

1    e-mail, but I don't have that one.
2          No.  I don't think I have e-mail --
3    everything that they've sent me, to my knowledge --
4        Q    Listen to my question.
5          Have you gone and looked through your
6    e-mails to see if you have any e-mails from Delta?
7    Have you done that yet?
8        A    I -- no, because they've never sent me any
9    e-mails.  They send everything by mail, to my
10   understanding.  I've just gotten everything in the
11   mail.
12       Q    Do you have any e-mails or other documents
13   from the time that you were working at Delta?  Have
14   you retained any of those?
15       A    Oh, I sent it to you, yeah, I did.
16          Is that what you're asking me?
17       Q    What I'm trying -- here's what I'm trying
18   to find out, Ms. Stevenson.
19          During the time -- you were at Delta for a
20   number of years.
21       A    Almost ten, yeah.
22       Q    During that time, you would have received
23   a number of communications from Delta, correct --
24       A    Uh-huh.
25       Q    -- by mail, by e-mail or otherwise;

Page 45

1  correct?
2      A   Uh-huh.  Okay.  Can I --
3      Q   **Listen to my question.**
4      A   Okay.
5      Q   **Am I correct on that?**
6      A   Yes.
7      Q   **Okay.  Do you -- have you gone and done a**
8  **search at your house for all of the communications**
9  **that you've gotten from Delta during your employment**
10 **or thereafter?  Have you looked for those yet?**
11     A   I have looked, and I didn't know that I
12 was supposed to be looking like for old e-mails from
13 when I worked there, because I never -- I love my
14 career so much, I never -- I never anticipated that
15 I wouldn't be able to, you know, like correspond or,
16 you know, get e-mails.
17         So I wasn't necessarily saving or anything
18 like that.  Like if something got sent to a personal
19 e-mail per like from my Delta, because I thought I
20 would still -- you know, I thought I would still be
21 working my job.
22     Q   **I'm asking a really simple question,**
23 **Ms. Stevenson.**
24         **You got e-mails; correct?**
25     A   Yes, yes.

Page 46

1      Q   **Have you gone and looked for e-mails from**
2  **Delta that you have at any time?  Have you done that**
3  **yet?**
4      A   No -- well, yes, I have, which are the
5  ones that I -- that I had printed out that I
6  actually faxed to you, if that makes sense to you,
7  what I just said.
8      Q   **So you do not have any e-mails from Delta,**
9  **other than what you've sent me.**
10     A   None that I know of.
11     Q   **Have you looked for any?**
12     A   Well, I have looked through them.  And the
13 ones that I e-mailed -- the ones that I faxed to
14 you, are the only ones that -- that I found in my
15 personal e-mail or my e-mail that I have, which is
16 what I printed out, per e-mails that were sent to me
17 at the time from my supervisors at Delta.  And they
18 sent them to me.  Then I get them.  And I'd print
19 them out, if I need to print them out, which is what
20 you have.  That's all I have.
21     Q   **How did you look for these e-mails?**
22     A   How?
23     Q   **Yeah.**
24     A   Well, just going through my -- my
25 personal -- like if you type in like Delta, yeah,

Page 47

1  that way, and then it will just pop up.  And I
2  just -- I printed out, based off of what I
3  remembered my supervisors forwarded to me at the
4  time, yeah.  At the time, I was -- I was getting
5  awards, and what they call, I guess --
6      Q   **I'm not asking you about that.  All I**
7  **asked is how you looked for your e-mails.**
8          **So you pulled up your e-mail; correct?**
9      A   Yeah.
10     Q   **Did you look at every single e-mail that**
11 **you had historically?**
12     A   Yes, I did, I did, and those are the ones
13 that I could -- that I printed out and gave to you.
14     Q   **How did you -- did you look just one by --**
15 **obviously, you have e-mails other than from Delta.**
16         **Did you look one by one through your**
17 **e-mails?**
18     A   Yes.
19         (Comment by Reporter.)
20         (Discussion off the record.)
21 BY MR. STONE:
22     Q   **I'm going to ask you a very specific, very**
23 **precise question, Ms. Stevenson.**
24         **To look for your e-mails --**
25     A   Uh-huh.

Page 48

1      Q   **-- did you do a word search for all Delta**
2  **e-mails?**
3      A   I just did Delta.  Like I'll type in
4  Delta, and it just -- things would just pop up.
5      Q   **What e-mail account did you look at for**
6  **your Delta e-mails?**
7      A   My Gmail or my Yahoo --
8      Q   **And what are those two --**
9      A   -- which I rarely use --
10     Q   **-- e-mail addresses?**
11     A   It's Q-U-A-N-I-A-H underscore S at Yahoo,
12 which I rarely even use.  I don't even really use
13 that e-mail that much anymore.  And then my Gmail,
14 which is the one that I mostly use.  It's
15 Quaniah2011 at gmail dot com.  That's the one I'm
16 usually on.
17     Q   **And you looked at both of those e-mails**
18 **and searched for the word Delta in those e-mails.**
19     A   Uh-huh.
20     Q   **You have to say yes or no.**
21     A   Yes.
22     Q   **What about hard copy documents that Delta**
23 **has mailed to you; have you looked for those yet?**
24     A   I e-mailed -- no.  I think that I faxed
25 some to you.

Page 49

1    Q   That's not my question.
2    A   Oh.
3    Q   Have you looked for all hard copy
4  documents that Delta has sent to you at any time?
5    A   I have at various times.  I have not
6  lately been able to locate if there are any more at
7  the present time, because I have some things in
8  storage that I had not been able to put my hands on.
9    Q   Where are those documents in storage?
10   A   What Delta sent me?  They -- if
11 they're there, they would be possibly in a -- maybe
12 one of my book bags or something like that.
13   Q   Why have you not looked for those yet?
14   A   Because I was not able to pay the bill.
15   Q   What bill?
16   A   My storage bill and --
17   Q   I got you.
18       So you have documents in storage that you
19 cannot access because you haven't paid your storage
20 bill.
21   A   Yes, sir.
22   Q   What storage location are those at?
23   A   If they're there -- and you're talking
24 about what Delta has mailed to me since the whole
25 process -- if they're there, it would be Iron Horse,

Page 50

1  which is off of South Cobb Drive.
2    Q   Let me be clear.  I'm talking about all
3  documents that Delta has sent you at any time,
4  during your employment or thereafter.
5    A   Oh, during my employment.  I mean yes.
6  I'm pretty sure I have my Delta uniforms and all of
7  that in my storage, my documents, all of that.  If
8  they're there, they would be in storage.  They
9  wouldn't be with me, because I have a lot of things
10 that -- in storage that I had not been able to
11 access because the bill -- I didn't look for them
12 because the bill was so behind.
13       And I had just gotten a call less than a
14 week ago about they were trying to auction my stuff
15 off, so I had to deal with something with that.
16   Q   All right.  What about documents that
17 you've received or sent -- received from or sent to
18 the EEOC; have you looked for those documents?
19   A   Those too -- some of them, I think, that I
20 have looked for, I think I've sent to you.  And then
21 some of them, same thing, would possibly be in one
22 of my book bags in my storage unit.
23   Q   All right.  And to be clear, while you
24 have not gone out -- because the bill is behind you
25 have not gone out to look for those documents;

Page 51

1  correct?
2    A   The bill -- the bill -- yes, the bill --
3  because of that, that's why I had not been able,
4  because they lock you out.
5    Q   Have you gone and asked to get in?
6    A   They -- Kelley would -- they -- she will
7  not -- like until the --
8    Q   Have you asked her if you can get it?
9    A   Oh, well, I had, yes, and it was --
10   Q   When did you ask her to get in?
11   A   I spoke with her last week.  And it was --
12 if the bill is not paid, they don't let anybody in
13 there, unless the bill is paid.  That's their
14 policy.  If the bill is behind, and the bill is
15 almost -- it was almost three months behind.
16   Q   So she told you -- you asked her
17 specifically, May I come in, and she said no?
18   A   Yes, I've asked her, because I even tried
19 to see if I could partial pay, and they were, no,
20 they only take full payments.  I asked them if they
21 could deduct late fees.  They said -- everything was
22 a no -- was a no, Attorney Stone, they couldn't do
23 that.
24   Q   How much do you owe?
25   A   How much do I owe on that deal?  It's paid

Page 52

1  now.
2    Q   Okay.  So you can access it now?
3    A   Yes.
4    Q   When did you pay it?
5    A   Just -- my father actually paid it a day
6  or so ago, which was not in time enough to get that
7  information for you, because it just got paid, I
8  think, a day or two ago.
9    Q   All right.
10   A   So that's why.
11   Q   Do you have any documents in your
12 possession relating to efforts you made to find a
13 job after you left Delta?
14   A   Do I have any documents --
15   Q   Uh-huh.
16   A   -- of what?
17   Q   Efforts you made to find a job after you
18 lost your job at Delta.
19   A   I don't think I have any documents,
20 because most things now, the same when I was at the
21 Department of Labor, you have to -- everything is so
22 online.  So to answer honestly, I wasn't keeping
23 documents or anything.  I just would -- I'm the type
24 of person I'll just go in and, you know, see if an
25 establishment is hiring.  And the next thing they

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                   June 29, 2017

Page 53

```
1    say is, You got to go online or whatever.  So
2    everything was kind of done online or by phone
3    call --
4        Q    So you --
5        A    -- at that time.
6        Q    And you didn't print out, for instance,
7    any job applications that you made.
8        A    No, I don't -- because everything was like
9    so electronic, stuff that I had applied for.  Like I
10   did apply for some stuff over at Southwest.  I
11   applied for some stuff at --
12       Q    I asked -- I didn't ask you --
13       A    Oh.
14       Q    -- those questions, Ms. Stevenson.
15            All I asked you is whether you printed out
16   job applications.
17       A    No.  I never printed it out.  They did
18   give me some responses back, the companies, e-mail,
19   but I did not print them out.  They're just --
20       Q    They're on your e-mail now?
21       A    If I did not erase them, they should be.
22       Q    Okay.  So you've got e-mail -- you've got
23   e-mail responses --
24       A    Yeah.
25       Q    -- back that are on your e-mail.
```

Page 54

```
1        A    Uh-huh.
2        Q    You've not printed those out yet and given
3    those to me.
4        A    I've never printed them out.
5        Q    And you've not --
6        A    I've just --
7        Q    You haven't done anything to give them to
8    me.
9            (Comment by Reporter.)
10           (Discussion off the record.)
11   BY MR. STONE:
12       Q    You have not printed those out yet.
13   They're on your e-mail; correct?
14       A    Yes.  They might be on the e-mail, if I
15   didn't erase them.
16       Q    All right.  Do you have any documents
17   relating to your nonrevenue travel benefits at
18   Delta?
19       A    Do I have any what?  Could you repeat the
20   question.
21       Q    Sure.  During the time that you were at
22   Delta you had pass benefits, nonrevenue travel
23   benefits.
24       A    Uh-huh.
25       Q    You have to say yes or no?
```

Page 55

```
1        A    Oh, yes, I'm sorry.
2        Q    Do you have any documents relating to
3    those travel benefits?  And I'm talking in the
4    broadest possible way.  Any documents relating to
5    your use of those benefits, your reservations on
6    DeltaNet, anything, related to your use of travel
7    benefits?
8        A    I can't answer that question effectively
9    because Delta has a record of everything I've ever
10   flown on.
11       Q    I'm not asking about Delta's records.  I'm
12   asking what you have, Ms. Stevenson.
13            Do you have any records?
14       A    All of my records, I'm saying, would have
15   been within my employee thing, my e-mail or my
16   TravelNet, whenever I would book.  I guess when we
17   get to that part of everything, they have every --
18   they have my entire record.
19       Q    So you have nothing.
20       A    No.  I -- again, I wasn't expecting that I
21   wouldn't be there so I -- all of my stuff was where
22   I could access while I was there.  Once I wasn't
23   there, I -- I haven't been able to go in and like
24   look and see.  Even with my regular e-mail, like any
25   of my nonrev stuff, because everything to my
```

Page 56

```
1    understanding --
2        Q    You've got to stop.  Just answer my
3    question, and then we'll move on.  Okay?
4            Next question, do you have any
5    communications with any of your travel companions
6    about Delta's nonrevenue travel benefits?
7        A    What could you -- what are you asking me
8    questionwise?
9        Q    Any, for example --
10       A    Do I have any communications with what?
11       Q    For instance, with Mr. Dais, who was your
12   travel companion --
13       A    Yes.
14       Q    -- correct?
15            Do you have any communications with
16   Mr. Dais about his use of nonrevenue travel
17   benefits?
18       A    Now?  I'm -- I don't understand the
19   question.  I don't --
20       Q    Do you have any communications with
21   Mr. Dais --
22       A    Uh-huh.
23       Q    -- about nonrevenue travel benefits?
24       A    No.
25       Q    All right.  So, for example, no e-mails or
```

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                    June 29, 2017

Page 57

1  texts where you're making travel reservations for
2  him.
3      A    Are you talking when I was employed?  I'm
4  just -- I'm just trying to understand.  Are you
5  talking about when I'm employed?
6      Q    I'm talking about anytime, anywhere,
7  anyplace.  I'm asking whether you have any
8  communications.
9      A    I communicated with him when I was -- I'm
10 saying as far as when I was employed, but not now
11 because I'm not employed.  So he doesn't nonrev now.
12     Q    Did you have any communications with
13 Mr. Dais during the time --
14     A    Yes.
15     Q    -- that you were employed --
16     A    Yes, when I was --
17     Q    -- about nonrevenue travel benefits?
18     A    Yes.
19     Q    Okay.
20     A    Yes.  I -- when I was employed.  That's
21 what I was trying to understand.  When I was
22 employed.  That was my boyfriend so --
23     Q    Do you have e-mails or texts or other
24 documents that would reflect those communications?
25     A    Just when I would book his travel for

Page 58

1  pleasure, which I made that very clear.
2      Q    You knew the rule was you could only
3  travel for pleasure.  Yes?
4      A    Yes.  I'm glad you asked me that.  I was
5  very clear that it was -- it's always -- when I
6  booked, I always booked my people, it was always for
7  pleasure.  They --
8      Q    We're going to talk about that.
9      A    Oh, okay.
10     Q    I promise you.
11         My question is, do you have in your
12 possession any communications with Mr. Dais about
13 travel that you booked for him during the time that
14 you were employed at Delta?
15     A    Just when I was there.  I guess like -- I
16 understand what you're asking me.  I'm trying to
17 answer the question effectively and honestly for
18 you.
19         Yes.  I communicated with him when I was
20 there about the nonrev travel.
21     Q    Do you have any of those communications?
22 Do you have any e-mails?  Do you have any texts?
23     A    Oh, no, none that -- none that I can --
24 not now.  I don't think I have anything -- there's
25 no -- I've changed phones.  He's changed -- like I

Page 59

1  don't -- that's what I'm saying, I don't really
2  understand.  I wouldn't have anything now, or even
3  then, other than my Delta TravelNet when I would
4  book his travel.  And say, Hey, you're booked for
5  whatever.
6      Q    There are no e-mails, for example, where
7  Mr. Dais says, Can you book some travel for me?
8      A    Within my Delta thing, it would probably
9  be -- that's what I'm saying, when I was at work, if
10 I was on my e-mail, you know, I would say, Hey,
11 you're booked for blah, blah -- blah, blah flight at
12 whatever time, but that was within my -- I can't
13 access Delta.
14     Q    So you currently have no such
15 communications.
16     A    No.
17     Q    All right.  And you've looked for them,
18 and can't find them.
19     A    Yeah, I -- yeah, I -- I don't -- we don't
20 even -- to answer you honestly, we -- after I wasn't
21 there, we don't even discuss nonrev.  I mean I --
22 yeah.  Since I wasn't there, he's not -- he hasn't
23 traveled nonrev.
24     Q    What I'm trying to understand is you have
25 e-mails in your possession that reflect

Page 60

1  communication with Mr. Dais, for example; correct?
2      A    Yes, when I was working there.
3      Q    Okay.
4      A    If you're talking about old stuff like
5  when I booked him a flight.  Is that what you're
6  saying?  I mean if I go back to, I guess, when I
7  first started, it may be an e-mail that shows,
8  Hey -- where he flew from here to here.  But that
9  was like way before any of this.
10         And, to my understanding, when the stuff
11 kind of occurred, it was like -- what I was told in
12 a meeting that I wasn't -- didn't have no knowledge
13 of, it was -- I don't -- they didn't want anything
14 from that far back.  So that's why I'm not
15 understanding.  It was like, no, we don't -- don't
16 worry about the stuff from '07, '08.  They didn't
17 want that.  So I'm not understanding.
18     Q    Ms. Stevenson, I'm not -- I haven't asked
19 you any of those questions.
20         What I'm asking you is -- I'm trying to
21 figure out what documents you currently have today
22 in your possession.
23     A    Yeah, I -- that's what I'm saying.  I
24 don't -- you're saying nonrev.  I guess where I'm
25 getting confused, I don't work at Delta anymore, so

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 16 of 87
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 233 of 675

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                          June 29, 2017

Page 61

1  I didn't keep any of me and his communication.
2      Q    All right.  So there's none on your
3  personal e-mail.
4      A    None that I know of, other than past stuff
5  where I would book it, and it might have come back
6  to me and say, Hey, you know, Mr. Dais is booked for
7  whatever whatever.
8          But usually, a lot of times, I would
9  just -- you know, just -- how it's a part where you
10 could send an e-mail, you know, send the person's
11 reservation.  And I sometimes would just send it to
12 him, meaning I wouldn't even seen it to my own, even
13 though I could.  I just would send it to him and
14 say, Here's your reservation.
15     Q    I haven't -- again, Ms. Stevenson, this --
16 I promise you this is --
17     A    Maybe I'm not understanding.
18     Q    Yeah, this is going to go a lot faster.
19         I'm asking a very simple question.
20     A    Uh-huh.
21     Q    I'm trying to figure out --
22     A    No.  I don't have anything now.
23     Q    And have you looked in your personal
24 e-mails to see if you do?
25     A    I haven't looked lately, but I looked back

Page 62

1  then.  I didn't see anything.
2      Q    Back then, before you left Delta, that's
3  when you last looked.
4      A    Yeah, or even right after I wasn't there.
5  But I didn't -- like I said, there was nothing --
6  nothing there.  He didn't -- he couldn't fly -- we
7  didn't fly anymore.
8      Q    Do you have any documents in your
9  possession that relate to jobs that you've held
10 since Delta?  For example, pay stubs from those
11 employers or --
12     A    Do I have pay stubs --
13     Q    (No response, indicating.)
14     A    -- from other jobs.
15     Q    (No response, indicating.)
16     A    I have -- well, now, now I do.
17     Q    Okay.  And you've not given me those;
18 correct?
19     A    Well, I'm newly -- like when you say --
20 no, I haven't -- I haven't given -- given them to
21 you.
22     Q    All right.
23     A    No.  I didn't know if you needed those.
24     Q    All right.  Give me your current address.
25     A    I'm kind of in between.  I'm homeless, and

Page 63

1  I'll give you where I stay sometimes.
2      Q    Okay.
3      A    It's 1744 -- oh, gosh, I just went blank.
4  1744 Cambridge Avenue.  And that's Atlanta, 30337.
5      Q    All right.
6      A    Yeah.
7      Q    And who owns that place?
8      A    I don't know the owner.  A friend of mine
9  just -- it's their place, and they just kind of
10 allow me to be there.
11     Q    Okay.  So have you a friend who's leasing
12 it?
13     A    Yes, yeah, they -- they lease it and --
14 yeah.  They know the owner or something.  I don't
15 know because, I'll be honest, I don't ask him their
16 business.  He just has allowed me to --
17     Q    Who's that friend?
18     A    Mark Brown.
19     Q    All right.  When was the last time you had
20 a permanent address?
21     A    About, what, four or five -- about four
22 months ago.  About four months ago.  I can give you
23 that address.
24     Q    What is that?
25     A    211 Crestridge Drive.  And that's Atlanta,

Page 64

1  30344.
2      Q    Okay.
3      A    That's who was -- someone else's, but I
4  was an occupant on there.  They -- yeah.
5      Q    Okay.  Were you leasing it, or you just
6  were staying there for free?
7      A    I was evicted.
8      Q    Were you leasing it?
9      A    Yes.
10     Q    Okay.
11     A    Couldn't pay the rent.
12     Q    And who were you leasing it from?
13     A    The name of the place is called Landmark.
14     Q    Okay.  All right.  And how long were you
15 there?
16     A    Just -- was it -- right at a year and --
17 yeah, that last month was -- couldn't make the rent.
18     Q    All right.  And why don't we go back one
19 further.
20         Where were you living before there?
21     A    That was when I was still working, 3871
22 Red Wine, just like the color and the wine, Red Wine
23 Road.  And it's Atlanta, 30344.
24     Q    And how long were you there?
25     A    I think probably two or two and a half

Page 65

```
1   years, probably almost maybe three, but two and a
2   half is -- yeah.
3        Q    And what's your date of birth?
4        A    ██████████.
5        Q    Okay.  All right.  You've mentioned that
6   you changed cell phones.  You told me that you
7   changed cell phones since the time you were at
8   Delta; is that correct?
9        A    Yes.  I've -- yeah.  I don't have the same
10  one, that I had when I was working there.
11       Q    Do you have the same phone number?
12       A    Yeah, yes.  I've had the same number for
13  probably 15 years.
14       Q    All right.  And what's your cell phone
15  number?
16       A    ████████2878.
17       Q    All right.  And you told me you've never
18  been married --
19       A    No.
20       Q    -- correct?
21       A    No.
22       Q    Do you have kids?
23       A    Unfortunately, not yet.
24       Q    Okay.  And you've got a high school
25  degree; correct?
```

Page 66

```
1        A    Yes.
2        Q    From Parker?
3        A    Parker High School.
4        Q    And you went -- you did some college at
5   Stillman; correct?
6        A    I graduated from Stillman.  And I did
7   college at University of Alabama, Roll Tide.
8        Q    Okay.
9        A    I did five years in undergrad.
10       Q    Okay.  What's your degree in?
11       A    It actually is interdisciplinary in
12  biology slash premed.
13       Q    Okay.  And I know you're fairly active on
14  social media; correct?
15       A    Uh-huh.
16       Q    You're on Facebook?
17       A    Yes.
18       Q    And what's your user ID?
19       A    It's just my name, Quaniah Stevenson.  You
20  can type in my name, and it's on there.
21       Q    What about Instagram?
22       A    I am on Instagram.  Usually what I put on
23  Instagram --
24            You need that?
25       Q    Yes?
```

Page 67

```
1        A    N-I-N-A, the number 9, L-U-C-K-Y.
2        Q    Nina9Lucky?
3        A    Yes.
4        Q    All right.  And are you on Snapchat?
5        A    I'll be honest, I am on there, but I
6   haven't been on there probably -- I don't know the
7   last time.  I don't even -- I don't use it.  I set
8   up an account.  I think I've been on there once.  I
9   don't understand Snapchat.  I leave that to the
10  younger kids.
11            MR. STONE:  Let's take a break for a few
12       minutes.
13            (Brief break.)
14            (Exhibit 5 was marked for identification.)
15  BY MR. STONE:
16       Q    Ms. Stevenson, you know you're still under
17  oath; correct?
18       A    Yes.
19       Q    All right.  You were hired by Delta in, if
20  I'm right, August of 2007; correct?
21       A    Actually, I was hired in May.  But what
22  they ended up doing, they hired me as seasonal, and
23  then they changed us from seasonal to ready reserve.
24  And changed all the people that started with me to
25  August 1st.
```

Page 68

```
1        Q    So you -- so your date of employment --
2        A    '07.
3            (Comment by Reporter.)
4            (Discussion off the record.)
5   BY MR. STONE:
6        Q    I put in front of you what's been marked
7   as Exhibit No. 5.
8            You recognize that as your Delta
9   employment application; correct?
10       A    Yes.
11       Q    All right.  And if you would take a moment
12  to look at Exhibit 5.  But, in particular, I want to
13  take you to page 4 of Exhibit No. 5.
14       A    Okay.
15       Q    All right.  And on page 4 of Exhibit
16  No. 5, you are reporting to Delta your job history
17  for the last ten years; correct?
18       A    Uh-huh.
19       Q    You have to say yes.
20       A    Oh, yes, I'm sorry.
21       Q    All right.  And I want to ask you, first
22  of all, is that an accurate recount of your past
23  employment history?
24       A    Is it correct?
25       Q    Yes.
```

Elizabeth Gallo
COURT REPORTING, LLC

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                    June 29, 2017

---

Page 69

1     A    This is not every job. But the ten-year
2  period is accurate -- is accurate on what I worked
3  during that time. I've worked other places. But
4  that was accurate at the time.
5     Q    Let me make sure I understand what you're
6  saying.
7         If you look at page -- the last page of
8  Exhibit 5, you'll see that you filled this
9  application out on -- in April of 2007; correct?
10    A    Yes, sir.
11    Q    All right. And you will -- on your
12 employment history section were listing your
13 employers for the last ten years before April of
14 2007; correct?
15    A    Uh-huh, uh-huh.
16    Q    You have to say yes or no.
17    A    Yes.
18    Q    All right. Is that a complete history of
19 your employment for the ten years that precedes
20 April of 2007?
21    A    Yes, that is accurate.
22    Q    So this is every place that you worked in
23 the ten-year period before you applied to Delta.
24    A    Yes.
25    Q    All right.

---

Page 70

1     A    It should be, yes.
2     Q    Well, it should be doesn't help me,
3  Ms. Stevenson.
4         Is it or is it not?
5     A    Yes.
6     Q    All right. So you didn't work anywhere
7  else between 1997 and 2007 when you filled this
8  application out.
9     A    As I stated, I put it within the years
10 that I worked there. I said I have worked other
11 places, I have.
12    Q    Between --
13    A    But that didn't apply to -- I don't think
14 it applied to here, during the --
15    Q    Ms. Stevenson, listen to my question.
16    A    Uh-huh.
17    Q    Between 1997 and 2007, did you work
18 anyplace other than the four employers listed on
19 page 4 of Exhibit No. 5?
20    A    Yes, yes.
21    Q    So this is not a complete history of your
22 employment between 1997 and 2007.
23    A    No, that's not a complete history.
24    Q    You see at the very top where it asks you
25 to provide a complete history on Line 1?

---

Page 71

1     A    I did a complete history within the ten
2  year, because all these years fell with what I had
3  actually worked in that time period.
4     Q    Ms. Stevenson, that makes no sense.
5     A    I don't think that's a fair question.
6     Q    Did you work somewhere else between 1997
7  and 2007 other than --
8     A    These are the places that I did work --
9     Q    Did you --
10    A    -- Mr. Stone.
11    Q    -- work anyplace else?
12    A    I did work other places, but that did not
13 fall within this, to my understanding. I put
14 everything that fell within that ten-year period.
15    Q    Between 1997 and 2007, where did you work,
16 other than the four locations listed here?
17    A    Again, this is -- this is -- I put what
18 was accurate at the time. I was very honest and
19 clear at the time with what I put here.
20    Q    Ms. Stevenson, a moment ago I asked you,
21 did you work anywhere else, other than these four
22 locations, between 1997 and 2007, and you answered
23 yes.
24    A    Yes, I said I did.
25    Q    Where else?

---

Page 72

1     A    Oh, you just want to know where else I
2  worked. Okay. I'm sorry. Because I don't -- okay.
3  I've worked at Southwest before.
4     Q    When did you work at Southwest?
5     A    I do not know or remember -- that was so
6  long ago. I don't -- I don't know.
7     Q    Was it between 1997 and 2007?
8     A    I don't -- I really don't -- I'm being --
9  I don't remember that part.
10    Q    Where else --
11    A    I did work there.
12    Q    -- did you work between 1997 and 2007,
13 other than the four locations listed on your
14 employment application?
15    A    Greater Atlanta Women's Healthcare. That
16 would be it. Those are the only two places.
17    Q    So other than the four locations on your
18 employment application, Southwest and Greater
19 Atlanta, there's nowhere else that you worked
20 between '97 and 2007.
21    A    None that I can recall, no, not at this --
22 this time.
23    Q    When did you work at Greater Atlanta
24 Women's Center?
25    A    I do not know the -- the year, I don't.

---

Elizabeth Gallo
COURT REPORTING, LLC

Page 73

1    Q    Give me your best estimate.
2    A    It might have been before '97. It might
3  have -- maybe a little bit before or right after.
4  I'm not accurate on that.
5    Q    Okay. And give me your best estimate as
6  to when you worked at Southwest.
7    A    It was maybe right around the time that I
8  have the at home. But, again, I'm not accurate on
9  that --
10   Q    Okay.
11   A    -- because I didn't -- I didn't stay long
12 any -- myself anyway. I didn't -- I didn't want to
13 work there. I resigned, so I -- I don't remember.
14   Q    So in -- so it was approximately '97
15 or '98 when you worked at Southwest, same time you
16 were working --
17   A    It might have been around that time.
18 Again, I --
19   Q    All right. And you resigned from
20 Southwest?
21   A    Uh-huh.
22   Q    Yes? You have to say yes or no.
23   A    Yes, I did.
24   Q    Did you do so under threat of termination?
25   A    Absolutely not. They did not want me to

Page 74

1  leave. I -- I did not -- I did not want to live
2  where I was based to. I felt that I was in a very
3  unsafe situation. So I just --
4    Q    Where were you living?
5    A    I resigned.
6         I was in Chicago, and the neighborhood was
7  just not safe, so I --
8    Q    And if I review your Southwest
9  application --
10   A    I resigned.
11   Q    -- will it reflect --
12        You've got to let me finish my question.
13   A    Uh-huh.
14   Q    If I review your Southwest application,
15 will it reflect any discipline?
16   A    Absolutely not.
17   Q    And it will not reflect that you were
18 under threat of termination.
19   A    It will absolutely not. It is a clear
20 resign.
21   Q    Why did you leave the Greater Atlanta
22 Women's Center?
23   A    Oh, better -- I just started getting
24 better situations of more money and just trying to
25 maneuver myself into better situations. And I

Page 75

1  decided -- at the time, I was thinking about -- I
2  was torn between the airline industry or go be an ER
3  doctor you know, or musician. I was a lot of
4  things. I was younger. So I was just trying to
5  figure out what I wanted to do then so --
6    Q    Did you leave --
7    A    -- I resigned. I just resigned. I just
8  decided to -- I just decided to --
9    Q    Yeah. Did you have any discipline at
10 Greater Atlanta Women's Center?
11   A    No, I did not.
12   Q    Did you resign because you had another
13 job?
14   A    I did. Which job was it? I did. I left
15 there, and I just got more into the things that I
16 work -- was happier doing.
17   Q    What job did you have that you resigned
18 for, Ms. Stevenson?
19   A    I -- to answer you honestly, I don't know
20 what my transition was from there to here. Because,
21 at that time in my life, I was searching. I was
22 working promotional jobs. I was way younger. I was
23 in my 20s, so I -- I was all over the place doing
24 what 20 year olds do. So, I'll be honest, I just --
25 I was working odd jobs, promo jobs. I was just

Page 76

1  doing a lot of different things at that time.
2    Q    So you worked a lot of other jobs, other
3  than these four.
4    A    No, no, no, it wasn't a lot of -- it was
5  more so -- like I said, it was promo stuff. But I
6  was all over the place, as far as I didn't know
7  which way I wanted to go. So I can't say where I
8  went after that. I just knew at that time I was no
9  longer seeking to be a doctor. And I kind of had my
10 eyes set on Delta. And I just kind of did whatever
11 I needed to do until Delta was what was in my heart.
12 And I -- that's what it was.
13   Q    Did you leave that job to take a job at
14 Delta?
15   A    No. Where did I come from? I think I was
16 doing -- what was I doing? I don't know what I was
17 doing before that.
18   Q    You worked --
19   A    I was working in promos, office, an
20 office. I was just doing something, an office type
21 situation.
22   Q    Your job application reflects that from
23 January of 1998 to May of 2002 you worked for
24 Another Dais Productions; is that correct?
25   A    Yes.

Page 77

1    Q    And that's a music production company
2  owned by Jovan Dais; correct?
3    A    Yes.
4    Q    And Mr. Dais was your boyfriend; correct?
5    A    Uh-huh.
6    Q    You have to say yes.
7    A    Oh, I'm sorry, yes.
8    Q    All right.  And your application reflects,
9  you'll see on the far right-hand side, that you --
10  at the time you were applying for Delta you were
11  still doing occasional work for Another Dais?
12    A    Yeah, yeah, I think.
13    Q    And how long did you continue doing
14  occasional work for Another Dais Productions?
15    A    That was ongoing, because that was my
16  significant person.
17    Q    So that was throughout your employment at
18  Delta?
19    A    Yeah.  Well, not throughout my employment.
20  Because as we got more serious, I didn't have to
21  necessarily -- you know, the work just went to
22  another person so --
23    Q    When did you stop doing work for Another
24  Dais Productions, if ever?
25    A    I never -- at that point, if I'm at Delta,

Page 78

1  and he was my boyfriend, I wasn't -- I don't know
2  what year.  I just -- it just went more personal.  I
3  didn't -- there was no -- I wasn't -- I don't know a
4  year to say, hey, it was this year when I stopped.
5    Q    Give me your best estimate.  We know it
6  was after 2007; correct?
7    A    Yeah.  I mean -- yeah, exactly.  I mean --
8  I don't know.  '08 or -- '08.  You could say '08, I
9  guess.
10    Q    Well, you tell --
11    A    He was my boyfriend so --
12    Q    It's your testimony.
13         How long did you continue to do occasional
14  work, to the best of your recollection?
15    A    Oh, I don't think I was working anymore
16  when he was my boyfriend, so I -- I just wasn't
17  around it, if that -- I was around it.
18    Q    What years was Mr. Dais your boyfriend?
19    A    Oh, gosh, probably -- am I supposed to
20  answer -- I'm saying is that -- do I -- I'm saying
21  is that personal?  I mean I don't -- I've never done
22  a deposition, so I don't know.  Am I supposed to
23  answer that?
24    Q    You need to answer my questions,
25  Ms. Stevenson.

Page 79

1    A    We started dating '01, the end of '01.
2  The reason I know that is because -- yeah.
3    Q    And when did you stop dating?
4    A    We still talk, but we're not -- you know,
5  we still --
6    Q    When did you stop dating?  When did you
7  stop having a romantic relationship with him?
8    A    We still talk though.
9    Q    When did you stop a romantic relationship
10  with him?
11    A    It's been ongoing.  I mean --
12    Q    So he's still your boyfriend.
13    A    We still talk, but I -- you know, I --
14  that's kind of -- we date every now and then.
15    Q    Okay.
16    A    But there is not a, you know --
17    Q    You're still dating Mr. Dais.
18    A    We still see each other from time to time.
19    Q    Okay.  But you are not --
20    A    We don't have any --
21    Q    You're not in any --
22    A    Yes, we're not the way we were.
23    Q    When did you stop being the way you were?
24    A    Maybe really, really like that -- I don't
25  know.  Maybe about a year, a year ago.

Page 80

1    Q    Okay.
2    A    Maybe about a year ago, yeah.  It wasn't
3  that serious.
4    Q    Okay.  And am I correct that Another Dais
5  Productions where you worked is a music production
6  company?
7    A    I don't want to speak, I guess, for him.
8  I'm trying -- yeah, they -- music production,
9  management, production management.
10    Q    And it focuses on the rap music world?
11    A    Actually a variety.  It's not just rap.
12  It's a variety.
13    Q    Is the company owned solely by Mr. Dais?
14    A    Yes.
15    Q    All right.  And how long has he had the
16  company?
17    A    To answer accurately, I've never asked
18  him.  I just know that he's -- yeah, many years.  I
19  definitely would say more than ten years.
20    Q    Did he have it when you guys started
21  dating in 2001?
22    A    Yes, yeah, his company, yeah.
23    Q    All right.  And when you were working for
24  Another Dais Productions, what were you doing for
25  them?

Page 81

1      A    I was -- I was the -- actually, it was
2  two -- I actually -- I'm a vocalist so I did a lot
3  of background recording, some touring.  And I did --
4  I got moved into -- they thought I would be better
5  at what I'm really good at, which is the marketing
6  department and promotions.  So I used to like
7  advertise.  And I was really good with branding.
8      Q    Okay.  Do you -- Mr. Dais is still
9  operating his production company; correct?
10     A    Yes, sir.
11     Q    And does he have employees?
12     A    Yes, yes, yeah, I guess it would be
13 artists you would call the people that he works
14 with.  He does.
15     Q    Are you doing work for them now?
16     A    No, I'm not, I'm not.
17     Q    When was the last time you did work for
18 them?
19     A    Well, like I said, I really haven't in
20 years, because we were -- we just kind of friends,
21 so I don't --
22     Q    How many employees does Mr. Dais have?
23     A    I could ask him.  I do not know because
24 that -- that business fluctuates.
25     Q    Do you know if he has more than five

Page 82

1  employees?
2      A    He might have five to eight.  And then it
3  could fluctuate, and he may have three.
4      Q    Does Mr. Dais have any business other than
5  his Another Dais Productions business?
6      A    What other businesses does he have?  None
7  that -- what else -- well, I mean I know he -- he's
8  carpentry, he's a builder.  I mean I don't know any
9  name or anything.  I've never asked him.  But I know
10 he knows how to build, like build stuff.
11     Q    Has he ever been in business as a
12 carpenter?
13     A    No, that part I do know, no.
14     Q    All right.  Do you know anybody who is
15 currently working for Mr. Dais?
16     A    No.
17     Q    Do you know anybody who has ever worked
18 for Mr. Dais?
19     A    Yeah.  I mean I know -- we have a couple
20 of mutual friends that I know that has worked in
21 partner with him.
22     Q    Who are those?
23     A    Dunn Bratton, a guy named Dunn Bratton has
24 worked for him before.
25     Q    Spell Bratton?

Page 83

1      A    B-R-A-T-T-O-N.
2      Q    All right.  Who else?
3      A    Rodney Turner.  He's one of the management
4  people.  Who else?  Asia, but I don't know her last
5  name.  I just know that they -- this girl does a lot
6  of work for him.  Her first name definitely is Asia,
7  as in A-S-I-A, yeah, Asia.  Who else?  Oh, Moore,
8  Marquis Moore.  That's one of his -- he's been there
9  for years, Marquis Moore, just like it sounds.  I
10 can't think of anybody else I know over there.
11     Q    All right.  Looking at your employment
12 application again at page 4, it looks like you were
13 working at a place called Castle Rock at the time
14 you applied for Delta; is that right?
15     A    Oh, yes, yes, yes.
16     Q    What did you do for Castle Rock?
17     A    It was -- he's a developer around -- a
18 developer, a builder.  And so, basically, it was
19 same thing.  He had me doing -- I'm really good at
20 branding, marketing, advertising, promo.
21          And, also, like when he would sell houses
22 or his property, he would -- like if you closed on
23 something or whatever, I'd get a -- he'd work out --
24 I'd get a percentage or something.  If he closed on
25 the situation, I would get something for helping him

Page 84

1  out, helping him close the deal or whatever.  I
2  guess that's what you would call it.
3      Q    Were you working for him on a salary
4  basis?  Were you working for him on a project basis?
5      A    Kind of a little bit of both.  It was kind
6  of like a little bit of both.
7      Q    Okay.  All right.  Media Star, what was
8  Media Star?
9      A    Same thing, branding, marketing and
10 promotion.
11     Q    What kind of company is Media Star?
12     A    Media Star, basically they were over a lot
13 of the club life in Atlanta.  At the time, Atlanta
14 was like a hot, hot spot.  So it was a lot of
15 promotions for liquor, cigarettes, both of the
16 things that I never have -- do.  But it was liquor.
17 It was cigarette branding.  It was club party promos
18 for a lot of the hot celebrities at that time.
19     Q    Do you -- was Media Star, was that a
20 full-time job or was that a part-time job?
21     A    It was kind of part time.  But as much as
22 I worked, I really want to say full time.  Part
23 time.  You can say part time.
24     Q    How many hours a week were you working?
25     A    It was kind of like a Thursday -- a

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 22 of 87
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 239 of 675

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                           June 29, 2017

Page 85

1  Thursday through Sunday.  Those were the hot nights.
2  Thursday, Friday, Saturday, maybe Sunday, depending
3  on the celebrities, Lil' Kim or somebody, Jay-Z come
4  through, yeah.
5        Q    How many hours a week were you working?
6        A    Probably -- I think I remember my checks
7  being like -- they ran from 30 to 32 maybe.
8        Q    What about for Castle Rock; was that a
9  full-time or part-time job?
10       A    That was really just kind of -- it was
11 full time.  But he's the owner, so he would -- like
12 this is the -- like this isn't like a -- he made
13 the -- it's like what -- he made the decision.  So
14 it was like him and his partner, like they owned
15 everything so --
16       Q    Was it a full-time or part-time job?
17       A    At the time it was more full time.  It was
18 more full -- because he had me doing a lot of stuff.
19       Q    How many hours a week were you working?
20       A    32 maybe, yeah, 32.
21       Q    And tell me, again, how he paid you.
22       A    He would -- cash.
23       Q    Paid you cash under the table?
24       A    Yeah.  He would give me cash, yeah.
25       Q    How much total did you make from him; do

Page 86

1  you know?
2        A    For the year?
3        Q    (No response, indicating.)
4        A    Maybe right at what I put there or
5  sometimes a little less, depending on his mood.
6        Q    Okay.
7        A    He was -- he was the head -- he was the
8  CEO.  So in account of what he said went.
9        Q    So let's go back to Delta for -- your
10 Delta employment for a moment.
11             You said you got hired as seasonal, ready
12 reserve in May and then --
13       A    Seasonal went from May to -- yeah, to
14 July.  And then they had started sending us letters
15 and calling us in.  Hey, you want to -- do you want
16 to move into something else?  Of course I did.  And,
17 I'm sorry, I get really giddy when I talk about it.
18 That was a good time for me because -- yeah.  And I
19 wanted to be full time with Delta, so yeah.
20       Q    And you were at Delta, you said, for a
21 number of years; correct?
22       A    Yes.
23       Q    Through 2015; correct?
24       A    Yes.
25       Q    All right.  I have your date of

Page 87

1  termination as July 29, 2015.
2             Was that --
3        A    It was actually July 28th.
4        Q    All right.  So you, I take it, were
5  generally familiar, because you were at Delta for a
6  number of years, with Delta's policies; correct?
7        A    Uh-huh.
8        Q    You have to say yes or no.
9        A    Yes.
10            (Exhibit 6 was marked for identification.)
11 BY MR. STONE:
12       Q    You are familiar with what I've shown as
13 Exhibit No. 6, which is, The Way We Fly at Delta;
14 correct?
15       A    That was so long ago when I started.
16       Q    Sure.  Take your time.
17       A    Is this what they gave me?  I'll be
18 accurate.  I don't -- well, if this is the one that
19 I had when I started, then it should be.  I just
20 know they made a lot of changes.  I still have a lot
21 of close friends there.  So I don't know if they
22 changed anything because I didn't ask but --
23       Q    As you look at Exhibit No. 6, it looks
24 generally familiar as Delta's policies, correct, The
25 Way We Fly?

Page 88

1        A    Uh-huh.
2        Q    Yes?
3        A    Uh-huh.
4        Q    You have to say yes or no.
5        A    Oh, yes, I'm sorry.
6        Q    Okay.  Fair enough.
7             And, in any event, you knew how to access
8  Delta's policies online, if you needed to get to
9  them; correct?
10       A    Uh-huh.  Yes, sir.
11       Q    Okay.
12       A    Yes, sir.
13       Q    All right.  You knew, for example, if you
14 turn to page 10 of Exhibit No. 6 -- I'm sorry.
15       A    Here?
16       Q    Yes, page 10.
17             You knew that Delta had a professionalism
18 and respect policy --
19       A    Oh, 10.
20       Q    -- correct?
21       A    I'm on 6.  I'm sorry.
22            Yes.  Okay.  Now what now?
23       Q    That Delta had a professionalism and
24 respect policy.
25       A    Yes.

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                        June 29, 2017

Page 89

1    Q    You were aware of that; correct?  And --
2    A    Yes.
3    Q    All right.  And you were aware on page 11
4    they had an open door policy; correct?  That was
5    well known at Delta?
6    A    Yes.
7    Q    All right.  And you were aware, for
8    example, that Delta, on page 13, had policies on,
9    for example, accommodation; correct?
10   A    Yes.
11   Q    All right.  And my understanding is is
12   that you, on occasion -- on occasion requested an
13   accommodation at Delta; correct?
14   A    Per the advisement of my performance
15   leader Carole --
16   Q    Carole Kerr?
17   A    -- Kerr at the time.
18   Q    Sure.
19   A    I did not -- at that time, I was going
20   through so much I had gotten a --
21        Oh, yeah, I remember.  I do remember this.
22        (Exhibit 7 was marked for identification.)
23   BY MR. STONE:
24   Q    I just showed you Exhibit No. 7.  That's
25   your accommodation request; correct?

Page 90

1    A    Yeah.  That's why I said, per the request
2    of my -- yeah, my performance leader at the time.
3    Because I had not at that time -- because this is
4    immediate.  I didn't -- I didn't know about this.  I
5    didn't remember.
6        So after I lost -- had a significant
7    family death, had went in and talked.  And it was,
8    Hey, you need to go see such and such.  I'll tell
9    you what you need to say, which is dah, dah.  You
10   need to get -- and ask for accommodation because,
11   you know, I see you going through a lot, which is
12   what I did.
13   Q    And you were having some car problems too,
14   it looks like as well, on top of that; correct?
15   A    I was having -- can I --
16   Q    Yeah, please do.  You can start -- I'm
17   really going to focus on that and that part of
18   Exhibit No. 7.
19   A    Oh, she asked me if I was there.  Uh-huh.
20   Q    Yes?
21   A    Yes, sir.
22   Q    That was your -- that's your accommodation
23   request that you made at Delta; correct?
24   A    Uh-huh.
25   Q    You have to say yes --

Page 91

1    A    Oh, yes, yes.  Okay.  Yeah.  Okay.  I
2    didn't -- yeah.  Okay.  I see I put that, in the
3    words of Carole.  Okay.  I didn't put her last name
4    down.
5    Q    All right.  And you received the e-mail,
6    at the top of Exhibit No. 6, back in response to
7    your accommodation request; is that right?
8    A    Oh, this right here?
9    Q    Yes.
10   A    Is this per Kiha?
11   Q    Yes.
12   A    Uh-huh.
13   Q    That was the response you received back;
14   correct?
15   A    Uh-huh.
16   Q    Yes?
17   A    Yes.
18   Q    And you were -- if I'm correct, you were
19   seeking a schedule change as an accommodation, a
20   less than 30 days schedule change, which is why Kiha
21   sent you that e-mail back at the top of Exhibit 6;
22   correct?
23   A    Uh-huh.
24   Q    Yes?
25   A    Yes.  I was seeking two things at the

Page 92

1    time.  I was seeking the schedule change.
2        But I also, Ben, was trying to -- I had
3    also seeked -- and I'm pretty sure Sheandra knows
4    about this, how you can -- I was seeking a lateral
5    move as well.  I don't know if that's later on.  But
6    I was seeking a lateral move of which to get off of
7    International because I knew of everything -- you
8    know, how much more stressful International was
9    because you just deal with more there with the
10   passports and everything.
11       So I was seeing a lateral move to go back
12   to Domestic for a slower pace.  And I actually was
13   granted that -- that lateral move -- I was granted
14   the lateral move.  Everybody started coming
15   congratulating me.  My name was there.  And then
16   maybe roughly about ten days, nine days later, I was
17   told that it had gotten awarded to someone else.  I
18   forgot the male counterpart's name.  I could get his
19   name.  I know -- but it was given to someone else.
20       And then I was told it wasn't supposed to
21   have been taken from me.  I didn't make a fuss about
22   it then.  I just said, okay, I'll stay where I was,
23   once I had got the call that I was to stay where I
24   was at.  And then soon after all of the other little
25   stuff kind of started coming and everything else.

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 24 of 87
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 241 of 675

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                              June 29, 2017

Page 93

1    Q    Let me make sure I understand what you're
2    saying.
3         So in this e-mail, it looks like we're
4    talking about your request for a shift change;
5    correct?
6    A    Well, it was --
7    Q    Temporary, 30 days.
8    A    Yeah, it was kind of -- yeah, yeah, yeah,
9    a shift change more so for, you know, later time and
10   account of the -- yeah, shift change.
11   Q    To address your car situation; correct?
12   A    Yes, just -- that and along with I was
13   dealing with grief.
14   Q    Because your mother had died --
15   A    No.
16   Q    -- or was sick?
17   A    It was actually -- it was my aunt that had
18   died.  But my mother was kind of going through some
19   things as well, some stuff I had talked over with
20   Carole, and I -- they had referred me -- let me see.
21   I had got --
22   Q    Well, let me stop you there.
23   A    Oh, okay.
24   Q    But you got that shift change is what I
25   was trying to ask.  They granted you the shift

Page 94

1    change, according to your complaint; correct?
2    A    Yeah.  Well, they didn't actually grant
3    the -- necessarily the shift change.  I wasn't
4    necessarily granted that.  It was just more so I
5    talked it over with Carole at the -- you know, at
6    the time.
7         And it was understood that normal -- the
8    normal time that in the system that it showed that I
9    would have normally -- people would have -- you
10   would have seen me in the briefing, you wouldn't
11   have necessarily saw me because I was kind of
12   allowed to come in, with everything I had going on,
13   during the later time, which I always made sure that
14   I was there.  And I still maintained that, as well
15   as working for other people at that time.
16   Q    But they took care of that situation for
17   you; correct?
18   A    Yes.
19   Q    All right.  And then let's talk about this
20   transfer to International.
21   A    Well, Domestic.
22   Q    I'm sorry, transfer to Domestic.
23        When did you make that request; do you
24   recall?
25   A    I'll be honest, I don't remember the exact

Page 95

1    time that I did it.  But it would have -- it would
2    have fallen right around like when -- like the every
3    six month thing that we get to do.
4    Q    Do you remember if it was 2014, 2015,
5    remember the year even, or you can't remember?
6    A    It might have been -- it might have
7    been --
8    Q    2015?
9    A    -- right around 2015.  No, it might have
10   been 2014 --
11   Q    Right.
12   A    -- right around in there where I was
13   trying to get off of -- like I said, trying to get
14   off of International.  It might have -- I'll be
15   accurate, I don't -- it might have been 2014.  But I
16   was trying to get off of International.
17        Because I knew just when I had worked at
18   Domestic, when we're waiting to get badges, the pace
19   of it was -- I knew it would work better for my
20   mental state and everything else.  So that's why I
21   went to do the lateral move and try to get it.  I
22   was awarded it, and then it was taken right -- taken
23   back from me.
24   Q    And you don't know why it was taken back
25   from you?

Page 96

1    A    I was told someone else had put in before
2    me -- and, again, this is just speculation.  I'm
3    just telling you what I was told.  That someone had
4    put in before me that were more senior to me, and
5    that's why it was taken from me.
6         But then -- then I was told I was -- that
7    I should have been allowed to still make the lateral
8    move, because of the time gap that I was told was
9    not -- didn't fall in within the compliance of like,
10   well, if you weren't told that within the three to
11   five days, and now you're getting a call like almost
12   two weeks later, that just isn't right.
13        And then it was just the male counterpart
14   that it was given to got the situation, complained
15   to some of my fellow coworkers and was actually then
16   upset about -- was upset about me getting awarded
17   the position over him.
18        And everybody in my department at that
19   particular time knew.  And they were like, Oh, he
20   pitched a fit about it.  They kind of just --
21   certain people just kind of was -- people talk.
22   They just --
23   Q    The person was upset because he had more
24   seniority and --
25   A    Yeah.

Page 97

1    Q    I got it.
2    A    And she shouldn't get it, and it became a
3  big mess and --
4    Q    And Delta concluded it was a mistake
5  because he had more seniority, and so they gave it
6  to him instead of you; correct?
7    A    Yeah, so that's what they -- that's what
8  they were saying at the time that's what happened.
9         Then he ended up per coworker people then
10  got there and complained more and was still upset.
11  And then didn't want to even be there when I wanted
12  to be there and would have been happy with it.
13    Q    All right.  When you -- how did you seek
14  this position?  Did you bid for it?
15    A    I bid, yes.
16    Q    So you weren't seeking it through the
17  accommodation process.  You just bid for it.
18    A    I bid for that one.
19         And like what -- the way -- I'm sure
20  Sheandra knows, like the way the system goes, which
21  is one of the supervisors at the time had told me at
22  the time, or one of the coworker people, were saying
23  that, to my knowledge, once we get awarded, you
24  know, through the system, other than, like you say,
25  going and seek accommodations, they'll tell you --

Page 98

1  and I've heard it before myself.
2         It's like you can't go then and say, well,
3  hey, the system gave me a 3:00 to 11:00.  I don't
4  want that.  The supervisor is going to look at you
5  like you're crazy and say no.
6    Q    Okay.  I understand what you're saying.
7         To be clear, you bid for that position.
8    A    I did.
9    Q    The accommodation you sought, however, was
10  Exhibit 7.
11    A    Yes, sir.
12    Q    And you sought it because your aunt had
13  been sick --
14    A    And my mom --
15    Q    -- and because of your car.
16    A    And the car.  Yeah, it was just a lot.
17  Everything happened at one time.
18    Q    I'm with you.
19         Any other reason you sought it, or those
20  are the reasons?
21    A    That.  I was heavily depressed.  It was
22  just a lot going on, Ben, to answer you honestly.
23  Depression.  My mom was going through some stuff.
24  What I know I'm dealing with with her, even to this
25  day.

Page 99

1    Q    Okay.  And they -- and we've already
2  talked about how they dealt with your shift issue;
3  correct?
4    A    Yes, sir.
5    Q    Okay.  You told me a moment ago -- we're
6  going to -- we were talking -- when we took that
7  detour, we were talking about Delta policies.  And
8  you told me a moment ago you were familiar with some
9  of the policies we've looked at already.
10         And I take it you are also familiar with
11  Delta's travel pass policies; correct?
12    A    Yes, sir, absolutely.
13         (Exhibit 8 was marked for identification.)
14  BY MR. STONE:
15    Q    Let me show you what's been marked as
16  Exhibit 8, and ask if you recognize those as Delta's
17  travel pass policies.
18    A    Yes.  I'm sure I am very familiar with
19  these, yeah.  Yes, sir.
20    Q    All right.  Just because you and I live in
21  the airport world, I'm going to ask you a couple of
22  questions that seem obvious, but just for people who
23  don't live in the airline world necessarily.
24         Delta provides, as a benefit to its
25  employees, free and reduced rate travel; correct?

Page 100

1    A    Yes, sir.
2    Q    And it's provided not only to employees,
3  but also to, for example, travel companions of
4  employees; correct?
5    A    Yes, sir.
6    Q    So if it's your spouse, you can take your
7  spouse on a free flight; correct?
8    A    Yes, sir.
9    Q    All right.  And if you don't have a
10  spouse, you can designate somebody as your travel
11  companion.
12    A    Yes, sir.
13    Q    Who also is entitled to free flights on
14  Delta; correct?
15    A    The companion is discounted.
16    Q    So if you designate -- you get reduced
17  rate travel; correct?
18    A    Yes, sir.
19    Q    And Delta also provides something called
20  buddy passes; correct?
21    A    Yes, sir.
22    Q    And those are passes you can give to
23  people.
24    A    Family, friends.
25    Q    Correct.  All of this, of course, is for

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                              June 29, 2017

Page 101

1  pleasure travel, not for business travel; correct?
2      A   Yes, sir.
3      Q   And that's a hard and fast rule at Delta,
4  isn't it?
5      A   That is a strict rule.
6      Q   Exactly.
7      A   I get it.  I know it.
8      Q   Yep.  I get it.  Good.
9          You are, of course, responsible for making
10  sure that you comply with your -- the rules related
11  to travel passes; correct?
12     A   Yes, sir.
13     Q   Not only for yourself, but for your travel
14  companions as well; correct?
15     A   Yes, sir.
16     Q   And Delta, of course, had other rules and
17  policies that were available on DeltaNet that you
18  could access during your employment; correct?
19     A   Yes, sir.
20     Q   You don't have access to those now,
21  because you've left employment.  But at the time you
22  had them; correct?
23     A   I did, yes, sir.
24     Q   All right.  Let's talk about your job
25  duties and responsibilities for a second while you

Page 102

1  were employed at Delta.
2          You were an airport -- in the airport
3  customer service division; correct?
4      A   Yes, ACS125, unless they've changed the
5  number.
6      Q   I don't believe they have changed the
7  number.
8          And 125 is what people call above the
9  wings service; correct.
10     A   Above wing, yes, absolutely.
11     Q   And that means basically you're working in
12  the airport; correct?
13     A   Yes.
14     Q   And, typically, you're working -- I know
15  there's some other assignments.  But, typically,
16  you're working either at the ticket counter or at
17  the gates; correct?
18     A   Yes, or arrivals.
19     Q   Arrivals.  You might be working arrivals
20  as well.  Fair enough.
21         You worked at the Atlanta airport;
22  correct?
23     A   Yes, sir.
24     Q   And that was true during your entire
25  career at Delta; correct?

Page 103

1      A   Yes.  Love it.
2      Q   Okay.  And you remained as a customer
3  service agent your entire career at Delta; correct?
4      A   Yes, just -- I just was -- I've been in a
5  lot of different departments at Delta, Sky Club,
6  baggage claim.  I never should have left baggage
7  claim.  That's where I was really thriving.  But,
8  yeah, baggage -- I started on the gates.  And then I
9  got to work.
10         And a month later my PL -- they called
11  them PLs at the time.  My PL told me, Hey, you've
12  been switched, you're going to baggage.
13         Everybody was like, No, you don't want to
14  go to baggage.
15         And I was like, Why?
16         You're not going to like it.
17         Got there, loved it.  I was in baggage for
18  like four years, three and a half years.  And then
19  ended up -- one of my supervisors -- Sky Club came
20  up.  I wanted to learn ticketing.  So ended up in
21  the Sky Club.  Loved, loved it.
22         And the only reason I got out of the Sky
23  Club is because at the time they didn't offer full
24  time.  So I bidded out and went to -- back to
25  ticketing so I could learn more ticketing.  So,

Page 104

1  yeah, gates, baggage, Sky Club, yeah.
2      Q   Worked lots of different areas at the
3  airport.
4      A   I worked in lots of different areas.
5      Q   And your performance was good; correct?
6      A   Yes.
7      Q   Was there, from your perspective, any
8  aspect of the job that you did not perform in a
9  satisfactory fashion?
10     A   No.  When I performed my job, I did my job
11  above and beyond.
12     Q   And you were able to do everything that
13  Delta required of you to Delta's full satisfaction.
14     A   I was.
15     Q   All right.  I recognize, of course, there
16  were times, including after the time you were hurt,
17  where you had to take some time off; correct?
18     A   Uh-huh.
19     Q   Yes?
20     A   Oh, yes, sorry.
21     Q   And you took some disability leave during
22  time that Delta granted you; correct?
23     A   Yes.  I paid, and they were real clear.
24  I'm actually glad I did that because -- yeah.
25     Q   You got paid during that time.

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                June 29, 2017

Page 105

1      A    Long term, short term.  I made sure I
2  always had that deducted from my check.
3      Q    Yeah.  So you, during the time you took
4  disability leave after your -- after the bag fell on
5  you, you received first short-term and then
6  long-term disability payments; correct?
7      A    The long term kicked in after a certain
8  point, yes, sir.
9      Q    But other than the time when you were
10  absent, either for that reason or because you had
11  the flu or your car broke down or something like
12  that, when you were at work you were able to do
13  everything that Delta required to Delta's
14  satisfaction; correct?
15      A    Yes, yes, I did.
16      Q    Okay.  And you -- as a customer service
17  agent, you would have reported to a supervisor;
18  correct?
19      A    Uh-huh.
20      Q    You have to say yes.
21      A    Yes, sir.  Yes, sir.
22      Q    All right.
23      A    Yes, sir.
24      Q    Sometimes they call them team leaders
25  during the time; correct?

Page 106

1      A    Performance leaders.
2      Q    Oh, performance leaders.
3      A    Yeah, I think they call them OS Sims or
4  OSS or something now.
5      Q    And because you were there for a number of
6  years, reported to a number of different
7  performance leaders; correct?
8      A    Yes.
9      Q    And during the time -- during part of the
10  time you reported to a woman named Carole Kerr;
11  correct?
12      A    Uh-huh.
13      Q    Say yes.
14      A    Yes.
15      Q    Okay.
16      A    Sorry.
17      Q    That's okay.
18          Are you okay?  Do you need a break or
19  anything?
20      A    No, I do not.  I'm okay.  I'm fine.
21          MR. STONE:  Let's go off the record for
22  one second.
23          (Discussion off the record.)
24          (Record read.)
25

Page 107

1  BY MR. STONE:
2      Q    And you told me a moment ago, Ms. Kerr, we
3  talked about her, she was the one who suggested --
4      A    Go talk to Kiha, but yeah.
5      Q    To go get an accommodation; correct?
6      A    Yeah, yes.
7      Q    All right.  Do you remember when Ms. Kerr
8  became your performance leader?
9      A    I don't remember like the actual date or
10  date, because I reported, again, to so many
11  various -- I pretty much know most of everybody that
12  I have -- like by name who I had to report to during
13  my whole career there.
14          I think I dealt with her more so on the
15  International side.  I think I -- she was on the
16  Domestic side I think for a short while.  But by the
17  time I, I guess, had gotten out of the Sky Club and
18  then on into -- over to the International side,
19  that's when she had started being the PL at that
20  time, over on that side.
21      Q    All right.  Do you remember what year that
22  was?
23      A    It might have fallen around the -- '13,
24  '14.  Can't say accurately, because I just honestly
25  don't remember.  But it was maybe right around that

Page 108

1  window of time that I was on International, like
2  between -- yes, between '14.  Yeah, right around --
3      Q    Around 2014?
4      A    -- 2014 maybe, yeah.
5      Q    All right.  We know that during your
6  employment you had some counselings and some
7  discipline.
8          Do you remember that?
9      A    I have had, yes.
10      Q    All right.  Fair enough.
11      A    Yeah, yeah.
12      Q    Let's do it this way.
13          (Exhibit 9 was marked for identification.)
14  BY MR. STONE:
15      Q    Let me show you what's been marked as
16  Exhibit No. 9.  I don't know if you've seen that
17  document before or not.  It's a document called,
18  Topics Discussed with Employee.
19          Have you seen that document before?
20      A    Is this -- oh, okay.  These, I --
21      Q    I haven't asked you any questions.
22      A    Oh.
23      Q    All I've asked is --
24      A    You just want me to read it.
25      Q    -- have you seen this document before?

Page 109

1    A    No.  I've never seen -- I've seen three
2  things, but it's something that I do see that I had
3  not seen before.
4    Q    All right.  Let me start really basic here
5  with you, Ms. Stevenson.
6        Each of these entries on Exhibit No. 9
7  reflects a topic that was discussed with you.  It
8  might have been a one on one.  It might have been a
9  coaching.  It might have been a verbal warning, for
10 example.
11       You with me?
12   A    Uh-huh.
13   Q    You have to say yes or no.
14   A    Yes.
15   Q    All right.  My first question is, did you,
16 in fact, if you remember, receive either coachings
17 or verbal warnings on each date reflected on
18 Exhibit No. 9?
19   A    Could you repeat the question?
20   Q    Sure.  I'm just trying to make sure I
21 understand -- I'm not asking you about the specific
22 events right now.  I'm just asking whether or not
23 there were discussions with you about job
24 performance issues on each date reflected on Exhibit
25 No. 9?

Page 110

1    A    Not each date.
2    Q    All right.  So let's do it then more
3  piecemeal.
4        There is -- the first entry on Exhibit
5  No. 9 is dated August 26, 2012; correct?
6    A    Yes.
7    Q    All right.  And that reflects a one on one
8  that was had with you; correct?
9    A    Uh-huh --
10   Q    And --
11   A    -- yes.
12   Q    -- you were told that you could start work
13 at 3:00 p.m. for the remainder of your bid --
14   A    Yes.
15   Q    -- correct?
16       So that occurred; correct?
17   A    Uh-huh.  Yes, that did occur.
18   Q    So that entry is accurate; correct?
19   A    That's accurate, yes.
20   Q    You also had a discussion on September 30,
21 2012, just a discussion, about your reliability;
22 correct?
23   A    Yes.
24   Q    And so that's -- it's accurate that there
25 was a discussion with you about reliability on that

Page 111

1  date; correct?
2    A    Yes.
3    Q    And then you were coached on October 11,
4  2012, about coming late to work; correct?
5    A    Yes.
6    Q    All right.  And then on February 14, 2013,
7  you had a conversation with your performance leader.
8  That was a verbal warning; correct?
9    A    I -- this is one of the ones I'm not clear
10 completely on.
11   Q    Okay.  I understand that you might
12 disagree, for example, that a verbal warning was
13 appropriate here.  I'm not asking you that question.
14       All I'm asking you is, did Delta give you
15 a verbal warning on that day, as best you recall?
16   A    Yes.
17   Q    Okay.  And this event -- the reason
18 that -- from Delta's perspective a verbal warning
19 was warranted, is reflected at the bottom of page 1
20 and most of page 2 of Exhibit 9; correct?
21   A    Oh, you're talking about the one --
22   Q    Yes.
23   A    This is the one we're still talking about?
24   Q    Yes.
25   A    Could you say that last part again?

Page 112

1    Q    Sure.  You told me a moment ago that Delta
2  gave you a -- did give you a verbal warning on
3  February 14, 2013; correct?
4    A    I don't remember the date.  I don't even
5  remember this incident at all but --
6    Q    That's what I was getting at.
7        So you don't remember whether you received
8  this verbal warning on February 14, 2013; correct?
9    A    That's Valentine's Day.  No, I do not
10 remember --
11   Q    All right.
12   A    -- this one.
13   Q    So it -- you might have.  You just don't
14 recall, as you sit here today; correct?
15   A    No.  And I tend to know pretty much -- I
16 don't --
17   Q    Okay.
18   A    -- no.
19   Q    You just can't recall what happened on
20 that day.
21   A    I can't recall.
22   Q    All right.  So you -- so because you can't
23 recall, you can't tell me whether this happened,
24 didn't happen, what happened.
25   A    Correctly.

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 29 of 87
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 246 of 675

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                June 29, 2017

Page 113

1    Q    Okay.  All right.  So then going down on
2  the next entry, February 19, 2013, it looks like you
3  are coached on that day for swapping with an agent;
4  correct?
5    A    Who was -- does it say who?  I remember
6  that -- that situation.
7    Q    All right.  So you would swap and agree to
8  work for an agent, but then called in and took FMLA
9  on that date; correct?
10   A    I remember this situation, but that's not
11 the way the situation was.
12   Q    Okay.  Do you remember what happened?
13   A    Let me read this.
14   Q    And if you don't, it's okay.  I just --
15   A    I -- I remember it, but it definitely was
16 nothing that I did wrong.
17   Q    Okay.
18   A    I just --
19        Yes.  That wasn't the situation.  It was
20 a -- and this particular person had a kind of
21 altercation.
22        I -- I didn't -- I didn't bail on this
23 person.  I never bailed on anybody.  And I worked
24 for -- I was one -- I worked for everybody.
25   Q    Do you remember this particular situation?

Page 114

1    A    I kind of do.  It's -- I'm being honest,
2  this is, like I say, so long ago.  I'll touch on it.
3  I really think -- no, what I know, I do know that
4  that wasn't the case.  I did not bail on her.
5        If I remember correctly, it was something
6  that had already been canceled out.  Like I wasn't
7  even due to even work for her.  But somebody on
8  their end did not make the correction.  Because when
9  me and -- when me and this person actually finally
10 even talked about she's like, I know you already
11 told me you weren't going to be able to do it that
12 day.
13        This is not accurate.  This isn't
14 accurate.  And I remember -- I think I remember even
15 this conversation.  I'm not -- it's not showing the
16 PL that -- which PL?  Because maybe that will help
17 me remember.  I do remember this.  I really, really
18 do but --
19   Q    But you can't give me the details?
20   A    This might have happened when I was in
21 baggage.  It might have been -- what's his name?
22 He's a manager now.  I think this was when I was in
23 baggage.  Michael -- is it Cousins?  That -- I don't
24 know.
25        Can we come back to that?

Page 115

1    Q    Sure.  If you -- you tell me if you -- if
2  you remember the story, you let me know during the
3  course of the day.  Okay?
4    A    Yeah, I -- I remember some of it but -- I
5  remember some -- I remember proving that.  Once I
6  sat there and explained it at the time to the PL, it
7  was like, I get it.  Like it was one of those deals
8  like I didn't -- I never bailed on anybody I had to
9  work for.
10   Q    But you don't remember what happened in
11 this particular situation.
12   A    Not --
13   Q    Not really?
14   A    -- not now.  I can't remember.  That was
15 in '13.
16   Q    Turning to page 3 of Exhibit No. 9, it
17 looks like there's a series of verbal coachings that
18 you would have received on -- in December 2013 --
19   A    Uh-huh.
20   Q    -- on March 9, 2014, on March 22, 2014.
21        Do you see all those?
22   A    Uh-huh.
23   Q    And those are all -- you received those
24 coachings on those days, as best you recall?
25   A    Yeah.  I remember speaking with Ron, EMP,

Page 116

1  because I was having the issues.  Yeah, I remember
2  missing --
3    Q    And then it looks like you were coached on
4  March 23, 2014, correct --
5    A    Uh-huh.
6    Q    -- about making sure you complied with
7  safety rules; right?
8    A    Uh-huh.
9    Q    Yes?
10   A    Yes.
11   Q    Sorry, you have to say yes.
12   A    Oh, yes, yes.
13   Q    And then it looks like on March 7, 2015,
14 you were -- Ms. Kerr gave you a coaching about -- or
15 at least spoke to you about uniform guidelines and
16 making sure you stayed in compliance with those;
17 correct?
18   A    Could I read that for a second?
19   Q    Sure.  Take your time.
20   A    I just -- I'll be quick.
21        That 3-7-15, that is totally inaccurate.
22   Q    Well, tell me what -- tell me what
23 Ms. Kerr --
24   A    I was --
25   Q    Stop, I'm sorry, let me ask the question

Page 117

1  again.
2      It's not inaccurate that Ms. Kerr talked
3  to you about your shoes; correct?
4      A    It's accurate that something was stated
5  about them.  I was never coached.  I was never
6  talked to.  I was never walked in the office.
7  Because usually the way coaching goes, the reason I
8  know this is because the way I know Ms. Lee and Ron
9  would always do stuff, like, you know, they -- they
10 coach you.  Sometimes they would even have you sign
11 or something.  But this isn't the way of which this
12 happened at all.
13     Q    Did Ms. Kerr talk to you about your shoes?
14     A    She didn't talk to me about my shoes.  It
15 didn't occur that way.  It didn't quite occur that
16 way.
17     Q    What did she say to you?
18     A    It was -- it didn't occur in the way
19 that -- in the way that it's stated, it's on here,
20 it's on here being in the way that -- my other PLs
21 professionally, like, you know, they did it the way
22 they were supposed to do it.  This was not done in
23 the way that it was supposed to have been done.
24     Q    Well, Ms. Kerr coached about your shoes;
25 correct?

Page 118

1      A    She didn't coach me.  We weren't in the
2  office.  It was nothing like that.
3      Q    What did she say to you?
4      A    It was -- I was -- we had finished up our
5  briefing.  It was very, very -- it was to the point
6  where my colleagues actually commented on the
7  abruptness.  I was constantly bothered by her.  It
8  was a constant thing.
9          But this particular day was very constant
10 with, I don't like the shoes.  I don't like your
11 shoes.  Those aren't the right shoes.  Out of
12 compliance.  These are the same shoes that I started
13 my career at Delta with.
14     Q    Other than Ms. Kerr saying, I don't like
15 your shoes, your shoes out of compliance, did she
16 say anything else to you?
17     A    On another day --
18     Q    On that day, is that all she said to you,
19 as best you can recall?
20     A    That's all -- that was all on that
21 particular day.  And that was it.  And she walked --
22 actually, kind of walked away, went to her office.
23 And I walked out the side door to get to my Delta
24 Direct where I was working at the time, which was on
25 E Concourse, Delta Direct.  She said nothing else to

Page 119

1  me that particular day.
2      Q    All right.  What else did she say to you
3  that you thought was bothersome or abrupt or
4  inappropriate on any day?
5      A    If I'm in the middle of doing my job, and
6  somebody is in front of me, and I'm whatever, I've
7  been pushed aside by her, physically pushed aside,
8  Move, step aside, you're moving too slow.  I don't
9  say anything.
10     Q    When did that happen?
11     A    I'll be honest, it was one of our IROP
12 nights.  I do not know the date or the time.  I just
13 do know that that particular occurrence, one of my
14 counterparts, I don't remember his name, but I'll
15 know him if I see him because he still works there,
16 he has the locks in his hair.  And he was like, Wow,
17 like she is very, very rude and -- to you, Q, and
18 treats you kind of horribly.
19         I said (indicating).  I just kind of
20 didn't really say much because I didn't want to -- I
21 looked at it as my supervisor.  I didn't want to be
22 in the hot seat or called -- make any waves.
23         The passenger that was actually -- that I
24 was initially waiting on stated, Is that your
25 supervisor?

Page 120

1          I said, Yes.
2          She is very rude to you.
3      Q    Now, this is the night of the IROP
4  situation?
5      A    This was the IROP night.
6      Q    So let me stop you and make sure I
7  understand.
8          So you're working.  It's an IROPs night,
9  which is irregular operations --
10     A    Irregular operations, yes.
11     Q    So it's chaotic --
12     A    Yes.
13     Q    -- at the airport.
14     A    It is chaotic, yes.
15         (Discussion off the record.)
16 BY MR. STONE:
17     Q    And Ms. Kerr says to you, You're moving
18 too slowly --
19     A    Oh, yep.
20     Q    -- she pushes you aside and starts working
21 the computer?
22     A    I was doing this, and she's -- she -- Step
23 aside.  Of course, I didn't give her -- I just -- I
24 just -- I stepped aside, and just let her do what
25 she did.  And she initially moved.  And I went back

Page 121

1  and I just started doing what I was doing after she
2  was done.
3        Passenger proceeded to say, Is that your
4  supervisor?
5        I said, like kind of common sense, Yes.
6        She was very rude to you.
7    Q    All right.  Other than --
8    A    I didn't comment on it.  I just kept --
9  because I know we don't get into that with the
10  passenger.  I just kept doing what I was doing.
11  That was another day.
12        Another day -- like the stuff in here
13  stated, it's correctly, but it's not put in here
14  right.  I had a bracelet on.  I was in briefing.  We
15  were finishing up briefing.  Get ready to get out.
16  I go into the -- we come out of the briefing.  I go
17  in the side door again.  I'm in the middle of my
18  shift, working, doing what I'm doing.  She walks
19  over to me (indicating), Take that off, take that
20  off.
21    Q    Tells you to take off your bracelet?
22    A    Yeah.  I was literally doing this.  She
23  walks up.  She touches it.  Take that off.
24    Q    Okay.
25    A    So I was like, Okay.

Page 122

1        And, again, coworkers was just, Wow.
2        I said nothing.  I proceeded to take it
3  off.  Just very, very aggressive with me.  Stuff
4  that I didn't see with other people.  Just very,
5  very aggressive in the way that I was being talked
6  to.
7    Q    Can you give me -- are there any other
8  circumstances that you can think of, other than the
9  ones --
10    A    I don't even know if I can even remember
11  them all, Ben, because I was just being
12  constantly -- constantly said things to.  It was --
13  it became real constant with her, very, very
14  constant.
15    Q    Did she do anything else that you can
16  specifically remember?
17    A    The bracelet.  The shoe.  The night of
18  being -- Step aside.
19        Well, and I remember an instance where a
20  pilot wrote in a good letter about something I did,
21  above and beyond.  They read it in the briefing.  It
22  was sent directly to Carol's e-mail or whatever.
23        And I asked her if I could get a copy of
24  that.  And she proceeded to say, What e-mail are you
25  talking about?  I didn't get that.  I don't have a

Page 123

1  copy.
2        I said, Well, they -- you all -- they read
3  it in the -- in the briefing.  I just wanted to just
4  get a copy of it, just so I could have it for my
5  files and show my parents a nice -- I just wanted --
6  I usually keep a copy of my stuff like that.
7        And she's like, I don't have it.  You
8  know, you can go in the office.  I need to shut the
9  door.
10        And I said, Okay.  And I never asked her
11  about that again.  It was just --
12    Q    Anything else, other than -- that you can
13  tell me about?
14    A    That's it that I can think of right now.
15  That's -- those are like one of the four main
16  things.
17    Q    All right.  You are aware, I take it, that
18  because Delta provides free travel for employees and
19  their travel companions that a potential for abuse
20  exists.
21    A    Yes, it does.
22    Q    There's a potential that the passes might
23  be sold which would violate Delta rules.
24    A    Exactly.
25    Q    There's a possibility that passes would be

Page 124

1  used for business travel, which would violate
2  Delta's rules; correct?
3    A    Yes.
4    Q    And you are aware -- let me stop right
5  there.  I realize there's two things I wanted to
6  show you very quickly.
7        (Exhibits 10 and 11 were marked for
8        identification.)
9        THE WITNESS:  She's my favorite.
10  BY MR. STONE:
11    Q    I'm going to show you, first of all,
12  Exhibit 10 and then Exhibit 11.
13    A    Uh-huh.
14    Q    And just ask if these are counselings and
15  disciplines that you received while you were at
16  Delta.  That's all I'm going to ask you.
17    A    Uh-huh.
18        Oh, you ready for me?  Sorry.
19    Q    Yes.  Can you answer the question?  Did
20  you receive those?
21    A    Yes, I did.
22    Q    And you mentioned, when you were looking
23  at No. 10, you said, She's my favorite.
24        Who were you speaking of?
25    A    Velma Edwards.

Page 125

1    Q    She was your favorite performance leader?
2    A    Uh-huh.
3    Q    You guys --
4    A    Yeah.
5    Q    You guys got along well?
6    A    Very.
7    Q    Other than Ms. Kerr, is there any
8    performance leader that you ever had any problems
9    with or didn't get along with that you can recall?
10   A    I would say not -- not to -- we're just
11   talking performance leaders, right, because I'll get
12   to the other later.  But I have not had any of
13   the -- any of those kinds of encounters with any
14   other performance leader like that, except for
15   Carole Kerr.
16   Q    Okay.
17   A    However -- how do I word it?  Not to
18   the -- not to that level.
19        Love her.  She -- yeah.
20   Q    The other ones treated you fairly, other
21   than Ms. Kerr?
22   A    I'm sorry, say that --
23   Q    The other performance leaders, other than
24   Ms. Kerr, you think treated you fairly.
25   A    They -- yeah, the others treated me

Page 126

1    fairly.
2         The only thing I want to -- am I allowed
3    to just comment on one thing.  This is fine.
4    Because -- yeah, that's -- yeah.
5         This one here though, I -- I always felt
6    this one was not fair.
7    Q    Okay.
8    A    It's not that I have an issue with the
9    performance leader, Performance Leader Marcus.  I
10   like him.  Taneesha, like her too.  I just feel like
11   this was very inaccurate to where I worked.  And I
12   feel like I was treated unfairly, based off of how I
13   watched my veteran counterparts, coworkers deal with
14   the passengers at the time.
15        And because I did feel unfairly about
16   this, Ben, I actually did go to HR about this
17   situation, and I did speak with -- she's dead now.
18   She worked -- Cheryl Taylor.  She spoke with me and
19   Marcus.  And based off of some of what I'm even
20   telling you now, I went over it with her, with some
21   of the things that I went through with -- in the Sky
22   Club -- that's one of the other reasons that I did
23   get out as well, because they weren't offering -- as
24   I stated earlier, they weren't offering the full
25   time so I bidded out.  But I also bidded out because

Page 127

1    Cheryl Taylor actually --
2    Q    Let me -- let's stop because we're way,
3    way, way off my question here.
4    A    Okay.
5    Q    Let's do this slowly and a little bit more
6    methodically here, Ms. Stevenson.
7    A    Okay.
8    Q    First of all, you have in front of you
9    Exhibit No. 11?
10   A    Uh-huh.
11   Q    Yes?
12   A    Yes.
13   Q    I think you told me a moment ago that
14   other than Ms. Kerr your other performance leaders
15   treated you fairly.
16        But you do believe that Exhibit No. 11 is
17   one instance where you were treated unfairly;
18   correct?
19   A    Yes.  I was treated -- yeah.  Oh, okay.
20   Q    So let's explore Exhibit No. 11 for a
21   second.
22        You were getting a probation letter in
23   November of 2010; correct?
24   A    Yes.
25   Q    All right.  And the reason is is because

Page 128

1    there's a celebrity in the club room, correct, in
2    Sky Club?
3    A    Yes.
4    Q    Who's the celebrity?
5    A    It was the Neelys.  They're --
6    Q    I know them.
7    A    -- from the Food Network.  They were
8    very -- well, I guess they -- they were extremely
9    nice to me.
10   Q    And they -- one of the things happened,
11   that you started talking with them; correct?
12   A    Yes.  They were my -- my passengers that I
13   had to escort.  And in escorting them, you're
14   talking to them, they -- you hold conversations.
15   Q    All right.
16   A    Uh-huh.
17   Q    And during the conversation, you asked the
18   Neelys to give you a shout out related to your music
19   career; is that correct?
20   A    No.  I never did that.  That's why I said.
21   If I -- I never asked them to give me a shout out.
22   If anything, it was -- my mother is a big fan of
23   their show.  And I was like, Oh, gosh, she's just
24   going to be -- well, I'm not -- whatever it says
25   here, because I don't want to, again, not say

Page 129

1  nothing that's not accurate.  Within here, if I read
2  it, that part should be pretty accurate.  But I
3  didn't -- I do not recall asking them to give me a
4  shout out.  That part is fabricated, yeah.
5      Q   So you don't know whether or not what was
6  reported to Delta?  So you don't know what Delta was
7  told about your conduct; correct?
8      A   Well, other than what I'm seeing right
9  here.
10     Q   All right.
11     A   And that's why I said I went to HR about
12  this situation, and we actually did discuss --
13     Q   You've got to answer my question.
14     A   Oh, okay.
15     Q   Listen to my question and answer my
16  question, Ms. Stevenson.  Here's my question.
17         You don't -- first of all, you told me a
18  minute ago, other than what you see here, you don't
19  know what the passenger reported; correct?
20     A   No, I do not.  I just know what my
21  performance leader told me they said.
22     Q   Okay.  And it says here that the Gold
23  Medallion passenger, and by your own admission, you
24  asked the passenger to give you a shout out.
25         Do you see that?

Page 130

1      A   Yes, but I -- those were not my words.
2  I --
3      Q   So you're --
4      A   I do not recall -- I would never -- I was
5  in the Sky Club for a long time, and I saw many
6  celebrities that were -- yeah.
7      Q   You --
8      A   I never said give me a shout out.
9      Q   Well, you just told me you don't recall
10  saying that.
11     A   Yeah.  Well, I do not recall -- I don't
12  think -- I would never ask them to give me a shout
13  out for my music.  And they weren't even in that --
14  they weren't even in that -- they couldn't help a
15  music career at all.
16     Q   Are you able to testify with certainty and
17  under oath --
18     A   Yes.  I do not recall ever saying -- I
19  asked them to give me a -- they're a cooking
20  network.  They're not Jay-Z.
21     Q   You're testifying that you don't recall.
22         And I'm going to ask you a different
23  question --
24     A   Okay.
25     Q   -- which is, is it possible that you did

Page 131

1  so, and you just don't recall that, as you sit here
2  today?  Is that possible?
3      A   That's not possible.
4      Q   All right.  So --
5      A   And if I remember correctly when I was in
6  the meeting with Taneesha and Marcus, I think I --
7  well, no, not think.  I remember saying to them, I
8  didn't say anything about -- I did say that.  I
9  said, I didn't say anything about my music, I said,
10  but I'm being honest, I did say about my mom.  And
11  the reason I know I said, Hey, you know, can you say
12  hello to my mom, because my mother, at that time --
13  they're not even married anymore.
14         But, at that time, my mother watched that
15  show -- she loved the Neelys.  She was a fan.  So
16  seeing them, it was like -- and everything I'm
17  saying to you I said it in this same way, same
18  demeanor with Taneesha and Marcus.
19         And they was like, Well, okay, just don't
20  do that again, Q.  We get it.  We get that you all
21  see celebrities.  You get excited.  We all have --
22  that's kind of how that particular meeting went.  It
23  was -- it's just -- it's a little -- it's
24  fabricated.  I said, Well, yeah, I would never --
25     Q   Did you ask for -- did you take a picture

Page 132

1  with them or ask for a picture?
2      A   I don't -- I might have.  I'll be honest,
3  I don't remember.  That was so long ago.
4      Q   Did you ask them --
5      A   I might have asked for a picture.  I might
6  have asked for an autograph.  Like I say, most of
7  that -- but the music part, that part, I'll be
8  honest, I think that is -- that part, I don't -- I
9  don't think I asked them for a shout out with my
10  music, because they're not -- I mean -- yeah, they
11  can't help my -- they couldn't help music.
12     Q   So you just told me --
13     A   But my mother --
14     Q   -- everything you can recall about this?
15     A   Yeah, the mother, all of that is accurate.
16  I talked -- yeah, we talked about the mom.  They
17  were talking and laughing with me.  I had no idea,
18  Ben, at that time, that they felt the way they felt,
19  meaning -- we're around celebrities a lot in the Sky
20  Club.  And if they don't want to be bothered,
21  they'll say, No, or whatever.  They held a whole
22  conversation with me, laughed, talked.
23         So I didn't know any different, other than
24  they were -- they were very engaging.  The next
25  thing I knew it was, well, no, they didn't want to

Page 133

1    talk.  But they didn't say that they didn't want to
2    talk.  So I didn't know any --
3        Q    You understand that they complained to
4    Delta about what you did.
5        A    Yeah, per my -- per my supervisor at that
6    time, and I -- yeah, I did.
7        Q    All right.  You told me that you went to
8    Cheryl Taylor in HR --
9        A    I did.
10        Q    -- and complained about this discipline;
11    correct?
12        A    Yes, I did.
13        Q    All right.  The discipline remained in the
14    file though; correct?
15        A    Here's the thing now --
16        Q    You've got to answer my question.
17    Correct?
18        A    Well, there were some things -- at that
19    time, she looked at Marcus, and she said, Well,
20    we're going to have this -- there were certain --
21    she said, We're going to have this removed.  You
22    know, there were -- it was that.  And it was
23    something else that I had complained about at the
24    time.  It all was just so much.  It's just that
25    Cheryl Taylor had said that she would have -- she'd

Page 134

1    have it removed.  Now, I actually --
2        Q    Wait, wait, wait, stop.
3        Are you telling me that Cheryl Taylor told
4    you the letter -- portions of the letter were going
5    to change?
6        A    I don't -- I'll be -- I'm up -- to be
7    clear, I don't know -- because I know Marcus would
8    remember this whole thing, if he's still there.  He
9    would remember.  I don't know if it was the letter
10    or whatever.
11        But the way -- how I'm discussing this
12    with you, me, Marcus and Cheryl Taylor discussed --
13    Taneesha wasn't in that particular meeting.  It was
14    just the three of us, and all of this was discussed.
15    And I was like -- well, I didn't -- I was like I
16    wasn't -- We get it, Q.  We get you didn't -- I get
17    it.  It's just, you know, they didn't get that.
18    That's why they complained.  It's not saying that
19    you didn't act -- you weren't unprofessional.
20        Because that's my whole thing.  I said, I
21    didn't handle them unprofessionally.  I handled
22    them -- I'm very friendly, so I handled them in a
23    friendly way.  And that's kind of how we was
24    discussing.  And that's why I was telling her I just
25    didn't understand why I would be wrote up for being

Page 135

1    friendly.  We're supposed to be friendly.
2        Q    But you understood that you're not
3    supposed to ask for autographs with celebrities or
4    take pictures with celebrities; correct?
5        A    Well, after the fact.  I'll be honest, I
6    didn't get that before because I watched the people
7    that were training me -- and, again, I'm not going
8    to get into other people's business.  So I thought I
9    was just doing what I saw the people that had worked
10    there longer than me asking people for autographs.
11    They didn't get reprimanded or nothing.  So I
12    thought when I saw my mom's biggest fans, I thought
13    it was okay.
14        Q    Who else asked for an autograph that you
15    saw?
16        A    Well, there are -- I mean I'm not going --
17    again, I've seen my coworkers at the time when I
18    worked in there.
19        Q    Who?
20        A    Who?
21        Q    Yeah.
22        A    I don't -- I can't say like names or
23    nothing because it's various.  It's various people
24    I'm saying that --
25        Q    Can you tell me one name?

Page 136

1        A    Well, they -- they've asked for pictures.
2        Q    Who?
3        A    I don't want -- I don't, you know, want to
4    bother like --
5        Q    Who?
6        A    There are various people that --
7        Q    Name one.
8        A    -- say, Can we get -- can we get a
9    photo --
10        Q    Name one person.
11        A    -- have a photo with you?
12        Well, that was years ago, Ben.
13        Q    So you can't.
14        A    No.  It's not that I can't.  I'm just
15    saying like there are people in there --
16        Q    Name one person, Ms. Stevenson.
17        A    But I mean like social media, like you all
18    can't see that.
19        Q    Name one person, Ms. Stevenson.  Answer
20    the question.
21        A    I don't want to get anybody in trouble for
22    asking --
23        Q    Ms. Stevenson --
24        A    -- for a picture.
25        Q    -- that's not the question.  Please answer

Page 137

1  my question.  Name one person.
2       A    She's such a good employee.
3       Q    Who is it?
4       A    I mean they just asked for a photo, and
5  the celebrity give it to them.
6       Q    Who?
7       A    Lucille.
8       Q    Who is Lucille?
9       A    I don't know her last name.  She's an
10 awesome employee.  I don't remember her last name
11 because she's married now.  She's a nice person
12 but --
13      Q    What was her last name?
14      A    I don't -- I don't remember her last name.
15 But she's one of the people that trained -- she's
16 been in there for years.  When I say -- like she's
17 very professional.  It's not like -- you know, like
18 bombarding the people.  But it's like, Oh, she's
19 just like, can I get a -- when the people walking
20 out, Can we get a picture?  You know, I'm sitting
21 there, and, you know, the celebrity is laughing.
22      Q    Ms. Stevenson, I'm begging you, listen to
23 my question.  Okay?
24      A    Well, that's just one person I'm saying
25 that work there.

Page 138

1       Q    Name another person, if you can remember
2  any.
3       A    I don't have another name.
4       Q    All right.  And can you tell me anything
5  about Lucille, what her last name is, what she looks
6  like?
7       A    I don't know -- like I said -- she's --
8  she's maybe -- she's about her height.  She's about
9  Sheandra's height.
10      Q    What does she look like?
11      A    She may be like a -- maybe your complexion
12 too, maybe a tad darker.
13      Q    She's African American?
14      A    Yeah, she's African American, very sweet,
15 very friendly.  And I forget what that guy -- it was
16 a tall guy, I just remember.  And he's like -- you
17 know, people have gotten -- like I said, like on the
18 way out, I remember that day.  It was just like
19 standing right by the elevator.  I -- again, I don't
20 know what B looks like.  Somebody told me B looks --
21      Q    Ms. Stevenson, I haven't asked you this
22 question.
23           All I've asked you is what she looks like.
24 That's all I've asked you.
25      A    Well --

Page 139

1       Q    Do you know is she older, younger, about
2  your age?
3       A    She's -- well, no, I'm in my 40s.  She
4  is -- Lucille may be in her 50s.  She might be in
5  her 50s.
6       Q    All right.
7       A    You know --
8       Q    All right.  And do you -- why do you think
9  they were mean to you and not to Lucille?
10      A    She wasn't mean to me.
11      Q    Why do you think they disciplined you and
12 not Lucille?
13      A    No.  Here, that's -- let me make that
14 clear.  I'm not saying that they did not discipline
15 Lucille.  I don't --
16      Q    You don't know.
17      A    Yes.  Oh, I don't know.  I've never -- I
18 don't want -- yeah, I didn't say that.  No, I'm not
19 saying that.
20      Q    All right.
21      A    It's tons of people that work at Delta
22 that take pictures with celebrities.
23      Q    Yeah.
24      A    I'm just saying -- yeah, I don't know her
25 business.  I'm just saying she's one of the people

Page 140

1  that trained me.
2       Q    Okay.
3       A    So when I see my veteran people --
4       Q    I haven't asked you this.  Stop.
5       A    Oh, okay.
6       Q    All right.  Do you --
7       A    I don't want to get that lady in trouble.
8       Q    Do you -- strike that.  Let me start
9  again.
10           We've just talked about you going to
11 Cheryl Taylor and making a complaint about
12 Exhibit No. 11; correct?
13      A    Yeah, 11.  It was 11 and -- and something
14 else.  I didn't really --
15      Q    What was the something else?
16      A    -- review this thing.
17           Yeah.  That's probably --
18      Q    Okay.  And you --
19      A    It was this --
20      Q    Wait, stop.
21           (Discussion off the record.)
22 BY MR. STONE:
23      Q    Let's go back.  You said a moment ago,
24 Ms. Stevenson, that in addition to complaining about
25 Exhibit 11 that you complained about something else

Page 141

1  to Ms. Taylor.
2       What was the something else?
3       A    The something else was -- it was this, and
4  it was the Red Coat at that time in the Sky Club.  I
5  don't even think he's in there anymore.  She had
6  that removed from a file too.  I remember that
7  because she said she was going to have that done.
8  She was going to have that done right -- she was
9  like, We're going to remove it right now.
10      Q    Ms. Stevenson, stop.  What was the
11  something else?
12      A    It was the Red Coat told a lie on me and
13  Lucille and Stan, I don't remember his last name,
14  they both work in the Sky Club, they were -- they
15  vouched for me and told Marcus that it was -- told
16  the performance leaders that that Red Coat actually
17  lied on me.
18      Q    What lie did the Red Coat say?
19      A    When we worked in the Sky Club, there was
20  a call that we had to make.  That they'd call and
21  do -- like we have to do like weekly, I'm trying to
22  remember because this was so long ago, these little
23  like briefing things.  And we all have to call in
24  and say, Hey, it's Q, B25.  Hey, it's such and such,
25  C whatever.  We'd call in.  And each day they'd give

Page 142

1  a different person the assignment to call and give
2  the report and the reviews of like the liquor count
3  and all of that that goes on, the people count, the
4  liquor count, all of that.
5       Well, that particular day, the -- he was
6  actually assigned to do it.  Failed to do it,
7  forgot, missed the actual call.  PL comes in and is
8  like, Why weren't you on the call?
9       When this all occurred, if I remember
10  correctly, it was like Taneesha or Marcus that had
11  actually designated him to do it.  It didn't get
12  done.  Stan and Lucille actually witnessed this go
13  down.  And I got reprimanded for it and got called
14  in the office and said, Well, write me up.  And when
15  I came out, they came and they was like, Well, you
16  don't say nothing.
17      So when I come out they were like, What
18  did -- I said, They -- I don't know.  I think they
19  wrote me up or reprimanded me, and I didn't even do
20  anything.  They're like, You didn't do that, Q.  We
21  know you didn't do that.  We'll let them know.  But
22  it ended up on my file.
23      Q    All right.  But it was taken out by
24  Ms. Taylor?
25      A    Cheryl -- yeah, per -- I think she's --

Page 143

1  yeah.
2       Q    Other than this complaint that you've just
3  described, and your complaint about Exhibit 11 --
4       A    Uh-huh.
5       Q    -- did you ever complain to HR about any
6  other unfair or inappropriate treatment that you
7  thought you were receiving while you were at Delta?
8       A    The only other thing, with this same --
9  the Red Coat, was I did -- I did express to Cheryl
10  that -- and she made me understand some things, so I
11  don't want you to think I'm being hostile with this
12  part.  But I told her that the person had made a
13  couple of advances.
14      But, again, that was worked out at that
15  time, so I don't want to make it like I'm not -- I'm
16  not here to hurt anybody -- hurt anybody.  I'm not
17  here to hurt Delta.  I love Delta.  But that
18  particular person at the time that did lie on me,
19  also had constantly kind of made little personal
20  references, advances, and I, you know, was not --
21      Q    Was asking you out on dates?
22      A    Yes.  And I -- yeah.  And like, Well, we
23  should do something, this, that and the other.  And
24  I stated that to Ms. Taylor.  Marcus was sitting
25  there.  And, again, she just had to remove -- she

Page 144

1  was like, you know what, men are men, women are
2  women.  When people see something -- so we'll get
3  it -- I'm going to clear it out, and she did.
4       So I'm just being honest about that.  So I
5  went through a lot there.  I was going to get to
6  that.  That was one of the reasons.  Along with
7  wanting full-time benefits, and the couple of things
8  that I did go through in there, that was why I
9  bidded it out.  And I said, you know, I just want to
10  go somewhere for some peace and work and enjoy my
11  career and be quiet.  And that's what I did.
12      When I was done with this also, Ben --
13      Q    All right.  Stop, because I've not asked
14  you about that.
15      A    Oh, okay.
16      Q    My question is, you've told me now about
17  the complaints that you've made to HR about unfair
18  treatment.
19      Have you told me all of them?
20      A    Yes.  That is --
21      Q    I got it.
22      A    I can't -- and I never went to HR with the
23  Carole thing.  I didn't go to that because, again, I
24  was at the point where I just wanted to be quiet,
25  and I just wanted to -- again, I did what I thought



Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 37 of 87
Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson

USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 254 of 675
June 29, 2017

Page 145

```
1   I could do in order to keep myself -- my job and
2   everything, which is why I tried to get off of
3   International to bid for Domestic.
4       Q    You never complained to HR -- made any
5   other complaints about discrimination --
6       A    No --
7       Q    -- or anything like?
8       A    -- I did not.  I did not.  I just -- I
9   wanted some peace.
10      Q    I got it.
11           All right.  Back to travel benefits for a
12  minute here.  And we talked about a moment ago the
13  potential for abuse, correct, of travel benefits?
14      A    Could I say something, one last thing?
15      Q    Let's keep going here.  And then we'll --
16  and then you can come back and correct anything that
17  you need to correct.
18           (Exhibit 12 was marked for
19           identification.)
20  BY MR. STONE:
21      Q    Let me show you what's been marked as
22  Exhibit No. 12.  And ask if you recognize that as a
23  memo that went out to employees at Delta.  It's
24  addressed to Delta Colleagues Worldwide.
25      A    I don't know if I remember it.  Oh, I
```

Page 146

```
1   don't remember this because -- I said I accessed.
2   But, I'll be honest, I don't remember this, because
3   I was -- if I remember correctly, I was out on my,
4   what do you call it, Workers' Comp thing.  I was out
5   at this time.
6       Q    Okay.
7       A    So if they sent it, like you said, to all
8   employees, I'm sure it went to my e-mail.  But I was
9   out at that point, so I probably -- to answer
10  honestly, I probably did not read this specific one.
11      Q    You would have received it, just not read
12  it.
13      A    I would have received it, yeah.  I'm sure
14  they sent it to me.
15           (Exhibit 13 was marked for
16           identification.)
17  BY MR. STONE:
18      Q    Let me show you Exhibit 13, which is a set
19  of frequently asked questions that went with
20  Exhibit 12, and see if that refreshes your
21  recollection at all.
22      A    I think I remember this.
23      Q    You do remember that?
24      A    Yeah.  I think I remember this.
25      Q    So you would have read it and understood
```

Page 147

```
1   it; correct?
2       A    Yes, I'm pretty sure.
3       Q    All right.
4           MR. STONE:  Let's take a break for
5       everybody.  Why don't we take ten minutes here.
6           (Brief break.)
7   BY MR. STONE:
8       Q    Ms. Stevenson, we're back on the record.
9           You realize you're still under oath;
10  correct?
11      A    Yes, I do.
12      Q    All right.  Okay.  So we were talking
13  about travel passes a moment ago.  And you I know --
14  I don't doubt recall that -- you have a recollection
15  of being called in in July of 2015 for an interview
16  regarding the use of travel passes by your travel
17  companions; correct?
18      A    Yes.  It wasn't an interview though.  It
19  was -- I was just told -- after I had got out of my
20  briefing, my PL at the time said, Go put your stuff
21  down.  And then he was like, Just come back by my
22  office in like 30 minutes.
23           And I was like, Oh, for what?
24           And he was like, he said, Just come back
25  in 30 minutes.  He was like, Honestly, I don't even
```

Page 148

```
1   know what for.  He was just like, We just have to go
2   down to HR.
3           And I said, Okay.  Put my stuff down.  Got
4   back, 30 minutes, got back down.  We walk in.
5           And then Kiha got up off of -- from her
6   desk.  Came out.  She's like, Hi, you know, Quaniah,
7   I'm Kiha.  We shook hands or whatever.
8           And I said, Okay.  Nice to meet you face
9   to face finally.
10           And then she's like, Oh, well, your --
11  some travel passes, we're doing some audits, and she
12  was like, Your name came up.
13           I said, Oh, okay.
14           And she's like, So I'm just going to ask
15  some questions.
16           And I was like, Okay.  Fine.
17           And me and my PL at the time, we sat down.
18  And then she announced that somebody was on a
19  speakerphone that would be listening in.  They
20  stated their name.  And then we proceeded to go
21  through whatever.  But she called it like a -- but
22  she didn't say interview.
23      Q    But they asked you a series of questions.
24      A    Oh, okay.  That's what you mean, yeah.
25      Q    And so was your PL, your performance
```

Page 149

1  leader, at that time was that Francisco Cortes?
2      A   Yes.
3      Q   And Mr. Cortes was somebody you obviously
4  liked, based on that tone of voice.  Yes?
5      A   Yes.
6      Q   And he always treated you fairly.
7      A   Yes, he did.
8      Q   And he's the one you said took you down to
9  HR; correct?
10     A   Uh-huh.
11     Q   You have to say yes.
12     A   Yes.
13     Q   And when you got there, you said Kiha
14  Jones was there; correct?
15     A   Yes, yes.
16     Q   And then there was somebody that was on
17  the phone.
18     A   She had them on the speaker phone.  They
19  announced --
20     Q   Do you remember what his name was?
21     A   It was a she.  And her name started with
22  an M.
23     Q   Was it --
24     A   And it was -- if I remember correctly, it
25  said Mehret.  I don't remember the last name, but

Page 150

1  Mehret or Mehret.
2      Q   Yep.  Did you -- had you ever met Mehret?
3      A   No.  All I know is I -- just Mehret.  I
4  think -- did she even say where she was -- I don't
5  even -- yeah, it was just she stated her name.  I
6  don't know if she said -- I don't know if she gave
7  her title, but I just remember that name.
8      Q   Did you have an understanding that she was
9  from the pass protection group or the audit group
10  that was responsible for ensuring compliance with
11  travel pass policies?
12     A   I can't say I remember if that was
13  properly explained, like in that detail, the way you
14  just stated it.  But definitely I was aware that
15  somebody was listening in, and that was her name.
16     Q   Okay.  Was Mehret just listening in, or
17  did she ask any questions?
18     A   She more so was listening in.  She did
19  ask -- it was more like when Kiha would say certain
20  stuff, she might bounce off of something Kiha might
21  have said or reiterate.  Like so, you know -- it was
22  more like Kiha would ask the question, and Mehret
23  may say, So you're saying blah, blah, blah.
24         And I would, you know, give whatever my
25  response was.

Page 151

1      Q   Okay.  So I just was trying to be clear
2  on -- yeah, she asked a couple of questions.  But
3  Kiha more so did the majority -- she did most of the
4  line of questioning for that particular --
5      Q   And you -- I think we've established you
6  liked Kiha and thought she treated you fairly during
7  your employment.  Yes?
8      A   Well, here's the thing, I don't -- I --
9  no, I do -- I have to disagree with that.
10     Q   Okay.
11     A   I do not know her like that.  My encounter
12  was not -- it wasn't the nicest encounter.  I'll say
13  that.  So, yeah, I have to say, yeah, I don't -- I
14  didn't have dealings with her like I had with other
15  people that I spoke on, so I can't really make that
16  assessment, other than it wasn't the nicest
17  encounter.
18     Q   You're talking about the interview --
19     A   Well --
20     Q   -- on the passes.  When you talk about
21  encounter, are you talking about this interview
22  we're talking about?
23     A   I'm talking about the interview, and I'm
24  talking about a couple of e-mails back and forth
25  that she and I had before I ever even faced -- you

Page 152

1  know, face to face or whatever, just the tone, and
2  I -- yeah, the tone of them.
3      Q   Okay.
4      A   Yeah.
5      Q   All right.  Do you know who it was that
6  made the decision to -- I'm going to call it an
7  interview, to interview you?
8      A   Just based off of what she said, was just
9  verbatim, I remember her stating, Your name came up.
10  It was never like, Oh, such and such said we need to
11  interview you.
12         It was just, Your name came up.  You know,
13  we're doing audits or whatever, and so I'm going to
14  ask you some questions.  This is -- do you know why
15  you're here?
16         And I preceded to say, No.
17         Okay.  Well -- yeah, no.
18     Q   Do you know -- when she said your name
19  came up, do you know who recognized your name coming
20  up and said, We need to interview Ms. Stevenson?
21     A   Yeah, that was never made clear to me,
22  like this person said we need to -- it was just,
23  Your name came up.
24     Q   Okay.  Did you ever become aware that the
25  reason that your name came up in the investigation

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                    June 29, 2017

Page 153

1    was that you had given a buddy pass to somebody
2    named Vendell Bailey.
3        Q    You said the reason what?  Could you say
4    that again?
5        Q    Yeah.  That the reason your name came up,
6    did anybody ever tell you the reason your name came
7    up was because you had given a buddy pass to
8    somebody named Vendell Bailey?
9        A    No.
10       Q    Do you know who Mr. Bailey is?
11       A    Yeah.  Well, the mother, I know the
12   mother, yeah, I do know.  But they never said --
13   that never -- she never said, Oh, Vendell Bailey is
14   why I'm talking to you.  It was -- that was not --
15   that wasn't even -- that came up later, but that
16   wasn't the -- that wasn't the part -- that wasn't
17   the reason for her really saying that she was
18   talking to me.
19       Q    Well, she didn't tell you why she was
20   talking to you, other than your name came up;
21   correct?
22       A    Well, that, and then throughout the thing
23   they got into my companion, and this is the reason
24   why.  And then she went so and so into other stuff
25   that I guess I'll tell you later.

Page 154

1        Q    Do you -- you said you do not know Vendell
2    Bailey personally?
3        A    Yeah, I know -- I do.  I know that
4    they're -- they're family friends of my family, and
5    I stated that with Kiha.
6        Q    Tell me who Vendell Bailey is.  He's a
7    family friend?
8        A    No.  He is the son of the mother.
9        Q    Okay.  And who -- what's his mother's
10   name?
11       A    That's Victoria.
12       Q    And how do you -- do you know Victoria?
13       A    Yeah, like --
14       Q    How do you know Victoria?
15       A    We're just friends, family friends.
16       Q    How long have you known her?
17       A    Now, maybe about seven years.
18       Q    But she doesn't work at Delta.
19       A    No.
20       Q    All right.  And do you know Vendell as
21   well?
22       A    Yes, that's her son.
23       Q    Have you met him and spoken with him?
24       A    Yes.
25       Q    Do you socialize with him?

Page 155

1        A    No.  I mean not like -- that's not --
2    that's not a regular friend that I hang out with.
3        Q    I'm with you.
4        A    It's friends of the family.
5        Q    How did Mr. Bailey get a travel buddy pass
6    that belonged to you?
7        A    Me.
8        Q    You gave it to him?
9        A    Uh-huh.
10       Q    When did you give it to him?
11       A    I do not recall that.  That's the same
12   thing I said to Kiha.  I don't remember dates that I
13   book my -- you know, we get more than one, so I
14   don't -- I don't write -- yeah, I don't remember the
15   date.
16       Q    Why did you give Mr. Bailey a buddy pass?
17       A    For pleasure travel to come from I
18   think -- again, I don't -- I think Detroit to
19   Atlanta, Atlanta to Detroit, which I stated that to
20   Kiha as well.  And I actually wrote it down.
21       Q    Did he ask you for a buddy pass?
22       A    Yes.
23       Q    How did he ask you?
24       A    Just, I need to fly.
25       Q    Did he call you?  Did he text you?  Did he

Page 156

1    write you?
2        A    No.  It was just a phone call.  It was
3    actually a three-way call.
4        Q    Three-way call between who and who and
5    who?
6        A    Mom.
7        Q    His mother Victoria?
8        A    Uh-huh.
9        Q    And yourself?
10       A    Yeah, yeah.  I said, Hey, I'll book it.
11       Q    All right.  Had you given him more than
12   one buddy pass?
13       A    No.
14       Q    Did you ever give Victoria any buddy
15   passes?
16       A    Uh-huh.  I think I gave her like one
17   before, like one or two before.
18       Q    All right.  Do you know anybody named
19   Ernest Adams?
20       A    Ernest Adams.
21       Q    Yes.  Does that name mean anything to you?
22       A    No.
23       Q    Do you know anybody named Brady Nicholson?
24       A    No.
25       Q    Do you know anybody named Candice Dubois?

Page 157

1    A    That's my coworker -- well, I'm not there
2 right now.  That's my coworker.
3    Q    She used to be a coworker of yours?
4    A    No, she works at Delta.
5    Q    What about Sedarius Johnson?
6    A    I don't know.  I think some of these --
7 these people, I think they work at Delta.  I think
8 so.  I definitely know Candice, yeah, because she's
9 on my Facebook too.
10   Q    Is she friends with you?
11   A    She just sent me a nice little message the
12 other day, commented on something.  I don't know.
13   Q    Is she friends with Victoria Bailey?
14   A    I -- I don't know if --
15   Q    Do you know of any way that she would know
16 Victoria Bailey?
17   A    I -- again, I don't know.  I -- some of the
18 Facebook people that Delta follow.  Some of the
19 people that are my personal friends, they're
20 friends on Facebook.  I don't know if Candice is
21 friends with her.  But that's my coworkers.
22   Q    Do you know any of the people I just
23 listed, Mr. Adams, Mr. Nicholson, Sedarius Johnson
24 or Candice Dubois or Dubois, are friends with
25 Vendell Bailey?

Page 158

1    A    No, I do not -- I do not know who else --
2    Q    Do you know if any --
3    A    I know she has other friends there, but I
4 don't -- no, I don't.
5    Q    Do you know if any of those people would
6 be friends with Victoria or Vendell Bailey?
7    A    I do not.
8    Q    Okay.
9    A    I am, but I don't know, you know.
10   Q    Do you know of any reason that any of
11 those people would give buddy passes to Victoria or
12 Vendell Bailey?
13   A    No.  But I mean Candice like -- what I
14 will say is like we've given each other passes
15 before, like -- like I've made -- we've stated that.
16 Like I stated that to Kiha and to supervisors
17 like -- to my understanding, even per the
18 supervisors, like if your coworker is your -- like
19 if we're friends or whatever, and somebody says,
20 Hey, you know, I'm out of mine.  You know, my aunt
21 needs to fly tomorrow.  Is it okay for my aunt to --
22 you know, if you have an extra one.
23        Yeah, you know, I have an extra one.
24        I don't know.  Correct me if -- at the
25 time, correct me if I'm wrong but -- and I stated

Page 159

1 this to Kiha.  I was like, you know, people -- if
2 we're friends with each other, you're coworkers,
3 I've had several performance leaders say, Yeah, you
4 know, if you're friends with the person, you're free
5 to give them to -- as long as it's for pleasure.
6 And I made that real clear, like --
7    Q    All right.
8    A    -- pleasure travel.
9    Q    Did you -- are you telling me that people
10 gave you passes to give to Vendell Bailey?
11   A    No.  I'm not saying that.  I'm just making
12 that analogy that --
13   Q    So you don't --
14   A    -- I was told that we're allowed to -- as
15 long as it's not for purchase, payment, you know,
16 that -- you're okay with that, as long as you're
17 not -- it's personal travel, and you are not
18 receiving any money.
19   Q    All right.  Just to be clear, you don't
20 know of any reason why any of those people would
21 give buddy passes to Vendell Bailey, as you sit
22 here?
23   A    I don't know.  I don't know if they know
24 her or him or whatever.
25   Q    All right.  You were asked during the --

Page 160

1 I'm again calling it an interview?
2    A    Yeah.  She asked me that in the interview.
3    Q    And you told her what you just told me?
4    A    Yeah.  I told her like -- well, she didn't
5 ask me about Candice now.  I don't think she --
6 yeah.  I don't remember her asking me about Candice
7 at all.
8    Q    But you told her that you had given a
9 buddy pass to Vendell -- to Victoria Bailey and
10 Vendell Bailey?
11   A    Yeah.  I think I actually wrote it out for
12 her too.
13   Q    You also spent considerable time talking
14 about Mr. Dais; correct?
15   A    Yeah, that -- that's what I was -- that
16 was pretty much -- that's why -- that was the whole
17 point of her conversation with me.
18   Q    And Mr. Dais, as we've established a
19 moment ago, was your travel companion at the time;
20 correct?
21   A    Uh-huh.
22   Q    You have to say yes.
23   A    Yes.
24   Q    And he was also your boyfriend; correct?
25   A    Yes.

Page 161

| | |
|---|---|
| 1 | Q     And he was not your travel companion |
| 2 | during the entirety of your employment at Delta, was |
| 3 | he? |
| 4 | A     No.  It was one -- it was one time I had |
| 5 | one other person on there.  And I made that clear to |
| 6 | her as well.  We -- |
| 7 | Q     That was Christopher Blanding? |
| 8 | A     Christopher Blanding, uh-huh, for that |
| 9 | short period of time. |
| 10 | Q     And who was Mr. Blanding? |
| 11 | A     He actually is a long-time friend that I |
| 12 | know for a long, long time and -- I've just known |
| 13 | him for a long time.  We worked together.  We've |
| 14 | done music together, yeah. |
| 15 | Q     And how long was Mr. Blanding your travel |
| 16 | companion? |
| 17 | A     Just that one year. |
| 18 | Q     And why did you take Mr. Dais off and make |
| 19 | Mr. Blanding your travel companion? |
| 20 | A     Because we had -- we broke up for a little |
| 21 | bit, until we got back together. |
| 22 | Q     Got you. |
| 23 |       And how did -- how is it that among |
| 24 | your -- all your friends and all your family members |
| 25 | Mr. Blanding was the person who got the benefit of |

Page 162

| | |
|---|---|
| 1 | that pass? |
| 2 | A     Oh, that -- I mean we've been friends for |
| 3 | a long time.  Like we've just been friends for a |
| 4 | very, very, very long time. |
| 5 | Q     And how did you come to choose him?  Did |
| 6 | he ask? |
| 7 | A     No.  I just -- I was real clear on he |
| 8 | wasn't on there no more.  We broke up.  Hey, you |
| 9 | want to fly? |
| 10 |       Cool. |
| 11 |       Act like you've got some sense, you know, |
| 12 | it's pleasure.  And I don't even think he even flew |
| 13 | that much so -- |
| 14 | Q     Mr. Blanding is in the music production |
| 15 | business, like -- |
| 16 | A     Yes, he is. |
| 17 | Q     Just like Mr. Dais; correct? |
| 18 | A     Uh-huh.  That is his job. |
| 19 | Q     Did you ever work for him? |
| 20 | A     I didn't work for him.  We just worked |
| 21 | together.  We did a lot of -- a lot of work |
| 22 | together. |
| 23 | Q     What kind of work did you do together? |
| 24 | A     Just music, a lot of music. |
| 25 | Q     Were you working together during the year |

Page 163

| | |
|---|---|
| 1 | that he was your travel companion? |
| 2 | A     Yes, uh-huh. |
| 3 | Q     And when you say a lot of music, tell me |
| 4 | what work you did together. |
| 5 | A     I mean like I would -- I sing, you know, I |
| 6 | just -- I sing.  Like if he needed to record |
| 7 | something.  We did a lot of singing. |
| 8 | Q     So he would hire you to record stuff? |
| 9 | A     Well, it's -- I don't want to say |
| 10 | necessarily hire, Ben, because he's a friend so -- |
| 11 | and he does something that I love, which is music. |
| 12 | So he could just call me and say, Hey, you know, I'm |
| 13 | going to e-mail you some music.  Can you sing it for |
| 14 | me?  And I -- or can you write it, because I'm a |
| 15 | writer too. |
| 16 |       And I'd say, Okay. |
| 17 | Q     Well, I assume he'd paid you something for |
| 18 | doing that.  Yes? |
| 19 | A     No, no. |
| 20 | Q     He didn't? |
| 21 | A     No.  I'm being honest, no, because we go |
| 22 | back 20 years.  Like we've known each other for a |
| 23 | long time.  So I just -- I would just do it for him |
| 24 | because that's -- we're cool.  We're cool like that. |
| 25 | Q     So all the work you did, the singing and |

Page 164

| | |
|---|---|
| 1 | the writing was all done for free? |
| 2 | A     Oh, if it wasn't, I probably would be a -- |
| 3 | it was -- it was done for free.  I have not made |
| 4 | anything with him. |
| 5 | Q     So when I ask Mr. Blanding that question, |
| 6 | he'll testify that he's never paid you any money for |
| 7 | anything that he's done? |
| 8 | A     Absolute -- you need my mother here on |
| 9 | that one.  Absolutely not. |
| 10 | Q     And then what caused you to take |
| 11 | Mr. Blanding off as your travel companion and |
| 12 | begin -- |
| 13 | A     We started back talking.  We -- |
| 14 | Q     You and Mr. Dais? |
| 15 | A     Yes, we did -- |
| 16 | Q     Okay. |
| 17 | A     -- we did. |
| 18 | Q     And during the July 15th interview, you |
| 19 | were asked about the places that Mr. Dais had |
| 20 | traveled; correct? |
| 21 | A     Uh-huh. |
| 22 | Q     And you identified three; correct? |
| 23 | A     Here's the thing.  Well, I don't know how |
| 24 | that is in your paperwork.  I wouldn't -- I did not |
| 25 | identify three.  I was real clear, Ben, with Kiha |

Page 165

1  that -- as she was asking me a lot of questions just
2  back to back, you know, unexpected me, I -- I can't
3  clearly say that I could just sit there and just say
4  every single place that I had ever booked him to.
5  And I was honest with her. I said, you know, I -- I
6  wrote down what I could write down, but I'm in the
7  middle of my workday. As a matter of fact, the day
8  that I was there, I was working for somebody.
9      Q    How many did you identify for Ms. --
10     A    I'll be honest, and I'm not -- I don't
11 have that piece of paper, but I know you might have
12 it. I actually wrote down a number of the places,
13 and I gave her that before we left out the day. And
14 then she says, Well, I'm going to suspend your --
15 when I came back in, because they had me --
16     Q    I haven't asked you any of this.
17     A    Oh, okay.
18     Q    Ms. Stevenson, again, I'm begging you,
19 answer my question.
20     A    Oh, because I think it's pertinent to what
21 you're asking me.
22     Q    I am asking you -- listen real hard to my
23 question, and answer my question. I promise you
24 this will go faster.
25           You're in the interview. You were asked

Page 166

1  by Kiha to name the places where Mr. Dais had
2  traveled; correct?
3      A    Right.
4      Q    And you identified -- at that meeting you
5  identified three places; correct?
6      A    I can't say that I can remember if it was
7  three. I really -- I think that I remember it might
8  have been more. It could have been less than that.
9           But as I stated to her, I said, I don't
10 remember back in '07.
11          And then she correct me, she said, I don't
12 need to -- you don't even have to go that far back.
13 I don't -- I know you probably don't -- I don't. I
14 don't remember even -- at the spur of the moment
15 like that she was asking me. And I stated it to her
16 like that.
17          And she agreed. She said, I don't
18 expect -- I don't expect you to remember every place
19 back from 2010-07.
20          I said, I'm in '15 -- well, at the time,
21 yeah, '15. I don't remember. I just feel like I
22 was blindsided, again, wrongly. I just -- I feel
23 like it was very unfair.
24     Q    Do you remember being asked the last place
25 that Mr. Dais had traveled?

Page 167

1      A    To be honest, Ben, again, that was two
2  years ago, I do not remember all of the line of
3  questioning she asked me. She probably did ask me
4  that. If I remember correctly, I might have said, I
5  don't know, Phoenix or California, you know,
6  because -- and then -- well, I guess that will be on
7  the -- because I know all of that, so you probably
8  going to get to that in a minute, so I'll just --
9      Q    Do you remember being asked who booked
10 Mr. Dais' travel?
11     A    Yes, I do. She did ask me that.
12     Q    And what was the answer to that question?
13     A    Myself.
14     Q    You booked all of his travel.
15     A    Yes. I did state that to Kiha, uh-huh.
16     Q    Okay. And how did you do all of -- book
17 all of his travel?
18     A    Did I -- I guess from my phone sometime,
19 you know, if I'm -- like, you know, through e-mails
20 or just -- like we go on the TravelNet. You can --
21 you have to go on the TravelNet and book the flight.
22     Q    So let me be -- let me be perfectly -- let
23 me make sure I understand.
24          So Mr. Dais would contact you, and say, I
25 need a flight from -- on X day to X place?

Page 168

1      A    Yeah, or like if he got -- sometimes if he
2  would get stuck somewhere, I could be in the middle
3  of my shift or something. Like I'll say, Hey, I'll
4  have to check my -- hey, I'm at work right now. I
5  can't talk. Call you on a break.
6           You know, I'm stuck in the airport. I
7  need to be booked blah, blah, blah, or I need a --
8  to get out of California, to get back.
9           So then I'd say, Hey, let me hit you back
10 on a break. I'm in the middle of my shift. And on
11 a break I would sometimes go and say, hey, look at
12 the flights on my break, like you could. And I
13 stated all this to Kiha. And I'd say, Hey, I just
14 booked from the Atlanta connecting in Phoenix,
15 Phoenix to -- I'm just throwing something out there,
16 like wherever, Philadelphia back through Orlando,
17 Orlando, however. And I'd tell him you've got to
18 take that route now. And I'd just send to him and
19 send his confirmation.
20     Q    And this would be by text? Is that how
21 this would typically take place?
22     A    Sometimes, yes, text message. I still
23 would have to go on --
24     Q    On the DeltaNet.
25     A    Yeah, go into the -- into my DeltaNet.

Page 169

1     Q     So when I check the text records and when
2  I check the cell phone records, I'll see
3  confirmation of all of them.  Yes?
4     A     Yes, yeah.
5     Q     All right.  Did he -- strike that.
6           You were asked during the interview
7  whether you and Mr. Dais had ever traveled together;
8  correct?
9     A     I'm so glad you asked me that.  Yes.
10    Q     And you said -- the answer to that
11  question was yes; correct?
12    A     No.
13    Q     So you did not tell Delta you had traveled
14  together.
15    A     I was really clear to Kiha that we had not
16  traveled.  There was a moment right in that section
17  where Mehret, whatever her name is, I think it's --
18  Mehret and her were kind of overlapping each other
19  talking.  And Kiha was like, Wait a minute, let me
20  ask you again.  And she said something.  She's like,
21  So which one is it?  Are you trying to --
22           And I said --
23           So yes you took --
24           No.  I'm not saying that we traveled
25  together.  We were just there around that same time,

Page 170

1  which was in California at the time.
2           And she asked me again.  I said, I'm being
3  clear.  We have never traveled together.
4     Q     Did you tell Delta and those interviewers
5  that you and Mr. Dais had gone to a funeral?
6     A     No.
7     Q     You never -- did the word funeral ever
8  come up?
9     A     Funeral did come up.  I was real clear
10  about that.
11    Q     What did you say?
12    A     That he was out there for -- he's a dual
13  resident.  At the time, the Mehret person is like,
14  Well, because I kind of know everything because I
15  follow him.
16           And I said, Okay.
17           I follow him all the time on Twitter and
18  his Instagram.  I see everything that he does.
19           And I -- again, I don't know what's going
20  on here, Ben.  I wasn't prepared for it.  I said,
21  Okay.  So, you know, what are you saying?
22           Well, you know, I see he goes for shows.
23           I said, Well, that's pleasure.  I said,
24  But he lives there.
25           No, he doesn't live there.

Page 171

1           I said, Yes, he does.  He's a resident.
2     Q     You're answering much more than my
3  question.
4           My question is, did the topic of a funeral
5  come up?
6     A     Yes, the funeral came up.  And she asked
7  me, she said, So he went to the funeral with your --
8  with you and your aunt.
9           I said, Absolutely not.  He was there
10  doing something else.  I said, I was at my aunt's
11  funeral.  We've never traveled together.  I said
12  that like two or three time.  I said, Kiha --
13    Q     How did the topic of a funeral first come
14  up, Ms. Stevenson?
15    A     I'll be honest, I don't even remember how
16  that came up.  I might have said it myself because
17  that was my aunt.
18    Q     So you said that you -- so you were asked
19  whether or not you had traveled with Mr. Dais, and
20  you raised the topic of the funeral?
21    A     I'll be honest, I don't remember what the
22  line of questioning was.  But I do remember stating
23  to her, My father -- I mean we had never traveled
24  together.  That was me and my father.
25    Q     So you and Mr. Dais are --

Page 172

1     A     But they did --
2     Q     -- boyfriend and girlfriend; correct?
3     A     Uh-huh, uh-huh.
4     Q     And Mr. Dais is your travel companion;
5  correct?
6     A     Uh-huh, uh-huh.
7     Q     And Mr. Dais does a great deal of travel;
8  correct?
9     A     Yes.
10    Q     And you guys have never once, even though
11  he's your travel companion --
12    A     (No response, indicating.)
13    Q     Can you explain why?
14    A     Why?  I mean --
15    Q     Why have you never traveled together?
16    A     We just have not.  And I -- Kiha, she
17  asked me, and I said we didn't.  And we've dated for
18  a very long time.
19    Q     You were asked, were you not, about
20  Mr. Dais's trip that he took in early June of 2015
21  to --
22    A     I was asked what?
23    Q     About Mr. Dais's trip to California in
24  early June of 2015.
25    A     Yeah.  I think she asked me that.  That

Page 173

1  was the one where Mehret was like she follows him,
2  she follows my boyfriend --
3      Q   Okay.
4      A   -- on Twitter.
5      Q   And why did you --
6      A   And I was real clear about something with
7  that.
8      Q   Why did Mr. Dais go out to California in
9  early June of 2015?
10     A   Here's the thing, I do not know because I
11 didn't -- as I stated to her, I said, I don't know
12 because I don't keep --
13         Well, I'm going to tell you.  This is what
14 the Mehret lady said.  Well, I'm telling you, well,
15 he went for some shows.
16         Well, he goes for fun.  People -- he goes
17 to shows.  He goes to concerts.  I did state that to
18 her.
19     Q   All right.  You don't know why he went in
20 June of 2015.
21     A   I only know what Kiha and Mehret told me.
22     Q   You've never asked Jovan that question?
23     A   No.  I'm being honest with you, I -- as I
24 said to Kiha, and I even sent her an e-mail, I said,
25 I cannot account for -- I was -- because I'm going

Page 174

1  real personal, and I didn't even want to go
2  personally.  Like I told her, I -- our
3  relationship -- like we just -- I don't -- I told
4  her -- we don't -- I don't -- he's a different kind
5  of guy.  Musicians are -- like I don't really get
6  into where you at, what -- I'm just -- and
7  everything I'm saying to you right now, Ben, I said
8  it the way -- that I said it to Kiha, I'm saying it
9  to you.
10     Q   You have no --
11     A   I don't question him and say -- all I know
12 is act like you got -- everybody act like you have
13 some sense.  This is pleasure.  Enjoy this.  It's a
14 benefit, key word benefit.  Don't give the gate
15 agent any problems, which that has never occurred or
16 anything.
17     Q   So you don't --
18     A   I just never -- I didn't -- and I told
19 Kiha, I said, I know that I booked his travel for
20 pleasure.  I said that maybe six times during the --
21     Q   How do you know that, if you don't know
22 why he was going?
23     A   Because I know he was going for pleasure.
24     Q   How do you know?
25     A   Because he knows -- he knows this is my

Page 175

1  career.  That I take and I took seriously, and this
2  was my livelihood.  And I --
3      Q   How do you know?
4      A   Well, it's kind of like -- like I think I
5  might have said to Kiha then it's like, Do you know
6  where your husband is every five minutes, like --
7  because, you know, I'm not married yet, but I would
8  like to know somebody who knows where their spouse
9  is 24 hours a day.  Most people don't these days.
10     Q   You --
11     A   I said that.  I'm just saying, I don't
12 know.
13     Q   Okay.
14     A   And I was honest with her.  She was like,
15 Okay.
16         And then I asked her a question, I said,
17 so am I supposed to know --
18         Well, yeah, you're supposed to know when
19 they leave the airport.  I remember that being --
20         I said, How am I supposed to know, you
21 know, that they went and got a hamburger when they
22 left the airport.  I mean I didn't say that -- that
23 part.  I'm just --
24     Q   Well, you understand you were responsible
25 for ensuring --

Page 176

1      A   Right.
2      Q   -- they complied with Delta policy;
3  correct?
4      A   I did.  And, like I said --
5      Q   And --
6      A   -- whenever I book it, and I said this to
7  her, I said, I'm booking it, and it's for pleasure.
8  Well, I didn't have to say that to my people because
9  they understand.  My friends and family know.  When
10 my parents flew they know, hey, you're flying for
11 pleasure.
12     Q   But you don't know whether Jovan was doing
13 that or not.  He might have been going for business.
14 You don't know.
15     A   No, he was not going for business.
16     Q   How do you know?  You don't know what he
17 was doing there.
18     A   He wasn't.  He --
19     Q   How do you know?
20     A   He -- he was going for business -- I mean
21 he was going for pleasure, I'm sorry, correct me.
22 He was going for --
23     Q   How do you know --
24     A   -- pleasure.
25     Q   You don't know what he was doing there?

Page 177

1    A   I was really clear with Kiha that he's
2  always going for pleasure.
3    Q   How do you know that he wasn't traveling
4  for business in June of 2015?
5    A   Ben, I --
6    Q   You don't.
7    A   Ben.  I don't know what nobody is doing
8  for -- I'm just saying when they -- I don't know
9  what anybody is doing, let's just be clear, if I'm
10 not with him 24 hours a day.  I said that to Kiha.
11 But I know he was traveling for pleasure when I
12 booked the trip.  And I said that to Kiha.
13   Q   Well, how do you know -- you don't know
14 what he was doing in California; right?
15   A   Well, I know he has a daughter there, and
16 he's a dual resident.  And I made that clear.  And,
17 at the time, Mehret said, No, he doesn't --
18   Q   Ms. --
19   A   -- but he does.
20   Q   Ms. Stevenson, stop.
21   A   It's not for business.
22   Q   You don't know what --
23   A   No.  I do know he has a daughter.
24   Q   Stop.  You don't know on this particular
25 trip --

Page 178

1    A   Oh, you're talking about that trip.
2    Q   Right.  You don't know what he was doing
3  out there, do you?
4    A   He was out there for pleasure.
5    Q   How do you know?
6    A   According to Mehret, and whatever she
7  stated that she saw, it clearly shows pleasure.
8    Q   What do you -- what was he doing out
9  there?
10   A   She says a show.  He wasn't doing a show.
11 People go to concerts for pleasure.  I mean I go to
12 other states and go to a concert for pleasure.  Like
13 you can't go to a concert for pleasure?
14   Q   Ms. Stevenson, let me ask you a question.
15 You've never talked to him about what he
16 was doing in California; right?
17   A   I mean after all of this happened or
18 whatever, and he thought -- he was like, What do you
19 mean?  I always travel for pleasure.  And he's a
20 dual resident.
21   Q   Stop.  You never talked to him -- listen
22 to my --
23   A   Yes, I said afterwards.  Yes, we had -- we
24 did talk about it.
25   Q   What was he doing in California on this

Page 179

1  trip?
2    A   He was there for pleasure and to see his
3  daughter.  I made -- I said that to Kiha.
4    Q   So he saw his daughter out there?
5    A   Yes.  And --
6    Q   How long was he out there?
7    A   I mean he goes back and forth.  I'll be
8  honest, I don't calculate, oh, he came back in five
9  day, four days.  He's a dual resident there, and his
10 daughter -- his little girl lives out there.
11   Q   How long was he out there on this
12 particular trip?
13   A   I do not know.  I could ask him how long
14 he was there.
15   Q   But you never asked.
16   A   Because Kiha didn't ask me that.  She
17 didn't ask me.  I don't think she asked me -- she
18 never asked me how long.  But, yeah, I mean it's
19 emotional because that's his little girl.
20   Q   You don't know what he was -- how many
21 days he was out there or what he was doing, do you?
22   A   Well, I never ask him how long he's
23 staying or nothing like that, Ben.  I mean I'm just
24 being honest, I don't.  Because he has a little girl
25 out there.  I'm not the child's mother.

Page 180

1    Q   Okay.  I want to be perfectly clear.
2    You don't have any personal knowledge of
3  what he was doing --
4    A   I do now.
5    Q   -- on that trip.
6    A   I'm saying based off of -- I'm being
7  clear.  I have -- the only knowledge I have is -- of
8  course we talked about it after all of the charades.
9  But based off of what Mehret and Kiha stated to me,
10 a bunch of bologna.  Like I know why he was there.
11   Q   Stop.
12   A   I don't, other than what they told me.  I
13 know what --
14   Q   You don't --
15   A   I'm saying all I -- what I know -- what I
16 know is what Kiha and Mehret told me.  That's all I
17 know.  Because they gave me the reason.  Because
18 that part of the question came up.  They said, You
19 know what, we're going to tell you why he was there.
20 He was there for a show.  But it wasn't his show.  I
21 made that clear.  And she's like, Okay.  Well, we're
22 telling you --
23   Q   How do you know it wasn't his show?
24   A   I'm saying that's what they -- they said
25 to me a show.  So I'm saying when I think show,

Page 181

1  people go to shows.  I know they go to shows and
2  concerts.
3      Q    Ms. Stevenson, we've gone around and
4  around on this.
5      A    Because when he's on tour --
6      Q    Let me be perfectly clear.
7      A    -- he's on a bus.
8      Q    All you know is what Kiha --
9      A    What they told me.
10     Q    -- and Mehret told you.
11     A    Uh-huh.
12     Q    You don't know any -- you don't have any
13  other information as to what he was doing out there
14  in California on that trip.
15     A    Well, other than what they told.  She said
16  she saw --
17     Q    Other than what they told you, you don't
18  have any other knowledge.
19     A    Other than what she also said to me
20  online, because they sent me something online.
21  That's what I'm saying.  I know that part.
22     And it's all what Kiha and Mehret -- she
23  says she follows -- I follow your boyfriend.
24     I said, Okay.
25     Q    Other than what they told you --

Page 182

1      A    Uh-huh.
2      Q    -- and what you saw online, and we'll look
3  at that in a minute --
4      A    Uh-huh.
5      Q    -- you don't have any other source of
6  knowledge of what he was doing there.
7      A    No, other than what he's told me.
8      Q    Okay.  What specifically did he tell you?
9      A    He was out there for pleasure and to see
10  his daughter.
11     Q    Okay.  That's what he told you?
12     A    Yeah.  I told Kiha that.
13     Q    What pleasure was he out there for?
14     A    I mean I don't -- again, I don't -- I
15  don't -- I don't ask him, Oh, did you and your
16  friends go to the bar?  Where was you at?  I'm
17  not -- I never -- I'm not that type of woman.  I
18  don't -- where you at, why --
19     Q    So he only told you two things.  He was
20  out there for pleasure, and he saw his daughter.
21     Is that all he told you?
22     A    Yeah.  He was out there for -- yeah, I
23  told Kiha that.  Pleasure, he saw his daughter.
24  He's a dual resident.  I said that as well.
25     And Mehret at the time was like, Well, how

Page 183

1  do you know -- how can you show us -- you know,
2  well, you need to provide something for that, which
3  eventually that came up, and I had to provide that.
4      Q    Did he spend much time with his daughter
5  on that trip; do you know?
6      A    I'll be honest, when he's out there,
7  according to what -- you know, what I can see, as
8  far as like a picture in his phone, he -- he tends
9  to -- when he's there, he spends a lot of time
10  with --
11     Q    And that would have been true in this June
12  trip?  He spent a lot of time with her?
13     A    I mean -- again, I would hope he did.  I
14  would hope he saw her.  That's what I -- that's the
15  thing I told you I wrote --
16     Q    So you don't know whether he actually saw
17  her or not.
18     A    No.  He saw his daughter.  I'm sure he --
19     Q    For how long?
20     A    I didn't ask him, Ben.
21     Q    How do you know he saw his daughter?
22     A    He saw his -- no.  I mean he saw his
23  daughter.  You're asking me the time.  That's not
24  fair.
25     Q    All he told is he --

Page 184

1      A    It's not fair.  It's not fair.  Yeah, he
2  saw -- believe me, he's not -- he's a good father.
3  I'd like to have a baby.  He's not -- he's not not
4  going to go to California and not see -- that's his
5  baby girl.  That's his baby girl.
6      Q    How old is his daughter?
7      A    Imari is -- I think she's 14.  She should
8  be about 14 now.
9      Q    But other than him telling you that, you
10  don't know if he was telling you the truth or not.
11     A    No.  I know he was telling the truth.  But
12  I know Mehret wasn't aware that he had a third
13  daughter, but she was aware that he had two other
14  daughters.
15     Q    How do you know he was telling you the
16  truth?
17     A    What, that he saw his daughter?
18     Q    (No response, indicating.)
19     A    He saw his daughter.
20     Q    How do you know he told you the truth?
21     A    I'm not a psychic.
22     Q    You don't know.
23     A    I'll just say I'm not psychic.
24     Q    So you don't know.  He might have --
25     A    He tells me he sees -- he sees his

Page 185

1  daughter.
2      Q    All right.
3      A    He better.
4           (Exhibit 14 was marked for
5      identification.)
6  BY MR. STONE:
7      Q    Let me show you what's been marked as
8  Exhibit 14.
9           You mentioned that you --
10     A    Yeah, I wrote this.
11     Q    That's your written statement that you
12  provided.
13     A    Uh-huh.  This is my handwriting.
14     Q    Okay.  Did you --
15     A    I was asked to write that like right then
16  and there.  So, again, I wrote as fast as I could.
17     Q    Did you provide any written statement
18  other than Exhibit 14?
19     A    No, this is all.  This is all that I gave
20  that particular -- like I said, while I was in there
21  with Frank Cortes.
22          (Exhibit 15 was marked for
23     identification.)
24  BY MR. STONE:
25     Q    And then let me show you Exhibit 15, and

Page 186

1  ask you if that's an e-mail that you sent.  And it's
2  an e-mail you would have sent to --
3      A    Yeah.  I think --
4      Q    -- Kiha Jones?
5      A    Yeah, I think.  I'll just reread it.  Just
6  looking at the top of it, I think I remember.  Yeah,
7  that's what I was saying.  I did send this.  I do
8  not have -- yep, uh-huh.
9      Q    All right.
10     A    Yeah.
11     Q    You're aware that on this particular trip
12  that we've been talking about, this June 2015
13  trip --
14     A    Uh-huh.
15     Q    -- that Mr. Dais traveled with a gentleman
16  named Caleb Boyette; correct?
17     A    Yes, she told me.
18     Q    And Mr. Boyette is a client of Mr. Dais;
19  correct?
20     A    No, not a client.  Actually, a friend.
21  They're friends.  And they work together -- they
22  work together, and they're friends.  Yeah, they do.
23     Q    He helps -- Mr. Dais helps Mr. Boyette
24  with his music business; correct?
25     A    They do music together, yes.

Page 187

1      Q    Mr. Dais is a producer, and Mr. Boyette is
2  an artist; correct?
3      A    Yes, he is an artist.
4      Q    All right.  And Mr. Dais also goes online
5  by a name -- by the name -- I'm sorry -- strike
6  that.
7      A    Yeah, Jino.  You said --
8      Q    Yeah.  Mr. Boyette also goes by the name
9  Jino, J-I-N-O.
10     A    Uh-huh.
11     Q    Yes?
12     A    Yes.  That's his rap name.
13     Q    All right.  And you're aware that on the
14  particular trip we've been talking about, the
15  June 2015 trip, that the reason for the trip was
16  that Mr. Boyette was performing?
17     A    Wait a minute.  Who said what?  Can you
18  say that again?
19     Q    Sure.  That the reason for the trip that
20  Mr. Dais and Mr. Boyette took to California in June
21  of 2015 was because Mr. Boyette was performing.
22     A    Okay.  You're asking me that, or you're
23  telling me that.
24     Q    I'm asking if you're aware of that fact.
25     A    Like I said to Kiha, when I -- when I

Page 188

1  booked the trip, it is for pleasure.  It is not for
2  anybody to go make money or anything like that.  I
3  was real clear on that.
4      Q    That's not -- that doesn't answer my
5  question.
6           Are you aware that the reason for the trip
7  is that Mr. Boyette was performing in a concert?
8      A    No.  And, like I said -- no.  Like I
9  stated, Ben, you asked me the question, I'm giving
10  the answer that I gave to Kiha.  It was for
11  pleasure.  They go to shows.  They go to concerts.
12  There's no compensation.  Clearly, there's no
13  compensation --
14     Q    So Mr. Boyette --
15     A    -- because I know their financial.
16  There's no compensation.
17     Q    Well, Mr. Boyette was performing in this
18  show; correct?
19     A    Like I stated to Kiha, it's for pleasure.
20  They --
21     Q    Ms. Stevenson --
22     A    -- go to the club.
23     Q    -- enough.  You're playing a game here.
24     A    I'm not --
25     Q    I'm asking you a very simple question.

Page 189

```
 1    A    Ben, I'm not --
 2    Q    Stop.
 3    A    Ben, I'm not --
 4    Q    I'm asking you --
 5    A    You're telling me how to answer.
 6    Q    -- a very simple question.
 7    A    You can't tell me how to answer.  I'm
 8  hearing your question.  But I'm saying I've giving
 9  you the same -- it's the truth.  This is the same
10  thing that --
11    Q    No, it's --
12    A    -- I said to Kiha.  This is not a game for
13  me.  This has been my life and my career.  And I
14  don't play with that.  I may look like I'm 21 --
15    Q    Ms. Stevenson --
16    A    -- or 20 --
17    Q    -- stop.
18    A    -- but I'm a grown woman.
19    Q    Stop.
20    A    And this is my life.  I'm not playing with
21  my career --
22    Q    Ms. Stevenson --
23    A    -- to be blindsided.
24    Q    -- we're going to get the judge on the
25  phone in a minute.
```

Page 190

```
 1    A    Oh, that's fine.
 2    Q    You have an obligation to answer the
 3  questions.
 4    A    I'm answering you.
 5    Q    Listen --
 6    A    But that's the answer I gave Kiha.  It
 7  doesn't change.  It's the truth.
 8    Q    You haven't answered my question.
 9    A    I did.
10    Q    Did Mr. Boyette --
11    A    I'm answering you.
12    Q    Listen to my question.
13    A    I told her when I booked the trip, it is
14  for pleasure.  That is all I said to Kiha.
15    Q    Yeah.  Ms. Stevenson --
16    A    I'm not booking --
17    Q    -- we can do this all day.
18    A    -- nothing for business.
19    Q    Was Mr. Boyette performing in that concert
20  or not?
21    A    Like I said to -- I was not there.  And I
22  said all this to --
23    Q    So you don't know.
24    A    I know when I -- when I booked the trip it
25  is for pleasure.
```

Page 191

```
 1    Q    Ms. Boyette --
 2    A    It's for --
 3    Q    -- Ms. Stevenson --
 4    A    I don't think it's funny.  This has been
 5  my life and my career that's been turned back upside
 6  down.
 7    Q    Ms. Stevenson --
 8    A    And I was -- I've been a very -- a great
 9  employee above and beyond when I was there.
10    Q    Ms. Stevenson, the judge is going to read
11  this transcript, and she's going to be very troubled
12  by it.
13    A    Well, why is she going to be troubled --
14    Q    Because you're --
15    A    -- when I'm giving you an honest answer.
16    Q    No, you're not.  You're not answering --
17    A    I'm giving you the same answer I gave
18  Kiha.
19    Q    But it's --
20    A    It's the truth.
21    Q    It's not.
22    A    It's consistent, and it's the truth.
23    Q    Ms. Stevenson --
24    A    I was not there in California.
25    Q    Was Mr. Boyette performing, yes or no?
```

Page 192

```
 1    A    I was not there.
 2    Q    You don't know.
 3    A    I was not there.
 4    Q    Was Mr. Boyette --
 5    A    I was in Atlanta.
 6    Q    Was Mr. Boyette paid?
 7    A    I was not there.  I don't -- I don't know
 8  that.
 9    Q    You would agree with --
10    A    That's not a fair question --
11    Q    But you would --
12    A    -- because I don't know that.
13    Q    You would agree --
14    A    Kiha didn't even ask me that.
15    Q    You would agree with me, Ms. Stevenson,
16  that if Mr. -- listen to me.
17    A    Uh-huh.
18    Q    If Mr. Dais and Mr. Boyette were traveling
19  to a show so that Mr. Boyette could get paid --
20    A    Oh, no.
21    Q    -- then it would be --
22    A    No.
23    Q    -- business; correct?
24    A    No.  They don't get paid.  They don't get
25  paid.
```

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 49 of 87

Quaniah R. Stevenson vs Delta Air Lines, Inc.
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 266 of 675
Quaniah Renetra Stevenson                                                        June 29, 2017

Page 193

1    Q    How do you know?  You just said you didn't
2  know.
3    A    No.  You're trying to put words in my
4  mouth, Ben.  That is not the way of it.  No, no, no,
5  no, no, no.
6         Do you know how many shows I've done free?
7  All of them.
8    Q    Yeah.  Ms. Stevenson, you just
9  testified --
10   A    No, all of them.
11   Q    -- you didn't know.
12   A    I don't know.  I said I wasn't there.  But
13  I know that they don't get paid.  They're not --
14  they don't get paid for that.
15   Q    How do you know?
16   A    I wasn't there.  That was my -- that's
17  my -- that was my boyfriend.  If anybody knows the
18  financial situational state, believe me, I do.
19   Q    How do you know that Mr. Boyette --
20   A    Believe me, I know.
21   Q    -- did not get paid?
22   A    If anybody knows the struggle, I do.
23  That's the fact.  That's the truth.
24   Q    How do you know that Mr. Boyette didn't
25  get paid for this show?

Page 194

1    A    I was not there.
2    Q    So you don't know.
3    A    I was -- I was -- you're asking -- I said
4  I wasn't there.
5    Q    So you don't know.
6    A    I wasn't there.
7    Q    Do you know?
8    A    I was not there.  No, I do not know.  I
9  wasn't there.  Exactly.
10   Q    All right.
11   A    But I -- we're not talking about that.
12  We're talking about travel.  This is why I lost --
13  well, I don't know.  We'll get to that in a minute.
14  But I wasn't there.
15   Q    Okay.  Mr. Boyette and Mr. Dais traveled
16  together frequently when Mr. Dais was using your
17  travel passes; correct?
18   A    Say what?
19   Q    Mr. Boyette and Mr. Dais traveled together
20  on repeated vacations.
21   A    Uh-huh.  I guess -- I guess they have --
22   Q    Yes.
23   A    -- when they traveled together.
24   Q    When Mr. Dais was using your travel
25  passes; correct?

Page 195

1    A    Yes.
2    Q    And when Mr. Dais and Mr. Boyette was
3  traveling together, Mr. Boyette, because he was
4  having to use buddy passes, was -- had to pay some
5  taxes and fees; correct?
6    A    Yeah, yeah.
7    Q    And Mr. Dais paid all those taxes and fees
8  for Mr. Boyette; correct?
9    A    I -- I mean you're asking me a question --
10  no.  I mean I don't -- to my understanding, I think
11  his mom manages him or whatever too.  So I -- again,
12  I don't know.  I can't answer that question.  I
13  don't know.  I'll be honest now, I do not know who
14  pays for -- for this kid's stuff.  Now that I don't
15  know.
16   Q    All right.
17   A    Because he is not -- yeah.  He don't --
18  that's not his kid.  They do shows, but that's not
19  his kid.
20        (Exhibit 16 was marked for
21        identification.)
22  BY MR. STONE:
23   Q    Let me show you what I'm going to mark as
24  Exhibit 16.
25   A    I saw that.  I think they sent that to me

Page 196

1  in the mail.
2    Q    So you've seen that before?
3    A    Yeah.  They sent that to me.
4    Q    And you recognize that as something that
5  Delta had that reflected social media
6  communications --
7    A    Right, she told me about that.
8    Q    -- both by Mr. Dais and --
9         You've got to let me finish my question,
10  Ms. Stevenson.
11   A    I'm sorry.  Go ahead.
12   Q    You recognize that, Exhibit No. 16, as a
13  document that Delta had that reflected social media
14  communications by Mr. Dais and Mr. Boyette about the
15  reason for the trip on June 15th; correct?
16   A    Uh-huh.
17   Q    Yes?
18   A    Yeah.  I saw this.  Yeah, they sent this
19  to me.
20   Q    Okay.  And because you were not in
21  California, you don't know what time, for example,
22  Mr. Boyette went on to the show --
23   A    Yeah.  Like I said, I don't know --
24   Q    -- or what time --
25   A    -- what time their stuff is.  I don't.  I

Page 197

```
 1  was at work, I'm sure.
 2      Q    Okay.  Where else did Mr. Dais and
 3  Mr. Boyette travel together?
 4      A    Again, like I -- as I stated to Kiha, I
 5  can't say that I remember every single place,
 6  especially now even at this point.  Even at that
 7  time, which was now about two years ago, it's -- I
 8  wrote out as much I could, as fast as I could
 9  because I was on the spot, like write it all out, so
10  I -- it's here.  I mean Phoenix.  I don't even think
11  Phoenix is on here.
12      But, again, I wasn't given that -- I
13  wasn't -- I was only given a set time to write this,
14  which was less than five minutes or so.  And I wrote
15  out what I could write out as fast as I could.  So,
16  clearly, I do not have everything, you know, as far
17  as -- yeah.
18      Q    Okay.
19      A    But I'll reiterate, it's always for
20  pleasure, which is what I said to Kiha.
21      Q    Yeah.  I know you say that, Ms.
22  Stevenson --
23      A    It is true.
24      Q    -- but you don't know.
25      A    I wouldn't live a life like that.  I
```

Page 198

```
 1  wouldn't.
 2      Q    Yeah.  Why was Mr. Boyette traveling to
 3  Houston for pleasure?
 4      A    I'm sorry, say that again.
 5      Q    Why was Mr. -- I'm sorry -- strike that.
 6      Why was Mr. Dais traveling to Houston for
 7  pleasure?
 8      A    They do travel for pleasure to Houston.  I
 9  think I remember Kiha asking me that.  That's one of
10  the hangout spots when -- him and his boys hang out
11  there.  Miami, I stated that to her, they go
12  clubbing.  That's one of the places that they really
13  like to party.
14      Q    Okay.  What about St. Louis?
15      A    Same thing.
16      Q    Okay.  So every place he went, he would go
17  party?
18      A    I think I did St. Louis --
19      Yes, they do.  And as I -- I made real
20  clear to her, like even when he did a tour, because
21  the Mehret lady, she vouched for what I said when I
22  said, Well, if you see something -- since you say --
23  you say you follow my boyfriend.
24      Yes, I do follow your boyfriend.
25      Okay.  I said, He was on tour with Keesha
```

Page 199

```
 1  Cole the whole -- for the most part of that -- for
 2  that most part of that tour all over the place,
 3  America, he -- I don't even -- I think he might have
 4  flown maybe one time.  The entire tour, they were on
 5  a bus.
 6      And so she was like, she said, Okay.
 7      So I said, So on that tour, he didn't --
 8  he didn't fly.  You know, like he didn't use my
 9  benefits, even though it was for pleasure.  That
10  whole time he was on a bus.  I mean but here's the
11  thing.  They were on a bus.  They didn't use -- and
12  if he had to call me for something, I -- of course,
13  I would book it, like if he got stuck somewhere.
14      But, again, a pleasure trip.  If they got
15  a break.  Hey, we're going to go down to Miami for
16  two days.  Keesha is giving us a break, that's how
17  the particular conversation would go.  Keesha is
18  giving us a break for two days.  Hey, I'm going to
19  come back to the Atlanta, blah, blah, blah.  That's
20  how that went.  He was on a bus for that tour.
21      Q    So let me make sure --
22      A    So he wasn't flying on Keesha Cole to
23  different places.  They were on a bus.
24      Q    So what's the name of this artist you're
25  talking about, Keesha Cole?
```

Page 200

```
 1      A    Yeah, Keesha Cole.
 2      Q    What kind of artist is she?
 3      A    She's an R&B artist.  I like her.  She
 4  makes good music.
 5      Q    Does he represent her?
 6      A    No.  He doesn't -- he doesn't --
 7      Q    Why is he touring --
 8      A    Well, that was, again, some years ago.
 9  But just --
10      Q    Helping her out?
11      A    Yeah, he knows -- it's all -- he knows the
12  people that tour her.  And so they just let him --
13  I'll put it to you like they let him hop on the bus.
14  And he just ended up going state to state.  People
15  try to get their foot in the door.  I guess
16  he's trying to --
17      Q    Yeah, I'm with you.  So he's riding -- so
18  he's trying to build his career.
19      A    Yeah, because clearly he didn't -- he
20  didn't get paid for that, and he was on a bus.
21      Q    Okay.  So he's -- and then if he gets --
22  if he's traveling with her, and he gets stuck
23  somewhere and he wants to get home, he'll call you,
24  and you'll get him home.
25      A    Well, I wouldn't -- let me -- I
```

---

Page 201

1  wouldn't -- I wouldn't want you to put the words in
2  my mouth like that again.  If she lets them off for
3  like two or three days, him and his buddies, they
4  love Houston, they love Miami.  Hey, I want to fly
5  down -- I want to go meet Dunn down in Miami.  Okay,
6  cool, something like that, but not for business.
7      Q    And then they would fly back and meet the
8  tour up again?
9      A    Sometimes if she -- if her bus was coming
10 through there, he would just -- you know, just get
11 back on the bus.
12     Q    Or otherwise he would fly back and get
13 her?
14     A    Not -- again, not for business, Ben, not
15 for business.
16     Q    Well, I'm trying to understand what you're
17 telling me.
18          He's on tour with this woman; correct?
19     A    Yeah.  When he's on --
20     Q    And he's flying there and flying back.
21     A    Right.  What I was making clear to Kiha is
22 if you want to try to make it like -- at the time I
23 was telling her you want to try to make it like
24 business.  It's not business.
25          Because when he does that kind of

---

Page 202

1  business, if he's on a bus -- anybody that knows
2  anything about the entertainment business, most of
3  the time most artists are on buses.  They're not in
4  the air.  They got to hit those cities.  They're
5  hitting -- he's on a bus.
6          So he's not -- he's not flying for
7  business.  He's just not.  They're on a bus.  That's
8  what -- they make their money with buses.  But he's
9  not the one making the money.  That's what I want to
10 make clear to you.  Clearly, Keesha wasn't even
11 making all of the money.
12         So, yeah, he's not -- he's just trying --
13 was trying to build himself up, and he happened to
14 know somebody that rolls with her, and they let him
15 get on because he knows a little bit about music.
16         No.  The money would have been nice.  But,
17 huh-uh, he didn't get paid for that.
18     Q    If I were to show you Mr. Dais's travel,
19 and it's -- as you know, it's extensive.
20     A    Yeah.  I think I --
21     Q    Would you be able to tell me on any given
22 trip what it is he's doing?
23     A    Oh, I never -- can I see it, or is that
24 something I can't see?
25     Q    I'll show it to you.

---

Page 203

1          (Exhibit 17 was marked for
2      identification.)
3  BY MR. STONE:
4      Q    Let me show you Exhibit No. 17.
5      A    Because that's what I was telling Kiha.  I
6  was like I know you all -- you all can see
7  everything.
8          THE WITNESS:  Sheandra, you all got the
9      record, you know, so you all can see where we
10     can fly.
11         So that's what I'm saying.  It's a
12     record -- you can see everywhere we fly.
13     That's why I was like --
14 BY MR. STONE:
15     Q    I haven't counted them.  It's certainly
16 well over 100 trips here.
17     A    Yeah, because he's been my -- I mean I've
18 been with Delta almost ten years, yeah.
19     Q    Well, I'm just talking --
20     A    Oh, okay.
21     Q    I'm just talking in 18 months.
22     A    Oh, okay.  Yeah.
23     Q    And can you tell me on any one of -- for
24 instance, I'll pick one at random.  If I look at a
25 flight in -- in June of 2014, for example, I see

---

Page 204

1  flights to Richmond.
2          Do you have any idea what he's doing in
3  Richmond?
4      A    Huh-uh.
5      Q    No?
6      A    Virginia.
7      Q    Yeah.
8      A    Pleasure.
9      Q    What is it?  What's he doing; do you know?
10     A    Again, I have to go back to what I said, I
11 mean I'm not with him on there.  So, yeah, I can't
12 say, you know --
13     Q    So you think it's for pleasure, but you
14 don't know what he's doing; correct?
15     A    I will say I know it's for pleasure but --
16     Q    But you don't know what he's doing.
17     A    But I don't -- yeah, I'm not there with
18 him.  And I did state that to Kiha.  I don't know.
19 I know -- well, he could have been up there with his
20 father.  His father is up in that area, you know.
21     Q    Are you aware of anybody else, other than
22 you, where Delta concluded --
23     A    I just know --
24     Q    You've got to let me finish my question,
25 Ms. Stevenson.

Page 205

1    A    Oh, okay.  No.  I wasn't trying to cut you
2    off.  I was venting, I'm sorry.
3    Q    Do you know of anybody else, other than
4    you, Ms. Stevenson, who Delta found to have misused
5    their travel passes for business purposes?
6    A    You said do I know anybody else?
7    Q    Do you know anybody else where Delta has
8    made that determination?
9    A    I mean I can't necessarily say like I know
10   I know.  I mean people talk.  Just to answer you
11   honestly, you know, people talk in conversations.
12   You overhear stuff from people that you know, you
13   work with, used to work with, say, Oh, this
14   person -- something about their companion.  I don't
15   get off in the, you know, conversation and say, Oh,
16   well, who is this or who is that?  You know, you
17   just hear people talking.  I wouldn't say -- no, you
18   directly.  I can't say, you know.
19   Q    Can you indirectly -- can you give me a
20   name of anybody else that Delta --
21   A    No.  I'm saying like I -- yeah, I --
22   Q    So --
23   A    I don't know.
24   Q    -- if there is any such person --
25   A    I hear talks of it.  But, like I said, I

Page 206

1    here talks, Oh, this person got wrote up or -- I
2    know one coworker had told me one time, I was still
3    working there though, They saw frequent travelers,
4    saw my companion.  Because he came out of the office
5    upset.  He's like, Well, they just wrote me up.
6         He still works there to this day.  But
7    they just wrote me up or whatever.  Told me you need
8    to tell your companion -- how did he say -- you need
9    to tell your companion to calm down all the flying
10   or whatever.  That was it.  I didn't ask him nothing
11   else.  I just left it at that, whatever.
12   Q    Who are we talking about?  What's the name
13   of this person?
14   A    He got wrote up or something for the
15   person.
16        Huh?
17   Q    What's the name of this person?
18   A    I don't -- I'll be honest, this was some
19   years ago, and I just do remember something like
20   that happened.  But I do not know anybody directly
21   like you said.  I don't.
22   Q    Okay.
23   A    I don't.
24   Q    All right.
25   A    People get wrote up all the time, and they

Page 207

1    still working, and I don't have my job.
2    Q    Anybody get written up for what you did,
3    using travel passes for business purposes?
4    A    Well, I didn't use my travel pass for
5    business purposes.
6    Q    Did anybody get written up for misuse of
7    travel passes for business purposes that you know?
8    A    I didn't -- like I said, I -- not that
9    I -- not that I can say I know right now.
10   Q    Okay.  Do you -- we talked a little bit
11   ago about your shoulder injury, that you hurt
12   your -- or your shoulder and cervical injury from
13   the bag fall; correct?
14   A    Yeah, my -- it's my neck and my shoulder
15   and my back, but it's all -- yeah.
16   Q    And you were on -- you were on leave as a
17   result of that, it looks to me, from roughly March
18   of 2014 to roughly November 2014?
19   A    November 10.  I think I remember the exact
20   time, because it was the day after my birthday, I
21   think.
22   Q    All right.
23        (Discussion off the record.)
24        (Brief break.)
25

Page 208

1    BY MR. STONE:
2    Q    Ms. Stevenson, we're back on the record
3    here.
4    A    Yes, sir.
5    Q    Let me backtrack for just ten seconds
6    here.
7         We were, a moment ago, talking about the
8    interview that you had about the travel pass --
9    A    Uh-huh.
10   Q    -- events.  And we looked at -- we talked
11   about that interview, and we looked at your written
12   statements.
13   A    Uh-huh.
14   Q    Was there anything else that happened,
15   first of all, in the interview that we have not
16   talked about?  Is there anything they said to you or
17   you said to them that you have not told me about
18   today?
19   A    With Kiha, right, that one?
20   Q    (No response, indicating.)
21   A    Oh, gosh, let me think.  I want to be
22   accurate.  That's been so long.  I think we covered
23   most of everything.
24        I just wanted to be clear on -- that I
25   made sure that I was real clear about he wasn't with

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 53 of 87
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 270 of 675

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                    June 29, 2017

---

**Page 209**

1  me, you know, at my aunt's funeral.  I was real
2  clear about we had not traveled together.  I made
3  that clear to Kiha.  And, yeah, that -- yeah,
4  that -- yeah, she -- yeah, she didn't -- because,
5  like I said, most of the focus of that particular
6  was -- it wasn't even focused on like -- but it
7  was -- it was more really, really focused on the
8  companion thing.  That's what most of that was
9  about.
10      Q    And you've told me everything that you can
11  recall happening and being said in that meeting?
12      A    I can't say I've said everything, Ben, but
13  mostly I think I have covered -- it always
14  happens -- maybe I might think of something a little
15  later.  But right this second, I can't think of
16  anything else that I honestly can think of and say,
17  okay, Kiha said this or Mehret said this or
18  whatever.  I can't think of nothing else.  Because
19  you kind of were very thorough on most of it, which
20  was about --
21           And then, like I said, it ended up with,
22  you know, she came back in there and was like she --
23  she was going to suspend my flight privileges until
24  further notice.  And then -- I can't think -- no.  I
25  don't think --

**Page 210**

1      Q    That's as much --
2      A    Yeah, because she said -- yeah, because
3  she was like she didn't feel like I couldn't
4  remember every -- everywhere that my companion had
5  flown to.  And I was clear on -- again, it had been
6  so long, and I booked so many trips for him, there
7  was no way that I -- that I could just remember all
8  of that like in that short period of time.  And this
9  was something that I wasn't even aware of.  That I
10  was even, what do you call it, being interviewed or
11  investigated for because I didn't know that there
12  was a problem.  I made that clear to her.
13      Q    Okay.  Anything else that you can recall
14  that was said in that meeting that you recall?
15      A    No, nothing else.  And, like I said,
16  because I was never -- I was never counseled or
17  anything on anything about the companion before her,
18  or nothing was ever -- like no -- nothing.  I was
19  never coached, nothing.
20      Q    Listen to my question.
21           Was there anything else that was said in
22  that meeting that you haven't told me about?
23      A    Nothing that I can think of at this time.
24      Q    All right.  We talked earlier about the --
25      A    Can I say one last thing?

**Page 211**

1      Q    -- the baggage --
2           Something else that happened in that
3  meeting?
4      A    Yeah.  Well, my PL, I kind of looked over
5  at him.  He looked at me.  And I mean I don't -- I
6  just -- I was like this -- I don't know.  He kind of
7  agreed with me on a lot of stuff.  He just didn't
8  think some stuff was done quite right but --
9      Q    What did he say to you?
10      A    Well, he just said he kind of just didn't
11  agree with some of the way that that kind of
12  occurred and went down.  And, you know, he told
13  me -- he was like, You answered the questions -- he
14  was like, You did a really good job.  You answered
15  the questions honestly.  I just don't agree with the
16  way that that kind of occurred for you.
17      Q    When did he say that to you?
18      A    He said that to me -- her and Mehret was
19  kind of finishing up some stuff.  He -- I kind of
20  looked over, and I was like, What -- I'm a good
21  employee.
22           And he was just like, I don't really -- in
23  his little raspy voice, I don't really agree with
24  that.  And we walked out.  And we were walking back,
25  and he was like, You just go on and go back.  He was

**Page 212**

1  like, But don't worry about that.  You answered
2  honestly.  You were concise.  I know you didn't know
3  what was that all --
4           I was like, I don't.  I was honest.
5           And he was like, you know, But never
6  have -- in all the time I've been here ever seen
7  anything -- I don't agree with the way that that
8  happened for you.
9           And that was it.  And I worked the rest of
10  my shift that day.  And then when I got off that
11  evening --
12      Q    All right.
13      A    -- my supervisor --
14      Q    I didn't ask --
15      A    Oh.
16      Q    I didn't ask you anything about that.
17      A    He talked to me again.
18      Q    Anything --
19      A    That was it.  That was it.  I'm just -- as
20  I'm talking, I'm trying to think of, as I was
21  talking to you, if that was it.  That was it.  And
22  then --
23      Q    Did Mr. -- did your performance leader say
24  something to you later about the meeting, other than
25  what you've told me already?

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                June 29, 2017

---

Page 213

1      A    When I -- at the end of my shift that
2  night, yeah -- well, he -- yeah, he just -- again,
3  he just -- he didn't -- he knows I'm a good
4  employee.  And he's just like, you know, Just stay
5  on your Ps and Qs.  You're a good employee.  I don't
6  like the way that occurred, but you'll be fine.
7  And, you know, just --
8      Q    Anything else?
9      A    You'll be fine.  I got your back.  Because
10 he was in -- and that was it.  And he said, Have a
11 good night.  And I walked out of my thing, and I got
12 on my employee bus and --
13     Q    Okay.  We were talking earlier about
14 your -- when the bag fell on you; correct?  You had
15 an OJI?
16     A    Yes, sir.
17          (Exhibit 18 was marked for
18          identification.)
19 BY MR. STONE:
20     Q    And I've put in front of you what I've
21 marked at Exhibit 18.  Let me start here.
22          Does this, first of all, refresh your
23 recollection that the injury that you suffered
24 occurred in 2014?  (Indicating.)
25     A    Uh-huh.

---

Page 214

1      Q    Yes?
2      A    Oh, you said does this what?
3      Q    Refresh your recollection that your injury
4  occurred in 2014?
5      A    Yes, yes.
6      Q    And you were out from March of 2014 until
7  November 10th of 2014; correct?
8      A    Uh-huh, uh-huh.
9      Q    Yes?
10     A    Yes, sir.
11     Q    And you weren't out of work for your
12 injury after that; correct?
13     A    After -- you mean when I went back in
14 November?
15     Q    Correct.
16     A    No.  I was just getting ready to go --
17 Dr. Kelley wanted to keep me on what you call
18 ongoing kind of therapy or whatever.  So even though
19 I went back, he still wanted to try to keep me like
20 in therapy or whatever.
21     Q    But you were -- if you look at Exhibit
22 No. 18 --
23     A    I'm trying to make sure I understand.
24     Q    -- for a minute, you were released
25 actually a little earlier.  And then you came back.

---

Page 215

1  Released as of August of 2014.  You were released to
2  work on regular duty; correct?
3      A    You know what, no -- well, I guess, I -- I
4  don't know if that's accurate because I didn't go
5  back to work until November.
6      Q    Okay.  Fair enough.
7          But you -- you see here that as of -- and
8  I realize it --
9      A    That might have been if --
10     Q    -- may have taken you some time.  But you
11 were released to full duty as of August of 2014, is
12 that correct, according to these notes?
13     A    Yeah.  I guess that's what it said.  But
14 that must be an error because -- yeah.  I would have
15 went back to work then.  I don't think I even went
16 back to work then.  I don't think I went back until
17 November.  This might be -- I'm pretty sure this is
18 an error because I wouldn't have had no job after
19 this.  I'm saying like if I -- if I didn't comply
20 with that I was supposed to do.  So I think this is
21 an error because maybe -- I don't know.  I should
22 have one for the November.
23          (Exhibit 19 was marked for
24          identification.)
25

---

Page 216

1  BY MR. STONE:
2      Q    All right.  I have one that's right before
3  then in October of 2014.
4      A    That might be when they was getting me
5  ready to go back in November.
6      Q    And you were released to full-duty work as
7  of -- according to the Exhibit 19, as of October 17,
8  2014?
9      A    Yeah.  So this might be the one -- yeah,
10 this -- yeah.  I don't think this one is the right
11 one.  I think this one is more accurate.
12     Q    All right.
13     A    Yeah.  He kept me in therapy.
14     Q    He kept you in therapy, but he didn't
15 restrict your work; right?
16     A    Right, at that point, until the
17 following -- the following year when I started kind
18 of having issues again.
19     Q    Well, tell me about that because I'm not
20 aware of that.
21     A    When was that -- oh, I thought I had
22 said -- that was -- I was trying to -- what it was
23 is I was trying to get another appointment to see
24 him, like I think sometime in April or whatever.
25 And I was having trouble getting in then.

---

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 55 of 87

Quaniah R. Stevenson vs Delta Air Lines, Inc.
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 272 of 675
Quaniah Renetra Stevenson                                          June 29, 2017

Page 217

1          I think they put me back on -- was it -- I
2   think -- did he put me back -- he put me back on
3   light duty, because then they wanted to see if they
4   needed to do some kind of procedure or something.
5   And I think that was around -- that was probably in
6   July.  I think it was July.  Because I tried to -- I
7   tried to get back with them in April and May.
8          They had me in the system.  But then the
9   assistant person called me and was like, Sorry,
10  Ms. Stevenson, I know we've been trying to get you
11  in.  They didn't get me in until July.  He assessed
12  me again.  Then he wanted to do something else.  I'm
13  sorry, I've been seeing him for so many years.  It's
14  a lot of paperwork.  I don't remember all of it.
15       Q   I am aware that you saw -- you went to
16  Peachtree Orthopaedics in May of 2015?
17       A   Uh-huh.
18       Q   And this may be what you're remembering.
19       A   Oh, maybe that's what I --
20           (Exhibit 20 was marked for
21       identification.)
22  BY MR. STONE:
23       Q   And you saw him -- and you're right, he
24  did some additional treatment, but he also, you'll
25  see from Exhibit 20 --

Page 218

1       A   Uh-huh.
2       Q   -- released you to full duty work in May
3   of 2015.
4           Is that consistent with your recollection?
5       A   Yeah, he sent me -- he sent me back.
6       Q   Okay.
7       A   But then he took me back out again.  Yeah,
8   he's -- that's right.  I need to -- he took me back
9   out again in July, yeah, in July, yeah, in July.
10      Q   Were you on -- when you say he took you
11  out, you took leave from work during that period of
12  time?
13      A   No, I didn't take a leave.  I just -- like
14  I said, I went to see him again, and I was in --
15  from what he assessed, I was in so much pain, he put
16  me back on light duty again.  I was still working.
17  Put me on light duty.
18          But then like right after that I think
19  that's when everything -- all the -- the interview
20  and craziness started happening, and he put me on
21  light duty.  I was on light duty or something.
22      Q   You were put on light duty at Delta?
23      A   Uh-huh.
24      Q   So you started working the light duty
25  temporary assignment?

Page 219

1       A   No, because they didn't -- they didn't
2   offer that or whatever so --
3       Q   So what --
4       A   And I didn't have a job at that point
5   anymore.
6       Q   So you took a -- I'm confused.
7           So this was after your termination from
8   Delta that he put you on light duty?
9       A   No, my -- here's the thing.  I think I saw
10  him.  My appointment was -- I think it was -- no,
11  that was the thing.  My appointment was scheduled
12  before that with the May thing that you're looking
13  at.  But then I ended up being on light duty.
14          I was suspended.  I was suspended.  I
15  wasn't told I was terminated or anything like that.
16  I was just -- I was told, You'll get a call back
17  within like a week to let -- and by seven days to
18  let you know when you can return back to work.
19          And the person that kind of relayed it to
20  me, I was like, Okay, am I being suspended with pay
21  or without.
22          I don't know.
23          And then the last thing they said to me
24  verbatim was, I'll never forget that, he said, I'm
25  just here to relay a message.  I don't know what's

Page 220

1   going on.
2           I said, This is my job.  Like am I
3   being --
4           No, they -- they didn't tell me if I was
5   being paid.  I didn't sign off on it.  It was
6   nothing.  It was just suspended.  They didn't know.
7   They just said they didn't know anything.  They just
8   relayed the message to me.
9           And I was walked out for suspension.  I
10  would hear from them in seven days, but I didn't
11  hear anything for almost a month.
12      Q   Before you were terminated?
13      A   Yeah.
14      Q   What I'm trying to figure out is from
15  Exhibit No. 20 we know that you were released to
16  full duty in May of 2015.
17      A   Right.
18      Q   And based on what I'm looking at, you were
19  able to work full duty from the time you came back
20  all the way at least until after May.
21      A   Yeah.
22      Q   Was there some point that changed?
23      A   Yeah.  Well, that's the thing, I -- around
24  this time is when I was doing my accommodation --
25  when I got my accommodations -- well, I actually

Page 221

1   asked for accommodations even before this right
2   here.
3        Q    We looked at that earlier; correct?
4        A    Right, yeah, that's what we looked at that
5   earlier.
6             So, again, like I say, on the job, I was
7   going through all the stuff I was going through with
8   my PL, which was Carole at the time, with certain
9   stuff, oh, I couldn't stand this long, or I couldn't
10  do whatever.  And that became more and more hostile
11  too with all kinds of stuff.
12            So, again, I had made an appointment to
13  try to go back to the doctor.  They couldn't -- they
14  didn't get me in when I needed to.  So I didn't end
15  up getting back to the doctor until July.  And then
16  he put me on -- put me on light duty.
17            And then I was I -- I was suspended before
18  that, I'm sorry, I was suspended.  And then I was
19  terminated, like I said, almost a month later, like
20  three weeks later --
21       Q    Let me go back --
22       A    -- while I was on light duty.
23       Q    -- to make sure.
24            So we know that you were released to full
25  duty as of May.

Page 222

1        A    Right.
2        Q    You had mentioned earlier, and we had
3   looked at your accommodation request.  That was
4   related to something.  That was related to your car
5   and your aunt and that stuff.
6        A    Well, that -- but all of that was -- all
7   of that was related -- all of that was kind of in
8   there.  With everything that I was dealing with, it
9   was all of that.  It was the death.  It was
10  everything that I was dealing with.  I still -- the
11  injury was still there.
12            Because according to a couple of -- him
13  and a couple of doctors at the time it was like
14  that's not -- you're old -- you may look old, but
15  your body really is what it is.  And as you get
16  older, it might get worse.
17       Q    Listen to my question real quick here.
18            We talked about your accommodation
19  request --
20       A    Uh-huh.
21       Q    -- which was the shift change.
22       A    Uh-huh.
23       Q    And you were granted that; correct?
24       A    Uh-huh, uh-huh.
25       Q    You have to say yes.

Page 223

1        A    Yes.
2        Q    We talked about the bid that you made?
3        A    Uh-huh.
4        Q    Okay.
5        A    Yes.
6        Q    Was there any other accommodation that you
7   made through the accommodation process that you can
8   recall?
9        A    No, it didn't, because all of it, to my
10  knowledge, I thought would have just fallen under
11  that.  But the thing was while I was there if there
12  was somewhere -- they need me to purge a line, or I
13  have to stand here or stand there, and it's like,
14  Hey, I can't stand for too long, whatever, which
15  I -- but, to be honest, I really didn't even
16  complain about it.  That kind of -- was going on.
17       Q    Got it.
18            Okay.  And you said --
19       A    Because they was like you have to go to --
20  if you're still having issues, then you just need to
21  go to the doctor about that or whatever.  Otherwise
22  you're going to have to whatever, because they
23  didn't -- that was kind of the thing.
24       Q    And do you remember the date that you were
25  put on light duty?  It was after -- it was after you

Page 224

1   were suspended?
2        A    Yeah.  But, remember, I had already seen
3   the doctor.  I don't remember the actual date, but
4   it was right around that time.  To be honest with
5   you, it might have been -- yeah, it was -- yeah.  I
6   can find that out for you.
7        Q    Okay.  And you said -- you told me already
8   about your suspension, right, the call in which you
9   were told they were --
10       A    Well, she told me in -- when I was in the
11  meeting with Kiha she suspended the benefits.  Then
12  two days later I came in to work for my coworker.
13  So when I -- when I got there to work for the
14  coworker, that is when I was -- when it went from my
15  benefits were suspended.  I came in to work for
16  somebody.  Then it was, Oh, now, you're suspended.
17  That's the order.  It wasn't a call.  I wasn't told
18  in person.
19            And then that's when I asked the person, I
20  said, Well, am I being paid?  Can I -- when do I
21  come --
22            Well, you're going to get a call within
23  seven days, and we'll let you know if you can go
24  ahead and come back.
25            And I was like, Oh, okay.  And I tried to

Page 225

1  ask, I said, Anything else --
2         And then he -- well, I don't know if I'm
3  supposed to say all of that.  He, you know, again,
4  Go get her things.  And, again, I didn't know -- it
5  was a whirlwind.  And, you know, he was just
6  relaying a message.
7         I said, From who?
8         He didn't say from who.  He said, I'm just
9  relaying a message.  I don't know what's going on.
10  Other people came in.  They took me out.  And I was
11  on the parking lot.
12         And the one supervisor said -- he
13  whispered in my ear, Give me a call.  And went to my
14  car.  They took my thing off the car.  And was like,
15  You'll get a call in about seven days, but I didn't
16  hear anything for -- it was like three weeks.
17     Q    And then how did you find out you were
18  terminated?
19     A    I got a call on the 29th.  And it was a
20  message left.  So then I called back.  And when I
21  finally called -- when I finally had called back,
22  I -- my PL was telling me about everything, about
23  the findings for the past -- of course, I don't
24  remember verbatim how he worded it.
25         But I remember most of -- you know,

Page 226

1  password, come back in and investigation.  So we're
2  going to go ahead and -- the findings are just have
3  you resign.  He was asking me if I wanted to resign.
4         And I was clear, I said, No, I don't want
5  to resign because I didn't do anything wrong.
6         Okay.  Well, in that case, I'm going to
7  have to go ahead and -- so you're sure.  I'm giving
8  you the option.
9         I said, If I resign it's like -- I did
10  nothing wrong so I don't want to resign.
11         He said, Okay, well, I'll tell you what,
12  I'm going to have to -- I'm going to put you on the
13  not rehire list, and I'm going to terminate you.
14         I said, Okay.
15         And then he hung up.  And I wasn't like
16  given no information or nothing.  And then I just
17  kind of had to call -- oh, he did state in that
18  conversation that I was -- he had -- I was
19  terminated the day before.  But it was late in the
20  day, it was late in the evening, I got busy, so I
21  just figured I would just call you the next morning.
22         Huh, okay, my career.  So really it was
23  the 28th.  But he called me the next day, which was
24  the 29th when I got the call from him.  And then
25  didn't give me all the information that I needed

Page 227

1  until like five days later.
2         And then I got a message that -- he had
3  apologized to me about -- he apologized for not
4  giving me that -- the information that he was
5  supposed to have given me on the initial
6  conversation or something so and that stuff.
7     Q    All right.  And then did anything else
8  happen, other than what you've just described in the
9  termination call?
10     A    No, no, nothing that I can -- I think that
11  was it.  It was, I'm going to put you on no rehire
12  and terminate you.
13     Q    I know that you appealed, and I'm going to
14  ask you that in a moment.
15         But before I do that, let me ask you
16  whether or not -- we've now done a pretty thorough
17  discussion of the events that occurred all leading
18  up to your termination.  And those are the
19  complaints you're complaining -- the events that
20  you're complaining about in this lawsuit.
21     A    Uh-huh.
22     Q    Is there anything that happened that
23  during -- anytime in your employment, up until the
24  time you were terminated, that you believe supports
25  the claims that you're asserting in this lawsuit?

Page 228

1  Is there any fact that occurred, any statement or
2  conversation that you had, anything else that you
3  think supports your case that you haven't told me
4  about?
5     A    I think a lot of -- a lot of -- how do I
6  say it?  Some of a lot of what I've said I think
7  that it does.
8         Do I -- do you want me to restate those?
9     Q    No.  You've told me -- I'm not asking you
10  to restate anything.
11     A    Oh, okay.
12     Q    I just want to know whether there's
13  anything that you haven't told me about --
14     A    Oh.
15     Q    -- that you think supports your case that
16  we haven't talked about today.
17     A    No.  I -- yeah, I think some of a lot, but
18  not everything, just some.
19     Q    Well, I realize not everything we've
20  talked about is supportive of your case.
21     A    Right.
22     Q    But I just want to make sure that there's
23  not something that you haven't told me about that
24  you think supports.
25         And there isn't?

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 58 of 87
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 275 of 675

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                June 29, 2017

Page 229

1     A     No.
2     Q     So nobody -- nothing you said to anybody,
3  nothing that anybody said to you that you think
4  supports your case.
5     A     No, sir.
6          (Exhibit 21 was marked for
7          identification.)
8  BY MR. STONE:
9     Q     Take a look at Exhibit 21.  And Exhibit 21
10  is a log of your appeal and, among other things, it
11  reflects an October 7, 2015, call --
12     A     Yes.
13     Q     -- that you would have had with EO,
14  particularly Barbara Shaw --
15     A     Uh-huh.
16     Q     -- about your termination and your appeal
17  of that.
18     A     Uh-huh, uh-huh.
19     Q     And I'm going to ask you to read the big,
20  long entry on Exhibit 21.
21     A     Read this?
22     Q     Yeah, on October 7th.
23     A     Out loud?
24     Q     No, not out loud, to yourself.
25          And I'm going to ask you whether or not

Page 230

1  that's an accurate summary of the conversation.
2     A     Okay.
3     Q     Take your time.
4     A     (Witness complying.)
5          Okay.  So the name is right, Mehret.
6     Q     Yeah.
7     A     Okay.  I was just -- like I said --
8          (Discussion off the record.)
9          THE WITNESS:  Okay.
10  BY MR. STONE:
11     Q     All right.
12     A     I don't know what this last one is.
13     Q     Yeah, you're welcome to read that.  I was
14  really going to focus on the one that's labeled
15  October 7, 2015.
16     A     Yes, this -- oh, yeah, because -- oh, the
17  first one first.  You don't want to address this
18  yet?
19     Q     Well, I'm --
20     A     Because that's not accurate at all.
21     Q     Well, I'm going to -- let me ask you,
22  first of all, October 7, 2015, does that -- you
23  recognize that's a recount of a conversation.
24     A     Uh-huh.  That's --
25     Q     Is it accurate?

Page 231

1     A     -- pretty clear on everything that we've
2  discussed here but -- for the most part, yeah.
3     Q     Is there anything in there that's
4  inaccurate that you can identify?
5     A     Well, that part back there.  But in this
6  part, the beginning to -- just this little section,
7  it is -- it's pretty clear.  It's pretty clear.
8     Q     Let me make sure what you're saying.
9          You're looking at an entry, it's a lengthy
10  entry --
11     A     Yeah, this one to --
12     Q     Stop.  You've got to let me finish my
13  question.
14          You're looking at an entry labeled
15  October 7, 2015, that starts on page 1 of Exhibit 21
16  and continues on to page 2.
17     A     Right.  All of this I think pretty much is
18  accurate.
19     Q     All the way --
20     A     All the way down to that, yeah.
21     Q     All the way to the end of the October 7,
22  2015; correct?
23     A     Uh-huh.
24     Q     Yes?
25     A     Uh-huh.

Page 232

1     Q     Yes?
2     A     Yes, I'm sorry.
3     Q     And there's nothing in there that you can
4  identify as inaccurate; correct?
5     A     No.  I think this is pretty much how the
6  conversation went, yes --
7     Q     All right.  And then --
8     A     -- except she spelled the name wrong.
9     Q     And on October 24, 2015, you say that that
10  entry is inaccurate.
11     A     That is.
12     Q     What way is that inaccurate?
13     A     This is all inaccurate, because I sent
14  her -- I sent her -- her main thing was, If anybody
15  can get your job back, I'm going, verbatim, I'm
16  going to that person -- well, she didn't even put
17  that in here.  That's the thing.  She didn't put
18  that in here at all.  You know, I'm going to be the
19  person that can go and talk to who I need to talk
20  to.
21          If I -- her main thing that she wanted me
22  to produce was the license.  It was the -- and, you
23  know, to prove the dual residency, which is what
24  Kiha and Mehret did not ask me for at all.
25          And so once I got that, I sent that.  You

Elizabeth Gallo
COURT REPORTING, LLC

Page 233

```
1   know, she didn't -- it wasn't really a time limit on
2   that.  It was just, If you can get that in there,
3   and I can just kind of look it over and see that he
4   is a dual resident, I'm going to the person that can
5   possibly talk to get you reinstated.  That's kind of
6   how that conversation went.
7        As far as like the graduation thing, I
8   told her I would try to see about getting that, as
9   far as, I guess, I don't know, a program or
10  something like that.  But that's where I think I
11  faxed to you the letter from Jovan per him saying
12  like he's not giving out his minor child's school
13  information, blah, blah, blah, this, that and the
14  other, information.
15       But I made sure that I did fax over that,
16  as well as I faxed the letter.  And I'm seeing that
17  said she didn't receive it.  But I know that I did
18  send -- I did send that to her so --
19    Q    So you sent her a driver's license, did
20  you?
21    A    I sent her the driver's license, as well
22  as the letter.  Because her -- and she was real
23  adamant on that part, because that was towards the
24  end of the conversation.  If you can by some chance
25  at least -- you know, because her thing was she
```

Page 234

```
1   recognized with Kiha that was the biggest thing
2   like -- because that was the thing that they didn't
3   know, that he had a minor child in California, which
4   is the coparenting thing.  Like that's why -- that's
5   what we kind of zeroed in towards the end with me
6   Quaniah and Kiha, I'm like, He goes -- because her main
7   thing was that's another reason why she was
8   suspending it, Ben, because she was like if he --
9     Q    You've got to stop.
10          The question is, there's a simple
11  question, you sent to Ms. Shaw --
12    A    Yes, I did.  I sent her the copy --
13    Q    Stop.  You sent to her a driver's license.
14    A    Uh-huh, I did.
15    Q    And you sent her a letter from Mr. Dais
16  that says, I'm not giving any information about my
17  minor child.
18    A    Yeah, about the school.  It was -- because
19  she was asking for -- like wanting the -- like a
20  school address or whatever.  And, of course, that
21  was a thing of him asking her mom.  And the mother
22  is like, No, who's asking about my kid.
23    Q    I didn't ask you any of those questions.
24  I just asked you what you sent her.
25    A    Yeah.  I sent her that letter, and I sent
```

Page 235

```
1   her the license, yes, sir.
2     Q    All right.  So you never sent her any
3   information that suggested that Mr. Dais was out
4   there for a graduation.
5     A    No, I didn't -- yeah.  That was the point
6   of the letter, him saying like he wasn't going to
7   send that part but --
8     Q    Did you --
9     A    -- her main thing was she wanted -- she
10  said, Get me that license.  I need to see that he is
11  a resident there.
12    Q    Anything else?
13    A    No.  That was it.  And I never talked back
14  to that lady again.
15    Q    All right.  Is there anything that you
16  talked about with Ms. Shaw, other than what you've
17  already told me or that's reflected in Exhibit 21?
18    A    No.  I never spoke to her ever again after
19  that.
20    Q    All right.
21    A    I didn't even hear back after I sent her
22  what I sent her, other than the letter that came
23  telling me that they up -- that she upheld it,
24  because she thought she didn't, I guess, get that.
25  But now I'm seeing I did send that to her.
```

Page 236

```
1     Q    Well, you sent her what you told me you
2   sent her; correct?
3     A    Yeah.  I sent her what she asked for, but
4   she said I didn't send it.
5     Q    You didn't send her anything about the
6   graduation.
7     A    Yeah, but she didn't -- that was the
8   thing.  Her main thing was she wanted -- she wanted
9   the license.
10    Q    That was your understanding?
11    A    That was my -- well, that was my
12  understanding.  Because that's what I said, towards
13  the end of the conversation she was very adamant on,
14  You get me that, then I could do -- try to do some
15  talking for you.  And then she ended it with,
16  Getting you reinstated.  But I need to be able to
17  verify that he is a resident there.
18    Q    She asked you to provide documentation to
19  support the claim that he was there for the
20  daughter's graduation; correct?
21    A    Yeah, but that --
22    Q    And you didn't do that.
23    A    No, but that -- no, that -- that's what
24  I'm saying, that's not accurate.  That's not -- that
25  part is not accurate.  She wanted the license, Ben.
```

Page 237

1  I sent her what she asked for.
2      Q   Ms. Stevenson, you're kind of making this
3  up as you go along.  Because a moment ago I asked
4  you if there was anything inaccurate in that
5  statement, and you said no, it was all accurate.
6          And now are you telling me it's
7  inaccurate?
8      A   It is all accurate.  But I'm saying that
9  what her thing was, she asked for a license.  I'm
10  not making anything up, Ben.  This is my life and my
11  career being toyed with.  So I'm not playing any
12  games with my life and my career.  This has been
13  really rough for me.  And I was very, very clear
14  on -- she was adamant on -- her main thing was if
15  she got the license.  In this it's stating that she
16  received nothing from me, when I did send her
17  something.
18      Q   Ms. Stevenson, who got -- after you were
19  terminated, who was hired to replace you; do you
20  know?
21      A   Who was hired to replace me?
22      Q   Yeah.  Who took your job over?
23      A   What do you mean?
24      Q   After you were fired from Delta.
25      A   I wasn't there, so how would I know that?

Page 238

1      Q   All right.  So you don't know anything
2  about that person.
3      A   What?  I -- I don't --
4      Q   Okay.
5      A   Delta hire people all the time, don't
6  they?  They never -- I don't think they tell you who
7  they're going to hire next.  I've never heard of
8  that before.
9      Q   All right.  Let me show you --
10      A   That's new to me.  I didn't know they
11  hired somebody.
12          (Exhibit 22 was marked for
13      identification.)
14  BY MR. STONE:
15      Q   All right.  Let me show you what's been
16  marked as Exhibit 22.
17      A   Uh-huh.
18      Q   And just ask you if this is the charge you
19  filed with the EEOC?
20      A   Uh-huh.  Yes.
21      Q   All right.  That's your signature at the
22  bottom?
23      A   That is my signature.
24      Q   All right.
25

Page 239

1          (Exhibit 23 was marked for
2      identification.)
3  BY MR. STONE:
4      Q   And let me show you -- all right.  Let me
5  show you what's been marked as Exhibit No. 23.
6      A   Uh-huh.
7      Q   And ask if this is the right to sue letter
8  that you received from the EEOC?
9      A   Is this the one -- is this the -- oh,
10  okay.  The right to -- yes, I think I -- yeah.
11      Q   And you understood this was a -- what's
12  called a no cause determination.  That the EEOC
13  found no reason to believe anything unlawful that
14  happened?
15      A   No.  I mean that's not the way that -- you
16  know, as far as like Mr. Pernice -- like that's not
17  the way it was explained to me, I guess, in you
18  all's terms, law.  I just --
19      Q   Explained to you by who?
20      A   Like just when I've just asked people.
21  Like I have a girlfriend that's an attorney.  And my
22  person that doesn't say it like that.  I mean --
23      Q   You understand that they checked the box
24  that said, The EEOC is unable to conclude that the
25  information obtained establishes a violation of the

Page 240

1  statutes.
2      A   But they gave me -- what's that, the right
3  to sue?  The right to sue.
4      Q   You understand everybody gets that no
5  matter what.
6      A   I'm not an attorney, so I mean --
7      Q   All right.
8      A   And I didn't ask my attorney friend.
9      Q   You were terminated from Delta in July of
10  2015; correct?
11      A   July 28th.
12      Q   All right.  And when did you start looking
13  for new work after that date?  How long did you
14  wait?
15      A   I'm going to be honest, I don't know, Ben.
16  My life was turned upside down.  I lost everything.
17  I have no clue -- I can't -- I can only go --
18  nobody -- I wasn't -- again, I was almost ten years
19  in, and I was loving my career.  I have no -- I
20  really don't know.  My mind was -- I don't remember
21  the day, if it was a week later, it was a -- I don't
22  know.  I just -- nothing was clear for me.
23      Q   When did you get a new job?
24      A   Right after that?
25      Q   Yeah.  When was the next time you worked?

Page 241

1     A    I'm going to be honest, I probably -- I
2 didn't.  I was -- I was in pain.  I was going
3 through -- I was going through a lot, so I --
4 mental, physical, homelessness, living in my car.
5 I -- I don't know.  I --
6     Q    Have you gotten any job since you left
7 Delta?
8     A    I have no idea or clue.
9          Huh?
10     Q    Have you gotten any job since you left
11 Delta?
12     A    Yes.
13     Q    What job -- what's the first job you got
14 after you left Delta?
15     A    I do work now -- well, I mean I worked --
16 I worked as a nanny and, you know, took -- helped to
17 take care of -- you know, a doctor, I helped to take
18 care of her kids, her autistic child.
19     Q    When was that?
20     A    That was probably -- I started -- I did
21 that like -- I think I started that -- I did that
22 May of last year, from -- from May until about March
23 of this year.  I occasionally still help her take
24 care of her kids, because she is a doctor, and she
25 don't have -- she always in surgery so --

Page 242

1     Q    What's her name?
2     A    Dr. Melinda Miller-Thrasher.
3     Q    Is that the same Melinda Miller-Thrasher
4 who's your OB/GYN?
5     A    Yes.  Well, she's -- she's my doctor, when
6 I go to her, but I have other doctors too, yeah.
7     Q    So you are a nanny for your OB/GYN.
8     A    Yes.  I have -- I have been.
9     Q    All right.  And was that a full-time job
10 from May of 2016 to March of 2017?
11     A    It was just kind of -- you know, she knew
12 I was down on my luck, and she just kind of -- she
13 knew I was homeless and stuff.  She just kind of
14 helped me out.  You know, it was like as -- like as
15 she needed me.  It became regularly, like every --
16 she used me like every -- every weekend.  Sometimes
17 it would be four days.  Sometimes it would be for
18 the whole week.
19     Q    How much did she pay you?
20     A    I would -- that varied, because sometimes
21 I would get paid like 350.  Sometimes it was 250.
22 No more than 350 for the week.
23     Q    Did she pay you cash, or did she write you
24 a check?
25     A    She did both.  She did a little bit of

Page 243

1 both.  Sometimes she would give me cash.  Sometimes
2 she would just write a check out to me.
3     Q    Do you have a bank account?
4     A    I do.
5     Q    Where is your bank account?
6     A    Regions, and I have a Wells Fargo.
7     Q    Okay.  Which account do you use as your
8 regular checking account?
9     A    I use Regions more.
10     Q    But you use both actively?
11     A    Yeah.  I can use both.  It's just --
12     Q    So when Dr. Thrasher would write you a
13 check, where would you deposit it?
14     A    Actually, what I would do is -- like she
15 has a Wells Fargo.  So if she like wrote me a check,
16 I would sometimes -- just sometimes cash it because
17 it was -- they'd charge me the $7, and they'd give
18 me the money.
19     Q    So we now know that you were working as a
20 nanny from May of 2016 forward and still do
21 occasionally now.
22     A    Yeah, I still help her out.
23     Q    Between July of 2015 and May of 2016, when
24 you started as a nanny, did you work any job?
25     A    No, I -- I helped out -- I went and did my

Page 244

1 community service.  I did polling.  I worked -- they
2 paid me to work the vote -- I worked the polls.
3     Q    Anything else?
4     A    They pay you -- they pay you 250, yeah,
5 250.  That's it, just the voting.  I -- there was --
6 yeah, just the nanny stuff.  That kind of helped me
7 out a little.
8     Q    Did you apply for any jobs?
9     A    I was applying.  I applied -- I applied at
10 Southwest.  I applied at American.  I did get an
11 e-mail back -- very competitive for the in flight,
12 which is where I've always wanted to be.  It was --
13 they -- I heard back from American.
14          I applied at United.  They told me they
15 still was looking at me, but they had a furlough or
16 something, and they had so many people just waiting.
17 So I just got to just wait to get a call.  Still
18 haven't gotten a call.
19          I was going to try to substitute teach
20 since I have a biology degree.  I mean I inquired at
21 Cobb County, but I didn't -- I mean I didn't --
22     Q    You didn't formally apply?
23     A    Yeah, I didn't -- I worked for them
24 before, and I didn't -- I just didn't go back by the
25 office thing.  Because, like I said, I was just

Page 245

1  going through a lot. I didn't go back by and go
2  back through the little certification for that.
3      Q    Other than Southwest, American and United,
4  did you apply for any other jobs?
5      A    I applied at a restaurant, actually right
6  up the street here, to be a waitress. What -- oh,
7  my gosh, it's a -- Cocina, La Cocina, just to be a
8  waitress because I know they make money every day
9  when they waitress. La Cocina. Sorry, this is
10 really emotionally difficult for me because I had a
11 career. La Cocina. What else? What else? I think
12 I -- I think I was just -- I was doing like
13 waitressing. Trying to get back on with the airline
14 industry. That was pretty much it and --
15     Q    Anyplace else that you applied that you
16 can tell me?
17     A    Gosh, did I apply at the -- no, I didn't
18 apply at the post office yet. Somebody gave me
19 information, but I don't think I ever did that. I
20 know I applied a couple of other places, Ben, but I
21 honestly do not remember.
22          I do know that by being the nanny, when
23 you take the kids to places where other nannies be
24 at, you get to talking. And I was being referred,
25 like, Oh, I think you would be good taking care of

Page 246

1  their kids or whatever. So people was referring me.
2  Like, Hey, I got to take off -- they go out of the
3  country for a month. And I'll probably see if they
4  can hire you, Quaniah, to take care of kids for two
5  months, that little stuff. So other nannies was
6  referring me to help them out with their kids so --
7      Q    Okay. Any other job applications?
8      A    Not that I can think of right now.
9      Q    Anyplace else that you've worked, other
10 than the polling place and as a nanny for that --
11     A    Oh, you know what, duh, light bulb, DGS.
12     Q    Uh-huh.
13     A    I'm sorry. I guess that's how much I got
14 on my mind.
15     Q    Okay. When did you apply to DGS?
16     A    I'll be honest, I don't remember
17 accurately when I applied. I just know I was
18 referred by another girl that worked there that gave
19 me the information. I applied -- I reached out to
20 the person -- I applied. And then at the time that
21 I initially applied, which probably was almost a
22 year ago, the supervisor e-mailed me back and said,
23 We're not hiring at this time. When we open back
24 up, we will let you know.
25          And then they opened it back up. Sent me

Page 247

1  an e-mail. And I'm working there now, just -- yeah.
2  He sent me an e-mail back. He sent me an e-mail
3  back. There's a little happiness there. He sent me
4  an e-mail back. And then he said, We are -- we
5  presently opened it back up. We're now hiring,
6  Quaniah. Are you still interested?
7          I said, Absolutely, and then so on and so
8  on.
9      Q    So what are you doing for them?
10     A    Security officer.
11     Q    Where?
12     A    Like Camp Creek Airport.
13     Q    How many days a week?
14     A    Four -- four days on, three days off.
15 That's the way they had it scheduled. Some people
16 are three days on. Some people are four days on. I
17 need to work as much as possible so I'm four days,
18 and three days off.
19     Q    And what are you earning?
20     A    How much is it? Oh, $10.
21     Q    $10 an hour?
22     A    Uh-huh.
23     Q    All right. And how many hours a week?
24     A    32.
25     Q    Okay. All right. Any other job that

Page 248

1  you've held, other than the three jobs that you've
2  identified, since you lost your employment at Delta?
3      A    No, sir, no, not just -- no, just the
4  nanny stuff and working the voting stuff.
5      Q    Is there any period of time since you left
6  Delta that you've been unable to work for any
7  reason?
8      A    No, no, just --
9      Q    All right. You told me a moment or a
10 little bit ago about Mr. Pernice and his -- and the
11 advice.
12          Have you hired any other lawyer to
13 represent you in this matter?
14     A    Not at this present time. I do have one
15 that, actually, I -- well, the -- what do you call
16 it, secretary assistant had called me back. I
17 actually was supposed to talk to that person. Was
18 it Thursday of last week for today. My phone got
19 disconnected. I had no contact for like three days,
20 and I missed out on that. So right now I don't know
21 if I'm -- I don't -- not right this second.
22     Q    All right.
23          MR. STONE: We are -- at this time, I'm
24 going to suspend, but not end the deposition,
25 Ms. Stevenson. And the reason is is because,

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson                                                    June 29, 2017

Page 249

1   candidly, you have a lot of documents that you
2   had an obligation to provide for months that
3   you haven't provided, including all the
4   documents in the storage area.
5        THE WITNESS:  I think most of those are --
6   honestly, Ben, there may be a couple, but I
7   think most of them might be a lot -- may just
8   be duplicates.
9        MR. STONE:  But you don't know that,
10  Ms. Stevenson --
11       THE WITNESS:  Oh, okay.
12       MR. STONE:  -- because you haven't looked
13  for them.
14       THE WITNESS:  Okay.
15       MR. STONE:  And so we're going to reserve
16  the right to reconvene this deposition at some
17  point in the future after you've done what the
18  court has repeatedly ordered you to do.
19       THE WITNESS:  And, again, like I say, you
20  would have had.  It's just I -- until my father
21  just, you know, helped me out with that, I
22  have -- I've been locked out and had no way to
23  go in there and look in other book bags and
24  see.
25       But I really think most of the stuff is

Page 250

1   more than likely probably duplicate.  Like it
2   probably is a duplicate of this, duplicate --
3   it may be -- I really don't think it's
4   anything.  So I really honestly think at this
5   point I've given you everything.
6        MR. STONE:  Well, Ms. Stevenson, I don't
7   have any idea what's in there because you
8   haven't looked yet.
9        So we'll reserve, after you've done what
10  you're required to do, which is to get us
11  additional tax returns and the additional
12  documents that are subject to production.
13       THE WITNESS:  The '12?  Because did you
14  get my fax with the others I sent?
15       MR. STONE:  I've gotten some, but I have
16  not gotten 2012.
17       THE WITNESS:  No, I'll get that.
18       MR. STONE:  So and then we'll reserve the
19  right to continue this deposition and to ask
20  further questions at the appropriate time, if
21  we so choose.  But subject to that, I have no
22  further questions at this time.  I appreciate
23  it.
24       (Discussion off the record.)
25       MR. STONE:  Ms. Stevenson, you -- we've

Page 251

1   just taken your deposition, or at least part of
2   your deposition here.
3        The way this works, of course, is that the
4   court reporter has been here and has been
5   taking down my questions to you and your
6   answers.
7        THE WITNESS:  Yes, sir.
8        MR. STONE:  In a matter of a couple or
9   three weeks probably she will have prepared a
10  transcript that is a -- looks like a booklet of
11  everything that was on the record asked and
12  answered.
13       THE WITNESS:  Even the uh-huhs.
14       MR. STONE:  Even the uh-huhs.  Correct.
15       THE WITNESS:  Got you.
16       MR. STONE:  You have a right, if you so
17  choose, to what's called reserve reading and
18  signing.  That is before the deposition is made
19  final, to read it over and see if there's any
20  mistakes that are made in the deposition
21  transcript, for example.
22       You don't have to do that, but you have a
23  right to do that.  And so the question is, do
24  you want to reserve that right, or do you want
25  to waive that right?

Page 252

1        THE WITNESS:  Reserving it --
2        MR. STONE:  Reserving it --
3        THE WITNESS:  -- means I can make
4   corrections if I want to?
5        MR. STONE:  -- means you'll get it and
6   you'll -- yes.
7        THE WITNESS:  Yeah, I'll reserve the
8   right, if I need to.
9        MR. STONE:  That will be fine.  And the
10  court reporter will -- you'll need to arrange a
11  way for the court reporter to get you a copy of
12  the deposition.
13       (Discussion off the record.)
14       THE REPORTER:  Paper, electronic or both?
15       MR. STONE:  I want an E-file, whatever you
16  all call them, and a Minuscript, please.
17       (Pursuant to Rule 30(e) of the Federal
18  Rules of Civil Procedure and/or O.C.G.A.
19  9-11-30(e) signature of the witness has been
20  reserved.)
21       (Deposition was concluded at 2:50 p.m.)
22
23
24
25

Page 253

```
 1              COURT REPORTER CERTIFICATE
 2
    STATE OF GEORGIA:
 3
    COUNTY OF FULTON:
 4
 5
 6       I hereby certify that the foregoing
 7  transcript was reported, as stated in the caption,
 8  and the questions and answers thereto were reduced
 9  to typewriting under my direction; that the
10  foregoing pages represent a true, complete and
11  correct transcript of the evidence given upon said
12  deposition, and I further certify that I am not of
13  kin or counsel to the parties in the case; am not in
14  the employ of counsel for any of said parties; nor
15  am I in any way interested in the result of said
16  case.
17
18
19                    _____
                      Mari B. Temple, RPR, CMRS
20                    Certified Court Reporter
                      Certificate Number 2844
21
22
23
24
25
```

Page 255

```
 1  CASE:  Quaniah R. Stevenson vs Delta Air Lines, Inc.
 2  NAME OF WITNESS:   Quaniah Renetra Stevenson
 3       The preceding deposition was taken
 4  in the matter, on the date and at the time and
 5  place set out on the title page hereof.
 6
 7       It was requested that the deposition
 8  be taken by the reporter and that same be
 9  reduced to typewritten form.
10
11       It was agreed by and between counsel
12  and the parties that the deponent will read and
13  sign the transcript of said deposition.
14
15       Said jurat is to be returned within
16  30 days following receipt of the transcript to
17  the following address:
18
19            Elizabeth Gallo Court Reporting, LLC
20            2900 Chamblee Tucker Road
21            Building 13, First Floor
22            Atlanta, Georgia 30341
23
24
25
```

Page 254

```
 1           DISCLOSURE OF NO CONTRACT
 2
 3       I, Mari B. Temple, RPR, Certified Court
    Reporter, do hereby disclose, pursuant to Article
 4  10.B. of the Rules and Regulations of the Board of
    Court Reporting of the Judicial Council of Georgia,
 5  that I am a Georgia Certified Court Reporter; I was
    contacted by the party taking the deposition to
 6  provide court reporting services for this
    deposition; I will not be taking this deposition
 7  under any contract that is prohibited by O.C.G.A.
    15-14-37(a) and (b) or Article 7.C. of the Rules and
 8  Regulations of the Board; and I am not disqualified
    for a relationship of interest under O.C.G.A.
 9  9-11-28(c).
10
         There is no contract to provide services
11  between myself or any person with whom I have a
    principal and agency relationship, nor any attorney
12  at law in this action, party to this action, party
    having a financial interest in this action, or agent
13  for an attorney at law in this action, party to this
    action, or party having a financial interest in this
14  action.  Any and all financial arrangements beyond
    my usual and customary rates have been disclosed and
15  offered to all parties.
16
         This 6th day of July, 2017.
17
18
19                    _____
20                    Mari B. Temple, RPR, CMRS
                      Certified Court Reporter
21                    Certificate Number 2844
22
23
24
25
```

Page 256

```
 1  NAME OF CASE:    Quaniah R. Stevenson vs Delta Air Lines, Inc.
    DATE OF DEPOSITION: 06/29/2017
 2  NAME OF WITNESS:   Quaniah Renetra Stevenson
 3  EGCR Job No.:    39485
 4              CERTIFICATE
 5       Before me this day personally
    appeared QUANIAH RENETRA STEVENSON, who, being duly
 6  sworn, states that the foregoing transcript of
    his/her deposition, taken in the matter, on
 7  the date and at the time and place set out on
    the title page hereof, constitutes a true and
 8  accurate transcript of said deposition.
 9            _____
10                 QUANIAH RENETRA STEVENSON
11       SUBSCRIBED and SWORN to before me
12  this _____ day of _____ 20____.
    in the jurisdiction aforesaid.
13
14  _____
15  My Commission Expires    Notary Public
16       STATE OF _____
17       COUNTY/CITY OF _____
18
19  [] No changes made to the Errata Sheet;
20  therefore, I am returning only this signed,
21  notarized certificate.
22  [] I am returning this signed,
23  notarized certificate and Errata Sheet with
24  changes noted.
25
```

Page 257

```
1              Errata Sheet
2  NAME OF CASE:      Quaniah R. Stevenson vs Delta Air Lines, Inc.
3  DATE OF DEPOSITION: 06/29/2017
4  NAME OF WITNESS:   Quaniah Renetra Stevenson
5  Reason Codes:  1. To clarify the record
6                 2. To correct transcription errors
7                 3. Other
   _____
8  _____
9   Page _____ Line _____ Reason _____
10  From _____ to _____
11  Page _____ Line _____ Reason _____
12  From _____ to _____
13  Page _____ Line _____ Reason _____
14  From _____ to _____
15  Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
18  From _____ to _____
19  Page _____ Line _____ Reason _____
20  From _____ to _____
21  Page _____ Line _____ Reason _____
22  From _____ to _____
23
24   SIGNATURE:_____DATE:_____
25          Quaniah Renetra Stevenson
```

Page 258

```
1              Errata Sheet
2  NAME OF CASE:      Quaniah R. Stevenson vs Delta Air Lines, Inc.
3  DATE OF DEPOSITION: 06/29/2017
4  NAME OF WITNESS:   Quaniah Renetra Stevenson
5  Reason Codes:  1. To clarify the record
6                 2. To correct transcription errors
7                 3. Other
   _____
8  _____
9   Page _____ Line _____ Reason _____
10  From _____ to _____
11  Page _____ Line _____ Reason _____
12  From _____ to _____
13  Page _____ Line _____ Reason _____
14  From _____ to _____
15  Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
18  From _____ to _____
19  Page _____ Line _____ Reason _____
20  From _____ to _____
21  Page _____ Line _____ Reason _____
22  From _____ to _____
23
24   SIGNATURE:_____DATE:_____
25          Quaniah Renetra Stevenson
```

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renefra Stevenson
June 29, 2017

---

### Exhibits

**Defendant's Exhibit 01**  3:9 19:12, 22

**Defendant's Exhibit 02**  3:10 20:23 21:3

**Defendant's Exhibit 03**  3:11 23:14,17 24:22 34:19

**Defendant's Exhibit 04**  3:12 34:6, 9,12,20 38:22 39:8

**Defendant's Exhibit 05**  3:14 67:14 68:7,12,13,15,16 69:8 70:19

**Defendant's Exhibit 06**  3:15 87:10,13,23 88:14 91:6, 21

**Defendant's Exhibit 07**  3:16 89:22,24 90:18 98:10

**Defendant's Exhibit 08**  3:17 99:13,16

**Defendant's Exhibit 09**  3:19 108:13,16 109:6,18,24, 25 110:4,5 111:20 115:16

**Defendant's Exhibit 10**  3:20 124:7,12

**Defendant's Exhibit 11**  3:21 124:7,12 127:9,16,20 140:12,25 143:3

**Defendant's Exhibit 12**  3:22 145:18,22 146:20

**Defendant's Exhibit 13**  3:24 146:15,18

**Defendant's Exhibit 14**  4:1 185:4, 8,18

**Defendant's Exhibit 15**  4:2 185:22,25

**Defendant's Exhibit 16**  4:3 195:20,24 196:12

**Defendant's Exhibit 17**  4:4 203:1, 4

**Defendant's Exhibit 18**  4:5 213:17,21 214:21,22

**Defendant's Exhibit 19**  4:6 215:23 216:7

**Defendant's Exhibit 20**  4:7 217:20,25 220:15

**Defendant's Exhibit 21**  4:8 229:6, 9,20 231:15 235:17

**Defendant's Exhibit 22**  4:9 238:12,16

**Defendant's Exhibit 23**  4:10 239:1,5

**Stevenson Exhibit Binder**  3:6

---

### $

**$10**  247:20,21

**$7**  243:17

---

### 0

**01**  79:1

**07**  14:16 15:5 60:16 68:2 166:10

**08**  14:16 15:5,9 60:16 78:8

---

### 1

**1**  19:12,20,22 20:11 39:7 70:25 111:19 231:15

**10**  88:14,16,19 124:7, 12,23 207:19

**100**  203:16

**10th**  214:7

**11**  89:3 111:3 124:7,12 127:9,16,20 140:12,13, 25 143:3

**11-09-1973**  65:4

**11:00**  98:3

**12**  145:18,22 146:20 250:13

**125**  102:8

**13**  20:2,9,13 21:11,13, 19,21 26:8,9 89:8 107:23 115:15 146:15, 18

**14**  26:8,9 107:24 108:2 111:6 112:3,8 184:7,8 185:4,8,18

**15**  65:13 166:20,21 185:22,25

**150**  19:3

**153**  19:3

**15th**  164:18 196:15

**16**  195:20,24 196:12

**17**  203:1,4 216:7

**1744**  63:3,4

**18**  203:21 213:17,21 214:22

**19**  113:2 215:23 216:7

**1997**  70:7,17,22 71:6, 15,22 72:7,12

**1998**  76:23

**1st**  67:25

---

### 2

**2**  20:23 21:3 111:20 231:16

**20**  75:24 163:22 189:16 217:20,25 220:15

**2001**  80:21

**2002**  76:23

**2007**  67:20 69:9,14,20 70:7,17,22 71:7,15,22 72:7,12,20 78:6

**2010**  15:10 127:23

**2010-07**  166:19

**2012**  41:3,4,7 42:4,23 110:5,21 111:4 250:16

**2013**  26:7 41:10 111:6 112:3,8 113:2 115:18

**2014**  41:10 95:4,10,15 108:3,4 115:20 116:4 203:25 207:18 213:24 214:4,6,7 215:1,11 216:3,8

**2015**  18:16 21:23 41:10 86:23 87:1 95:4,8,9 116:13 147:15 172:20, 24 173:9,20 177:4 186:12 187:15,21 217:16 218:3 220:16 229:11 230:15,22 231:15,22 232:9 240:10 243:23

**2016**  29:3 33:15,25 41:10 242:10 243:20,23

**2017**  5:2 242:10

**20s**  75:23

**20th**  26:10,11

**21**  189:14 229:6,9,20 231:15 235:17

**211**  63:25

**21st**  26:11

**22**  115:20 238:12,16

**23**  116:4 239:1,5

**24**  9:16 11:16 175:9 177:10 232:9

---

Elizabeth Gallo
COURT REPORTING, LLC

**250** 242:21 244:4,5

**26** 110:5

**28th** 87:3 226:23 240:11

**29** 5:2 87:1

**29th** 225:19 226:24

**2:50** 252:21

---

**3**

**3** 23:14,17 24:22 34:19, 23 115:16

**3-7-15** 116:21

**30** 12:22 24:14 85:7 91:20 93:7 110:20 147:22,25 148:4

**30(e)** 252:17

**30337** 63:4

**30344** 64:1,23

**32** 85:7,20 247:24

**350** 242:21,22

**3871** 64:21

**3:00** 98:3 110:13

---

**4**

**4** 34:6,9,12,20,23 38:22 39:8 68:13,15 70:19 83:12

**40s** 139:3

---

**5**

**5** 67:14 68:7,12,13,16 69:8 70:19

**50s** 139:4,5

---

**6**

**6** 24:24 31:14 87:10,13, 23 88:14,21 91:6,21

---

**7**

**7** 20:6,8,9 21:12 89:22, 24 90:18 98:10 116:13 229:11 230:15,22 231:15,21

**770 572-2878** 65:16

**7th** 229:22

---

**8**

**8** 99:13,16

---

**9**

**9** 67:1 108:13,16 109:6, 18,25 110:5 111:20 115:16,20

**9-11-30(e)** 252:19

**97** 72:20 73:2,14

**98** 73:15

---

**A**

**A-S-I-A** 83:7

**ability** 9:5,21

**abrupt** 119:3

**abruptness** 118:7

**absent** 105:10

**Absolute** 164:8

**absolutely** 12:17 73:25 74:16,19 99:12 102:10 164:9 171:9 247:7

**abuse** 123:19 145:13

**access** 49:19 50:11 52:2 55:22 59:13 88:7 101:18,20

**accessed** 146:1

**accommodation** 89:9, 13,25 90:10,22 91:7,19 97:17 98:9 107:5 220:24 222:3,18 223:6, 7

**accommodations** 97:25 220:25 221:1

**account** 48:5 67:8 86:8 93:10 173:25 243:3,5,7, 8

**accurate** 9:9 24:16 26:9 68:22 69:2,4,21 71:18 73:4,8 87:18 95:15 110:18,19,24 114:13,14 117:4 129:1, 2 132:15 208:22 215:4 216:11 230:1,20,25 231:18 236:24,25 237:5,8

**accurately** 14:9 27:21 29:16 32:4 80:17 107:24 246:17

**ACS125** 102:4

**act** 134:19 162:11 174:12

**active** 66:13

**actively** 243:10

**actual** 18:8 107:9 142:7 224:3

**adamant** 233:23 236:13 237:14

**Adams** 156:19,20 157:23

**addition** 140:24

**additional** 217:24 250:11

**address** 62:24 63:20, 23 93:11 230:17 234:20

**addressed** 145:24

**addresses** 48:10

**Administration** 22:25

**admission** 129:23

**advances** 143:13,20

**advertise** 81:7

**advertising** 83:20

**advice** 37:6,7,14,25 38:4 248:11

**advised** 20:4

**advisement** 89:14

**affairs** 21:4 22:4,9

**affecting** 9:18

**African** 138:13,14

**age** 139:2

**agent** 103:3 105:17 113:3,8 174:15

**aggressive** 122:3,5

**agree** 113:7 192:9,13, 15 211:11,15,23 212:7

**agreeance** 30:9

**agreed** 166:17 211:7

**ahead** 196:11 224:24 226:2,7

**air** 202:4

**airline** 75:2 99:23 245:13

**airport** 99:21 102:2,12, 21 104:3 120:13 168:6 175:19,22 247:12

**Alabama** 66:7

**alcohol** 11:12,15

**all's** 239:18

**allowed** 34:24,25 35:3, 4,5 63:16 94:12 96:7 126:2 159:14

**altercation** 113:21

**America** 199:3

**American** 138:13,14 244:10,13 245:3

**amitriptyline** 10:1 28:23 29:8

**amitryptyline** 11:5

**amount** 18:21,25 19:1

**analogy** 159:12

**and/or** 252:18

**announced** 148:18 149:19

**answering** 40:10 171:2 190:4,11 191:16

---



answers 7:12 251:6

anticipated 45:14

anxiety 32:14,17 33:14

anymore 48:13 60:25 62:7 78:15 131:13 141:5 219:5

anyplace 57:7 70:18 71:11 245:15 246:9

anytime 57:6 227:23

apologized 227:3

apologizes 36:25

appeal 229:10,16

appealed 227:13

application 68:9 69:9 70:8 72:14,18 74:9,14 76:22 77:8 83:12

applications 53:7,16 246:7

applied 17:23,24,25 53:9,11 69:23 70:14 83:14 244:9,10,14 245:5,15,20 246:17,19, 20,21

applies 13:21

apply 18:4,7 53:10 70:13 244:8,22 245:4, 17,18 246:15

applying 77:10 244:9

appointment 216:23 219:10,11 221:12

approximately 29:24 73:14

April 69:9,13,20 216:24 217:7

area 16:17 35:22 204:20 249:4

areas 104:2,4

arise 5:11

arrange 252:10

arrest 14:21,22 15:4

arrested 14:6,8,22 15:6,15,25 16:5

arrests 14:1,4 17:3

arrivals 102:18,19

artist 187:2,3 199:24 200:2,3

artists 81:13 202:3

Asia 83:4,6,7

asks 70:24

aspect 104:8

asserting 227:25

assessed 217:11 218:15

assessment 151:16

assigned 142:6

assignment 142:1 218:25

assignments 102:15

assistant 217:9 248:16

assists 37:11

assume 8:24 22:13 39:5 163:17

Atlanta 16:8 35:22 37:11 63:4,25 64:23 72:15,19,23 74:21 75:10 84:13 102:21 155:19 168:14 192:5 199:19

attack 32:17

attorney 20:1,3,17 21:10,11 37:8,23 39:5 51:22 239:21 240:6,8

attorneys 21:12 35:21, 25 37:12

auction 50:14

audit 150:9

audits 148:11 152:13

August 18:14 67:20,25 110:5 215:1,11

aunt 93:17 98:12 158:20,21 171:8,17 222:5

aunt's 171:10 209:1

autistic 241:18

autograph 132:6 135:14

autographs 135:3,10

Avenue 63:4

awarded 92:17 95:22 96:16 97:23

awards 47:5

aware 89:1,3,7 123:17 124:4 150:14 152:24 184:12,13 186:11 187:13,24 188:6 204:21 210:9 216:20 217:15

awesome 137:10

---

## B

B-R-A-T-T-O-N 83:1

B25 141:24

baby 184:3,5

back 25:23 29:4 36:9 53:18,25 60:6,14 61:5, 25 62:2 64:18 86:9 91:6,13,21 92:11 95:23, 24 103:24 114:25 120:25 140:23 145:11, 16 147:8,21,24 148:4 151:24 161:21 163:22 164:13 165:2,15 166:10,12,19 168:8,9, 16 179:7,8 191:5 199:19 201:7,11,12,20 204:10 207:15 208:2 209:22 211:24,25 213:9 214:13,19,25 215:5,15, 16 216:5 217:1,2,7 218:5,7,8,16 219:16,18 220:19 221:13,15,21 224:24 225:20,21 226:1 231:5 232:15 235:13,21 244:11,13,24 245:1,2, 13 246:22,23,25 247:2, 3,4,5 248:16

background 81:3

backtrack 208:5

badges 95:18

bag 25:21 26:5 105:4

207:13 213:14

baggage 103:6,8,12, 14,17 104:1 114:21,23 211:1

bags 49:12 50:22 249:23

bail 113:22 114:4

bailed 113:23 115:8

Bailey 153:2,8,10,13 154:2,6 155:5,16 157:13,16,25 158:6,12 159:10,21 160:9,10

balance 17:19

bank 243:3,5

bankruptcy 13:5,7 17:6 19:15,24 20:14,22 21:19 22:15 36:7

bar 182:16

Barbara 229:14

based 30:9 37:9 47:2 74:2 126:12,19 149:4 152:8 180:6,9 220:18

basic 109:4

basically 83:18 84:12 102:11

basis 10:25 84:4

begging 137:22 165:18

begin 164:12

beginning 231:6

behalf 20:17 21:5 22:12 23:24

belonged 155:6

Ben 42:11 92:2 98:22 122:11 126:16 132:18 136:12 144:12 163:10 164:25 167:1 170:20 174:7 177:5,7 179:23 183:20 188:9 189:1,3 193:4 201:14 209:12 234:8 236:25 237:10 240:15 245:20 249:6

bench 16:21

benefit 99:24 161:25 174:14



**benefits** 17:24 18:1 22:24 23:10 54:17,22, 23 55:3,5,7 56:6,17,23 57:17 144:7 145:11,13 199:9 224:11,15

**bid** 97:14,15,17,18 98:7 110:13 145:3 223:2

**bidded** 103:24 126:25 144:9

**big** 97:3 128:22 229:19

**biggest** 135:12 234:1

**bill** 49:14,15,16,20 50:11,12,24 51:2,12,13, 14

**biology** 66:12 244:20

**birth** 65:3

**birthday** 207:20

**bit** 73:3 84:5,6 127:5 161:21 202:15 207:10 242:25 248:10

**blah** 59:11 150:23 168:7 199:19 233:13

**Blanding** 161:7,8,10, 15,19,25 162:14 164:5, 11

**blank** 63:3

**blindsided** 166:22 189:23

**body** 222:15

**bologna** 180:10

**bombarding** 137:18

**book** 49:12 50:22 55:16 57:25 59:4,7 61:5 155:13 156:10 167:16, 21 176:6 199:13 249:23

**booked** 58:6,13 59:4, 11 60:5 61:6 165:4 167:9,14 168:7,14 174:19 177:12 188:1 190:13,24 210:6

**booking** 176:7 190:16

**booklet** 251:10

**bother** 136:4

**bothered** 118:7 132:20

**bothersome** 119:3

**bottom** 111:19 238:22

**bounce** 150:20

**box** 239:23

**Boyette** 186:16,18,23 187:1,8,16,20,21 188:7, 14,17 190:10,19 191:1, 25 192:4,6,18,19 193:19,24 194:15,19 195:2,3,8 196:14,22 197:3 198:2

**boyfriend** 57:22 77:4 78:1,11,16,18 79:12 160:24 172:2 173:2 181:23 193:17 198:23, 24

**boys** 198:10

**bracelet** 121:14,21 122:17

**Brady** 156:23

**branding** 81:7 83:20 84:9,17

**Bratton** 82:23,25

**break** 67:11,13 106:18 147:4,6 168:5,10,11,12 199:15,16,18 207:24

**briefing** 94:10 118:5 121:14,15,16 122:21 123:3 141:23 147:20

**broadest** 55:4

**broke** 105:11 161:20 162:8

**Brown** 63:18

**buddies** 201:3

**buddy** 100:20 153:1,7 155:5,16,21 156:12,14 158:11 159:21 160:9 195:4

**build** 82:10 200:18 202:13

**builder** 82:8 83:18

**bulb** 246:11

**bunch** 180:10

**bus** 181:7 199:5,10,11, 20,23 200:13,20 201:9, 11 202:1,5,7 213:12

**buses** 202:3,8

**business** 63:16 81:24 82:4,5,11 101:1 124:1 135:8 139:25 162:15 176:13,15,20 177:4,21 186:24 190:18 192:23 201:6,14,15,24 202:1,2, 7 205:5 207:3,5,7

**businesses** 82:6

**busy** 36:19 226:20

---

**C**

**calculate** 179:8

**Caleb** 186:16

**California** 167:5 168:8 170:1 172:23 173:8 177:14 178:16,25 181:14 184:4 187:20 191:24 196:21 234:3

**call** 5:22 10:9 28:4 41:14 42:25 47:5 50:13 53:3 81:13 84:2 92:23 96:11 102:8 105:24 106:3 141:20,23,25 142:1,7,8 146:4 152:6 155:25 156:2,3,4 163:12 168:5 199:12 200:23 210:10 214:17 219:16 224:8,17,22 225:13,15,19 226:17, 21,24 227:9 229:11 244:17,18 248:15 252:16

**called** 25:9 64:13 83:13 100:19 103:10 108:17 113:8 119:22 142:13 147:15 148:21 217:9 225:20,21 226:23 239:12 248:16 251:17

**calling** 86:15 160:1

**calls** 5:24

**calm** 206:9

**Cambridge** 63:4

**Camp** 247:12

**canceled** 114:6

**Candice** 156:25 157:8, 20,24 158:13 160:5,6

**candidly** 249:1

**car** 20:7 90:13 93:11 98:15,16 105:11 222:4 225:14 241:4

**cardiologist** 33:12

**care** 23:7 94:16 241:17, 18,24 245:25 246:4

**career** 45:14 102:25 103:3 107:13 118:13 128:19 130:15 144:11 175:1 189:13,21 191:5 200:18 226:22 237:11, 12 240:19 245:11

**careful** 22:19

**Carol's** 122:22

**Carole** 89:15,16 91:3 93:20 94:5 106:10 125:15 144:23 221:8

**carpenter** 82:12

**carpentry** 82:8

**case** 19:15 34:15 36:15 37:2,6 38:1,10 39:15 114:4 226:6 228:3,15, 20 229:4

**cases** 36:1 37:13

**cash** 85:22,23,24 242:23 243:1,16

**Castle** 83:13,16 85:8

**catches** 37:3

**caused** 164:10

**celebrities** 84:18 85:3 130:6 131:21 132:19 135:3,4 139:22

**celebrity** 128:1,4 137:5,21

**cell** 65:6,7,14 169:2

**Center** 72:24 74:22 75:10

---



**CEO** 86:8

**certainty** 130:16

**certification** 245:2

**cervical** 207:12

**chance** 41:21 233:24

**change** 31:24 91:19,20 92:1 93:4,9,10,24 94:1, 3 134:5 190:7 222:21

**changed** 6:5 58:25 65:6,7 67:23,24 87:22 102:4,6 220:22

**chaotic** 120:11,14

**Chapter** 20:2,13 21:11, 19,21

**charades** 180:8

**charge** 238:18 243:17

**check** 105:2 168:4 169:1,2 242:24 243:2, 13,15

**checked** 43:17 239:23

**checking** 243:8

**checks** 85:6

**Cherukupally** 10:15, 19 26:23 27:19 30:3,7 31:8,15

**Cheryl** 126:18 127:1 133:8,25 134:3,12 140:11 142:25 143:9

**chest** 32:13,14 33:14

**Chicago** 74:6

**child** 234:3,17 241:18

**child's** 179:25 233:12

**choose** 162:5 250:21 251:17

**Christopher** 161:7,8

**cigarette** 84:17

**cigarettes** 84:15

**circumstances** 122:8

**cities** 202:4

**city** 16:8

**civil** 17:7,10 252:18

**claim** 103:6,7 236:19

**claims** 227:25

**clarification** 9:2

**clarify** 26:15

**Clavo** 30:5,23,24 31:6, 11,15

**clear** 24:2 50:2,23 58:1, 5 71:19 74:19 98:7 104:23 111:9 134:7 139:14 144:3 151:1 152:21 159:6,19 161:5 162:7 164:25 169:15 170:3,9 173:6 177:1,9, 16 180:1,7,21 181:6 188:3 198:20 201:21 202:10 208:24,25 209:2,3 210:5,12 226:4 231:1,7 237:13 240:22

**client** 186:18,20

**close** 84:1 87:21

**closed** 83:22,24

**club** 84:13,17 103:5,19, 21,23 104:1 107:17 126:22 128:1,2 130:5 132:20 141:4,14,19 188:22

**clubbing** 198:12

**clue** 240:17 241:8

**coach** 117:10 118:1

**coached** 111:3 113:3 116:3 117:5,24 210:19

**coaching** 109:9 116:14 117:7

**coachings** 109:16 115:17,24

**Coat** 141:4,12,16,18 143:9

**Cobb** 50:1 244:21

**Cocina** 245:7,9,11

**Cole** 199:1,22,25 200:1

**colleagues** 36:19 118:6 145:24

**college** 16:15,18 66:4,7

**color** 64:22

**comment** 22:5 47:19 54:9 68:3 121:8 126:3

**commented** 118:6 157:12

**common** 121:5

**communicated** 57:9 58:19

**communication** 60:1 61:1

**communications** 42:13 43:12 44:23 45:8 56:5,10,15,20 57:8,12, 24 58:12,21 59:15 196:6,14

**community** 244:1

**Comp** 146:4

**companies** 53:18

**companion** 56:12 100:11,15 153:23 160:19 161:1,16,19 163:1 164:11 172:4,11 205:14 206:4,8,9 209:8 210:4,17

**companions** 56:5 100:3 101:14 123:19 147:17

**company** 77:1 80:6,13, 16,22 81:9 84:11

**compensation** 188:12,13,16

**competitive** 244:11

**complain** 143:5 223:16

**complained** 96:14 97:10 133:3,10,23 134:18 140:25 145:4

**complaining** 140:24 227:19,20

**complaint** 39:15,18,19 40:12 94:1 140:11 143:2,3

**complaints** 12:9 144:17 145:5 227:19

**complete** 9:9 24:16 69:18 70:21,23,25 71:1

**completely** 7:17 111:10

**complexion** 138:11

**compliance** 96:9 116:16 118:12,15 150:10

**complied** 116:6 176:2

**comply** 101:10 215:19

**complying** 230:4

**computer** 41:16 120:21

**concert** 178:12,13 188:7 190:19

**concerts** 173:17 178:11 181:2 188:11

**concise** 212:2

**conclude** 239:24

**concluded** 97:4 204:22 252:21

**Concourse** 118:25

**condition** 30:12,20,25 31:16

**conditions** 30:4

**conduct** 129:7

**confirm** 20:18

**confirmation** 168:19 169:3

**confused** 60:25 219:6

**congratulating** 92:15

**connecting** 168:14

**considerable** 160:13

**consistent** 22:14 191:22 218:4

**constant** 118:8,9 122:13,14

**constantly** 118:7 122:12 143:19

**contact** 36:2 167:24 248:19



**continue** 77:13 78:13 250:19

**continues** 231:16

**conversation** 41:25 111:7 114:15 128:17 132:22 160:17 199:17 205:15 226:18 227:6 228:2 230:1,23 232:6 233:6,24 236:13

**conversations** 30:6 128:14 205:11

**cooking** 130:19

**cool** 162:10 163:24 201:6

**coparenting** 234:4

**copied** 43:2

**copy** 41:9,10 43:4 48:22 49:3 122:23 123:1,4,6 234:12 252:11

**correct** 5:18 6:19 7:5,9, 12 13:5 16:9 22:16,20 23:1 24:7,13,18 25:4,17 26:5,7,19 37:21 38:5,22 39:6,7,20 44:23 45:1,5, 24 47:8 51:1 54:13 56:14 60:1 62:18 65:8, 20,25 66:5,14 67:17,20 68:9,17,24 69:9,14 76:24 77:2,4 78:6 80:4 81:9 86:21,23 87:6,14, 24 88:9,20 89:1,4,9,13, 25 90:14,23 91:14,18, 22 93:5,11 94:1,17 97:6 99:3,11,25 100:4,7,14, 17,20,25 101:1,11,14, 18,22 102:3,9,12,17,22, 25 103:3 104:5,17,22 105:6,14,18,25 106:7, 11 107:5 110:5,8,15,16, 18,22 111:1,4,8,20 112:3,8,14 113:4,9 116:4,17 117:3,25 124:2 127:18,23 128:1, 11,19 129:7,19 133:11, 14,17 135:4 140:12 145:13,16,17 147:1,10, 17 149:9,14 153:21 158:24,25 160:14,20,24 162:17 164:20,22 166:2,5,11 169:8,11

**coworker** 97:9,22 157:1,2,3 158:18 206:2 224:12,14

**coworkers** 96:15 122:1 126:13 135:17 157:21 159:2

**Crawford** 32:10

**craziness** 218:20

**crazy** 41:5 98:5

**credit** 17:10

**Creek** 247:12

**Crestridge** 63:25

**criminal** 7:1 17:7,9

**current** 62:24

**customer** 102:3 103:2 105:16

**cut** 19:1 205:1

**172:2,5,8 176:3,21 186:16,19,24 187:2 188:18 192:23 194:17, 25 195:5,8 196:15 201:18 204:14 207:13 213:14 214:7,12,15 215:2,12 221:3 222:23 231:22 232:4 236:2,20 240:10 251:14**

**correction** 114:8

**corrections** 252:4

**correctly** 112:25 114:5 121:13 131:5 142:10 146:3 149:24 167:4

**correspond** 45:15

**Cortes** 149:1,3 185:21

**counseled** 210:16

**counselings** 108:6 124:14

**count** 13:15 36:23 142:2,3,4

**counted** 29:17 36:16 203:15

**counter** 102:16

**counterpart** 96:13

**counterpart's** 92:18

**counterparts** 119:14 126:13

**country** 246:3

**County** 244:21

**couple** 6:14 7:14 19:9 82:19 99:21 143:13 144:7 151:2,24 222:12, 13 245:20 249:6 251:8

**court** 6:19,23 7:23 8:5 12:6 14:18 15:19,23 17:18 19:25 20:18 22:16 43:5 249:18 251:4 252:10,11

**courthouse** 16:17,19

**courts** 11:22

**Cousins** 114:23

**covered** 208:22 209:13

---

## D

**dah** 90:9

**Dais** 56:11,16,21 57:13 58:12 59:7 60:1 61:6 76:24 77:2,4,11,14,24 78:18 79:17 80:4,13,24 81:8,22 82:4,5,15,18 160:14,18 161:18 162:17 164:14,19 166:1,25 167:24 169:7 170:5 171:19,25 172:4, 7 173:8 186:15,18,23 187:1,4,20 192:18 194:15,16,19,24 195:2, 7 196:8,14 197:2 198:6 234:15 235:3

**Dais's** 167:10 172:20, 23 202:18

**darker** 138:12

**date** 18:8 28:24,25 65:3 68:1 79:14 86:25 107:9, 10 109:17,24 110:1 111:1 112:4 113:9 119:12 155:15 223:24 224:3 240:13

**dated** 110:5 172:17

**dates** 143:21 155:12

**dating** 79:1,3,6,17 80:21

**daughter** 177:15,23 179:3,4,10 182:10,20, 23 183:4,18,21,23 184:6,13,17,19 185:1

**daughter's** 236:20

**daughters** 184:14

**day** 6:15 7:15 8:17 16:23,24 36:5 52:5,8 98:25 111:15 112:9,20 113:3 114:12 115:3 118:9,17,18,21 119:1,4 121:11,12 138:18 141:25 142:5 157:12 165:7,13 167:25 175:9 177:10 179:9 190:17 206:6 207:20 212:10 226:19,20,23 240:21 245:8

**days** 33:9,12 91:20 92:16 93:7 96:11 115:24 175:9 179:9,21 199:16,18 201:3 219:17 220:10 224:12,23 225:15 227:1 242:17 247:13,14,16,17,18 248:19

**dead** 126:17

**deal** 28:9 50:15 51:25 84:1 92:9 126:13 172:7

**dealing** 15:12 28:8 42:11 93:13 98:24 222:8,10

**dealings** 151:14

**deals** 115:7

**dealt** 15:18 99:2 107:14

**death** 90:7 222:9

**December** 21:20,23 115:18

**decided** 28:21 75:1,8

**decision** 85:13 152:6

**deduct** 51:21

**deducted** 17:14 105:2



Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 72 of 87
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 289 of 675
June 29, 2017

**degree** 65:25 66:10 244:20

**Delta** 18:11 23:20,21,24 42:14 43:12,14,15,18, 20,24,25 44:6,13,19,23 45:9,19 46:2,8,17,25 47:15 48:1,3,4,6,18,22 49:4,10,24 50:3,6 52:13,18 54:18,22 55:9 58:14 59:3,8,13 60:25 62:2,10 65:8 67:19 68:8,16 69:23 76:10,11, 14 77:10,18,25 83:14 86:9,10,19,20 87:5,13 88:17,23 89:5,8,13 90:23 97:4 99:7,24 100:14,19 101:3,16 102:1,25 103:3,5 104:13,22 105:13 111:14 112:1 118:13, 23,25 123:18,23 124:16 129:6 133:4 139:21 143:7,17 145:23,24 154:18 157:4,7,18 161:2 169:13 170:4 176:2 196:5,13 203:18 204:22 205:4,7,20 218:22 219:8 237:24 238:5 240:9 241:7,11, 14 248:2,6

**Delta's** 24:9 34:14 55:11 56:6 87:6,24 88:8 99:11,16 104:13 105:13 111:18 124:2

**Deltanet** 55:6 101:17 168:24,25

**demeanor** 131:18

**department** 52:21 81:6 96:18

**departments** 103:5

**depending** 85:2 86:5

**deposit** 243:13

**deposition** 5:1,12 6:12 7:2 11:19 12:3 78:22 248:24 249:16 250:19 251:1,2,18,20 252:12, 21

**depressed** 29:21 98:21

**depression** 10:6 31:4 98:23

**designate** 100:10,16

**designated** 142:11

**desk** 148:6

**detail** 150:13

**details** 114:19

**determination** 205:8 239:12

**detour** 99:7

**Detroit** 155:18,19

**developer** 83:17,18

**DGS** 246:11,15

**diary** 42:13,15

**died** 93:14,18

**difficult** 245:10

**Direct** 118:24,25

**directly** 43:15 122:22 205:18 206:20

**disability** 22:24 104:21 105:4,6

**disagree** 111:12 151:9

**discipline** 74:15 75:9 108:7 133:10,13 139:14

**disciplined** 139:11

**disciplines** 124:15

**disconnected** 248:19

**discounted** 100:15

**discovery** 43:6

**discrimination** 145:5

**discuss** 59:21 129:12

**discussed** 108:18 109:7 134:12,14 231:2

**discussing** 134:11,24

**discussion** 20:24 22:6 34:10 47:20 54:10 68:4 106:23 110:20,21,25 120:15 140:21 207:23 227:17 230:8 250:24 252:13

**discussions** 109:23

**dismissed** 17:18

**district** 20:18

**division** 102:3

**divorce** 13:9

**doctor** 30:11 31:9 32:15 75:3 76:9 221:13, 15 223:21 224:3 241:17,24 242:5

**doctors** 31:13,24 222:13 242:6

**doctors'** 31:23

**document** 19:18 20:22 24:20 34:14 39:6 108:17,19,25 196:13

**documentation** 236:18

**documents** 11:21 12:2,4,11,21,23 19:10, 17 26:15 40:16 44:12 48:22 49:4,9,18 50:3,7, 16,18,25 52:11,14,19, 23 54:16 55:2,4 57:24 60:21 62:8 249:1,4 250:12

**Domestic** 92:12 94:21, 22 95:18 107:16 145:3

**door** 89:4 118:23 121:17 123:9 200:15

**dot** 48:15

**double-check** 11:10

**doubt** 9:1 147:14

**draft** 38:23

**drafted** 38:22

**drink** 11:12,14

**Drive** 50:1 63:25

**driver's** 233:19,21 234:13

**dropped** 18:18

**dual** 170:12 177:16 178:20 179:9 182:24 232:23 233:4

**Dubois** 156:25 157:24

**due** 114:7

**duh** 246:11

**duly** 5:5

**Dunn** 82:23 201:5

**duplicate** 250:1,2

**duplicates** 249:8

**duties** 101:25

**duty** 215:2,11 217:3 218:2,16,17,21,22,24 219:8,13 220:16,19 221:16,22,25 223:25

**E**

**E-FILE** 252:15

**e-mail** 43:9,23,25 44:1, 2,25 45:19 46:15 47:8, 10 48:5,10,13 53:18,20, 22,23,25 54:13,14 55:15,24 59:10 60:7 61:3,10 91:5,21 93:3 122:22,24 146:8 163:13 173:24 186:1,2 244:11 247:1,2,4

**e-mailed** 40:2,3,6,7 41:4 46:13 48:24 246:22

**e-mails** 43:9,10,11,15, 18,20 44:6,9,12 45:12, 16,24 46:1,8,16,21 47:7,15,17,24 48:2,6, 17,18 56:25 57:23 58:22 59:6,25 61:24 151:24 167:19

**ear** 225:13

**earlier** 126:24 210:24 213:13 214:25 221:3,5 222:2

**early** 172:20,24 173:9

**earning** 247:19

**easier** 7:15,21 8:4

**easily** 41:20

**East** 16:13,15,18

**easy** 41:18



Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson
June 29, 2017

**educational** 38:19

**Edwards** 124:25

**EEOC** 50:18 238:19 239:8,12,24

**effect** 41:13

**effectively** 55:8 58:17

**efforts** 52:12,17

**elderly** 23:8

**electronic** 53:9 252:14

**elevator** 138:19

**else's** 64:3

**Emory** 32:10 33:12

**emotional** 179:19

**emotionally** 245:10

**EMP** 115:25

**emphasized** 31:9

**employed** 57:3,5,10, 11,15,20,22 58:14 102:1

**employee** 55:15 108:18 137:2,10 191:9 211:21 213:4,5,12

**employees** 81:11,22 82:1 99:25 100:2,4 123:18 145:23 146:8

**employers** 62:11 69:13 70:18

**employment** 45:9 50:4,5 68:1,9,23 69:12, 19 70:22 72:14,18 77:17,19 83:11 86:10 101:18,21 108:6 151:7 161:2 227:23 248:2

**encounter** 151:11,12, 17,21

**encounters** 125:13

**end** 79:1 114:8 213:1 221:14 231:21 233:24 234:5 236:13 248:24

**ended** 16:23 41:8 67:22 97:9 103:19,20 142:22 200:14 209:21 219:13 236:15

**engaging** 132:24

**enjoy** 144:10 174:13

**ensuring** 150:10 175:25

**entertainment** 202:2

**entire** 43:2 55:18 102:24 103:3 199:4

**entirety** 161:2

**entitled** 100:13

**entries** 109:6

**entry** 110:4,18 113:2 229:20 231:9,10,14 232:10

**EO** 229:13

**ER** 31:22 32:3,8,11 33:4 34:2 75:2

**erase** 53:21 54:15

**Ernest** 156:19,20

**error** 215:14,18,21

**escort** 128:13

**escorting** 128:13

**established** 151:5 160:18

**establishes** 239:25

**establishment** 52:25

**estimate** 14:15 29:1,18 33:21 73:1,5 78:5

**evening** 33:1 212:11 226:20

**event** 88:7 111:17

**events** 109:22 208:10 227:17,19

**eventually** 183:3

**evicted** 64:7

**eviction** 13:12 14:3 17:3

**exact** 15:9 94:25 207:19

**EXAMINATION** 5:7

**examined** 5:5

**exception** 42:23

**excited** 131:21

**exhibit** 19:12,22 20:23 21:3 23:14,17 24:22 34:6,9,12,19,20 38:22 39:8 67:14 68:7,12,13, 15 69:8 70:19 87:10,13, 23 88:14 89:22,24 90:18 91:6,21 98:10 99:13,16 108:13,16 109:6,18,24 110:4 111:20 115:16 124:12 127:9,16,20 140:12,25 143:3 145:18,22 146:15,18,20 185:4,8, 18,22,25 195:20,24 196:12 203:1,4 213:17, 21 214:21 215:23 216:7 217:20,25 220:15 229:6,9,20 231:15 235:17 238:12,16 239:1,5

**exhibits** 124:7

**exists** 123:20

**expect** 22:2 166:18

**expecting** 55:20

**explain** 172:13

**explained** 115:6 150:13 239:17,19

**explaining** 32:16

**explore** 127:20

**express** 143:9

**extensive** 33:13 202:19

**extra** 158:22,23

**extremely** 36:18,19 128:8

**eyes** 76:10

---

**F**

---

**fabricated** 129:4 131:24

**face** 148:8,9 152:1

**Facebook** 66:16 157:9, 18,20

**faced** 151:25

**fact** 109:16 135:5 165:7 187:24 193:23 228:1

**facts** 38:24

**Failed** 142:6

**fair** 23:13 39:9,11,12,13 71:5 88:6 102:20 108:10 126:6 183:24 184:1 192:10 215:6

**fairly** 66:13 125:20,24 126:1 127:15 149:6 151:6

**fall** 26:5 71:13 96:9 207:13

**fallen** 95:2 107:23 223:10

**false** 7:2

**familiar** 87:5,12,24 99:8,10,18

**family** 5:24 90:7 100:24 154:4,7,15 155:4 161:24 176:9

**fan** 128:22 131:15

**fans** 135:12

**Fargo** 243:6,15

**fashion** 104:9

**fast** 101:3 185:16 197:8,15

**faster** 61:18 165:24

**father** 52:5 171:23,24 184:2 204:20 249:20

**favorite** 124:9,23 125:1

**fax** 233:15 250:14

**faxed** 46:6,13 48:24 233:11,16

**February** 111:6 112:3, 8 113:2

**federal** 6:23 252:17

**feel** 29:21 126:10,12,15 166:21,22 210:3

**feeling** 10:10 38:15

**fees** 51:21 195:5,7



www.GeorgiaReporting.com/Schedule
404.389.1155

**fell** 25:21 71:2,14 105:4
213:14

**fellow** 96:15

**felt** 74:2 126:5 132:18

**figure** 60:21 61:21 75:5
220:14

**figured** 226:21

**file** 22:18 40:8 133:14
141:6 142:22

**filed** 12:6 19:24 20:14
21:4,11,16,18,23 22:10,
23 23:2 39:16 41:1
238:19

**files** 123:5

**filing** 23:3

**filings** 22:15 37:25

**fill** 33:2

**filled** 69:8 70:7

**final** 251:19

**finally** 114:9 148:9
225:21

**financial** 21:4 22:4,9
188:15 193:18

**find** 33:19 44:18 52:12,
17 59:18 224:6 225:17

**findings** 28:21 225:23
226:2

**fine** 106:20 126:3
148:16 190:1 213:6,9
252:9

**finish** 7:17 74:12 196:9
204:24 231:12

**finished** 118:4

**finishing** 121:15
211:19

**fired** 237:24

**firm** 35:19 41:17

**firms** 37:11

**fit** 96:20

**flew** 60:8 162:12 176:10

**flight** 59:11 60:5 100:7
167:21,25 203:25

209:23 244:11

**flights** 100:13 168:12
204:1

**flown** 55:10 199:4
210:5

**flu** 105:11

**fluctuate** 82:3

**fluctuates** 81:24

**fly** 62:6,7 87:13,25
155:24 158:21 162:9
199:8 201:4,7,12
203:10,12

**flying** 176:10 199:22
201:20 202:6 206:9

**FMLA** 113:8

**focus** 90:17 209:5
230:14

**focused** 209:6,7

**focuses** 80:10

**folder** 42:18,21 43:2

**follow** 157:18 170:15,
17 181:23 198:23,24

**food** 18:2,3,7,23 128:7

**foot** 200:15

**forget** 138:15 219:24

**forgot** 33:11 92:18
142:7

**formally** 244:22

**forward** 243:20

**forwarded** 47:3

**found** 29:5 46:14 205:4
239:13

**Francisco** 149:1

**Frank** 185:21

**free** 64:6 99:25 100:7,
13 123:18 159:4 164:1,
3 193:6

**frequent** 206:3

**frequently** 146:19
194:16

**Friday** 85:2

**friend** 63:8,11,17 154:7
155:2 161:11 163:10
186:20 240:8

**friendly** 134:22,23
135:1 138:15

**friends** 81:20 82:20
87:21 100:24 154:4,15
155:4 157:10,13,19,20,
21,24 158:3,6,19 159:2,
4 161:24 162:2,3 176:9
182:16 186:21,22

**front** 68:6 119:6 127:8
213:20

**full** 9:9 51:20 84:22
85:11,17,18 86:19
103:23 104:13 126:24
215:11 218:2 220:16,19
221:24

**full-duty** 216:6

**full-time** 84:20 85:9,16
144:7 242:9

**fun** 173:16

**funeral** 170:5,7,9
171:4,6,7,11,13,20
209:1

**funny** 191:4

**furlough** 244:15

**fuss** 92:21

**future** 249:17

---

## G

**game** 188:23 189:12

**games** 237:12

**gap** 96:8

**Gary** 35:10

**Gary's** 35:11

**gate** 174:14

**gates** 102:17 103:8
104:1

**gathering** 37:12

**gave** 6:19 18:21 20:2
32:25 38:24 39:6 40:7
47:13 87:17 97:5 98:3

112:2 116:14 150:6
155:8 156:16 159:10
165:13 180:17 185:19
188:10 190:6 191:17
240:2 245:18 246:18

**general** 7:7 39:5

**generally** 87:5,24

**generate** 41:17

**gentleman** 186:15

**Georgia** 19:25

**get along** 125:9

**giddy** 86:17

**girl** 83:5 179:10,19,24
184:5 246:18

**girlfriend** 172:2 239:21

**give** 6:14 7:18,25 8:23
9:9 12:7 14:15 29:1
35:6 38:4 40:21 41:9
53:18 54:7 62:24 63:1,
22 73:1,5 78:5 85:24
100:22 111:14 112:2
114:19 120:23 122:7
128:18,21 129:3,24
130:8,12,19 137:5
141:25 142:1 150:24
155:10,16 156:14
158:11 159:5,10,21
174:14 205:19 225:13
226:25 243:1,17

**giving** 6:22 8:13 37:15,
25 188:9 189:8 191:15,
17 199:16,18 226:7
227:4 233:12 234:16

**glad** 58:4 104:24 169:9

**glass** 11:13

**gmail** 48:7,13,15

**Gold** 129:22

**good** 30:2 81:5,7 83:19
86:18 101:8 104:5
122:20 137:2 184:2
200:4 211:14,20 213:3,
5,11 245:25

**gosh** 14:16 16:10 26:8
29:2 63:3 78:19 128:23
208:21 245:7,17



**governmental** 18:1

**graduated** 66:6

**graduation** 233:7 235:4 236:6,20

**grant** 94:2

**granted** 92:13 93:25 94:4 104:22 222:23

**great** 172:7 191:8

**Greater** 72:15,18,23 74:21 75:10

**grief** 93:13

**group** 150:9

**grown** 189:18

**guess** 10:9 12:8 28:20 38:16,24 39:10 47:5 55:16 58:15 60:6,24 78:9 80:7 81:12 84:2 107:17 128:8 153:25 167:6,18 194:21 200:15 215:3,13 233:9 235:24 239:17 246:13

**guessing** 7:7

**guidelines** 6:14 116:15

**guy** 82:23 138:15,16 174:5

**guys** 80:20 125:3,5 172:10

**gynecologist** 25:8

---

**H**

**hair** 119:16

**half** 33:8,23,24 64:25 65:2 103:18

**hamburger** 175:21

**handle** 36:21 134:21

**handled** 134:21,22

**hands** 49:8 148:7

**handwriting** 185:13

**hang** 24:19 155:2 198:10

**hangout** 198:10

**happen** 7:8 8:17 15:24 112:24 119:10 227:8

**happened** 15:10 16:9 26:10,11 97:8 98:17 112:19,23,24 113:12 114:20 115:10 117:12 128:10 178:17 202:13 206:20 208:14 211:2 212:8 227:22 239:14

**happening** 209:11 218:20

**happier** 75:16

**happiness** 247:3

**happy** 97:12

**hard** 8:5 48:22 49:3 101:3 165:22

**he'll** 36:25 37:3 38:3 39:2 164:6 200:23

**head** 86:7

**healthcare** 25:2,9 31:16 72:15

**hear** 205:17,25 220:10, 11 225:16 235:21

**heard** 98:1 238:7 244:13

**hearing** 189:8

**heart** 33:13 76:11

**heavily** 98:21

**heck** 37:1

**height** 138:8,9

**held** 62:9 132:21 248:1

**helped** 23:2 241:16,17 242:14 243:25 244:6 249:21

**helping** 83:25 84:1 200:10

**helps** 29:21 35:21,25 186:23

**Hewitt** 41:8,14,20 42:6, 24

**hey** 37:1 59:4,10 60:8 61:6 78:4 86:15 90:8 98:3 103:11 131:11 141:24 156:10 158:20

162:8 163:12 168:3,4,9, 11,13 176:10 199:15,18 201:4 223:14 246:2

**hide** 43:1

**high** 65:24 66:3

**hire** 163:8,10 238:5,7 246:4

**hired** 67:19,21,22 86:11 237:19,21 238:11 248:12

**hiring** 52:25 246:23 247:5

**historically** 47:11

**history** 68:16,23 69:12, 18 70:21,23,25 71:1

**hit** 168:9 202:4

**hitting** 202:5

**hold** 128:14

**holiday** 11:14

**home** 73:8 200:23,24

**homeless** 62:25 242:13

**homelessness** 241:4

**honest** 27:12 63:15 67:5 71:18 75:24 94:25 114:1 119:11 131:10 132:2,8 135:5 144:4 146:2 163:21 165:5,10 167:1 171:15,21 173:23 175:14 179:8,24 183:6 191:15 195:13 206:18 212:4 223:15 224:4 240:15 241:1 246:16

**honestly** 40:5,10 52:22 58:17 59:20 75:19 98:22 107:24 146:10 147:25 205:11 209:16 211:15 212:2 245:21 249:6 250:4

**hop** 200:13

**hope** 183:13,14

**horribly** 119:18

**Horse** 49:25

**hostile** 143:11 221:10

**hot** 84:14,18 85:1 119:22

**hour** 247:21

**hours** 9:16 11:16 14:13 18:18 84:24 85:5,19 175:9 177:10 247:23

**house** 13:1 45:8

**houses** 83:21

**Houston** 198:3,6,8 201:4

**HR** 126:16 129:11 133:8 143:5 144:17,22 145:4 148:2 149:9

**huh-uh** 202:17 204:4

**huh-uhs** 8:6

**hung** 226:15

**hurt** 104:16 143:16,17 207:11

**husband** 175:6

---

**I**

**ID** 66:18

**idea** 7:7 132:17 204:2 241:8 250:7

**identification** 19:12 20:23 23:14 34:6 67:14 87:10 89:22 99:13 108:13 124:8 145:19 146:16 185:5,23 195:21 203:2 213:18 215:24 217:21 229:7 238:13 239:2

**identified** 27:10 164:22 166:4,5 248:2

**identify** 25:14 164:25 165:9 231:4 232:4

**Imari** 184:7

**impaired** 9:6,7

**inaccurate** 116:21 117:2 126:11 231:4 232:4,10,12,13 237:4,7

**inappropriate** 119:4 143:6

Elizabeth Gallo
COURT REPORTING, LLC

**incident** 112:5

**include** 14:3

**including** 7:1 104:16 249:3

**income** 18:18,22 41:4

**indicating** 5:16 21:14 29:19 39:17 62:13,15 86:3 119:19 121:19 172:12 184:18 208:20 213:24

**indirectly** 205:19

**industry** 75:2 245:14

**information** 7:2 37:12 38:17 52:7 181:13 226:16,25 227:4 233:13,14 234:16 235:3 239:25 245:19 246:19

**initial** 28:8 39:16 227:5

**initially** 12:9 119:24 120:25 246:21

**injury** 25:21 26:4 31:1 207:11,12 213:23 214:3,12 222:11

**inquired** 244:20

**Instagram** 66:21,22,23 170:18

**instance** 53:6 56:11 122:19 127:17 203:24

**interdisciplinary** 66:11

**interested** 247:6

**International** 92:7,8 94:20 95:14,16 107:15, 18 108:1 145:3

**interrogatories** 12:8 23:18 24:10

**interrogatory** 24:24 31:14 34:20

**interrupt** 8:12,13

**interview** 147:15,18 148:22 151:18,21,23 152:7,11,20 160:1,2 164:18 165:25 169:6 208:8,11,15 218:19

**interviewed** 210:10

**interviewers** 170:4

**investigated** 210:11

**investigation** 152:25 226:1

**involved** 17:7,21

**Iron** 49:25

**IROP** 119:11 120:3,5

**IROPS** 120:8

**irregular** 10:25 120:9, 10

**issue** 99:2 126:8

**issues** 5:11 28:11 109:24 116:1 216:18 223:20

## J

**J-I-N-O** 187:9

**Jackson** 41:8,13,19 42:6,24

**January** 76:23

**Jay-z** 85:3 130:20

**Jino** 187:7,9

**job** 36:9 45:21 52:13, 17,18 53:7,16 68:16 69:1 75:13,14,17 76:13, 22 84:20 85:9,16 101:24 104:8,10 109:23 119:5 145:1 162:18 207:1 211:14 215:18 219:4 220:2 221:6 232:15 237:22 240:23 241:6,10,13 242:9 243:24 246:7 247:25

**jobs** 62:9,14 75:22,25 76:2 244:8 245:4 248:1

**Johnson** 157:5,23

**Jones** 149:14 186:4

**Jovan** 77:2 173:22 176:12 233:11

**judge** 5:9,10 15:21 17:13,19 189:24 191:10

**judgment** 17:11

**judgments** 13:17

**July** 86:14 87:1,3 147:15 164:18 217:6,11 218:9 221:15 240:9,11 243:23

**June** 5:2 172:20,24 173:9,20 177:4 183:11 186:12 187:15,20 196:15 203:25

## K

**keeping** 52:22

**Keesha** 198:25 199:16, 17,22,25 200:1 202:10

**Kelley** 25:16,20 26:18 31:15 51:6 214:17

**Kerr** 89:16,17 106:10 107:2,7 116:14,23 117:2,13,24 118:14 120:17 125:7,15,21,24 127:14

**key** 174:14

**kicked** 105:7

**kid** 5:23 195:18,19 234:22

**kid's** 195:14

**kids** 65:22 67:10 241:18,24 245:23 246:1,4,6

**Kiha** 91:10,20 107:4 148:5,7 149:13 150:19, 20,22 151:3,6 154:5 155:12,20 158:16 159:1 164:25 166:1 167:15 168:13 169:15,19 171:12 172:16 173:21, 24 174:8,19 175:5 177:1,10,12 179:3,16 180:9,16 181:8,22 182:12,23 186:4 187:25 188:10,19 189:12 190:6,14 191:18 192:14 197:4,20 198:9 201:21 203:5 204:18 208:19 209:3,17 224:11 232:24 234:1,6

**Kim** 85:3

**kind** 8:10 11:20 16:18 25:25 28:19 29:21 30:6, 8 31:5,8 32:15 36:6,7 38:15 41:15 53:2 60:11 62:25 63:9 76:9,10 79:14 81:20 84:5,11,21, 25 85:10 92:25 93:8,18 94:11 96:20,21 113:20 114:1 118:22 119:18,19 121:5 131:22 134:23 143:19 162:23 169:18 170:14 174:4 175:4 200:2 201:25 209:19 211:4,6,10,11,16,19 214:18 216:17 217:4 219:19 222:7 223:16,23 226:17 233:3,5 234:5 237:2 242:11,12,13 244:6

**kinds** 125:13 221:11

**knew** 28:19 31:1 58:2 76:8 88:7,13,17 92:7 95:17,19 96:19 132:25 242:11,13

**knowing** 36:7

**knowledge** 44:3 60:12 97:23 180:2,7 181:18 182:6 223:10

## L

**L-U-C-K-Y** 67:1

**La** 245:7,9,11

**labeled** 230:14 231:14

**Labor** 52:21

**lady** 36:4,5 140:7 173:14 198:21 235:14

**Landmark** 64:13

**language** 39:7

**late** 51:21 111:4 226:19, 20

**lateral** 92:4,6,11,13,14 95:21 96:7

**laughed** 132:22

**laughing** 132:17 137:21


Elizabeth Gallo
COURT REPORTING, LLC

Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson
June 29, 2017

law 35:19 38:7 239:18

lawsuit 13:9 227:20,25

lawsuits 14:2

lawyer 248:12

leader 89:15 90:2 107:8 111:7 125:1,8,14 126:9 129:21 149:1 212:23

leaders 105:24 106:1, 2,7 125:11,23 127:14 141:16 159:3

leading 227:17

learn 103:20,25

lease 63:13

leasing 17:14 63:11 64:5,8,12

leave 67:9 74:1,21 75:6 76:13 104:21 105:4 175:19 207:16 218:11, 13

leaving 41:8

Lee 117:8

left 10:22 27:5 29:5 41:17 52:13 62:2 75:14 101:21 103:6 165:13 175:22 206:11 225:20 241:6,10,14 248:5

legal 6:3 13:4,8,15,25 14:1 17:7,20 37:5,7,14 38:4,17

lengthy 231:9

lets 201:2

letter 122:20 127:22 134:4,9 233:11,22 234:15,25 235:6,22 239:7

letters 86:14

level 125:18

license 232:22 233:16, 19,21 234:13 235:1,10 236:9,25 237:9,15

lie 141:12,18 143:18

lied 141:17

life 7:21 14:23 15:16

29:8,24 30:13 75:21 84:13 189:13,20 191:5 197:25 237:10,12 240:16

light 217:3 218:16,17, 21,22,24 219:8,13 221:16,22 223:25 246:11

likes 41:9

Lil' 85:3

limit 233:1

liquor 84:15,16 142:2,4

list 226:13

listed 25:15 31:14 70:18 71:16 72:13 157:23

listen 44:4 45:3 70:15 129:15 137:22 165:22 178:21 190:5,12 192:16 210:20 222:17

listening 148:19 150:15,16,18

listing 69:12

literally 121:22

live 74:1 99:20,23 170:25 197:25

livelihood 175:2

lives 170:24 179:10

living 64:20 74:4 241:4

locate 49:6

location 49:22

locations 71:16,22 72:13,17

lock 51:4

locked 249:22

locks 119:16

log 229:10

long 15:6 16:10 27:23 32:10 38:13 64:14,24 72:6 73:11 77:13 78:13 80:15 87:15 105:1,7 114:2 130:5 132:3 141:22 154:16 159:5,

15,16 161:12,13,15 162:3,4 163:23 172:18 179:6,11,13,18,22 183:19 208:22 210:6 221:9 223:14 229:20 240:13

long-term 105:6

long-time 161:11

longer 27:4 41:13 76:9 135:10

looked 12:15 23:19 44:5 45:10,11 46:1,11, 12 47:7 48:17,23 49:3, 13 50:18,20 59:17 61:23,25 62:3 99:9 119:21 133:19 208:10, 11 211:4,5,20 221:3,4 222:3 249:12 250:8

lost 52:18 90:6 194:12 240:16 248:2

lot 19:10 28:19 34:4 35:25 38:13 42:11 50:9 61:8,18 75:3 76:1,2,4 81:2 83:5 84:12,14,18 85:18 87:20 90:11 98:16,22 103:5 132:19 144:5 162:21,24 163:3, 7 165:1 183:9,12 211:7 217:14 225:11 228:5,6, 17 241:3 245:1 249:1,7

lots 104:2,4

loud 229:23,24

Louis 198:14,18

love 45:13 103:1 125:19 143:17 163:11 201:4

loved 103:17,21 131:15

loving 240:19

lowered 17:19

Lucille 137:7,8 138:5 139:4,9,12,15 141:13 142:12

luck 242:12

M

made 14:18 52:12,17

53:7 58:1 85:12,13 87:20 90:23 94:13 105:1 143:10,12,19 144:17 145:4 152:6,21 158:15 159:6 161:5 164:3 177:16 179:3 180:21 198:19 205:8 208:25 209:2 210:12 221:12 223:2,7 233:15 251:18,20

mail 43:16 44:9,11,25 196:1

mailed 12:5 43:16 48:23 49:24

main 6:1 16:17 123:15 232:14,21 234:6 235:9 236:8 237:14

maintained 94:14

majority 151:3

make 6:15 7:14,21 8:4, 20 13 13:13 15:22 21:6 22:3,19 64:17 69:5 85:25 92:21 93:1 94:23 96:7 109:20 114:8 119:22 120:6 139:13 141:20 143:15 151:15 161:18 167:23 188:2 199:21 201:22,23 202:8,10 214:23 221:23 228:22 231:8 245:8 252:3

makes 46:6 71:4 200:4

making 8:11 18:19 38:1 57:1 101:9 116:6, 16 140:11 159:11 201:21 202:9,11 237:2, 10

male 92:18 96:13

management 80:9 83:3

manager 114:22

manages 195:11

maneuver 74:25

March 26:10,11 115:20 116:4,13 207:17 214:6 241:22 242:10

Marcus 126:9,19



131:6,18 133:19 134:7, 12 141:15 142:10 143:24

**Mari** 7:22

**mark** 19:19 63:18 195:23

**marked** 19:12 20:23 21:3 23:14,16 34:6,8 67:14 68:6 87:10 89:22 99:13,15 108:13,15 124:7 145:18,21 146:15 185:4,7,22 195:20 203:1 213:17,21 215:23 217:20 229:6 238:12,16 239:1,5

**marketing** 81:5 83:20 84:9

**Marquis** 83:8,9

**married** 13:10 65:18 131:13 137:11 175:7

**material** 12:16 40:21

**matter** 165:7 240:5 248:13 251:8

**maximum** 18:21,25 19:2

**meaning** 61:12 132:19

**means** 102:11 252:3,5

**Medallion** 129:23

**media** 66:14 84:7,8,11, 12,19 136:17 196:5,13

**medical** 28:21

**medication** 9:15,18 10:5,24

**medications** 9:12,23, 25

**meet** 40:7 148:8 201:5, 7

**meeting** 60:12 131:6, 22 134:13 166:4 209:11 210:14,22 211:3 212:24 224:11

**Mehret** 149:25 150:1,2, 3,16,22 169:17,18 170:13 173:1,14,21 177:17 178:6 180:9,16

181:10,22 182:25 184:12 198:21 209:17 211:18 230:5 232:24

**Melinda** 31:18 242:2,3

**members** 161:24

**memo** 145:23

**memory** 9:5,19

**men** 144:1

**mental** 95:20 241:4

**mentioned** 65:5 124:22 185:9 222:2

**mess** 97:3

**message** 157:11 168:22 219:25 220:8 225:6,9,20 227:2

**met** 36:6 150:2 154:23

**methodically** 127:6

**Miami** 198:11 199:15 201:4,5

**Michael** 114:23

**middle** 6:7 119:5 121:17 165:7 168:2,10

**Miller-thrasher** 31:18 242:2,3

**mind** 9:1 240:20 246:14

**mine** 63:8 158:20

**minor** 233:12 234:3,17

**Minuscript** 252:16

**minute** 25:13 129:18 145:12 167:8 169:19 182:3 187:17 189:25 194:13 214:24

**minutes** 12:22 24:14 67:12 147:5,22,25 148:4 175:6 197:14

**mispronounce** 26:22

**missed** 14:18 15:19 142:7 248:20

**missing** 116:2

**mistake** 97:4

**mistakes** 251:20

**misuse** 207:6

**misused** 205:4

**mom** 23:4 98:14,23 131:10,12 132:16 156:6 195:11 234:21

**mom's** 135:12

**moment** 6:11 26:21 68:11 71:20 86:10 99:5, 8 107:2 112:1 127:13 140:23 145:12 147:13 160:19 166:14 169:16 208:7 227:14 237:3 248:9

**money** 74:24 159:18 164:6 188:2 202:8,9,11, 16 243:18 245:8

**month** 10:12 19:6 64:17 95:3 103:10 220:11 221:19 246:3

**months** 27:24 36:20 38:14 51:15 63:22 203:21 246:5 249:2

**mood** 10:6,10 29:21 86:5

**Moore** 83:7,8,9

**morning** 33:5 226:21

**mother** 23:3 93:14,18 128:22 131:12,14 132:13,15 153:11,12 154:8 156:7 164:8 179:25 234:21

**mother's** 154:9

**Mountain** 16:10,12

**mouth** 193:4 201:2

**move** 56:3 86:16 92:5, 6,11,13,14 95:21 96:8 119:8

**moved** 81:4 120:25

**moving** 119:8 120:17

**music** 77:1 80:5,8,10 128:18 130:13,15 131:9 132:7,10,11 161:14 162:14,24 163:3,11,13 186:24,25 200:4 202:15

**musician** 75:3

**Musicians** 174:5

**mutual** 82:20

---

## N

**N-I-N-A** 67:1

**named** 82:23 106:10 153:2,8 156:18,23,25 186:16

**names** 31:23 135:22

**nannies** 245:23 246:5

**nanny** 241:16 242:7 243:20,24 244:6 245:22 246:10 248:4

**narrative** 8:1

**narrow** 26:3

**necessarily** 45:17 77:21 94:3,4,11 99:23 163:10 205:9

**neck** 25:23,25 26:1 28:9 207:14

**needed** 62:23 76:11 88:8 163:6 217:4 221:14 226:25 242:15

**Neelys** 128:5,18 131:15

**neighborhood** 74:6

**network** 128:7 130:20

**newly** 62:19

**Niah** 5:23

**nice** 123:5 128:9 137:11 148:8 157:11 202:16

**nicest** 151:12,16

**Nicholson** 156:23 157:23

**nickname** 5:25

**night** 12:19 16:25 120:3,5,8 122:17 213:2, 11

**nights** 85:1 119:12

**Nina9lucky** 67:2

**nonrev** 55:25 57:11



58:20 59:21,23 60:24

**nonrevenue** 54:17,22 56:6,16,23 57:17

**normal** 94:7,8

**notes** 31:8 215:12

**notice** 209:24

**November** 127:23 207:18,19 214:7,14 215:5,17,22 216:5

**number** 19:19 44:20,23 65:11,12,15 67:1 86:21 87:6 102:5,7 106:5,6 165:12

---

### O

**O.C.G.A.** 252:18

**oath** 6:19,21 7:3 22:19 67:17 130:17 147:9

**OB/GYN** 31:19 242:4,7

**objections** 39:6

**obligation** 190:2 249:2

**obtained** 239:25

**obvious** 99:22

**occasion** 89:12

**occasional** 77:11,14 78:13

**occasionally** 11:14 241:23 243:21

**occupant** 64:4

**occur** 110:17 117:15,18

**occurred** 15:5,7,9 18:14 60:11 110:16 142:9 174:15 211:12,16 213:6,24 214:4 227:17 228:1

**occurrence** 119:13

**October** 29:3 111:3 216:3,7 229:11,22 230:15,22 231:15,21 232:9

**odd** 75:25

**offer** 103:23 219:2

**offering** 126:23,24

**office** 76:19,20 117:6 118:2,22 123:8 142:14 147:22 206:4 244:25 245:18

**officer** 247:10

**OJI** 213:15

**older** 139:1 222:16

**olds** 75:24

**on-site** 26:12

**ongoing** 18:20 77:15 79:11 214:18

**online** 52:22 53:1,2 88:8 181:20 182:2 187:4

**open** 89:4 246:23

**opened** 246:25 247:5

**operating** 81:9

**operations** 120:9,10

**option** 226:8

**order** 145:1 224:17

**ordered** 15:20 17:14,16 249:18

**Orlando** 168:16,17

**Orthopaedics** 25:16, 19 26:19 217:16

**orthopedic** 26:4

**OS** 106:3

**OSS** 106:4

**outpatient** 28:4,6

**overhear** 205:12

**overlapping** 169:18

**overnight** 33:3

**owe** 51:24,25

**owed** 13:17 17:15

**owned** 77:2 80:13 85:14

**owner** 17:15 63:8,14 85:11

**owns** 63:7

---

### P

**P-E-R-N-I-C-E** 35:14

**p.m.** 110:13 252:21

**pace** 92:12 95:18

**packet** 42:17

**paid** 16:20 49:19 51:12, 13,25 52:5,7 85:21,23 104:23,25 163:17 164:6 192:6,19,24,25 193:13, 14,21,25 195:7 200:20 202:17 220:5 224:20 242:21 244:2

**pain** 218:15 241:2

**pains** 32:13,14 33:14

**paper** 165:11 252:14

**papers** 21:8

**paperwork** 21:15 164:24 217:14

**paralegal** 35:7,16 37:8, 10

**parents** 123:5 176:10

**Park** 16:16,18

**Parker** 66:2,3

**parking** 15:18 225:11

**part** 55:17 61:9 72:9 82:13 84:21,22,23 90:17 106:9 111:25 129:2,4 132:7,8 143:12 153:16 175:23 180:18 181:21 199:1,2 231:2,5, 6 233:23 235:7 236:25 251:1

**part-time** 84:20 85:9, 16

**partial** 51:19

**partner** 82:21 85:14

**party** 13:4,8 84:17 198:13,17

**pass** 54:22 99:11,17 150:9,11 153:1,7 155:5, 16,21 156:12 160:9 162:1 207:4 208:8

**passenger** 119:23 121:3,10 129:19,23,24

**passengers** 126:14 128:12

**passes** 100:20,22 101:11 123:22,25 147:13,16 148:11 151:20 156:15 158:11, 14 159:10,21 194:17,25 195:4 205:5 207:3,7

**passing** 36:6

**passports** 92:10

**password** 226:1

**past** 32:5 61:4 68:22 225:23

**pay** 14:18 15:20 49:14 51:19 52:4 62:10,12 64:11 195:4 219:20 242:19,23 244:4

**payment** 159:15

**payments** 51:20 105:6

**pays** 195:14

**peace** 144:10 145:9

**Peachtree** 25:16,19 26:18 217:16

**penalties** 6:25 7:1

**people** 5:22,23 16:17 25:15 41:6 58:6 67:24 81:13 83:4 94:9,15 96:21 97:9,22 99:22 100:23 102:8 122:4 135:6,9,10,23 136:6,15 137:15,18,19 138:17 139:21,25 140:3 142:3 144:2 151:15 157:7,18, 19,22 158:5,11 159:1,9, 20 173:16 175:9 176:8 178:11 181:1 200:12,14 205:10,11,12,17 206:25 225:10 238:5 239:20 244:16 246:1 247:15,16

**people's** 135:8

**percentage** 83:24

**Perfect** 8:15

**perfectly** 167:22 180:1 181:6



**perform** 104:8

**performance** 89:14 90:2 104:5 106:1,2,7 107:8 109:24 111:7 125:1,8,11,14,23 126:9 127:14 129:21 141:16 148:25 159:3 212:23

**performed** 104:10

**performing** 187:16,21 188:7,17 190:19 191:25

**period** 69:2,23 71:3,14 161:9 210:8 218:11 248:5

**periodic** 37:5

**periods** 36:18 38:13

**permanent** 63:20

**Pernice** 35:12,13,15 36:3,12,15 39:14 239:16 248:10

**person** 17:15 27:9,15 30:4 35:3,7 52:24 77:16,22 96:23 113:20, 23 114:9 136:10,16,19 137:1,11,24 138:1 142:1 143:12,18 152:22 159:4 161:5,25 170:13 205:14,24 206:1,13,15, 17 217:9 219:19 224:18,19 232:16,19 233:4 238:2 239:22 246:20 248:17

**person's** 35:8 61:10

**personal** 45:18 46:15, 25 61:3,23 78:2,21 143:19 157:19 159:17 174:1 180:2

**personally** 154:2 174:2

**perspective** 104:7 111:18

**pertinent** 165:20

**petition** 19:15,24 20:14

**Philadelphia** 168:16

**Phoenix** 167:5 168:14, 15 197:10,11

**phone** 53:2 65:11,14 149:17,18 156:2 167:18 169:2 183:8 189:25 248:18

**phones** 58:25 65:6,7

**photo** 136:9,11 137:4

**physical** 241:4

**physically** 29:14 119:7

**pick** 203:24

**picture** 131:25 132:1,5 136:24 137:20 183:8

**pictures** 135:4 136:1 139:22

**piece** 165:11

**piecemeal** 110:3

**pill** 29:15

**pilot** 122:20

**pitched** 96:20

**PL** 103:10,11 107:19 114:16 115:6 142:7 147:20 148:17,25 211:4 221:8 225:22

**place** 28:22,23 63:7,9 64:13 69:22 75:23 76:6 83:13 165:4 166:18,24 167:25 168:21 197:5 198:16 199:2 246:10

**places** 69:3 70:11 71:8, 12 72:16 164:19 165:12 166:1,5 198:12 199:23 245:20,23

**play** 189:14

**playing** 188:23 189:20 237:11

**pleasure** 58:1,3,7 101:1 155:17 159:5,8 162:12 170:23 174:13, 20,23 176:7,11,21,24 177:2,11 178:4,7,11,12, 13,19 179:2 182:9,13, 20,23 188:1,11,19 190:14,25 197:20 198:3,7,8 199:9,14 204:8,13,15

**PLS** 103:11 117:20

**point** 8:11,16 16:13,15, 19 40:20 43:8,12 77:25 105:8 118:5 144:24 146:9 160:17 197:6 216:16 219:4 220:22 235:5 249:17 250:5

**policies** 87:6,24 88:8 89:8 99:7,9,11,17 101:17 150:11

**policy** 51:14 88:18,24 89:4 176:2

**polling** 244:1 246:10

**polls** 244:2

**poor** 29:13

**pop** 47:1 48:4

**portions** 134:4

**position** 96:17 97:14 98:7

**possession** 40:17 52:12 58:12 59:25 60:22 62:9

**possibility** 123:25

**possibly** 11:9 15:10 32:7 49:11 50:21 233:5

**post** 245:18

**potential** 123:19,22 145:13

**practice** 10:23 22:13, 14 27:5 29:5

**preceded** 152:16

**precedes** 69:19

**precise** 47:23

**premed** 66:12

**prepare** 11:19 35:21 36:1

**prepared** 34:19,23 170:20 251:9

**preparer** 41:5

**prescribe** 32:21

**prescribed** 29:9 30:9 32:23 33:2

**prescribes** 10:14

**prescription** 11:5,7

**present** 49:7 248:14

**presently** 247:5

**pretty** 12:10 50:6 92:3 107:11 112:15 129:2 147:2 160:16 215:17 227:16 231:1,7,17 232:5 245:14

**print** 41:20 46:18,19 53:6,19

**printed** 46:5,16 47:2,13 53:15,17 54:2,4,12

**prior** 33:8

**prison** 16:25

**privileges** 209:23

**pro** 37:21 38:21

**probation** 127:22

**problem** 33:19 210:12

**problems** 90:13 125:8 174:15

**procedure** 28:4,6 217:4 252:18

**procedures** 31:3

**proceed** 17:16

**proceeded** 121:3 122:2,24 148:20

**proceeding** 13:8,16 17:8,20

**proceedings** 13:4 14:3 17:4

**process** 38:12 49:25 97:17 223:7

**produce** 232:22

**producer** 187:1

**production** 77:1 80:5, 8,9 81:9 162:14 250:12

**Productions** 76:24 77:14,24 80:5,24 82:5

**professional** 137:17

**professionalism** 88:17,23



**professionally** 117:21

**program** 233:9

**project** 84:4

**promise** 58:10 61:16 165:23

**promised** 7:12

**promo** 75:25 76:5 83:20

**promos** 76:19 84:17

**promotion** 84:10

**promotional** 75:22

**promotions** 81:6 84:15

**properly** 150:13

**property** 83:22

**protection** 150:9

**prove** 232:23

**provide** 7:11 37:7 70:25 183:2,3 185:17 236:18 249:2

**provided** 25:3 100:2 185:12 249:3

**providers** 25:3,10

**providing** 7:2 37:5,14

**proving** 115:5

**Ps** 213:5

**psychic** 184:21,23

**psychological** 28:11 30:4,12,20

**psychologist** 27:2,7 28:14 31:6

**pulled** 47:8

**purchase** 159:15

**purge** 223:12

**purposes** 205:5 207:3, 5,7

**pursuant** 252:17

**pushed** 119:7

**pushes** 120:20

**put** 25:7 42:18 49:8 66:22 68:6 70:9 71:13, 17,19 86:4 91:2,3 96:1, 4 121:13 147:20 148:3 193:3 200:13 201:1 213:20 217:1,2 218:15, 17,20,22 219:8 221:16 223:25 226:12 227:11 232:16,17

**putting** 37:12

## Q

**Q-U-A-N-I-A-H** 48:11

**Qs** 213:5

**QU** 5:22

**qualify** 18:19 23:12

**Quaniah** 5:1,4,17 6:1 66:19 148:6 246:4 247:6

**Quaniah2011** 48:15

**question** 7:17,24 8:2, 18,24 19:23 22:8 24:17 29:13 35:2,6 37:16 42:2 44:4 45:3,22 47:23 49:1 54:20 55:8 56:3,4,19 58:11,17 61:19 70:15 71:5 74:12 109:15,19 111:13 116:25 124:19 127:3 129:13,15,16 130:23 133:16 136:20, 25 137:1,23 138:22 144:16 150:22 164:5 165:19,23 167:12 169:11 171:3,4 173:22 174:11 175:16 178:14 180:18 188:5,9,25 189:6,8 190:8,12 192:10 195:9,12 196:9 204:24 210:20 222:17 231:13 234:10,11 251:23

**questioning** 151:4 167:3 171:22

**questions** 7:9 19:11 24:20 40:16 53:14 60:19 78:24 99:22 108:21 146:19 148:15, 23 150:17 151:2 152:14 165:1 190:3 211:13,15

234:23 250:20,22 251:5

**questionwise** 56:8

**quick** 19:16 116:20 222:17

**quickly** 6:15 124:6

**quiet** 144:11,24

## R

**R&b** 200:3

**R-E-N-E-T-R-A** 6:10

**raised** 171:20

**ran** 85:7

**random** 203:24

**rap** 80:10,11 187:12

**rarely** 48:9,12

**raspy** 211:23

**rate** 99:25 100:17

**reach** 27:11 36:24

**reached** 27:9 246:19

**reaches** 36:25

**read** 11:20 31:7 106:24 108:24 113:13 116:18 122:21 123:2 129:1 146:10,11,25 191:10 229:19,21 230:13 251:19

**reading** 251:17

**ready** 12:3 67:23 86:11 121:15 124:18 214:16 216:5

**real** 104:23 122:13 159:6 162:7 164:25 165:22 170:9 173:6 174:1 188:3 198:19 208:25 209:1 222:17 233:22

**realize** 124:5 147:9 215:8 228:19

**reason** 9:5,8 16:6 41:5, 7 79:2 98:19 103:22 105:10 111:17 117:7 127:25 131:11 152:25 153:3,5,6,17,23 158:10

159:20 180:17 187:15, 19 188:6 196:15 234:7 239:13 248:7,25

**reasons** 98:20 126:22 144:6

**recall** 30:19 72:21 94:24 111:15 112:14, 19,21,23 115:24 118:19 125:9 129:3 130:4,9,11, 18,21 131:1 132:14 147:14 155:11 209:11 210:13,14 223:8

**receive** 109:16 124:20 233:17

**received** 44:22 50:17 91:5,13 105:5 112:7 115:18,23 124:15 146:11,13 237:16 239:8

**receiving** 18:23 19:2 38:25 143:7 159:18

**recent** 40:25 43:7

**recently** 23:3 27:8 43:19

**recognize** 21:6 22:3 23:17 24:6 68:8 99:16 104:15 145:22 196:4,12 230:23

**recognized** 152:19 234:1

**recollection** 30:17 78:14 146:21 147:14 213:23 214:3 218:4

**reconvene** 249:16

**record** 20:24 22:6 34:10 47:20 54:10 55:9, 18 68:4 106:21,23,24 120:15 140:21 147:8 163:6,8 203:9,12 207:23 208:2 230:8 250:24 251:11 252:13

**recording** 81:3

**records** 55:11,13,14 169:1,2

**recount** 68:22 230:23

**Red** 64:22 141:4,12,16, 18 143:9



redrafted 39:20

reduced 99:25 100:16

refer 36:10

references 143:20

referred 36:4,13 93:20
245:24 246:18

referring 246:1,6

reflect 57:24 59:25
74:11,15,17

reflected 109:17,24
111:19 196:5,13 235:17

reflects 76:22 77:8
109:7 110:7 229:11

refresh 30:17 213:22
214:3

refreshes 146:20

Regions 243:6,9

regular 10:25 55:24
155:2 215:2 243:8

regularly 9:14,22
242:15

rehire 226:13 227:11

reinstated 233:5
236:16

reiterate 150:21 197:19

relate 62:9

related 20:22 55:6
101:10 128:18 222:4,7

relating 52:12 54:17
55:2,4

relationship 79:7,9
174:3

relay 219:25

relayed 219:19 220:8

relaying 225:6,9

released 14:13,19
16:23,24 214:24 215:1,
11 216:6 218:2 220:15
221:24

reliability 110:21,25

remainder 110:13

remained 103:2 133:13

remember 10:20 14:9
15:19 16:9,12 17:10
18:8 27:14 28:24 30:15,
17 33:7 41:24 72:5,9
73:13 85:6 89:21 90:5
94:25 95:4,5 107:7,9,
21,25 108:8 109:16
112:4,5,7,10 113:5,10,
12,15,25 114:5,14,17
115:2,4,5,10,14,25
116:1 119:14 122:10,
16,19 131:5,7 132:3
134:8,9 137:10,14
138:1,16,18 141:6,13,
22 142:9 145:25 146:1,
2,3,22,23,24 149:20,24,
25 150:7,12 152:9
155:12,14 160:6 166:6,
7,10,14,18,21,24 167:2,
4,9 171:15,21,22
175:19 186:6 197:5
198:9 206:19 207:19
210:4,7 217:14 223:24
224:2,3 225:24,25
240:20 245:21 246:16

remembered 47:3

remembering 217:18

remove 141:9 143:25

removed 133:21 134:1
141:6

Renetra 5:1,4 6:8

rent 13:18 17:11 64:11,
17

rental 17:11

repeat 54:19 109:19

repeated 194:20

repeatedly 249:18

replace 237:19,21

report 17:11 107:12
142:2

reported 105:17 106:6,
10 107:10 129:6,19

reporter 6:19 7:23 8:5
22:5 47:19 54:9 68:3
251:4 252:10,11,14

reporting 68:16

represent 200:5
248:13

reprimanded 135:11
142:13,19

request 34:14 89:25
90:1,23 91:7 93:4 94:23
222:3,19

requested 89:12

requests 39:6

required 104:13
105:13 250:10

reread 186:5

reservation 61:11,14

reservations 55:5 57:1

reserve 67:23 86:12
249:15 250:9,18
251:17,24 252:7

reserved 252:20

Reserving 252:1,2

residency 232:23

resident 170:13 171:1
177:16 178:20 179:9
182:24 233:4 235:11
236:17

resign 74:20 75:12
226:3,5,9,10

resigned 73:13,19
74:5,10 75:7,17

respect 88:18,24

responded 24:9

response 5:16 7:25 8:1
24:15,24 29:19 31:14
39:17 62:13,15 86:3
91:6,13 150:25 172:12
184:18 208:20

responses 23:18 24:3
34:14,20 53:18,23

responsibilities
101:25

responsible 101:9
150:10 175:24

rest 212:9

restate 228:8,10

restaurant 245:5

restrict 216:15

result 207:17

retained 44:14

return 42:4 219:18

returns 40:24 250:11

review 12:2 74:8,14
140:16

reviewed 24:12

reviews 142:2

Richmond 204:1,3

riding 200:17

right-hand 77:9

Road 64:23

Rock 83:13,16 85:8

Rodney 83:3

Roll 66:7

rolls 202:14

romantic 79:7,9

Ron 115:25 117:8

room 128:1

rough 237:13

roughly 10:11 33:16
92:16 207:17,18

route 168:18

rude 119:17 120:2
121:6

rule 58:2 101:3,5
252:17

ruled 17:13

rules 101:10,16 116:7
123:23 124:2 252:18

run 33:13 38:3

## S

safe 74:7

safety 116:7



**salary** 84:3

**sat** 115:6 148:17

**satisfaction** 104:13 105:14

**satisfactory** 104:9

**Saturday** 85:2

**saving** 45:17

**schedule** 91:19,20 92:1

**scheduled** 219:11 247:15

**school** 65:24 66:3 233:12 234:18,20

**scratch** 39:3

**search** 45:8 48:1

**searched** 48:18

**searching** 75:21

**seasonal** 67:22,23 86:11,13

**seat** 119:22

**seconds** 208:5

**secretary** 248:16

**section** 69:12 169:16 231:6

**Security** 18:1 22:24 23:10 247:10

**Sedarius** 157:5,23

**seek** 97:13,25

**seeked** 92:3

**seeking** 76:9 91:19,25 92:1,4,6 97:16

**sees** 184:25

**sell** 83:21

**send** 43:24 44:9 61:10, 11,13 168:18,19 186:7 233:18 235:7,25 236:4, 5 237:16

**sending** 86:14

**senior** 96:4

**seniority** 96:24 97:5

**sense** 46:6 71:4 121:5 162:11 174:13

**September** 29:3 110:20

**series** 7:9 19:17 115:17 148:23

**service** 102:3,9 103:3 105:16 244:1

**services** 25:3

**set** 67:7 76:10 146:18 197:13

**Shaw** 229:14 234:11 235:16

**she'd** 133:25

**Sheandra** 92:3 97:20 203:8

**Sheandra's** 138:9

**shift** 93:4,9,10,24,25 94:3 99:2 121:18 168:3, 10 212:10 213:1 222:21

**shoe** 122:17

**shoes** 117:3,13,14,24 118:10,11,12,15

**shook** 148:7

**short** 105:1 107:16 161:9 210:8

**short-term** 105:5

**shoulder** 25:21,22,23 28:9 207:11,12,14

**shout** 128:18,21 129:4, 24 130:8,12 132:9

**show** 15:22,23 16:21 19:9,14,17,18 20:10,21 21:2 23:16 34:8 40:13 99:15 108:15 123:5 124:6,11 128:23 131:15 145:21 146:18 178:10 180:20,23,25 183:1 185:7,25 188:18 192:19 193:25 195:23 196:22 202:18,25 203:4 238:9, 15 239:4,5

**showed** 89:24 94:8

**showing** 19:22 34:12 114:15

**shown** 87:12

**shows** 60:7 170:22 173:15,17 178:7 181:1 188:11 193:6 195:18

**shut** 123:8

**sick** 16:22 93:16 98:13

**side** 77:9 107:15,16,18, 20 118:23 121:17

**sign** 117:10 220:5

**signature** 238:21,23 252:19

**significant** 77:16 90:6

**signing** 251:18

**simple** 42:2 45:22 61:19 188:25 189:6 234:10

**Sims** 106:3

**sing** 163:5,6,13

**singing** 163:7,25

**single** 14:21 47:10 165:4 197:5

**sir** 6:6 7:6 8:14,22,25 9:3,24 11:24 12:25 13:2,6 17:5 18:6,12,24 19:8,21 22:17,21 24:1, 5,8,11 26:20 32:10,20 33:23 34:1,18 40:14,22 49:21 69:10 81:10 88:10,12 90:21 98:11 99:4,12,19 100:1,5,8, 12,18,21 101:2,12,15, 19,23 102:23 105:8,21, 23 208:4 213:16 214:10 229:5 235:1 248:3 251:7

**sit** 112:14 131:1 159:21 165:3

**sitting** 137:20 143:24

**situation** 16:3 32:14 74:3 76:21 83:25 93:11 94:16 96:14 113:6,10, 11,19,25 115:11 120:4 126:17 129:12

**situational** 193:18

**situations** 74:24,25

**Sky** 103:5,19,21,22 104:1 107:17 126:21 128:2 130:5 132:19 141:4,14,19

**slash** 66:12

**slow** 119:8

**slower** 92:12

**slowly** 120:18 127:5

**smoothly** 6:16

**Snapchat** 67:4,9

**social** 18:1 22:24 23:10 66:14 136:17 196:5,13

**socialize** 154:25

**software** 41:15

**sold** 123:23

**solely** 80:13

**son** 154:8,22

**sought** 23:9 98:9,12,19

**sounds** 83:9

**source** 182:5

**South** 50:1

**Southwest** 53:10 72:3, 4,18 73:6,15,20 74:8,14 244:10 245:3

**speak** 80:7 126:17

**speaker** 149:18

**speakerphone** 148:19

**speaking** 115:25 124:24

**specialist** 26:1,2

**specific** 12:2 47:22 109:21 146:10

**specifically** 51:17 122:16 182:8

**speculation** 96:2

**speeding** 13:23 14:10 15:1,2,12,16,18 16:22

**spell** 6:9 10:3 82:25

**spelled** 232:8

**spend** 12:20 183:4



**spends** 183:9

**spent** 16:25 160:13 183:12

**spoke** 51:11 116:15 126:18 151:15 235:18

**spoken** 36:14,16 154:23

**spot** 84:14 197:9

**spots** 198:10

**spouse** 100:6,7,10 175:8

**spur** 166:14

**St** 198:14,18

**stamps** 18:2,3,7,17,23

**Stan** 141:13 142:12

**stand** 221:9 223:13,14

**standing** 138:19

**Star** 84:7,8,11,12,19

**start** 7:18 90:16 109:4 110:12 140:8 213:21 240:12

**started** 32:16 60:7 67:24 74:23 79:1 80:20 86:14 87:15,19 92:14, 25 103:8 107:19 118:12 121:1 128:11 149:21 164:13 216:17 218:20, 24 241:20,21 243:24

**starts** 120:20 231:15

**state** 35:25 95:20 167:15 173:17 193:18 200:14 204:18 226:17

**stated** 37:10 70:9 117:4,19 119:24 121:13 126:24 143:24 148:20 150:5,14 154:5 155:19 158:15,16,25 166:9,15 168:13 173:11 178:7 180:9 188:9,19 197:4 198:11

**statement** 21:4 22:4,9 39:11 185:11,17 228:1 237:5

**statements** 208:12

**states** 178:12

**stating** 37:9 152:9 171:22 237:15

**statutes** 240:1

**stay** 33:3 63:1 73:11 92:22,23 213:4

**stayed** 17:12 116:16

**staying** 64:6 179:23

**step** 119:8 120:22 122:18

**stepped** 120:24

**Stevenson** 5:1,4,10,17 9:4 11:18 34:9 44:18 45:23 47:23 53:14 55:12 60:18 61:15 66:19 67:16 70:3,15 71:4,20 75:18 78:25 109:5 127:6 129:16 136:16,19,23 137:22 138:21 140:24 141:10 147:8 152:20 165:18 171:14 177:20 178:14 181:3 188:21 189:15,22 190:15 191:3,7,10,23 192:15 193:8 196:10 197:22 204:25 205:4 208:2 217:10 237:2,18 248:25 249:10 250:6,25

**sticker** 19:19

**Stillman** 66:5,6

**Stone** 5:8 16:10,12 19:13 21:1,10 22:7 23:15 34:7,11 47:21 51:22 54:11 67:11,15 68:5 71:10 87:11 89:23 99:14 106:21 107:1 108:14 120:16 124:10 140:22 145:20 146:17 147:4,7 185:6,24 195:22 203:3,14 208:1 213:19 216:1 217:22 229:8 230:10 238:14 239:3 248:23 249:9,12, 15 250:6,15,18,25 251:8,14,16 252:2,5,9, 15

**stop** 42:1 56:2 77:23 79:3,6,7,9,23 93:22 116:25 120:6 124:4

127:2 134:2 140:4,20 141:10 144:13 177:20, 24 178:21 180:11 189:2,17,19 231:12 234:9,13

**stopped** 78:4

**storage** 49:8,9,16,18, 19,22 50:7,8,10,22 249:4

**story** 115:2

**street** 16:17 245:6

**stressful** 92:8

**strict** 101:5

**strike** 140:8 169:5 187:5 198:5

**struggle** 193:22

**stubs** 62:10,12

**stuck** 168:2,6 199:13 200:22

**stuff** 33:13 36:7,9 42:16 43:16 50:14 53:9,10,11 55:21,25 60:4,10,16 61:4 76:5 82:10 85:18 92:25 93:19 98:23 117:9 121:12 122:3 123:6 147:20 148:3 150:20 153:24 163:8 195:14 196:25 205:12 211:7,8,19 221:7,9,11 222:5 227:6 242:13 244:6 246:5 248:4 249:25

**subject** 250:12,21

**submit** 43:5

**submitted** 11:22

**substitute** 244:19

**sue** 239:7 240:3

**suffered** 26:4 213:23

**suggest** 20:5

**suggested** 107:3 235:3

**summary** 230:1

**Sunday** 85:1,2

**supervisor** 26:12 98:4 105:17 119:21,25 121:4 133:5 212:13 225:12 246:22

**supervisors** 46:17 47:3 97:21 103:19 158:16,18

**support** 236:19

**supportive** 228:20

**supports** 227:24 228:3,15,24 229:4

**supposed** 45:12 78:19, 22 92:20 117:22,23 135:1,3 175:17,18,20 215:20 225:3 227:5 248:17

**surgery** 28:3 241:25

**suspend** 165:14 209:23 248:24

**suspended** 219:14,20 220:6 221:17,18 224:1, 11,15,16

**suspending** 234:8

**suspension** 220:9 224:8

**swap** 113:7

**swapping** 113:3

**sweet** 138:14

**swing** 10:10

**switched** 103:12

**sworn** 5:5

**system** 94:8 97:20,24 98:3 217:8

---

**T**

**table** 85:23

**tad** 138:12

**taking** 245:25 251:5

**talk** 25:12 28:18 30:24 36:20 37:19 58:8 79:4, 8,13 86:17 94:19 96:21 101:24 107:4 117:13,14 133:1,2 151:20 168:5


Elizabeth Gallo
COURT REPORTING, LLC

178:24 205:10,11
232:19 233:5 248:17

**talked** 30:10,23 31:2,4,
9 36:23 38:9,14 90:7
93:19 94:5 99:2 107:3
114:10 117:2,6 122:5
132:16,22 140:10
145:12 178:15,21 180:8
207:10 208:10,16
210:24 212:17 222:18
223:2 228:16,20
235:13,16

**talking** 13:25 14:2
37:15 49:23 50:2 55:3
57:3,5,6 60:4 93:4 99:6,
7 111:21,23 122:25
125:11 128:11,14
132:17 147:12 151:18,
21,22,23,24 153:14,18,
20 160:13 164:13
169:19 178:1 186:12
187:14 194:11,12
199:25 203:19,21
205:17 206:12 208:7
212:20,21 213:13
236:15 245:24

**talks** 205:25 206:1

**tall** 138:16

**Taneesha** 126:10
131:6,18 134:13 142:10

**tax** 40:23 41:4 250:11

**taxes** 41:7,11 195:5,7

**Taylor** 126:18 127:1
133:8,25 134:3,12
140:11 141:1 142:24
143:24

**teach** 244:19

**team** 105:24

**telling** 20:5 96:3 126:20
134:3,24 159:9 173:14
180:22 184:9,10,11,15
187:23 189:5 201:17,23
203:5 225:22 235:23
237:6

**tells** 121:21 184:25

**temporary** 93:7 218:25

**ten** 25:4 31:17 36:23
38:9 44:21 68:17 69:13,

19 71:1 80:19 92:16
147:5 203:18 208:5
240:18

**ten-year** 69:1,23 71:14

**tend** 112:15

**term** 105:1,7

**terminate** 226:13
227:12

**terminated** 18:9,21
219:15 220:12 221:19
225:18 226:19 227:24
237:19 240:9

**termination** 73:24
74:18 87:1 219:7 227:9,
18 229:16

**terms** 239:18

**testified** 5:5 193:9

**testify** 9:5,21 130:16
164:6

**testifying** 130:21

**testimony** 6:22 9:9
78:12

**text** 155:25 168:20,22
169:1

**texts** 57:1,23 58:22

**therapy** 26:13 214:18,
20 216:13,14

**thing** 8:10 13:13 15:2,
11,14 16:21 19:14 21:2
38:5 50:21 52:25 55:15
59:8 83:19 84:9 95:3
118:8 126:2,3 132:25
133:15 134:8,20 140:16
143:8 144:23 145:14
146:4 151:8 153:22
155:12 164:23 173:10
183:15 189:10 198:15
199:11 209:8 210:25
213:11 219:9,11,12,23
220:23 223:11,23
225:14 232:14,17,21
233:7,25 234:1,2,4,7,21
235:9 236:8 237:9,14
244:25

**things** 7:14,20 12:5,6
15:15 23:6 28:19 31:5
36:8 38:25 39:1 41:11

42:11 43:7 48:4 49:7
50:9 52:20 75:4,15 76:1
84:16 91:25 93:19
109:2 122:12 123:16
124:5 126:21 128:10
133:18 141:23 143:10
144:7 182:19 225:4
229:10

**thinking** 38:16 75:1

**thought** 29:10,11
45:19,20 81:4 119:3
135:8,12 143:7 144:25
151:6 178:18 216:21
223:10 235:24

**Thrasher** 31:22 243:12

**threat** 73:24 74:18

**three-way** 156:3,4

**thriving** 103:7

**throwing** 168:15

**Thursday** 84:25 85:1,2
248:18

**ticket** 14:10,17,18 15:1,
2,18,20,21 16:20
102:16

**ticketing** 103:20,25

**tickets** 13:20 14:24,25
15:16,17,23

**Tide** 66:7

**time** 8:17,18 9:23 10:18
11:4,14 12:20 14:8,23
15:5 17:13 19:18 20:2,
3,7 21:5,24 24:16 29:12
30:14 32:1 38:13,15
41:8,25 43:22 44:13,19,
22 46:2,17 47:4 49:4,7
50:3 52:6 53:5 54:21
57:13 58:13 59:12
63:19 65:7 67:7 69:3,4
71:3,18,19 72:22 73:7,
15,17 75:1,21 76:1,8
77:10 79:18 81:17
83:13 84:13,18,21,22,
23 85:11,17 86:18,19
87:16 89:17,19 90:2,3
92:1 93:9 94:6,8,13,15
95:1 96:8,19 97:8,21,22
98:17 101:21 103:11,
23,24 104:16,17,22,25

105:3,9,25 106:9,10
107:17,20 108:1 115:6
116:19 118:24 119:12
126:14,25 130:5
131:12,14 132:18
133:6,19,24 135:17
141:4 143:15,18 146:5
147:20 148:17 149:1
158:25 160:13,19
161:4,9,12,13 162:3,4
163:23 166:20 169:25
170:1,13,17 171:12
172:18 177:17 182:25
183:4,9,12,23 196:21,
24,25 197:7,13 199:4,
10 201:22 202:3 206:2,
25 207:20 210:8,23
212:6 215:10 218:12
220:19,24 221:8 222:13
224:4 227:24 230:3
233:1 238:5 240:25
246:20,23 248:5,14,23
250:20,22

**times** 16:1 28:2 29:7,
14,23,25 30:1 31:11
32:2 36:14,16,17,23
38:9 49:5 61:8 104:16
174:20

**title** 150:7

**today** 6:16 7:8,15 9:10
11:19 19:17 60:21
112:14 131:2 208:18
228:16 248:18

**told** 6:11 15:4 17:3
22:14,22 26:21 27:18
35:18,20 51:16 60:11
65:6,17 92:17,20 96:1,
3,6,8,10 97:21 99:5,8
103:11 107:2 110:12
112:1 114:11 127:13
129:7,17,21 130:9
132:12 133:7 134:3
138:20 141:12,15
143:12 144:16,19
147:19 159:14 160:3,4,
8 173:21 174:2,3,18
180:12,16 181:9,10,15,
17,25 182:7,11,12,19,
21,23 183:15,25 184:20
186:17 190:13 196:7
206:2,7 208:17 209:10
210:22 211:12 212:25
219:15,16 224:7,9,10,



Quaniah R. Stevenson vs Delta Air Lines, Inc.
Quaniah Renetra Stevenson

Case 1:16-cv-02571-AT   Document 88-4   Filed 01/07/21   Page 86 of 87
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 303 of 675
June 29, 2017

17 228:3,9,13,23 233:8 235:17 236:1 244:14 248:9

**tomorrow** 158:21

**tone** 149:4 152:1,2

**tons** 139:21

**top** 21:17 70:24 90:14 91:6,21 186:6

**topic** 109:7 171:4,13,20

**Topics** 108:18

**torn** 75:2

**total** 85:25

**totally** 116:21

**touch** 114:2

**touches** 121:23

**tour** 181:5 198:20,25 199:2,4,7,20 200:12 201:8,18

**touring** 81:3 200:7

**townhouse** 17:16

**toyed** 237:11

**traffic** 13:20 15:12 16:3

**trained** 137:15 140:1

**training** 28:15 135:7

**transcript** 191:11 251:10,21

**transfer** 94:20,22

**transition** 75:20

**transpired** 12:10

**travel** 54:17,22 55:3,6 56:5,6,12,16,23 57:1, 17,25 58:3,13,20 59:4,7 99:11,17,25 100:3,10, 17 101:1,11,13 123:18, 19 124:1 145:11,13 147:13,16 148:11 150:11 155:5,17 159:8, 17 160:19 161:1,15,19 163:1 164:11 167:10, 14,17 172:4,7,11 174:19 178:19 194:12, 17,24 197:3 198:8 202:18 205:5 207:3,4,7

208:8

**traveled** 59:23 164:20 166:2,25 169:7,13,16, 24 170:3 171:11,19,23 172:15 186:15 194:15, 19,23 209:2

**travelers** 206:3

**traveling** 177:3,11 192:18 195:3 198:2,6 200:22

**Travelnet** 55:16 59:3 167:20,21

**treat** 26:25 27:23 28:18 30:24

**treated** 25:20 26:2 125:20,24,25 126:12 127:15,17,19 149:6 151:6

**treating** 26:19,25 28:10

**treatment** 143:6 144:18 217:24

**treats** 119:18

**trip** 172:20,23 177:12, 25 178:1 179:1,12 180:5 181:14 183:5,12 186:11,13 187:14,15,19 188:1,6 190:13,24 196:15 199:14 202:22

**trips** 34:2 203:16 210:6

**trouble** 136:21 140:7 216:25

**troubled** 191:11,13

**true** 102:24 183:11 197:23

**truth** 22:15 24:10 184:10,11,16,20 189:9 190:7 191:20,22 193:23

**truthful** 7:12 22:20 35:6

**turn** 24:22 88:14

**turned** 191:5 240:16

**Turner** 83:3

**Turning** 115:16

**Twitter** 170:17 173:4

**type** 15:18 16:3 39:22 46:25 48:3 52:23 66:20 76:20 182:17

**typically** 102:14,15 168:21

---

**U**

**uh-huh** 7:4 21:22 44:24 45:2 47:25 48:19 52:15 54:1,24 56:22 61:20 66:15 68:18 69:15 70:16 73:21 74:13 77:5 87:7 88:1,3,10 90:19,24 91:12,15,23 104:18 105:19 106:12 109:12 110:9,17 115:19,22 116:5,8 124:13,17 125:2 127:10 128:16 143:4 149:10 155:9 156:8,16 160:21 161:8 162:18 163:2 164:21 167:15 172:3,6 181:11 182:1,4 185:13 186:8, 14 187:10 192:17 194:21 196:16 208:9,13 213:25 214:8 217:17 218:1,23 222:20,22,24 223:3 227:21 229:15,18 230:24 231:23,25 234:14 238:17,20 239:6 246:12 247:22

**uh-huhs** 8:6 251:13,14

**unable** 239:24 248:6

**undergrad** 66:9

**underscore** 48:11

**understand** 6:18,21,25 8:19,20,24 37:16 56:18 57:4,21 58:16 59:2,24 67:9 69:5 93:1 98:6 109:21 111:11 120:7 133:3 134:25 143:10 167:23 175:24 176:9 201:16 214:23 239:23 240:4

**understanding** 44:10 56:1 60:10,15,17 61:17 71:13 89:11 150:8 158:17 195:10 236:10, 12

**understood** 94:7 135:2 146:25 239:11

**unemployment** 17:24

**unexpected** 165:2

**unfair** 143:6 144:17 166:23

**unfairly** 126:12,15 127:17

**uniform** 116:15

**uniforms** 50:6

**unit** 50:22

**United** 244:14 245:3

**University** 66:7

**unlawful** 239:13

**unpaid** 14:11,17,25 15:2,16

**unprofessional** 134:19

**unprofessionally** 134:21

**unsafe** 74:3

**upheld** 235:23

**upset** 96:16,23 97:10 206:5

**upside** 191:5 240:16

**user** 66:18

---

**V**

**vacations** 194:20

**Valentine's** 112:9

**Valium** 32:23,24

**varied** 242:20

**variety** 80:11,12

**Velma** 124:25

**Vendell** 153:2,8,13 154:1,6,20 157:25 158:6,12 159:10,21 160:9,10

**venting** 205:2



**verbal** 7:25 109:9,17 111:8,12,15,18 112:2,8 115:17

**verbatim** 152:9 219:24 225:24 232:15

**verbiage** 37:22

**verify** 236:17

**veteran** 126:13 140:3

**Victoria** 154:11,12,14 156:7,14 157:13,16 158:6,11 160:9

**violate** 123:23 124:1

**violation** 16:4 239:25

**violations** 15:12

**Virginia** 204:6

**vocalist** 81:2

**voice** 149:4 211:23

**voluntary** 19:15

**vote** 244:2

**voting** 244:5 248:4

**vouched** 141:15 198:21

---

**W**

**wait** 134:2 140:20 169:19 187:17 240:14 244:17

**waiting** 95:18 119:24 244:16

**waitress** 245:6,8,9

**waitressing** 245:13

**waive** 251:25

**walk** 148:4

**walked** 117:6 118:21, 22,23 211:24 213:11 220:9

**walking** 137:19 211:24

**walks** 121:18,23

**wanted** 28:21 33:12 75:5 76:7 86:19 97:11 103:20 123:3,5 124:5

144:24,25 145:9 208:24 214:17,19 217:3,12 226:3 232:21 235:9 236:8,25 244:12

**wanting** 144:7 234:19

**warning** 109:9 111:8, 12,15,18 112:2,8

**warnings** 109:17

**warranted** 111:19

**watched** 126:13 131:14 135:6

**waves** 119:22

**week** 50:14 51:11 84:24 85:5,19 219:17 240:21 242:18,22 247:13,23 248:18

**weekend** 242:16

**weekly** 141:21

**weeks** 96:12 221:20 225:16 251:9

**Wells** 243:6,15

**whirlwind** 225:5

**whispered** 225:13

**window** 108:1

**wine** 11:13 64:22

**wing** 102:10

**wings** 102:9

**witnessed** 142:12

**woman** 106:10 182:11 189:18 201:18

**women** 144:1,2

**Women's** 72:15,24 74:22 75:10

**word** 30:8 38:16,18 48:1,18 125:17 170:7 174:14

**worded** 225:24

**wording** 39:9

**words** 91:3 130:1 193:3 201:1

**work** 17:17,18 20:5 59:9 60:25 70:6,17

71:6,8,11,12,15,21 72:4,11,12,23 73:13 75:16 77:11,14,21,23 78:14 81:15,17 83:6,23 95:19 103:9 105:12 110:12 111:4 113:8 114:7 115:9 137:25 139:21 141:14 144:10 154:18 157:7 162:19, 20,21,23 163:4,25 168:4 186:21,22 197:1 205:13 214:11 215:2,5, 15,16 216:6,15 218:2, 11 219:18 220:19 224:12,13,15 240:13 241:15 243:24 244:2 247:17 248:6

**workday** 165:7

**worked** 45:13 69:2,3, 22 70:10 71:3 72:2,3,19 73:6,15 76:2,18,23 80:5 82:17,20,24 84:22 95:17 102:21 104:2,4 113:23,24 126:11,18 135:9,18 141:19 143:14 161:13 162:20 212:9 240:25 241:15,16 244:1,2,23 246:9,18

**Workers'** 146:4

**working** 36:19 44:13 45:21 60:2 64:21 65:10 73:16 75:22,25 76:19 78:15 80:23 82:15 83:13 84:3,4,24 85:5,19 94:15 102:11,14,16,19 118:24 120:8,20 121:18 162:25 165:8 206:3 207:1 218:16,24 243:19 247:1 248:4

**works** 35:23,25 37:11 81:13 119:15 157:4 206:6 251:3

**world** 80:10 99:21,23

**Worldwide** 145:24

**worry** 60:16 212:1

**worse** 222:16

**Wow** 119:16 122:1

**write** 37:20 38:2 39:1,2, 15,18 142:14 155:14 156:1 163:14 165:6

185:15 197:9,13,15 242:23 243:2,12

**writer** 163:15

**writing** 164:1

**written** 185:11,17 207:2,6 208:11

**wrong** 113:16 158:25 226:5,10 232:8

**wrongly** 166:22

**wrote** 39:19 40:3,10 122:20 134:25 142:19 155:20 160:11 165:6,12 183:15 185:10,16 197:8,14 206:1,5,7,14, 25 243:15

---

**Y**

**Yahoo** 48:7,11

**year** 10:21,22 11:8,9 14:10,15 15:9 26:9 27:19,20 32:5,12,19 33:8,15,21,23,24 64:16 71:2 72:25 75:24 78:2,4 79:25 80:2 86:2 95:5 107:21 161:17 162:25 216:17 241:22,23 246:22

**years** 25:4 31:17 44:20 65:1,13 66:9 68:17 69:13,19 70:9 71:2 78:18 80:18,19 81:20 83:9 86:21 87:6 103:18 106:6 136:12 137:16 154:17 163:22 167:2 197:7 200:8 203:18 206:19 217:13 240:18

**yesterday** 24:13

**younger** 67:10 75:4,22 139:1

---

**Z**

**zeroed** 234:5



www.GeorgiaReporting.com/Schedule
404.389.1155

**Ben Stone**

| | |
|---|---|
| **From:** | Jones, Kiha M <kiha.jones@delta.com> |
| **Sent:** | Monday, June 8, 2015 3:57 PM |
| **To:** | Stevenson, Quaniah R |
| **Subject:** | RE: "Q"uaniah IMPORTANT!!! 770-572-2878 |

Q-

Please work with your work staff and f... ... to approve Stevenson 2015 my accommodations. These accommodations are not handled/approved by HR.

Thanks,

Kiha

**From:** Stevenson, Quaniah R
**Sent:** Monday, June 08, 2015 3:25 PM
**To:** Jones, Kiha M
**Subject:** RE: "Q"uaniah IMPORTANT!!! 770-572-2878

GoodAfternoon  Khia,
Oh ok Thank You I appreciate you an this. Are you here today? I am if you are in the office just wanting to know if I can come an speak with you about accomadation approval that I been waiting to ask you for permission for, in the words of my PL Carol:-) just a time adjustment for a few weeks until me an my Mother get car situation more balanced.
 Respectfully,
"Q"uaniah

**rom:** Jones, Kiha M
**Sent:** Sunday, June 07, 2015 10:32 PM
**To:** Stevenson, Quaniah R
**Subject:** Re: "Q"uaniah IMPORTANT!!! 770-572-2878

You will need to reapply. The role has been reposted. Pls do so and notify me of our new ref#. Unfortunately, the old requisition has been closed.

Kiha Jones, HR Manager
Airport Customer Service- Atlanta
404-205-2355

On Jun 6, 2015, at 4:04 PM, Stevenson, Quaniah R <Quaniah.R.Stevenson@delta.com> wrote:

> Hi Kiha,
> I am just returning to work as of today. ... you, I am receiving your messages. I am wanting to know if we could set something up for Tues I arrive at work 3PM. As I did try out the system did not allow me to apply for it. It has been less than a month since I had my the initial hire view sent to me. An so I am thinkn it will not allow me to redo unless I am placed in manually somehow. I am just wanting my opportunity chance to do My Virtual that I was not able to do because I was in middle of my Aunts Funeral. Anyway, can u please advise me on these two things with accomadation s as well as my being able to do my virtual. I do have a previous Virtual that they should have on File from last year.
> Respectfully,
> "Q"uaniah

DEFENDANT'S EXHIBIT
Stevenson
N3.4   6-29-17

# Delta Pass Travel Policy

## General Information and Restrictions

> **Find Info Fast!**
>
> Check out the Pass Rider Magazine or World at your Fingertips Fact Sheet for an overview of Delta's pass travel program. More information is also available on the Pass Travel Site (DeltaNet > Employee Info > Employee Connection > Pass Travel).

The **Primary Pass Rider** or **PPR** is the person whose direct relationship and employment status with Delta qualifies that person for Delta nonrevenue and reduced-rate transportation ("pass travel privileges"). This includes regular full- and part-time employees, Ready Reserve employees, retirees, eligible survivors of deceased employees, employees on approved short-term and long-term disability, approved leaves of absence, furlough and certain other inactive statuses.

The Internal Revenue Service (IRS) defines who is eligible for free pass travel privileges within Section 132(h) of the IRS Code. This includes the employee, spouse, dependent children and parents. In addition, Delta also provides privileges to nondependent children, travel companions, Domestic Partners and their children, and Buddy Pass riders ("Buddies").

Pass travel is a privilege granted to Delta employees, retirees and survivors and their eligible family members, designated travel companions, and Buddies. Pass travel privileges (other than those issued for official Company or government business) are to be used solely for leisure or emergency travel.

It is imperative that the information provided in this document be reviewed and understood by all Primary Pass Riders, their family members and designated pass riders who are eligible for pass travel.

> **The Fine Print**
>
> Any employee or pass rider who uses their pass travel privileges for personal business or other purposes not specifically permitted in this document, who engage in the barter, purchase or sale of such privileges, who fraudulently add individuals who are not eligible for pass privileges, or who violate any other provision of this document, will subject the responsible employee and the pass rider to disciplinary action, up to and including suspension of pass travel privileges and termination of employment.
>
> Delta may deny or suspend these privileges to any current or former employee, or eligible pass rider or Buddy, whenever Delta deems such action to be warranted.


**DEFENDANT'S EXHIBIT**
Stevenson

| R | 2/9/2015 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

By using pass travel privileges for themselves or their family members, employees agree that all charges and penalties may be deducted from their pay, including from any final paycheck(s), and that any remaining balance is due to Delta upon termination of employment.

## Restrictions

Delta's pass travel program is a privilege and one of the most generous pass travel programs in the industry. However, occasional situations of abuse dilute Delta's revenue and negatively affect legitimate travel use by other employees and their eligible pass riders.

## Eligibility

If an individual is deemed ineligible for Delta pass travel, they are ineligible to participate in **any type** of pass travel privilege for themselves or as pass riders of any other Primary Pass Rider. For example, a person who was suspended from travel for disciplinary reasons may not become the designated Travel Companion of another employee or travel on his own Buddy Pass privileges or those of another employee.

Commuting is allowed to and from work; however the following is prohibited for any traveler using pass travel privileges:

- Travel for any business activity or professional career whenever the cost of such transportation could be filed with the IRS as a business travel expense (see IRS Tax Topic 511).

- Traveling for independent business ventures or on behalf of an external company or organization. For example: Traveling in order to make a presentation at a trade show or convention, or traveling to transport animals, plants or merchandise for an external company or organization.

- Traveling if the cost of transportation could be reimbursed by an external company organization.

## Additional Restrictions

- Using Delta pass travel privileges to transport checked items on board an aircraft for which the pass rider has no intent to travel (in other words, you're not allowed to check a bag if you're not planning to fly).

- Nonrevenue standby travel is prohibited on any flight for which a pass rider is holding or has held a confirmed reservation (whether the reservation is ticketed, unticketed, or previously canceled). Additionally, individuals may not travel as a nonrevenue passenger on any flight in the same market on the same day they hold a confirmed reservation in that market. This also applies to any confirmed SkyMiles award reservation, Fly Confirmed program reservation or confirmed employee award travel reservation.

- Travel for which the Armed Services provides a travel allowance.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## General Etiquette, Conduct and Dress Code

---

**Find Info Fast**

The "Jetiquette" Fact Sheet provides an overview of Pass Travel etiquette expectations and is available on the Pass Travel site of Employee Connection.

---

All pass riders must conduct themselves in accordance with acceptable standards of business etiquette. When necessary, gate agents are authorized to deny boarding to any pass rider whose behavior is inappropriate.

Observe the following when using your pass travel privileges:

- Do your research. Always check for pass travel alerts, embargoes and baggage restrictions when you are planning your trip. Updates are posted regularly to the Alerts section of the Pass Travel site on the Employee Connection.

- Be kind to your fellow pass riders. Do not list on multiple flights on the same day of travel or on consecutive days to the same destination or to destinations within the same vicinity. Cancel your listings ahead of time if your plans change and you no longer plan to travel on a flight.

- Be discreet and professional. Avoid boisterous or boastful behavior. Any use of profanity is unacceptable.

- Do not allow your actions to identify you as a pass rider to our customers – however, if questioned, it is acceptable to discreetly identify yourself as a Delta employee.

- Do not engage in conversation with other passengers that would obstruct procedural and service duties of the gate agents, flight attendants or other on-duty staff.

- Respect your colleagues who are on duty by cooperating and complying with all rules and regulations. Observe all gate agent and In-flight crew instructions.

- Keep children seated and under control. The accompanying adult pass rider is responsible for the activities of their children to ensure they do not interfere with the comfort of other passengers or the service offered by flight attendants.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

- Be sure to remind your Buddies that their travel is space available and that they may need to make alternative travel arrangements if space is not available on Delta flights.

- Since pass riders are often the last to board and space is limited, they are encouraged to travel light or to check their luggage when it exceeds carry-on size limitations. Federal regulations require that all checked luggage has identification attached.

- Please do not request special services or considerations from ground or in-flight personnel.

## Seat Assignment

- Accept your seat assignment and cabin assignment as issued by the gate agent or flight attendant without question or dispute. Once on board, if asked by on-duty personnel to relocate to another seat, cooperate fully and move as instructed. Any questions should be handled with your manager upon your return or by completing the Online Travel Survey.

- Do not ask other passengers to change their seating.

## Alcoholic Beverages

- Never overindulge in alcoholic beverages.

- Coach passengers must pay for all alcoholic beverages served as well as headsets on domestic flights. If seated in first class, it is not acceptable to carry beverages, food or headsets to other pass riders seated in the coach cabin.

- Employees in uniform are prohibited from consuming alcohol.

- Do not carry drinks off the aircraft.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Meal Service

- Never ask for additional or special meal service (i.e. salt-free, low calorie, etc.) and do not question or argue if your preferred selection of meal option is not available.

- It is appropriate to identify yourself to the flight attendant as a pass rider if there is a meal shortage.

- Pass riders must pay for meals and premium snacks from the "EATS" menu (applicable to certain flights).

## Sky Club

- Delta Sky Club usage is available for use by eligible pass riders as long as they have a valid membership, one-day pass or are the guest of a member.

- Pass riders must abide by and are subject to all the Terms and Conditions of Sky Club membership.

## Federal Regulations

Abide by all federal regulations which apply to all passengers including:

- Remain seated during take-off and landing

- Do not carry explosives, incendiary devices, deadly or dangerous weapons on board the aircraft

- Do not tamper with or disable the smoke detector

- Follow current regulations regarding the use of cell phones or other electronic devices as directed by In-flight personnel/Sky Magazine.

## Dress Code

The pass travel dress guidelines provide you and your pass riders the same flexibility as other passengers when deciding what to wear on your flight.

As a general rule, if the attire is appropriate for a revenue passenger to wear, then a pass rider can also wear the same attire.

This applies to all classes of service on any Delta or Delta Connection flight (Note the exceptions to this policy listed on the next page). Check the Other Airline Index on Employee Connection for the dress codes of other carriers.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

Here are some general guidelines to keep in mind:

| Appropriate | Inappropriate |
| --- | --- |
| • Overall appearance should be well groomed, neat, clean, safe and respectful, from head to toe. | • Passenger that is (or appears to be) intoxicated |
| • Footwear – shoes are required unless the pass rider is not able to wear footwear due to a disability or physical condition. | • Passenger whose dress violates public decency laws and or community standards (examples include clothing that is sheer or inappropriately revealing, clothing designated as sleepwear, underwear, or swim attire) |
| | • Bare feet |
| | • Clothing that is excessively dirty, stained or torn |
| | • Clothing that is vulgar, offensive or `suggestive |

**Exceptions to Delta's Dress Code Policy:**

- Pilot personnel should consult with **Section 11** of the Flight Operations Manual for specific Appearance Standards while traveling in uniform or on Company Business. Those standards take precedence over any conflicting provisions detailed in this document.

- Business casual or approved uniform attire is required when utilizing the jumpseat.

| R | 2/9/2015 |
| --- | --- |
| L | N O |
| D M | #216ATG |
| D # | 0002 |

# Delta Pass Travel Policy

## For International Travel

It is the pass rider's responsibility to have proper documentation for travel. Because of the nature of standby travel, all pass riders traveling to another country should **consider any connecting point (or transit point on through flights) as a final destination** and be prepared with documentation to enter that country.

## Example:

- A passport is required for entry to France, but Green Card holders and citizens of countries other than the United States may also need tourist/transit visas before traveling to and/or connecting through Nice (NCE) or Paris/Charles de Gaulle (CDG).

- When travel originates outside the United States, or for those who are transiting via the United States to another country, for example LIM/ATL/MAD, pass riders must have proper documentation required by Immigration & Naturalization Service (INS) for entry into the United States even if the United States is not the pass rider's final destination. **Examples:** passport, visa, etc.

## Passenger Identification - Valid Forms of ID, International Travel Documents and Letter of Introduction

## Valid Forms of Identification

## For travel within the United States, U.S. Virgin Islands, and Puerto Rico

Every passenger 18 years of age or older is required to show valid, unexpired photo ID upon check-in at the security checkpoint.

Acceptable forms of identification include: Passport, Driver's License, Military ID or Delta employee ID (if the Delta employee ID includes an expiration date). For more information about the types of ID accepted at U.S. security checkpoints, check **the Transportation Security Administration website**.

## For International Travel

It is the pass rider's responsibility to have proper documentation for travel. Because of the nature of standby travel, all pass riders traveling to another country should **consider any connecting point (or transit point on through flights) as a final destination** and be prepared with documentation to enter that country.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

**For example:**

A passport is required for entry to France, but Green Card holders and citizens of countries other than the United States may also need tourist/transit visas before traveling to and/or connecting through Nice (NCE) or Paris/Charles de Gaulle (CDG).

When travel originates outside the United States, or for those who are transiting via the United States to another country, for example LIM/ATL/MAD, pass riders must have proper documentation required by Immigration & Naturalization Service (INS) for entry into the United States even if the United States is not the pass rider's final destination.

**Example:** passport, visa, etc.

## Letter of Introduction

Airline employees are often eligible for travel industry discounts (including hotels, tour operators, etc.). Most discounts are detailed on the Delta Perks site of DeltaNet and a majority of businesses will accept presentation of an employee or retiree badge as proof of eligibility. In certain cases, the business will require the employee or retiree to present a "Letter of Introduction" to identify you as an eligible employee.

> NOTE:  This process does not apply for other airline travel.

## Active Employees

Request a letter of introduction from your direct supervisor for themselves or on behalf of their eligible family members. The local manager prepares and signs on Company letterhead a general letter of introduction. These letters are to be provided to employees only. Delta will not provide such letters directly to private companies, travel agencies, tour operators, etc.

## Inactive & Retired Employees

Retired Delta employees, and employees on certain leaves of absences, may e-mail the Employee Travel Center at passtravel@delta.com to request a letter of introduction for themselves or on behalf of their eligible family members. E-mails should have "Letter of Introduction" included in the subject line. Allow 10 business days for processing.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

> NOTE: Employees who have taken a severance package (voluntary or involuntary) that is not in conjunction with retirement, furloughed employees and survivors are not eligible to receive a Letter of Introduction.

An example of a Letter of Introduction is located on the next page.

| R | 2 / 9 / 2 0 1 5 |
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |



Delta Air Lines, Inc.
Post Office Box 20706
Atlanta, Georgia 30320-6001


*Date*


Subject:  Letter of Introduction


To Whom It May Concern:

This letter is to verify that *name* is *a/an active/retired* employee of Delta Air Lines,
Inc., and *he/she* is eligible for Delta pass travel privileges. Please extend any and
all discounts or courtesies as applicable.

Employee number:
Employment date:

Eligible family members include:

Dependent children:                                    Parents:
1.                          3.                         1.
2.                          4.                         2.


Thank you for your cooperation and assistance. We look forward to serving you
on a Delta flight in the near future.


Sincerely,


*Manager Name*
*Title*

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Annual Activation Fee

Primary Pass Riders who wish to use pass travel privileges (including access to Fly Confirmed for Less Programs, other airline reduced rate travel and flowback from the jumpseat) are required to pay a $50 non-refundable annual activation fee. This includes all eligible employees, retirees and survivors who are eligible for Delta pass travel privileges.

## Annual Activation Fee Exceptions

Emergency (S1A), Relocation (S1) and Honor Roll/Perfect Attendance (S2B) passes can be used by employees, retirees and survivors (as applicable) without having to pay the Annual Activation Fee.  A number of internationally based employees are exempt from the Annual Activation Fee due to local laws.

## Eligibility

A single $50 non-refundable fee covers all pass riders listed in the Primary Pass Rider's account – including Buddy Pass riders – until the next pass eligibility date. Once the fee is processed, it will not be refunded even if the Primary Pass Rider loses eligibility before pass travel privileges are used.

> NOTE: If a Primary Pass Rider has more than one PPR account (i.e. active employee and also a survivor) and wants to use Delta pass travel privileges from each PPR account, the Annual Activation Fee must be paid for *each* account.

## Payment

The Annual Activation Fee is payable every year on the Primary Pass Rider's pass eligibility date. The fee may be paid either before or after the actual pass eligibility date; however the Primary Pass Rider will not be eligible for Delta pass travel privileges until the fee has been paid. The Annual Activation Fee must be paid online on TravelNet and a credit/debit card is the only acceptable form of payment.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

If the Annual Activation Fee is not paid for the new pass eligibility year, any ticket issued in the prior pass eligibility year will not be valid for travel until the Annual Activation Fee is paid. This includes yield fare tickets and Buddy Pass tickets.

## Flight Listing, Travel Alerts and Embargoes

Pass riders must list for flights in advance. Be kind to your fellow pass riders. Do not list on multiple flights on the same day of travel or on consecutive days to the same destination or to destinations within the same vicinity. Cancel your listings ahead of time if your plans change and you no longer plan to travel on a flight.

## How to List for a Flight

To list for a flight, eligible employees, retirees and survivors can log on to TravelNet from the DeltaNet home page. The use of TravelNet is limited to eligible employees, retirees and survivors only.

**You should never share your employee number and password with anyone;**
**You risk compromising Delta's security as well as the security of your personal information.**

Those employees, retirees and survivors without Internet access, as well as other pass riders can list by calling the Travel Line, 1-800 MY DELTA and selecting option 1. Both TravelNet and the TravelLine are available 24/7.

Always obtain the confirmation number of the listing. Be cautious if you do not receive a confirmation number as it may not have been processed correctly.

## Traveling with other pass riders

*Traveling with children age five and younger.* The accompanying pass rider(s) must be listed in the coach cabin. If the party is to be split into two cabins, or if members of the party are traveling on different standby codes, separate listings must be completed; however, if the employee or eligible pass rider desires to be cleared from the airport standby list with their Buddies, the employee should complete one listing. The standby code for pass riders booked in the same flight listing as a Buddy will be downgraded to the S4 standby code. If two employees are listed together in one PNR, both employees will be added to the airport standby list using the pass eligibility date of the employee with the least seniority.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Calling Reservations

TravelNet is the primary resource for pass travel. Occasionally, TravelNet will direct the Primary
Pass Rider to call reservations in order to complete a transaction, such as issuing yield fare tickets or reissuing
Buddy Pass tickets. When calling reservations, please flight list in advance whenever possible and be prepared to
provide the record locator.

Employees should *not* call Reservations to:

- verify a listing
- obtain the number of standby passengers listed
- verify or request seat availability
- verify the boarding status of a pass rider

## Travel Alerts & Embargoes

**Standby travel is never guaranteed.** As you are planning your upcoming trip, check for pass travel alerts,
embargoes and baggage restrictions. Updates are posted regularly to the 'Alerts' section of the Pass Travel site on
the Employee Connection.

## Buddy Pass Embargoes

Reducing the number of pass riders on peak traffic days allows our frontline employees to focus their efforts on
serving our customers. As a result, Buddy Pass travel will be embargoed when appropriate to support operational
and business needs, including in the following instances:

- All new international stations embargo Buddy Pass travel for a one-year period to allow the local station
  team to focus on our revenue passengers, while familiarizing themselves with our pass policies.

- Stations that are experiencing significant passenger or cargo volume and that are the source of significant
  revenue dilution may embargo Buddy Pass travel for a period of time.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Accompaniment of Children

Depending on the child's age and destination, a child may or may not be eligible to travel alone. The following information applies to pass riders traveling on Delta and Delta Connection flights. For travel on other airlines, check with the operating carrier for information regarding their policy. **No exceptions** are permitted to Delta's accompaniment policies.

Here are some general accompaniment rules:

- Children **under age 15** are not permitted to travel unaccompanied on any transoceanic flights, flights to/from Mexico, Central or South America, or on any domestic connecting or through flights.

- If one adult is accompanying two or more children and one or more of the children are ineligible for travel in the first class/BusinessElite cabin, all children and the accompanying adult must ride in coach.

- Children between the ages of 0-5 must be accompanied by an adult age 18 or older and must all sit in the economy cabin.  Minor children between the ages of 6-14 may travel in a separate cabin from the accompanying adult.

- Children age 0-14 must be accompanied by an adult at least 18 years of age, or the child's legal parent, to be considered accompanied.

- On-duty employees cannot be the accompanying adult for a pass rider.

- A pass rider cannot be the accompanying adult for a confirmed child passenger and a confirmed adult cannot be the accompanying adult for a child who is a pass rider.

*Exception: Employees participating in the Airline Ambassadors Make a Wish Foundation or other humanitarian efforts may be the accompanying adult for a confirmed child passenger.*

*Questions should be sent to passtravel@delta.com.*

- Minor children accompanied by adults with a lower boarding priority will be processed from the standby list at the same boarding priority as the accompanying adult, even if it is lower.

- When an eligible child is traveling on an unaccompanied basis, one adult can escort them to the gate after completing the UMNR paperwork and obtaining clearance from a ticket counter agent.

- Always research documentation requirements for children traveling to another country.  For example, children under age 18 traveling to Mexico without both parents should carry a notarized consent letter at all times in the event airline or Mexican immigration representatives request one. If the child's documentation is issued in Mexico, additional documents may be required.

| R | 2 / 9 / 2 0 1 5 |
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Accompaniment Policy by Age

To ensure the safety of children traveling on an unaccompanied basis, it's important for pass riders to be familiar with these policies. Any Primary Pass Riders who deviate from these accompaniment policies will be subject to disciplinary action, up to and including suspension of pass travel privileges and termination of employment.

## Accompaniment by Age

| AGE OF CHILD | RESTRICTIONS | ACCOMPANIED MINOR (UMNR) PROCESS |
|---|---|---|
| Under 5 years of age | **May not** travel unaccompanied on any type of pass program (including Fly Confirmed discount programs). | Not applicable. |
| Between 5 and 14 years of age | • May travel unaccompanied on nonstop flights within the US, Canada and the Caribbean* **except for** travel on nonstop domestic red-eye flights greater than two (2) hours in duration departing between 9 pm - 5 am (not including nonstop flights to/from Alaska and Hawaii, or nonstop flights in markets which only have a single daily flight and that flight is a red-eye flight - i.e. LAX-FLL, SJC-ATL, etc.).<br>• May **not** travel unaccompanied to Mexico, Central America, or South America. | The **UMNR Envelope** <u>must be completed at check-in</u> to ensure that the child is escorted to the gate and met at the final destination by a designated adult. Note that Delta accompaniment services are not available to pass riders and therefore, no fee will be collected. |
| Between 15 and 17 years of age | May travel unaccompanied on all flights.<br><br>Children traveling to Mexico, without both parents should carry a notarized consent letter at all times in the event airline or Mexican immigration representatives request one. See below. | The **UMNR Envelope** is not required unless the child is traveling on an unaccompanied basis with a younger child between the ages of 5-14, in which case the travel restrictions which apply to the youngest child will apply to all children in the party.<br>The **UMNR Envelope** may be completed at check-in to ensure that the child is escorted to the gate and met at the final destination by a designated adult. However, Delta accompaniment services are not available to pass riders and therefore, no fee will be collected. |

| | |
|---|---|
| R | 2 / 9 / 2 0 1 5 |
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## *Additional Restrictions for Children Traveling to Mexico

In addition to normal entry documentation, dependent children under 18 years of age must have the following for travel to Mexico:

- If traveling with one parent, written/notarized permission of the other parent.

- If traveling with an adult other than parent, written/notarized permission of both parents.

- If traveling unaccompanied, written/notarized permission of both parents.

- In the event of divorce or death of one parent, the minor child may travel with the written/notarized permission of the other parent or guardian. The written/notarized permission must indicate that the parents are divorced and that the parent has custody of the child, or that the other parent is deceased.

- If the unaccompanied child is a Mexican citizen traveling with an individual passport, he /she must have permission stamped inside the passport with the following text:
  "El titular del presente viaja de conformidad con el articulo 421 Del Codigo civil vigente."

## Traveling with Children under the age of 2

Infant pass riders under the age of 2 may travel in an approved car seat or be held in the lap of the accompanying adult. For additional information about traveling with an infant, please visit www.delta.com.

## Infant Occupying a Seat

If the infant is traveling in his/her child restraint seat, the infant should be flight listed in the same reservation as the accompanying adult pass rider using the same process as flight listing an adult.

## Infant in Arms (Lap Child)

The option to travel with an infant in arms is limited to children under the age of 2. When traveling with an infant in arms, the accompanying adult's flight listing must be noted with a Special Service Request (SSR) indicating there is an infant traveling as a lap child. After listing the pass rider online in TravelNet, select the SSR option and enter the child's name and birth date into the fields provided.

For domestic travel, a paper ticket is not required; however, for international travel a paper ticket will be issued upon check-in to collect only the appropriate fees and taxes.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Special charges for Buddy and Yield fare pass riders

Buddies and Yield Fare pass riders traveling with an infant in arms on an international flight will be required to purchase an infant ticket at 10% of the adult buddy pass fare and pay any applicable taxes and fees. This transaction is completed at check-in.

## Traveling Solo with Multiple Infants

When traveling with more than one infant, an infant occupying a seat with the child restraint should be listed using the same process as flight listing an adult pass rider and in the same reservation as the accompanying adult pass rider. For an infant that will not occupy a seat, the same listing should be noted with an SSR indicating there is an infant traveling as a lap child. The name and birth date of the child are required in the SSR. For international travel, the appropriate taxes and fees for the infant in arms will be collected upon check-in.

## Flight Check-In Requirements and Procedures

**Find Info Fast!** The "Leaving on a Jet Plane" fact sheet provides an overview of check-in requirements and is available on the Pass Travel site of Employee Connection.

## Check your check-in time

Check-in requirements vary by airport so check **delta.com** before you head out on your trip. Standby passengers need to be at the gate much earlier than confirmed passengers regardless of the minimum check-in time limits. Remember, it's your responsibility to arrive at the airport with enough time to complete all baggage check and security clearance procedures and to arrive at the gate ready to board. If you don't complete the check-in process by the deadlines or if you're not at the gate at the time required for nonrevs, you may not make your flight.

**Agents may refuse seating to pass riders who do not comply with requirements specific to each station. A pass rider's standby code cannot be changed after the local check-in deadline**

| | Arrive at airport | Check in | Be at the gate |
|---|---|---|---|
| Domestic Flights | At least 1 hour prior to scheduled departure | At least 30 minutes (45 if checking a bag) prior to scheduled departure, however, allow enough time to be at the gate 35 minutes prior to departure | At least **35 minutes prior** to scheduled departure |
| International Flights | At least 90 minutes prior to scheduled departure | At least 1 hour prior to scheduled departure, however, allow enough time to be at the gate 50 minutes prior to departure. | At least **50 minutes prior** to scheduled departure |

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Travel Procedures - Domestic Flights

### Check in & add yourself to the Airport Standby List

Pass riders can check in online at delta.com and add themselves to the Airport Standby List up to 24 hours before departure for most flights. Follow these easy steps:

| STEP | ACTION |
|------|--------|
| 1. | Check in online at delta.com home page by selecting the "Check In" button and entering your confirmation # (Record Locator) and departure airport. You can obtain your Record Locator on TravelNet on the "My Listings/Reservations" page. |
| 2. | Select which passengers to check in; If there is more than one passenger traveling, each passenger name must be selected. |
| 3. | Review your Itinerary" screen which will include all flights in the current itinerary. (If you have more than one connection, you will have to be added to the Airport Standby List again at your second connecting point.) |
| 4. | Select your standby listing priority (standby code.  If the trip is international, you will be prompted to enter passport information. |
| 5. | Select the number of bags you will be checking. At the airport, go directly to the Baggage Drop. *Remember* - baggage will not be accepted after the check-in deadline. |
| 6. | Select your boarding document (Seat Request Card) and click "Check In" to be added to the Airport Standby List. |

Alternately, you can check in at the airport. Upon arrival at the originating airport, as early as 4 hours prior and generally no later than 30 minutes (or 45 minutes if checking a bag) prior to scheduled departure for domestic flights and generally no later than **60 minutes prior** to scheduled departure for international flights, pass riders should add themselves to the Airport Standby List by checking in at a kiosk.  Allow enough time to be in the gate area at least 35 minutes prior to scheduled departure for domestic flights and 50 minutes prior for international flights.

> NOTE: Certain stations require check-in earlier than the general guidelines listed above.
> Check www.delta.com for a list of check-in requirement time exceptions.

If a kiosk is not available, you may check-in at any economy class ticket counter or information counter.
It is **not permitted** for pass riders to check-in at the SkyPriority, First Class, BusinessElite, or Medallion ticket counter.

## Pass Travel on Delta Flights

| | |
|-----|-----------|
| R | 2 / 9 / 2 0 1 5 |
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

When using a ticket or information counter to check-in, please be prepared to:

- Present positive identification for acceptable forms of ID)
- Identify yourself as a nonrevenue standby passenger
- Tell the agent your standby code and whether there are connecting flights in your itinerary.

It is the responsibility of each pass rider to know which standby code he/she intends to use and are eligible to use before traveling. Agents are NOT responsible for pass riders who use standby codes for which they are not eligible.

Usage of an unauthorized standby code by a pass rider will result in a penalty of $150 per flight day per passenger for domestic travel and $300 per flight day per passenger for transoceanic travel1. In addition, disciplinary action up to and including suspension of pass travel privileges and termination of employment may apply.

## Special note for connecting flights

If the itinerary includes one or more connecting Delta flights, the pass rider should advise the agent of the flight number and the destination of the desired connection. When there is only one connection, the pass rider's name will automatically be added to the Airport Standby List of the connecting Delta flight.

**If more than one connection** is involved, the pass rider must see an agent to be added to the Airport Standby List at the second connecting city.

## Review Seat Request Card

Verify the standby code is correct. A standby code may not be changed after travel or within the required check-in time limits before scheduled departure. Retain the seat request card - this will be required for clearance through security checkpoints and for boarding the flight. It's also recommended to keep the card for your records.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## At the Gate

Where GIDS (Gate Information Display) screens are available, pass riders should watch the screen to see when they are cleared from the Airport Standby List. Listen and wait for the agent to announce that the pass rider has been cleared for travel and use the seat request card to board.

## International Taxes and Fees

Pass riders traveling on international routes are subject to any applicable international taxes and fees. The amount of these fees depends on the city pair flown and in some cases may be over $100 per pass rider. These are payroll deducted from active employees or billed to inactive and retired employees' home addresses.

## Arrival Fees

Certain countries require payment of an additional fee at the airport in cash before an arriving international passenger can clear customs and enter that country (some countries also allow credit card payment). These fees range from approximately $6 to $150 depending on the city and must be paid by the pass rider directly to the local government official. Pass riders should check with Delta's ticket counter or departure gate in the U.S. gateway city to determine the amount of the fee.

## Departure Fees

Many international cities require that additional fees be paid at the airport before a passenger can depart from the city. These fees vary widely based on the airport you leave from and may even vary by season or day of the week. Pass riders should check with Delta's ticket counter upon arrival to determine the amount of the fee and whether or not it must be paid in local currency.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Boarding Sequence

The boarding sequence for pass riders is determined by both standby code (pass classification) and pass eligibility date. Pass riders using the same standby code and who have the same pass eligibility date will be boarded in order of check-in time as reflected on the Airport Standby List. Other airline employees traveling on industry discount tickets (ZED, ID90, ID75, etc.), are generally assigned a standby code of S4 and the date of travel is used in lieu of a pass eligibility date.

## Pass Standby Codes and Boarding Sequence

The following order will be used to board nonrevenue standby passengers. For a complete description of all Delta standby codes, please visit the Ops data site.

| Positive Space Standby Codes |
| --- |
| PS -- not confirmed, standing by for an earlier/later flight |
| PSUP -- confirmed in coach, standing by for a first/business class upgrade |
| **Space-Available Standby Codes** |
| S1A Emergency |
| S1 Relocation |
| S2 Priority |
| S2B Honor Roll |
| S3 Standard |
| S3B Standard Parent, Nondependent, Retiree |
| S3C Delta Connection |
| S3CR Delta Connection Parents |
| S3D SkyTeam Other Airline |
| S4 Buddy Passes and Other Airline |
| S4B Former Pan Am Participants |

NOTE: If pass riders arrive at the gate after the standby passenger boarding process has begun, they are boarded after all other pass riders regardless of which standby code was selected at check-in.

| R | 2 / 9 / 2 0 1 5 |
| --- | --- |
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## First Class and BusinessElite Seating

Pass riders may be boarded in First Class and BusinessElite when these seats are available, with the following exceptions:

- Pass riders under 6 years of age may not travel in First Class or BusinessElite.

- Parents or accompanying pass riders must travel in the same cabin as their child(ren) and will not be accommodated in First Class or BusinessElite if their child is under 6 years of age.

- According to the interline agreement, Other Airline employees and their dependents traveling on leisure should be boarded in Coach Class. (Note: Delta Connection employees, DGS employees, and Delta General Sales Agents (GSAs) and their pass riders are eligible for travel in First Class or BusinessElite when seats are available.)

- Other Airline jumpseat passengers should be boarded in Coach Class only

    - If a flight is payload optimized, some or all pass riders may be boarded in Coach Class even if First Class or BusinessElite seats are available

## Through Flights

A through flight is a single flight from origin to destination with one or more intermediate stops and retains the same flight number for marketing purposes. When traveling on a through flight, pass riders **must** be listed point-to-point and will be considered a local boarding passenger at all intermediate stops for standby passenger processing.

## Baggage Regulations

Pass riders are exempt from the 1st and 2nd bag fee, as well as the cabin pet fee (see below). Aside from these waivers, pass riders are subject to the same baggage allowances, fees (including charges for special baggage items) and regulations as revenue passengers. Refer to the Policies & Procedures section of the Pass Travel site on the Employee Connection for current regulations and excess baggage fees.

NOTE: Each pass rider is limited to one piece of checked baggage per passenger for designated markets. Check the Alerts section of the Pass Travel site on the Employee Connection for an up-to-date list of impacted markets.

| R | 2/9/2015 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Checked Baggage

All passengers must have proper identification before baggage can be checked.

For international travel, it may be necessary to claim baggage at the gateway city and re-check it at the International Ticket Counter. Be sure to have proper entry documents for connection cities as well as final destination cities. See international entry documentation requirements located in this document.

Pass riders connecting from a standby itinerary on Delta to a confirmed or standby itinerary on Delta or another airline which Delta has an interline baggage agreement may check their baggage to the final destination (except those who are connecting to a confirmed itinerary in Nice [NCE] or Paris/Charles de Gaulle [CDG]). These passengers must provide proof of the confirmed itinerary and must check-in with an agent who will manually enter the connecting flight information; kiosk check-in is not possible. Co-terminal cities do not apply.

## For example:

A pass rider has a standby listing ATL-JFK then a confirmed reservation JFK-FCO. Upon providing proof of the confirmed reservation, his/her baggage can be checked through to FCO by the ATL check-in agent. If the pass rider is not boarded on the ATL-JFK flight, his/her baggage will not be loaded on the JFK-FCO flight.

A pass rider has a standby listing ATL-LGA then a confirmed reservation JFK-FCO. The pass rider is responsible for reclaiming his/her baggage at LGA and rechecking it at JFK - Delta will not transfer the baggage between the two New York airports.


## Carry-On Baggage

Below are required guidelines for carry-on baggage:

The carry-on baggage allowance for pass riders is the same as for revenue passengers. Refer to delta.com for current guidelines and restrictions.

- Carry-on items may be retained in the passenger's custody provided they can be stowed under the passenger's seat or in an approved overhead compartment.

- Baggage stowed under a seat should not infringe upon the leg room of another passenger. Therefore, such baggage should be placed under the seat immediately in front of the seat the passenger occupies.

- The bulkhead seats do not have under seat baggage stowage available. Carry-on items must be placed in the overhead bins.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

⊡ The aircraft coat closets are not approved stowage areas for carry-on baggage items except for garment bags. Once the capacity of the coat closets has been reached, garment bags will be accepted only as checked baggage.

## Cabin Pets

⊡ Pass riders may carry on a cabin pet at no charge in lieu of a carry-on bag

⊡ The number of cabin pets allowed on each flight is limited. Pass riders' cabin pets will be accommodated if the allowable number of cabin pets on the aircraft is not reached after all revenue passengers and their cabin pets have been boarded.

⊡ Pass riders traveling with a cabin pet must check in with an airport agent on the date of travel so their flight listing can be noted that they are traveling with a cabin pet.

⊡ Pass riders should not call reservations or ask an agent to add the flight listing notation prior to the date of travel

---

NOTE: Pass riders who check pets as baggage or cargo are charged the applicable revenue passenger fee.

---

## Delayed, Lost or Damaged Baggage

The same tracking procedures are used to locate a lost article for all passengers. Baggage service agents will file a claim and provide a file reference number for pass riders unless the baggage already shows en route to the pass rider's destination on a later flight (see BSRM 8 for further information); however, pass riders must always conduct themselves professionally and never make demands on or express extreme emotions toward baggage service agents.

Claims must be reported promptly after flight arrival. Pass riders are **not** eligible for reimbursement for out-of-pocket expenses due to temporary loss of baggage. Please visit delta.com to track delayed baggage. If additional assistance is needed, contact Delta's Baggage Service Center at 800-325-8224.

Pass riders are required to pick up their delayed baggage at the airport where the claim was filed, or can request to have it forwarded to another airport for pick-up.

Claims for damaged, pilfered and lost baggage are handled in the same manner as for a revenue passenger. Please visit delta.com/baggage to complete and submit a Damage/Pilferage/Loss claim form and submit within 30 days of the occurrence.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Emergency Travel

The S1A Emergency standby code provides for an elevated standby priority in the event of a life or death emergency. This code is limited to the following situations:

- In the event of the death of a qualified family member
- Hospitalization of a family member due to serious illness or accident with an impending threat of death.

NOTE: Scheduled surgery does not qualify for S1A Emergency use. In the event of a life crisis or extreme circumstance that warrants the S1A Emergency standby code at the discretion of the local manager

## Eligibility

The following pass rider types are eligible to use the emergency travel standby code:

- Active employees, retirees and inactive employees whose leave of absence provides pass travel
- All pass riders listed and active in the Primary Pass Rider's account. Nondependent children and Travel Companions must pay yield fare for S1A Emergency travel.
- Buddy pass riders and Survivors are not eligible for emergency travel.

## Qualifying Family Members

Emergency travel may be authorized if the emergency involves one of the following family members:

- Employee
- Employee's spouse/Domestic Partner
- Employee's child or child's spouse
- Employee's parents or stepparents
- Employee's spouse's/Domestic Partner's parents or stepparents
- Employee's sister/brother or stepsister/stepbrother
- Employee's spouse's/Domestic Partner's sister/brother
- Employee's grandchildren / great grandchildren
- Employee's grandparents / great grandparents
- Employee's spouse's/Domestic Partner's grandparents/great grandparents
- Employee's stepchildren/Domestic Partner's children

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Emergency Travel Procedures

### Active Employees

- Notify the direct supervisor that an emergency has occurred as soon as possible.

- List for travel following the same listing procedure on TravelNet as used for leisure travel. The S1A Emergency standby code may be used for one way or round trip travel.

- At check-in, select S1A at the kiosk.

- Managers review a monthly report which lists all Emergency S1A travel taken by their employees and report any unapproved travel to the Employee Service Center, 951/ATG.

### Inactive Employees & Retirees

E-mail the Employee Service Center (ESC) as soon as possible after an emergency has occurred at passtravel@delta.com. Please include "Emergency Travel" in the subject line of the e-mail and include the following information:

- Name, PPR number and two-digit identifier of each pass rider

- Origin and Destination cities

- Dates of travel

- Nature of emergency and relationship to the inactive employee/retiree of the family member involved in the emergency (see list of qualifying family members above).

---

NOTE: If the emergency occurs after hours, the ESC should be notified as soon as possible or at the Primary Pass Rider's earliest convenience, especially if the Primary Pass Rider is unsure the circumstances warrant usage of the S1A Emergency standby code.

---

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Pass Penalty

Unauthorized use of S1A Emergency standby code will result in a penalty of $150 domestic and $300 transoceanic per flight day and may also result in suspension of pass travel privileges and/or administrative action, up to and including termination of employment.

## Flight Days, S2 Priority and S2B Honor Roll Programs

Delta utilizes a flight day system to allocate the allotment of S2 Priority and S2B Honor Roll Standby Codes, as well as to assess any applicable service charges or pass penalties for travel. A flight day is defined as a 24-hour period beginning with the departure of the first flight. Regardless of the number of *scheduled* departures made during the 24-hour period, the pass rider's allotment will be reduced by one "flight day."

**Example**: Employee travels between Honolulu and Orlando with a connection in Salt Lake City:

- Employee selects S2 standby code at check-in.

- The originating flight departs Honolulu on 01 May at 11:00 p.m. and arrives in Salt Lake City at 9:00 a.m. on 02 May.

- The connecting flight departs Salt Lake City on 02 May at 10:00 a.m. and arrives in Orlando at 4:30 p.m.

- Since the connecting flight has a *scheduled* departure within 24 hours of the *scheduled* departure of the originating flight, only one S2 flight day will be decremented from the employee's allotment.

## S2 Priority Flight Day

S2 flight days are available for pass riders to enhance their chances to board a flight.

## Eligibility

- Eligible pass riders are provided six flight days of S2 Priority standby code travel every pass Eligibility Year. This includes active employees, employees on certain leaves of absence, as well as their spouse/Domestic Partner, dependent children, and eligible parents (**see Eligibility reference for parent S2 eligibility located in this document**)

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

- After completing 1 year of service, Ready Reserve employees and their eligible pass riders are provided six flight days of S2 Priority standby code travel each subsequent pass eligibility year.

- Retirees and Survivors, and their eligible pass riders, are not eligible for S2 Priority flight days.

## Pass Allotments

- S2 Priority flight day allotments are renewed on each employee's pass eligibility date. Flight days may only be used during the pass eligibility year to which they are allotted. The allotment may not be carried over from one pass eligibility year to the next.

- S2 Priority standby code travel is permitted on an unaccompanied basis. Remaining flight days (except flight days used within the past two calendar days) may be checked on TravelNet.

## S2B Honor Roll Flight Day

- S2B Honor Roll Flight Days are awarded to Delta employees in appreciation of customer service which exceeds Delta's normal high standards for customer service. S2B Honor Roll flight days should not be issued if there is indication that a passenger's compliment was solicited. S2B Honor Roll flight days may be used system-wide.

## Eligibility

- The employee and one of the eligible pass riders in their Primary Pass Rider (PPR) account. Employees cannot use two complimentary letters in order to carry multiple pass riders on one trip.

- Honor Roll S2B travel must be completed within one year from the date of the departmental approval and while the employee is on active payroll, company convenience leave (PLOC/SLIP) or military leave. Retirees and employees on other types of leave of absence are not eligible.

- Not more than three (3) S2B flight days may be used in a calendar month. Honor Roll passes may not be used after retirement or while on any leave of absence

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## S2B Honor Roll Travel Procedures

- When an employee wants to use an earned S2B Honor Roll, the employee informs his/her manager and must provide the manager with a copy of the complimentary letter.

- List for travel following the same listing procedure on TravelNet as used for leisure travel.

- Honor Roll awards are valid for 3 flight days. If a nondependent child or travel companion is chosen for S2B Honor Roll travel, a space available yield fare ticket must be purchased before traveling.

- If a parent is chosen for S2B Honor Roll travel on a transoceanic flight, a $75 service charge will apply per flight day.

- The employee must accompany their pass rider for travel on all flights.

- At check-in, select S2B at the kiosk.

- Managers review a monthly report which lists all S2B Honor Roll travel taken by individuals within the manager's department and report any unapproved travel to the Employee Service Center, 951/ATG.

- Any applicable taxes also apply to S2B flight days.

## S2B Perfect Attendance Travel

Pre-Merger Northwest Perfect Attendance passes were awarded to Northwest employees who completed 365 consecutive days of perfect attendance with no tardy occurrences between pass eligibility dates.

This program was discontinued effective June 23, 2009, however employees with active flight certificates remaining have been grandfathered under Delta's Honor Roll program.

Eligible employees received a letter which contained two coupons. Each coupon is valid for one round-trip (up to three (3) S2B flight days) for all eligible pass riders and the maximum stay is 30 days. NW Perfect Attendance passes are valid system-wide on flights operated by Delta or Delta Connection.

- When an employee wants to use an earned S2B Perfect Attendance coupon, the employee must present the coupon to his/her before or within 30 days of travel.
- Retirees: Mail the original Perfect Attendance pass coupon(s) to the Delta Employee Service Center at the address listed below within 30 days after the first date of travel.

Delta Employee Service Center
PO BOX 52045
Phoenix, AZ 85072

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

- List for travel following the same listing procedure on TravelNet as used for leisure travel.

- Perfect Attendance coupons are valid for 3 flight days. If a nondependent child or travel companion is chosen for S2B Perfect Attendance travel, a space available yield fare ticket must be purchased before traveling.

- If a parent is chosen for S2B Perfect Attendance travel on a transoceanic flight, a $75 service charge will apply per flight day.

- The employee must accompany their pass rider for travel on all flights.

- At check-in, select S2B at the kiosk.

- Managers review a monthly report which lists all S2B Perfect Attendance travel taken by individuals within the manager's department and report any unapproved travel to the Employee Service Center, 951/ATG.

- Any applicable taxes also apply to S2B flight days.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Eligibility

- Active Employees, employees on SLIP Leave and Retirees, as well as their spouse/Domestic Partner/travel companion, parents and dependent children may fly using a single S2B Perfect Attendance certificate.

- Employees on military leave of absence and employees on furlough, as well as their spouse/Domestic Partner/travel companion, parents and dependent children may fly using one S2B Perfect Attendance certificate for **each** traveler.

- Employees on sick leave, disability leave, FMLA and personal leave are **not eligible** to use S2B Perfect Attendance flight days.

- Travel must be accompanied (on-duty employees are not eligible to provide accompaniment).

- S2B Perfect Attendance passes do not expire and may be used after the employee retires. Once issued, the ticket expires one year after the original issue date.

- Lost or misplaced perfect attendance letters/certificates will not be replaced.

## Active Employee Travel Procedures

- When an active employee wants to use an earned S2B Perfect Attendance pass, the employee informs his/her manager and must provide the manager with their Perfect Attendance Certificate.

- List for travel following the same listing procedure on TravelNet as used for leisure travel. If a nondependent child or travel companion is chosen for S2B Perfect Attendance travel, a space available yield fare ticket must be purchased before traveling. If a parent is chosen for S2B Perfect Attendance travel on a transoceanic flight, a $75 service charge will apply per flight day.

- The employee must accompany their pass rider for travel on all flights.

- At check-in, select S2B at the kiosk.

- Managers review a monthly report which lists all S2B Honor Roll travel taken by individuals within the manager's department and report any unapproved travel to the Employee Service Center, 951/ATG.

- Any taxes that are applicable would also apply to S2B flight days.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Inactive Employee & Retiree Travel Procedures

Procedures for inactive employees and retirees are the same, except that Perfect Attendance
Certificates should be mailed to: Delta Air Lines, Employee Travel, PO Box 52045, Phoenix, AZ.

## Pass Penalty

If a pass rider exceeds his/her S2 Priority allotments or uses an S2B Honor Roll or Perfect Attendance pass in an
unauthorized manner, the Primary Pass Rider will be penalized $150 per day exceeded for domestic travel and $300
per day exceeded for transoceanic travel. This may also result in suspension of pass travel privileges and/or
administrative action, up to and including termination of employment.

## Employees – Eligible Pass Riders and Allotments

The Internal Revenue Service (IRS) defines who is eligible for free pass travel privileges within Section 132(h) of the
IRS Code. Eligible family members include legal spouse, dependent children and stepchildren, parents and
stepparents. Domestic partners and children of domestic partners may also be designated for pass travel. The value
of their travel will be processed as imputed income. Employees' nondependent children are eligible for yield fare
travel privileges. Employees may also designate a travel companion, in lieu of a spouse/domestic partner, who is
also eligible for yield fare travel privileges.

## Adding, Updating Information or Removing Pass Riders

It is important for employees to inform Delta of any changes in the status of their eligible pass riders. Employees
must report any life events within 60 days of the event. Check out the HR How To site (**Pass Travel > Resources**)
on Employee Connection for instructions on how to manage your eligible pass riders.

# Spouse/Domestic Partner & Dependent Child Pass Travel

## Spouse Eligibility Criteria

An employee and spouse are defined as those persons who are legally married and living together in the same
household. If an employee and spouse do not live together as husband and wife either because they are divorced or
separated, the spouse is not eligible to use any pass travel privileges. In cases in which two Delta employees are
married to one another, the two employees and their eligible family members are eligible for travel on both the
employee's own and the employee's spouse's pass travel privileges.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Domestic Partner Eligibility Criteria

An employee can designate an opposite or same sex Domestic Partner for pass travel privileges.
Domestic Partner eligibility requirements include all of the following:

- Both are at least 18 years of age

- Neither is legally married (or the common law spouse) to any other person and neither is engaged in another domestic partnership

- Are not related by blood

- Reside together in the same permanent residence and have lived in a spousal type relationship for at least six consecutive months.

- Are financially inter-dependent

Imputed income applies for travel by Domestic Partners.
Exception: Delta employees and retirees will not be assessed imputed income for the value of pass travel used by their same or opposite sex domestic partner or same sex spouse who is also eligible for tax-free travel as an employee or retiree of Delta (or Northwest), a Delta Connection carrier or a Delta Subsidiary. The employees should submit the Domestic Partner Family Status Change Form to the Employee Service Center within 60 days of the life event for approval of the imputed income exemption.

## Divorce, Death, Separation or Termination of Domestic Partnership

When circumstances such as death, divorce or separation cause the eligibility of a family member to cease, the employee should notify the Employee Service Center within 60 days of the event so that pass travel privileges are revoked for the ineligible pass rider(s).

---

NOTE: Travel privileges ultimately belong to Delta and not the employee. A court may not award Delta pass travel privileges to an ex-spouse.

---

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Designated Travel Companions

Employees can designate a Travel Companion in lieu of their spouse/Domestic Partner. In this situation, the spouse loses all pass travel privileges (including Emergency S1A pass travel privileges).

## Dependent Children Eligibility

A closer look at pass travel…your dependent children include:

- **Natural or legally adopted children:**  who are under age 19 or are full time students from age 19 to their 24th birthday, who live with you on full-time or, in the case of divorce/separation, live with the other parent and you pay more than 50% support.

  In the case of adopted children, once adoption procedures have begun, a child will be eligible for pass privileges beginning on the legal adoption file date or the date the child is placed in your household for adoption, unless adopting a newborn. When legal adoption procedures have begun and you have financial responsibility for the child from birth, privileges will be effective the date of the birth with proof of financial responsibility and adoption documentation. The following adoption documentation may be submitted:

  - Photocopy of adoption placement order
  - Photocopy of Petition to adopt
  - Adoption finalization order
  - Applicable international paperwork for international adoption (must be translated into English prior to being submitted to the Delta Employee Service Center)

- **Stepchildren and children of domestic partners/same sex spouse:**  In this case, the children need not reside in your household to be eligible for pass travel privileges; however, they must be receiving at least 50% support from you or your spouse/domestic partner. Pass travel privileges for stepchildren and children of domestic partners will end immediately if you and your spouse or domestic partner separate, divorce or end your relationship.

- **Children Mentally or Physically Incapacitated:**  Your mentally or physically incapacitated children who are unmarried, and totally and permanently incapacitated, if the child was disabled before turning age 19 or age 24 if a full-time student. These children are not eligible for interline passes or interline reduced-rate privileges. Incapacitation approval is required. Contact the Delta Employee Service Center for details.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

- **Legal Guardian Children of Employee:** Children for whom you have been appointed as the legal guardian by a court, who meet the other criteria for natural born and legally adopted children, and who live permanently in your home (other than time spent living away at school). These individuals are not eligible for interline passes or interline reduced-rate privileges. The effective date of pass eligibility will be the first day of the pay period following the guardianship assignment.

- **Foster Children of Employee:** Foster children who have been placed in your home as a foster child by an authorized placement agency or by judgment, decree, or other order of any court of competent jurisdiction, have never been married and reside with you.

- **Full-Time Students:** Your dependent children who have graduated from high school or reached their 19th birthdays, whichever occurs first, may be approved for full dependent pass privileges until their 24th birthdays if they are full-time students of an accredited university, college, or a United States Armed Forces Service Academy (U.S. Military, Naval, Air Force, Coast Guard or Merchant Marines Academies). Eligibility criteria for full-time students are the same as the Delta Family-Care/Pilots Medical Plans. Most interline pass and reduced-rate privileges cease at age 24. Check specific carrier for requirements. Children who reach age 19 and are not a full-time student or who have reached their 24rd birthday will automatically become a nondependent child

- **Children of Employee's Domestic Partner** need not reside in the household of the employee to be eligible for pass and reduced rate travel privileges but must be dependent on the employee, never married and a full-time student if between the ages of 19 and 22 years.

- **Children in the military:** your child between age 18 and until age 24 who is on active duty status with a local country military service or the U.S. Military (Army / Navy / Air Force / Marines / Coast Guard) or active/inactive duty status with the National Guard and Reserves and is not married nor has ever been married. You must complete an Employee Family Status Change form and submit it with a copy of your child's military orders showing active status. The form can be sent via US mail to: Delta Employee Service Center, PO Box 52045, Phoenix, AZ 85072 or via fax to FAX number: 602-797-6261. Your child will not require yield fare tickets for his travel, however, for U.S. domestic employees, the yield fare value will be reported as taxable income. You will pay only the income taxes on the travel value. These children are not eligible for discounted travel on other airlines.

Please note that most interline privileges cease at age 23 – please check specific carrier for requirements.

Your dependent children may travel using the same boarding priority allotments that you do as an employee or retiree, and can travel unaccompanied at that priority, as long as they meet certain age requirements. See "Accompaniment of Children"

| R   | 2 / 9 / 2 0 1 5 |
|-----|-----------------|
| L   | N O             |
| D M | # 2 1 6 A T G   |
| D # | 0 0 0 2         |

# Delta Pass Travel Policy

If, on your dependent child's 19th birthday, he/she is not attending an accredited university, college, U.S. Armed Forces Service Academy or participating in a qualified missionary service on a full-time basis, his/her dependent pass travel privileges will continue for an additional 90 days unless he/she marries or becomes employed on a full-time basis. In most cases, your child will be eligible for nondependent pass travel privileges at the end of the 90-day extension period.

If your dependent child, age 19 up to age 24, graduates from school or no longer qualifies as a full-time student, his/her dependent pass travel privileges will continue for an additional 90 days unless he/she marries, becomes employed on a full-time basis, or reaches age 24. In most cases, your child will be eligible for nondependent pass travel privileges at the end of the 90-day extension period.

**Note:** If a dependent child becomes a nondependent midway through a trip, he/she must purchase a yield fare ticket for all remaining segments and board the remaining segments using the S3B standby code.

▣   Nondependent children eligibility: a closer look…

A nondependent child is one who was a dependent child of the employee but has either turned 19 years old and is no longer a full-time student, or is age 24 or older. Nondependent stepchildren, nondependent children of Domestic Partners and legal guardian children may be approved for pass travel privileges provided they were the employee's dependent child until age 19.

Once your dependent children turn 19 and are no longer full-time students or missionaries, or once your dependent children who are full-time students or missionaries turn 24, they will automatically transition to nondependent pass travel privileges.

Nondependent children must purchase a yield fare ticket in advance of using pass travel privileges. The standard standby code for nondependent children is S3B. A nondependent child of an active employee can upgrade to the S3 standby code using the kiosk when the nondependent is accompanied by you, booked in the same flight listing as you, and you are also using the S3 standby code. If the nondependent isn't in the same flight listing as you, an airport agent can manually change the nondependent's standby code from S3B to S3 as long as both you and nondependent are traveling together and using S3 standby code. Standby codes cannot be changed after the flight check-in deadline. If you are traveling on the S2 standby code, the nondependent will remain on the S3B standby code. Nondependents are eligible for S1A emergency travel; yield fare tickets are required. Pass eligibility of nondependents ceases upon your death. Nondependent children are not eligible for yield fare travel on codeshare flights operated by other airlines.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## 90-Day Extension Period

- ☐ If, on a dependent child's 19th birthday, he/she is not attending school full-time, his/her dependent pass travel privileges will continue for an additional 90 days unless he/she marries or becomes employed on a full-time basis.

- ☐ If a dependent child, age 19 up to age 24, graduates from school or no longer qualifies as a full-time student, his/her dependent pass travel privileges will continue for an additional 90 days unless he/she marries, becomes employed on a full-time basis, or reaches age 24.

---

NOTE: If a dependent child becomes a nondependent midway through a trip, he/she must purchase a yield fare ticket for all remaining segments and board the remaining segments using the S3B standby code.

---

## Travel Allotments – Employee on Active Payroll Status, Spouse & Dependent Children

The employee, spouse and dependent children are eligible for travel on Delta and Delta Connection flights system-wide utilizing the following allotted days:

- ☐ **S3 Standard Leisure –** unlimited S3 flight days
- ☐ **S2 Priority –** six (6) S2 Priority flight days
- ☐ **S1A Emergency –** as defined in this reference document.

---

NOTE: Domestic Partners, same sex spouses and dependent children of Domestic Partners/same sex spouses are eligible for the same allotment but the value of travel will be added to the employee's paycheck as imputed income unless both partners are Delta employees. If both partners are Delta employees they may request an imputed income exemption as previously described in the section entitled, "Domestic Partner Eligibility Criteria."

---

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Dependent Certification

To help make sure only eligible dependents are using travel privileges, employees and retirees will be asked to annually certify their relationship to all dependents (including travel only dependents) on file. After the online certification window closes, employees and retirees who are certified may be randomly audited and will have to provide proof of relationship to their dependents. Any dependents that are non-certified during either the online certification or the random audit that follows will be removed from pass travel eligibility. Employees and retirees are also required to certify their understanding of an agreement to follow Delta's Buddy Pass Policy on an annual basis. Certified employees and retirees will continue to have access to the Buddy Pass Program. Non-Certified employees will be dropped from the Buddy Pass Program.

## Parent Pass Travel

**Find Info Fast!**

The "Mom and Dad Have the Travelbug" fact sheet provides an overview of Parent Pass Travel privileges and is available on the Pass Travel site of Employee Connection.

Employees may add up to four parents for pass travel privileges; however, the person added must be either the employee's legal parent or stepparent (currently legally married to the employee's parent). If the employee's legal parent dies, the stepparent continues to be eligible for parent pass travel privileges.

If the employee's legal parent and stepparent divorce, the stepparent is no longer eligible and the employee must remove the stepparent from eligibility. Foster parents, legal guardian parents, domestic partners of parents and in-laws may not be added as a parent to pass travel privileges.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Travel Allotments – Parents

An employee's marital and dependent status determines his/her parent flight day allotment. Parents are eligible for the following pass travel privileges for travel on Delta and Delta Connection flights systemwide:

| Employee Type | S2 Priority Flight Days *No Charge* | S3 Flight Days *No Charge* | S3B Flight Days *$75 service charge per transoceanic2 flight day* |
|---|---|---|---|
| Employees with a same or opposite sex spouse/Domestic Partner or designated travel companion | Not Eligible | Not Eligible | Unlimited Allotment |
| Single employees (without dependent children, travel companion or Domestic Partner | **1-2 Parents:** Each parent receives six S2 Priority flight days. <br><br> **3-4 Parents:** All parents share a total of 12 S2 Priority flight days, not to exceed six per parent maximum | Eligible for 18 S3 flight days to be used for Transoceanic travel. Allotment shared by all parents. | Unlimited Allotment |
| Single employees (with dependent children, but no travel companion or Domestic Partner | All parents share a total of six S2 Priority flight days. | 18 S3 flight days shared by all parents to be used for transoceanic travel. | Unlimited Allotment |

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

In addition to the privileges detailed previously, parents may qualify for S1A Emergency Travel or S2B Honor Roll Travel.

## Accompanied Travel Exception

Parents of employees who have a spouse, Domestic Partner or travel companion may only travel S3B. However, parents may upgrade to the S3 standby code when traveling with the employee who is using the S3 standby code.

> NOTE:
> - When used on transoceanic flights, the $75 service charge will still apply.
> - This does not apply if the employee is traveling on an S2 Priority standby code in which case the parent's standby code will remain S3B.
> - Parents of employees who travel on S3 standby code and do not meet the preceding criteria may be assessed a flight abuse penalty (charged to the employee) and/or suspension of pass travel privileges.

## Yield Fare Tickets

The yield fare is a cents-per-mile charge with a minimum fare of $15 one way or $30 round trip (the United States, Canada, Mexico and the Caribbean Islands) and $75 one way or $150 round trip (Africa, Europe, Asia, Central America, South America and Transoceanic). Additional international taxes and fees, if applicable, will be charged at the time of ticketing.

Yield fares are automatically calculated at the time of purchase and employees can obtain the fare ahead of time by using the Yield Fare Calculator located under the Tools menu on TravelNet.

## Purchasing Yield Fare Tickets

- Yield fare tickets should be purchased by the Primary Pass Rider ahead of time on-line using TravelNet or at a Delta ticket counter. Yield fare tickets can also be purchased directly by the pass rider by calling the TravelLine in which case the caller will be offered the option to transfer to speak with Reservations to purchase the ticket. Pass riders should not call Reservations separately for this purpose.
- Yield fare tickets are valid one year from the date of purchase as long as the pass rider is eligible for Delta pass travel privileges. The pass rider must be active in the Primary Pass Rider's TravelNet account in order to use a yield fare ticket.
- Unused yield fare tickets may be refunded according to Delta's corporate refund policy.
- Yield fare tickets may be reissued for a different destination without penalty.

| R | 2/9/2015 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Pass Travel while Absent from Work

Pass travel privileges vary based on the type of absence from work.  Employees on any type of approved leave are **not eligible** for reduced-rate travel on other airlines.

## Travel while Absent from Work due to Personal Illness or Injury, Pregnancy or Family Leave

When employees are absent from work due to illness or injury, they must take steps to facilitate their return to work as quickly as possible.  In addition, employees must refrain from any activity inconsistent with their medical restrictions and from any activity that could delay their return to work. These requirements apply to an employee's use of pass travel privileges, as well as any other activity.

Managers may verify usage of pass travel privileges of an employee who is absent from work due to illness, injury or FMLA, by sending an e-mail to HR.ATG951@acs-inc.com, with "Flight History Request" in the subject line and include the employee's full name, 9-digit PPR number, date range and reason for the request in the body of the e-mail.

## Intermittent Sick, Unscheduled PPT, Intermittent Family Medical Leave (FMLA)

Not eligible for pass travel privileges unless approved by the employee's local manager in advance.  Travel is usually only approved for emergency situations.

## Certified Time, Short-Term Disability (STD), Pilot Temporary Disability, Continuous Family Medical Leave (FMLA)

An employee already approved for short-term disability by Sedgwick CMS (or for pilot certified for temporary disability by Harvey Watt) does not need permission from his or her supervisor prior to travel.  The employee and his/her family members are eligible for travel on Delta and Delta Connection.

## Workers' Compensation

Not eligible for pass travel privileges unless approved by Sedgwick or Harvey Watt for disability.  If on an approved disability status, employee will receive the applicable disability pass travel privileges.

## Long-Term Disability (LTD)

See Leave of Absence reference document

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Approved UMLOA (Leave of Absence Policy) or other absences due to illness or injury

Not eligible for pass travel privileges.

## Travel while on Military Leave and Company Convenience/SLIP Leave

Eligible for the same pass travel privileges as regular active employees on Delta and Delta Connection flights systemwide.  Separate pre-approval is not required for travel.

## Travel While on Personal Leave

Employees and their pass riders are eligible for unlimited travel on Delta and Delta Connection flights systemwide by purchasing S4 yield fare tickets and S1A Emergency yield fare tickets.

## Employees on Long-Term Disability

Disabled employees are eligible for pass travel privileges while they are receiving monthly benefits under the provisions of a Company-sponsored long-term disability (LTD) benefit program based on the employee's consecutive years of service at the time that their approved LTD leave began.

- **Employees with at least 10 years of consecutive service** at the time their approved LTD leave began are eligible for unlimited S3B pass travel privileges while they are receiving monthly benefits under the provisions of a Company-sponsored long-term disability (LTD) benefit program.

- **Employees with less than 10 years of consecutive service** at the time their approved LTD leave began will have unlimited S3B pass travel privileges **for the length of their years of service <u>only</u>.**  All pass travel must be completed before eligibility ends. For example, if an employee had 7 years of consecutive service when their leave began, their pass eligibility will end 7 years from the date the leave began and they remain ineligible for pass travel privileges until they return to work.

- **Employees are not eligible for retiree pass travel privileges** if they retire from an approved LTD leave with less than 10 years of consecutive service prior to the date their approved LTD leave began.

| R | 2 / 9 / 2 0 1 5 |
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Travel Allotments

Employees are eligible for travel for themselves, as well as their spouse/Domestic Partner, dependent children, nondependent children, travel companion, and parents.

## Travel by Employee, Spouse/Domestic Partner, Dependent Children, Parents

These pass riders are eligible for unlimited free S3B flight days (parents pay $75 per transoceanic flight day) every pass anniversary year for use on Delta and certain Delta Connection flights systemwide.

### Travel by Nondependent Children, Travel Companion

Eligible nondependent children and travel companions of employees on an approved LTD leave are eligible for unlimited S3B yield fare tickets for use on Delta and certain Delta Connection flights systemwide.

## Emergency Travel

All pass riders (except buddies) of employees on an approved LTD leave are eligible for S1A Emergency flight days. The employee should follow the Emergency Travel procedures as outlined in this reference document.

## Retiree Pass Travel

### Retiree Pass Travel Policy

Retirees are eligible for the same pass travel privileges as active Delta employees, with the exception that leisure travel is limited to S3B standby code.  Retirees are not eligible to travel using the S2 or S3 standby codes. All applicable international fees and taxes will be billed to the retiree's home address.

### Pass Riders added after Last Day Worked

If an employee marries, adds a Domestic Partner, or adds dependent children after his/her Last Day Worked and is still eligible for pass travel privileges, these family members will be eligible for pass travel privileges until the death of the employee.  Pass travel privileges for pass riders added after the employee's Last Day Worked (as defined below) cease upon the employee's death.

**Last Day Worked** is defined as the earlier of a) the last day the employee is on active payroll status; or, b) the day before the employee begins an approved short-term disability leave of absence.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

> Find Info Fast!
>
> *The "Look at the Sky, Life's Begun" fact sheet provides an overview of Retiree Pass Travel privileges and is available on the Pass Travel site of Employee Connection.*

## Eligibility

Full-time, part-time and ready reserve employees must meet one of the following criteria at the time of retirement in order to be eligible for retiree pass travel privileges:

- At least age 52 (age 50 for pilots) and has completed at least 10 years of consecutive service since the most recent date of hire, **or**

- At least 25 years of service, with at least 10 years of consecutive service since the most recent date of hire. An employee retiring directly form Personal Leave of Absence, Long-Term Disability or Denied Disability status must be at least age 52 (50 for pilots) and have at least 10 years of consecutive service prior to the start of inactive status.

## Calculating Consecutive Service

- Time while on furlough, Company Convenience Leave (PLOC/SLIP), Delta Recovery or Delta Workforce leaves of absence, Short-Term Disability (STD) and Military Leave is included in the 10 years of consecutive service requirement.

- Time while on an approved Personal leave of absence or LTD leave of absence is included in the 10 years of consecutive service requirement if the employee returns to work prior to retirement.

- Employees may retire directly from an approved Personal leave of absence, an approved LTD leave of absence and receive regular retiree travel privileges if they are at least age 52 (or age 50 for pilots) and have completed at least 10 years of consecutive service prior to the beginning of their approved Personal or LTD leave of absence.

- Employees may retire directly from an approved Unpaid Medical Leave of Absence (UMLOA) and receive regular retiree travel privileges if they are at least age 52 (or age 50 for pilots) and have completed at least 10 years of consecutive service prior to the later of their Last Day Worked (as defined below) OR the end of their STD leave of absence.

- Employees may retire directly from a suspension or denied disability status and receive regular retiree travel privileges if they are at least age 52 (or age 50 for pilots) and have completed at least 10 years of consecutive service prior to their Last Day Worked (as defined below) **AND** they retire during the first 180 days of the suspension or denied disability status.

| R | 2 / 9 / 2 0 1 5 |
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

For example:

- An employee who was continuously employed by Delta from January 1, 1990 to January 1, 2002, resigned, then returned to work January 1, 2004, and retired January 1, 2006, *would not be eligible* for retiree pass travel privileges.

- On the other hand, an employee who was continuously employed by Delta from January 1, 1990, to January 1, 1992, resigned, then returned to work January 1, 1995, met the age requirement of 52 (50 for pilots) or the 25 years of service requirement and retired January 1, 2007, *would be eligible* for retiree pass travel privileges.

## Survivor Pass Travel

> **Find Info Fast!** The "Keep on Flying" Fact Sheet provides an overview of Survivor Pass Travel privileges and is available on the Pass Travel site of Employee Connection.

Eligible survivors are defined as the employee or retiree's spouse or Domestic Partner, and dependent children. Survivors are limited to S3B standby travel on Delta and Delta Connection flights systemwide and are not eligible for reduced-rate travel on other airlines. In addition, survivors are not eligible for Emergency S1A travel. Surviving family members of Ready Reserve employees are not eligible for survivor pass travel privileges. Pass riders added after the employee's/retiree's Last Day Worked are not eligible for survivor pass travel privileges. All applicable international fees and taxes will be billed to the survivor's home address.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Delta Pass Travel Policy

## Eligibility Criteria and Travel Allotments

The specific pass travel privileges vary based on the employee's age, years of service and status at the time of their death, as follows:

## Employees on Active or Inactive Pass-Eligible Status at Time of Death

- Survivors of an employee with **at least** 10 years of consecutive service are eligible for unlimited lifetime space-available S3B flight days systemwide (dependent children are eligible until the child attains nondependent status).

- Survivors of an employee with **less than** 10 years of consecutive service are eligible for unlimited space-available S3B flight days systemwide for a period of 10 years following death (dependent children are eligible for a maximum period of 10 years following death or, if earlier, until the dependent child attains nondependent status).

## Employees on Retirement status at Time of Death

- Survivors of retirees who left the company at age 52 or older (age 50 for pilots) with at least 10 years of consecutive service upon retirement are eligible for unlimited lifetime space-available S3B flight days systemwide (dependent children are eligible until the child attains nondependent status).

- Survivors of retirees who left the company before attaining age 52 (age 50 for pilots) or who retired with less than 10 years of consecutive service are not eligible for pass travel privileges following the retiree's death.

Note: Pass travel privileges will be available to the surviving spouse/domestic partner for an unlimited number of years regardless of whether or not the spouse remarries. For surviving dependent children, pass travel privileges will generally be available until the child reaches age 19 (or age 24 if a full-time student or missionary). Survivors who are eligible for pass travel privileges may also select a travel companion. Parents and non-dependents are not eligible for survivor pass travel.

| R | 2 / 9 / 2 0 1 5 |
|---|---|
| L | N O |
| D M | # 2 1 6 A T G |
| D # | 0 0 0 2 |

# Topics Discussed with Employee

0412-80620 RECORD 11-99

| Employee: | CSA Quaniah Stevenson<br>EN 689688<br>DOE 08/01/2007 | Manager/Supervisor: | Caldwell – PL<br>Morrison – Mgr |
|---|---|---|---|

| Date | Topics Discussed |
|---|---|
| 08/26/2012<br><br>Caldwell | **1:1** – Q was advised that she can start work at 3pm for the remainder of the bid and to report to the 3pm briefing each day. Q was reminded to always report to this briefing before reporting to her position. |
| 09/30/2012<br><br>Caldwell | **Reliability**: Discussed with Q the importance of improving her arrival into work. Q was reminded that she's required to be in briefing at her scheduled start time and clock in. Q mentioned that she's in the market of looking for a new car and this will help with her on-time arrival. Q currently have 1 occasion on 1 day and 4 times tardy. |
| 10/11/12<br><br>PL. Lee<br>Shreve | **Coaching:**<br><br>Q was late to come to work and she was sick on 9th Oct, due to she still working on car, I've advised that she must improve immediately. It shows last 3monts 2days 4Tardy<br><br>This is unacceptable. On 9th October Q did not know she needs to call sick line and Sedgwick. Informed Q that she needs to call sick line for report. It will take an action if Q is not improving reliability. |
| 2/14/13<br><br>PL. Lee | **Job performance – verbal warning**<br><br>On 14th Feb, Q checked in wrong person at the counter and it was caused inconvenienced passengers and gate agents also violated security.<br>Has been advised that she must focus to the PNR ensure check-in correctly and verify with passport before end of transaction.<br>E-mail from   the boarding Gate:<br>Today I had Mr. Hernandez Oneto (GZS6JQ) GM that checked in local at F-con with his spouse and infant. Mr. Hernandez Oneto stated that the agent that checked him in had issues checking him in and also could not assign his seat next to his spouse (GZMVII).   He also stated he could not understand why he was in zone 3 as a GM and she stated "To address it at the gate". The GM also stated that he is a GM and its not on his boarding card!   So the following is what happened once I verified all the issues at the gate While Boarding! The agent Ms. Stevenson checked in Mrs. Lozano the GM's spouse and then went by the last name of Mr. Hernandez and the flight number and proceeded to check in Mr. Juan Hernandez (G40JVJ) that was transiting through ATL from LGA and never checked in at the Lobby. Ms. Stevenson also added additional bags to Mr. Juan Hernandez without charge and incorrectly since the bags did NOT belong to Mr. Juan Hernandez.   Once the GM approached the gatehouse while boarding he requested to sit next to his spouse and this is when I realized that he had the wrong boarding card as well as 2 bag tags with the other passengers name.   If checked in correctly they were seated together from the beginning and if Ms. Stevenson checked in the right person she would have noticed that as well as noticed that Mr. Hernandez was connecting from LGA. This caused major issues at the gate since the bags were under another passenger as well as Mr. Hernandez Oneto was upset. This also means that Mr. Hernandez Oneto also went thru security with Mr. Juan |



DEFENDANT'S EXHIBIT
Stevenson
9   6-29-17

# Topics Discussed with Employee

0412-80620 RECORD 11-99

Hernandez boarding card since they both are JUAN HERNANDEZ!  However if verified by Ms. Stevenson one is JUAN JOSE HERNANDEZ ONETO and the other JUAN M HERNANDEZ.

So my concern here is that Ms. Stevenson looked at Mr. Hernandez Oneto passport and never realized that this was not the correct Hernandez. So I checked him in at the gatehouse while boarding. I input the passport info and had to add the bag tags from the tags he had stapled to the boarding card. This is a major security issue since everything that was done was under the other Hernandez. The ZN sign is the primary agent Silvani Enriquez whom was signed in when I jumped in to help so it can be verified that the passenger was checked in at the gatehouse.   Can this please be addressed with the agent!

DL RECORD LOCATOR GZS6JQ        ETKT PRESENT-SEE ETR* AND *TI
1. 1HERNANDEZ ONETO/JUAN JOSE**FF2652201597-FF AWARD 35000
1 DL 351N 14FEB4 ATLMEX HK1    545P  836P      ON 12C     *B
2 DL 368N 17FEB7 MEXATL HK1    345P  800P      RS 23B
HA FAX- ** SSRS PRESENT ** UPGRADE DATA PRESENT >*UPG
   1.OSI TYPE L
   5.OSI DL FF2652201597-HERNANDEZONETO/JUANJOSE **GM**
GEN FAX- ** SSRS PRESENT **
FONE-ATL 678 621 3659
TKT-TK/TE/1104P/21JAN
¥>
>*351-14F<
DL RECORD LOCATOR G4OJVJ        ETKT PRESENT-SEE ETR* AND *TI
1. 1HERNANDEZ/JUANM
HDQAAJUFRVQ/AG3C/99999999/MIA/AA/T/US/USD
1 DL 781T 14FEB4 LGAATL HK1    100P  337P      ON 28A     *B
2 DL 351T 14FEB4 ATLMEX HK1    545P  836P      ON 14F     *B
3 DL 484T 19FEB2 MEXJFK HK1    227P  807P      RS 42F
HA FAX- ** SSRS PRESENT **
   1.OSI DL CTCH MIA19144374403 H
   6.OSI DL KIOSK/14FEB/LGA/1056/DOC P ADDED LGAMEX 14FEB
9145925
E986
¥>

| | |
|---|---|
| 2/19/13 | **Coached – Swap policy:**<br><br>On 1st Feb, Q swapped with agent but Q called FMLA reported in Sedgwick therefore agent Stephenson, Shaughna A worked for Q but she could not get paid.<br><br>Has been advised that now on if MPS is not approved swap is not honor. |

**Topics Discussed with Employee**

0412-80620 RECORD 11-99

| | |
|---|---|
| | Due to company policy Q must followed company policy. |
| 12/2/13<br><br>Lee Shreve | **Verbal Coaching**<br><br>Quaniah has been advised that she need to improve time management.<br><br>On 2nd Dec she came to work 30min late but will not dock however she will stay late 30min. |
| 3/9/14<br><br>PL. Lee Shreve | **Verbal Coaching**<br><br>Discussed with Quaniah due to she failed clock in and daily also she failed attended briefing on 9th Mar. she was tardy and has been advised Quaniah that she must follow the company policy and time management. Ms. Quaniah told me that she was at the counter instead of coming to briefing.<br><br>Expectations are clock in and out timely manner and need to be attending briefing unless communicate with PLs or PSAs on duty. Agent Quaniah agreed she will follow up company policy. If happening again in the future it will taken action.<br><br>Also I've refer to EAP for personal consulate. |
| 22Mar14<br><br>PL Ron Segura<br><br>PL Lee Shreve | **Verbal Coaching – Attendance/Reliability**<br><br>Had another conversation with Quaniah regarding her inability to arrive to work on time. Despite Quaniah's conversation with Ms. Lee on 09Mar14 she was 1hr tardy on 21Mar14 and 20min tardy on 22Mar14. Quianiah's attendance review reflects 3 days on 3 occasions and 5 times tardy. Quaniah has also failed to clock in and out as required.<br><br>Quaniah explained that a personal issue at home causes her to be late for work. We recommended EAP and advised her that FMLA maybe an option if her personal issue qualifies. We referred her to Sedgwick but Quaniah showed us a letter from Sedgwick as proof that she has contacted them.<br><br>I advised Quaniah that her current absences and tardies are not covered and she must follow through to see if she qualifies. Quaniah stated that she understood. I advised her that she is required to clock in and out on time and she is expected to be in briefing on time.<br><br>I explained to Quaniah that any future absences may result in further corrective action. Quaniah stated that she understands and she will be to work on time…starting tomorrow.<br><br>PL Ron Segura |
| 23Mar 14<br><br>PL Ron Segura | **Safety – On the Job Injury**<br><br>Quaniah mentioned that she may have injured herself on Friday, 21Mar 2014. She mentioned the possible injury as she was leaving. She stated that she is not reporting the injury because she doesn't want to miss work. I immediately questioned her about the injury and informed her that we will report to A27 tomorrow to write formal report.<br><br>I advised Quaniah that she must report on the job injuries immediately. I explained the 24hr window to report injuries. Quaniah stated that she understands and will report injuries on time if she sustains another. |
| 03/07/15<br><br>Carole Kerr | Spoke to Quaniah about uniform guidelines her shoes were out of compliance .She had on a grey undershirt with a short sleeve and also a few bracelets. ~~She~~ explained that she had always done this and no one said anything. I also spoke to her regarding her reliability she is consistently coming in late .She stated she had various problems .we spoke to her on seeking an accommodation or seeking swaps with later agents |

# Topics Discussed with Employee

0412-80620 RECORD 11-99

| 04/03/2015 | Spoke to Quaniah regarding being on time she stated a few issues with her and we had her call EAP. |
|------------|---------------------------------------------------------------------------------------------------|
|            |                                                                                                   |
|            |                                                                                                   |
|            |                                                                                                   |
|            |                                                                                                   |



**▲Delta Air Lines**

**Internal Memorandum**
Date: 11th Jan, 2009

To: **Quaniah Stevenson**
From: **Velma Edwards,** Performance Leader, Atlanta Worldport
Subject: **Warning Letter** – Job / Performance

Quaniah Stevenson , a review of your attendance records over the past few months, shows that your attendance is below standard, the following dates listed below you never showed up to work.

1/4/09
1/5/09
1/6/09

Quaniah, your failure to consistently report to work as scheduled places a burden on your co-workers and hinders the operation. Therefore, you are being issued a warning letter.

Quaniah, we have also discussed you being tardy on several occasions.

Quaniah, immediate and lasting improvement in your attendance is needed. Failure to improve this area of your performance, or any infraction of company policy or failure to meet company standards will result in a recommendation of termination of your employment.

We expect you to take whatever steps are necessary to improve your attendance. Please remember I am available to assist you in any way possible, but the ultimate responsibility for improvement is yours.

Velma Edwards- Bleau

I have read and fully understand the contents of this letter.

_____   1-11-2009
Acknowledgment of Receipt                    Date

cc: Manager
    Personnel File



DEFENDANT'S EXHIBIT
Stevenson
10

**Delta Air Lines, Inc.**
Dept 125 – Atlanta Worldport

To:      Quaniah Stevenson, 689688, CSA, Dept.127, ATL

From:    Marcus Caldwell, Performance Leader, Atlanta Worldport

Date:    November 23, 2010

Re:      Probation Letter – Unprofessional Conduct

Quaniah, on Monday, November 8, 2010, while assigned at the B25 Sky Club (reception desk), you displayed unprofessional conduct while assisting a Gold Medallion passenger.  Per the Gold Medallion passenger and by your own admission, you asked the passenger to assist you with the promotion of your music career through a "shout out" on her cooking show or via the networking circles she is affiliated with.  Additionally, per the passenger, you took pictures and asked for an autograph.  You also called your mother and handed the phone to the passenger so your mother could speak with her.  Furthermore, you continued to exhibit inappropriate behavior when you asked another Sky Club member to relocate to another seat to accommodate this passenger's travel party.  This service failure is very serious and has the potential to cause not only revenue loss to the company but also great distress to our customers.

On January 11, 2009, you were advised in a Warning Letter that your job performance was below standard and improvement was needed or further disciplinary action would be imposed.  Additionally, on November 8, 2010, you were verbally advised of the need for improvement in your attendance.  The necessary improvements in your attendance have not been forthcoming and your overall job performance has not improved as evidenced by your recent display of unprofessional conduct as well as your recent tardy on November 8, 2010.  A review of your previous twelve-month attendance record reflects two days absent on two occasions and three times tardy.

Quaniah, your conduct and unprofessional behavior is unacceptable.  At Delta, all employees are expected to take an active part in maintaining high standards of work, appearance, professionalism, and conduct set and maintained by Delta and expected by our customers.  Given that, you are receiving this Probation Warning Letter to ensure you understand the severity of your conduct.  Additionally, with this Probation Warning you will be placed on probation for a minimum of six months.  Any salary increases which may occur will be withheld as long as the probationary period is in effect.  You will not be eligible to bid on any other positions nor will you be able to participate in the educational assistance program for the duration of the probationary period.  Additionally, the requirement for you to submit a doctor's certification for each absence is also extended for a minimum of six months.  This certification must include the doctor's signature, diagnosis, treatment date(s) and date(s) unavailable to work.  Failure to submit the proper certification by the appropriate date could result in further disciplinary action.

DEFENDANT'S
EXHIBIT
Stevenson
11
6-24-17

It is imperative that you realize the seriousness of this situation and take immediate steps to improve your behavior. Any further display of inappropriate behavior or other infractions of company policy or failure to meet Company standards may result in further disciplinary action up to and including termination of employment. I am willing to assist you, but the ultimate responsibility for correcting this area of concern is yours.

_Marcus Caldwell_   11/23/2010

Marcus Caldwell, Performance Leader – ACS/127
Atlanta Worldport

I have read and fully understand the contents of this letter.

Acknowledgment of Receipt                     11/23/2010
                                                          Date

cc:  Manager / Personnel File

**▲ DELTA**

| | |
|---|---|
| **Mike Campbell** | **Delta Air Lines, Inc.** |
| Executive Vice President | 1040 Delta Boulevard |
| HR & Labor Relations | Atlanta, GA 30354 |
| | Mike.campbell@delta.com |

# MEMO

To:      Delta Colleagues Worldwide

Date:    April 23, 2014

Re:      Pass Travel, our Brand and the Bottom line

Pass travel privileges allow us to see the world with our close family and friends, and it is rightfully considered a highly valued perk.  We all have the responsibility to maintain the highest standards and integrity with this privilege, and the vast majority of us do just that. However, over the past few years, we have found an increasing number of individuals who are abusing these privileges, harming our brand and our bottom line.

Even though this represents the actions of only a few, it impacts all of us because it does not align with our values as laid out in the Rules of the Road, jeopardizes the integrity of our company and chips away at our profitability.

Travel Companion and Buddy passes can be found for sale online every day.  In several cases, "pass travel brokers" run underground businesses to make money unethically selling hundreds of passes – a situation that continues to escalate.  In other cases, employees have sold their travel companion designations to others or even fraudulently designated individuals as eligible family members.  Some employees have even used their privileges to travel for other jobs or side businesses.

Actions like these hurt us all on a number of fronts:

- When individuals are being sold passes at inflated rates and misled to believe they have purchased confirmed tickets on Delta, this often results in them being stranded for days.  This can cause a disruption to our operation and significantly damages our company's brand and reputation.
- When employees or their pass riders are using travel privileges for their personal business gain, this hurts Delta's revenue – and therefore your Profit Sharing – since these passengers would have otherwise purchased tickets on Delta.
- When individuals are flying under false pretenses, they may be taking seats away from you or your eligible pass riders.

These actions are clear violations of the pass policy and will not be allowed to continue.  In the absolute worst cases, our pass privileges have been used for suspected criminal activities.  Like with any criminal activity, we take this very seriously, not only as a legal matter but also as a violation of Delta values – and, therefore we will pursue action to the fullest extent.


DEFENDANT'S
EXHIBIT
Stevenson
12
63947

Advance the Brand the Bottom Line
April 23, 2014
Page 2

Starting today, we are launching the *Fly Right* campaign.  For the vast majority of us, this will simply be a reaffirmation of what we already do.  For others, it will shed a light on any abuse that must stop.  A new Pass Protection Group will work to proactively identify cases of possible abuse and investigate them thoroughly.  This team has already identified a number of cases of suspected fraud and is in the process of following up with employees involved.

As always, the team will adhere to a thorough and objective investigation process before any action is taken; employees involved will have an opportunity to explain any questionable travel activities.  Decisions by operational leaders and our HR and Equal Opportunity teams will only be made after careful consideration of the information gathered by the company and the employee's explanation.  As we learn from these investigations, we may pursue some policy, process, or technology changes in the future that will help stop abuse in the system.

The vast majority of us take great care to represent Delta in the best light and use pass travel as it was intended - to allow us to see the world with close family and friends.  Thank you for your integrity and your help in protecting the brand we've all worked so hard to build.

# FLY RIGHT –
# PASS PROTECTION FAQs

**Q1.    Why does Delta offer pass travel to employees and retirees?**
Pass travel is a special and unique privilege offered in the airline industry to employees and their eligible pass riders to experience the service and destinations offered by the airline. Delta offers a generous pass travel program to Delta employees, retirees, survivors and their eligible pass riders. Pass travel is offered for leisure travel only and using it for business purposes is not allowed.

**Q2.    Who can I share my passes with?**
You may choose anyone to be your buddies or Travel Companion, but choose carefully. The best approach is to only extend your travel privileges to trusted family members and well known friends who will use your privileges properly for leisure travel only, and who will represent you and Delta in a positive way when traveling. The IRS dictates which family members are eligible for free pass travel which include spouses, parents and dependent children (son, daughter, stepchildren). Please see the Pass Travel Site on DeltaNet for eligibility details. Make sure all your pass riders understand the challenges of standby travel abide by professional behavior expectations and are prepared with backup plans.

**Q3.    Who should I *NOT* share my passes with?**
- Don't share your passes with people who have lost their pass privileges due to misconduct. They are not eligible for *any* type of Delta pass travel privileges.
- Don't share your passes with anyone who intends to use pass travel for business purposes or who would otherwise purchase full-fare tickets.
- Don't share your passes with people who do not understand or do not have the tolerance for standby travel.
- Don't offer standby travel to someone who intends to travel to an important event they *must* attend. For example, standby travel isn't the best choice for traveling to a wedding for someone who is in the wedding party, or who has prepaid for a vacation without travel insurance.

**Q4.    Can I use my passes for business travel, other than Delta?**
No. Delta's pass travel privileges are for leisure travel only. Using nonrevenue standby travel or Fly Confirmed discount tickets for business purposes hurts Delta's bottom line and in turn, your profit sharing. Using travel privileges for business purposes can result in loss of travel privileges and even termination from employment.

**Q5.    Can passes be used for commuting?**
Yes. Commuting is allowed to and from work except for the following:
- Pass travel may not be used for any business activity or professional career whenever the cost of such transportation could be filed with the IRS as a business travel expense (see IRS Tax Topic 511).
- Pass travel may not be used if traveling for independent business ventures or on behalf of an external company, organization or individual. For example: Traveling in order to make a presentation at a trade show or convention, or traveling to transport animals, plants or merchandise as part of any business venture or business arrangement is not permissible.
- Pass travel may not be used if the cost of transportation could be reimbursed by a company or organization.

**Q6.    What should I do if someone requests to be my travel companion? Or asks for a Buddy Pass?**
You are responsible for how your pass travel privileges are used. When you decide with whom you are going to share them, do so wisely. Know the individual well and enough to trust he or she will use the pass travel privileges properly. Never accept money or other goods or services in exchange for pass travel privileges. Doing so may result in termination of your employment.



DEFENDANT'S
EXHIBIT
Stevenson
13

# FLY RIGHT –
## PASS PROTECTION FAQs

**Q7.** **Can I share my Delta Passport with my Travel Companion so he can use TravelNet to look up flights and make his own listings?**

You should never share your Delta Passport credentials with anyone.  The Passport allows access to private information, including your pay and personal information.  In addition, make sure you always logout when finished with a DeltaNet session to prevent others from accessing your information.

**Q8.** **Can I give my standby boarding pass to someone else to travel?**

No. While it is admirable you may want to give up your seat assignment to someone you feel may have a more urgent need to travel, we must always clear passengers based upon their respective standby code and seniority. Other passengers may have circumstances you're not aware of that may be just as urgent.  Honoring the standby code and seniority date ensures fairness for everyone regardless of circumstance. In addition, the flight passenger manifest must always reflect the exact number and names of passengers and crew on board.

**Q9.** **Where do I find Buddy Pass embargos or other nonrev travel restrictions?**

Visit the Pass Travel Alerts page on DeltaNet for information about Buddy Pass embargos, baggage restrictions and payload optimized flights.

**Q10.** **What are the potential consequences for nonrev misconduct?**

Pass travel abuses or misconduct by any associated pass rider to the sponsoring employee can result in either a temporary or permanent revocation of pass travel privileges or in some cases, termination of employment.

6/15/2015                                        JOVAN DAIS (@jovandais) | Twitter



Search Twitter                    Q      Have an account? Log in ▾

**JOVAN D...**        TWEETS      FOLLOWING   FOLLOWER
@jovandais           5,389       1,729       7,411        ☺ Follow

                     FAVORITES   LISTS
**JOVAN DAIS**          3          1      Tweets      Tweets & replies      Photos & videos
@jovandais

booking/features: nodaisoff@gmail.com

📍 GODS GREEN EARTH

🔗 facebook.com/mrdais

🕐 Joined December 2008

📷 553 Photos and videos

  

  

 **JOVAN DAIS** @jovandais · Jun 12
Baby girl getting better behind the wheel... riding with my oldest
listening to who else???... instagram.com/p/32Yvg4LTYF/

↩   ♺   ☆   •••

**JOVAN DAIS** @jovandais · Jun 8
S/O 2 my daughter @iamaleacea for being fearless abt going after her
dreams.... thnxx 2 @v103atlanta... instagram.com/p/3rtczjrTRU/

↩   ♺   ☆   •••

**JOVAN DAIS** retweeted
 **#SLICK** @BIGOOH · Jun 7
" We Done Came a Long Way, ---> Still We Got So Far 2 Go ‼ " -
@jovandais instagram.com/p/3pVQCgM-qO/

↩   ♺ 1   ☆   •••

**JOVAN DAIS** retweeted
 **J!N©** @jusjino · Jun 6
ON SOME L.A. SHIT WITH @jovandais Top Down On The Highway
Headed to my Show in Bakersfield with @tyga...
instagram.com/p/3nD2qLnP55/

↩   ♺ 1   ☆   •••

**JOVAN DAIS** @jovandais · Jun 6
We out!!! @jusjino @jspoolz
#goingback2cali  #dutycalls #beecherboys
#nodaisoff instagram.com/p/3mGswnLTTy/

↩   ♺ 1   ☆   •••

**JOVAN DAIS** @jovandais · May 31
On Set with @theggsband new video "On & On" coming soon!!
Thanxx 2 @nachishairsalon leimaje... instagram.com/p/3XeNVqrTW3/

↩   ♺   ☆   •••

DEFENDANT'S
EXHIBIT


6/15/2015

JOVAN DAIS (@jovandais) | Twitter



**JOVAN DAIS** @jovandais · May 27
REPOST FROM @iamaleacea:
"Make sure yall come out , new music , new show , new outfits , this...
instagram.com/p/3MHD3iLTQO/



**JOVAN DAIS** @jovandais · May 26
inkchink getting it in!!!! @theggsband video shoot for "On & On"
@bemoremedia #theggsband #beecherboys
instagram.com/p/3KB0pXrTWT/



**JOVAN DAIS** @jovandais · May 24
On the set with @bemoremedia shooting "i
know" ~~off @jusjino new album!!! "Jus Jino"~~
hosted by...
instagram.com/p/3Fqd1OrTQ8/



**JOVAN DAIS** @jovandais · May 20
REPOST FROM @jusjino:
"Abt last nite!!! S/O 2 everyone tht came out to  @ctrlatl 2  represent
wit... instagram.com/p/27gr-zrTSR/



6/15/2015    JOVAN DAIS (@jovandais) | Twitter


#beecherboys #nodaisoff instagram.com/p/2uZn_ArTUF/


JOVAN DAIS retweeted
#HotRunsIndy Hot 963 @Hot963 · May 14
#NP @JSPOOLZ feat @wizkhalifa @jovandais SMOKIN GOOD On
The #NEWAT10 with @CoachRedd & @Bswift317

↩ ⟳ 3 ☆ •••


JOVAN DAIS retweeted
J!N© @jusjino · May 14
They Build To Destroy.... But I Was Built To Last... Ft. @jovandais
#JusJino #NoDaisOff #BeecherBoys instagram.com/p/2qq41LHP78/

↩ ⟳ 1 ☆ •••


JOVAN DAIS @jovandais · May 14
REPOST FROM @jusjino:
"They Build To Destroy.... But I Was Built To Last... Ft. @jovandais
#JusJino... instagram.com/p/2q-QE6rTSt/

↩ ⟳ ☆ •••

New to Twitter?

Sign up now to get your
own personalized
timeline!

You may also like ·
Refresh


julienews.it
@julieitalia


T-Town Pro...
@ttownprod


Blogs Daddy
@BlogsDaddy


MONEY CA...
@_MoneyCarlo


a bad think
@abadthink

Trends

#panda
#iamdefensesquad
#PSYCasaCorazon
#MagnaCarta
Jeremy Corbyn
#AstonDmSpree
Jack Grealish
#MondayMotivation





6/15/2016

Instagram

ethiopian_p    Log out

# #beecherboys
522 posts





 jusjino

FOLLOW




6/15/2015

Instagram



37 likes                                                         1w

jusjino Tonight I'm opening for @kinggoldchains in California!
#NODAISOFF #BEECHERBOYS #JUSJINO #LastKings

ro_akin Congrats bro !

ayyodezi congrats Caleb !! 🙌🏾🙌🏾🙌🏾

buckcitynow Yea nigga get it remember you the headliner

guitarboymusic1 Yeazirrrrr Docta!!!! @jusjino

an_jelllo Do work kid 💯

demetriasampsonbolar Who's up next? Not you youngin. You up
NOW!

santimars_ Congrats man

missjamaica300 Definitely need a mixtape ! Been listening to it all
week 👌🏿 #proud & congrats homie

ABOUT US    SUPPORT    BLOG    PRESS    API    JOBS    PRIVACY    TERMS

© 2015 INSTAGRAM

JOVAN DAIS (@jovandais) | Twitter

Gilas Cadets
#WorldMeatFreeDay

© 2015 Twitter   About
Help   Ads info

ethiopian_p    Log out

## #beecherboys
522 posts



jusjino

FOLLOW



6/15/2015                                    Instagram





52 likes                                              1w

jusjino ON SOME L.A. SHIT WITH @therealjovandais Top Down On
The Highway Headed to my Show in Bakersfield with @kinggoldchains
#NODAISOFF #BEECHERBOYS #JUSJINO #LastKings

isisrahgawd Bruh u got more hair then me[]

Add a comment...



ABOUT US   SUPPORT   BLOG   PRESS   API   JOBS   PRIVACY   TERMS          © 2015 INSTAGRAM

6/15/2015   Jovan Dais on Instagram: "On the set with @jusjino @bemoremedia #New music "Jus Jino" 3.16.15 #californiavideoshoot #jusjino #beecherboys #nodai...

ethiopian_p   Log out

therealjovandais

FOLLOW



16 likes

14w

6/15/2015   Jovan Dais on Instagram: "On the set with @jusjino @bemoremedia #New music "Jus Jino" 3.16.15 #californiavideoshoot #jusjino #beecher boys #nodai…

therealjovandais On the set with @jusjino @bemoremedia #New music "Jus Jino" 3.16.15
#californiavideoshoot #jusjino #beecherboys #nodaisoff

Add a comment…

ABOUT US    SUPPORT    BLOG    PRESS    API    JOBS    PRIVACY    TERMS          © 2015 INSTAGRAM

6/15/2015    Jovandais on Instagram : "See ya boi @jusjino live!! current sxsw dates more added soon!! #jusjino #beecherboys #nodaisoff #VelvWorks"

therealjovandais See ya boi @jusjino live!! current sxsw dates more added soon!! #jusjino #beecherboys #nodaisoff #VelvWorks

kiyanatakemeaway LIT!!!! 👊, I'm coming

thequeenraquellee @skr~efrecradiou

Add a comment...

ABOUT US    SUPPORT    BLOGS    PRESS    API    JOBS    PRIVACY    TERMS                ©2015 INSTAGRAM

6/15/2015 Jovan Dais on Instagram: "See ya bon @jusjino live!! current sxsw dates more added soon!! #jusjino #beecherboys #nodaisoff #VelvWorks"

ethiopian_p... Log out

 therealjovandais

FOLLOW





**SXSW 2015**

**Thursday, March 19th 12PM - 6PM**
#LightTheTorch
**KRAVE 302 E. 6th St.**

**Friday, March 20th 6PM - 2AM**
#HipHopNHipsters
**Victory Grill 1104 E. 11th St.**

**Friday, March 20th 7PM - 2AM**
#ZoolyGvng Official SXSW Stage
**405 Club 405 E. 7th St.**

**Saturday, March 21st 9PM - 3AM**
#TrapHouseParty
**Location TBA**

14 likes

13w

**Sluss, Ansley**

| | |
|---|---|
| **From:** | Langel, Ryan D |
| **Sent:** | Saturday, January 02, 2016 2:42 PM |
| **To:** | Sluss, Ansley |
| **Subject:** | FW: Flight History |

See below.

Ryan D. Langel
Special Counsel
Delta Air Lines, Inc. – Law Department

CONFIDENTIALITY NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this message in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. Our transmission of this message does not constitute a waiver of the attorney-client or the attorney work product privilege.

-----Original Message-----
From: esc@delta.com [mailto:esc@delta.com]
Sent: Saturday, January 02, 2016 2:42 PM
To: Langel, Ryan D
Subject: Flight History

*** DO NOT REPLY TO THIS EMAIL ***

Last 24 Months Flight History For DAIS,JOVAN J

| Depart Date | Flt # | ORIG | DEST | Pass/Charge Type | Total Charges |
|---|---|---|---|---|---|
| 06/08/2015 | 1446 | PHX | ATL | Domestic | 0.00 |
| 06/07/2015 | 0730 | LAX | PHX | Domestic | 0.00 |
| 06/06/2015 | 1755 | ATL | LAX | Domestic | 0.00 |
| 03/11/2015 | 1554 | LAX | ATL | Domestic | 0.00 |
| 03/05/2015 | 1094 | ATL | LAX | Domestic | 0.00 |
| 01/16/2015 | 1554 | LAX | ATL | Domestic | 0.00 |
| 01/13/2015 | 2355 | ATL | LAX | Domestic | 0.00 |
| 12/07/2014 | 5130 | HPN | ATL | Transoceanic | 0.00 |
| 12/06/2014 | 5146 | ATL | HPN | Transoceanic | 0.00 |
| 12/04/2014 | 1617 | HOU | ATL | Domestic | 0.00 |
| 12/03/2014 | 1064 | ATL | HOU | Domestic | 0.00 |
| 11/25/2014 | 1554 | LAX | ATL | Domestic | 0.00 |
| 11/18/2014 | 2055 | ATL | LAX | Domestic | 0.00 |
| 10/27/2014 | 1080 | STL | ATL | Domestic | 0.00 |
| 10/26/2014 | 1423 | ATL | STL | Domestic | 0.00 |
| 10/25/2014 | 1554 | LAX | ATL | Domestic | 0.00 |
| 10/22/2014 | 2355 | ATL | LAX | Domestic | 0.00 |
| 10/13/2014 | 1549 | HOU | ATL | Domestic | 0.00 |
| 10/04/2014 | 0754 | PIT | ATL | Domestic | 0.00 |


DEFENDANT'S
EXHIBIT

| 10/02/2014 | 1365 | ATL | PIT | Domestic | 0.00 |
| 09/15/2014 | 1454 | LAX | ATL | Domestic | 0.00 |
| 09/09/2014 | 0110 | ATL | LAX | Domestic | 0.00 |
| 09/07/2014 | 1810 | DFW | ATL | Domestic | 0.00 |
| 09/06/2014 | 1711 | ATL | DFW | Domestic | 0.00 |
| 08/31/2014 | 1654 | LAX | ATL | Priority | 0.00 |
| 08/24/2014 | 6437 | SFO | LAX | Domestic | 0.00 |
| 08/21/2014 | 1255 | ATL | LAX | Domestic | 0.00 |
| 08/18/2014 | 0176 | DFW | ATL | Domestic | 0.00 |
| 08/15/2014 | 1810 | ATL | IAH | Domestic | 0.00 |
| 08/15/2014 | 0775 | MSY | ATL | Domestic | 0.00 |
| 08/13/2014 | 1325 | LAX | MSY | Domestic | 0.00 |
| 08/12/2014 | 1060 | MCO | LAX | Domestic | 0.00 |
| 07/28/2014 | 0986 | ATL | LGA | Domestic | 0.00 |
| 07/28/2014 | 0672 | CLE | ATL | Domestic | 0.00 |
| 07/22/2014 | 0629 | ATL | DTW | Domestic | 0.00 |
| 07/14/2014 | 1354 | LAX | ATL | Domestic | 0.00 |
| 07/08/2014 | 1435 | ATL | LAX | Domestic | 0.00 |
| 07/01/2014 | 1454 | LAX | ATL | Domestic | 0.00 |
| 06/23/2014 | 4794 | PHX | LAX | Domestic | 0.00 |
| 06/23/2014 | 1772 | ATL | PHX | Domestic | 0.00 |
| 06/19/2014 | 2234 | LAX | ATL | Domestic | 0.00 |
| 06/17/2014 | 0081 | ATL | LAX | Domestic | 0.00 |
| 06/13/2014 | 2234 | LAX | ATL | Domestic | 0.00 |
| 06/10/2014 | 1169 | MIA | LAX | Domestic | 0.00 |
| 06/07/2014 | 1982 | LGA | MIA | Domestic | 0.00 |
| 06/05/2014 | 1286 | ATL | LGA | Domestic | 0.00 |
| 06/04/2014 | 4569 | BUR | SLC | Domestic | 0.00 |
| 06/04/2014 | 1222 | SLC | ATL | Transoceanic | 0.00 |
| 06/02/2014 | 2255 | ATL | LAX | Domestic | 0.00 |
| 06/01/2014 | 0386 | RIC | ATL | Domestic | 0.00 |
| 05/31/2014 | 2399 | ATL | RIC | Domestic | 0.00 |
| 05/30/2014 | 1818 | MCO | ATL | Domestic | 0.00 |
| 05/27/2014 | 0883 | LAX | MCO | Domestic | 0.00 |
| 05/14/2014 | 2204 | LAX | SLC | Transoceanic | 0.00 |
| 05/14/2014 | 1222 | SLC | ATL | Transoceanic | 0.00 |
| 05/05/2014 | 1577 | MSY | LAX | Priority | 0.00 |
| 05/03/2014 | 4667 | LAX | LAS | Domestic | 0.00 |
| 04/24/2014 | 3303 | IAH | CVG | Transoceanic | 0.00 |
| 04/24/2014 | 2469 | CVG | ATL | Transoceanic | 0.00 |
| 04/22/2014 | 1142 | ATL | HOU | Domestic | 0.00 |
| 04/16/2014 | 1554 | LAX | ATL | Domestic | 0.00 |
| 04/05/2014 | 2355 | ATL | LAX | Priority | 0.00 |
| 04/04/2014 | 1654 | LAX | ATL | Domestic | 0.00 |
| 03/29/2014 | 1076 | ATL | LAX | Domestic | 0.00 |
| 03/25/2014 | 1969 | LAX | ATL | Priority | 0.00 |
| 03/24/2014 | 0110 | ATL | LAX | Domestic | 0.00 |
| 03/20/2014 | 1254 | LAX | ATL | Domestic | 0.00 |
| 02/24/2014 | 1555 | ATL | LAX | Domestic | 0.00 |
| 02/21/2014 | 1354 | LAX | ATL | Priority | 0.00 |
| 02/17/2014 | 2355 | ATL | LAX | Domestic | 0.00 |
| 02/16/2014 | 1654 | LAX | ATL | Priority | 0.00 |

01/23/2014  4916  JFK  HPN  Domestic         200.00
01/21/2014  5366  ATL  HPN  Domestic           0.00

Last 24 Months Imputed Trip History For DAIS,JOVAN J

Trip Date  Flt #  ORIG  DEST  Payment   Imputed Wage  Imputed Val  Eff Date   Report Date
---------- ----- ----- ----- --------- ------------ ----------- ---------- -----------

athena
Peachtree Orthopaedic Clinic • 2001 Peachtree Rd. NE, ATLANTA, GA 30309-1253
STEVENSON, QUANIAH R (Id #186983, dob: 10/09/1983)

Case 1:16-cv-02571-AT Document 88-14 Filed 01/07/21 Page 1 of 1
Document 30: 10/09/1983 03/30/2022    Page: 379 of 675



## PEACHTREE ORTHOPAEDIC CLINIC

### Workers' Compensation Status Form

☐ New Patient    ☐ Re-Check    ☐ Pre-Op    ☐ No Show    ☐ Re-Schedule

**Patient:** Quaniah Stevenson

Account #: 186983

Date of Birth: [redacted]    SSN [redacted]    Was seen in my office on: 10/17/2014

Diagnosis:

Treatment Plan:

The patient has had a left shoulder strain with mild fasciitis and complains of persistent symptoms. I can find no evidence of internal derangement. I reviewed her MRI of her shoulder from 5/16/14 and this reveals only mild tendinitis. The patient has requested additional physical therapy and I have ordered 6 visits. She may resume full unrestricted work as of today and has no additional impairment. She will be seen back as needed. She is scheduled to see Dr. Kelly back for final visit and folded the release in the next several weeks.

**1. Shoulder pain**
719.41: Pain in joint, shoulder region
• PHYSICAL THERAPY REFERRAL -
      Schedule Within: provider's discretion          Note to Provider: left shoulder strain
      Visits per Week: 2 Number of Weeks: 3

## Discussion

**Patient Instructions**
Full duty work

None recorded.

• LEE A KELLEY, MD for Recheck 30 at Phoenix POC on 11/03/2014 at 12:30 PM
• as needed

Electronically Signed by: MICHAEL P BERNOT, MD 10/17/2014



DEFENDANT'S
EXHIBIT
Stevenson
19
6-29-17

10/17/2014 12:00:00 AM          64984942590995B          44201506288045725

**Employee:** STEVENSON,QUANIAH R
**Employee Number: 689688**

| Date | |
|------|---|
| 09/08/2015 | Received Appeal Letter.  Contacted EE at 770-572-2878; left message on voice mail acknowledging receipt of letter; explained time line and process. File retrieved; assigned to BLS - LTC |
| 10/06/2015 | Scheduled for 10/7/15 @ 13:00 est.<br><br>Barbara L. Shaw<br>Program Manager |
| 10/07/2015 | Spoke with Ms. Stevenson regarding her termination appeal; explained the process and my role. Verified contact information and provided mine.  She asked if she could click over to add her attorney. I explained Delta policy regarding third parties including attorneys being a part of the appeal process. I asked her if she needed to disconnect the call from her attorney; she stated yes. Our call was disconnected and I called her back. I explained Delta policy regarding recording conversations. I told her she did not have my permission to record this conversation. I asked if she was recording the conversation, she stated no. She asked if I was recording the conversation, I told her no it was against company policy. I asked if anyone else was on the line, she stated no.<br><br>I asked her to explain the reason for termination, she stated she was not clear about the term. She stated she received different versions. She stated she did not know the reason. She stated she met with her leader PL Frank Cortez, EO Specialist Mehret Tafesse, and HRM Kiha Jones. She stated they told her the company was conducting an audit. She stated they asked her questions regarding Jovan Dais, her travel companion. She stated Tafesse asked her about Dais' Twitter and Facebook postings. She stated she was told it appeared Dais was traveling for business purposes. She stated she was asked who booked the travel and where he flew. She stated she was able to recall his travel dates and destinations. She stated he also lives in GA/CA because he co-parents with his ex.  She stated he has driver's license in CA.<br><br>I asked her to explain her relationship with Dais, she stated he is her boyfriend. I asked how long he's been her travel companion she stated since 2007, with the exception of one year she gave it to a family friend. She stated there were no problems with Dias' travel. I asked what Dias did for living, she stated carpentry and he plays music. I asked if he ever travelled to complete carpentry work or play music, she stated no. She stated he knew the rules that travel was for pleasure only. She stated he travels for his music business, but the cost is paid for by the artist that he's helping. She stated he did some engineering work for Keisha Cole, all expenses were paid for by Cole.  I asked who booked his travel, she stated she did. I asked if they travel together she stated no.<br><br>I asked her about a trip he took June 6, 2015, she stated he went to LAX for his daughter's graduation. I asked if she had a program from the |



|  | daughter's school, she stated she asked him for it but he was reluctant to ask the ex because of the drama it would bring. I asked her to explain she stated Dais and his daughter's mother have a difficult relationship and anything he asks for brings drama.  I asked her to explain his twitter post regarding performing with Tiga, she stated he did not perform with Tiga. She stated he was with a friend and retweeted the friend's post.  I asked if she knew the name of the friend she stated no. She stated Dais travelled to LAX quite often.

I asked her about Caleb Boyett, she stated he is a friend of Dias.  She stated they hang out together and go to each other's birthday parties.  She stated they travel and party together.  I asked if he's ever flown on her buddy passes, she stated yes once or twice.  She stated they travelled to hangout.  She stated Dais and Boyett frequently travel to the same places such as LAX, HOU, and MIA. She stated they never used her travel for any performances.  I asked her about Vendell Bailey, she stated she is a friend of her friend.

I asked her to provide documentation to support her claim that Dias was in LAX on June 6th for his daughter's graduation. I asked her to ask Dias about the twitter posts stating he was there to perform with Tiga.  She stated she would also send Dais' DL.  She committed to try to get these documents to me. I provided my email address as well as my fax number.

Barbara L. Shaw
Program Manager |
| 10/14/2015 | As of today, I have not heard from Ms. Stevenson nor did she send me anything via email or fax. Ms. Stevenson did not provide any new information that would warrant reversal of her termination; therefore I recommend her termination be upheld in her appeal denied.

Barbara L. Shaw
Program Manager |

## Delta Air Lines 30(b)(6) K. Nabors

**Page 1**

```
1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4  QUANIAH STEVENSON,        )

5           Plaintiff,       )
                             )
6  vs.                       )   CIVIL ACTION:
                             )   1:16-CV-2571-AT-LTW
7                            )
   DELTA AIR LINES, INC.     )
8           Defendant.       )
9  _____)

10

11    30(b)(6) DEPOSITION OF DELTA AIR LINES, INC.

12                    (KELLY NABORS)

13

14         30(b)(6) Deposition of Kelly Nabors,

15  taken by the Plaintiff, before Kesha F.

16  Richardson, Certified Court Reporter, held at

17  Munger & Stone, LLP, 999 Peachtree Street, NE.,

18  Suite 2850, Atlanta, Georgia 30309, commencing at

19  approximately 10:30 a.m. on February 26, 2019.

20              * * * * * * * * * * * *

21

22

23

24

25
```

**Page 2**

```
1              APPEARANCES

2

3  ON BEHALF OF THE PLAINTIFF:

4  Charlena L. Thorpe, Esq.
   INCORPORATING INNOVATION, LLC

5  6340 Sugerloaf Parkway, Suite 200
   Duluth, Georgia 30097

6

7  ON BEHALF OF THE DEFENDANT:

8  Benjamin A. Stone, Esq.
   MUNGER & STONE, LLP

9  999 Peachtree Street, NE
   Suite 2850

10 Atlanta, Georgia 30309

11

12 Sheandra R. Clark, Esq.
   Assistant General Counsel.

13 DELTA AIR LINES, INC.
   Department 981.

14 P.O. Box 20574.
   Atlanta, Georgia 30320.

15

16 ALSO PRESENT:

17 Ms. Quaniah Stevenson

18

19

20

21

22

23

24

25
```

**Page 3**

```
1              TABLE OF CONTENTS

2

3  Appearances .....................................3

4  Proceedings .....................................5

5  Disclosure ....................................182

6  Court Reporter's Certificate .................183

7              EXAMINATION INDEX

8

   Examination by Ms. Thorpe ......................5

9

   Cross-Examination by Mr. Stone ...............179

10

   Redirect-Examination by Ms. Thorpe ...........180

11

12             PLAINTIFF'S EXHIBIT INDEX

13 Plaintiff's Exhibit 1 .........................12
   CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER -

14         Stevenson/Delta _002542

15 Plaintiff's Exhibit 2 .........................20
   Delta Internal Memorandum - July 20, 2015

16

   Plaintiff's Exhibit 3 .........................27

17 Delta Pass Travel Policy

18 Plaintiff's Exhibit 4 .........................38
   Social media posts

19

   Plaintiff's Exhibit 5 .........................50

20 Passenger Flight Leg Report - 01 Aug 2007 - 08 Nov
            2017

21

   Plaintiff's Exhibit 6 ........................100

22 July 6, 2015 Letter

23 Plaintiff's Exhibit 7 ........................121
   Recap of appeal conversation

24

   Plaintiff's Exhibit 8 ........................130

25 Jovan Dais' California driver's license
```

**Page 4**

```
1  Plaintiff's Exhibit 9 ........................140
   E-mails

2

   Plaintiff's Exhibit 10 .......................161

3  Audit Update

4  Plaintiff's Exhibit 11 .......................162
   Pass Protection Group - Audit Details and Roles

5         and Responsibilities, March 2014 Audit

6  Plaintiff's Exhibit 12 .......................171
   November 3, 2014 Pass Protection Group Audit

7

   Plaintiff's Exhibit 13 .......................173

8  Equifax TALX UCM Services

9  Plaintiff's Exhibit 14 .......................174
   Georgia Department of Labor Claims Examiner's

10        Determination

11 Plaintiff's Exhibit 15 .......................175
   Social media

12

   Plaintiff's Exhibit's 16 .....................176

13 Social media posts

14            DEFENDANT'S EXHIBIT INDEX

15

   Defendant's Exhibit 1 ........................179

16 Topics Discussed with Employee

17 Defendant's Exhibit 2 ........................180
   Delta Memo

18

19

20

21

22

23

24

25
```

Delta Air Lines 30(b)(6) K. Nabors

Page 101

1     Q.  If you could turn to the page labeled
2  000408.
3     A.  Okay.
4     Q.  It is stated that Quaniah was not
5  truthful and forthcoming.  Do you see that
6  statement?
7     A.  I do.
8     Q.  What was Ms. Stevenson not truthful and
9  forthcoming about?
10    A.  Her current companion, Mr. Dais, and she
11  was not able to verify all of the pass travel for
12  him.
13    Q.  What about Ms. Stevenson's current
14  companion was she not being truthful and
15  forthcoming about?
16    A.  Let me go through this really quickly,
17  and I will point out.
18        We asked a series of different questions
19  during the investigation, and she initially said
20  that they had traveled to Los Angeles together for
21  a funeral, and then she said, when we told her our
22  records don't show that they traveled together
23  since he had been added, when asked the purpose of
24  Jovan's travel to L.A., she said that his children
25  live there, and they both have family members who

Page 102

1  lived in L.A.
2        Let me continue to clarify.
3        So we gave her specific dates that he
4  was traveling to L.A., and she was not traveling
5  with him on any of those dates.  When the HR
6  manager said to Quaniah that she mentioned that
7  they traveled together, and that they did travel
8  together in April, Quaniah said that they have
9  traveled together, but not for the funeral.
10       When asked, again, why they had traveled
11  together, Quaniah said that they traveled together
12  before in the past.
13       So she changed her story several times
14  during that investigation.
15    Q.  If Ms. Stevenson disputes that -- if
16  Ms. Stevenson stated that she never said to
17  Delta's investigative team there that she traveled
18  with Mr. Dais, then that would be a factual
19  dispute between Ms. Stevenson and Delta; correct?
20       MR. STONE:  Object to form, calls for a
21  legal conclusion.
22       MS. THORPE:  That's not a legal
23  conclusion.
24       MR. STONE:  For purposes of summary
25  judgment.

Page 103

1       MS. THORPE:  If someone disputes facts,
2  one person has one version of facts, and
3  someone else has another version, that's a
4  disputed fact.  That's not a legal
5  conclusion.  That's not anything having to do
6  with the law.
7       MR. STONE:  Ask the question again.
8       THE COURT REPORTER:  "If Ms. Stevenson
9  disputes that -- if Ms. Stevenson stated that
10  she never said to Delta's investigative team
11  there that she traveled with Mr. Dais, then
12  that would be a factual dispute between Ms.
13  Stevenson and Delta; correct?"
14       MR. STONE:  You can answer.
15       THE WITNESS:  The three people that
16  heard her say that had no reason to suggest
17  she said it when she didn't.  Three people in
18  the room heard her say it.
19       MS. THORPE:  Objection, nonresponsive.
20       MR. STONE:  Actually, it was perfectly
21  responsive.
22       MS. THORPE:  No, it doesn't answer my
23  question.  Could you repeat the question,
24  please?
25       THE COURT REPORTER:  "If Ms. Stevenson

Page 104

1  disputes that -- if Ms. Stevenson stated that
2  she never said to Delta's investigative team
3  there that she traveled with Mr. Dais, then
4  that would be a factual dispute between Ms.
5  Stevenson and Delta; correct?"
6       THE WITNESS:  That would mean that the
7  three people that said she did, that heard
8  she did, and her have a difference of
9  opinion.
10  BY MS. THORPE:
11    Q.  The fact that someone is not able to
12  verify every single place that a companion has
13  traveled on their travel benefits, would that
14  suggest they're being untruthful or not
15  forthcoming?
16    A.  It could be, but it also suggests a loss
17  of control.
18    Q.  A loss of control is different from
19  being -- not being truthful and forthcoming.
20    A.  It could be one and the same.  If I've
21  lost control, because I have either given you my
22  password, you broke your flights on your own
23  through our automated line or some other way, then
24  I also would not know where you're traveling.  It
25  could be both, and they could be completely

Delta Air Lines 30(b)(6) K. Nabors

Page 157

1 companion or buddy?
2   A. I'm with you. Thank you. It appears as
3 though the first time he traveled was in 2007,
4 December of 2007, and these go through until June
5 of 2015, and again, sometimes traveling on a buddy
6 pass, sometimes traveling as a companion.
7   Q. You may have made reference to it
8 earlier, but what is the difference?
9   A. The companion pass rider has an
10 unlimited amount of travel. The employee -- and
11 they travel at a higher priority than a buddy pass
12 rider. It simply means they get on the airplane
13 faster than a buddy pass person would, and again,
14 they can go -- there's not a limit to that. The
15 buddy pass is one buddy pass, one trip.
16   Q. Does a travel companion pay for his or
17 her ticket?
18   A. There is a fee. It's a zone fair, if
19 you will, from point A to point B, depending on
20 what point A is and what point B. It's a small
21 fee.
22   Q. For the buddy pass, are those paid-for
23 fairs as well?
24   A. They are. It's still a fee. It is a
25 little bit higher than the companion fee, but it

Page 158

1 does not guarantee a seat on the plane. It's just
2 the fees, taxes.
3   Q. The travel companion does guarantee a
4 seat.
5   A. No, neither.
6   Q. Is it Delta's contention that Mr. Dais
7 has been traveling for business since December 4,
8 2007 or December 2007?
9   A. I don't know if I can tell you that
10 since 2007 he's been traveling for business or
11 not.
12   Q. As we mentioned, the real travel in
13 question was the June 6 travel; correct?
14   A. The audit looked to the specific period
15 of time too, so that was kind of encompassed
16 within that audit, but yeah, the June 6th date was
17 a concern.
18   Q. You would agree that since Mr. Dais has
19 been traveling since December 2007, there has been
20 a considerable delay in addressing his travel
21 patterns; correct?
22   MR. STONE: Object to form. I don't
23 know what considerable delay means.
24 BY MS. THORPE:
25   Q. Do you know what considerable delay

Page 159

1 means?
2   A. I don't.
3   Q. What don't you understand about what
4 that term means?
5   A. You're asking if there was a
6 considerable delay in reviewing her pass travel.
7 She was pulled up, along with others, for an
8 audit. That's why we looked at the pass travel.
9 That's what that was part of, so if he was
10 traveling for business prior to that, and she got
11 lucky enough not to get caught by somebody or
12 turned in, then that's what happened. This is an
13 audit, though.
14   Q. Are you saying that Delta only looked at
15 Mr. Dais' travel for a particular period of time?
16   A. We had parameters for audit, and she and
17 pass riders of hers fell within those parameters.
18   Q. What were those parameters?
19   A. I don't want to misstate the parameters.
20 They're outlined in one of our documents that
21 states kind of date and time, but I believe we
22 looked at pass travel folks that had numerous
23 segments between 2013, I believe, to the current
24 when we started the audit, and folks that had been
25 traveling on somebody else's buddy passes or

Page 160

1 companion passes, at least five or more employees'
2 passes.
3   Q. You said, "Pass travel segments." What
4 are segments?
5   A. Every trip that you take is a segment,
6 so each one-way trip is one segment.
7   Q. Referring to Plaintiff's Exhibit 5,
8 there are various reports in here. As you said,
9 some are buddy passes, and some are companion
10 passes.
11   A. Yes.
12   Q. How do you know which is which?
13   A. When you look here on top of this page,
14 the page number is 000532. It says, "Passenger
15 flight leg report, August 1, 2007 through 8
16 November 2017, PPR, which is her employee number
17 that's related to her, and dash 3 is the code for
18 what this person is listed in her personal pass
19 travel, so a parent, a child, a companion, a
20 spouse, a domestic partner, all of those people
21 have their own personal number, so we know whose
22 traveling, and that number is only given to a
23 companion or somebody in your PPR, so it gives the
24 name here of our primary pass rider, which is
25 Quaniah Stevenson, the employee, and the passenger

Delta Air Lines 30(b)(6) K. Nabors

Page 165

BY MS. THORPE:
1 BY MS. THORPE:
2    Q.  Read the bullet point, and explain to me
3 what that is.
4    A.  "Partner with leader to prepare PD
5 letter and ensure verbiage is accurate, and the
6 infraction loss of control, travel suspension and
7 dates of travel suspensions are addressed in all
8 letters for PPR and buddies."
9        So what this is saying is when the PPG
10 group writes the investigation summary, they send
11 it to anybody that was in the room, the leader,
12 and the HR person that was in the room, and asks
13 them to review and ensure the facts are what they
14 have and what they remember as well as what the
15 PPG person had written down and remembered, so
16 that's in relation to the verbiage.
17        The infraction, for example, loss of
18 control, that's not obviously, the only infraction
19 that could be, but the travel suspension and dates
20 of travel suspension are addressed in all letters,
21 so any letter that the employee would be given, if
22 it was a PD letter, it would spell out what the
23 infraction was, the date the letter applies, and
24 the amount of time, including from X date to X
25 date of the suspension would be in effect.

Page 166

1    Q.  It says in all letters.  Does it specify
2 what type of letter?  You mentioned all letters to
3 employees, but could it be internal letters as
4 well?
5    A.  That would be a performance development
6 letter, so if an employee was not terminated, they
7 would be given a performance development letter,
8 and the point of this is make sure they understand
9 how long the travel suspension is in play and why
10 they're being given a letter.
11    Q.  What does PD stand for?
12    A.  Performance development.
13        MS. THORPE:  Let's have a five-minute
14    break or so.  I want to wrap up and make sure
15    there are no other questions.
16        (OFF THE RECORD AT 4:20 PM)
17        (BEGAN AT 4:36 PM)
18 BY MS. THORPE:
19    Q.  I previously presented to you what was
20 marked as Plaintiff's Exhibit 3, Delta's pass
21 travel policy; however, Delta produced several
22 different versions of that to me.  I wanted to ask
23 you based on the policy set forth in there, are
24 there any changes over the years, particularly
25 related to the definitions of business travel?

Page 167

1        MR. STONE:  I'm going to object to form.
2    You used the phrase, "Over the years."
3        MS. THORPE:  Well, I mean, I can
4    introduce all the other --
5        MR. STONE:  We can compare -- they
6    probably speak for themselves, Charlena, but
7    we can compare the various definitions if you
8    want.  I will tell you -- well, she can
9    answer your question.
10 BY MS. THORPE:
11    Q.  Would your answer regarding Delta pass
12 travel policy with respect to the business travel
13 set forth in Delta's pass travel policy change if
14 we looked at other documents?
15        MR. STONE:  Same objection.
16        THE WITNESS:  I don't know that -- it's
17    completely different in other documents.  It
18    could be more detailed in other documents,
19    but the pass policy is the pass policy.  It
20    has not changed dramatically at all.  If
21    we've made tweaks or edits, or like I said,
22    in The Way We Fly, it may outline more than
23    what it outlines here.
24 BY MS. THORPE:
25    Q.  How did Quaniah's travel benefits use

Page 168

1 come under scrutiny in the first place?
2    A.  Can I look at the Exhibit 6 again, the
3 investigation summary?
4    Q.  Sure.
5    A.  Thank you. Her travel was being reviewed
6 for a number of different reasons, but she shared
7 a buddy pass rider with several other Delta
8 employees, so that particular buddy pass rider,
9 Vendell Bailey, was shared by numerous different
10 employees in different stations.
11    Q.  You said for other reasons as well.  In
12 addition to Vendell Bailey, there were other
13 reasons her travel benefit use was being
14 investigated.
15    A.  When it started, the reason she did come
16 up on the travel was the shared buddy pass rider,
17 Vendell Bailey.
18    Q.  There was an investigation done with
19 respect to Vendell Bailey, and others that had
20 allowed him to use their travel benefits.
21    A.  Anybody that had Vendell Bailey on their
22 privileges was talked to, yes.
23    Q.  Do you know who those people were?
24    A.  It outlines them here:  Ernest Adams,
25 Brady Nicholson, Candice Dubois, and Sirdarius

# Dkt/Tab 89 (Sealed)

# Dkt/Tab 92 (Sealed)

# Dkt/Tab 94 (Sealed)

# Dkt/Tab 96

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| Quaniah R. Stevenson | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil No.: 1:16-CV-2571-AT-LTW |
| Delta Air Lines, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF QUANIAH R. STEVENSON'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT AND STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS

Plaintiff Quaniah R. Stevenson brought this action in the United States District Court for the Northern District of Georgia against Defendant Delta Air Lines, Inc. for violations of the American with Disabilities Act (ADA), race discrimination, gender discrimination, age discrimination, and retaliatory discharge.

In her complaint, Ms. Stevenson, whom is over the age of 40, states that she suffered an injury while on the job at Delta in March 2014. This work injury caused her to be out of work for eight (8) months. Prior to this time, Ms. Stevenson had been successfully employed with Delta since August 1, 2007.

However, upon returning to work in November 2014, as alleged in her complaint, Ms. Stevenson was subjected to retaliation and harassment because of

her disability and because she exercised her rights under the ADA.  The harassment that Ms. Stevenson suffered is set forth in detail in Plaintiff's complaint at paragraphs 20-28, for example.  Delta's harassment caused Ms. Stevenson to suffer depression and contributed to pain caused by her work related injury, which resulted in her taking leave including an overnight stay in the hospital.

On July 28, 2015, Delta terminated Ms. Stevenson's employment alleging that Ms. Stevenson violated the company's employee travel benefits (e.g. Delta's "Pass Travel", "Travel Passes", or "Buddy Passes").  The  alleged violation was based one flight.  Ms. Stevenson contends that this reason for her termination is pretext for Delta's unlawful harassment, discrimination, and retaliation.

Delta primary defense is that Ms. Stevenson "Stevenson has no evidence that Delta's decision was because of her race, sex, gender and/or alleged disability, and her claims fail as a matter of law."  (Def.'s Br. Supp. Mot. Summ. J. 2 ECF No. 88-2.)  Delta alleges that "Stevenson cannot identify anyone, of any race, age or sex, who Delta found to have lost control of their passes and allowed them to be used for business travel, and who Delta then found to be untruthful during an investigation, who was not treated the same." (Id. at 15.)

Delta alleges that "Delta produced the records which established, again, that none of these individuals engaged in the wide array of travel pass misconduct in

which Plaintiff engaged." (Id. at 16 n.7.). However, as discuss in detailed below, Delta only alleges **one (1)** travel violation of Ms. Stevenson, not a "wide array of travel pass misconduct." Furthermore, as discussed in detailed below, the allegations that there is no evidence of others that committed the alleged same (or much worse) conduct as Ms. Stevenson but was allowed to keep their job is blatantly untrue.

Delta further assert that "Delta concluded in good faith that Dais was using his passes for business travel connected with his music business and concluded that Plaintiff had lost control of her travel passes and lied to Delta about it." (Id. at 17.)

Delta further asserts that it had a legitimate, nondiscriminatory reason for its action. (Id. at 20.) Still further, Delta asserts that "Stevenson admitted that she made no complaints about any discriminatory conduct covered by Title VII, the ADA, the ADEA or § 1981." (Id.)

First, Delta has not addressed or fully addressed Ms. Stevenson's harassment (e.g., under Title V), hostile work environment, and retaliation claims under the ADA. See, e.g., In Fox v. General Motors Corp., 247 F.3d 169 (4th Cir. 2001); Flowers v. Southern Regional Physician Services, Inc., 247 F.3d 229 (5th Cir. 2001); EEOC v. BobRich Enterprises, No. 3:05-CV01928-M (N.D. Tex. Jul. 27, 2007; Arrieta-Colon v. Wal-Mart Stores, 434 F.3d 75 (1st Cir. 2006); Quiles-Quiles

v. Henderson, 439 F.3d 1 (1st Cir. 2006).   For example, under the ADA, retaliation claims can arise absent complaints about discrimination or harassment.   For example, protected activity can also arise when an employee requests a reasonable accommodation under the Americans With Disabilities Act (ADA).   Plaintiff contend that Defendant retaliated by harassing Plaintiff for exercising her rights.

Second, evidence shows that Ms. Stevenson was treated less favorably and differently (i.e., terminated with no warning for an alleged single violation of travel benefits) than individuals outside of her protected classification for those claims that require her to prove that she is in a protected class.   (See, e.g., Nabors Deposition, pp. 71-100, 169-173, 135-139, Ex. 1 and any other exhibits cited therein; Franz Deposition).   Evidence shows that the individuals outside of her protected classification for those claims that require her to prove that she is in a protected class that committed more egregious acts were allowed to keep their job. Evidence shows that the reason for terminating Ms. Stevenson was subjective, unsubstianted, purely speculative, and not good faith, yet individuals outside of her protected classification for those claims that require her to prove that she is in a protected class where allegations were "unsubstiated" were allowed to keep their job.  Evidence shows that Delta investigated her travel more rigorously that individuals outside of her protected classification for those claims that require her to prove that she is in a

protected class.  There is absolutely no good faith evidence in the record that Dias was traveling on business. In fact, the primary reasons that Delta provides is that "" and Delta cits to no evidence that Boyette was Dias's client.  Delta admits that Dias activity in connection with the travel was consistent with leisure travel, however, the key reasoning for concluding it was business, Delta has absolutely no evidence. This is very problematic because The evidence shows that Delta "took the word" of or gave "the benefit of the doubt" to individuals outside of her protected classification for those claims that require her to prove that she is in a protected class but did not take Ms. Stevenson's work.  Evidences shows that Delta did not perform online research, like it did in her investigation, to investigate individuals outside of her protected class.

Third, Ms. Stevenson can prove that Delta's reason for terminating her employment is pretext (as discussed below\

Plaintiff responds to Defendant's Statement of Undisputed Facts as follow:

1.      Admit.

2.      Defendant admits that she worked at least in the areas listed.

3.      Plaintiff denies that she was ever "disciplined" for her attendance and job performance during her employment except for when she was terminated on or about July 28, 2015.  (See Decl. Quaniah Stevenson Ex. 1, ¶7.)  Plaintiff admits that

5

she received a warning letter on 1/11/2009 for tardiness that occurred on 1/4/2009

through 1/6/2009 and that she received coaching on 10/11/2012 (for tardiness due to

being sick and car issues; Plaintiff was advised to call the sick line), December 2,

2013 (for coming to work 30 minutes late), March 9, 2014 (for time management

and company policy regarding clocking in/out and attending briefing), March 22,

2014 (for tardiness due to family issues and FMLA), and on March 23 2014 (for

safety after injury at work that is the subject of this complaint).  (See Dep. Quaniah

Stevenson 108-133, 144, ECF No. 88-4; Id. Ex. 9, ECF No. 88-7, Ex. 10, ECF No.

88-8.)  Defendant denies that she received a verbal warning on 2/14/2013 (Id. at 112,

ECF No. 88-4.) Defendant denies that she received coaching on 2/19/2013.  (Id. at

113-15.)  Defendants denies that she received coaching on 3/7/15. (Id. at 116-18.)

    4.    Admit

    5.    Admit

    6.    Plaintiff denies that Delta periodically issues reminders to employees

of the importance of complying with the policies regarding pass travel. (See Decl.

Quaniah Stevenson Ex. 1, ¶8.)

    7.    Plaintiff denies that Delta expressly prohibits the use of travel passes

for anything other than leisure travel.  (See Dep. Quaniah Stevenson Ex. 8, at 1, ECF

No. 88-6.)  The cited document establishes that Delta permits non-leisure travel (e.g.,

for emergency purposes and for "official Company or government business").  (Id.)
Furthermore, Delta has produced documents where numerous employees have been
permitted to allow their travel passes to be used for business travel without any
discipline, minor consequences (e.g., verbal coaching), or discipline less than
termination. These include:

- Marian Bicksler (see Dep. Kelly Nabors 71-74, ECF No. 92; Id. Ex. 1, at 2,
  ECF No. 92-1);

- Cindy Fudala (Id. at 75-76, ECF No. 92; Id. Ex. 1, at 3, ECF No. 92-1);

- Douglas Rehm (Id. at 78-80, ECF No. 92; Id. Ex. 1, at 3, ECF No. 92-1; see
  also. Ex. 2).  It is noted that Delta includes in business travel "travel if the cost
  of transportation could be reimbursed by an external company organization"
  (see Dep. Kelly Nabor Ex. 3, at 2, ECF No. 92-3). In Rehm's case, Douglass
  Rehm admitted that the person using his travel pass was seeking
  reimbursement of the cost of transporation.  See Ex. 2 ("Carson was
  attempting to obtain a receipt **so that he would be reimbursed for the taxes
  and other fees associated with the pass**.")

- Susan Galyardt (Dep. Kelly Nabor 80-82, ECF No. 92; Id. Ex. 1, at 5, ECF
  No. 92-1).  In this case, it was admitted that Ms. Galyardt travel pass was used
  for business purposes.  However, instead of permanently suspending her

travel pass privileges (which would have been analogous to termination), Ms. Galyardt could reapply for travel benefits in 3 years).

- Bryan McKenzie (Id. at 84-88, ECF No. 92; Id. Ex. 1, at 5, ECF No. 92-1). Mr. McKenzie was able to keep his job after travel pass use for business purposes.

- Randolph Bucher (Id. at 88-89, ECF No. 92; Id. Ex. 1, at 5, ECF No. 92-1). Mr. Bucher was able to retire in lieu of termination after travel pass use for business purposes.

- Debbra Mercer (Id. at 92-93, ECF No. 92; Id. Ex. 1, at 9, ECF No. 92-1).  Ms. Mercer was able to keep her job although her travel pass was used for business purposes.

- Angel Mooring (Id. at 93-96, ECF No. 92; Id. Ex. 1, at 9, ECF No. 92-1).  Ms. Mooring was able to keep her job although her travel pass was used for business purposes.  It is noted Delta includes in business travel "nonrevenue standby … on any flight for which a pass rider is holding or has held a confirmed reservation . . . . " (see Dep. Kelly Nabor Ex. 3, at 2, ECF No. 92-3).

- Heather Cross (<u>Id.</u> at 97-99, ECF No. 92; <u>Id.</u> Ex. 1, at 13, ECF No. 92-1; <u>see also</u>. Ex. 3). Ms. Cross was able to keep her job although her travel pass was used for extensive business purposes.

- David Bishton (<u>see</u> Dep. Barbara Franz 88-104, ECF No. 89; <u>Id.</u> Ex. 22, ECF No. 89-12; <u>Id.</u> Ex. 23, ECF No. 89-13; <u>Id.</u> Ex. 24, ECF No. 89-14).   Mr. Bishton was able to escape an intensive investigation by Delta although a quick internet search by Ms. Quaniah Stevenson reveals that Mr. Bishton travel pass was used for extensive business purposes by his marathon runner brother. (<u>See</u> Decl. Quaniah Stevenson Ex. 1, ¶15.) Delta took Mr. Bishton's word and did not perform any independent investigation.

8.     Plaintiff admits that travel companion and buddy passes are provided at free and reduces rates and it is the intention of Delta that they be uses for leisure travel.  Plaintiff denies the remaining allegations.  (<u>See </u>Dep. Quaniah Stevenson Ex. 8, ECF No. 88-6.)

9.     Plaintiff denies these allegations.  (<u>See </u>Dep. Quaniah Stevenson Ex. 8, ECF No. 88-6.).  Plaintiff incorporates by reference Plaintiff's response to paragraph 7.   Plaintiff in her deposition only admitted that it her responsibility to the follow the rules.  Plaintiff incorporates by reference Plaintiff's response to paragraph 15.

10.     Admit

11.    Plaintiff denies that Delta's Travel Pass Policy states that business travel is expressly prohibited. Delta's Travel Pass Policy allows some business travel and other travel.  (See Stevenson Deposition, Exh. 8, p. 2.) Plaintiff incorporates by reference Plaintiff's response to paragraph 7.

12.    Plaintiff denies Plaintiff was aware that Delta requires that its employees keep "control" of their passes and the passes of their designated companions -- including by ensuring that the employee is aware of the travel being undertaken by their companion and that the pass travel is not for business or other improper purposes.  (See Decl. Quaniah Stevenson Ex. 1, ¶9).  Plaintiff incorporates by reference Plaintiff's response to paragraph 15.

13.    Plaintiff denies that Plaintiff was aware that Delta employees are responsible for overseeing and maintaining control of the use of their travel passes and ensuring that their non-employee travel companions comply with these Delta policies relating to travel passes.  (See Decl. Quaniah Stevenson Ex. 1, ¶9.)

14.    Plaintiff denies the allegation and paragraph 14 and asserts that this is merely pre-text for wrongfully firing Plaintiff.

15.    Plaintiff denies the allegation and paragraph 14 and asserts that this is merely pre-text for wrongfully firing Plaintiff.  Plaintiff denies the allegation and paragraph 15.  The memo states that employees may only use the Delta's pass travel

privileges for leisure only and provides that "[w]hen you decide with whom you are going to share them, do so wisely.  Know the individual well and enough to trust he or she will use the pass travel privileges properly".  The memo does not purport to hold an employee strictly liable for others use of the employee's travel pass privileges.   Instead, the memo, only requires that the employee "[k]now the individual well and enough to trust he or she will use the pass travel privileges properly."  (See Dep. Quaniah Stevenson Ex. 13 at Q6, ECF No. 88-11; see also, Dep. Barbara Franz 29-31, ECF No. 89.)

16.   Plaintiff admits that the April 2014 communication states, "[d]on't share your passes with anyone who intends to use pass travel for business purpose".

17.   Plaintiff denies the allegation of 17.  Q4 is directed to employee use while Q6 is directed to others use of the pass travel privileges. Regarding an employee's use, the memo states that only using travel privileges for business purpose use by an employee "can result in loss of travel privileges and even termination from employment."  Regarding others use, the memo states that only "accepting money or other goods or services in exchange for pass travel privileges" "may result in termination of [] employment." (See Stevenson Deposition, Exh. 13 at Q6.).  The last sentence of Q6 modifies the immediately proceeding paragraph. Q10 merely indicates that "in some cases" termination of employment may result

for "[p]ass travel abuse or misconduct by any associated pass rider." The "some cases" are expressly stated in Q6 for only "accepting money or other goods or services in exchange for pass travel privileges."

18.   Admit

19.   Admit

20.   Plaintiff denies the allegations in paragraph 20 and asserts that this is merely pre-text for wrongfully firing Plaintiff. Furthermore, Ms. Nabors could not speak with certainty on this point and states, "·I don't want to misstate the parameters . . . . but *I believe* . . . ." (See Dep. Kelly Nabors 160, ECF No. 92 (emphasis added).) Plaintiff Quaniah R. Stevenson brought this action in the United States District Court for the Northern District of Georgia against Defendant Delta Air Lines, Inc. for violations of the American with Disabilities Act (ADA), race discrimination, gender discrimination, age discrimination, and retaliatory discharge. In her complaint and declaration attached hereto, Ms. Stevenson, whom was over the age of 40 at all relevant times, states that she suffered an injury while on the job at Delta in March 2014. (See Decl. Quaniah Stevenson Ex. 1, ¶¶1-2.) This work injury caused her to be out of work for eight (8) months. (See Decl. Quaniah Stevenson Ex. 1, ¶2.) Prior to this time, Ms. Stevenson had been successfully employed with Delta since at least August 1, 2007. (See Decl. Quaniah Stevenson Ex. 1, ¶3; see also ep. Kelly Nabors

139-153, ECF No. 92; <u>Id.</u> Ex. 2, ECF No. 92-2 and <u>Id.</u> Ex. 9, ECF No. 92-9.)
However, upon returning to work in November 2014, as alleged in her complaint
and declaration attached hereto, Ms. Stevenson was subjected to retaliation and
harassment because of her disability and because she exercised her rights under the
ADA.  (<u>See</u> Decl. Quaniah Stevenson Ex. 1, ¶¶4-5.)  The harassment that Ms.
Stevenson suffered is set forth in detail in Plaintiff's complaint at paragraphs 20-28,
for example.  (<u>See</u> Decl. Quaniah Stevenson Ex. 1, ¶5.)  Delta's harassment caused
Ms. Stevenson to suffer depression and contributed to pain caused by her work
related injury, which resulted in her taking leave including an overnight stay in the
hospital.  (<u>See</u> Decl. Quaniah Stevenson Ex. 1, ¶6.)  On July 28, 2015, Delta
terminated Ms. Stevenson's employment however, alleging that Ms. Stevenson
violated the company's employee travel benefits (e.g. Delta's "Pass Travel", "Travel
Passes", or "Buddy Passes").  (<u>See</u> Decl. Quaniah Stevenson Ex. 1, ¶7.)  This reason
for her termination is pretext for Delta's unlawful harassment, discrimination, and
retaliation. Delta's reason for terminating Ms. Stevenson's employment is pretext
because:

(1) Delta has changed its reason for the termination (<u>See, e.g.,</u> Dep. Kelly Nabors
21-26, ECF No. 92; <u>contrast</u> <u>Id</u>. Ex. 2, ECF No. 92-2, Ex. 6, ECF No. 92-6, Ex. 11,

ECF No. 92-11, Ex. 13, ECF No. 92-13, Ex. 14, ECF No. 92-14, and Defendant's Ex. 2, ECF No. 92-19).

(2) similarly situated employees were treated differently (See, e.g., Dep. Kelly Nabors 71-100, 169-173, 135-139, ECF No. 92; Id. Ex. 1, ECF No. 92-1.) All the white employees investigated and were able to keep their jobs were giving the benefit of doubt, were treated less harshly, and were scrutinize far less. The following employees were treated differently:

*the employees listed in Plaintiff response to Paragraph 7, which is incorporated herein by reference.

*David Ragan (see Dep. Barbara Franz 110-116, ECF No. 89; Id. Ex. 18, ECF No. 89-9.)   Mr. Ragan was able to keep his job despite not being able to recall several buddy pass riders, giving away his password for booking flights, and other more egregious infractions than alleged by Plaintiff.

*Richard Service (see Dep. Barbara Franz 116-124, ECF No. 89; Id. Ex. 19, ECF No. 89-10.)   Mr. Service was able to keep his job despite making numerous untruthful statements and losing control of his travel pass, among other egregious infractions.

14

*Sabrina Simmons (see Dep. Barbara Franz 127-136, ECF No. 89; Id. Ex. 19, ECF No. 89-11.)  Ms. Simmons was able to keep her job despite not being able to recall where her travel companion traveled whom appears to have been traveling for business.  Ms. Simmons did not know when he traveled and why he traveled. Ms. Simmons also did not know all here travel companions. Ms. Simmons was never questioned on why her travel companions used her travel pass.  There was thorough investigation. Ms. Simmons egregious acts were swept under the rug and she was able to keep her job despite the numerus egregious infractions.

* Sidarious Johnson (see Dep. Barbara Franz 104-110, ECF No. 89; Id. Ex. 12, ECF No. 89-5.).  Defendant claims that Ms. Quaniah Stevenson was investigated because of Vendal Bailey however Sirdarious Johnson, who was investigated in association with Mr. Bailey, committed more egregious conduct yet was allowed to keep his job. Mr. Bailey is a male and under the age of 40.

(3) Mr. Dais has been traveling under Ms. Stevenson's Delta travel benefits since 2007 yet Delta only decided to investigate Mr. Dais until after Ms. Stevenson's

disability and after she exercised her rights under the ADA.  This considerable delay suggests that Delta's reason was a pretextual afterthought, especially when the reason is articulated for the first time in response to Ms. Stevenson's claims of harassment and retaliation (see, e.g., Dep. Kelly Nabors 156-57, ECF No. 90 and exhibits cited therein);

(4) it is impossible for an employee to always know the reasons someone uses a travel pass; this unattainable goal is evidence of pretext.  See, e.g., Denesha v. Farmers Ins. Exch., 161 F.3d 491, 499 (8th Cir. 1998) (holding the imposition of unattainable production goals on an employee was evidence supporting a jury's finding of discrimination); see also, Dep. Barbara Franz 79, ECF No. 89.

(5) Delta deviated from its normal management procedures when it summarily terminated Ms. Stevenson (See, e.g., Dep. Kelly Nabors 161-62, ECF No. 92; Id. Ex. 10, ECF No. 92-10). More specifically, Ms. Stevenson was terminated for loss of control (See, e.g., Id. Ex. 2, ECF No. 92-2, Ex. 13, ECF No. 92-13, and Ex. 14, ECF No. 92-14.)  Delta normally takes corrective action, for example, a two-year pass suspension of benefits, when there is a loss of· control of pass travel privileges

(see, e.g., Id. 161-62, ECF No. 92; Id. Ex. 10, ECF No. 92-10.).  However, in this case, Ms. Stevenson was fired.

(6) Ms. Stevenson had a good performance history (see, e.g., Id. 139-153, ECF No. 92; Id. Exs. 2, ECF No. 92-2 and Ex. 9. ECF No. 92-9) and, in fact, Delta's subsidiary had re-hired Ms. Stevenson and restored her travel pass privileges (See Decl. Quaniah Stevenson Ex. 1, ¶11.);  See, e.g., *59 Causes of Action 2d, Cause of Action under Age Discrimination in Employment Act* §24 (2013): ("[E]vidence of satisfactory or superior performance evaluations … may tend to show … the illegitimate nature of the defendant's articulated reason.").

(7) despite Ms. Stevenson's long employment history with Delta, Delta cites to only **one alleged travel pass violation** as its reasoning to terminate Ms. Stevenson.  (See, e.g., Dep. Kelly Nabors Ex. 2, ECF No. 92-2, Ex. 13, ECF No. 92-13, and Ex. 14, ECF No. 92-14.)  See, Stalter v. Wal-Mart Stores, Inc., 195 F. 3d 285 (7th Cir. 1999)("More compelling is the severity of the punishment in relation to the alleged offense. … This strikes us as swatting a fly with a sledge hammer. That Wal-Mart felt compelled to terminate Stalter for this offense does not pass the straight-face test ….""").

(8) Ms. Steven, in fact, did not violate any travel pass policy. More specifically, there is no credible or good faith evidence that Mr. Dias was traveling on business (See, e.g., Dep. Kelly Nabors 33- 70, 175-176, ECF No. 92 and Ex. 2, ECF No. 92-2 and Ex. 9, ECF No. 92-9).  Defendant contends that social media post are the bases for the conclusion that Mr. Dias was traveling for business (See, e.g., Id., Ex. 2, ECF No. 92-2.)  However, Delta could not point to any credible social media posts that Mr. Dias was traveling for business.  (See, e.g., Id. 33–70 and 175-176, ECF No. 92 and exhibits cited therein).  There is no credible evidence that Mr. Boyett was a client of Mr. Dias or that Mr. Dias made a profit from the travel.    In fact, the evidence establishes that Mr. Dias is a residency of California (the destination of the travel) and that Mr. Dias has a daughter that lives in California, which the evidence established that he visited his daughter during the travel and attend, for leisure, a concert.  (See, e.g., Id. 29-30, and 113-133, ECF No. 92 and exhibits cited therein).  Delta admits that this sort of travel is not business travel but leisure/personal travel.  (See, e.g., Id. 29-30, and 113-133, ECF No. 92).

21.    Plaintiff denies the allegations in paragraph 21 and asserts that this is merely pre-text for wrongfully firing Plaintiff.  Plaintiff incorporates by reference Plaintiff's response to paragraph 20.

22.     Plaintiff denies the allegations in paragraph 22 and asserts that this is merely pre-text for wrongfully firing Plaintiff.  Plaintiff incorporates by reference Plaintiff's response to paragraph 20.  Furthermore, others that provided travel passes to Mr. Bailey, were not fully and carefully reviewed and to the extent as Plaintiff.  (See, e.g., Nabors Deposition 169-173, ECF No. 92 and exhibits cited therein);

23.     Plaintiff denies the allegations in paragraph 23 and asserts that this is merely pre-text for wrongfully firing Plaintiff.  Plaintiff incorporates by reference Plaintiff's response to paragraph 20.  Furthermore, Jovan Dais travel does not reflect possible business travel use.

24.     Plaintiff denies the allegations in paragraph 24 to the extent they contradict the record, which speaks for itself.  (See Decl. Jovan Dias Ex. 3.)

25.     Plaintiff denies the allegations in paragraph 25 and asserts that this is merely pre-text for wrongfully firing Plaintiff.  Plaintiff incorporates by reference Plaintiff's response to paragraph 20.   There is no credible evidence that Mr. Dias was traveling on business or that Mr. Dias "worked" with or for Mr. Boyett (See, e.g., Nabors Deposition, pp. 33- 70, 175-176, and Exhs. 2 and 9; see also Decl. Jovan Dias Ex. 3.).   Defendant contends that social media post are the bases for the conclusion that Mr. Dias was traveling for business (See, e.g., Nabors Deposition, Exh. 2).  However, Delta could not point to any credible social media posts that Mr.

Dias was traveling for business.  (See, e.g., Nabors Deposition, pp. 33–70 and 175–176 and exhibits cited therein).  There is no credible evidence that Mr. Boyett was a client of Mr. Dias or that Mr. Dias made a profit from the travel.   (See Decl. Jovan Dias Ex. 3.) In fact, the evidence establishes that Mr. Dias is a residency of California (the destination of the travel) and that Mr. Dias has a daughter that lives in California, which the evidence established that he visited his daughter during the travel and attend, for leisure, a concert.  (See, e.g., Nabors Deposition, pp. 29-30, and 113-133 and exhibits cited therein). Delta admits that this sort of travel is not business travel but leisure/personal travel.  (See, e.g., Nabors Deposition, pp. 29-30, and 113-133).

26.    Plaintiff denies the allegations in paragraph 26 and asserts that this is merely pre-text for wrongfully firing Plaintiff. Plaintiff incorporates by reference Plaintiff's response to paragraph 20 and 25.   The record does not reflect that Mr. Dais and Mr. Boyett "performed" together.  (See Decl. Jovan Dias Ex. 3.)

27.    Plaintiff denies the allegations in paragraph 27, Mr. Boyette was not on Ms. Stevenson travel pass during the June 6. 2015 travel. (See Exh. 1, paragraph 10; See, Franz Deposition Ex. 27, ECF. 89-14.)

28.    Plaintiff denies the allegations in paragraph 28 to the extent they contradict the record, which speaks for itself.

29.    Plaintiff denies the allegations in paragraph 29.

30.     Plaintiff denies the allegations in paragraph 30 and asserts that this is merely pre-text for wrongfully firing Plaintiff. Plaintiff incorporates by reference Plaintiff's response to paragraph 20 and 25.  The record does not reflect that Mr. Dais and Mr. Boyett were work partners.  (See Decl. Jovan Dias Ex. 3.) Mr. Diaz and Mr. Boyett are friends, not business associates (See Exh. 1, paragraph 14.); (See Decl. Jovan Dias Ex. 3.)  Further, Defendant admits that friends travel together and pay for each other. (See, e.g., Nabors Deposition, p. 47).

31.     Plaintiff denies the allegations in paragraph 31.

32.     Plaintiff denies the allegations in paragraph 32 and asserts that this is merely pre-text for wrongfully firing Plaintiff. Plaintiff incorporates by reference Plaintiff's response to paragraph 20.

33.     Admit

34.     Admit

35.     Plaintiff denies the allegations in paragraph 35 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

36.     Plaintiff denies the allegations in paragraph 36.

37.     Plaintiff denies the allegations in paragraph 37 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

38.     Plaintiff denies the allegations in paragraph 38 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

39.     Plaintiff denies the allegations in paragraph 39 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

40.     Plaintiff denies the allegations in paragraph 40 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

41.     Plaintiff denies the allegations in paragraph 41 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

42.     Plaintiff denies the allegations in paragraph 42 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

43.   Plaintiff denies the allegations in paragraph 43 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

44.   Plaintiff denies the allegations in paragraph 44 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.  Plaintiff advised Delta Mr. Dais also lived in California and before the termination and appeal.  See Quaniah Declaration, Ex. 1.

45.   Plaintiff denies the allegations in paragraph 45 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 16, 21.  Specially, the evidence establishes that Delta was provided evidence that Mr. Dias is a residency of California (the destination of the travel) and that Mr. Dias has a daughter that lives in California, which the evidence established that he visited his daughter during the travel and attend, for leisure, a concert.  (See, e.g., Nabors Deposition, pp. 29-30, and 113-133 and exhibits cited therein). Delta admits that this sort of travel is not business travel but leisure/personal travel.  (See, e.g., Nabors Deposition, pp. 29-30, and 113-133).

46.     Plaintiff denies the allegations in paragraph 43 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

47.     Plaintiff denies the allegations in paragraph 43 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

48.     Admit

49.     Deny.  Upon returning to work in November 2014, as alleged in her complaint and declaration attached hereto, Ms. Stevenson was subjected to retaliation and harassment because of her disability and because she exercised her rights under the ADA.  (See Exh. 1, paragraphs 4-5.)  The harassment that Ms. Stevenson suffered is set forth in detail in Plaintiff's complaint at paragraphs 20-28, for example.  (See Exh. 1, paragraph 5.)  Delta's harassment caused Ms. Stevenson to suffer depression and contributed to pain caused by her work related injury, which resulted in her taking leave including an overnight stay in the hospital.  (See Exh. 1, paragraph 6.)   Furthermore, upon returning to work in November 2014, as alleged in her complaint and declaration attached hereto, Ms. Stevenson was subjected to retaliation and harassment because of her disability and because she exercised her rights under the ADA.  (See Exh. 1, paragraphs 4-5.)  The harassment that Ms.

Stevenson suffered is set forth in detail in Plaintiff's complaint at paragraphs 20-28, for example.  (See Exh. 1, paragraph 5.)  Delta's harassment caused Ms. Stevenson to suffer depression and contributed to pain caused by her work related injury, which resulted in her taking leave including an overnight stay in the hospital.  (See Exh. 1, paragraph 6.) Upon returning to work in November 2014, as alleged in her complaint and declaration attached hereto, Ms. Stevenson was subjected to retaliation and harassment because of her disability and because she exercised her rights under the ADA.  (See Exh. 1, paragraphs 4-5.)  The harassment that Ms. Stevenson suffered is set forth in detail in Plaintiff's complaint at paragraphs 20-28, for example.  (See Exh. 1, paragraph 5.)  Delta's harassment caused Ms. Stevenson to suffer depression and contributed to pain caused by her work related injury, which resulted in her taking leave including an overnight stay in the hospital.  (See Exh. 1, paragraph 6.) On July 28, 2015, Delta terminated Ms. Stevenson's employment however, alleging that Ms. Stevenson violated the company's employee travel benefits (e.g. Delta's "Pass Travel", "Travel Passes", or "Buddy Passes").  (See Exh. 1, paragraph 7.)  This reason for her termination is pretext for Delta's unlawful harassment, discrimination, and retaliation.

50.    Deny. Plaintiff incorporates her response to paragraph 49.

51.    Deny. Plaintiff incorporates her response to paragraph 49.

52.    Deny. Plaintiff incorporates her response to paragraph 49/

53.    Deny. Plaintiff incorporates her response to paragraph 49

Respectfully submitted this 31st day of July, 2019.

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

**Counsel certifies that the brief has been prepared with one of the font and point selections approved by the court in LR 5.1C.  Counsel further certifies that counsel attempted to meet and confer with Defendant's counsel prior to serving this motion.

I certify that I have served **PLAINTIFF QUANIAH R. STEVENSON'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT AND STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS** via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: September 27, 2019    By: /s/ Charlena Thorpe
                                 Charlena Thorpe

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

Quaniah R. Stevenson        )
        )
         Plaintiff,      )
        )
      vs.        )
        )   Civil No.: 1:16-CV-2571-AT-LTW
Delta Air Lines, Inc.        )
        )
        Defendants.   )
        )

## <u>DECLARATION OF QUANIAH STEVENSON</u>

I, Quaniah Stevenson, declare as follows:

1.     I was over the age of 40 at all relevant times. Specifically, I was over the age of 40 at the time of my termination from Delta and on March 2014.

2.     I suffered an injury while on the job at Delta in March 2014.  This work injury caused me to be out of work for eight (8) months.

3.     Prior to this time, I had been successfully employed with Delta since at at least August 1, 2007.

4.     However, upon returning to work in November 2014, I was subjected to retaliation and harassment because of my disability and because I exercised my rights under the ADA.

5.      The harassment that I suffered is set forth in detail in my complaint at paragraphs 20-28, for example, which is incorporated by reference herein.

6.      Delta's harassment caused me to suffer depression and contributed to pain caused by my work related injury, which resulted in me taking leave including an overnight stay in the hospital.

7.      On July 28, 2015, Delta terminated my employment alleging that I violated the company's employee travel benefits (e.g. Delta's "Pass Travel", "Travel Passes", or "Buddy Passes").   I was ever "disciplined" for my attendance and job performance during my employment except for when I was terminated on July 28, 2015.

8.      Delta does not periodically issue reminders to employees of the importance of complying with the policies regarding pass travel.  I did not receive periodic reminders of the importance of complying with the policies regarding pass travel.

9.      I was not aware that Delta requires that its employees keep "control" of their passes and the passes of their companions -- including by ensuring that they are aware of the travel being undertaken by their companion and that it is not for business or other improper purposes and overseeing use.

10.     Mr. Boyette was not on my travel pass during the June 6. 2015 travel.

11.    Delta's subsidiary has re-hired me and restored the very travel pass privileges that I was afforded while working with Delta.

12.    I·advised Delta that Mr. Dais also lived in California and before the termination and appeal.

13.    I never told·Delta's investigative team there that I traveled with Mr. Dais.

14.    Mr. Diaz and Mr. Boyett are friends, not business associates.

15.    After a brief internet search, I was able to easily find a Robert Jeff Bishton who is a marathon runner that run marathon's for prizes.  (See Dep. Barbara Franz Ex. 23, ECF No. 89-13; Id. Ex. 24, ECF No. 89-14).  This Robert Jeff Bishton internet records corresponds to the documents in David Bishton's investigation records.  (See Id. Ex. 22, ECF No. 89-12.  Based on this quick internet search, it appears David Bishton was being untruthful to Delta regarding his travel pass use for business purposes.

I declare under the penalty of perjury of the laws of Georgia that the foregoing is true and correct, and that this declaration was executed on September 27, 2019.

/s/ Quaniah Stevenson
Quaniah Stevenson


Respectfully submitted this 28th day of January, 2021.

3

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

I certify that I have served DECLARATION OF QUANIAH STEVENSON via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: January 28, 2021          By: /s/ Charlena Thorpe
                                      Charlena Thorpe

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| Quaniah R. Stevenson | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Civil No.: 1:16-CV-2571-AT-LTW |
| Delta Air Lines, Inc. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>DECLARATION OF JOVAN DIAS</u>

I, Jovan, declare as follows:

1.      During the travel in question to California with Boyett, it was please.

Boyett is not my client and we are not business parties.

I declare under the penalty of perjury of the laws of Georgia that the foregoing

is true and correct, and that this declaration was executed on September 27, 2019.

<u>/s/ Jovan Dias</u>
Jovan Dias


Respectfully submitted this 28th day of January, 2021.

1

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

I certify that I have served DECLARATION OF JOVAN DIAS via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: January 28, 2021        By: /s/ Charlena Thorpe
                                    Charlena Thorpe

# Dkt/Tab 98

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

Quaniah R. Stevenson )
                                                )
                              Plaintiff,     )
                                                )
              vs.                             )     Civil No.: 1:16-CV-2571-AT-LTW
                                                )
Delta Air Lines, Inc.                     )
                                                )
                              Defendants.  )
_____ )

**MOTION FOR LEAVE TO FILE PLAINTIFF QUANIAH R.**
**STEVENSON'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF**
**UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL**
**MATERIAL FACTS**

Plaintiff Quaniah Stevenson files this motion for leave to supplement and herein supplements her response to Defendant Delta Air Lines, Inc.'s Motion for Summary Judgment filed on January 28, 2021 (see Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 96) to correct typos and to provide minor additional citations to the record previously submitted and minor supplementations to some responses for completeness and consistency.  Also, the wrong version of declarant's Jovan Dais declaration was submitted in error. This supplemental response corrects this filing error with the correct declaration of Jovan Dais, the content of which is supported by the original response. (Id.)  Although a supplemental declaration of Stevenson is

included, it merely corrected a typographical error. This supplemental response will benefit the Court as it places ECF No. 96 in better form and does not prejudice Defendant.

Plaintiff brought this action in the United States District Court for the Northern District of Georgia against Defendant Delta Air Lines, Inc. for violations of the American with Disabilities Act (ADA), race discrimination, gender discrimination, age discrimination, and retaliatory discharge.   (See generally, Compl., ECF No. 3.)

In her complaint, Ms. Stevenson, whom is over the age of 40, states that she suffered an injury while on the job at Delta in March 2014.   (Id. at ¶15; see also, Suppl. Decl. Stevenson Ex. 1, ¶2.) This work injury caused her to be out of work for eight (8) months.   (Suppl. Decl. Stevenson Ex. 1, ¶2.)   Prior to this time, Ms. Stevenson had been successfully employed with Delta since August 1, 2007.   (Id. ¶3.)

However, upon returning to work in November 2014, as alleged in her complaint, Ms. Stevenson was subjected to retaliation and harassment because of her disability and because she exercised her rights under the ADA.   (Id. at ¶4.) The harassment that Ms. Stevenson suffered is set forth in detail in Plaintiff's complaint at paragraphs 20-28, for example.   (Id. at ¶5.)   Delta's harassment caused Ms.

Stevenson to suffer depression and contributed to pain caused by her work-related injury, which resulted in her taking leave including an overnight stay in the hospital. (Id. at ¶6.)

On July 28, 2015, Delta terminated Ms. Stevenson's employment alleging that Ms. Stevenson violated the company's employee travel benefits (e.g., Delta's "Pass Travel", "Travel Passes", or "Buddy Passes"). (Id. at ¶7.) The alleged violation was based on **one** flight as discussed below. Ms. Stevenson contends that this reason for her termination is pretext for Delta's unlawful harassment, discrimination, and retaliation.

Delta primary defense is that "Stevenson has no evidence that Delta's decision was because of her race, sex, gender and/or alleged disability, and her claims fail as a matter of law." (Def.'s Br. Supp. Mot. Summ. J. 2 ECF No. 88-2.) Delta alleges that "Stevenson cannot identify anyone, of any race, age or sex, who Delta found to have lost control of their passes and allowed them to be used for business travel, and who Delta then found to be untruthful during an investigation, who was not treated the same." (Id. at 15.)

Delta alleges that "Delta produced the records which established, again, that none of these individuals engaged in the wide array of travel pass misconduct in which Plaintiff engaged." (Id. at 16 n.7.). However, as discussed in below, Delta

3

only alleges **one (1)** travel violation of Ms. Stevenson and not a "wide array of travel pass misconduct."  (<u>See</u>, <u>e.g.</u>, Dep. Barbara Franz 66-67, ECF No. 89; <u>see also</u>, <u>e.g.</u>, Dep. Kelly Nabors 34-34, 158, ECF No. 92.)  Furthermore, as discussed in detailed below, the allegations that there is no evidence of others that committed the alleged same (or much worse) conduct as Ms. Stevenson but was allowed to keep their job is blatantly untrue.

Delta further asserts that "Delta concluded in good faith that Dais was using his passes for business travel connected with his music business and concluded that Plaintiff had lost control of her travel passes and lied to Delta about it."  (Def.'s Br. Supp. Mot. Summ. J. 17 ECF No. 88-2.)  Delta further asserts that it had a legitimate, nondiscriminatory reason for its action.  (<u>Id</u>. at 20.)  Still further, Delta asserts that "Stevenson admitted that she made no complaints about any discriminatory conduct covered by Title VII, the ADA, the ADEA or § 1981." (<u>Id</u>.)

First, Delta has not addressed or fully addressed Ms. Stevenson's harassment (e.g., under Title V), hostile work environment, and retaliation claims under the ADA.  <u>See</u>, <u>e.g.</u>, <u>In Fox v. General Motors Corp.</u>, 247 F.3d 169 (4th Cir. 2001); <u>Flowers v. Southern Regional Physician Services, Inc.</u>, 247 F.3d 229 (5th Cir. 2001); <u>EEOC v. BobRich Enterprises</u>, No. 3:05-CV01928-M (N.D. Tex. Jul. 27, 2007; <u>Arrieta-Colon v. Wal-Mart Stores</u>, 434 F.3d 75 (1st Cir. 2006); <u>Quiles-Quiles v.</u>

Henderson, 439 F.3d 1 (1st Cir. 2006).   For example, under the ADA, retaliation claims can arise absent complaints about discrimination or harassment.   For example, protected activity can also arise when an employee requests a reasonable accommodation under the Americans With Disabilities Act (ADA).   Plaintiff contends that Defendant retaliated by harassing Plaintiff for exercising her rights.

Second, evidence shows that Ms. Stevenson was treated less favorably and differently (i.e., terminated with no warning for an alleged single violation of travel benefits) than individuals outside of her protected classification for those claims that require her to prove that she is in a protected class.   (See, e.g., Dep. Kelly Nabors 71-100, 135-139, and 169-173, ECF No. 92; Id. Ex. 1, ECF No. 92-1 and any other exhibits cited therein; see also, Dep. Barbara Franz 88-144, ECF No. 89 and exhibits cited therein).   Evidence shows that the individuals outside of Ms. Stevenson's protected classification for those claims that require her to prove that she is in a protected class that committed more egregious acts were allowed to keep their job. (See, e.g., Dep. Kelly Nabors 71-100, 135-139, and 169-173, ECF No. 92; Id. Ex. 1, ECF No. 92-1 and any other exhibits cited therein; see also, Dep. Barbara Franz 88-144, ECF No. 89 and exhibits cited therein).   Evidence shows that the reason for terminating Ms. Stevenson was subjective, unsubstantiated, purely speculative, and not in good faith. (see, e.g., Dep. Kelly Nabors 71-100, 169-173, 135-139, ECF No.

92; <u>see also</u>, Dep. Barbara Franz 88-144. ECF No. 89 and exhibits cited therein.),

yet individuals outside of her protected classification for those claims that require

her to prove that she is in a protected class where allegations were "unsubstantiated"

were allowed to keep their job.  (<u>See, e.g.</u>, Dep. Barbara Franz 88-144. ECF No. 89

and exhibits cited therein.) Evidence shows that Delta investigated her travel more

rigorously than individuals outside of her protected classification for those claims

that require her to prove that she is in a protected class.  (<u>Id.</u>) There is absolutely no

good faith evidence in the record that Jovan Dais, her travel companion, was

traveling on business for the one travel date in question (i.e., June 6. 2015). (<u>See e.g.</u>,

Dep. Kelly Nabors 40, 42-45, 46-47, 57-58, and 61-70, ECF No. 92; <u>see also</u>, Dep.

Barbara Franz 87-88, ECF No. 89.)  In fact, the primary reason that Delta provides

to conclude that Mr. Dais was traveling on business is because Mr. Dais showed up

at a concert with Mr. Caleb Boyett (someone that was not using Ms. Stevenson's

travel benefit on the travel date in question - (<u>See</u> Suppl. Decl. Stevenson Ex. 1, ¶10;

<u>See</u>, Franz Deposition 72-74, ECF No. 89; <u>Id.</u> at Ex. 27, ECF. 89-14.)). Delta cites

to no evidence that Mr. Boyett was Ms. Dais's client.  (<u>See e.g.</u>, Dep. Kelly Nabors

40, 42-45, 46-47, 57-58, and 61-70, ECF No. 92; <u>see also</u>, Dep. Barbara Franz 72-

74 and 87-88, ECF No. 89.)  Delta admits that Dais activity in connection with the

travel was consistent with leisure travel (<u>see e.g.</u>, Dep. Kelly Nabors 29-30, 47, 61-

62, and 113-133, ECF No. 92), however, the key reasoning for concluding it was business (i.e., because Mr. Boyett was a client of Ms. Dais), Delta provides absolutely no evidence (Id. at 68.). This is very problematic because the evidence shows that Delta "took the word of" or "gave the benefit of the doubt" to individuals outside of Ms. Stevenson's protected classification for those claims that require her to prove that she is in a protected class but did not take Ms. Stevenson's word.  (See, e.g., Dep. Barbara Franz 88-144. ECF No. 89 and exhibits cited therein.) Evidence shows that Delta did not perform online research, like it did in Ms. Stevenson's investigation, to investigate individuals outside of her protected class.  See e.g., Id.

Third, Ms. Stevenson can prove that Delta's reason for terminating her employment is pretext (as discussed below).

Plaintiff responds to Defendant's Statement of Undisputed Facts as follow:

1.      Admit.

2.      Defendant admits that she worked at least in the areas listed.

3.      Plaintiff denies that she was ever "disciplined" for her attendance and job performance during her employment except for when she was terminated on or about July 28, 2015.  (See Suppl. Decl. Stevenson Ex. 1, ¶7.)  Plaintiff admits that she received a warning letter on 1/11/2009 for tardiness that occurred on 1/4/2009 through 1/6/2009 and that she received coaching on 10/11/2012 (for tardiness due to

being sick and car issues; Plaintiff was advised to call the sick line), December 2, 2013 (for coming to work 30 minutes late), March 9, 2014 (for time management and company policy regarding clocking in/out and attending briefing), March 22, 2014 (for tardiness due to family issues and FMLA), and on March 23 2014 (for safety after injury at work that is the subject of this complaint).  (See Dep. Quaniah Stevenson 108-133, 144, ECF No. 88-4; Id. Ex. 9, ECF No. 88-7, Ex. 10, ECF No. 88-8.)  Defendant denies that she received a verbal warning on 2/14/2013 (Id. at 112, ECF No. 88-4.) Defendant denies that she received coaching on 2/19/2013.  (Id. at 113-15.)  Defendants denies that she received coaching on 3/7/15. (Id. at 116-18.)

4.     Admit

5.     Admit

6.     Plaintiff denies that Delta periodically issues reminders to employees of the importance of complying with the policies regarding pass travel. (See Suppl. Decl. Stevenson Ex. 1, ¶8.)

7.     Plaintiff denies that Delta expressly prohibits the use of travel passes for anything other than leisure travel.  (See Dep. Quaniah Stevenson Ex. 8, at 1, ECF No. 88-6.)  The cited document establishes that Delta permits non-leisure travel (e.g., for emergency purposes and for "official Company or government business").  (Id.) Furthermore, Delta has produced documents where numerous employees have been

permitted to allow their travel passes to be used for business travel without any discipline or just minor consequences (e.g., verbal coaching) or discipline less than termination. These include:

- **Marian Bicksler** (white) (<u>see</u> Dep. Kelly Nabors 71-74, ECF No. 92; <u>Id.</u> Ex. 1, at 2, ECF No. 92-1);

- **Cindy Fudala** (white) (<u>Id.</u> at 75-76, ECF No. 92; <u>Id.</u> Ex. 1, at 3, ECF No. 92-1);

- **Douglas Rehm** (white male) (<u>Id.</u> at 78-80, ECF No. 92; <u>Id.</u> Ex. 1, at 3, ECF No. 92-1; <u>see also</u>. Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 4, ECF No. 96-4).  It is noted that Delta includes in business travel "travel if the cost of transportation could be reimbursed by an external company organization" (<u>see</u> Dep. Kelly Nabors Ex. 3, at 2, ECF No. 92-3). In Rehm's case, Douglass Rehm admitted that the person using his travel pass was seeking reimbursement of the cost of transportation.  <u>See</u> Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 4, ECF No. 96-4 ("Carson was attempting to obtain a receipt **so that he would be reimbursed for the taxes and other fees associated with the pass**.")

- **Susan Galyardt** (white) (Dep. Kelly Nabors 80-82, ECF No. 92; <u>Id.</u> Ex. 1, at 5, ECF No. 92-1).  In this case, it was admitted that Ms. Galyardt's travel pass

was used for business purposes.  However, instead of permanently suspending her travel pass privileges (which would have been analogous to termination), Ms. Galyardt could reapply for travel benefits in 3 years).

- **Bryan McKenzie** (white male) (<u>Id.</u> at 84-88, ECF No. 92; <u>Id.</u> Ex. 1, at 5, ECF No. 92-1).  Mr. McKenzie was able to keep his job after travel pass use for business purposes.

- **Randolph Bucher** (white male) (<u>Id.</u> at 88-89, ECF No. 92; <u>Id.</u> Ex. 1, at 5, ECF No. 92-1).  Mr. Bucher was able to retire in lieu of termination after travel pass use for business purposes.

- **Debbra Mercer** (white) (<u>Id.</u> at 92-93, ECF No. 92; <u>Id.</u> Ex. 1, at 9, ECF No. 92-1).  Ms. Mercer was able to keep her job although her travel pass was used for business purposes.

- **Angel Mooring** (white) (<u>Id.</u> at 93-96, ECF No. 92; <u>Id.</u> Ex. 1, at 9, ECF No. 92-1).  Ms. Mooring was able to keep her job although her travel pass was used for business purposes.  It is noted that Delta includes in business travel "nonrevenue standby … on any flight for which a pass rider is holding or has held a confirmed reservation . . . . " (<u>see</u> Dep. Kelly Nabors Ex. 3, at 2, ECF No. 92-3).  In Mooring's case, her travel companion engaged in business travel because he "purchases tickets in case he cannot get on as a·non-rev."

(Id. at 93-94, ECF No. 92.)

- **Heather Cross** (white) (Id. at 97-99, ECF No. 92; Id. Ex. 1, at 13, ECF No. 92-1; see also. Ex. 3). Ms. Cross was able to keep her job although her travel pass was used for extensive business purposes.

- **David Bishton** (white male) (see Dep. Barbara Franz 88-104, ECF No. 89; Id. Ex. 22, ECF No. 89-12; Id. Ex. 23, ECF No. 89-13; Id. Ex. 24, ECF No. 89-14).  Mr. Bishton was able to escape an intensive investigation by Delta although a quick internet search by Ms. Quaniah Stevenson reveals that Mr. Bishton travel pass was used for extensive business purposes by his marathon runner brother. (See Suppl. Decl. Stevenson Ex. 1, ¶15.) Delta took Mr. Bishton's word and did not perform any independent investigation.

8.     Plaintiff admits that travel companion and buddy passes are provided at free and reduces rates and it is the intention of Delta that they be used for leisure travel.  Plaintiff denies the remaining allegations.  (See Dep. Quaniah Stevenson Ex. 8, ECF No. 88-6.)

9.     Plaintiff denies these allegations.  (See Dep. Quaniah Stevenson Ex. 8, ECF No. 88-6.).  Plaintiff incorporates by reference Plaintiff's response to paragraph 7.  Plaintiff in her deposition only admitted that it her responsibility to follow the rules.  (Dep. Quaniah Stevenson 101, ECF No. 88-4.) Plaintiff incorporates by

reference Plaintiff's response to paragraph 15.

    10.    Admit

    11.    Plaintiff denies that Delta's Travel Pass Policy states that business travel is expressly prohibited. Delta's Travel Pass Policy allows some business travel and other travel.  (See Dep. Quaniah Stevenson Ex. 8, at 2, ECF No. 88-6.) Plaintiff incorporates by reference Plaintiff's response to paragraph 7.

    12.    Plaintiff denies Plaintiff was aware that Delta requires that its employees keep "control" of their passes and the passes of their designated companions -- including by ensuring that the employee is aware of the travel being undertaken by their companion and that the pass travel is not for business or other improper purposes.  (See Suppl. Decl. Stevenson Ex. 1, ¶9).  Plaintiff incorporates by reference Plaintiff's response to paragraph 15.

    13.    Plaintiff denies that Plaintiff was aware that Delta employees are responsible for overseeing and maintaining control of the use of their travel passes and ensuring that their non-employee travel companions comply with these Delta policies relating to travel passes. (See Suppl. Decl. Stevenson Ex. 1, ¶9). Plaintiff incorporates by reference Plaintiff's response to paragraphs 9 and 15.

    14.    Plaintiff denies the allegations in paragraph 14 and asserts that this is merely pre-text for wrongfully firing Plaintiff.

15.    Plaintiff denies the allegations in paragraph 15.  The memo states that employees may only use the Delta's pass travel privileges for leisure only and provides that "[w]hen you decide with whom you are going to share them, do so wisely.  Know the individual well and enough to trust he or she will use the pass travel privileges properly".  The memo does not purport to hold an employee strictly liable for others use of the employee's travel pass privileges.  Instead, the memo, only requires that the employee "[k]now the individual well and enough to trust he or she will use the pass travel privileges properly."  (See Dep. Quaniah Stevenson Ex. 13 at Q6, ECF No. 88-11; see also, Dep. Barbara Franz 29-31, ECF No. 89.)

16.    Plaintiff admits that the April 2014 communication states, "[d]on't share your passes with anyone who intends to use pass travel for business purpose".

17.    Plaintiff denies the allegation of paragraph 17.  Q4 is directed to employee use while Q6 is directed to others use of the pass travel privileges. Regarding an employee's use, the memo states that only using travel privileges for business purpose use by an employee "can result in loss of travel privileges and even termination from employment."  Regarding others use, the memo states that only "accepting money or other goods or services in exchange for pass travel privileges" "may result in termination of [] employment." (See Dep. Quaniah Stevenson Ex. 13, at Q6, ECF No. 88-11.)  The last sentence of Q6 modifies the immediately preceding

paragraph. Q10 merely indicates that "in some cases" termination of employment may result for "[p]ass travel abuse or misconduct by any associated pass rider." The "some cases" are expressly stated in Q6 for only "accepting money or other goods or services in exchange for pass travel privileges."

18.     Admit

19.     Admit

20.     Plaintiff denies the allegations in paragraph 20 and asserts that this is merely pre-text for wrongfully firing Plaintiff. Furthermore, Ms. Nabors could not speak with certainty on this point and states, "·I don't want to misstate the parameters . . . . but *I believe* . . . ." (See Dep. Kelly Nabors 160, ECF No. 92 (emphasis added).) Plaintiff Quaniah R. Stevenson brought this action in the United States District Court for the Northern District of Georgia against Defendant Delta Air Lines, Inc. for violations of the American with Disabilities Act (ADA), race discrimination, gender discrimination, age discrimination, and retaliatory discharge. In her complaint and declaration attached hereto, Ms. Stevenson, whom was over the age of 40 at all relevant times, states that she suffered an injury while on the job at Delta in March 2014. (See Suppl. Decl. Stevenson Ex. 1, ¶¶1-2.) This work injury caused her to be out of work for eight (8) months. (See Suppl. Decl. Stevenson Ex. 1, ¶2.) Prior to this time, Ms. Stevenson had been successfully employed with Delta since at least

August 1, 2007.  (See Suppl. Decl. Stevenson Ex. 1, ¶3; see also ep. Kelly Nabors 139-153, ECF No. 92; Id. Ex. 2, ECF No. 92-2 and Id. Ex. 9, ECF No. 92-9.) However, upon returning to work in November 2014, as alleged in her complaint and declaration attached hereto, Ms. Stevenson was subjected to retaliation and harassment because of her disability and because she exercised her rights under the ADA.  (See Suppl. Decl. Stevenson Ex. 1, ¶¶4-5.)  The harassment that Ms. Stevenson suffered is set forth in detail in Plaintiff's complaint at paragraphs 20-28, for example.  (See Suppl. Decl. Stevenson Ex. 1, ¶5.)  Delta's harassment caused Ms. Stevenson to suffer depression and contributed to pain caused by her work related injury, which resulted in her taking leave including an overnight stay in the hospital.  (See Suppl. Decl. Stevenson Ex. 1, ¶6.)  On July 28, 2015, Delta terminated Ms. Stevenson's employment however, alleging that Ms. Stevenson violated the company's employee travel benefits (e.g., Delta's "Pass Travel", "Travel Passes", or "Buddy Passes").  (See Suppl. Decl. Stevenson Ex. 1, ¶7.)  This reason for her termination is pretext for Delta's unlawful harassment, discrimination, and retaliation. Delta's reason for terminating Ms. Stevenson's employment is pretext because:

(1) Delta has changed its reason for the termination (See, e.g., Dep. Kelly Nabors 21-26, ECF No. 92; contrast Id. Ex. 2, ECF No. 92-2, Ex. 6, ECF No. 92-6, Ex. 11,

ECF No. 92-11, Ex. 13, ECF No. 92-13, Ex. 14, ECF No. 92-14, and Defendant's

Ex. 2, ECF No. 92-19).

(2) similarly situated employees were treated differently (See, e.g., Dep. Kelly

Nabors 71-100, 169-173, 135-139, ECF No. 92 and exhibits cited therein; Id. Ex. 1,

ECF No. 92-1; see also, Dep. Barbara Franz 88-144. ECF No. 89 and exhibits cited

therein.) All the white employees investigated and were able to keep their jobs were

giving the benefit of doubt, were treated less harshly, and were scrutinize far less.

The following employees were treated differently:

**\*the employees listed in Plaintiff response to Paragraph 7, which are

incorporated herein by reference**.

\***David Ragan** (white male) (see Dep. Barbara Franz 110-116, ECF No. 89; Id. Ex.

18, ECF No. 89-9.)   Mr. Ragan was able to keep his job despite not being able to

recall several buddy pass riders, giving away his password for booking flights, and

other more egregious infractions than alleged by Plaintiff.

\***Richard Service** (white male) (<u>see</u> Dep. Barbara Franz 116-124, ECF No. 89; <u>Id.</u> Ex. 19, ECF No. 89-10.)   Mr. Service was able to keep his job despite making numerous untruthful statements and losing control of his travel pass, among other egregious infractions.

\***Sabrina Simmons** (white) (<u>see</u> Dep. Barbara Franz 127-136, ECF No. 89; <u>Id.</u> Ex. 19, ECF No. 89-11.)  Ms. Simmons was able to keep her job despite not being able to recall where her travel companion traveled whom appears to have been traveling for business.  Ms. Simmons did not know when he traveled and why he traveled. Ms. Simmons also did not know all here travel companions. Ms. Simmons was never questioned on why her travel companions used her travel pass.  There was no thorough investigation. Ms. Simmons egregious acts were swept under the rug and she was able to keep her job despite the numerus egregious infractions.

\***Sidarious Johnson** (black male) (<u>see</u> Dep. Barbara Franz 104-110, ECF No. 89; <u>Id.</u> Ex. 12, ECF No. 89-5.).  Defendant claims that Ms. Quaniah Stevenson was investigated because of Venda Bailey however Sirdarious Johnson, who was investigated in association with Mr. Bailey, committed more egregious conduct yet was allowed to keep his job. Mr. Bailey is a male and under the age of 40.

(3) Mr. Dais has been traveling under Ms. Stevenson's Delta travel benefits since 2007 yet Delta only decided to investigate Mr. Dais until after Ms. Stevenson's disability and after she exercised her rights under the ADA. This considerable delay suggests that Delta's reason was a pretextual afterthought, especially when the reason is articulated for the first time in response to Ms. Stevenson's claims of harassment and retaliation (see, e.g., Dep. Kelly Nabors 156-57, ECF No. 90 and exhibits cited therein).

(4) it is impossible for an employee to always know the reasons someone uses a travel pass; this unattainable goal is evidence of pretext.  See, e.g., Denesha v. Farmers Ins. Exch., 161 F.3d 491, 499 (8th Cir. 1998) (holding the imposition of unattainable production goals on an employee was evidence supporting a jury's finding of discrimination); see also, Dep. Barbara Franz 79, ECF No. 89.

(5) Delta deviated from its normal management procedures when it summarily terminated Ms. Stevenson (See, e.g., Dep. Kelly Nabors 161-62, ECF No. 92; Id. Ex. 10, ECF No. 92-10). More specifically, Ms. Stevenson was terminated for loss of control (See, e.g., Id. Ex. 2, ECF No. 92-2, Ex. 13, ECF No. 92-13, and Ex. 14, ECF No. 92-14.)  Delta normally takes corrective action, for example, a two-year

pass suspension of benefits, when there is a loss of· control of pass travel privileges

(see, e.g., Id. 161-62, ECF No. 92; Id. Ex. 10, ECF No. 92-10.).   However, in this

case, Ms. Stevenson was fired.

(6) Ms. Stevenson had a good performance history (see, e.g., Id. 139-153, ECF No.

92; Id. Ex. 2, ECF No. 92-2 and Ex. 9. ECF No. 92-9) and, in fact, Delta's subsidiary

had re-hired Ms. Stevenson and restored her travel pass privileges (See Suppl. Decl.

Stevenson Ex. 1, ¶11.); See, e.g., *59 Causes of Action 2d, Cause of Action under Age*

*Discrimination in Employment Act* §24 (2013): ("[E]vidence of satisfactory or

superior performance evaluations … may tend to show … the illegitimate nature of

the defendant's articulated reason.").

(7) despite Ms. Stevenson's long employment history with Delta, Delta cites to only

**one alleged travel pass violation** as its reasoning to terminate Ms. Stevenson.  (See,

e.g., Dep. Kelly Nabors 34-34, 158, ECF No. 92; Id. at Ex. 2, ECF No. 92-2; Id. at

Ex. 13, ECF No. 92-13, and Id. at Ex. 14, ECF No. 92-14; see also, Dep. Barbara

Franz 66-67, ECF No. 89.)  See, Stalter v. Wal-Mart Stores, Inc., 195 F. 3d 285 (7th

Cir. 1999)("More compelling is the severity of the punishment in relation to the

alleged offense. … This strikes us as swatting a fly with a sledge hammer. That Wal-

Mart felt compelled to terminate Stalter for this offense does not pass the straight-face test …."").

(8) Ms. Stevenson, in fact, did not violate any travel pass policy. More specifically, there is no credible or good faith evidence that Mr. Dais was traveling on business (See, e.g., Dep. Kelly Nabors 33-70 (more specifically 40,42-45, 46-47, 57-58, and 61-70), 175-176, ECF No. 92; Id. at Ex. 2, ECF No. 92-2; Id. at Ex. 9, ECF No. 92-9; see also Dep. Barbara Franz 87-88, ECF No. 89.)  Defendant contends that social media post are the bases for the conclusion that Mr. Dais was traveling for business (See, e.g., Dep. Kelly Nabors Ex. 2, ECF No. 92-2; Id. at Ex. 9, ECF No. 92-9.) However, Delta could not point to any credible social media posts that Mr. Dais was traveling for business.  (See, e.g., Id. 33–70 (more specifically 40,42-45, 46-47, 57-58, and 61-70), 175-176, ECF No. 92 and exhibits cited therein; see also, Dep. Barbara Franz 87-88, ECF No. 89.)  There is no credible evidence that Mr. Boyett was a client or work-partner of Mr. Dais or that Mr. Dais made a profit from the travel.  (See e.g., Dep. Kelly Nabors 40, 42-45, 46-47, 57-58, and 61-70 (more specifically, 68), ECF No. 92; Id. at Ex. 2, ECF No. 92-2; Id. at Ex. 9, ECF No. 92-9; see also, Dep. Barbara Franz 87-88, ECF No. 89.)  In fact, the evidence establishes that Mr. Dais is a residency of California (the destination of the travel) and that Mr.

Dais has a daughter that lives in California, which the evidence established that he visited his daughter during the travel and attend, for leisure, a concert.  (See, e.g., Dep. Kelly Nabors 29-30 and 113-133, ECF No. 92 and exhibits cited therein). Delta admits that this sort of travel is not business travel but leisure/personal travel.  (See, e.g., Id. at 29-30, 47, 61-62, and 113-133, ECF No. 92.)

21.    Plaintiff denies the allegations in paragraph 21 and asserts that this is merely pre-text for wrongfully firing Plaintiff.  Plaintiff incorporates by reference Plaintiff's response to paragraph 20.

22.    Plaintiff denies the allegations in paragraph 22 and asserts that this is merely pre-text for wrongfully firing Plaintiff.  Plaintiff incorporates by reference Plaintiff's response to paragraph 20.  Furthermore, others that provided travel passes to Mr. Bailey, were not fully and carefully reviewed and to the extent as Plaintiff. (See, e.g., Dep. Kelly Nabors 169-173, ECF No. 92 and exhibits cited therein.)

23.    Plaintiff denies the allegations in paragraph 23 and asserts that this is merely pre-text for wrongfully firing Plaintiff.  Plaintiff incorporates by reference Plaintiff's response to paragraph 20.  Furthermore, Jovan Dais travel does not reflect possible business travel use.

24.    Plaintiff denies the allegations in paragraph 24 to the extent they contradict the record, which speaks for itself.  (See Suppl. Decl. Jovan Dais Ex. 2.)

25.     Plaintiff denies the allegations in paragraph 25 and asserts that this is merely pre-text for wrongfully firing Plaintiff.  Plaintiff incorporates by reference Plaintiff's response to paragraph 20.  (See also, Suppl. Decl. Jovan Dais Ex. 2.)

26.     Plaintiff denies the allegations in paragraph 26 and asserts that this is merely pre-text for wrongfully firing Plaintiff. Plaintiff incorporates by reference Plaintiff's response to paragraphs 20 and 25.   The record does not reflect that Mr. Dais and Mr. Boyett "performed" together.  (See also, Suppl. Decl. Jovan Dais Ex. 2.)

27.     Plaintiff denies the allegations in paragraph 27. Plaintiff incorporates by reference Plaintiff's response to paragraphs 20 and 25.   Mr. Boyett was not on Ms. Stevenson travel pass during the June 6. 2015 travel. (See Suppl. Decl. Stevenson Ex. 1, ¶10; See, Franz Deposition 72-74, ECF No. 89; Id. at Ex. 27, ECF. 89-14.)

28.     Plaintiff denies the allegations in paragraph 28 to the extent they contradict the record, which speaks for itself.

29.     Plaintiff denies the allegations in paragraph 29.

30.     Plaintiff denies the allegations in paragraph 30 and asserts that this is merely pre-text for wrongfully firing Plaintiff. Plaintiff incorporates by reference Plaintiff's response to paragraph 20 and 25.  The record does not reflect that Mr.

Dais and Mr. Boyett were work partners.  (See also; Suppl. Decl. Jovan Dais Ex. 2.)
Mr. Diaz and Mr. Boyett are friends, not business associates (See also, Suppl. Decl.
Stevenson Ex. 1, ¶14; see also Suppl. Decl. Jovan Dais Ex. 2.)  Further, Defendant
admits that friends travel together and pay for each other. (See, e.g., Dep. Kelly
Nabors 47, ECF No. 92).

31.    Plaintiff denies the allegations in paragraph 31. (See also Suppl. Decl.
Jovan Dais Ex. 2.) Plaintiff incorporates by reference Plaintiff's response to
paragraph 30.

32.    Plaintiff denies the allegations in paragraph 32 and asserts that this is
merely pre-text for wrongfully firing Plaintiff. Plaintiff incorporates by reference
Plaintiff's response to paragraph 20.

33.    Admit

34.    Admit

35.    Plaintiff denies the allegations in paragraph 35 and asserts that this is
merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference
Plaintiff's response to paragraphs 20, 25, 27, and 30.  Delta's reason for terminating
Ms. Stevenson was subjective, unsubstantiated, purely speculative, and not good
faith. (See, e.g., Dep. Kelly Nabors 71-100, 169-173, 135-139, ECF No. 92; see also,
Dep. Barbara Franz 88-144. ECF No. 89 and exhibits cited therein.), yet individuals

outside of her protected classification for those claims that require her to prove that she is in a protected class where allegations were "unsubstantiated" were allowed to keep their job. (See, e.g., Dep. Barbara Franz 88-144. ECF No. 89 and exhibits cited therein.) Evidence shows that Delta investigated her travel more rigorously and was more inclined to characterize Ms. Stevenson's conduct as "not forthcoming" than individuals outside of her protected classification for those claims that require her to prove that she is in a protected class. (Id.) Delta "took the word of" or "gave the benefit of the doubt" to individuals outside of her protected classification for those claims that require her to prove that she is in a protected class but did not take Ms. Stevenson's word. (See, e.g., Dep. Barbara Franz 88-144, ECF No. 89 and exhibits cited therein.).

36.    Plaintiff denies the allegations in paragraph 36.

37.    Plaintiff denies the allegations in paragraph 37 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, 30, and 35.

38.    Plaintiff denies the allegations in paragraph 38 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, 30, and 35.  Evidence shows that Delta investigated Ms. Stevenson's travel more rigorously and was more inclined to use

Ms. Stevenson's less than perfect memory against her than individuals outside of her protected classification for those claims that require her to prove that she is in a protected class. (<u>See, e.g.</u>, Dep. Barbara Franz 88-144. ECF No. 89 and exhibits cited therein.)

39.     Plaintiff denies the allegations in paragraph 39 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, 30. and 35.  Plaintiff denies that she told·Delta's investigative team that she traveled with Mr. Dais. (<u>See</u> Suppl. Decl. Stevenson Ex. 1, ¶13.)

40.     Plaintiff denies the allegations in paragraph 40 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, 30, and 35.

41.     Plaintiff denies the allegations in paragraph 41 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, 30, 35, and 38.

42.     Plaintiff denies the allegations in paragraph 42 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, 30, 35, and 38.

43.     Plaintiff denies the allegations in paragraph 43 and asserts that this is

merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, 30, 35, and 38.

44.   Plaintiff denies the allegations in paragraph 44 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, 30, 35, and 38.  Plaintiff advised Delta Mr. Dais also lived in California and before the termination and appeal.  (See Suppl. Decl. Stevenson Ex. 1, ¶12.)

45.   Plaintiff denies the allegations in paragraph 45 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25.  Specially, the evidence establishes that Delta was provided evidence that Mr. Dais is a residency of California (the destination of the travel) and that Mr. Dais has a daughter that lives in California, which the evidence established that he visited his daughter during the travel and attend, for leisure, a concert.  (See, e.g., Dep. Kelly Nabors 29-30, and 113-133, ECF No. 92 and exhibits cited therein.) Delta admits that this sort of travel is not business travel but leisure/personal travel.  (See, e.g., Id. at 29-30, 47, 61-62, and 113-133).

46.   Plaintiff denies the allegations in paragraph 46 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, and 30.

47.     Plaintiff denies the allegations in paragraph 47 and asserts that this is merely pre-text for wrongfully firing Plaintiff.   Plaintiff incorporates by reference Plaintiff's response to paragraphs 20, 25, 27, 30, and 35.

48.     Admit

49.     Deny.  Upon returning to work in November 2014, as alleged in her complaint and declaration attached hereto, Ms. Stevenson was subjected to retaliation and harassment because of her disability and because she exercised her rights under the ADA.  (See Suppl. Decl. Stevenson Ex. 1, ¶¶4-5.)  The harassment that Ms. Stevenson suffered is set forth in detail in Plaintiff's complaint at paragraphs 20-28, for example.  (See Id. at ¶5.)  Delta's harassment caused Ms. Stevenson to suffer depression and contributed to pain caused by her work related injury, which resulted in her taking leave including an overnight stay in the hospital. (See Id. at ¶6.)  On July 28, 2015, Delta terminated Ms. Stevenson's employment however, alleging that Ms. Stevenson violated the company's employee travel benefits (e.g., Delta's "Pass Travel", "Travel Passes", or "Buddy Passes").  (See Id. at ¶7.)  This reason for her termination is pretext for Delta's unlawful harassment, discrimination, and retaliation.

50.     Deny. Plaintiff incorporates her response to paragraph 49.

51.     Deny. Plaintiff incorporates her response to paragraph 49.

52.    Deny. Plaintiff incorporates her response to paragraph 49/

53.    Deny. Plaintiff incorporates her response to paragraph 49.

Respectfully submitted this 3rd day of February, 2020.

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

**Counsel certifies that the brief has been prepared with one of the font and point selections approved by the court in LR 5.1C.

I certify that I have served **PLAINTIFF QUANIAH R. STEVENSON'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT AND STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS** via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: February 3, 2021      By: /s/ Charlena Thorpe _____
                                      Charlena Thorpe

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| Quaniah R. Stevenson ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil No.: 1:16-CV-2571-AT-LTW |
| ) | |
| Delta Air Lines, Inc. ) | |
| ) | |
| Defendants. ) | |
| ) | |

## <u>SUPPLEMENTAL DECLARATION OF QUANIAH STEVENSON</u>

I, Quaniah Stevenson, declare as follows:

1.      I was over the age of 40 at all relevant times. Specifically, I was over the age of 40 at the time of my termination from Delta and on March 2014.

2.      I suffered an injury while on the job at Delta in March 2014.  This work injury caused me to be out of work for eight (8) months.

3.      Prior to this time, I had been successfully employed with Delta since at at least August 1, 2007.

4.      However, upon returning to work in November 2014, I was subjected to retaliation and harassment because of my disability and because I exercised my rights under the ADA.

5.     The harassment that I suffered is set forth in detail in my complaint at paragraphs 20-28, for example, which is incorporated by reference herein.

6.     Delta's harassment caused me to suffer depression and contributed to pain caused by my work related injury, which resulted in me taking leave including an overnight stay in the hospital.

7.     On July 28, 2015, Delta terminated my employment alleging that I violated the company's employee travel benefits (e.g. Delta's "Pass Travel", "Travel Passes", or "Buddy Passes").   I was never "disciplined" for my attendance and job performance during my employment except for when I was terminated on July 28, 2015.

8.     Delta does not periodically issue reminders to employees of the importance of complying with the policies regarding pass travel.  I did not receive periodic reminders of the importance of complying with the policies regarding pass travel.

9.     I was not aware that Delta requires that its employees keep "control" of their passes and the passes of their companions -- including by ensuring that they are aware of the travel being undertaken by their companion and that it is not for business or other improper purposes and overseeing use.

10.    Mr. Boyette was not on my travel pass during the June 6. 2015 travel.

11.    Delta's subsidiary has re-hired me and restored the very travel pass privileges that I was afforded while working with Delta.

12.    I·advised Delta that Mr. Dais also lived in California and before the termination and appeal.

13.    I never told·Delta's investigative team there that I traveled with Mr. Dais.

14.    Mr. Diaz and Mr. Boyett are friends, not business associates.

15.    After a brief internet search, I was able to easily find a Robert Jeff Bishton who is a marathon runner that run marathon's for prizes.  (See Dep. Barbara Franz Ex. 23, ECF No. 89-13; Id. Ex. 24, ECF No. 89-14).  This Robert Jeff Bishton internet records corresponds to the documents in David Bishton's investigation records.  (See Id. Ex. 22, ECF No. 89-12.  Based on this quick internet search, it appears David Bishton was being untruthful to Delta regarding his travel pass use for business purposes.

I declare under the penalty of perjury of the laws of Georgia that the foregoing is true and correct, and that this declaration was executed on January 28, 2021.

/s/ Quaniah Stevenson
Quaniah Stevenson


Respectfully submitted this 3rd day of February, 2021.

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

I certify that I have served SUPPLEMENTAL DECLARATION OF QUANIAH STEVENSON via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: February 3, 2021        By: /s/ Charlena Thorpe
                                    Charlena Thorpe

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| Quaniah R. Stevenson | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Civil No.: 1:16-CV-2571-AT-LTW |
| Delta Air Lines, Inc. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>SUPPLEMENTAL DECLARATION OF JOVAN DAIS</u>

I, Jovan Dais, declare as follows:

1.      During the travel in question to California with Caleb Boyett on June 6, 2015, I was not traveling for business and did not make any money.  Boyett was not my client and we were not business partners.  I went as part of an entourage for leisure time out enjoying a show and I was in town for personal reasons to visit my daughter, who is a minor.

I declare under the penalty of perjury of the laws of Georgia that the foregoing is true and correct, and that this declaration was executed on January 28th 2021.

/s/ Jovan Dais<br>
Jovan Dais

Respectfully submitted this 3rd day of February, 2021.

1

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

I certify that I have served SUPPLEMENTAL DECLARATION OF JOVAN DIAS via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: February 3, 2021        By: /s/ Charlena Thorpe
                                      Charlena Thorpe

# Dkt/Tab 99

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**QUANIAH R. STEVENSON,**

      **Plaintiff,**

**vs.**

**DELTA AIR LINES, INC.,**

      **Defendant.**

**Civil Action No.
1:16-cv-2571-AT-LTW**

## DEFENDANT'S REPLY IN SUPPORT OF SUMMARY JUDGMENT[1]

In its Opening Brief, Delta pointed to the undisputed facts showing that Plaintiff was terminated after Delta determined that she had allowed her travel companion to use her free travel benefits for purposes of his music business in direct violation of Delta policy, lost control of those benefits, and then was not forthcoming in Delta's investigation of her violation. Delta also showed that Plaintiff fully admitted on deposition that its conclusion was right -- and knew her

---

[1] Plaintiff responded to Delta's Summary Judgment Motion at Dkt. No. 96. After the deadline for responding to Delta's Motion passed, Plaintiff filed a new Response at Dkt. No. 98 and two revised declarations. While Plaintiff provides no basis for this out-of-time filing, Delta does not object to the late Response and thus addresses it in this Reply. Delta notes, however, that Plaintiff's newly-filed Declarations are not properly signed by the witnesses (but instead were electronically signed by counsel) and thus are not admissible evidence. See Bruss v. King & Brimm Ins., Inc., 2012 U.S. Dist. LEXIS 198454 (N.D. Ga. April 26, 2012) at * 7. As set forth below, however, even if they were admissible, they would be far from sufficient basis to deny Delta's motion.

travel companion was utilizing his travel passes for his music business. And Delta

showed through undisputed evidence that individuals of all races, ages and genders

were terminated for similar misconduct (undercutting the notion of discrimination).

As set forth below, Plaintiff's Response to Delta's Motion does not remotely

comply with this Court's Local Rules and, even if it did, it does not offer any basis

to deny Delta's motion.

## A.   Plaintiff's Response Is Properly Stricken For Violating The Local Rules.

Local Rule 56.1 (N.D. Ga.) requires a Plaintiff who is opposing a Motion for

Summary Judgment to file a response to the movant's statement of undisputed

facts that contains "individually numbered, concise, nonargumentative responses

corresponding to each of the movant's numbered undisputed material facts." If the

Plaintiff fails to "directly refute the movant's fact with concise responses supported

by specific citations to evidence," the Court properly "deem[s] each of the

movant's facts as admitted." Local Rule 56.1 also requires that a respondent

provide "[a] statement of additional facts which the respondent contends are

material and present a genuine issue for trial." See LR 56.1(B)(2)(b).

Here, Plaintiff filed a single document (over the permitted 25 pages) that

purports to respond to Delta's Summary Judgment Motion. She titles it as a

"Response" to Delta's Motion, but it is neither a Brief, nor a proper response to

Delta's Statement of Undisputed Facts, nor a statement of any additional, allegedly material facts.

While Plaintiff states, in the middle of her single "Response" that she is responding to Delta's Statement of Undisputed Facts, she files no separate response to these facts, and she does not come close to complying with the rules requiring record citations and concise, non-argumentative responses.  She repeatedly violates the rules by:

- Denying Delta's allegations without even a purported record cite.  See Response to Statement of Undisputed Facts ("RDSUF"), ¶¶ 14, 28, 29, and 36.

- Denying a Statement of Fact, but providing a record cite that does not support the denial.  See e.g., RDSUF 9 (denying she was aware of the prohibition on business travel by citing evidence that has nothing to do with her knowledge). See also RDSUF, ¶ 8, 15, 17, 20-27, 31, 32, 35, 37-44, 45,[2] 46, 47, 49, 50-53.

- Admitting part of Delta's Undisputed Facts and simply ignoring or recasting the remainder.  See RDSUF, ¶¶ 6, 7, 15, 26, 27.

---

[2] Plaintiff's denial of Undisputed Fact No. 45 is particularly noteworthy.  In a lengthy argumentative response, she alleges that "the evidence established that [her travel companion, Dais] visited his daughter during the travel [at issue]..." Plaintiff cites only to a block of pages and exhibits in the deposition of Kelly Nabors, and a review of those pages reveals *exactly the opposite* of what Plaintiff claims.  (See Nabors Dep., p. 122-24 and Exh. 7 (showing that Plaintiff claimed *after being terminated* that Mr. Dais travel was to visit his daughter, but she could provide no factual support for this claim after being given opportunity by Delta)).

- Making sham denials of a fact after admitting the fact on deposition. <u>See</u> RDSUF, ¶ 9 (denying that she knew about Delta's travel pass policies when she admitted at p. 99 of her deposition  she was "absolutely" aware of them); ¶ 30 (denying Dais and Boyette worked together when she twice expressly admitted they "work together" on page 186 of her deposition). <u>See</u> <u>also</u> RDSUF ¶¶ 6, 11, 13, 25, 26, 37, 44, 45, 49, 50, 51-53.

- Responding to a Statement of Fact with an entirely argumentative section. <u>See</u> <u>e.g.</u>, RDSUF  ¶ 7 (4-page response to one-sentence fact); 20 (denying without citation the Statement of Fact and then making a 7-page argument).

     In <u>Hill v. Delta Air Lines, Inc.</u>, Case No. 1:18-CV-05589-JPB-WEJ (attached hereto as Exhibit "A"), Magistrate Judge Johnson reviewed similar, abusive conduct by a party in connection with a violation of Local Rule 56.1 -- including making denials without any support in the record, making false denials and making argumentative denials.  Judge Johnson found that the Plaintiff's filings which violated that rule were properly struck and that the Defendant's undisputed facts were deemed admitted.  <u>Id</u>., pp. 4-5 (noting "plaintiff's penchant" to "misstate the facts or make assertions based on speculation which is unsupported by any probative record evidence")  The precise same remedy is appropriate here based solely on Plaintiff's improper filings.  <u>See also</u> <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1303 (11th Cir. 2009) ("Plaintiffs['] failure to comply with local rule

56.1 is not a mere technicality."); <u>Smith v. Mercer</u>, 572 F. App'x 676, 678 (11th Cir. 2014) (facts admitted under Local Rule 56.1 after improper responses).

In addition to violating this Court's Rules in failing to properly respond to Delta's Statement of Undisputed Facts, Plaintiff also violated the rules by failing to submit her own Statement of Additional Material Facts.  While she intersperses new, alleged facts in her "Response" she provides no separate statement of these alleged facts with citations to the evidence as required by the Court's Rules.  Thus, these facts are also properly disregarded.  <u>See</u> <u>Rossi v. Fulton Cty.</u> 2013 U.S. Dist. LEXIS 44753, at *54-56 n.13 (N.D. Ga. Feb. 4, 2013) (although plaintiff relied upon facts in her response, these facts were "not properly before the Court" because she "did not present the evidence in a statement of material fact"); <u>Schott v. Am. Express Co.</u>,  2019 U.S. Dist. LEXIS 61876, at *12 (N.D. Ga. Jan. 4, 2019) ("the Court "will not consider any fact . . . set out only in the brief and not in a numbered statement of additional facts as required by [the Court's Local Rules]").

Given her various rules violations, at most, the only thing properly considered in Plaintiff's "Response" is her scant legal arguments -- which are indisputably incorrect and do nothing to help her avoid summary judgment.

**B.    <u>Plaintiff's ADA Harassment and Retaliation Claims Are Frivolous.</u>**

Plaintiff begins her Response by arguing that she was "subjected to retaliation and harassment" in violation of the ADA because of a shoulder injury in

2014.  As noted in Delta's Opening Brief, any such claims (and any claims other than a claim arising from Plaintiff's termination) are time-barred.  (See Delta's Opening Brief, pp. 14-15, n. 6)  Plaintiff does not dispute this argument.

Second, while Plaintiff pleads no harassment claim in her Complaint, even if she did, such a claim boils down to the contention that her supervisor (Carol Kerr) twice counseled her about her uniform and one time told her to step aside because she was working too slowly during a busy time.  (Complaint, ¶¶ 20-28; Stevenson Dep., pp. 116-23)  Plaintiff does not deny that she was out of compliance with the uniform requirements, or that she was working more slowly than Ms. Kerr thought appropriate, but even if she did, her claims plainly fail because: (1) she points to no evidence that these minor counselings had anything to do with a shoulder injury; and (2) these events were not remotely severe or pervasive as required by the law.[3]

Plaintiff's allegation that she was unlawfully retaliated against under the ADA is equally flawed.  In her Complaint, Plaintiff alleged that she was retaliated against because she "complained to Defendant's Human Resources Department about discrimination in harassment by her supervisors."  (Complaint, ¶ 82)  Delta has already demonstrated that this claim fails for many reasons -- including

---

[3]  See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (unlawful harassment must be based on a characteristic protected by the law). Cheatham v. DeKalb Cty., 2015 U.S. Dist. LEXIS 176004, at *31 (N.D. Ga. Dec. 10, 2015) (even suspension not severe and pervasive).

Plaintiff's *admission that she never made any discrimination complaint*.  (Delta

Opening Brief, pp. 19-20)  Absent evidence of "protected activity" -- and evidence

of a "causal connection" between the activity and the adverse action -- a retaliation

claim cannot proceed.  See Drago v. Jenne, 453 F.3d 1301, 1305 (11th Cir. 2006).

## C.   **Plaintiff's Termination Claim Also Fails.**

In its Opening Brief, Delta demonstrated the numerous reasons that

Plaintiff's shotgun claims that she was terminated in violation of Title VII, the

ADEA, and the ADA fail.  (See Delta Opening Brief, pp. 13-19)

As Delta first noted, Plaintiff cannot establish even a *prima facie* case of

unlawful discrimination or retaliation -- as she points to no evidence that ties her

termination to any protected status.  Plaintiff admitted on deposition that she could

not point to any "similarly situated" individual outside of her protected

classification who was treated more favorably.  (Stevenson Dep., pp. 205-06)

Despite her testimony, Plaintiff tries to avoid summary judgment on her

termination claim by throwing out (in various places in her brief) the names of 14

Delta employees or former employees that she claims were comparable to her and

given favorable treatment by not being terminated.  Plaintiff claims these

individuals were "permitted to allow their travel passes to be used for business

travel without any discipline, minor consequences.... or discipline less than

termination."  (Plaintiff's Response, p. 7)  As noted above, Plaintiff does not

include any of these alleged facts (as is required) in a Statement of Material Facts and thus they are properly disregarded. Even if she did, however, these alleged comparables do nothing to carry her required burden.

First, the group of allegedly "favored" employees identified by Plaintiff *consists almost entirely of empl*oye*s in one or more of the same protected classifications as Plaintiff.* As examples of allegedly "favored" employees, Plaintiff points to female employees, black employees and employees over the age of forty.[4] To state the obvious, evidence that individuals in the same protected classifications as Plaintiff received favorable treatment is the opposite of discrimination evidence. See Waldemar v. Am. Cancer Soc'y, 971 F. Supp. 547, 553 (N.D. Ga. 1995) (plaintiff cannot show sex discrimination by showing a comparator of the same sex); Wilson v. Wilkie, 2020 U.S. Dist. LEXIS 57062, at *22-23 (N.D. Ala. Apr. 1, 2020) (same holding in a race discrimination claim).

Second, also included within Plaintiff's group of allegedly 14 "favored" employees is at least one white male (Bucher) who was going to be terminated, but

---

[4] The demographic information for the 14 individuals cited by Plaintiff (including sex and race) is recited in Plaintiff's Supplemental Response to Delta's Summary Judgment Motion and is also shown on the spreadsheet that Plaintiff relies upon at Exhibit 1 to the Deposition of Kelly Nabors. As is evident, the group of allegedly favored employees cited by Plaintiff includes females just like Plaintiff (Bicksler, Fudala, Galyardt, Mercer, Mooring, Cross, and Simmons), an individual who is black (i.e., of the same race and race code) as Plaintiff (Sidarius Johnson) and individuals who are actually older than Plaintiff (Bicksler, Fudala, Rehm, Galyardt, McKenzie, Bucher, Mercer, Mooring, Bishton, Ragan, and Service).

voluntarily left Delta before he could be.  (See Nabors Dep., pp. 88-89 and Exh. 1)

Plaintiff's evidence that white male employees resigned in lieu of being fired is the

opposite of discrimination.

Third, a review of the evidence that Plaintiff proffers to the Court also

indisputably shows:  (1) scores of instances where white employees, male

employees and employees younger than she was (who had never claimed any

disability) were terminated for pass misconduct; and (2) scores of instances where

female employees, black employees, and employees older than she was (including

employees who had sought accommodation from Delta) were either entirely

cleared of any misconduct after a review, or found to have engaged in less serious

misconduct than Plaintiff and issued discipline short of termination.[5]  See also

Nabors Dep., p. 172 (testimony about cleared black female employees).

That is, the evidence proffered to the Court by Plaintiff herself shows large

numbers of individuals in exactly the same protected classes as her receiving

---

[5] The spreadsheet attached as Exhibit 1 to the Deposition of Kelly Nabors shows
large number of other females, black employees, and employees older than
Plaintiff who were investigated for misuse of travel passes and were either entirely
cleared or issued discipline less than termination.  As shown on the spreadsheet,
black females who were investigated and who received discipline short of
termination included Daryl Plummer, Ruby Powers, Stephanie Moorer, and Pyrrha
Nicholas   The same list also shows numerous male, white and young employees
who were investigated and terminated, including James Malcolm, Ralph Curtis,
Robert Harrington, Brian Hennies, Joel Simonson, Edward Connor, John Pegram,
Mark Dickson, Keith Carlisle, Bryan Wisner, Daryl Maroney, and Matt Johannsen.

"favorable treatment" that Plaintiff contends she was denied.  And it shows large

numbers of individuals outside her protected class who, like Plaintiff, were

terminated.  Plaintiff does not mention this undisputed evidence to the Court

because she knows that evidence which shows a pattern in which protected

employees sometimes do better, and sometimes do worse that "is not evidence of...

discrimination."  See Calhoun v. EPS Corp., 36 F. Supp. 3d 1344, 1353 (N.D. Ga.

2014).  See also Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 642

(3d Cir. 1998) (plaintiff does not create an issue of fact by "ignoring a significant

group of comparators who were treated equally to her."); Davis v. Dunn Constr.

Co., 872 F. Supp. 2d 1291, 1311 (N.D. Ala. 2012) (same).

Even ignoring the above facts (and pretending that the allegedly "favored"

employees cited by were outside her protected classes), these employees would

*still* not support even a *prima facie* claim of any discrimination.

To make a *prima facie* case of discrimination using alleged comparators, a

*plaintiff* bears the burden of showing that such comparators are "similarly situated

in all material respects."  Lewis v. City of Union City, 918 F.3d 1213, 1226-27

(11th Cir. 2019); Robertson v. Riverstone Cmtys., LLC, 2019 U.S. Dist. LEXIS

121618, at *27 (N.D. Ga. May 28, 2019).  To demonstrate that the comparable is

"similarly situated," the *plaintiff* must demonstrate -- among other things -- that he

or she  engaged in the same "quality and quantity" of misconduct (see Nurse v.

City of Alpharetta, 2018 U.S. Dist. LEXIS 20472, at *14 n. 66 (N.D. Ga. Feb. 7, 2018)); that there are "no mitigating circumstances that would differentiate" the plaintiff from the alleged comparable (see Hayes v. Deluxe Mfg. Operations LLC, No. 2018 U.S. Dist. LEXIS 67373, at *60 (N.D. Ga. Jan. 9, 2018)); and that the decision-maker(s) who judged the plaintiff's conduct are the same decision-makers who judged the conduct of the alleged comparable. (See Brown v. Bd. of Regents of the Univ. Sys. of Ga., 2016 U.S. Dist. LEXIS 183830 (N.D. Ga. Feb. 12, 2016)).

Plaintiff does not even *allege* much less offer evidence that there is any individual (either inside or outside her protected classifications) who is similarly situated in all material respects. That is, she does not allege that there was *even one employee* outside her protected classification where the same decision makers involved in her termination determined that the employee lost control and allowed their travel companion to use passes for business purposes -- and determined that the employee lied about it -- and then did not terminate the employee.

Plaintiff does not attempt to carry her required burden because she knows she cannot. Instead, she points to employees and alleges (as described below, indisputably incorrectly) that they did only one of the things she did without being terminated. In other words, she does not even *allege* anyone (in any demographic group) who had the same quantity and quality of misconduct as she had.

First, the vast majority of employees she points to were in different departments from Plaintiff's Atlanta Airport Customer Service Department 125 -- and thus would have different supervisors and managers.[6]  Brown at * 32-33.

Second, looking at the evidence about the specific individuals she points to shows that -- far from determining that these individuals engaged in misconduct -- Delta determined that they were *entirely "cleared" of any misconduct by Delta after an investigation or that any allegation of misconduct was unsubstantiated.*[7] There is no evidence that Delta did not act in good faith in clearing any of these individuals  and, obviously, an employee who was investigated and cleared of misconduct, is not similarly situated to Stevenson.[8]

---

[6] The Division in which each employee relied on by Plaintiff worked is contained on the spreadsheet that Plaintiff relies upon that is found at Nabors Dep., Exh. 1 under the "DIV" column.  The location can be found under the "STN" column. The vast majority of the employees relied upon by Plaintiff did not work in the Atlanta ACS Division where Plaintiff worked and had different HR and Operational Decision Makers.  This includes Employees Bicksler, Fudala, Rehm, Galyardt, McKenzie, Bucher Mercer, Mooring, and Cross.  Id.  Further, another of the employees relied upon by Plaintiff (Galyardt) was not even an employee of Delta at the time of the relevant events.  Instead, she was a retiree -- and her travel passes were terminated which is the most severe discipline Delta can issue to a Retiree.  (Nabors Dep., pp. 80-81)

[7] These employees are Bicksler, Fudala, Barr, Bishton, Simmons and Mercer.  (See Nabors Dep., Exh. 1, pp. 2543, 2544, 2548 and 2550 (noting each employee was cleared or the allegations were unsubstantiated))

[8] Plaintiff briefly contends that Delta did not thoroughly investigate the facts surrounding some employees, but she submits investigation files for male and white employees that are lengthy and detailed.  (See e.g., Franz Dep, Exhs. 18, 20

With respect to the employees who were not cleared by Delta, the undisputed facts establish that they were either subject to termination (Bucher), not employed by Delta but nonetheless suffered serious consequence (Galyardt), or are easily distinguishable from Plaintiff.  None of these individuals were determined to have lost control of their passes, allowed their passes to be used for business purposes, , and then lied about it.  For instance:

- Plaintiff relies on Douglas Rehm (who is a pilot and thus not similarly situated to Plaintiff as a matter of law) but points only to evidence showing that the travel at issue was personal travel of his son.  (See Dkt. No.  96-4)

- Plaintiff also relies on Angel Mooring (who was also not in Plaintiff's department and had different decision makers) but shows no evidence that Delta found Ms. Mooring to have allowed her passes to be utilized for business travel or that she lied to Delta about it.[9]

---

and 21).  She also makes arguments that can fairly be characterized as bizarre that Delta was wrong in clearing some of these individuals.  She argues, for instance, that Delta employee David Bishton should not have been cleared because his travel companion used his travel passes to run in marathons.  According to Plaintiff, she has found evidence that -- *ten years after he ran a marathon* -- the marathon in which he ran offered prize money to professional runners when competed in it.  (Stevenson Dec., ¶ 15 and exhibits cited therein)  There is, of course, no evidence that Mr. Bishton's travel companion was a professional runner or ever competed for money, much less that Delta had any knowledge of such a fact.

[9] Instead, the only evidence cited by Plaintiff shows that Mooring's companion purchased a ticket in case he could not use his travel passes because of a full flight.  While this was a violation of Delta pass policies, it is facially different a less severe violation than using passes for business travel.  (Nabors Dep., pp. 94-95)

- Plaintiff also relies on Heather Cross (again outside her department).  The only evidence submitted by Plaintiff shows that Cross' companion suffered from blindness because of Usher's Disease -- and he traveled to speaking engagements to raise awareness about that disease.  [See Dkt. No. 96-3]  There is no evidence that the travel companion received any benefit for any business he ran, and the only evidence is that the decision-makers involved in that case determined that the charity travel (including because Delta benefited from "good will" for the support) did not warrant termination under Delta's business travel policy.  There was also no indication of any untruthfulness.

- Finally, Plaintiff relies on David Ragan and Richard Service but offers no evidence that either employee allowed their passes to be used for business.  While one of these employees (Mr. Service) was determined to have provided inaccurate information -- and was disciplined for it -- there is no evidence of any business travel.  (Franz Dep., pp. 111-13, 125)

Because Plaintiff has not come close to carrying her burden of showing that any similarly situated individual was treated better than her -- and instead offers evidence that shows that individuals outside of her protected categories such as white males were terminated like her or resigned in lieu of termination -- she has not shown even a *prima facie* case of any unlawful discrimination.

Plaintiff's only other attempt to avoid summary judgment is to contend that there is some "pretext" in Delta's explanation for terminating her.  Of course, simply showing "pretext" is not enough to survive summary judgment -- when Plaintiff has not shown even *prima facie* discrimination.  See Brooks v. Mobilitie Mgmt., LLC, 2019 U.S. App. LEXIS 28103, at *5 (11th Cir. Sep. 19, 2019) Further, Plaintiff's arguments of "pretext" easily fail.[10]

Plaintiff finally argues what she has argued all along -- that she was not guilty of the misconduct that Delta found.  However, her argument that she "didn't do it" does not demonstrate that Delta's explanation for terminating her was pretextual.  First, as noted in Delta's Opening Brief, she admittedly engaged in the misconduct that Delta found.  More importantly, however, as is well established, the relevant question is not whether she engaged in the improper act, but whether Delta determined that she did.  Hayes v. Deluxe Mfg. Operations LLC, 2018 U.S. Dist. LEXIS 67373, at *69-70 (N.D. Ga. Jan. 9, 2018).  As there is no dispute that Delta reached this conclusion, summary judgment is warranted.

---

[10] For instance, Plaintiff contends that Delta does not prohibit personal business travel with its passes, but the record evidence she cites for this proposition directly contradicts this claim.  (Stevenson Dep., Exh. 8)  She also argues that Delta somehow "changed its reason for the termination," but she offers no explanation as to how.  Delta's recommendation for termination stated that Plaintiff was recommended for termination for precisely the reasons set forth by Delta here.  (Nabors Dep., Exh. 2)

Respectfully Submitted,


s/ Benjamin A. Stone
Georgia Bar No. 683850
MUNGER & STONE LLP
999 Peachtree Street, NE, Suite 2850
Atlanta, GA 30309
Tel:  (404) 815-1884
Fax: (404) 815-4687
ben.stone@mungerandstone.com

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1D of the Local Rules for the United States District

Court for the Northern District of Georgia, I hereby certify that the foregoing has

been prepared in Times New Roman, 14-point font, as permitted by Local Rule

5.1B

s/ Benjamin A. Stone
Georgia Bar No. 683850

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **QUANIAH R. STEVENSON,**<br><br>  **Plaintiff,**<br><br>**vs.**<br><br>**DELTA AIR LINES, INC.,**<br><br>  **Defendant.** | **Civil Action No.<br>1:16-cv-2571-AT-LTW** |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 10th day of February, 2021 filed the foregoing DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to Plaintiff's counsel: Charlena Thorpe.

s/ Benjamin A. Stone<br>
Georgia Bar No. 683850

18

# Dkt/Tab 102

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

QUANIAH R. STEVENSON,

     Plaintiff,

v.

DELTA AIR LINES, INC.,

     Defendant.

CIVIL ACTION FILE NO.
1:16-cv-002571-AT-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This case is currently before the Court on a Motion for Summary Judgment filed by Defendant Delta Air Lines, Inc. ("Delta"). [Doc. 88]. For the reasons detailed below, the undersigned **RECOMMENDS** that the Motion for Summary Judgment be **GRANTED**. [Doc. 88].

## PRELIMINARY ISSUES

The Local Rules provide that the "respondent to a summary judgment motion shall include the following documents with the responsive brief:" (a) a "response to the movant's statement of undisputed facts," and (b) a "statement of additional facts which the respondent contends are material and present a genuine issue for trial." N.D. Ga. Loc. R. 56.1(B)(2). Plaintiff did not provide a statement of additional facts and did not provide a response to Defendant's Statement of Undisputed Facts "with" her brief. See

[Doc. 96].   Instead, Plaintiff decided to "respond[ ] to Defendant's Statement of Undisputed Facts" in her brief.   [Id. at 5–26].   If Plaintiff were pro se, this violation of the Court's rules would be understandable.   But she is not; Plaintiff is represented by a licensed attorney.   Even after Defendant pointed out the flaws with Plaintiff's response over a month ago, Plaintiff's counsel made no effort to correct the deficiencies.   See [Doc. 99 at 2–5].

The Local Rules clearly state that a respondent "shall" include a "statement of additional facts which the respondent contends are material and present a genuine issue for trial."   N.D. Ga. Loc. R. 56.1(B)(2)(b).   That "statement of additional facts" must be a "separate statement" and "must meet the requirements" of Local Rule 56.1(B)(1).   N.D. Ga. Loc. R. 56.1(B)(2)(b).   Specifically, Local Rule 56.1(B)(1) confirms that the statement of material facts must be "separate" from the brief.   N.D. Ga. Loc. R. 56.1(B)(1).   As mentioned above, Plaintiff's counsel did not provide the required "statement of additional facts," or even a "separate statement."   Instead, Plaintiff's counsel appears to have included her purported factual disputes throughout her brief. See [Doc. 96].   The Local Rules are abundantly clear that the Court "**will not** consider any fact . . . set out only in the brief and not in [a separate] statement."   N.D. Ga. Loc. R. 56.1(B)(1) (emphasis added).

If this were some mere technical flaw, Plaintiff's counsel might be forgiven.  But the Court cannot discern what "additional facts" Plaintiff's counsel would have included in a "separate statement."  Plaintiff's brief does not contain a fact section.  And, the "facts" Plaintiff intersperses in her brief fail to comply with Local Rule 56.1 in other ways as well.  Statements of fact "must be numbered separately and supported by a citation to evidence proving such fact."  N.D. Ga. Loc. R. 56.1(B)(1).  Crucially, the facts must be "concise" and the Court "will not consider any fact" that is "supported by a citation to a pleading rather than to evidence" or is "stated as an issue or legal conclusion."  Id.  To the extent Plaintiff tries to include "additional facts," her brief runs afoul of all these principles.  Plaintiff argues she suffered "harassment" as "set forth in detail in Plaintiff's complaint at paragraphs 20–28." [Doc. 96 at 13].  As will be discussed more below, Plaintiff cannot survive summary judgment by simply trying to "incorporate" allegations from her Complaint that are contradicted by Plaintiff's own testimony.

Plaintiff also nakedly asserts that "similarly situated employees were treated differently," but this is a mere legal conclusion that the Court need not consider.  [Id. at 14]; see also N.D. Ga. Loc. R. 56.1(B)(1).  And Plaintiff's argument is not properly "supported by a citation to evidence proving such fact."  See N.D. Ga. Loc. R. 56.1(B)(1).  Instead, Plaintiff supports her argument by citation to 40 pages from a

deposition and an exhibit containing information regarding **190 Delta employees**. [Doc. 96 at 14].  District courts are not required to "dig through volumes of documents and transcripts" to try to figure out what facts Plaintiff might think support her position. Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011).

When Plaintiff later cherry picks some employees for particular discussion, she fairs little better.  With respect to two of her alleged comparators, Plaintiff simply lists their names with no explanation regarding how or why Plaintiff contends these individuals are comparators.  [Doc. 96 at 7].  Even when Plaintiff does provide explanations, her assertions are nothing but legal conclusions and are not supported by citations to specific evidence.  For example, Plaintiff argues David Bishton's brother used Mr. Bishton's travel pass "for extensive business purposes," but Plaintiff fails to provide an explanation for that statement.  See [id. at 9].  Instead, Plaintiff cites to 17 pages from a deposition and nearly 60 pages of exhibits containing information regarding hundreds of flights.  [Id.]; see also [Docs. 89-12, 89-13, 89-14].[1]

Plaintiff's counsel appears to leave it to the Court to sort through the record to determine which facts might support her arguments.  The entire purpose of Local Rule

---

[1] Plaintiff also cites to a paragraph from her declaration that, as will be discussed more below, centers on her own speculation that Mr. Bishton's brother "run [*sic*] marathon's [*sic*] for prizes" and that Mr. Bishton "appears" to have been untruthful. [Doc. 96-1 ¶15].

56.1 is to get parties to "organize the evidence rather than leaving the burden upon the district judge." Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008) (quoting Alsina–Ortiz v. Laboy, 400 F.3d 77, 80 (1st Cir.2005)). Again, it is not the Court's job to "dig through volumes of documents and transcripts" to try to find facts to support Plaintiff's position. Chavez, 647 F.3d at 1061. Because Plaintiff's counsel failed to comply with Local Rule 56.1(B)(2)(b) in myriad ways, the Court will not consider the facts set out in her brief that she "contends are material and present a genuine issue for trial." See N.D. Ga. Loc. R. 56.1(B)(2)(b); see also id. 56.1(B)(1).

Plaintiff's attempt to "respond[ ] to Defendant's Statement of Undisputed Facts" is not much better. [Doc. 96 at 5–26]. The response to a statement of undisputed facts must contain "**nonargumentative** responses." N.D. Ga. Loc. R. 56.1(B)(2)(a)(1) (emphasis added). But because Plaintiff's "response" to Defendant's Statement of Undisputed Facts is the bulk of her brief, most of the responses are not nonargumentative. See [Doc. 96 at 5–26]. For example, Defendant states that its "Pass Protection Group utilized a set of objective criteria or parameters to determine which employees would have their travel pass usage reviewed." [Doc. 88-1 ¶20]. Plaintiff purports to "den[y]" this fact, but her response has almost nothing to do with Defendant's "Pass Protection Group" or what criteria it used to determine which employees it would review. [Doc. 96 at 12–18]. After one single sentence quibbling

5

with Kelly Nabors' testimony because "Ms. Nabors could not speak with certainty," Plaintiff goes on for **over six pages** discussing the allegations in her complaint and arguing that the "reason for her termination is pretext." [Id.].  The fact that Plaintiff was responding to never discusses the allegations in Plaintiff's complaint or the reason for Plaintiff's termination.  See [Doc. 88-1 ¶20].

As the Court has explained, "a response to a statement of undisputed material facts is not an opportunity to write another brief."  Walker v. U.S., I.R.S., No. 4:07-CV-0102-HLM, 2009 WL 1241929, at *3 (N.D. Ga. Feb. 26, 2009) (quoting Darnell v. Georgia Power Co., No. 4:04–CV–0166–HLM, slip op. at 8 (N.D. Ga. Dec. 21, 2005)).  Or, in this case, an opportunity to write Plaintiff's initial brief.  The response to the statement of undisputed facts is to be a separate document containing "**nonargumentative** responses."  N.D. Ga. Loc. R. 56.1(B)(2)(a)(1) (emphasis added).  Plaintiff's arguments should be reserved for her brief.  Because Plaintiff's counsel failed to comply with this requirement, the Court is left to sort out what portions of her "response" are responses to Defendant's statement of undisputed facts and what portions are arguments she intends to use to support her claims.

Plaintiff's brief also violates the rule that a "response to a motion [is] limited in length to twenty-five (25) pages."  N.D. Ga. R. 7.1(D).  The brief itself spills over onto the 26th page, though only slightly.  [Doc. 96 at 26].  But in reality, the brief is far

longer than that.  Plaintiff's counsel "incorporates by reference" her responses to other paragraphs **28 times**, including 11 times where she attempts to "incorporate[ ]" responses from 4 paragraphs at once.  <u>See</u> [Doc. 96 at 9–26].  And many of the paragraphs Plaintiff "incorporates by reference" are themselves quite long.  For example, Plaintiff's response to Defendant's statement number 20, discussed above, is over six pages long.  [<u>Id</u>. at 12–18].  Plaintiff "incorporates by reference" her response to that paragraph **18 times**.  [<u>Id</u>. at 18–24].  By doing so, Plaintiff thus "incorporates" more than 100 extra pages into her brief through this paragraph alone.  This does not include the fact that Plaintiff repeatedly attempts to incorporate the allegations from her Complaint, in contravention of the clear rule that a party cannot support her position by "a citation to a pleading."  <u>See</u> [<u>id</u>. at 2, 13, 24–25]; <u>see also</u> N.D. Ga. Loc. R. 56.1(B)(1).

The Court could strike the response entirely for failing to comply with Local Rules 56.1 and 7.1(D).  <u>See, e.g.</u>, <u>Ctr. Hill Courts Condo. Ass'n, Inc. v. Rockhill Ins. Co.</u>, No. 19-CV-80111, 2020 WL 442467, at *1 n.1 (S.D. Fla. Jan. 28, 2020).  But "in the interest of fairness and expediency, the Court will consider [the] noncompliant brief[ ]."  <u>Id</u>.  However, as discussed above, the Court "will not consider any fact . . . set out only in the brief."  <u>See</u> N.D. Ga. Loc. R. 56.1(B)(1).  And the Court will not indulge any attempt by Plaintiff to "incorporate[ ] by reference" her responses to other

7

paragraphs.[2]  The Court will not allow Plaintiff to file a brief that is, in effect, more than 150 pages long, even if most of those pages are Plaintiff effectively copying and pasting the same arguments over and over again.

## **FACTUAL BACKGROUND**

Plaintiff began working for Delta in 2007.  [Doc. 88-1 ¶1].  Throughout her time at Delta, Plaintiff was warned and counseled for various workplace infractions involving attendance and job performance issues.  [Id. ¶3]; see also [Doc. 96 at 5–6]. In 2014, Plaintiff injured her shoulder, neck, and back at work.  [Doc. 88-1 ¶48].  After a long recuperation, Plaintiff was released to full duty work with no restrictions in October 2014 and was never again restricted from performing any of her work assignments at Delta.  See [id. ¶49].[3]  Other than taking time off to recover, Plaintiff

---

[2] As will be discussed below, many of Plaintiff's responses are immaterial.  This is doubly so when Plaintiff "incorporates" her responses to other paragraphs.  For example, Paragraph 46 of Defendant's Statement of Material Facts says, Plaintiff "could produce no document supporting any [alleged] graduation."  [Doc. 88-1 ¶46]. In response, Plaintiff simply "incorporates" her responses to four other paragraphs without pointing to contrary evidence.  [Doc. 96 at 24].  Even if the Court were to consider Plaintiff's responses to these other paragraphs, none of them contain any evidence disputing Defendant's statement that Plaintiff "could produce no document supporting any [alleged] graduation."  See [Doc. 88-1 ¶46]; see also [Doc. 96 at 12–21].

[3] Plaintiff purports to "Deny" this fact but, as will be discussed in the analysis below, Plaintiff's denial is based only on allegations from her Complaint and an affidavit that contradicts her own testimony.  See [Doc. 96 at 24–25].

never asked for an accommodation relating to the injury.  See [id. ¶50].  But at the suggestion of her supervisor, Carol Kerr, Plaintiff did receive an adjustment to her shift schedule to deal with personal problems.  [Id. ¶51].

As a benefit of employment, Delta provides employees, certain of their family, and a designated "travel companion" with free and reduced-rate travel known as "travel passes."  [Doc. 88-1 ¶4].  Employees also receive "buddy passes," which allow the employee to provide reduced-rate transportation to family or friends not discussed above.  [Id. ¶5].  Delta has written policies regarding the use of these travel benefits that, *inter alia*, expressly prohibit their use for business travel.  [Id. ¶¶6–7]; see also [Doc. 96 at 6–7].  Plaintiff is aware of this prohibition and described it as "a strict rule." [Doc. 88-4 at 100:25–101:7].  Delta's travel policy states that if an employee's "pass rider" uses a pass for business, the employee is subject to "disciplinary action, up to and including . . . termination of employment."  [Doc. 88-1 ¶10].

Delta also requires its employees to keep "control" of their passes and the passes of their designated companions—including by ensuring that the employee is aware of the travel being undertaken by their companion and that the travel pass is not used for

9

business purposes. [Id. ¶12].[4]  In early 2014, Delta became aware that some employees were misusing their travel passes in various ways, including allowing them to be used for business purposes.  [Id. ¶14].[5]  In April 2014, Delta issued a memo explicitly reminding its employees, "Don't share your passes with anyone who intends to use pass travel for business purposes . . . ."  [Id. ¶16].  The memo states that travel pass "misconduct by any associated pass rider" could result in "termination of employment." [Doc. 88-11 at 2].

The April 2014 communication informed employees that Delta was beginning an initiative known as "Fly Right" to prevent travel abuse.  [Doc. 88-1 ¶18].  Delta established a group called the Pass Protection Group ("PPG") to proactively identify cases of possible abuse and investigate them.  [Id. ¶19].  The PPG focused on employees whose travel companions had very high travel pass usage and employees who shared buddy passes with individuals who received buddy passes from a

---

[4] Plaintiff denies she "was aware" of this policy, but that dispute is immaterial. [Doc. 96 at 10].  Plaintiff does not dispute she was required to keep control of her travel passes and to ensure they were not used for business travel.  See [id.]

[5] Plaintiff purports to deny this fact, but her denial does not comply with Local Rule in 56.1(B)(2)(a)(2). [Doc. 96 at 10].  The fact is thus deemed admitted. N.D. Ga. Loc. R. 56.1(B)(2)(a)(2).

substantial number of Delta employees.  [Id. ¶20].[6]  Based on these criteria, the PPG

began investigating five employees, including Plaintiff, who shared a buddy pass with

an individual named Vendal Bailey.  [Id. ¶¶21–22].[7]

While investigating Plaintiff, the PPG identified information showing that

Plaintiff's designated travel companion, Jovan Dais, was frequently traveling to

disparate locations in a way that reflected possible business travel.  [Id. ¶23].[8]  Delta's

---

[6] Plaintiff purports to deny this fact because the testifying Delta employee said she "believe[d]" those were the criteria.  [Doc. 96 at 12].  Plaintiff's denial fails to meet the criteria of Local Rule 56.1(B)(2)(a)(2) because it does not "directly refute[ ]" Delta's fact and Plaintiff does not demonstrate that the evidence "does not support [Delta's] fact."  N.D. Ga. Loc. R. 56.1(B)(2)(a)(2).  The remainder of Plaintiff's response to Paragraph 20 is not relevant, as discussed above.  See [Doc. 96 at 12–18].  As such, this fact is deemed admitted.

[7] Plaintiff asserts the other employees who provided travel passes to Mr. Bailey "were not fully and carefully investigated to the extent as [sic] Plaintiff."  [Doc. 96 at 19].  The record Plaintiff cites does not support her assertion.  [Doc. 92 at 168:5–173:2].  In any event, Plaintiff's assertion is largely immaterial.  Plaintiff ignores the fact that one of the individuals investigated was outside of her protected class and was terminated.  See [id. at 172:10–11]; see also [Doc. 92-1 at 11].  And Plaintiff does not mention that one of the individuals who was cleared of any wrongdoing is, like Plaintiff, an African-American woman.  [Doc. 92 at 172:5–17].  To the extent Plaintiff argues one of the individuals, Sidarius Johnson, is a "comparator," her arguments are discussed below.

[8] Plaintiff purports to deny this fact, but her denial does not comply with Local Rule in 56.1(B)(2)(a)(2).  [Doc. 96 at 19].  Plaintiff only offers an unsupported contention that Mr. Dais's "travel does not reflect possible business travel."  [Id.].  The fact is thus deemed admitted.  N.D. Ga. Loc. R. 56.1(B)(2)(a)(2).

records showed Mr. Dais traveled frequently, often for short duration, to locations that included Los Angeles; Phoenix; New York; Houston; St. Louis; Pittsburgh; Dallas; New Orleans; Washington, D.C.; San Francisco; New York; Orlando; Salt Lake City; Burlington, Vt.; Cincinnati; Las Vegas; and Detroit.  [Id. ¶24]; see also [Doc. 88-13].[9]

In particular, the PPG investigated a one-night trip Mr. Dais took using Plaintiff's travel pass to Los Angeles, California on June 6, 2015.  See [Doc. 88-3 ¶12]. During her deposition, Plaintiff admitted that Mr. Dais and a music artist named Caleb Boyette—who goes by the "rap name" Jino—"do music together" and that the two "work together."  [Doc. 88-4 at 186:15–25]; see also [id. at 187:8–12].  Delta's records showed that Mr. Dais and Mr. Boyett traveled to Los Angeles together using Plaintiff's travel pass benefits and that Mr. Dais paid Mr. Boyett's fees associated with using the Delta travel pass.  [Doc. 88-3 at 4–5, ¶12]; [Doc. 88-1 ¶31].  During the investigation, the PPG uncovered social media posts in which Mr. Boyett promoted the fact he was preforming in a concert in California on June 6, 2015.  [Doc. 88-12 at 5–9].  Mr. Dais posted a picture of himself with Mr. Boyett "[o]n the set" at the concert.  [Id. 10–11].

---

[9] Plaintiff purports to deny these facts "to the extent they contradict the record." [Doc. 96 at 19].  But Plaintiff does not explain how Defendant's statement allegedly contradicts the record, and the only "evidence" she cites is a declaration by Mr. Dais saying one trip he took "was please [sic]."  [Id.]; see also [Doc. 96-2 at 1].

The PPG decided to interview Plaintiff to discuss their suspicion that Mr. Dais was using her travel passes for his music business.  [Doc. 88-1 ¶32].  During the interview, Plaintiff said Mr. Dais lives in Georgia. [Doc. 88-3 at 27].  Delta's research confirmed Mr. Dias's address and showed the business he "works for" does "music production, studio rentals," etc.  [Id.].  When asked about Mr. Dias's travel, Plaintiff failed to identify the vast majority of the places where Mr. Dais traveled.  [Id.].  Plaintiff admitted she "sometimes" booked flights for Mr. Dais "at his house on his computer and the computer could save her password." [Doc. 88-3 at 27].  Plaintiff claimed that she "traveled together" with Mr. Dais for a funeral, then claimed "she said they never traveled together," then "said they have traveled together but not for the funeral."  [Id. at 28].  Delta's records did not show Plaintiff and Mr. Dais traveling together since he was added as a travel companion in August 2011.  See [id.].  When asked why Mr. Dais traveled to Los Angles, Plaintiff stated his "children live in LA."  [Id.].  When confronted with the social media posts uncovered by the PPG, Plaintiff said she "didn't know anything about that."  [Id.].  The PPG members who interviewed Plaintiff decided she "was not truthful and forthcoming about her current companion pass rider Jovan Dias."  [Id. at 29].

Performance leader Mark Harris recommended Plaintiff be terminated because "she was not forthcoming" and "her companion used non-revenue benefits for business

13

purposes." [Id. at 31].  The memo recommending Plaintiff's termination noted that Plaintiff had received two warnings for performance/attendance issues within the last five months.  [Id.].  Station Manager Kelly Patton concurred with the recommendation for termination, and Human Resources manager Barbara Franz "also concurred with the termination decision" after having reviewed the investigation materials.  [Id.]; see also [id. at 6, ¶16].  At no point prior to her termination did Plaintiff complain of any discriminatory conduct.  [Doc. 88-1 ¶53].

Plaintiff appealed her termination and then alleged that the June 6, 2015 trip was "for [Mr. Dias's] daughter's graduation."  [Doc. 88-15 at 1].  Plaintiff was asked about Mr. Dias's social media posts, and Plaintiff claimed that Mr. Dias simply "retweeted [a] friend's post."  [Id. at 2].  Plaintiff was told "to provide documentation to support her claim that Mr. Dias was in [Los Angles] for his daughter's graduation" and to "ask Dias about the twitter posts."  [Id.].  Plaintiff sent Delta a copy of Mr. Dias's California driver's license and a letter from Mr. Dias that said "he's not giving out his minor child's school information."  See [Doc. 88-4 at 232:21–233:14].

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant can discharge this burden by merely

"'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). After the movant has carried her burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing a genuine disputed issue for trial. <u>Id.</u> at 324.

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material when it is identified as such by the controlling substantive law. <u>Id.</u> at 248.

Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." <u>Anderson</u>, 477 U.S. at 249-50. To the extent one party's

version of events "is blatantly contradicted by the record," the "court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 379–81 (2007).

## LEGAL ANALYSIS

As an initial matter, the Court must address what claims Plaintiff brings. Plaintiff asserts Defendant did not address her "harassment" and "hostile work environment" claims.  [Doc. 96 at 3].[10]  Plaintiff's assertion is incorrect. Defendant correctly pointed out "Plaintiff does not assert any hostile work environment claim in her Complaint."  [Doc. 88-2 at 15 n.6]; see also [Doc. 3].  And the only time Plaintiff mentions "harassment" in her claims is in the context of her retaliation claim.  [Doc. 3 ¶82].  "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."  Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).  In any event, "hostile work environment" and "harassment" are different names for the same claim.  See Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1248 (11th Cir. 2014).  Defendant correctly pointed out that the alleged "harassment" did not "remotely create a hostile work environment."  [Doc. 88-2 at 15 n.6]; see also [Doc.

---

[10] Plaintiff also asserts Defendant did not "fully address[ ]" her "retaliation claims [*sic*] under the [Americans With Disabilities Act ("ADA")]."  [Doc. 96 at 3]. Plaintiff actually did bring an ADA retaliation claim, so that claim is discussed in the analysis below.

99 at 6]. As will be discussed below, Plaintiff does not present competent evidence to support the allegations of "harassment" found in her Complaint, or evidence of the kind of harassment that would support a hostile work environment. [11]

Looking to the Complaint, Plaintiff brings five counts under three statutes. First, Plaintiff alleges violations of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). [Doc. 3 ¶¶42–52]. Within this count, Plaintiff alleges two kinds of ADA violations: a failure "to reasonably accommodate Plaintiff's actual or perceived disabilities" (the "failure-to-accommodate claim") and termination "because of her actual or perceived disabilities" (the "ADA discrimination claim"). [Id. ¶¶44–45]. Plaintiff's second count alleges racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII") and 42 U.S.C. § 198l. [Id. ¶¶53–61]. Third, Plaintiff brings a count of gender discrimination, also in violation

---

[11] The only examples of harassment Plaintiff mentioned in her deposition are isolated, not severe, and have nothing to do with a protected characteristic. One time, Plaintiff was told her shoes were "[o]ut of compliance" and "that was it." [Doc. 88-4 at 118:11–119:1]. Plaintiff heavily disputes whether this incident even qualified as a verbal coaching. [Id. at 117:2–118:2]. Another time during irregularly busy operations, Plaintiff was "pushed aside" because her supervisor believed she was working "too slow." [Id. at 119:2–121:6]. One time, Plaintiff was told to take off a bracelet. [Id. at 121:12–122:6]. And one time, Plaintiff asked for a copy of an email praising "something [she] did," but Plaintiff's supervisor said, "I don't have it." [Id. at 122:15–123:11]. While Plaintiff claims her supervisor "constantly said things to" her, those are the only incidents Plaintiff could remember and she characterizes them as "the four main things." [Id. at 122:7–14; 123:12–16].

of Title VII.  [Id. ¶¶62–70].   Fourth, Plaintiff brings a claim under the Age

Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et. seq.* ("ADEA").  [Id.

¶¶72–80].  Last, Plaintiff alleges a count of retaliation under Title VII, § 198l, the ADA,

and the ADEA.  [Id. ¶¶81–88].  The Court discusses each of these claims in turn, but

because all of Plaintiff's discriminatory termination claims require a similar prima facie

showing, those counts are discussed together.  See Liebman v. Metro. Life Ins. Co.,

808 F.3d 1294, 1298 (11th Cir. 2015); Holly v. Clairson Indus., L.L.C., 492 F.3d 1247,

1255–56 (11th Cir. 2007); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th

Cir.1998).

## I.     The Failure-to-Accommodate Claim

"To establish a prima facie case of discrimination under the ADA, a plaintiff

must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected

to unlawful discrimination because of his disability."  Holly, 492 F.3d at 1255–56.  The

term "discrimination" as used in the ADA includes "not making reasonable

accommodations to the known physical . . . limitations of an otherwise qualified

individual with a disability."  42 U.S.C. § 12112(b)(5)(A).

As an initial matter, Plaintiff never points to any evidence that she "is disabled"

within the meaning of the ADA.  See [Doc. 96].  Plaintiff simply asserts that she has

an unspecified "disability."  See [id. at 1–2, 12–13, 15–16, 24–25].  Plaintiff is

presumably referring to her "work injury," but the mere fact that Plaintiff missed work because of an injury does not mean she is "disabled" within the meaning of the ADA. See [id. at 1]; see also Sutton v. Lader, 185 F.3d 1203, 1209 (11th Cir. 1999) (holding that a "temporary inability to work while recuperating from surgery is not . . . a permanent or long-term impairment and does not constitute evidence of a disability" under the Rehabilitation Act).

Plaintiff also suggests that Defendant's actions "caused [her] to suffer depression" and that the condition "resulted in her taking leave including an overnight stay in the hospital." [Doc. 96 at 13].  Even if this statement is true,[12] Plaintiff's assertion that she took leave and stayed in a hospital overnight is not sufficient to show she was "disabled" within the meaning of the ADA.  Garrett v. Univ. of Alabama at Birmingham Bd. of Trustees, 507 F.3d 1306, 1315 (11th Cir. 2007) ("A severe

---

[12] The only evidence Plaintiff cites in support of this position is her declaration, where she makes the same assertion nearly verbatim.  [Doc. 96-1 ¶6]. But that declaration appears to be a sham and need not be credited.  See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 656 (11th Cir.1984) (explaining that an affidavit is a "sham" when it "merely contradicts [a party's] prior testimony without giving any valid explanation").  During her deposition, Plaintiff testified that her depression occurred because of issues with her car, her aunt, and her mother.  [Doc. 88-4 at 98:9–25].  Plaintiff never asserted her depression was caused by Defendant's actions.  Plaintiff also never testified that she had an overnight hospital stay because of her depression.  Instead, Plaintiff testified that *after* her termination she twice stayed in the hospital overnight due to "chest pains" and "anxiety."  [Id. at 32:11–34:5].

limitation that is short term and temporary is not evidence of a disability."); see also [Doc. 88-4 at 26:21–31:12] (testifying that the only psychological treatment she has received is a prescription for a medication she has taken "[m]aybe eight times"). Setting aside this flaw, Plaintiff's failure-to-accommodate claim still fails because she never requested a reasonable accommodation.

In its Motion for Summary Judgment, Defendant argues Plaintiff "made no request for reasonable accommodation relating to her injury." [Doc. 88-2 at 21]. Having pointed to this absence of evidence, the burden shifts to Plaintiff to present competent evidence showing a genuine disputed issue for trial. Celotex, 477 U.S. at 324. But Plaintiff does not meet her burden. Nowhere in her brief does Plaintiff assert that she requested any kind of accommodation for her unspecified "disability," and nowhere does she assert that any request for an accommodation was denied. See [Doc. 96]. The closest Plaintiff comes is her assertion that "Defendant *retaliated* by harassing Plaintiff for exercising her rights" under the ADA. [Id. at 4] (emphasis added). Plaintiff's retaliation claim will be discussed below, but for present purposes, it is sufficient to note that Plaintiff never explains how she "exercis[ed] her rights" under the ADA, and she does not point to any competent evidence that she requested an accommodation. [Id.].

20

Defendant also argues Plaintiff's failure-to-accommodate claim fails because Plaintiff "needed no accommodation to perform the essential functions of her position." [Doc. 88-2 at 21–22]. Given that Plaintiff fails to point to a request for any kind of accommodation, she nowhere argues she requested a "reasonable accommodation." See [Doc. 96]. Even if Plaintiff had a disability, she would not be entitled to whatever accommodation her heart desired. The ADA only requires employers to provide "reasonable accommodations." 42 U.S.C. § 12112(b)(5)(A). "An accommodation is 'reasonable' and necessary under the ADA only if it enables the employee to perform the essential functions of the job." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1259–60 (11th Cir. 2001). As of October 17, 2014, Plaintiff was released to "Full duty work," regardless of whatever lingering ailment she had. [Doc. 88-14]. As Plaintiff herself testified, after her return from approved leave, she was "able to do everything that Delta required to Delta's satisfaction." [Doc. 88-4 at 105:9–15]. Thus, even if Plaintiff had requested some kind of accommodation, that accommodation necessarily would not have been a reasonable one because it was not needed for Plaintiff "to perform the essential functions of the job." See Lucas, 257 F.3d at 1259–60. Based on the foregoing reasons, Plaintiff's failure to accommodate claim fails as a matter of law.

## II.   **The Discrimination Claims**

Plaintiff alleges she was discriminated against based on her race, gender, age,

and alleged disability. [Doc. 3 ¶¶45, 53–80]. For each claim, the Court applies the McDonnell Douglas[13] burden-shifting framework. Under that framework, Plaintiff first has the burden of establishing a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). If the plaintiff meets her burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254; Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). Plaintiff is then given an opportunity to show that Defendant's proffered nondiscriminatory reason was merely a pretext for discriminatory intent. Burdine, 450 U.S. at 253; Chapman, 229 F.3d at 1024. The Court addresses Plaintiff's discrimination claims under each statute separately, since the elements of each are slightly different.

### A.   *ADEA*

"To make a prima facie case of age discrimination, the employee must show: (1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from

---

[13] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)

22

which he was discharged." Liebman v. Metro. Life Ins. Co., 808 F.3d 1294, 1298 (11th Cir. 2015). Plaintiff fails to make a prima facie showing of discrimination in violation of the ADEA. Plaintiff offers no evidence "a substantially younger person filled the position from which [s]he was discharged." Id. Plaintiff does not offer evidence that a substantially younger Delta employee was treated differently. In her response brief, Plaintiff only mentions the age of two people: herself and Vendal Bailey. See [Doc. 96]. Mr. Bailey's age is not relevant because he is simply someone who was "provided travel passes" by Delta employees. See [id. at 19]. Mr. Bailey was not a Delta employee and thus could not have been terminated by Delta for abusing travel passes. See [Doc. 92-1].

Even if Mr. Bailey were a Delta employee, Plaintiff did not show he was "substantially younger." Plaintiff simply states, she is "over the age of 40" and Mr. Bailey is "under the age of 40." [Doc. 96 at 12, 15]. Although Plaintiff is protected by the ADEA because she is over 40, she does not automatically state an ADEA claim by showing someone under 40 was treated differently. Liebman, 808 F.3d at 1299. "The proper inquiry . . . is whether [the other employee] was substantially younger than [Plaintiff]." Id. Even setting aside the fact Mr. Bailey is not a Delta employee, Plaintiff makes no showing he is substantially younger. Plaintiff just asserts, without any citation to the record, that Mr. Bailey is under 40. [Doc. 96 at 15]. Even if Plaintiff

had made out a prima facie case under the ADEA, Defendant would still be entitled to summary judgment because Plaintiff does not rebut its legitimate, non-discriminatory reason for her termination, as will be discussed below.

### B.   *ADA*

"To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." Holly, 492 F.3d at 1255–56.  As discussed above, Plaintiff has not shown she is "disabled" within the meaning of the ADA, and thus she cannot satisfy the first element of her prima facie case.  Even if Plaintiff were disabled and a qualified individual, she has not shown she was subjected to unlawful discrimination because of her disability.  Plaintiff points to no evidence regarding the disability status of any of her alleged comparators.  See [Doc. 96]. Moreover, Plaintiff cites to no **evidence** that she was subjected to any unlawful discrimination.  Plaintiff just says she suffered "harassment" as "set forth in detail in Plaintiff's complaint at paragraphs 20–28, for example."  [Doc. 96 at 13].

The Local Rules are abundantly clear that a party cannot support their position at summary judgment "by a citation to a pleading rather than to evidence."  N.D. Ga. Loc. R. 56(B).  Even if the Court were to consider Plaintiff's declaration despite the fact that Plaintiff failed to provide an additional statement of material facts, the

24

declaration does not change the result. Plaintiff cannot do indirectly what she cannot do directly, and thus Plaintiff cannot just "incorporate[ ] by reference" a pleading to survive summary judgment. See [Doc. 96-1 ¶5]; see also Fed. R. Civ. P. 56(c)(4). Eleventh Circuit precedent is clear that an affidavit must contain "specific facts to show why there is an issue for trial." Leigh v. Warner Bros., 212 F.3d 1210, 1217 (11th Cir. 2000) (quoting Gossett v. Du–Ra–Kel Corp., 569 F.2d 869, 872 (5th Cir. 1978)). Furthermore, as mentioned in footnote twelve above, Plaintiff's declaration is a sham that cannot be credited. See Van T. Junkins, 736 F.2d at 656.

For example, one of the allegations from her Complaint that Plaintiff tries to "incorporate" is that "one month before her discharge, Plaintiff was required to go to the emergency room to address the debilitating pain from her injury and the severe depression caused by her supervisor's conduct" and that she "remained in the hospital overnight." [Doc. 3, ¶27]. During her deposition, however, Plaintiff testified that her depression occurred because of issues with her car, her aunt, and her mother. [Doc. 88-4 at 98:9–25]. Plaintiff never asserted her depression was caused by Defendant's actions. Plaintiff also never testified that she had an overnight hospital stay because of her depression. Instead, Plaintiff testified that *after* her termination she twice went to the emergency room and stayed in the hospital overnight due to "chest pains" and "anxiety." [Id. at 32:11–34:5]. The declaration appears to be a demonstrable sham

that simply contradicts Plaintiff's sworn testimony, without explanation.  Even if Plaintiff had shown a prima facie case of disability discrimination, her claim fails because she cannot rebut Defendant's non-discriminatory reasons for her termination, as will be discussed below.

### C.    *Title VII*

A prima facie case of discrimination under Title VII requires the plaintiff to show: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees more favorably; and (4) she was qualified to do the job." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (quoting EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000)).  Plaintiff never shows any of her alleged comparators were outside of her protected class because she never mentions the race or gender of any alleged comparator.  See [Doc. 96 at 7–9; 14–15].[14]  Even assuming that all of the alleged comparators are outside of Plaintiff's protected class, she has not shown they were "similarly situated."

---

[14] Again, Plaintiff does state that Vendal Bailey "is a male and under the age of 40," without citing to any record evidence.  [Doc. 96 at 15].  That fact has no relevance to Plaintiff's claims because Mr. Bailey was not a Delta employee.  See [id. at 19].

To be "similarly situated," an individual outside the plaintiff's protected class must be similar in "all material respects." Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1227 (11th Cir. 2019). While the "similarly situated" analysis must occur "on a case-by-case basis," it generally requires that the alleged comparator: (1) "engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) was "subject to the same employment policy, guideline, or rule as the plaintiff;" (3) was "under the jurisdiction of the same supervisor as the plaintiff;" and (4) "share[d] the plaintiff's employment or disciplinary history." Id. at 1227–28. Plaintiff fails to show any of her alleged comparators were "similarly situated." Plaintiff points to fourteen individuals as alleged comparators: (1) Marian Bicksler, (2) Cindy Fundala, (3) Douglas Rehm, (4) Susan Galyardt, (5) Bryan McKenzie, (6) Randolph Butcher, (7) Debra Mercer, (8) Angela Mooring, (9) Heather Cross, (10) David Bishton, (11) David Ragan, (12) Richard Service, (13) Sabrina Simmons, and (14) Sidarious Johnson. [Doc. 96 at 7–9, 14–15].[15]

---

[15] As Defendant correctly notes, Plaintiff's alleged comparators are a cherry-picked handful from a list of approximately 200 employees. [Doc. 99 at 9]. Plaintiff does not address the dozen young, white, male employees who were terminated and the numerous individuals in Plaintiff's protected class who were not terminated. See [id. n.5]. Pretermitting whether Plaintiff can survive summary judgment by discussing "only a tiny slice of the relevant comparators," her claims still fail for the reasons given below. See Calhoun v. EPS Corp., 36 F. Supp. 3d 1344, 1352–53 (N.D. Ga. 2014),

But Plaintiff never alleges that any of her comparators were supervised by the same decision maker(s) involved in Plaintiff's termination.  See [Doc. 99 at 11]; see also [Doc. 96].  Nor does Plaintiff allege that any of her alleged comparators had a similar disciplinary history as Plaintiff, who had received two warnings in the months leading up to her termination.  See [Doc. 88-3 at 31]; see also [Doc. 96].  Most importantly, none of the alleged comparators engaged in the same basic misconduct as Plaintiff.  Five of the alleged comparators were cleared of any misconduct. Five engaged in some kind of misconduct but did not allow their travel passes to be used for business purposes.  And the remaining four who did allow their travel passes to be used for business purposes were not dishonest when confronted.  The Court discusses each category of "comparator" in turn.

### i.     The individuals cleared of any misconduct

Five of Plaintiff's alleged comparators (Bicksler, Fudala, Mercer, Bishton, and Simmons) were cleared of any misconduct.  [Doc. 92-1 at 2–3, 9]; [Docs. 89-11, 89-12].  Plaintiff does not allege that Bicksler or Fudala allowed travel passes to be used for business purposes or that they were untruthful during their respective investigations, and Plaintiff does not point to any evidence creating a genuine issue of

---

*order vacated in part on other grounds*, No. 1:13-CV-2954-TCB, 2014 WL 12799080 (N.D. Ga. Sept. 15, 2014).

material fact.  [Doc. 96 at 7].  Plaintiff notes that Mercer's "travel pass was used for business purposes," but Mercer did not *allow* her pass to be used for business purposes.  [Doc. 96 at 8].  Instead, Mercer immediately informed Delta when she learned that her "ex[-husband] might be traveling for his business."  [Doc. 92-1 at 9].  The ex-husband was "removed forever" as a travel companion, but Mercer herself was cleared of any wrongdoing.  [Id.].

Plaintiff's assertion that Bishton's "travel pass was used for extensive business purposes" also falls short.  See [Doc. 96 at 9].  Bishton was investigated "regarding the frequent travel of his Father," who "was traveling with [h]is son Jeff to Marathons."  [Doc. 89-12 at 1].  Plaintiff presents unverified evidence that Jeff participated in the Madison Marathon in 2010 and 2011.  [Doc. 89-13].  Plaintiff also presents unverified evidence that the Madison Marathon offered a small prize to the top three finishers in 2020.  [Doc. 89-14].  But Plaintiff offers no evidence the Madison Marathon offered prize money in 2010 or 2011.  And, more importantly, Plaintiff does not point to any evidence Jeff used a travel pass to attend the Madison Marathon.  Nor has the Court found any such evidence.  See [Doc. 89-12].  If Plaintiff means to suggest that other marathons Jeff participated in might have offered prize money, Plaintiff's speculation is not enough to survive summary judgment.  Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005).  Additionally, Bishton was retired at the time of the

29

investigation, thus he could not have been a proper comparator even if he had been found to have engaged in misconduct. <u>See</u> [Doc. 89-12 at 1]. Plaintiff fails to cite *any* authority holding that an employee and a retiree can be "similarly situated" for purposes of a discriminatory termination claim. <u>See</u> [Doc. 96].

Last, Simmons was also cleared of any misconduct. [Doc. 89-11]. Plaintiff points to no evidence that anyone using Simmons travel pass flew for business purposes. Instead, Plaintiff simply offers her own conjecture that one of Simmons's travel pass users "appears" to have traveled for business. [Doc. 96 at 15]. Again, such speculation is not enough to survive summary judgment. <u>Cordoba</u>, 419 F.3d at 1181. Plaintiff asserts Simmons did not know "where her travel companion traveled," but Simmons, in fact, recalled numerous places where he traveled, although she could not "recall every one of the cities [he] traveled to, because it was a good while ago." <u>See</u> [<u>id</u>.]; <u>see also</u> [Doc. 89-11 at 2–3]. Plaintiff also contends Simmons "was never questioned on why her travel companions used her travel pass," but that assertion is contradicted by the record. <u>See</u> [Doc. 96 at 15]. The investigator's notes show that the questioning of Simmons revealed her companions traveled "due to father having cancer," "for a youth trip," and "to see [about an] ill mother." [Doc. 89-11 at 3]. Also, nothing in the record indicates Simmons was found to have been deceptive or untruthful in any way. <u>See</u> [Doc. 89-11].

ii.     **The individuals whose passes were not used for business purposes**

Five of Plaintiff's other comparators (McKenzie, Butcher, Ragan, Service, and Johnson) engaged in misconduct, but did not allow their travel passes to be used for business purposes. One of these employees, McKenzie, was terminated—although he was reinstated after an appeal—and another employee, Bucher, resigned before he could be terminated. [Doc. 92 at 85:11–16]; [id. at 88:19–89:9]. Plaintiff offers no argument that she should have been allowed to retire instead of being terminated, and she offers no evidence that McKenzie was treated differently during his appeal process. See [Doc. 96]. Just like McKenzie, Plaintiff was given an opportunity to appeal. During her appeal, Plaintiff for the first time asserted that Mr. Dais's June 6, 2015 trip was so he could attend his daughter's "graduation" that was the same night as Mr. Boyett's concert. See [Doc. 88-15 at 1]. Plaintiff was told "to provide documentation to support her claim that Dias was in [Los Angles] for his daughter's graduation." [Id. at 2]. But the only "evidence" Plaintiff provided was a copy of a California driver's license and a letter from Mr. Dias stating that "he's not giving out his minor child's school information." See [Doc. 88-4 at 232:21–233:14]. Plaintiff does not discuss McKenzie's appeal process, and she does not demonstrate that McKenzie provided no "evidence" to support his appeal. See [Doc. 96].

As noted above, none of these individuals Plaintiff points to engaged in the same basic misconduct as Plaintiff.  McKenzie "los[t] control of [his] buddy passes," but there was no evidence the passes were used for business purposes and McKenzie was truthful with investigators.  [Doc. 92 at 84:3–88:18]; see also [Doc. 92-1 at 5].  Ragan "gave his passwords to another employee" and thus was "not able to recall" all the people who used his buddy passes.  [Doc. 89 at 111:5–25].  But there was no evidence Ragan's passes were used for business travel and he freely admitted to the misconduct.  [Id. at 111:5–116:15].  Ragan was given "a final corrective action notice," but apparently was not terminated.  [Id. at 115:1–116:15].

During  PPG's investigation of Service, he made several apparently incorrect statements, such as claiming "Stefan" and "Steffanye" were the same person and claiming to attend a particular church even though research by PPG investigators "indicated that there was not a church by that name."  [Id. at 117:12–123:22].  Service was given a "corrective action" for not being honest during the investigation, but there was no evidence that his travel passes were misused in any way.  [Id. at 125:7–21].  Last, Plaintiff claims Johnson "committed more egregious conduct yet was allowed to keep his job," though she provides no explanation.  [Doc. 96 at 15].  The record shows that Johnson was not truthful and forthcoming, but there was no evidence that his travel

passes were used for business purposes.  [Doc. 89 at 105:7–10]; <u>see also</u> [<u>id</u>. at 110:2–10].  As such, Johnson did not engage in the same basic misconduct as Plaintiff.

### iii.    The individuals who were truthful during their investigations

That leaves four individuals who were found to have allowed their travel passes to be used for business purposes—Galyardt, Mooring, Rehm, and Cross.  Initially, the Court notes that there is no evidence any of those individuals were untruthful when confronted.  One of these people, Galyardt, was retired at the time of her investigation and thus cannot be used as a comparator. [Doc. 92-1 at 5].  Plaintiff argues a permanent suspension of Galyardt's travel pass privileges "would have been analogous to termination," but this is simply Plaintiff's own conjecture.  [Doc. 96 at 7–8].  As mentioned above, Plaintiff fails to cite *any* authority holding that an employee and a retiree can be "similarly situated" for the purposes of a discriminatory termination claim.  In any event, Galyardt *did* receive a "pass suspension for life," just like Plaintiff says she should have.  [Doc. 92-1 at 5].  That Galyardt could "appeal" is not relevant; Galyardt had an opportunity to appeal "just like a terminated employee could appeal their termination." [Doc. 92 at 81:23–82:1].  Plaintiff herself appealed.  <u>See</u> [Doc. 88-15 at 1].  There is no evidence Galyardt ever had her travel pass privileges restored, and there is no evidence Galyardt was untruthful.

Plaintiff asserts Mooring's "travel pass was used for business purposes" but the evidence she cites does not support that position. [Doc. 96 at 8]. Mooring's companion "purchase[d] tickets in case he [could not] get on" using a travel pass. [Doc. 92-1 at 9]. This was coded as "TRAVELING FOR BUSINESS/IMPROPER PURPOSES," but contrary to Plaintiff's suggestion Delta's pass travel policy does not say the use is "business travel." See [id.]. Delta's pass travel policy explicitly discusses travel for "any business activity" or for "independent business ventures or on behalf of an external company or organization" in its "Eligibility" section. [Doc. 92-3 at 2]. The prohibition on using standby travel "on any flight for which a pass rider is holding or has held a confirmed reservation" is listed in the separate "Additional Restrictions" section. [Id.]. Thus, while Mooring's companion used the travel pass improperly, there is no evidence he used the pass for a "business activity." Even if the pass had been used for business purposes, there is no evidence Mooring was found to be untruthful during the investigation. See [Doc. 92-1 at 9]; see also [Doc. 92 at 93:18–97:12].

With regard to Rehm, his son-in-law attempted "to obtain a receipt so that he would be reimbursed" with funds held by the organization he worked for. [Doc. 96-4]. This was certainly a violation of Delta's pass travel policy ([Doc. 92-3 at 2]), however, Plaintiff's own evidence indicates the reimbursement was not for "business expenses" but rather would have been for "personal expenses" and paid out of money

the son-in-law "raised to support himself" as a ministry leader.  [Doc. 96]. There is no evidence Rehm was dishonest during the investigation.  Instead, Rehm wrote a letter "apologiz[ing] for this incident and the related confusion and miscommunication." [Id.].  Rehm admitted he "should have communicated much more clearly" with his son-in-law and they subsequently "discussed the proper procedures and circumstances to use a pass."  [Id.].

Last, Plaintiff makes a conclusory assertion that Cross's companion used her travel pass "for extensive business purposes."  [Doc. 96 at 9].  A review of the lengthy, detailed investigation file reveals that Cross's companion did, in fact, travel for "business purposes."  [Doc. 96-3 at 74].  Specifically, Cross's companion traveled on behalf of a charity raising "awareness for Usher Syndrome," a disease that afflicted him.  See [Doc. 96-3 at 75].  Even though Cross's companion was not paid for his speaking engagements, he still violated Delta's pass travel policy because he was traveling "on behalf of an external company or organization."  [Doc. 92-3 at 2].  Delta decided not to terminate Cross, and instead gave her a "Final Corrective Action Notice" and suspended her passes for two years.  [Doc. 96-3 at 74].  But Cross is not similarly situated to Plaintiff in two crucial, material respects.  First, the reason Cross was not terminated was because her companion gave "recognition to Delta," publicly stating "he is able to travel" because of his use of Cross's travel passes.  [Doc. 96-3 at 75–76].

This led to Delta "receiving accolades for making his travel possible" and other "good will." [Id.]. Second, there is no evidence Cross was dishonest or evasive when she was confronted about her companion's business travel. See [Doc. 96-3]; see also [Doc. 92 at 97:13–98:21]; [Doc. 92-1 at 13].

Accordingly, none of the individuals Plaintiff points to are proper comparators because they are not similarly situated in "all material respects." See Lewis, 918 F.3d at 1227. There is no evidence any of alleged comparators were investigated by the same decision makers or that they shared Plaintiff's disciplinary history. See id. at 1227–28. Five of the alleged comparators were found not to have engaged in any misconduct at all. Five were disciplined for other misconduct—including two who were to be terminated—but there was no evidence that any allowed their passes to be used for business purposes. And of the four who ostensibly allowed their passes to be used for business purposes, one received the exact sanction Plaintiff argues was appropriate and the other three engaged in demonstrably less severe conduct. More importantly, there is no evidence that any of the individuals who allowed their passes to be used for business travel were dishonest or evasive during their respective investigations.

To be sure, use of a comparator is not the only way for a plaintiff to prove a prima facie case of discrimination. King v. Ferguson Enterprises, Inc., 971 F. Supp.

2d 1200, 1216 (N.D. Ga. 2013).  But Plaintiff does not argue or produce any evidence, that she can prove discriminatory animus in any other way.  <u>See</u> [Doc. 96].  Instead, Plaintiff's brief is dedicated to arguing about "pretext," never mentioning her burden to prove a prima facie case.  [<u>Id</u>.].  The Court does not consider whether Defendant's reasons were "pretext" until Plaintiff meets her initial burden of establishing a prima facie case.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.  Because Plaintiff has not done so, Defendant is entitled to summary judgment on Plaintiff's discriminatory termination claims.

### iv.     Whether Delta's reasons are pretextual

Even if Plaintiff had established a prima facie case, Defendant has certainly articulated legitimate, non-discriminatory reasons for Plaintiff's termination. Specifically, performance leader Mark Harris recommended Plaintiff be terminated because "she was not forthcoming" and "her companion used non-revenue benefits for business purposes."  [Doc. 88-3 at 31].  Where, as here, an employer offers more than one reason for an adverse employment action, the plaintiff must rebut "each of the proffered reasons of the employer."  <u>Crawford v. City of Fairburn, Ga.</u>, 482 F.3d 1305, 1309 (11th Cir. 2007).  To rebut the employer's reason, Plaintiff must demonstrate "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them

unworthy of credence." Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)).  Plaintiff "cannot succeed by simply quarreling with the wisdom of [the employer's] reason[s]." Chapman, 229 F.3d at 1030.

Plaintiff lists eight reasons why she contends Delta's reasons for terminating her are pretextual, none of which are availing.  [Doc. 96 at 13–18].  First, Plaintiff argues Delta "changed its reason for the termination," but she does not provide any argument to support this assertion.  [Id. at 13–14].  Delta's reasons for Plaintiff's termination were outlined at the time, and they are the same reasons Delta relies on now.  [Doc. 88-3 at 31]; see also [Doc. 88-2 at 11].  Plaintiff does not show Delta's reasons for her termination have ever been "fundamentally inconsistent," and thus she does not show pretext. Phillips v. Aaron Rents, Inc., 262 F. App'x 202, 210 (11th Cir. 2008).  Second, Plaintiff argues "similarly situated employees were treated differently," because "[a]ll the white employees investigated were able to keep their jobs."  [Doc. 96 at 14]; see also [Doc. 92-1].  To the extent Plaintiff discusses particular individuals she claims were "similarly situated," she is wrong, as discussed above.

Third, Plaintiff argues "Delta only decided to investigate" her after her "disability and after she exercised her rights under the ADA" and after she made "claims of harassment and retaliation."  [Doc. 96 at 15–16].  As discussed above,

Plaintiff never "exercised her rights under the ADA" and, as will be discussed below, Plaintiff does not cite any evidence that she complained "of harassment and retaliation." Plaintiff's argument that Delta's "delay" in investigating her "suggests that Delta's reason was a pretextual afterthought" falls short. The "Fly Right" campaign did not exist until after Plaintiff's workplace injury. [Doc. 88-1 ¶¶18–19]. The suggestion that Delta invented the campaign to create a pretextual reason for firing Plaintiff more than a year later would not be believed by a reasonable jury. Delta clearly explained why Plaintiff was investigated. Every individual, including Plaintiff, who shared a buddy pass with Vendal Bailey was investigated by the PPG. [Id. ¶¶21–22]. Plaintiff offers no evidence suggesting Delta's reason for investigating her is untrue. See [Doc. 96 at 15–16].

Fourth, Plaintiff argues "it is impossible for an employee to always know the reasons someone uses a travel pass" and that "this unattainable goal is evidence of pretext." [Id. at 16]. It is, of course, not an "unattainable goal," because Delta employees are expected to have control over their passes and book the trips for their companions, thus giving the employees an opportunity to ensure that the passes are being used for a proper reason. In any event, Plaintiff's argument is irrelevant, because Plaintiff was not terminated for failing to "always know the reasons someone uses a travel pass." See [Doc. 88-3 at 31].

Fifth, Plaintiff argues "Delta deviated from its normal management procedures" and that "Delta normally takes corrective action." [Doc. 96 at 16–17]. This argument is based on Plaintiff's naked assertion that the only reason she "was terminated for loss of control." [Id.]. Plaintiff ignores that the documents she cites also say she was terminated because her companion "traveled for business." [Doc. 92-2]; [Doc. 92-13]. As the very document Plaintiff relies on explains, "Travel Companion being use [*sic*] for business purposes (results in termination)." [Doc. 92-10]; see also [Doc. 88-1 ¶10] (quoting Delta's travel policy, which states that if an employee's "pass rider" uses a pass for business the employee is subject to "disciplinary action, up to and including . . . termination of employment").

Sixth, Plaintiff argues she "had a good performance history." [Doc. 96 at 17]. Setting aside the fact that this argument is belied by Plaintiff's own admission that she received warnings for tardiness or other workplace misconduct, the argument is irrelevant. Plaintiff was not terminated for poor performance, and evidence that Plaintiff "had a good performance history" does not disprove Delta's conclusion that she allowed her passes to be used for business purposes and she as not truthful when confronted. See [Doc. 88-3 at 31].

Seventh, Plaintiff argues she was terminated for "only one alleged travel pass violation." [Doc. 96 at 17] (emphasis omitted). Plaintiff ignores the fact that she was

found to have been untruthful when confronted about the violation, which was a separate, independent reason for Delta terminating her.  See Crawford, 482 F.3d at 1309 (explaining that a plaintiff must rebut "each of the proffered reasons of the employer").  Plaintiff cites no evidence that Delta had a progressive discipline policy that prohibited it from terminating an employee for "only one alleged travel pass violation."  See [Doc. 96 at 17].  Plaintiff's own evidence indicates that, long before Plaintiff's investigation, Delta's policy was "Travel Companion being use [*sic*] for business purposes (results in termination)."  [Doc. 92-10]; see also [Doc. 88-1 ¶10] (quoting Delta's travel policy, which states that if an employee's "pass rider" uses a pass for business the employee is subject to "disciplinary action, up to and including . . . termination of employment").

Last, the real crux of Plaintiff's argument is that she "did not violate any travel policy."  [Doc. 96 at 18].  Plaintiff characterizes the social media posts showing that Mr. Dias and Mr. Boyett traveled to California so Boyett could perform in a concert as not being "credible evidence that Mr. Boyett was a client of Mr. Dias or that Mr. Dias made a profit from the travel."  [Id.].  Plaintiff never addresses her own admission that Mr. Dais and Mr. Boyette "do music together" and that the two "work together."  [Doc. 88-4 at 186:15–25]; see also [id. at 187:8–12].  Nor does Plaintiff address the evidence that Mr. Dias's business "is music production, studio rentals," and the like.  [Doc. 88-

3 at 27].  Plaintiff simply argues Delta should have credited her assertion Mr. Dias

"visited his daughter."  [Doc. 96 at 18].

But the Court is not a "super personnel department that second-guesses employers' business judgments."  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)).  The Court's "inquiry is limited to whether the employer gave an honest explanation of its behavior," even if the ultimate conclusion was factually incorrect.  Id.  Plaintiff must show more than "merely that the defendant's employment decisions were mistaken."  Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000).  Thus, even crediting Plaintiff's assertion that Mr. Dias did not travel to California for business purposes, she does not show pretext.  That is, Plaintiff does not show sufficient "weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons."  Jackson, 405 F.3d at 1289 (quoting Combs, 106 F.3d at 1538).

Given that Mr. Dias is a music producer who "work[s] together" with Mr. Boyett and that Mr. Boyett was traveling to California to perform in a concert that Mr. Dias attended, it was not surprising that Delta's investigators believed Mr. Dias was traveling for business reasons.  As noted before, Delta did not believe Plaintiff was being "forthcoming" during the investigation.  See [Doc. 88-3 at 31].  Plaintiff

objectively was untruthful about traveling with Mr. Dias, changing her story several times, and she could only identify a small fraction of the cities Mr. Dias flew to.  [Id. at 27–28].  When asked about the California trip specifically, Plaintiff failed to mention he "attended, for leisure, a concert," like she now claims.  [Id. at 28]; see also [Doc. 96 at 18].  In fact, Plaintiff claimed she "didn't know anything about that."  [Doc. 88-3 at 28].

Even Plaintiff's assertion that "Mr. Dias is a residency [*sic*] of California" was dubious.  See [Doc. 96 at 18].  Plaintiff provided a driver's license, which showed Mr. Dias *was* a resident of California.  But Delta would rightly have been suspicious of such evidence given that it seemingly contradicted Plaintiff's own statements that Mr. Dias lives and works in Georgia.  [Doc. 88-3 at 27].  Plaintiff ignores the fact that she changed her story after her termination.  Plaintiff claimed Mr. Dias was attending his "daughter's graduation."  See [Doc. 88-15 at 1].  Thus, Plaintiff's story became that Mr. Dias flew into LAX the afternoon of June 6, 2015, attended his daughter's graduation in the "Woodland Hills area" approximately 25 miles from LAX, and then traveled another 100 miles or so to attend his friend's opening act at the Fox Theater in Bakersfield.  See [Doc. 92-8 at 2]; [Doc. 88-3 at 17–21].  Delta, understandably, wanted some "documentation" to support Plaintiff's claims.  [Doc. 88-15 at 2].  But the only thing Plaintiff could provide was a letter from Mr. Dias saying he had "a 12

43

year old daughter [that] resides in California" and that he was not "Comfortable Exposing My Minor Childs [*sic*] Personal Information." [Doc. 92-8 at 2]. The letter conspicuously does not say the daughter had a "graduation" or that Mr. Dias attended it. [Id.].[16]

The Court assumes that Plaintiff's story is true, for purposes of this motion. But again, the Court is not tasked with deciding if Plaintiff's story is true. The Court's role is to decide if Plaintiff has shown "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Jackson, 405 F.3d at 1289 (quoting Combs, 106 F.3d at 1538). Even assuming Plaintiff's story is, in fact, accurate, looking at the evidence above Delta could have reasonably believed that Mr. Dias traveled for business purposes and that Plaintiff had repeatedly been untruthful about Mr. Dias's travel. The question is not whether Delta was factually right, but whether Delta "gave an honest explanation of its behavior." Elrod, 939 F.2d at 1470 (quoting Mechnig, 864 F.2d at 1365). Plaintiff has not shown that Delta's explanation is false and, just as importantly, she has not shown "that discrimination was the real reason" for her termination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515

---

[16] Based on the daughter's age, the "graduation" would presumably have been for the sixth or seventh grade. See [Doc. 92-8 at 2].

(1993). As such, Plaintiff has not shown pretext—even if she had presented evidence supporting a prima facie case—and Defendant is entitled to summary judgment on Plaintiff's discriminatory termination claims.

## III.  The Retaliation Claims

Plaintiff also alleges a count of retaliation under Title VII, § 1981, the ADA, and the ADEA. [Doc. 3 ¶¶81–88]. To state a prima facie case of retaliation, Plaintiff must show: (1) she engaged in statutorily protected expression, (2) the employer took a materially adverse action against her, and (3) some causal relationship existed between the two events. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (Title VII case); see also Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008) (holding that the elements of retaliation claims under Title VII and § 1981 are the same); Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997) (noting that the Eleventh Circuit "assess ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII"); Stone v. Geico Gen. Ins. Co., 279 F. App'x 821, 822 (11th Cir. 2008) ) ("To establish a prima facie case of retaliation, Stone must show that (1) she engaged in ADEA protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression."). As Defendant notes, all of

Plaintiff's retaliation claims fail because Plaintiff did not engage in any statutorily protected activity. [Doc. 88-2 at 20].

In her response, Plaintiff fails to point to any evidence that she engaged in statutorily protected activity. The only time Plaintiff mentions "protected activity" anywhere in her brief is to assert that "protected activity *can* . . . arise when an employee requests a reasonable accommodation." [Doc. 96 at 4] (emphasis added). Plaintiff then asserts that she was retaliated against "for exercising her rights," but she never explains what rights she allegedly exercised or how she allegedly exercised them. [Id.]. More to the point, Plaintiff points to no *evidence* that she exercised any statutorily protected rights. [Id.]. At summary judgment, Plaintiff cannot just nakedly assert she "exercis[ed] her rights." She must point to *evidence*, which she fails to do. See Celotex, 477 U.S. at 324.

While an employee certainly "can" engage in protected activity under the ADA by requesting a reasonable accommodation, Plaintiff nowhere asserts she made any request for an accommodation, as discussed above. See [Doc. 96]. Even if Plaintiff had requested an accommodation, it would not have been a reasonable request because Plaintiff "needed no accommodation to perform the essential functions of her position." See [Doc. 88-2 at 21–22]. Plaintiff never engaged in any protected activity under Title VII, § 1981, or the ADEA. See [Doc. 96]. Plaintiff freely admitted during her

deposition, she never made any complaints about any of the alleged harassment or "discrimination" discussed in her Complaint.  [Doc. 88-4 at 144:16–145:10].[17]   As such, Plaintiff did not engage in protected activity under any of those statutes either.  See Ingram v. Sec'y of the Army, 743 F. App'x 914, 918 (11th Cir. 2018) (affirming the dismissal of a retaliation claim because the plaintiff "did not communicate his belief that he was being subjected to race discrimination"); Demers v. Adams Homes of Nw. Fla., Inc., 321 F. App'x 847, 852 (11th Cir. 2009) (holding that, "to engage in protected activity, the employee must still, at the very least, communicate her belief that discrimination is occurring to the employer").

Thus, Plaintiff fails to point to evidence sufficient to support a prima facie case of retaliation under Title VII, § 1981, the ADA, or the ADEA.  See Crawford, 529 F.3d at 970; Goldsmith, 513 F.3d at 1277; Stewart, 117 F.3d at 1287; Stone, 279 F. App'x at 822.  Even if Plaintiff had produced evidence sufficient to support a prima facie case, her retaliation claims would be analyzed under the McDonnell Douglas framework,

---

[17] Plaintiff previously made complaints to human resources about other matters that are not the subject of this lawsuit.  For example, in 2010, Plaintiff argued that a group of celebrities "fabricated" a story that Plaintiff "asked them to give [Plaintiff] a shout out" to help her music career.  [Doc. 88-4 at 127:16–129:12].  Plaintiff also complained to human resources that an unspecified "Red Coat . . . lied on [her]" and that he "made a couple of advances."  [Id. at 141:2–143:13].  Both instances were "worked out at that time."  See [id. at 142:23–143:20].

because Plaintiff points to no direct evidence of a retaliatory intent.  See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000).  As discussed above, Defendant pointed to legitimate, non-discriminatory reasons for Plaintiff's termination, and Plaintiff does not demonstrate that Defendant's reasons are pretextual.

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment ([Doc. 88]) be **GRANTED**.  Since this is a final Report and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED AND REPORTED AND RECOMMENDED**, this   12   day of April, 2021.


_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

# Dkt/Tab 104

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| Quaniah R. Stevenson | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No.: 1:16-CV-2571-AT-LTW |
| | ) | |
| Delta Air Lines, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### PLAINTIFF QUANIAH R. STEVENSON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND PLAINTIFF'S MOTION TO REJECT IN WHOLE THE RECOMMENDATIONS MADE BY THE MAGISTRATE JUDGE, MOTION TO RECEIVE FURTHER EVIDENCE, AND MOTION FOR HEARING

As explained in detail below, the Magistrate Judge spends the first eight (8) pages of the Report and Recommendation, erroneously criticizing the form of Plaintiff's response.  (See ECF 102 at 1-8.) The Magistrate Judge erroneous takes issues with the fact that Plaintiff did not file (1) a statement of additional facts or (2) "provide a response to Defendant's Statement of Undisputed Facts 'with' her brief". However, as discussed in more detail below, there is nothing in the Local Rules, the Scheduling Order And Guidelines For Discovery And Summary Judgment Practice (see ECF No. 15), or the Standing Order: Guidelines To Parties And Counsel In Cases Proceeding Before The Honorable Amy Totenberg (Ex. 1) that ***require***

Plaintiff to file a statement of additional facts. Furthermore, as discussed below, these same authorities only discuss at length responding to the moving party's Statement of Undisputed Material Facts.   Pursuant to these above-referenced authorities, all of Plaintiff's factual disputes are in direct response to Defendant's Statement of Undisputed Facts as required by the rules.  It appears that the Magistrate Judge erroneously equates the paragraph proceedings Plaintiff's response to the Defendant's Statement of Undisputed Facts as Plaintiff's statement of additional facts; however this is Plaintifff's brief.  Furthermore, contrary to the authorities referenced above and discussed specifically below, it appears that the Magistrate Judge takes issues with Plaintiff explaining the reason for her denials of Defendant's Statement of Undisputed Facts as required by the rules.  (See, e.g., Scheduling Order, ECF No. 15 at 6.)  The Magistrate Judge erroneously states, "But because Plaintiff's 'response' to Defendant's Statement of Undisputed Facts is the bulk of her brief, most of the responses are not nonargumentative."  (See ECF 102 at 5.)  However, Plaintiff is required to explain the reason for a denial and cite to authority (see, e.g., Scheduling Order, ECF No. 15 at 6.); this is not argumentative.

More specifically, sections II(B) and (F) of the Scheduling Order And Guidelines For Discovery And Summary Judgment Practice (ECF No. 15 at 6, 7-8) entered in this case by this Court provides:

B. Pursuant to Local Rule 56. 1B, the party moving for summary judgment must attach to the motion a statement of material facts to which the movant contends there is no genuine issue to be tried. Each fact must be numbered, and there should be only one sentence per number. A citation to the record must follow each numbered fact. Also, statements in the form of issues, questions, or legal conclusions (rather than material facts) will not be considered by the Court. The statement of material facts to which the movant contends there is no genuine issue to be <u>tried shall not exceed twenty-five (25) pages.</u>

**<u>The non-moving party shall file a response to the moving party's "Statement of Undisputed Material Facts."</u>** In the response, **the non-moving party <u>shall respond to each numbered fact by number, admitting or denying the fact, and providing</u> citations to the record to support any denial as well as an explaining the reason for the denial of the fact**. The Court will deem as admitted those facts in the moving party's statement that the non-moving party does not controvert with citations to the record in its response to that statement. See L.R. 56.l(B)(2) N.D. Ga. The non-movant's statement of additional material facts which the non-movant contends are material and present a genuine issue for trial shall not exceed twenty-five (25) pages.

. . .

F. Because "[i]t should be the party's responsibility to direct the Court's attention separately to each portion of the record which supports each of the party's distinct arguments," **every factual statement made <u>in the parties' briefs should be followed by a citation to the record.</u>** Dickson v. Amoco Performance Products, Inc., 845 F. Supp. 1565, 1570 (N.D. Ga. 1994). These citations should include specific page or paragraph numbers, where appropriate. **<u>Citations should not be made to the parties' statement of material facts or response thereto</u>**.

Furthermore, LR 56.1(B)(2) and (3) provides;

> (2) A respondent to a summary judgment motion shall include the following documents with the responsive brief:

> a. **A response to the movant's statement of undisputed facts**.

> (1) This response shall contain individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts.

> (2) **This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact <u>with concise responses supported by specific citations to evidence (including page or paragraph number);</u>** (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).

> . . .

> b. A statement of **additional facts <u>which the respondent contends</u>** are material and present a genuine issue for trial.

> (3) ***If*** **respondent provides a statement of additional material facts**, then, within the time allowed for filing a reply, the movant shall file a response to each of the respondent's facts.

Still further, the Standing Order: Guidelines To Parties And Counsel In Cases

Proceeding Before The Honorable Amy Totenberg (Ex. 1) provides that:

> In addition to following the form instructions set out in Local Rule 56.1(B), NDGa, **a party responding to a statement of material facts shall copy into its response document the**

**numbered statement to which it is responding and  provide
its response to that statement immediately following**.

Accordingly, an explanation or response is required when responding to Defendant's Statement of Undisputed Facts.  Although the Magistrate Judge seems to take issue with the form of Plaintiff's response, the Scheduling Order entered by this Court (ECF No. 15), LR 56.1(B)(2), (3), and the Standing Order (Ex. 1) only mention in response to a Motion for Summary judgement that the responding party file with its responsive brief "a response to the moving party's "Statement of Undisputed Material Facts."   Furthermore, LR.56.1(B)(3) clearly envisions that Plaintiff might not (and is not required to) file a statement of additional material facts.  See LR 56(B)(3) ("***If*** respondent provides a statement of additional material facts . . . .").  Furthermore, by denying a statement in a movant's Statement of Undisputed Facts, the nonmoving partying disputes that fact.  There is no need to file a separate **statement of additional material facts**.  As the name implies, a statement of additional fact, are only for "***additional fact***" not already at issue in the movant's Statement of Undisputed Facts.  Thus, Plaintiff is not required to file a statement of additional material facts as the Magistrate erroneous contends.

The Magistrate Judge also takes issue with Plaintiff "incorporating by reference" some of its responses to Defendant's Statement of Undisputed Facts in other responses although the Magistrate Judge cites to no specific authority to object

to this practice.  (See ECF 102 at 6-7.)  Plaintiff only "incorporate by reference" when the response deals with the exact same legal/factual issue (e.g., pretext or Delta's Travel Policy).  The Magistrate Judge concludes that "the Court will not indulge any attempt by Plaintiff to "incorporate[ ] by reference" her responses to other paragraphs".  (See Id. at 7-9.)  This is erroneous and Plaintiff objects.

Plaintiff also objects to the Magistrate Judge's position that "the Court will not consider the facts set out in her brief that she "contends are material and present a genuine issue for trial." (See Id. at 5.)  As set further in the Scheduling Order (see ECF No. 15 at 7-8 ):

> F. Because "[i]t should be the party's responsibility to direct the Court's attention separately to each portion of the record which supports each of the party's distinct arguments," **every factual statement made in the parties' briefs should be followed by a citation to the record.** Dickson v. Amoco Performance Products, Inc., 845 F. Supp. 1565, 1570 (N.D. Ga. 1994). These citations should include specific page or paragraph numbers, where appropriate. **Citations should not be made to the parties' statement of material facts or response thereto**.

Accordingly, Plaintiff's respectfully objects to the Magistrate Judge's Final Report and Recommendation at pages 1-8 in its entirety as it is replete with errors.

Because of the numerous errors made by the Magistrate Judge in considering Plaintiff response, it is difficult to discern what evidence was considered and what evidence was not considered by the Magistrate Judge.  For these reasons, Plaintiff

moves this court to reject **in whole** the recommendation made by the Magistrate

Judge and decide the Motion de novo.

Furthermore, Plaintiff requested a hearing on Defendant's Motion For

Summary Judgment (see Ex. 2).   Plaintiff explained that "[t]here are many

documents and much testimony in this case. Oral arguments will be helpful to

explain the evidence and the parties' arguments. The focus of the proposed hearing

will be on pretext, comparator issues, and Plaintiff's ADA claim(s)."   (Id.) The

Magistrate Judge declined to conduct a hearing.   Plaintiff moves the Court for a

hearing and to receive further evidence pursuant to 28 U.S. Code § 636(b)(1)(C).

Furthermore, pursuant to the Standing Order (see Ex. 1 at 27), Plaintiff assert that "a

lawyer with less than five (5) years experience will be chiefly responsible for oral

argument".   Accordingly, Plaintiff respectfully requests a hearing in this Matter.

Summary judgment is improper "[i]f a reasonable fact finder could draw more

than one inference from the facts, and that inference creates a genuine issue of

material fact." _Cornelius v. Highland Lake,_ 880 F.2d 348, 351 (11th Cir. 1989), _cert._

_denied,_ 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990).  The court may not

weigh evidence to resolve a factual dispute; if a genuine issue of material fact is

present, the court must deny summary judgment. _Hutcherson v. Progressive Corp.,_

984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, if reasonable minds could differ on

the inferences arising from undisputed facts, then the court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992).

On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *McCabe v. Sharrett,* 12 F.3d 1558, 1560 (11th Cir.1994).

The Magistrate Judge throughout the report and recommendation weighed evidence to resolve factual disputes and did not view all reasonable inferences in the light most favorable to Plaintiff.  Also, as set forth above, it appears the Magistrate Judge did not consider much of Plaintiff's evidence.   It further appears the Magistrate Judge adopted Defendant's reply brief *in toto*, which would explain why the evidence was weighed and inferences where not viewed in the light most favorable to Plaintiff.  These errors were made throughout the factual findings – too numerous to even delineate particularly since they are not enumerated.  Accordingly, Plaintiff objects to the Magistrate Judges Factual Background (see ECF 102 at 8-14) and urges the Court to make de novo findings of fact.

Plaintiff objects to the Magistrate Judge's factual finding that "Throughout her time at Delta, Plaintiff was warned and counseled for various workplace infractions involving attendance and job performance issues."  (See ECF 102 at 8.)

This is a disputed, material fact for a jury to decide. (See, e.g., ECF 98 at p. 7, ¶3.)

Plaintiff objects to the Magistrate Judge factual findings that "Delta has written policies regarding the use of these travel benefits that, inter alia, expressly prohibit their use for business travel", "Plaintiff is aware of this prohibition and described it as "a strict rule."",  and "Delta's travel policy states that if an employee's "pass rider" uses a pass for business, the employee is subject to "disciplinary action, up to and including . . . termination of employment."" (See ECF 102 at 9.) Plaintiff also objects to the other factual finding regarding Delta's travel policy including what the April 2014 memo states. (Id. at 9-10.) These are all disputed, material facts for a jury to decide. (See, e.g., ECF 98 at pp. 8-14, ¶¶6-9, 11-13, 15, 17.)

Plaintiff objects to the Magistrate Judge factual findings as to the reason employees were reviewed and the specific reason Plaintiff was investigated. (See ECF 102 at 10-11.) These are all disputed, material facts for a jury to decide. (See, e.g., ECF 98 ¶¶20-22.)

Plaintiffs objects to the Magistrate Judge factual finding that "Jovan Dais, was frequently traveling to disparate locations in a way that reflected possible business travel." (See ECF 102 at 11.) This is a disputed, material fact for a jury to decide. (See, e.g., ECF 98 ¶23.)

Plaintiff objects to the Magistrate Judge's factual findings that "Delta's

records showed that Mr. Dais and Mr. Boyett traveled to Los Angeles together using Plaintiff's travel pass benefits and that Mr. Dais paid Mr. Boyett's fees associated with using the Delta travel pass." (See ECF 102 at 10-11.) These are all disputed, material facts for a jury to decide. (See, e.g., ECF 98 ¶¶20, 27, 30.)

Plaintiff objects to the Magistrate Judges finding that Plaintiff did not assert a hostile work environment claim and "Plaintiff does not present competent evidence to support the allegations of "harassment" found in her Complaint, or evidence of the kind of harassment that would support a hostile work environment." (See ECF 102 at 16, 17).

Plaintiff objects to the Magistrate Judge's finding that "Plaintiff never shows any of her alleged comparators were outside of her protected class because she never mentions the race or gender of any alleged comparator." (See ECF 102 at 26.) Plaintiff does mention and the evidence discloses the race and gender of the comparators. (See, e.g., ECF 98 at pp. 5-7 and ¶¶20, 25, 27, 30, 35, 38.)

Plaintiff object to the Magistrate Judges finding that 'Plaintiff fails to show any of her alleged comparators were "similarly situated." (See ECF 102 at 26.) However, Plaintiff does explain how these individual or similar situated. (See, e.g., ECF 98 at pp. 5-7 and ¶¶20, 25, 27, 30, 35, 38.) The Magistrate Judges erroneously engages in a nearly 10 page weighing the evidence. (See ECF 102 at 28-37). In this

regard, the Magistrate Judge throughout the report and recommendation weighed evidence to resolve this factual dispute and did not view all reasonable inferences in the light most favorable to Plaintiff. Also, as set forth above, it appears the Magistrate Judge did not consider much of Plaintiff's evidence. It further appears the Magistrate Judge adopted Defendant's reply brief *in toto*, which would explain why the evidence was weighed and inferences where not viewed in the light most favorable to Plaintiff. These errors were made throughout the "similarly situated" factual findings. Accordingly, Plaintiff objects to the Magistrate Judges finding that Plaintiff fails to show any of her alleged comparators were "similarly situated." (See ECF 102 at 26) and urges the Court to make de novo findings of fact. These are material facts for a jury to decide.

Furthermore, the Magistrate Judge states that "Plaintiff never alleges that any of her comparators were supervised by the same decision maker(s) involved in Plaintiff's termination". However, this issue has already been decided by the Court when plaintiff was able to get these comparators during discovery in the first instance. See e.g., [ECF 67]. Furthermore, Defendant did not include in its Statement of Undisputed Facts "these comparators were not supervised by the same decision maker(s) involved in Plaintiff's termination", which Defendant was aware would be an issue.

Furthermore, Plaintiff objects to the Magistrate Judges finding that:

> Most  importantly, none of the alleged comparators engaged in the same basic misconduct as Plaintiff. Five of the alleged comparators were cleared of any misconduct. Five engaged in some kind of misconduct but did not allow their travel passes to be used for business purposes. And the remaining four who did allow their travel passes to be used for business purposes were not dishonest when confronted.

These are disputed, material facts for a jury to decide.

Plaintiff objects to the Magistrate Judge's finding that "Even if Plaintiff had established a prima facie case, Defendant has certainly articulated legitimate, non-discriminatory reasons for Plaintiff's termination." (See ECF 102 at 37.)  Plaintiff further objects to the Magistrate Judge's finding that "Plaintiff does not rebut [Delta's] legitimate, non-discriminatory reason for her termination."  (Id. at 24.) These are disputed, material facts for a jury to decide.  (See, e.g., ECF 98 ¶20.)

Plaintiff objects to the Magistrate Judge's finding that "Plaintiff argues Delta "changed its reason for the termination," but she does not provide any argument to support this assertion." and "'Delta's reasons for Plaintiff's termination were outlined at the time, and they are the same reasons Delta relies on now."  (See ECF 102 at 38.)  This is not true.  Plaintiff pointed to many documents that show that the Delta's reason for the termination was changed.  (See, e.g., ECF 98 pp. 15-16 ¶¶20.) Nevertheless, these are disputed, material facts for a jury to decide.

Plaintiff objects to the Magistrates Finding that "It is, of course, not an "unattainable goal," because Delta employees are expected to have control over their passes and book the trips for their companions, thus giving the employees an opportunity to ensure that the passes are being used for a proper reason"  As discussed above, it is disputed what is Delta's policy and whether Plaintiff violated that policy.  The Magisttrate erroneous argues that "In any event, Plaintiff's argument is irrelevant, because Plaintiff was not terminated for failing to "always know the reasons someone uses a travel pass." However, Plaintiff was alleged fired for being "untruthful" because she did not know all the places a travel person using her benefits traveled. Thus, this is relevant.

The Magistrate Judge seems to discount Plaintiff's performance history, to which Plaintiff object.  This can be a factor is proving pretext.

The Magistrate Judge challenges Plaintiff's assertion that Plaintiff did not violate any travel policy.  However, this is a disputed, material fact for a jury to decide. As set forth in Plaintiff Response (See, e.g., ECF 98 ¶20), Plaintiff has presented evidence to send this issue to a jury.

Plaintiff objects to the Magistrate Judge's finding that "Plaintiff does not offer evidence that a substantially younger Delta employee was treated differently" and "Plaintiff just asserts, without any citation to the record, that Mr. Bailey is under 40."

(See ECF 102 at 23.) Plaintiff alleges that Sidarious Johnson is under the age of 40.

(See, e.g., ECF 98 at p. 17.) It is noted that Plaintiff stated that "Mr. Bailey is a male

and under the age of 40" (Id.) however, this was a typo.  It is obvious that Plaintiff

meant to assert that Sidarious Johnson is under the age of 40 as the Magistrate Judge

recognizes "Mr. Bailey's age is not relevant because he is simply someone who was

"provided travel passes" by Delta employees". (See ECF 102 at 23.)   Plaintiff

requests the Court to find that evidence exists that show that Sidarious Johnson is

under the age of 40 and/or receive further evidence. (See, e.g., evidence cited at ECF

98 at p. 17 (namely Dep. Barbara Franz 104-110, ECF No. 89; Id. Ex. 12, ECF No.

89-5).)

Even in view of the above, establishing the elements of the *McDonnell

Douglas* framework is not, and never was intended to be, the *sine qua non* for a

plaintiff to survive a summary judgment motion in an employment discrimination

case. Accordingly, the plaintiff's alleged failure to produce a comparator does not

necessarily doom the plaintiff's case. Rather, the plaintiff will always survive

summary judgment if he presents circumstantial evidence that creates a triable issue

concerning the employer's discriminatory intent. *See Holifield v. Reno,* 115 F.3d

1555, 1562 (11th Cir.1997) (declaring that, in cases where a plaintiff cannot

establish a prima facie case, summary judgment only will be "appropriate where no

other evidence of discrimination is present." (citations omitted)); *Silverman v. Bd. of Educ.,* 637 F.3d 729, 733 (7th Cir.2011) ("To avoid summary judgment ... the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision."). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer[25] intentional discrimination by the decisionmaker." *Silverman,* 637 F.3d at 734 (citations and internal quotation marks omitted); *see also James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000) ("[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove — particularly discrimination.").

A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence. *Rioux v. City of Atlanta,* 520 F.3d 1269, 1281 (11th Cir.2008) (holding that the plaintiff established a prima facie case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient); *see also Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1264 (11th Cir.2010) (stating that the circumstantial evidence necessary to present a Title VII case of discrimination under

*McDonnell Douglas* is "flexible and depend[s] on the particular situation" (citations omitted)); *cf. Burke-Fowler v. Orange County, Fla.,* 447 F.3d 1319, 1325 (11th Cir.2006) (affirming the district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented *no other circumstantial evidence suggesting racial discrimination*" (emphasis added)). Yet, no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.

Here, Plaintiff did not need to rely on the *McDonnell Douglas* presumption to establish a case for the jury. The record contained sufficient evidence to allow a jury to infer that Delta fired Steven improperly as set forth in the Complaint. (See, e.g., ECF 98.)

For the above reasons, the Court should grant the relief requested by Plaintiff.

Respectfully submitted this 27rd day of April, 2021.

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth, GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

\*\*Counsel certifies that the brief has been prepared with one of the font and point selections approved by the court in LR 5.1C.

    I certify that I have served **PLAINTIFF QUANIAH R. STEVENSON'S OBJECTIONS TO MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND PLAINTIFF'S MOTION TO REJECT IN WHOLE THE RECOMMENDATIONS MADE BY THE MAGISTRATE JUDGE, MOTION TO RECEIVE FURTHER EVIDENCE, AND MOTION FOR HEARING** via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: April 27, 2021    By: /s/ Charlena Thorpe
                      Charlena Thorpe

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                                          :
                                                :
CASES ASSIGNED TO                               :
JUDGE AMY TOTENBERG                             :

**STANDING ORDER:**
**GUIDELINES TO PARTIES AND COUNSEL**
**IN CASES PROCEEDING BEFORE**
**THE HONORABLE AMY TOTENBERG**

This case has been assigned to Judge Amy Totenberg.  These guidelines are furnished to inform the parties and their counsel of the Court's policies, procedures, and practice, and to promote the just, speedy, and economical disposition of cases.  This order, in combination with the Local Rules of this Court and the Federal Rules of Civil Procedure, shall govern this case.  **You are required to sign and file a Certificate of Compliance in a format consistent with the Certificate of Compliance attached hereto.**

**Table of Contents**

I.    General Matters ...................................................................................... 4

II.   Case Administration ............................................................................... 4

    a.    Contacting Chambers ..................................................................... 4

    b.    Courtesy Copies of Documents ...................................................... 5

    c.    Attorneys ........................................................................................ 6

        i.    Admission of Counsel Pro Hac Vice ................................... 6

        ii.   Electronic Registration for All Counsel ............................ 6

        iii.  Leaves of Absence ................................................................ 7

        iv.   Withdrawal or Substitution of Counsel ............................. 7

        v.    Corporate Representation .................................................. 7

    d.    *Pro Se* Litigants ............................................................................. 8

III.  Case Management ................................................................................. 11

    a.    Motions for Temporary Restraining Orders or Preliminary Injunctive
        Relief ............................................................................................ 11

    b.    Extensions of Time ...................................................................... 11

    c.    Conferences ................................................................................. 12

    d.    Discovery ..................................................................................... 12

        i.    General Principles of Discovery ....................................... 12

        ii.   Discovery Responses: Boilerplate and General Objections ................ 14

        iii.  Interrogatories ................................................................... 15

        iv.   Requests for Production or Inspection .............................. 17

        v.    Requests for Admission ..................................................... 18

        vi.   Depositions ........................................................................ 18

    e.    Discovery Disputes ...................................................................... 20

    f.    Confidentiality Agreements, Protective Orders, and Motions to Seal ..... 22

        i.    Legal Standards Governing Public Access to Judicial Proceedings .... 22

        ii.   Procedure for Requesting the Court to Seal Information Designated as
        "Confidential" ................................................................... 24

g.   Electronic Filing of Exhibits and Attachments ......................................... 25

h.   Motions for Summary Judgment ................................................................ 25

i.   Form of Statement of Material Facts & Response to Statement of Material Facts ................................................................................................................ 26

j.   Amended Complaints and Motions to Dismiss .........................................27

k.   Requests for Oral Argument on Motions...................................................27

l.   Pretrial Conference .......................................................................................27

m.  Proposed Findings of Fact and Conclusions of Law ............................... 28

n.   Jury Trial ....................................................................................................... 29

o.   Jury Charges ................................................................................................. 34

p.   Courtroom Technology ............................................................................... 34

**Appendix: Certificate of Compliance**

# I.    GENERAL MATTERS

Attorneys and *pro se* litigants appearing in this court in civil litigation must observe three sets of rules:

1. The Federal Rules of Civil Procedure.    These rules are available at [www.uscourts.gov/RulesAndPolicies/FederalRulemaking/Overview.aspx](www.uscourts.gov/RulesAndPolicies/FederalRulemaking/Overview.aspx).

2. The local rules of this District Court and Instructions Regarding Pretrial Proceedings.    The local rules of this Court are available for downloading at [www.gand.uscourts.gov/local-rules](www.gand.uscourts.gov/local-rules).    Various forms and the Court's pretrial instruction package are available at [http://www.gand.uscourts.gov/rules-standing-orders-forms](http://www.gand.uscourts.gov/rules-standing-orders-forms).

3. The rules and practices of the district judge, and magistrate judge if appropriate, assigned to your case.

# II.    CASE ADMINISTRATION

## a.    <u>**Contacting Chambers**</u>

Harry Martin, the Courtroom Deputy Clerk, is your principal point of contact on matters related to this case.    Where possible, communications with Mr. Martin should be via email ([Harry_Martin@gand.uscourts.gov](Harry_Martin@gand.uscourts.gov)) Telephone (404-215-1437).    Please note that Mr. Martin is often in the courtroom, so telephone messages may not be returned for 24 hours.    Any mail, couriered, or hand-delivered communications should be addressed as follows:

Harry Martin
Courtroom Deputy Clerk
2388 United States Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303-3309

<u>Neither the parties nor their counsel should discuss the merits of the case with Mr. Martin or any of the Court's law clerks.</u>

**b.    <u>Courtesy Copies of Documents</u>**

Parties frequently forward copies of motions or other filings directly to chambers for the Court's convenience.  Courtesy copies are not required **except for** emergency motions filed pursuant to Local Rule 7.2B, NDGa, motions for temporary restraining orders and/or preliminary injunctions, motions for summary judgment, or motions with voluminous exhibits.  Courtesy paper copies of emergency motions, motions for temporary restraining orders, and/or motions for preliminary injunctions should be hand-delivered to chambers in Room 2388 on the 23rd floor of the Richard B. Russell Federal Building located at 75 Ted Turner Drive, SW.  Courtesy paper copies of motions for summary judgments, including all exhibits, or motions with voluminous exhibits, may be either hand-delivered to chambers in Room 2388 or submitted via regular mail to attention of the Courtroom Deputy Clerk at the above provided address.  Courtesy copies of motions and exhibits should be printed double-sided directly from the docket on the CM/ECF system with the docket header across the top of the document so

that the case number, docket number, and page numbers appear on each page. Courtesy copies should be assembled in a tabbed, indexed three-ring binder.

### c.   <u>Attorneys</u>

#### i.   **Admission of Counsel Pro Hac Vice**

In the event that lead counsel had been admitted pro hac vice, local counsel is required to be familiar with the case, and may be called upon to attend hearings or participate in conferences on behalf of the lead counsel.

#### ii.   **Electronic Registration for All Counsel**

All counsel — including counsel admitted pro hac vice — must register and participate in the Court's electronic filing system, CM/ECF (Case Management/Electronic Case Filing).  Standing Order 04-01 states,

> Effective July 15, 2005, absent good cause shown and the permission of the Court, attorneys in good standing admitted to practice before the Bar of this Court, to include attorneys admitted *pro hac vice*, will file, sign, and verify documents only by electronic means to the extent and in the manner authorized by this Standing Order, Local Rule 5.1 A. NDGa., and the administrative procedures attached hereto as Exhibits A and B, Administrative Procedures for Filing, Signing, and Verifying Pleadings and Papers by Electronic Means in Civil and Criminal Cases in the United States District Court for the Northern District of Georgia (Administrative Procedures).

### iii.      Leaves of Absence

Counsel are encouraged to review their calendars and submit as early as possible any requests for leave of absence.  Leave requests shall comply with Local Rule 83.1, NDGa.

### iv.      Withdrawal or Substitution of Counsel

It is counsel's responsibility to keep the Court informed of any change of its status.  Counsel should comply with Local Rule 83.1, NDGa, when substituting or withdrawing as counsel.  Counsel who do not comply with this Local Rule will not be allowed to withdraw from the case until compliance is achieved.

### v.      Corporate Representation

Corporate entities must be represented in court by an attorney.   A corporate officer may not represent the corporation unless that officer is also licensed to practice law in the state of Georgia.  Local Rule 83.1, NDGa, states:

> a corporation may only be represented in court by an attorney, that a(n) attorney must sign all pleadings submitted to the court, and that a corporate officer may not represent the corporation in court unless that officer is also an attorney licensed to practice law in the state of Georgia, and that failure to comply with this rule could result in a default being entered against the corporate party.

Failure to comply with this rule can result in dismissal of a corporation's complaint or default being entered against the corporation.

### d. *Pro Se* Litigants

Parties proceeding *pro se* (without an attorney) are **ADVISED** that they must comply with the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), as well as the Local Rules of the United States District Court for the Northern District of Georgia ("LR, NDGa.").  *Pro se* parties may obtain certain basic materials and hand-outs from the Office of the Clerk of Court located on the 22nd Floor of the United States Courthouse, 75 Ted Turner Drive, SW, Atlanta, Georgia.  Many documents are also available on the Court's website at www.gand.uscourts.gov. *Pro se* litigants may also utilize the law library located on the 23rd floor of the United States Courthouse at the above provided address.

Counsel and parties representing themselves are prohibited from engaging in *ex parte* communications with the Court or the Court's staff.  "*Ex parte* communications" mean any form of contact with the Court outside the presence of the opposing party or opposing party's counsel.  This includes, but is not limited to, telephone calls, written correspondence, or in-person contact, by one party or party's counsel.  If counsel or a *pro se* litigant seeks court action, the appropriate procedure is to put the request in writing, in the form of a motion, file the motion with the Clerk's office and serve the opposing party or party's counsel.  *See* Fed. R. Civ. P. 5; LR 5.1 and 5.2, NDGa.; *see also* LR 7.4, NDGa. ("Communications to judges seeking a ruling or order, including an extension of time, shall be by motion and not by letter. A letter seeking such action ordinarily

will not be treated as a motion. Counsel [and *pro se* litigants] shall not provide the Court with copies of correspondence among themselves relating to matters in dispute.").

The Clerk of Court and the U.S. Marshals Service will not serve documents filed by either party, unless expressly directed to do so by the Court. The Court will only direct the Clerk or the U.S. Marshals Service to serve in the following instances: (1) in the event a plaintiff is granted leave to proceed *in forma pauperis* (without prepayment of fees), the Court will direct the Clerk to prepare (and deliver to the U.S. Marshals Service if necessary) a service package containing the case initiating document(s) or (2) in exceptional circumstances under the Court's discretion. The National Association of Professional Process Servers provides a search engine for locating process servers across the nation at its website (www.napps.org).

A *pro se* plaintiff is **REQUIRED** to provide the Clerk with an original of any further pleadings or other papers filed with the Court after the complaint and is further **REQUIRED** to **SERVE** upon the defendant(s) or counsel for the defendant(s),[1] by mail or by hand delivery under Rule 5 of the Federal Rules of Civil Procedure, a copy of every additional pleading or other paper described in Rule 5 of the Federal Rules of Civil Procedure.

---

[1] Once counsel for a defendant has appeared in the case, it is not necessary to serve the defendant individually; service on counsel is sufficient.

Each pleading or paper described in Rule 5, including pleadings, papers related to discovery required to be served, motions, notices and similar papers, shall include a certificate stating the date on which an accurate copy of that pleading or document was mailed or hand-delivered to the defendant(s) or their counsel. This Court shall disregard any papers submitted which have not been properly filed with the Clerk, or which do not include a certificate of service. *Pro se* parties are also **ADVISED** that, under Local Rule 7, NDGa, "PLEADINGS ALLOWED; FORM OF MOTIONS," if the deadline for a response to a motion passes without a response being filed, the motion is treated as unopposed. *See* LR 7.1B, NDGa. Furthermore, under Local Rule 56.1, NDGa, the failure by a respondent to a motion for summary judgment to contest the movant's statement of material facts will be taken as an admission of those facts not objected to in respondent's statement.

*Pro se* parties are further **REQUIRED** to keep the Court advised of their current address at all times during the pendency of the lawsuit. Local Rule 83.1D(3), NDGa provides that counsel and parties appearing *pro se* have, in all cases, a duty to notify the Clerk's Office by letter of any change in address and/or telephone number. Per this rule, "a failure to keep the clerk's office so informed which causes a delay or otherwise adversely affects the management of a civil case shall constitute grounds for dismissal without prejudice or entry of a judgment by default." *Pro se* parties are encouraged to provide the opposing

10

party/counsel with an email address for purposes of communicating regarding the case and serving copies of pleadings filed and served via regular mail.  If a *pro se* party provides an email address, opposing counsel shall serve copies of all pleadings via email and regular mail.  *Pro se* parties are **ADVISED**, however, that the Court serves via paper only and not via email.

## III.   CASE MANAGEMENT

### a.   <u>Motions for Temporary Restraining Orders or Preliminary Injunctive Relief</u>

The Court will not entertain granting a temporary restraining order or preliminary injunctive relief absent a properly supported motion with attached evidence pursuant to Fed. R. Civ. P. 65.  *See* LR 7.1A(1), NDGa.  If a party requests such relief only in their complaint or other pleadings, but fails to file a separate motion seeking the same, that request will not be considered until the merits of the case are addressed.

### b.   <u>Extensions of Time</u>

The Court, along with counsel for the parties, is responsible for processing cases toward prompt and just resolutions.  To that end, the Court seeks to set reasonable but firm deadlines.  Motions for extension, whether joint, unopposed, or designated as consent, will not be granted as a matter of course.  Parties seeking an extension should explain with specificity the unanticipated or

unforeseen circumstances necessitating the extension and should set forth a timetable for the completion of the tasks for which the extension is sought.

### c.      <u>Conferences</u>

Scheduling, discovery, pre-trial, and settlement conferences promote the speedy, just, and efficient resolution of cases.  Therefore, the Court encourages the parties to request a conference with the Court when counsel believes that a conference will be helpful and counsel has specific goals and an agenda for the conference.  Conferences may be requested by contacting the Courtroom Deputy Clerk via email or telephone.

### d.      <u>Discovery</u>

Initial disclosures should be as complete as possible based upon information reasonably available.  Responses may not be reserved for later supplementation.

#### i.      **General Principles of Discovery**

Counsel and *pro se* litigants should be guided by courtesy, candor and common sense, and should conform to the Federal Rules of Civil Procedure, the Local Rules and applicable orders in conducting discovery.  In particular, counsel and *pro se* litigants should have in mind the restrictions on the scope of discovery stated in Fed. R. Civ. P. 26(b) and the good faith obligations implicit in Rule 26(g).  Direct and informal communication between counsel is encouraged to

facilitate discovery and resolve disputes.  In this regard, the Court refers counsel

and parties to the guidance offered by the district court for the Central District of

California in *O'Connor v. Boeing North American, Inc.*, 185 F.R.D. 272, 284

(C.D. Cal. 1999) (citations omitted):

> The Court would like to take this opportunity to address the
> parties and their counsel, to stress that "[t]he discovery system
> depends absolutely on good faith and common sense from
> counsel. The courts, sorely pressed by demands to try cases
> promptly and to rule thoughtfully on potentially case
> dispositive motions, simply do not have the resources to police
> closely the operation of the discovery process. The whole
> system of [c]ivil adjudication would be ground to a virtual halt
> if the courts were forced to intervene in even a modest
> percentage of discovery transactions. That fact should impose
> on counsel an acute sense of responsibility about how they
> handle discovery matters. They should strive to be
> cooperative, practical and sensible, and should turn to the
> courts (or take positions that force others to turn to the courts)
> only in extraordinary situations that implicate truly significant
> interests."

All discovery must be served early enough so that the responses thereto are

due on or before the last day of the discovery period.  Requests for extension of

the discovery period or deadlines within the discovery period must be made in

accordance with Local Rule 26.2B, NDGa.  All requests for extensions of the

discovery period must be made via motion and must state: (1) the original (and if

applicable, current) date from which the extension is being sought; (2) the

number of previous requests for extensions, if any; (3) whether these previous

requests were granted or denied; and (4) whether the adversary consents, and if

not, the reasons given by the adversary for refusing to consent.  An agreed upon

or consent motion to extend the discovery period or deadlines therein should be clearly designated as a <u>consent</u> motion.  Motions must be filed prior to the expiration of the existing discovery period.  The Court will not enforce the private agreements between the parties and/or their counsel to conduct discovery beyond conclusion of the discovery period.

The Court does not allow evidence at trial which was requested and not revealed during the discovery period.

### ii.    Discovery Responses: Boilerplate and General Objections

Boilerplate objections in response to discovery requests are strictly prohibited.  Parties should not carelessly invoke the usual litany of rote objections, i.e., attorney-client privilege, work-product immunity from discovery, overly broad/unduly burdensome, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence.

Moreover, general objections are prohibited, i.e., a party shall not include in his response to a discovery request a "Preamble" or a "General Objections" section stating that the party objects to the discovery request "to the extent that" it violates some rule pertaining to discovery, e.g., the attorney-client privilege, the work product immunity from discovery, the requirement that discovery requests be reasonably calculated to lead to the discovery of admissible evidence, and the prohibition against discovery requests that are vague, ambiguous, overly broad, or unduly burdensome.  Instead, each individual discovery request must be met

with every specific objection thereto – but only those objections that actually apply to that particular request.  Otherwise, it is impossible for the Court or the party upon whom the discovery response is served to know exactly what objections have been asserted to each individual request.  All such general objections shall be disregarded by the Court.

Finally, a party who objects to a discovery request but then responds to the request must indicate whether the response is complete, i.e., whether additional information or documents would have been provided but for the objection(s). For example, in response to an interrogatory, a party is not permitted to raise objections and then state, "Subject to these objections and without waiving them, the response is as follows . . ." unless the party expressly indicates whether additional information would have been included in the response but for the objection(s).

### iii.    Interrogatories

Whenever possible, counsel should try to exchange information informally. The results of such exchanges, to the extent relevant, may then be made of record by requests for admission.

The parties are expected to observe the limitations regarding the number and scope of interrogatories as stated in Fed. R. Civ. P. 26(b) and 33. Counsel's or a *pro se* litigant's signature on the interrogatories constitutes a certification of compliance with those limitations.    Interrogatories should be brief,

straightforward, neutral, particularized, and capable of being understood by jurors when read in conjunction with the answer. Ordinarily, they should be limited to requesting objective facts, such as, the identification of persons or documents, dates, places, transactions, and amounts. Argumentative interrogatories, attempts to cross-examine, and multiple repetitive interrogatories are objectionable.

Fed. R. Civ. P. 33(b) requires the respondent to provide separate written answers to each interrogatory unless it is objected to. If an objection is made, the reason(s) for the objection shall be stated and the interrogatory is to be answered to the extent it is not objectionable. When in doubt about the meaning of an interrogatory, give it a reasonable interpretation (which may be specified in the response) and answer it so as to provide rather than deny information. Generally, the responding party is required to produce information only in the form in which it is maintained or is available. If an answer is made by reference to a document, attach it or identify it and make it available for inspection. (*See* No. 9 below). Generalized cross-references, such as to a deposition, are not an acceptable answer.

The parties are directed to consult Rules 26(b) and 33(b)-(d) about the permissible scope of discovery and objections. Counsel's or a *pro se* litigant's signature on the answer constitutes a certification of compliance with the requirements of Fed. R. Civ. P. 26(g).

If an objection is based on privilege, the claim of privilege must be supported by a statement of particulars sufficient to enable the Court to assess its validity. In the case of a document, such a statement should specify the privilege relied on and include the date, title, description, subject, and purpose of the document; the name and position of the author; and the addresses of other recipients. In the case of a communication, the statement should include the privilege relied on; the date, place, subject, and purpose of the communication; and the names and positions of all persons present. *See* Fed. R. Civ. P. 26(b)(5).

### iv.    Requests for Production or Inspection

Please consult Fed. R. Civ. P. 26(b) and 34 about the permissible scope of discovery and objections. To the extent possible, requests should specify with particularity the title and description of documents or records requested. (Information needed for specification can often be obtained by informal discovery or by deposition or by interrogatories, if necessary.) The certification requirement of Fed. R. Civ. P. 26(g) applies.

When responding to requests, materials (including electronically stored information), should be produced in accordance with Fed. R. Civ. P. 34(b)(2)(E). Documents should be produced either with labels corresponding to the categories in the specific requests to which they respond or in the manner in which they are kept in the usual course of business. Opening a warehouse for inspection by the requesting party, burying the responsive documents in a mass of materials, and

similar procedures do not meet the good faith requirements of the rules.  The certification procedure of Fed. R. Civ. P. 26(g) is applicable.

### v.  Requests for Admission

Requests for admission are an economical and efficient means of making a record of informal exchanges of information, stipulations, and matters subject to judicial notice, and of narrowing issues.  Each request should be brief, clear, simple, addressed to a single point and stated in neutral, non-argumentative words.  Requests ordinarily should deal with only objective facts.  They may be combined with interrogatories to ask for the factual basis of a claim or a denial.  The attorney's or *pro se* litigant's signature certifies compliance with Fed. R. Civ. P. 26(g).  Fed. R. Civ. P. 36(a)(4) requires that a response shall specifically deny a matter or set forth in detail the reasons why the party cannot admit or deny.  A denial shall fairly meet the substance of the request, and when good faith requires, a party shall specify so much as is true and qualify or deny the remainder.  The responding party has a duty to make reasonable inquiry before responding.  The certification requirement of Fed. R. Civ. P. 26(g) applies.

### vi.  Depositions

Barring extraordinary circumstances, opposing counsel and *pro se* litigants should be consulted, and the convenience of counsel, witnesses, and the parties

accommodated, before a deposition is noticed.  Concurrent depositions are not permitted in the absence of stipulation or order.

When counsel enter (or a party enters) into stipulations at the beginning of a deposition, the terms of the stipulation should be fully stated on the record of the deposition.

Questions should be brief, clear, and simple.  A deposition should not be used to harass or intimidate a witness.  Normally, except in the case of impeachment, a witness should be shown a document before being questioned about it.

Under Fed. R. Civ. P. 30(c)(2), objections to the manner of taking the deposition, to the evidence, or to the conduct of a party shall be noted on the record but the evidence objected to shall be taken subject to the objection.  In the absence of a good faith claim of privilege, instructions not to answer are rarely justified and may lead to sanctions under Fed. R. Civ. P. 37.  Speaking objections and other tactics for coaching a witness during the deposition are not permissible.  If counsel or a *pro se* litigant believes that a motion to terminate or limit the examination under Fed. R. Civ. P. 30(d) would be warranted, counsel and/or the *pro se* litigant should promptly initiate a conference call to the Court with opposing counsel for a pre-motion conference to attempt to resolve the problem.

Fed. R. Civ. P. 26(b)(4) should be consulted regarding expert disclosures. Experts who are prospective witnesses are normally produced for deposition by the opposing party as a matter of course.

The parties are expected to observe the limitations on depositions specified in Fed. R. Civ. P. 26(b) and 30 and, in particular, to avoid unnecessary depositions.

**e.   Discovery Disputes**

The parties shall not file discovery motions (including motions to compel, motions for protective order, and motions for sanctions) without prior permission from the Court.  These disputes are often resolved in a conference with the Court, thus avoiding a delay of discovery.   In the event a discovery dispute arises, the parties are required to meet and confer in an effort to resolve the dispute.  Counsel or *pro se* litigants are required to confer, by telephone or in person, in good faith before bringing a discovery dispute to the Court.  *See* Fed. R. Civ. P. 26(c) and 37(a)(1); LR 37.1A, NDGa.  The duty to confer is NOT satisfied by sending a written document, such as a letter, email, or fax, to the adversary, UNLESS repeated attempts to confer by telephone or in person are unsuccessful due to the conduct of the adversary.

If the dispute cannot be resolved, the parties shall file on the case docket via the CM/ECF system a Consolidated/Joint Discovery Statement outlining their positions on each of the discovery items in dispute.  The consolidated submission

is not to exceed 6 pages if there are 4 or less issues. For 5-10 issues, the statement should not exceed 10 pages, and if there are more than 10 issues, the statement should not exceed 12 pages. The statement should be formatted in a logical order, i.e., identify each issue in dispute followed by a discussion from each of the parties setting forth an explanation of its respective position on the issue as follows:

  **I.**  **Identify Discovery Issue #1**
     A. Party A's Position
     B. Party B's Response
     C. Party A's Reply

  **II.**  **Identify Discovery Issue #2**
     A. Party A's Position
     B. Party B's Response
     C. Party A's Reply

   The parties are required to attach as an exhibit to the Consolidated Statement an excerpt of the relevant discovery requests including only the language of the specific requests and, potentially, the disputed responses, that are the subject of the dispute. The parties should not attach an entire copy of their Interrogatories, Requests for Production of Documents, or Requests for Admission. No other exhibits are allowed without prior permission from the Court. The Court will determine whether the dispute can be resolved on the papers or whether a conference is necessary and will notify the parties accordingly. All discovery conferences will be recorded by a court reporter. If the

differences cannot be resolved during the conference with the Court, the Court will direct further proceedings.

**f.    Confidentiality Agreements, Protective Orders, and Motions to Seal**

    **i.    Legal Standards Governing Public Access to Judicial Proceedings**

In this Court, confidentiality of proceedings is the exception, not the rule. *See Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) ("The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process."); *Newman v. Graddick*, 696 F.2d 796, 803 (11th Cir. 1983) ("The historic presumption of access to judicial records must be considered in the balance of competing interests.").  Federal Rule of Civil Procedure 26 allows a court to enter a protective order rendering documents or portions thereof unavailable to the public after a showing of good cause.  Good cause is determined by balancing the public's "interest in obtaining access" against the "party's interest in keeping the information confidential."  *Id.* at 1315; *see also In re Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 184 F. Supp. 2d 1353, 1363 (N.D. Ga. 2002) (quotation and citation omitted) (stating that "even where no third party challenges a protective order, the judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal the record (or part of it)").

22

Mere agreement by the parties that documents should be designated as confidential does not automatically satisfy the Rule 26(c) good cause standard. *See Chicago Tribune*, 263 F.3d at 1313; *CBS*, 184 F. Supp. 2d at 1362 ("calling a document confidential does not make it so in the eyes of the court; these consensual protective orders merely delay the inevitable moment when the court will be called upon to determine whether Rule 26(c) protection is deserved, a decision ultimately rooted in whether the proponent demonstrates 'good cause.'"). Good cause will generally only be established where the materials (e.g., documents or testimony) contain trade secrets, personal identifying information, and sensitive commercial information, where public disclosure would result in "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

Where a party satisfies the good cause standard and information is filed under seal, the party is also entitled to the protection from public disclosure of such information through its being quoted verbatim in the pleadings, motions, and briefs filed with the Court. The mere reference or discussion of confidential information, however, does not warrant sealing of the entire document and all attachments to be filed. Instead, the Court is only interested in sealing or filing in a redacted format very specific portions of documents that contain or refer to confidential information. *See Romero v. Drummond Co.*, 480 F.3d 1234, 1245-46 (11th Cir. 2007) ("Material filed in connection with any substantive

pretrial motion, unrelated to discovery, is subject to the common law right of access . . . . A motion that is presented to the court to invoke its powers or affect its decisions, whether or not characterized as dispositive, is subject to the public right of access.") (internal quotations and citations omitted).

### ii.    Procedure for Requesting the Court to Seal Information

"It is the general policy of this Court not to allow the filing of documents under seal without a Court order, even if all parties consent to the filing under seal."  LR App H, Section II(J), NDGa.  **To request to file material under seal, the Parties should follow the mechanism described in Section II(J) of Appendix H to the Court's Local Civil Rules**.  If a document contains some discrete material that is deemed confidential and subject to protection from public disclosure under Rule 26(c), the Parties will be entitled to redact only those portions of the document deemed confidential.  The Court cautions that only in rare instances will it be appropriate to seal an entire document from public access.  Thus, pleadings, motions, or briefs which mention or reference a document containing confidential information, without disclosing the nature or contents of the protected information, shall not be sealed or filed in a redacted format.  Where it is necessary for the Parties to quote or disclose protected confidential information in pleadings, motions, or briefs, the Parties shall file redacted versions of their pleadings, motions, or briefs.

**g.**   **Electronic Filing of Exhibits and Attachments**

The parties should make every effort to label all electronically uploaded exhibits and attachments according to their content to assist the Court in making its ruling.  For example, the Court would prefer to have documents uploaded as Ex. A: Smith Deposition, Ex. B: Employment Contract, and Ex. C: Jones Letter, rather than simply Ex. A, Ex. B, and Ex. C.

**h.**   **Motions for Summary Judgment**

All citations to the record evidence should be contained in each party's brief, not just in the party's statement of undisputed (or disputed) facts. When filing a brief in support of or in opposition to a motion for summary judgment, the party shall simultaneously file on the docket the complete transcript of each deposition referenced in the brief. The party should include in the brief, immediately following the deposition reference, a citation indicating the page and line numbers of the transcript where the referenced testimony can be found. The party should also include as an exhibit to the brief a copy of the specific pages of the deposition that are referenced in the brief.  The party should not attach to the brief a copy of the entire deposition transcript.   The entire deposition transcript is to be filed separately.

i.   **Form of Statement of Material Facts & Response to Statement of Material Facts**

In addition to following the form instructions set out in Local Rule 56.1(B), NDGa, a party responding to a statement of material facts shall copy into its response document the numbered statement to which it is responding and provide its response to that statement immediately following.   A party that chooses to reply to a response shall copy into its reply document its original numbered statement of material fact and the opposing party's response, then provide its reply to that statement immediately following.  Each party shall file its documents in a text-searchable PDF format.  For an example of the response format the Court prefers, *see Walker v. United States Postal Service*, No. 1:09-cv-2550, Doc. 45.   Statements of material fact that do not conform to these instructions will be returned to counsel for revision.

The parties are **REQUIRED** to submit courtesy paper copies of motions for summary judgments, including all exhibits, to chambers.  Courtesy copies may be hand-delivered to Room 2388 on the 23rd floor of the Richard B. Russell Federal Building or may be submitted via mail, addressed as follows:

> Harry Martin
> Courtroom Deputy Clerk
> 2388 United States Courthouse
> 75 Ted Turner Drive, SW
> Atlanta, GA 30303-3309

Courtesy copies of motions and exhibits should be printed double-sided directly from the docket on the CM/ECF system with the docket header across

the top of the document so that the case number, docket number, and page numbers appear on each page.  Courtesy copies should be assembled in a tabbed, indexed three-ring binder.

### j.      Amended Complaints and Motions to Dismiss

If in response to a motion to dismiss, a plaintiff files an amended complaint pursuant to Fed. R. Civ. P. 15(a)(1), the parties are directed to confer whether the motion to dismiss is rendered moot. If so, the defendant shall withdraw the motion prior to filing any motion to dismiss the amended complaint.

### k.      Requests for Oral Argument on Motions

In accordance with Local Rule 7.1(E), motions are usually decided without oral argument, but the Court will consider any request for hearing.  If oral argument is requested, the party or parties should specify the particular reasons argument may be helpful to the Court and what issues will be the focus of the proposed argument.  The Court will strongly consider granting oral argument in any case where a lawyer with less than five (5) years experience will be chiefly responsible for oral argument.

### l.      Pretrial Conference

The Court will normally conduct a pretrial conference prior to trial.  The purpose of the conference is to simplify the issues to be tried and to rule on

27

evidentiary objections raised in the pretrial order.  Parties should bring to the conference a copy of the proposed pretrial order and attachments thereto, as well as any outstanding motions.

At the pretrial conference, the parties will be required to identify the specific witnesses they will call in their case at trial.  The Court may require the parties to bring to the pretrial conference those exhibits they plan to introduce at trial and to which there are objections, so that the Court may consider the objections thereto.

Unless otherwise directed, all motions in limine shall be filed at least fourteen (14) days before the pretrial conference. Briefs in opposition to motions in limine should be filed at least one (1) week before the pretrial conference. Ordinarily, the Court will decide motions in limine at the pretrial conference.

The attorneys for all parties are further directed to meet together by agreement, initiated by counsel for the plaintiff, no later than ten (10) days before the date of the pretrial conference to:

> a. discuss settlement;
> b. stipulate to as many facts and issues as possible.

The Court will discuss settlement with the parties if the case is to be tried by jury.

## m.  **Proposed Findings of Fact and Conclusions of Law**

When counsel is required to submit proposed findings of fact and conclusions of law, *see* LR 16.4B(25), NDGa, in addition to electronically filing

same, counsel should provide an electronic copy thereof in Microsoft Word format to the Courtroom Deputy Clerk, Mr. Martin, at Harry_Martin@gand.uscourts.gov

**n.**   **Jury Trial**

The Court usually is in session from 9:30 a.m. until 5:00 p.m.  There will be a fifteen (15) minute recess mid-morning and again mid-afternoon, as well as a lunch break.

When the jury is in the courtroom, it is the Court's and the litigants' responsibility to use the jury's time efficiently.  If matters need to be taken up outside the presence of the jury, they should be raised during breaks or before the start of the trial day.

Voir dire will be conducted as follows.  In civil cases that are not expected to last more than two (2) weeks, the Court will empanel eight (8) jurors, none of whom will serve as an alternate. The panel from which the eight (8) will be selected will normally consist of twenty (20) prospective jurors.  If counsel anticipate the need for a larger panel, e.g., in cases with media attention or in cases involving a mutual insurance company (which may be owned in part by one or more panel members), counsel should alert the Court promptly upon calendaring of the case for trial.

The jurors will enter the courtroom and be seated in the order listed on the juror list.  The Court will briefly inform the jury of the name and nature of the

case and will then collectively ask the jurors a list of qualifying questions.  One question will be whether any juror knows any witness in the case, so counsel should be prepared to identify the witnesses who may be called to testify (whether live or by deposition).  The Court will then individually question each juror.  Each juror will be identified by name (one at a time) and each juror will answer a predetermined list of questions.  This will be followed by a few more collective questions by the Court, and then counsel for each side will be allowed to question the jurors collectively and individually.

The jury will then be excused from the courtroom for a ten-minute recess. Once the jury is excused, the parties shall make motions to strike any juror(s) for cause.  Prior to returning the jury to the courtroom, the Court will consider any requests by counsel to ask any brief, follow-up questions to any particular juror(s).  After the Court rules on any such requests, the jury will be brought back into the Courtroom.   After the Court asks the follow-up questions (if any), counsel shall strike the jury.  Each side shall be entitled to three (3) peremptory strikes.  The Courtroom Deputy Clerk will pass the peremptory strike sheet back and forth between counsel, beginning with plaintiff, and counsel will write one juror number to be stricken.  This will continue until each side has exercised its allotted strikes.  The Court will then call the names of the jurors who have been selected, and they shall take a seat in the jury box.  At this time, counsel may

make motions challenging the makeup of the jury at a sidebar.  The remaining panel will be excused, and the selected jury will be sworn.

Opening statements are generally limited to twenty (20) minutes per side.  Closing arguments generally are limited to thirty (30) minutes per side.  Parties requesting more time for these presentations must seek leave of Court at the pretrial conference.  During opening statement, counsel may refer to the contents of, and show the jury, exhibits — provided that counsel is unaware of a genuine issue as to the admissibility of the exhibit into evidence *and* counsel genuinely expects that each such exhibit will be admitted into evidence.

It is each party's responsibility to have enough witnesses on hand for each day's proceedings.

To assist the Court Reporter, all communications to the Court should be made before a microphone from a position at counsel table or from the lectern.  During trial, a portable microphone is available that will allow counsel to move about the courtroom.  Any witness not testifying from the witness stand must also use a portable microphone.

Counsel should refrain from making disparaging remarks or displaying ill will toward other counsel and from causing or encouraging any ill feeling among the litigants.  Counsel and litigants are to refrain from making gestures, facial expressions, or audible comments as manifestations of approval or disapproval of testimony, argument, or rulings by the Court.

Arrangements with the Courtroom Deputy Clerk for the use of chalkboards, view boxes, tripods, or other visual aids should be made sufficiently in advance so that they may be set up while court is not in session.

Exhibits must be examined and marked before trial in compliance with Local Rule 16.4, NDGa.  Exhibits need not be shown to counsel during trial for the purpose of interposing objections or foundational inquires.  A notebook containing all exhibits should be tendered to the Courtroom Deputy Clerk prior to the start of trial, for use by the Judge on the bench during proceedings.

Because enlarged exhibits and demonstrative boards are often placed on an easel in front of the jury and thus out of the Court's view, it would be helpful if counsel, when showing such an exhibit or board to the jury, would provide the Court with a small (e.g., letter or legal-sized) copy of the exhibit or board so that the Court can view its contents.

All papers intended for the Judge should be handed to the Courtroom Deputy Clerk, who will pass them to the Judge.  Counsel are not required to obtain permission from the Judge to approach a witness in order to show the witness an exhibit or other document.

Only one attorney per party may object to the testimony of a witness being questioned by an opposing party.  The objection must be made by the attorney who has conducted or is to conduct the examination of the witness.  Only one attorney for each party may address the Court during the charge conference.

Examination of a witness should be limited to questions addressed to the witness.  Counsel are to refrain from making extraneous statements, comments, or remarks during examination.

Offers or requests for stipulations should be made privately, not within the hearing of the jury.

Counsel should refrain from putting any matter before the jury in the form of a question that counsel knows or expects will be subject to an objection that is likely to be sustained.  Such matters should be taken up with the Court outside the presence of the jury.

Counsel should not ordinarily make motions in the presence of the jury. Such matters may be raised at the first recess or at sidebar.  A motion for mistrial must be made immediately, but the Court may require argument at the next recess or excuse the jury.  When making an objection, counsel shall state only the legal basis of the objections (e.g., "leading" or "hearsay") and should not elaborate, argue, or refer to other evidence unless asked to do so by the Judge.

Counsel are prohibited from addressing comments or questions to each other.  All arguments, objections and motions should be addressed to the Court.

The Court expects five (5) to six (6) hours of testimony per day in jury trials and will not allow sidebar conferences or lengthy hearings outside the presence of the jury to disrupt the orderly presentation of evidence.

**o.**   **Jury Charges**

Ordinarily, the Court will charge the jury after closing argument.  The parties must file, and email to the Courtroom Deputy Clerk in Microsoft Word format, a single, unified set of proposed jury instructions on the law applicable to the specific case; where an instruction is not agreed upon, the parties should indicate who is proposing the instruction and the legal basis for the instruction and for the other party's opposition to the instruction.  The Court will not accept supplemental jury charges from the parties that are submitted later than a day prior to the end of trial.  The parties must orally request leave of court to file supplemental jury charges.  The jury will be provided with a written copy of the jury charge.

**p.**   **Courtroom Technology**

The courtroom has various electronic equipment for use by counsel at trial. For more information on the equipment, or to schedule an opportunity to test the equipment, please contact the Courtroom Deputy Clerk, Mr. Martin, at Harry_Martin@gand.uscourts.gov   or   404-215-1437.   It is the parties' responsibility to make sure they know how to use the equipment available, to have the cables necessary to hook up their equipment, and to ensure that their equipment will interface with the Court's technology.

A court order is required to bring boxes of exhibits, projectors, laptops— virtually anything necessary for use at trial—into the courthouse.  The parties

should file a motion, with proposed order, detailing the equipment they wish to bring into the courtroom.  This should be done not less than three (3) business days prior to the hearing or trial, to allow for proper notification to the United States Marshals Service.

**IT IS SO ORDERED** this 26th day of November, 2018.

**Amy Totenberg**
**United States District Judge**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| _____ | : |
| _____, | : |
| | : |
| Plaintiff[s], | : |
| | : |
| v. | : |
| | : |
| _____ | :   CIVIL ACTION NO. |
| _____, | :   1:\_\_\_\_-CV-_____-AT |
| | : |
| Defendant[s]. | : |

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that I have read the Court's Standing Order in Cases Proceeding Before the Honorable Amy Totenberg and that I will comply with its provisions during the pendency of this litigation.

_____
**Signature of counsel or *pro se* party**

The Law Office of Charlena Thorpe, Inc. Mail - Stevenson v. Delta Air L...    https://mail.google.com/mail/u/1?ik=f054f2938b&view=pt&search=all&...

Case 1:16-cv-02571-AT   Document 104-2   Filed 04/27/21   Page 1 of 1
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 579 of 675

 **Gmail**                    **Charlena Thorpe <charlena.thorpe@charlenathorpe.com>**

---

## Stevenson v. Delta Air Lines, Inc., Civil Action. No. 1:16-cv-02571-AT-LTW: Request For Hearing Re Summary Judgment Motion

---

**Charlena Thorpe** <charlena.thorpe@charlenathorpe.com>                    Wed, Feb 3, 2021 at 7:51 AM
To: Sonya Lee-Coggins <Sonya_Lee-Coggins@gand.uscourts.gov>
Cc: Ben Stone <ben.stone@mungerandstone.com>

Dear Ms.Coggins,

I hope you are doing well. Plaintiff respectfully requests a hearing in the above case on Defendant's Motion For Summary Judgment pursuant to Judge Amy Totenberg's Standing Order: Guidelines To Parties And Counsel In Cases Proceeding Before The Honorable Amy Totenberg, which provides

### k. Requests for Oral Argument on Motions
In accordance with Local Rule 7.1(E), motions are usually decided without oral argument, but the Court will consider any request for hearing. If oral argument is requested, the party or parties should specify the particular reasons argument may be helpful to the Court and what issues will be the focus of the proposed argument. The Court will strongly consider granting oral argument in any case where a lawyer with less than five (5) years experience will be chiefly responsible for oral argument.

There are many documents and much testimony in this case. Oral arguments will be helpful to explain the evidence and the parties' arguments. The focus of the proposed hearing will be on pretext, comparator issues, and Plaintiff's ADA claim(s).

Sincerely,

Charlena

**\*\*PLEASE NOTE OUR NEW ADDRESS AND TELEPHONE NUMBER BELOW**

*Incorporating Innovation LLC*
*  with Charlena Thorpe, Patent Attorney*

Charlena L. Thorpe, Esq. | President | Incorporating Innovation LLC
6340 Sugarloaf Parkway Suite 200 Duluth, Georgia 30097
Tel 770-325-2741 | Fax 770-325-2741
web: www.charlenathorpe.com
email: charlena@incorporatinginnovation.com

# Dkt/Tab 106

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

QUANIAH R. STEVENSON,          :
                               :
     Plaintiff,                :
                               :
     v.                        :          CIVIL ACTION NO:
                               :
DELTA AIR LINES, INC.,         :          16-cv-2571-AT
                               :
     Defendant.                :
                               :

## ORDER

Presently before the Court is the Magistrate Judge's Report and Recommendation ("R&R") [Doc. 102]. The R&R recommends that the Court grant Defendant Delta's Motion for Summary Judgment [Doc. 88] in full. Plaintiff has filed objections to the R&R. [Doc. 104].

After conducting a careful and complete review of a magistrate judge's findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1)(C); *Williams v. Wainwright,* 681 F.2d 732, 732 (11th Cir. 1982). Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews any portion of the R&R that is the subject of a proper objection on a *de novo* basis and any non-objected portion for plain error. 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 154 (1985). The district judge must "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. Of Educ. Of Ga.*, 896 F.2d 507, 512 (11th

Cir. 1990). In review, the Court applies the standards for grant of summary judgment under Rule 56 of the Federal Rules of Civil Procedure set forth in *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986) and its progeny.[1]

Plaintiff objects to the totality of the R&R. Plaintiff argues that the Magistrate Judge erroneously found that Plaintiff's response brief failed to comply with the Local Rules and also ignored alleged disputed facts. Plaintiff also objects to the Magistrate Judge's legal analyses and conclusions that Plaintiff failed to present comparator evidence, that Delta offered legitimate nondiscriminatory reasons for firing Plaintiff, and that Plaintiff failed to point to any evidence that Delta's reasons for terminating her were pretextual.

The Court has conducted a full *de novo* review of the record and concurs with the R&R's findings. The Court agrees with the Magistrate Judge's initial finding that Plaintiff failed to comply with the Local Rules in responding to Delta's summary judgment motion and statement of material facts. Even after noting this procedural failure, the Magistrate Judge substantively assessed Plaintiff's claims in light of the governing authority and properly determined that Plaintiff failed to cite to evidence sufficient to create an issue of material fact that makes a difference in the legal analysis of her claims. The Court has similarly reviewed the record,

---

[1] The district court should resolve all reasonable doubts about the facts in favor of the non-movant and draw all justifiable inferences in [her] **favor."** *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys. in State of Ala.,* 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*) (citations and punctuation omitted). The Court may not weigh conflicting evidence or make credibility determinations. **Hairston v. Gainesville Sun Publ'g Co**., 9 F.3d 913, 919 (11th Cir. 1993), **reh'g denied**, 16 F.3d 1233 (11th Cir. 1994) (*en banc*).

including Plaintiff's response brief and objections, and agrees with the R&R's conclusions that Plaintiff has not established a *prima facie* case as to any of her claims, much less rebutted the legitimate nondiscriminatory reasons provided by Delta for either the broad investigation of employees' travel benefits or for Plaintiff's termination.  It is not the Court's role to second-guess Delta's policy or the rationales behind it.  *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that federal courts "do not sit as a super personnel department that reexamines an entity's business decisions.")[2]

Accordingly, the Court OVERRULES Defendant's Objections [Doc. 104], ADOPTS the Magistrate Judge's R&R [Doc. 102], and GRANTS Defendant's Motion for Summary Judgment [Doc. 88] as to all counts. The Clerk is DIRECTED to enter judgment for Delta and further DIRECTED to close the case.

IT IS SO ORDERED this 29th day of September, 2021.

Amy Totenberg
United States District Judge

---

[2] In her objections, Plaintiff argues, for the first time, that she can prove her claims through the convincing mosaic analysis. (Obj. at 14-15.) Plaintiff did not make this argument in her response to Defendant's summary judgment motion. "[A] district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge." *Williams v. McNeil*, 557 F.3d 1287, 1291-92 (11th Cir. 2009) (explaining that requiring district courts to consider new arguments raised in objections would "eliminate efficiencies gained through the Magistrates Act and would unfairly benefit litigants who could change their tactics after issuance of the magistrate judge's report and recommendation"). Here, the Court declines to consider Plaintiff's new argument. Further, even if it were to consider it, Plaintiff has not articulated what evidence she relies on or demonstrated how any such evidence would support her claims under the convincing mosaic theory.

# Dkt/Tab 108

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| Quaniah R. Stevenson | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil No.: 1:16-CV-2571-AT-LTW |
| Delta Air Lines, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Quaniah Stevenson, plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the order (Doc. No. 106) adopting the Magistrate Judge's Report and Recommendation and granting Defendant Delta's Motion for Summary Judgment entered in this action on September 29, 2021.

Respectfully submitted this 28th day of October, 2021.

/s/ Charlena Thorpe
Charlena L. Thorpe
Georgia Bar No. 760954
charlena@incorporatinginnovation.com
6340 Sugarloaf Parkway Suite 200, Duluth,
GA 30097
Tel: 770-325-2741
Fax:  770-325-2741

*Attorney for Plaintiff*

I certify that I have served **NOTICE OF APPEAL** via the Court's CM/ECF system on the date below, to opposing counsel of record.

Dated: October 28, 2021          By: /s/ Charlena Thorpe
                                    Charlena Thorpe

# Dkt/Tab 117

The following is the PDF of an official transcript.
Official transcripts may only be filed in CM/ECF by the
Official Court Reporter and will be restricted in CM/ECF for a
period of 90 days. You may cite to a portion of the attached
transcript by the docket entry number, referencing page and
line number, only after the Court Reporter has filed the
official transcript; however, you are prohibited from attaching
a full or partial transcript to any document filed with the
Court.

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3   QUANIAH R. STEVENSON,            :
                                      :
 4          PLAINTIFF,                :
                                      :
 5   vs.                             :   DOCKET NUMBER
                                      :   1:16-CV-2571-AT
 6   DELTA AIR LINES, INC,            :
                                      :
 7          DEFENDANT.                :

 8


 9      TRANSCRIPT OF TELEPHONE CONFERENCE VIA ZOOM PROCEEDINGS

10        BEFORE THE HONORABLE LINDA T. WALKER

11            UNITED STATES MAGISTRATE JUDGE

12                   FEBRUARY 18, 2021

13


14   APPEARANCES OF COUNSEL:

15        FOR THE PLAINTIFF:

16        CHARLENA L. THORPE
          INCORPORATING INNOVATION LLC WITH CHARLENA THORPE
17
          FOR THE DEFENDANT:
18
          BENJAMIN ALEXANDER STONE
19        MUNGER & STONE

20


21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                 TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 3 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 590 of 675

2

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **(Atlanta, Fulton County, Georgia; February 18, 2021.)** |
| 3 | THE COURT:  Good morning. |
| 4 | MR. STONE:  Morning, Your Honor. |
| 5 | THE COURT:  It looks like we have everybody present. |
| 6 | The Court calls the case of Quaniah Stevenson v. Delta Air |
| 7 | Lines, Inc.  This is Case Number 1:16-CV-2571. |
| 8 | We have appearing on behalf of the plaintiff Charlena |
| 9 | Thorpe.  And on behalf of Delta Air Lines, we have Benjamin |
| 10 | Stone and Ms. Cometto. |
| 11 | MR. STONE:  It is Val Cometto, Your Honor. |
| 12 | Unfortunately the in-house staff lawyer who was assigned to |
| 13 | this case, Ms. Clarke, passed away a couple of months ago. |
| 14 | THE COURT:  I'm sorry to hear that. |
| 15 | MR. STONE:  Yes.  It was very unexpected and very |
| 16 | tragic.  So -- |
| 17 | THE COURT:  Oh, wow. |
| 18 | MR. STONE:  It was a shock.  Ms. Cometto is a new |
| 19 | Delta attorney and has taken over responsibility in-house for |
| 20 | this matter. |
| 21 | THE COURT:  Okay.  Thank you.  Sorry to hear of |
| 22 | Ms. Clarke's passing -- untimely passing. |
| 23 | I know you are probably wondering why we are here. |
| 24 | First, I have got a couple of quick matters that I wanted to |
| 25 | just go ahead and address. |

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 4 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 591 of 675

3

1          There are two motions for leave to file matters under
2     seal.  That was 95 and 98.  That being part of the deposition
3     of Ms. Nabors, and then there was another motion for leave to
4     file matters under seal, 98.  There was no objection to either
5     of those.  So I can go ahead and grant those.
6          And then there was a supplemental motion.  Based on
7     my reading of that motion, that was for -- I'm sorry -- that
8     was -- I may have gotten my numbers -- the motions for leave to
9     seal were 95 and 97.
10         There was a motion for leave to file plaintiff's
11    supplemental response to defendant's motion for summary
12    judgment.  That supplemental response based on the Court's
13    reading of it, which is Docket Entry 98, was to correct some
14    grammatical and other errors.
15         And I wanted to make sure that the defendant didn't
16    have any problems with that because you did do a reply.  So I
17    know the time may not have fully run for you to object to that.
18    But I wanted to make sure you didn't have any objections to
19    that.
20         MR. STONE:  We did not.  I noted that in a footnote
21    in my reply brief.  We're fine with the supplemental filing.
22         THE COURT:  Okay.
23              **(Unintelligible cross-talk)**
24         THE COURT:  Okay.  Great.  So all of those are
25    granted.

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 5 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 592 of 675

4

1          And then I thought I would check back -- see how the

2    parties are doing.  I know that plaintiff is working on the

3    response to the motion for summary judgment.  If the parties

4    were interested in -- I know a couple of years ago you pursued

5    discovery -- I'm sorry -- not discovery -- mediation.  I wanted

6    to see if the parties were interested in -- thinking about that

7    or considering that again at this juncture.

8          MR. STONE:  Your Honor, I don't know.  Ms. Thorpe,

9    I'm happy to have you speak.

10          I can tell you that Ms. Thorpe had reached out about

11    a Rule 16.3 conference.  We did mediate in front of Judge --

12    Judge Johnson.

13          THE COURT:  Johnson.

14          MR. STONE:  Yeah.  It has been a while.

15          THE COURT:  Judge Johnson.

16          MR. STONE:  I apologize, Your Honor, for not --

17          THE COURT:  January 26, 2018.

18          MR. STONE:  Yeah.  So it has been a little bit of a

19    time here.

20          Judge, we were so far apart that it just didn't -- we

21    just couldn't get it done.  And I don't have any reason to

22    believe -- Delta's perspective on resolution hasn't changed.  I

23    don't know if Your Honor has reviewed the briefing yet or not.

24          But I think Delta's position hasn't changed.  I

25    understand -- I know how backed up the court is right now.

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 6 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 593 of 675

5

```
 1          If Ms. Thorpe's position or believes that
 2   Ms. Stevenson's position has changed, we're happy to obviously
 3   hear about that.
 4          THE COURT:  Ms. Thorpe?
 5          MS. THORPE:  Yes, if I may.  I think that that first
 6   conference that we had -- the reason the parties were so far
 7   apart is because, as you know, plaintiff represented herself
 8   pro se for a vast majority of the time up until the first
 9   summary judgment pleadings.  And that's when I came in, and
10   then discovery was reopened for a limited time.
11          And so right at the beginning, before really any
12   discovery had taken place, there were no documents.  And really
13   her case at that point was -- was really in jeopardy of being
14   dismissed because there was no discovery that had taken place.
15          We had went to mediation at that time prior to any
16   documents from Delta, before any evidence of comparators, and
17   pretext and all of that.
18          And we have had three depositions since that point,
19   documents, discovery if you will.  And I feel, you know, that
20   because of that mediation might be more fruitful.  I could
21   definitely understand Delta's position the first time around.
22          But I think, you know, quite frankly, considering the
23   case and as you said looking at the briefs I think that Ms. --
24   Ms. -- the plaintiff has a better case -- definitely a very
25   strong case in my opinion.
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 7 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 594 of 675

6

1          So I think that mediation would be helpful to the

2     parties at this point with the guidance of a mediator because

3     of the discovery that has taken place.

4          MR. STONE:  Your Honor, actually if y'all -- once you

5     review the documents, I think you'll understand why Delta's

6     perspective hasn't changed.  Obviously we'll do whatever the

7     Court desires here.

8          I do have a little bit of concern here.  The last

9     time we went to mediation, we actually got a motion for

10    sanctions from the plaintiff saying that we were not

11    participating in good faith because we didn't value the case

12    very highly.

13         And so I don't want there to be any misunderstanding

14    or misapprehension here about Delta's perspective on the value

15    of this case.  It is not high.

16         Your Honor, we think summary judgment is pretty

17    easily warranted in the case for the reasons that are set forth

18    in the briefing that is done now.

19         And so obviously we'll do whatever Your Honor desires

20    and whatever Your Honor instructs us to do here.  But we just

21    don't want there to be any misunderstanding or misapprehension

22    about Delta's perspective here or suggestion that Delta's

23    settlement perspective has changed at all since the last

24    mediation here.

25         THE COURT:  Well, let's do this.  What I don't want

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 8 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 595 of 675

7

1    to do is -- we do have a lot still going on, particularly in

2    the magistrate judges because our court did not close.  And so

3    we have been still working on having evidentiary hearings,

4    having -- well, our work has not stopped.  So we have been

5    laboring.  Not that the district court judges -- they are just

6    not having jury trials.  But we have been still been moving

7    along, and we are still working very diligently.

8            I don't want to waste one of my colleagues' time if

9    it is not going to be fruitful.  So I don't really take -- I

10   don't really send people to discovery -- I'm sorry.  I don't

11   send people to mediation if both parties don't think it will be

12   worthwhile.

13           So if one party does not want to go, then I'm not

14   inclined to just send you anyway to waste the magistrate

15   judge's or the parties' time either.  Or then you have someone

16   who is upset because you are not really here -- well, I didn't

17   want to come in the first place.

18           I always ask if anyone is mediating in front of me

19   did the parties agree to come or did the court make you come.

20   Because there is a difference.  And it is a difference in how

21   much work I would have to put in or if it is even going to be

22   fruitful.  If one party is being forced to go and the other

23   party doesn't want to go, then it is not going to be helpful to

24   either of the parties.

25           It is just -- it is not in the best practice for

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 9 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 596 of 675

8

1    judicial economy.  So I will just say that.

2         So it may be -- it may be better to -- if the two of

3    you can exchange some numbers and see before we actually either

4    stay the case or just have you go to one of my colleagues.  If

5    the parties can exchange numbers amongst themselves, so that if

6    Delta sends over a number and plaintiff is offended by that

7    number, then we just proceed on to let the plaintiff respond to

8    the summary judgment that is pending.

9         Because I don't want to -- I do remember there was a

10   sanctions motion.  So I don't want the plaintiff to feel that

11   Delta is not taking it serious.  And Delta may be feeling like

12   we have already expended the resources on summary judgment in a

13   case that has been pending for a number of years.

14        And so based on what little bit I have heard so far,

15   if the last one wasn't fruitful and there wasn't a lot of

16   discovery, plaintiff believes the case may be worth a little

17   bit more now than plaintiff believed two years ago.  And so

18   Delta may not see that increase of value.  There still may not

19   be a meeting of the minds as to the increased value once

20   plaintiff has replaced maybe comparators or evidence of pretext

21   or whatever.

22        So how about that?  How about -- I mean, I could

23   just -- maybe it is easier to just let the parties take a week

24   or two to just exchange some numbers and see if it will be

25   fruitful.

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 10 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 597 of 675

9

```
 1              If the magistrate judge, one of my colleagues, can
 2   sort of nudge you over one way or the other or give sometimes
 3   one party or the other a reality check as to what I see here --
 4   so is that something you want to do first before we actually
 5   just send you to one of my colleagues?
 6              Because we are still mediating both -- I think I am
 7   one of the few that is doing it still in person -- in person
 8   and on Zoom.  So only if both parties agree.  If they want to
 9   do it in person, I'll do it in person.  But for the most part,
10   most people are doing it via Zoom.
11              MR. STONE:  Yeah.  We have had one with Judge
12   Baverman -- actually two with Judge Baverman by Zoom, and so --
13   yeah.  It has worked surprisingly well actually.  I was a
14   skeptic.  But it has worked surprisingly well, Your Honor.
15              Your Honor, we are happy obviously to -- at Your
16   Honor's discretion to talk further with Ms. Thorpe, figure out
17   if there is likely to be any common ground, and then report
18   back to the Court on whether we think both parties think that
19   mediation would be fruitful.
20              THE COURT:  Okay.  So do you want to take like two
21   weeks?  Do you think that will be enough?  Because then too you
22   also have -- because we are still mediating too.  So you would
23   have to get on whatever judge -- whether it is back to Judge
24   Johnson or some other judge, you would have to get on their
25   calendar too.
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 11 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 598 of 675

10

```
 1              And I know I have just finished criminal duty a

 2   little while ago.  So I'm behind on my mediations now because I

 3   have to catch up because I have had 17 days of in court every

 4   day.

 5              So I'm going to be mediating.  And then I had a son

 6   that had surgery.  So that pushed my mediations back even

 7   further.

 8              So -- so more than likely, you may have to get on a

 9   particular judge's calendar too.  So I don't want to delay that

10   unnecessarily.  So if you could take -- we'll take two weeks

11   and just report back to the Court, if you think it will be

12   fruitful.

13              You may get a little closer than you think and say,

14   well, we may just need -- either client may need to have a

15   judge say, this may survive or that may not survive on summary

16   judgment.  So --

17              MR. STONE:  Yeah.  That would be fine, Judge.

18              THE COURT:  Ms. Thorpe?

19              MR. STONE:  That would be fine.

20              MS. THORPE:  I think that is a good compromise for

21   now.

22              THE COURT:  So do you -- do I need to stay your

23   response?  Are you still working on your response to the

24   summary judgment?

25              MR. STONE:  Briefing is all done, Judge.
```

1          MS. THORPE:  The briefing (Zoom interference) --

2          THE COURT:  Everything has already been filed.

3          MS. THORPE:  Yes, Judge.  I did exchange

4    communications with Ms. Coggins about requesting an oral -- a

5    hearing for the motion for summary judgment.  So that -- that

6    would be something we should decide if we don't settle the

7    case.

8          THE COURT:  Okay.  Okay.  Well, we'll cross that

9    bridge when we get to it.

10         So okay.  Then anything else on behalf of either

11   party?

12         MR. STONE:  Nothing else from us, Your Honor.  We

13   appreciate your time.

14         THE COURT:  Sure.  Not a problem.

15         Okay.  If there is nothing else in front of the

16   Court, the court is in recess.  Have a good day.

17         So we want a report back -- let's get a date certain.

18         What is today?  Let me get my --

19         MR. STONE:  Do you want us to report back either way,

20   Your Honor?

21         THE COURT:  Yes.  Just so I know we can go ahead and

22   start working on that summary judgment -- our report and

23   recommendation on the summary judgment.

24         So let me get my calendar up.

25         So you want to just report back, let's say, on the

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 13 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 600 of 675

12

```
 1   5th of March?

 2           MR. STONE:  Yeah.  No problem at all, Your Honor.

 3           THE COURT:  Okay.

 4           MR. STONE:  We'll just do a joint status report or

 5   something?

 6           THE COURT:  Yes.  So we'll know -- yeah.  So we'll

 7   know whether to go ahead and get the R&R prepared.

 8           Okay?

 9           MR. STONE:  Perfect.  Thank you so much, Your Honor.

10           THE COURT:  Okay.  Thank you-all.  Have a good day

11   and good weekend.

12           MS. THORPE:  Thank you.  You too.

13           THE COURT:  Bye-bye.  You're welcome.  Bye-bye.

14                   (The audio-recorded proceedings were thereby

15                   concluded.)

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

Case 1:16-cv-02571-AT   Document 117   Filed 12/22/21   Page 14 of 14
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 601 of 675

13

```
 1                  C E R T I F I C A T E

 2

 3    UNITED STATES OF AMERICA

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7    the United States District Court, for the Northern District of

 8    Georgia, Atlanta Division, do hereby certify that the foregoing

 9    12 pages constitute a true transcript of proceedings had before

10    the said Court, held in the City of Atlanta, Georgia, in the

11    matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13    22nd day of December, 2021.

14

15

16

17    _____
      SHANNON R. WELCH, RMR, CRR
18    OFFICIAL COURT REPORTER
      UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

# Dkt/Tab 118

The following is the PDF of an official transcript.

Official transcripts may only be filed in CM/ECF by the

Official Court Reporter and will be restricted in CM/ECF for a

period of 90 days. You may cite to a portion of the attached

transcript by the docket entry number, referencing page and

line number, only after the Court Reporter has filed the

official transcript; however, you are prohibited from attaching

a full or partial transcript to any document filed with the

Court.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3   QUANIAH R. STEVENSON,          :
                                    :
 4          PLAINTIFF,              :
                                    :
 5   vs.                            :   DOCKET NUMBER
                                    :   1:16-CV-2571-AT
 6   DELTA AIR LINES, INC.,         :
                                    :
 7          DEFENDANT.              :

 8

 9    TRANSCRIPT OF AUDIO-RECORDED TELEPHONE CONFERENCE PROCEEDINGS

10           BEFORE THE HONORABLE LINDA T. WALKER

11              UNITED STATES MAGISTRATE JUDGE

12                    MARCH 28, 2019

13

14   APPEARANCES OF COUNSEL:

15        FOR THE PLAINTIFF:

16        CHARLENA L. THORPE
          INCORPORATING INNOVATION LLC WITH CHARLENA THORPE
17
          FOR THE DEFENDANT:
18
          BENJAMIN ALEXANDER STONE
19        MUNGER & STONE

20   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

21                  TRANSCRIPT PRODUCED BY:

22

23   OFFICIAL COURT REPORTER:      SHANNON R. WELCH, RMR, CRR
                                   2394 UNITED STATES COURTHOUSE
24                                 75 TED TURNER DRIVE, SOUTHWEST
                                   ATLANTA, GEORGIA  30303
25                                 (404) 215-1383
```

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 3 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 605 of 675

2

```
 1                      P R O C E E D I N G S

 2      (Atlanta, Fulton County, Georgia; March 28, 2019.)

 3                THE COURT:  Good morning.

 4                MR. STONE:  Morning, Your Honor.

 5                MS. THORPE:  Morning.

 6                THE COURT:  This is the case of Quaniah Stevenson v.

 7      Delta Air Lines, Case Number 1:16-CV-2571.

 8                We have on the line on behalf of the plaintiff

 9      Charlena Thorpe.  And on behalf of the defendant, Delta Air

10      Lines, we have Benjamin Stone.

11                We are here this morning for another discovery

12      conference.  The Court allowed the parties additional

13      discovery.  And it is my understanding there is another dispute

14      that has come up regarding additional files.  And you want to

15      discuss -- either party can start -- either plaintiff or

16      defendant.

17                MR. STONE:  Your Honor, I'm happy to start.  I'm

18      happy to have Ms. Thorpe start.

19                I think the dispute is a relatively narrow one.  Your

20      Honor may recall that what happened was the plaintiff had asked

21      for some additional files seeking some additional information

22      about comparables, that is, other people similarly situated who

23      were terminated or investigated for reasons similar to the

24      reasons that the plaintiff in this case was terminated, that

25      is, for improper use of Delta's travel passes for either
```

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 4 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 606 of 675

3

1    business travel or loss of control of those passes.

2            Delta has conferred with the plaintiff.  And we

3    have -- we previously produced -- identified a couple of

4    hundred people who had been identified in Delta's database as

5    having been investigated for business travel or loss of

6    control.

7            The plaintiff asked for a broader set of individuals,

8    that is, individuals who were working within the HR people, the

9    people who authored and received the memo that ultimately

10   related to her termination.

11           The way it works at Delta is that the operations

12   people make a recommendation of termination.  The HR people

13   review the operation -- the operation personnel's

14   recommendation for termination.  And then the person is

15   terminated if the HR people agree with the recommendation.

16           The HR people who are primarily involved in this were

17   the HR people who were over the Atlanta Worldport over airport

18   customer service, the area where the plaintiff worked over the

19   Atlanta Worldport.

20           So we have agreed to produce everybody who was

21   investigated within the Atlanta Worldport for business travel

22   or loss of control -- anybody who would be under that HR

23   umbrella.

24           The plaintiff has asked for even more.  The plaintiff

25   has asked for everybody within Delta's ACS division across the

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 5 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 607 of 675

4

1   country who was investigated.  And the reason, as I understand

2   it, that she's made the request is that the final sign-off on

3   the memo that leads to her -- the plaintiff's termination comes

4   from a customer service director of HR, a woman named Lisa

5   Blackmon.  And that is absolutely accurate.  It is.  As a

6   matter of practice, has the head of HR review the terminations

7   of everybody in ACS.

8           Ms. Blackmon, however, does not review all

9   investigations.  In other words, she would not have any

10  knowledge or any reason to have any knowledge of the people who

11  were investigated who did not flow up to the very top as a

12  recommendation for termination.

13          And so it is not -- this is not a situation where

14  she's reviewing and making decisions we're going to fire this

15  person, we're not going to fire that person by looking at all

16  of that.  She is simply high-level HR sign off on a

17  termination.

18          We -- you know, Delta believes and Delta has agreed

19  to produce everybody within the Worldport who is within the

20  core HR and operations function who were investigated, whether

21  they were terminated or not, for the kinds of offenses that the

22  plaintiff engaged in.

23          The plaintiff's request, we believe, Your Honor, for

24  all -- everybody in ACS across the country, everybody within

25  the airport customer service division throughout the country --

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 6 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 608 of 675

5

1  those would be hundreds and hundreds of individuals.  I think

2  the count, as best we know -- we would have to look at -- I

3  think it is 7- or 800 different files, Your Honor, one by one

4  to determine whether or not all of those people were

5  investigated, when the person who they based this request on

6  would never have looked at those files or made any decision

7  with respect to those files.

8           We think therefore, Your Honor, it is not an

9  appropriate request.  We think it is far too broad.  And we

10 think it is out of proportion, particularly for this single

11 plaintiff employment discrimination case with an ACS customer

12 service rep.

13          We think the relevant group is everybody within

14 Atlanta.  And we -- while it is a lot of work, Your Honor, we

15 are willing to produce it.  We actually think that is broader

16 than the relevant group.  We actually think the relevant group

17 is actually within the operational unit where she worked.

18          But we're not here to have that fight right now, Your

19 Honor.  We're willing to produce all of Atlanta.  But the

20 notion that we would have to do nationwide discovery and

21 produce all across the country we think is irrelevant and

22 entirely out of proportion with this case.

23          THE COURT:  Okay.  Ms. Thorpe?

24          MS. THORPE:  Yes.  I think that Mr. Stone has

25 conveniently ignored the posture of how we got here today.  We

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 7 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 609 of 675

6

1   very recently had a very detailed conversation with Your Honor

2   regarding this issue based on my motion to extend -- emergency

3   motion to extend the close of discovery date as well as motion

4   to compel.  And we had a conversation in detail with Your Honor

5   just very recently.

6          And so in that conversation, we specifically talked

7   about who are the decision-makers.  And I think it is very

8   clear from the document that I presented that the two

9   individuals that signed the document, Exhibit Number 2, one of

10  those individuals, whom Mr. Stone agreed would be within the

11  relevant scope, is on that document but as well as another

12  individual, the director who signed the document a week later.

13         So it is very clear that the director is part of the

14  decision-making body.  Recommendations were made.  But the

15  agreement was made by the two individuals that signed that

16  document on Exhibit 2.

17         And that was the content of our discussion weeks ago

18  in getting to the heart of who are the decision-makers.  And we

19  already concluded that the appeal department, the EO, was part

20  of that, as well as the HR leaders that made the decision.  And

21  those are the two HR leaders who made that decision.

22         And Mr. Stone is conveniently testifying to all of

23  this.  You know, he -- but it doesn't pan out with the

24  documents nor with what Delta's 30(b) witness said about the

25  leaders, which is something that I haven't presented to you.

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 8 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 610 of 675

7

1    But we do have a transcript of their 30(b)(6) witness who spoke

2    about the document but also mentioned other operational leaders

3    that are not on that exhibit who are directors as well.

4           So what -- what Mr. Stone is testifying to doesn't

5    pan out with the evidence or with what Delta's own 30(b)(6)

6    witness has testified to.

7           THE COURT:  What did the 30(b) witness testify to

8    with regard to Ms. Blackmon --

9           MS. THORPE:  Let me pull that up very quickly.

10          THE COURT:  -- and her role in the -- your client's

11   termination?

12          MS. THORPE:  I can read here from the transcript.

13          Okay.  I said, so who made the final decision to

14   terminate Ms. Stevenson?

15          Answer, the operations makes the decision.

16          I said, I'm sorry?

17          The operational leaders make the decision.

18          And I also asked the question, structurally-speaking

19   organizationalwise, who is the organizational leaders?

20          And the answer was, sure.  Her operational service

21   manager, which is the immediate supervisor of an employee --

22   the operational service manager's leader.  They could be a

23   manager, department manager, general manager.  But just

24   depending upon their title and the person that -- the leader of

25   that person that reports to, which would be a director, is what

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 9 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 611 of 675

8

```
 1   she said.

 2           THE COURT:  Mr. Stone?

 3           MR. STONE:  Yeah.  I'm sorry.

 4           What page are you on?  I apologize, Charlena.  I was

 5   pulling up that testimony because I want to make sure that I'm

 6   not misstating anything here.

 7           MS. THORPE:  Page 21, Lines 16 through Page 22

 8   Line 5.

 9           MR. STONE:  Yeah.  That is -- she's correctly read

10   the testimony.  And the testimony is that it is the operational

11   leaders not the HR people who make these decisions.  And that

12   is true at this individual.

13           The -- as was later explained, it is the operational

14   leaders.  That is the people that work in -- in the local

15   operation.  That is ACS, not the HR people, who make those

16   decisions.  It is also correct that that decision is reviewed

17   by HR.  And the people who are responsible for reviewing both

18   the people who are recommended for termination and other

19   discipline are the local HR people, the people in Atlanta.

20           The only role that Ms. Blackmon plays -- there is no

21   testimony, I don't believe, about Ms. Blackmon in Ms. Nabors'

22   deposition.  I don't recall any such testimony.  I'm looking

23   right now.  But I don't believe there is any such testimony.

24           And the facts are that Ms. -- the role that

25   Ms. Blackmon plays is at the very end because there is a
```

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 10 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 612 of 675

9

1    high-level HR person who reviews all the terminations at Delta.

2    But they don't review non-termination decisions.  They don't

3    review people who are investigated and cleared.  They don't

4    review people who are investigated and not disciplined.  It is

5    a final, frankly, cursory check-off but not a situation where

6    she's playing an active role in this decision.  As Ms. -- as

7    the 30(b)(6) witness, Ms. Nabors, testified, it is the

8    operational folks that do this.

9         MS. THORPE:  She -- she -- the 30(b)(6) witness

10   didn't state that their decision is just a sign-off.  She, in

11   fact, said this is the HR document that is supporting what the

12   operational leaders recommended.

13        MR. STONE:  Which is true.

14        THE COURT:  I thought you said -- I wrote it down.

15   You said final -- I thought the 30(b)(6) said the final

16   decision is operation service manager.

17        Is that not what you read to me?  That the final

18   decision -- is there any -- is there any contention that

19   Ms. Blackmon was a final decision-maker?

20        MS. THORPE:  I would argue that they had -- the

21   recommendations were made and it says agreement.  The

22   operational leaders or whomever -- it comes to HR who then

23   makes -- which are just recommendations at that point.  And

24   then HR makes the decision, which is what the document

25   purports.

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 11 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 613 of 675

10

1          MR. STONE:  What the -- you know, Judge Walker, what

2     the 30(b)6 witness testified to is that it is the operational

3     people who make the final decision here.  It is correct that HR

4     does review it, does review their recommendation.  But it is

5     the operational folks.

6          And the HR people who are directly involved in this

7     are the people who wrote and received the HR memo.  That is the

8     two local HR people.  Ms. Blackmon's only role was to look at

9     it at the end, as she looks at all ACS terminations and say,

10    okay.  Looks okay to me as well.

11         But she does not play any active role.  She --

12    certainly in, you know, other disciplinary decisions in

13    connection with these kinds of things.  In other words, to the

14    extent the theory of the plaintiff is that Delta is somehow --

15    the facts don't bear this out but is somehow only terminating

16    African-Americans for these offenses and not whites -- that

17    would be not Ms. Blackmon's decision.

18         She's not looking at the people who are not being

19    terminated and saying, yeah, let's not terminate this person,

20    let's terminate that person.  That's not her role.  And there's

21    no suggestion otherwise.

22         MS. THORPE:  Well, the matter is that that director

23    and the other person that signed that -- the departments that

24    get those decisions -- the investigations within those

25    departments that are under the director are relevant to see

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 12 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 614 of 675

11

1   what kind of decisions they are making.  Because the document

2   shows that the director and the manager are the final

3   decision-makers.

4          THE COURT:  Okay.  This is what I'm inclined to do as

5   opposed to producing 7- or 800 files.  I am inclined to allow

6   you to limited questioning of Ms. Blackmon regarding her role

7   in your client's termination.

8          MS. THORPE:  Ms. -- Judge Walker --

9              **(Unintelligible cross-talk)**

10         MS. THORPE:  One thing I wanted to mention is that

11  Mr. Stone testified that they keep a database of all these

12  things anyway.  And that is what we were agreeing to, the

13  spreadsheet that included all of the information.  So this

14  wouldn't be a burden to him.

15         THE COURT:  You said this is what you-all are

16  agreeing to.

17         The two of you already had an agreement?

18         MS. THORPE:  Well, he also talked during our last

19  conversation -- because the whole point with my motion to

20  compel was that there was evidence that he was withholding

21  documents pursuant to our agreement because it didn't include

22  certain documents.

23         And my concern was that he was not producing all the

24  documents, particularly documents that did not help their

25  defense.  But he mentioned that they keep all of these things

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 13 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 615 of 675

12

```
 1   in databases anyway.  All the investigations are kept in a
 2   database and that he could simply prepare a database of all of
 3   this data.
 4           That is the matter why we agreed in a balance of
 5   everything for him to produce the database, the spreadsheet
 6   that he could clearly to create this database.  So now he wants
 7   to say, well, there's all these files and burden and whatnot.
 8           MR. STONE:  Well --
 9           MS. THORPE:  But the whole premise is that they
10   already keep this information.  It could just simply be queried
11   for -- for the information.
12           THE COURT:  Okay.  So --
13           MR. STONE:  Judge --
14           THE COURT:  There is an agreement.  Was there an
15   agreement and he's going back on the agreement?  I'm not sure
16   if I'm following you.  It sounds like you are saying he already
17   agreed to produce this to you, and now he is changing his mind.
18           Is that accurate, Mr. Stone?
19           MR. STONE:  No, Judge.  That is -- the facts are
20   exactly the opposite.  Ms. Thorpe is correct there is a
21   database.  And we have already produced out of the database
22   everybody who is coded in the database.  We have already
23   identified on the spreadsheet -- and I can't remember what the
24   number is.  It is 175 or 200 individuals by name, race, sex,
25   age, all of the characteristics who were investigated for loss
```

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 14 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 616 of 675

13

1   of control or business travel.

2   The -- there are additional -- those people --

3   everybody who has been coded as such, we have produced.

4   There are additional individuals who are not coded, I

5   have learned, or are coded differently.  And so for us to --

6   and so in some circumstances, we may not be able to identify

7   that they were, in fact -- there may be people who are loss of

8   control or business travel who are not coded as such.

9   And so for us to be certain -- and we're willing to

10  do this -- we would have to go through each of the files and

11  say, okay, that person is, that person is, that person isn't.

12  Therein lies the challenge.

13  Judge, producing information out of the database is

14  not -- is not a problem.  The problem is that for us to be

15  starting that we're identifying everybody who is loss of

16  control or business travel who were -- that is who was

17  investigated for things similar to what the plaintiff was

18  investigated for, we would literally have to go through those

19  files.

20  That is -- that is the challenge.  That is what would

21  take a lot of time and energy in the process here.

22  MS. THORPE:  Right.

23  MR. STONE:  And, Judge --

24  **(Unintelligible cross-talk)**

25  THE COURT:  One at a time.

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 15 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 617 of 675

14

```
 1              MR. STONE:  I'm sorry.

 2              THE COURT:  Go ahead.  One at a time.  I think you

 3  both were speaking at the same time.

 4              MR. STONE:  I was done, Your Honor.  I thought

 5  Ms. Thorpe was starting to speak.  I just didn't hear.

 6              MS. THORPE:  I apologize.  And also with that

 7  database, there are certain fields that are not coded.  So it

 8  doesn't have the underlying information that we need.  So yes,

 9  we did agree that you should produce those underlying

10  documents.

11              THE COURT:  Okay.  If you two --

12              MR. STONE:  Yeah.  We had actually -- Judge, we had

13  actually reached an agreement that we would produce out of the

14  database the people who were investigated for loss of control

15  or business travel and that we would -- we would produce all

16  the hard copies out of individuals under the operational

17  person's control.

18              We reached an agreement.  Ms. Thorpe and I reached an

19  agreement on that.  So to the extent that anybody has

20  changed -- and that that would be the end of it.  There are

21  documents that say that is the end of the review.

22              So if there is anybody changing the deal, it is

23  actually Ms. Thorpe here.  I'm not here to --

24              MS. THORPE:  I'm not --

25                     (Unintelligible cross-talk)
```

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 16 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 618 of 675

15

```
 1              MR. STONE:  Hang on.  Hang on.  I'm not here to do
 2   anything other than try and reach the -- reach a logical
 3   conclusion, Judge.  We're just trying to get the information
 4   that is reasonable and relevant here and trying to get to the
 5   dispositive motion phase here.
 6              We already -- as Your Honor knows, we had already
 7   filed a summary judgment motion.  Your Honor had opened
 8   discovery up for a very limited purpose for a single
 9   deposition, not for all of this that is going on right now.
10              Again, we feel like we've bent over backwards.  But
11   Your Honor after summary judgment made very clear in your order
12   that this was for a single deposition.  And we are now a year
13   later and still having discussions now about things that don't
14   have anything to do with the single deposition.
15              THE COURT:  Okay.  So the issue --
16              MS. THORPE:  I would say that I'm not changing any
17   order.  I'm trying to implement what we talked about during our
18   last hearing with the Judge.  And that's what I'm trying to do.
19   So I'm not changing anything.
20              And when we talked about the decision-makers, you
21   agreed that one of the signatures on that HR document was a
22   final decision-maker and did agree to produce that.  And my
23   question is the other person who signed on the document, they
24   should be within the scope of this agreement as well.
25              THE COURT:  Okay.  So this is what -- again, I'm
```

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 17 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 619 of 675

16

1    going back to my prior ruling.  I'm not inclined to require an

2    additional -- whatever the two of you have agreed to, that is

3    fine with the Court.

4          However, to the extent that plaintiff is seeking an

5    additional 700, 800 files or anything that Ms. Blackmon ever

6    signed off on nationwide, I'm not inclined to grant that

7    request.

8          What I will do because it may be relevant is if she

9    has any knowledge with regard to your client's termination to

10   allow you to have a limited deposition with regard to her role

11   if she reinvestigated or investigated anything or discussed

12   with either of the operations manager or the other senior human

13   resource manager -- anybody in the plaintiff's line of command

14   regarding the circumstances and facts or issues surrounding her

15   termination, suspension, options, anything of that nature.

16         So that is what I'm going to do.  And this is not to

17   start going to what you have done nationwide but limited to her

18   involvement in your client's case.

19         MS. THORPE:  Uh-huh (affirmative).  Your Honor, if

20   it -- if it is determined that she wasn't -- where do we go

21   from there then?

22         THE COURT:  You are going to depose her and use that

23   information you glean from there.

24         MS. THORPE:  What I mean is -- because the ultimate

25   answer is who was the final decision-maker.

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 18 of 20
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 620 of 675

17

```
 1              And if we determine that her role as a director in

 2    signing and approving recommendations for termination is more

 3    than what Mr. Stone has suggested, then where do we go from

 4    there?

 5              THE COURT:  Well, we'll have to cross that bridge

 6    when we get to it.  Because my concern is you can always argue

 7    that regardless that -- even if she said she did not, she

 8    doesn't even remember your client, you can still argue that and

 9    still get the 700-plus documents.

10              So we'll just cross that bridge when we get to it.

11              MS. THORPE:  Okay.

12              MR. STONE:  Your Honor, thank you very much.  I guess

13    we'll -- we'll complete that, and then we'll see if --

14    Ms. Thorpe and I will see if we can work out the balance of

15    this.

16              I assume we are -- obviously we've got a summary

17    judgment deadline coming up in the next -- I think it is in the

18    next day or so.

19              I assume that is off temporarily until we get through

20    this issue?

21              THE COURT:  Yes.  And so we'll have to submit a -- I

22    guess a revised consent order.

23              Now I had a consent order.  Was that from both of you

24    or was this -- because I had one that came with defendant, and

25    then I had another one that came.  So I wasn't sure --
```

```
 1              MR. STONE:  Yeah.  We'll have -- I think we'll

 2  both -- based on Your Honor's rulings, I think we'll both have

 3  to get together and submit you something that is consistent

 4  with Your Honor's rulings today --

 5              THE COURT:  Okay.

 6              MR. STONE:  -- and will have some new dates in it.

 7  Ms. Thorpe and I will work on that.

 8              THE COURT:  Okay.  Thank you.  Have a good day.

 9              MR. STONE:  Thank you, Judge.  We appreciate it.

10              MS. THORPE:  Thank you.  Bye-bye.

11                    (The audio-recorded proceedings were thereby

12                    concluded at 11:39 A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

Case 1:16-cv-02571-AT   Document 118   Filed 12/22/21   Page 20 of 20
USCA11 Case: 21-13814    Document: 20    Date Filed: 03/30/2022    Page: 622 of 675

19

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   18 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   22nd day of December, 2021.

14

15

16

17                              _____
                                SHANNON R. WELCH, RMR, CRR
18                              OFFICIAL COURT REPORTER
                                UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

# Dkt/Tab 119

The following is the PDF of an official transcript.
Official transcripts may only be filed in CM/ECF by the
Official Court Reporter and will be restricted in CM/ECF for a
period of 90 days. You may cite to a portion of the attached
transcript by the docket entry number, referencing page and
line number, only after the Court Reporter has filed the
official transcript; however, you are prohibited from attaching
a full or partial transcript to any document filed with the
Court.

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA

2                    ATLANTA DIVISION

3  QUANIAH R. STEVENSON,         :
                            :

4        PLAINTIFF,        :
                            :

5  vs.                 :  DOCKET NUMBER
                            :  1:16-CV-2571-AT

6  DELTA AIR LINES, INC.,      :
                            :

7        DEFENDANT.        :

8

9   **TRANSCRIPT OF AUDIO-RECORDED TELEPHONE CONFERENCE PROCEEDINGS**
           **BEFORE THE HONORABLE LINDA T. WALKER**
10          **UNITED STATES MAGISTRATE JUDGE**
               **MARCH 1, 2019**
11              **3:06 P.M.**

12

APPEARANCES OF COUNSEL:

13

14     **FOR THE PLAINTIFF:**

15     CHARLENA L. THORPE
      INCORPORATING INNOVATION LLC WITH CHARLENA THORPE
16
     **FOR THE DEFENDANT:**
17
     BENJAMIN ALEXANDER STONE
18    MUNGER & STONE

19

20   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

21         *TRANSCRIPT PRODUCED BY:*

22

*OFFICIAL COURT REPORTER:*     *SHANNON R. WELCH, RMR, CRR*
23                       *2394 UNITED STATES COURTHOUSE*
                             *75 TED TURNER DRIVE, SOUTHWEST*
24                       *ATLANTA, GEORGIA  30303*
                             *(404) 215-1383*

25

```
 1                    P R O C E E D I N G S

 2    (Atlanta, Fulton County, Georgia; March 1, 2019.)

 3              THE COURT:  Good afternoon.

 4              MR. STONE:  Afternoon, Your Honor.

 5              MS. THORPE:  Afternoon.

 6              THE COURT:  This is the case of Quaniah Stevenson v.

 7    Delta Air Lines, Inc., Case Number 1:16-CV-2571.

 8              It is my understanding we have on the line -- on

 9    behalf of Plaintiff Stevenson, we have Ms. Thorpe.  And on

10    behalf of Delta Air Lines, we have Mr. Stone.

11              I understand that the Court has scheduled this

12    teleconference because the plaintiff filed an emergency -- was

13    seeking emergency relief from the Court regarding a motion for

14    extension of discovery as well as a motion to compel.

15              Okay.  Do you want to start, Ms. Thorpe?

16              MS. THORPE:  Yes, Your Honor.  I did file the motions

17    just because the close of discovery was scheduled for

18    yesterday -- end of the day yesterday.  And, of course,

19    pursuant to the rules, you know, if there are any outstanding

20    documents that have not been produced and things of that, I

21    have to file that motion to compel before the close of

22    discovery.  So I needed to get that on file, and that is why I

23    did that.

24              But there was a deposition of defendant on Tuesday.

25    And during that deposition, it came to light that the defendant
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1  has not been forthcoming with documents.  And I emailed earlier

2  today a few items that I think will illustrate that.

3       For example, we worked very hard in trying to tailor

4  the deposition -- the document request so that they are

5  specific and relevant and narrowly tailored so that defendant

6  isn't producing a lot of documents.

7       And from the beginning, the defendant has asserted

8  that there is just this mountain of documents and that it would

9  be onerous to produce.

10      But from the summary documents that they produced, it

11 is clear that they could have produced all of those documents

12 in the first place.

13      But nevertheless, the summary document was something

14 that we had agreed upon.  However, it has come to my attention

15 that the defendant is not being forthcoming in preparing those

16 summary documents.

17      First of all, for any particular employee that is

18 being investigated for a travel benefit violation, there is an

19 investigative summary report that is done that pretty much

20 spells out what the findings were.

21      That document is very important to this case so that

22 a comparison can be made between, you know, the things that

23 Ms. Stevenson were accused of and also what the outcome was to

24 determine if, you know, similarly situated individuals were

25 treated differently.

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 5 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 628 of 675

4

1          Also a document that is produced during that

2   investigation is a recommendation on the penalty.  For example,

3   would that employee be recommended for termination or travel

4   pass suspension, revocation, or anything along those lines.

5   And those documents haven't been produced.

6          For example, for -- particularly I mentioned in the

7   motion there was a document request, Document Request Number 8.

8   And it was for all documents related to Delta Air Lines' Delta

9   Pass Protection Group investigation of a V. Bailey.

10          Now, V. Bailey is the -- is a travel companion who

11   the defendant contends was the reason Quaniah, Ms. Stevenson,

12   was investigated in the first place.  And Ms. Quaniah, as well

13   as group of five or six other employees, were investigated

14   because they at some point had allowed V. Bailey to use their

15   travel benefits.

16          And I asked for all the documents related to that

17   investigation.  I didn't receive all of the documents.  I

18   received an investigative summary, which I provided in an

19   attachment of the investigative summary for a Sidarious

20   Johnson, who would be a comparator in this case.

21          However, the document -- his recommendation on --

22   from -- on sanctions was not included.  I found out during the

23   deposition that he was, in fact, allowed to keep his job.  He

24   wasn't fired.

25          THE COURT:  What was the name?  I'm sorry.  Could you

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 6 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 629 of 675

5

1    tell me the name again.

2             Is that Mr. Johnson?

3             MS. THORPE:  Sidarious.

4             THE COURT:  Okay.

5             MS. THORPE:  Sidarious Johnson, yes.  I included the

6    investigative summary for Mr. Johnson in the attachment email.

7    I did not receive the document though that stated what the

8    final disposition of Mr. Johnson was.

9             I found out during the deposition that he was allowed

10   to keep his job.  And that is very relevant to our case because

11   a comparison of Mr. Johnson's behavior to Ms. Quaniah's alleged

12   behavior -- you know, arguably I contend that Mr. Johnson's

13   behavior is much more culpable, that he was allowed to keep his

14   job.  He would be a comparator.  He is a male.  And he is also

15   under the age of 40.

16            But these documents -- the documents for his -- his

17   punishment, if you will, was not included in the document

18   request.

19            And more importantly, Mr. Johnson -- he wasn't listed

20   on the summary document that was prepared in relation to

21   productions 12 -- the Document Request Number 12 and 13.

22            On Document Request Number 12 and 13, Mr. Stone and I

23   agreed that he could provide a summary document so long that it

24   included all the information that I needed.  And then he

25   wouldn't have to reveal or produce all the underlying

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 7 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 630 of 675

6

```
 1   documents.
 2          Well, I have attached the summary document.  And,
 3   Number 1, Mr. Johnson isn't on that document, as he should be.
 4   His name should be on that list, and it is not.
 5          Mr. Stone said he is not on the list because his
 6   offense wasn't considered a loss of rights or a business travel
 7   violation.
 8          But if you look at the investigative summary report
 9   from Mr. Duncan, it clearly is.  It clearly was a loss of
10   rights case or -- I mean, addressed potential -- whether it was
11   business use, i.e., was he selling his -- his travel benefits.
12          So he is not listed on that summary document which
13   raises the concern who else is not listed because Mr. --
14   Mr. Stone is deciding for himself or whomever -- whomever else
15   has decided that this case doesn't qualify as a loss of rights
16   or loss of -- loss of control is what it is called.  Loss of
17   control or a business purpose case when clearly Mr. Johnson
18   falls into that category.  So -- so there's clearly not been
19   forthcoming a document in this case.
20          THE COURT:  Okay.  Let me hear -- let me hear from
21   Mr. Stone regarding -- first, I want you to just give me a
22   little bit of an overview of the business travel, loss of
23   control policy.
24          What does that include?
25          MR. STONE:  Production.
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 8 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 631 of 675

7

| 1 | THE COURT:  Production.  Yeah.  What does that mean? |
|---|---|

1     THE COURT:  Production.  Yeah.  What does that mean?
2  What does it include?  Would you just tell me a little bit
3  about it first though, loss of rights control or business
4  purpose.
5     MR. STONE:  Sure.
6                    **(Unintelligible cross-talk)**
7     THE COURT:  From Delta's perspective?  Okay.
8     MR. STONE:  I apologize.  I didn't mean to interrupt.
9     THE COURT:  That's okay.  So --
10    MR. STONE:  Yeah.
11    THE COURT:  Tell me -- just tell me a little bit
12  about it, and then we'll work back to the question of why
13  Mr. Stevenson does or does not qualify for this case.
14    You may or may not find it relevant to this case.
15  But tell me about the policy in general.
16    MR. STONE:  Absolutely.  Let me give you 30 seconds
17  of context, if I can, Judge, because I think it will help
18  explain what is going on here.
19    Your Honor will recall, I presume, that this started
20  after Delta filed a motion for summary judgment in the case.
21    THE COURT:  Okay.
22    MR. STONE:  And after that time, Your Honor had at
23  the plaintiff's request reopened discovery and allowed
24  plaintiff to take a single deposition.  The plaintiff took that
25  order and expanded it and served a very lengthy 30(b)(6)

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 9 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 632 of 675

8

1    deposition notice and a very lengthy set of document requests,

2    including requests for nationwide discovery on all

3    investigations done by Delta relating to -- relating to past

4    travel events.

5         We met and conferred.  We were unable to reach a

6    agreement.  So we came to see Your Honor.  And Your Honor made

7    very clear, consistent with controlling law, that what is

8    relevant is her area, her department.  And --

9         MS. THORPE:  That wasn't --

10        MR. STONE:  Charlena, please don't interrupt.

11        MS. THORPE:  I won't.  But that is not what we

12   concluded.

13        THE COURT:  Okay.  Let him finish.  Just let him

14   finish.

15        Okay.  Go ahead, Mr. Stone.

16        MR. STONE:  Thank you, Your Honor.  So, Your Honor, I

17   think it is very clear -- made clear and controlling law is

18   clear that what is relevant is her work area, her work group.

19        And so I talked with plaintiff's counsel, and we

20   reached an agreement where I would produce two sets of

21   information relating to other investigations.

22        First of all, it would be -- there's kind of two

23   universes of documents.  One is there is a spreadsheet, a

24   database, Your Honor, that is maintained by Delta.  It is not

25   maintained by (unintelligible).  I don't deal with that

```
1    database.
2           But there is a database that identified all the past
3    travel investigations, including past travel investigations
4    that related to either business travel, that is, use of a
5    travel pass for business purposes, or loss of control.  That is
6    the inability to identify -- and this was talked about at some
7    length in the deposition -- basically the inability to identify
8    who is using your passes.  That is -- that is an
9    oversimplification.  But that is a summary.
10          And Delta has a database that codes what
11   investigations are for those particular kinds of offenses.  And
12   so I produced the database identifying everybody who was coded
13   in such a way and in addition for everybody in plaintiff's
14   department, Your Honor.
15          And we tried to bend over backwards and being
16   accommodating we went outside of Atlanta for other stations as
17   well and produced all the underlying summary documents.  That
18   requires us to go to individual files, individual personnel
19   files, that sort of stuff.  It is a fairly significant
20   undertaking.
21          But we went, and we did it to make sure that
22   plaintiff would have all the relevant information in this case.
23   That is, everybody who in her department, really throughout her
24   country -- so even outside her supervisory chain were
25   investigated.  We produced all those documents.
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 11 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 634 of 675

10

1          Plaintiff came back and said I want more.  And I said

2     no, from our perspective we produced more than everything that

3     is relevant in this case.  And plaintiff's counsel asked for

4     nationwide discovery, all divisions, all departments throughout

5     Delta and no matter where, no matter who they reported to who

6     was investigated and the result of that investigation.

7          And I said we're not going to do that.  We think that

8     is dramatically overbroad.  It would be significant -- a

9     significant burden for us to go and look through all of those

10    files.

11         And so we -- we negotiated back and forth, and we

12    reached an agreement, Your Honor.  And the agreement was:  Here

13    is what we'll do.  I'll go to Delta's database, and we will

14    identify summary information that we have in our possession in

15    that database for everybody nationwide.

16         Don't get me wrong.  We believe that information has

17    no relevance to this case under the law.  But in an effort not

18    to involve you any further, Your Honor, we agreed to do that.

19         Plaintiff's counsel then agreed in response that will

20    be all they will seek, that we will not be then having a fight

21    about whether we have got to go and gather up documents for

22    what is hundreds of investigations here that I listed on the

23    summary spreadsheet that are outside of her department and

24    outside of her division.

25         That agreement was reached.  It was in writing.  And

```
 1   it was in an email confirmation.  We said, we're only going to
 2   do this if we reach that agreement.  And plaintiff's counsel
 3   said fine.  And so we reached that agreement.
 4          We then produced the spreadsheet.  Let me be clear,
 5   Your Honor.  I did not compile the spreadsheet.  That
 6   spreadsheet is compiled by Delta.  They identify and they have
 7   coded way before this case began everybody who they considered
 8   to be somebody who was investigated for business travel or loss
 9   of control.  And that is what I produced.  I produced
10   everything within the database.
11          Your Honor, there were 15-, 16-, 1700 investigations.
12   I can't remember the exact number.  A large number.  I was not
13   responsible for coding.  Somebody at Delta was responsible for
14   coding.
15          Is it possible that there are people who plaintiff
16   would consider to be loss of control that are not coded in such
17   a way?  Absolutely, that is possible.  I don't have any idea.
18          But we produced -- we produced everybody who was
19   coded in such a way and everybody nationwide in all
20   departments, in all divisions to show that people on both sides
21   of the equation, African-American and white, older and younger,
22   male and female.  Both were terminated as a result of Delta's
23   determinations and cleared as a result of Delta's
24   investigation.  That spreadsheet confirmed that.
25          But the understanding in the agreement was we are not
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 13 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 636 of 675

12

```
 1    going to have this fight about us going and gathering up
 2    hundreds and hundreds of personnel files and hundreds and
 3    hundreds of documents within those personnel files.  That was
 4    the deal, A, because that was the deal and, B, Your Honor,
 5    because controlling law says these individuals, you know,
 6    who -- where disciplinary decisions were made by other -- by
 7    other supervisors in other departments aren't relevant.
 8              Mr. Johnson is not relevant for two different
 9    reasons.  One is he is not on the list, as Ms. Thorpe correctly
10    points out.  He is outside her department.  He is in a
11    different supervisory chain, a different -- a different area.
12              So from our perspective, Your Honor, particularly
13    given how this began, which was the right for a single
14    deposition, we have bent over backwards by producing to
15    plaintiff everybody within her department who was subject to
16    one of these investigations.
17              We think, Your Honor, we have done more than gracious
18    plenty in this case and certainly more than the law requires.
19    And so that's the reason why we think the motion to compel is
20    not -- not with any merit.
21              THE COURT:  Let me ask you a question:  Where is --
22    where is -- is Mr. Johnson in Atlanta or is he --
23              MR. STONE:  Mr. Johnson is in Atlanta.  He is in a
24    different department, Your Honor, yes.  And by the way, I have
25    agreed to give to -- we have already given the investigation
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 14 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 637 of 675

13

1    document.

2          If there is any disciplinary document -- I can't

3    remember right now, Your Honor.  But if there is any

4    disciplinary document, I'm happy to give that to Ms. Thorpe as

5    well.

6          THE COURT:  For Mr. Johnson?

7          MR. STONE:  For Mr. Johnson.  Absolutely.  If that is

8    what she is seeking in order to resolve this, absolutely happy

9    to do it.

10         THE COURT:  So you will give her a disciplinary

11   document.  It seems like what she wanted was the last column

12   was to what happened with him, what was the -- obviously she

13   said he didn't lose his job.

14         But what was the recommendation?

15         MR. STONE:  Yeah.  And Delta's witness testified

16   about this, Your Honor, at the deposition.  Despite the fact

17   that he is in a different department, she gave that

18   information.  I can't remember if he was cleared or if he got

19   some lesser form of discipline.

20         If he was cleared, there would be no document.  If he

21   got some lesser form of discipline, we will absolutely give the

22   document.  That would all there would be, I think, Your Honor.

23         But we'll double-check, and we'll produce it --

24         THE COURT:  Okay.

25         MR. STONE:  -- so as to resolve this.  Again, we

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 15 of 51
USCA11 Case: 21-13814    Document: 20    Date Filed: 03/30/2022    Page: 638 of 675

14

1   think he is not relevant.  But we're happy to do it.

2           THE COURT:  Let me -- let me just start with -- let

3   me ask you a question then, Ms. Thorpe.

4           Is there anyone in her department that you believe

5   may be a comparator, or do you have any reason to believe that

6   you have not received everything with regard to her department?

7           MS. THORPE:  Well, first of all, Your Honor,

8   Mr. Stone prefaced all this discovery with the fact that it

9   would be a significant burden to do this and that --

10          THE COURT:  No.  Let's just answer the question

11  because we're going to work back to that.  But just answer the

12  question.

13          Is there anyone with regard to your client's,

14  Ms. Stevenson's, department do you believe you have not

15  received comparator information from?

16          MS. THORPE:  Yes.  I am concerned because of the

17  Sidarious Johnson document because this --

18          THE COURT:  But he was not in her department.

19          MS. THORPE:  He was one that they said --

20                  **(Unintelligible cross-talk)**

21          THE COURT:  He was not in her department.

22          MS. THORPE:  No.  But my point is that I am missing

23  that.

24          THE COURT:  No.  No.  No.  Let me finish.

25          Are you aware of any information or have any reason

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 16 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 639 of 675

15

 1   to believe outside of someone who is not in her department --

 2   we're just focusing on her department -- and she was -- was she

 3   in customer service?

 4           MR. STONE:  She was a gate ticket agent, Your Honor,

 5   in department 125.  That is the gate and ticket agent

 6   department at Delta.

 7           THE COURT:  Okay.

 8           MR. STONE:  The people who you see in the airport.

 9           THE COURT:  Okay.  So outside of -- are you aware of

10   or have any reason to believe outside of what you may have seen

11   nationwide that you have not received everything you need are

12   comparators -- let me stop.  Let me strike that.  Let me start

13   again.

14           Did you receive a summary sheet for department 125,

15   plaintiff's department?

16           MS. THORPE:  One of the attachments was a summary

17   sheet that is similar to as Mr. Stone described.  But, again,

18   that is based on their determination of what is considered loss

19   of control or business purpose violation.

20           Yes, I'm concerned that the relevant people are not

21   on that list because -- and I know Mr. Johnson isn't part of

22   her group.  But that is a prime example of one that is falling

23   through the cracks that is a clear comparator.

24           I'm concerned that that might be the case that there

25   has been some determination -- determination by someone that a

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 17 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 640 of 675

16

1    particular investigation wasn't a loss of control.

2         When you look at Mr. Johnson's investigative file,

3    which I attached to the email, that was a clear loss of

4    control.  They questioned him about who used his travel

5    benefits and where those people went on his travel benefits.

6    And he could not tell them.  And so that is what loss of

7    control is about.

8         And they did not classify that as a loss of control.

9    So I'm concerned that yes, in her group that she has told me

10   there are people who have been in similar situations to her and

11   have kept their jobs.

12        So yes, I am concerned that there are people that are

13   not mentioned or listed.  And Mr. Stone, you know, keeps

14   talking about a significant burden and all of this.  But when

15   he produced that first document, which I attached, it was like

16   a very limited number of people in the first place.  Even the

17   people they have identified, it is a very limited group.

18        And so those documents should have just been produced

19   in the first place versus having to resort to a summary

20   document.  So he has been -- I don't want to say untruthful but

21   mischaracterizing the extent of the documents.

22        Even the second document where we went to a,

23   quote-unquote, nationwide search as he says, that document --

24   that summary document in terms of the number of employees is

25   limited as well.  And he and I agreed that he would provide the

 1   information in lieu of the documents.

 2        If you look at the charts, that primary column that I

 3   need information for to determine comparators is not there.  It

 4   is empty.  And he -- he -- you know, the premise of our

 5   agreement was that the document -- the summary document would

 6   be completed.

 7        I wouldn't get whatever Delta provided.  How I would

 8   think the summary document is, that is what I would get.  The

 9   presumption was it would be filled out and complete.  Otherwise

10   it makes no sense.

11        And then, you know, they have a pass protection group

12   that was created to -- and his witness testified and the

13   documents also state the whole primary purpose is to punish

14   employees consistent across all groups and whatnot.

15        So -- so all of that is relevant.  You know, the --

16   as a matter of fact, the second -- the second summary document

17   that he showed me, there were numerous white male or female

18   employees that I can gather from the summary documents who did

19   egregious acts and are still allowed to keep their jobs.  There

20   was one -- one --

21        THE COURT:  Okay.  Let me stop you, Ms. Thorpe.

22        So I think the answer to my question is yes, that

23   Delta did provide you with a summary spreadsheet of other

24   individuals who have been investigated for the -- I would just

25   say for short the buddy -- violations of the buddy pass policy.

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 19 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 642 of 675

18

 1          Yes, you did receive that.  Did you -- did that

 2   summary from her department contain what happened?

 3          I understand one of your arguments is that with

 4   regard to the nationwide policy or violations of the policy

 5   that the results were not provided on the spreadsheet.  But on

 6   the spreadsheet that you were provided, whatever information

 7   you were provided from her department, did you have the

 8   disposition of the disciplinary action?

 9          MS. THORPE:  Well, with the first -- with the first

10   production with her department because it was a smaller sample

11   size, he provided the actual investigative report that went

12   along with the summary document for each employee listed on the

13   summary document because it was such a limited document.

14          THE COURT:  Okay.

15          MS. THORPE:  But it was a separate investigative --

16   full investigative summary report that I did have that

17   listed -- so I can see exactly what the accusations were and

18   the findings were linked into that sort.

19          THE COURT:  And so you would agree that Mr. Johnson

20   had a different supervisor/manager than your client,

21   Ms. Stevenson?

22          MS. THORPE:  I can't say that for sure because I

23   haven't -- I can't -- I don't think that has been brought out.

24          THE COURT:  Okay.  Let's stop -- let me stop there

25   then.

```
1              Let me ask Mr. Thorpe -- I'm sorry -- Mr. Stone:  Did
2    they have the same supervisor?
3              MR. STONE:  No, Judge.  He's in a different
4    department.  So they would have a different supervisor.
5              THE COURT:  Where did Mr. Johnson work?
6              MR. STONE:  He worked in department 120.  He was a
7    baggage loader.
8              THE COURT:  Okay.  And who was his -- who was his
9    supervisor or manager?
10             MR. STONE:  Your Honor, I'm sorry.  I cannot answer
11   that question off the top of my head.  I don't know.
12             THE COURT:  Okay.  But it was not the same manager --
13   let me ask you this:  Who was the final decision-maker?  I
14   mean, we may get to that.  I mean, that may be relevant to
15   where we go from here if we're having --
16             MR. STONE:  Sure.
17             THE COURT:  -- different decision-makers.  I
18   understand we have --
19             MR. STONE:  And that's right.
20             THE COURT:  -- different departments -- different
21   departments.  But before we extend discovery yet again, I'm
22   curious as to the decision-makers.
23             Was Delta or the HR the final decision-maker with
24   regard to either one of the two?
25             Let's just say with regard to the plaintiff.  And
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 21 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 644 of 675

20

1    that may be an issue later as to who the actual final

2    decision-maker was.

3              MR. STONE:  Right.  Ms. -- yeah.  Ms. Nabors

4    testified -- Ms. Nabors was Delta's witness.  And she testified

5    consistent with our policy that the decision-makers would have

6    been the operational managers over -- over Ms. -- over

7    Ms. Stevenson.  And there is the documents that are consistent

8    with that.  So that is the answer to that question.

9                    **(Unintelligible cross-talk)**

10             THE COURT:  Okay.  You're talking, Ms. Thorpe.  I

11   can't -- I can't hear both of you.

12             MR. STONE:  I'm sorry, Your Honor.

13             THE COURT:  Ms. Thorpe, I think you were saying

14   something too.

15             MS. THORPE:  I'm so sorry.

16             THE COURT:  Okay.  Go ahead and finish, Mr. Stone.

17             MR. STONE:  Sure.  Just I -- I may not have been

18   clear.  Ms. Nabors, who was Delta's witness, testified.  And

19   the documents have been produced.

20             And the answer to the question is the operational

21   managers are the decision-makers.  The operational managers

22   within 125, they make a recommendation.  They fill out a

23   document.  HR looks at it and says we agree.

24             And so that is -- that is what causes the

25   termination.

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 22 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 645 of 675

21

```
 1              MS. THORPE:  So HR looks at it and decides --

 2              MR. STONE:  Sure.

 3              MS. THORPE:  -- whether to terminate or not?

 4         And then there is also an appeal process with the

 5    equal opportunity group that also looks at the decision as

 6    well.

 7              MR. STONE:  It is correct that there is an appeal

 8    process after the person is terminated.  If they want, they can

 9    appeal through an equal opportunity area.  That is certainly

10    true.

11              THE COURT:  Let me ask --

12              MR. STONE:  But that is not who the decision-maker is

13    with respect to the termination.

14              MS. THORPE:  And the documents show that there were

15    some -- even some comparators, a white individual who -- who

16    had their termination overturned at the EO level -- at the

17    appeal level.

18              THE COURT:  That is with Delta?

19              MR. STONE:  Yeah.  There was one such individual --

20    that is true, Your Honor -- that has been identified.

21              THE COURT:  Did plaintiff appeal her termination to

22    the -- at the EO level?

23              MS. THORPE:  She did.  Yes, she did, Your Honor.

24              MR. STONE:  She did, Your Honor, yes.

25              THE COURT:  Okay.
```

```
 1          MR. STONE:  It is a small -- relatively small number
 2   of people who appeal.  I think we're aware of two people in
 3   this group who did.
 4          There may be some additional ones.  I'm not aware of
 5   them.  But I think it is a relatively -- it is a subset,
 6   certainly a small number.
 7          THE COURT:  Did Mr. Johnson -- do you know whether or
 8   not Mr. Johnson appealed his at the EO level?
 9          MR. STONE:  I don't think he was terminated.  He was
10   an African-American male.
11          THE COURT:  Oh, that's right.  That's right.
12          MR. STONE:  I do not believe he was terminated.  And
13   therefore I doubt -- he would not have certainly appealed the
14   termination to the EO level.
15          THE COURT:  Okay.  And tell me about the -- and the
16   HR would be the same HR for Mr. Johnson as well?
17          MR. STONE:  Your Honor, I don't know the answer to
18   that question.  I don't know if the HR individuals would have
19   had any responsibility or any area broader than Ms. -- they
20   certainly have responsibility over Ms. Stevenson's area.
21          I actually think those HR people are responsible for
22   particular concourses within the airport as opposed to broadly.
23          But I don't know -- I apologize.  I don't know the
24   answer to that question off the top of my head.
25          THE COURT:  Okay.  Yeah.  That -- I was just
```

```
 1   wondering whether or not some of you -- I would assume Delta
 2   has multiple HR.  But I wasn't sure if there is one particular
 3   person that -- let's say for metropolitan Atlanta area, those
 4   who are working at the Hartsfield Jackson Airport, there is one
 5   HR department that all of the, for example, buddy pass
 6   violations would report to that HR office.
 7           Does HR have the authority to overturn, or is that
 8   definitely -- that is just passed on to the appeal level?
 9           I'm trying to see whether or not the HR can be --
10   arguably can be considered the final decision-maker.
11           MR. STONE:  It is a fair question, Your Honor.  I
12   mean, the decision -- Delta always says the decision-maker is
13   the operational individuals.  They do need HR to approve the
14   recommendation.
15           So from that perspective, I guess they -- you know,
16   HR certainly plays that role where they look at the -- they
17   look at the operational decision and say, yeah, that looks okay
18   to us.
19           THE COURT:  Okay.
20           MR. STONE:  It is -- I guess it is theoretically
21   possible that they say we have got a concern about that and
22   there would be a back-and-forth, and perhaps the operation
23   changes the decision, or perhaps operation gets HR comfortable
24   with the process.
25           THE COURT:  Okay.  And then after the termination,
```

```
 1   you appeal to the -- what I'm -- I guess what I'm curious as

 2   to -- two questions:  The HR -- if it is the same HR department

 3   division individual -- however we want to put it.  And we can

 4   use the example with Mr. Johnson as well as Ms. Stevenson.  And

 5   then I'm assuming the EO level, is that from the metropolitan

 6   area?  Is that your --

 7           MR. STONE:  No.  That would be EO -- that would be EO

 8   nationwide.  They would handle --

 9           THE COURT:  Okay.

10           MR. STONE:  EO nationwide.  Delta doesn't have that

11   many terminations.  But EO nationwide would handle any

12   (unintelligible) appeals.  But they would handle all appeals

13   nationwide.

14           THE COURT:  Okay.  And -- and you say that the

15   plaintiff, Ms. Stevenson, did appeal hers all the way to the EO

16   level?

17           MR. STONE:  She did.  She -- after her appeal -- as

18   all Delta employees have a right to, after her termination, she

19   asked EO to overturn her termination and EO declined to do

20   that.  It is a fairly high threshold, Your Honor.

21           But that is -- you know, that's an opportunity that

22   Delta makes available to its employees.

23           THE COURT:  Okay.

24           MR. STONE:  I think that's fairly common, Your Honor,

25   among companies around the world.  I mean, it is still -- it is
```

1   still the case -- and we think the law is very clear -- that

2   the relevant group here is her department, her area where the

3   decision-makers who affected her made the decision.  That's the

4   relevant group for purposes of a claim of discrimination.

5          THE COURT:  Yeah.  That's why I'm trying to get

6   additional information.  While I initially agree with that,

7   however, you know, it is -- for purposes of how the district

8   court judge is also going to look at it.  I'm trying to save

9   all of us time.

10         MR. STONE:  Sure.  Sure.

11         THE COURT:  I think that the Court would be

12   particularly concerned with anything that is overlapping, such

13   as the HR and then now the EO level.  Because if she did

14   appeal, then I think that with regard to the district court

15   will really want to know what appeals were overturned and the

16   circumstances with regard to the buddy passes or the control --

17   loss of control or --

18         What was the other one?  Investigation --

19                   **(Unintelligible cross-talk)**

20         THE COURT:  Loss of control.

21         MS. THORPE:  Abuse of privilege.

22         THE COURT:  Yeah.  Abusing a privilege.  Abusing

23   privilege.

24         Okay.  Was she loss of control, or was she abusing a

25   privilege?

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 27 of 51
USCA11 Case: 21-13814    Document: 20    Date Filed: 03/30/2022    Page: 650 of 675

26

1          MR. STONE:  She was -- Your Honor, she was both.  She

2     got -- she did three things wrong according to the testimony.

3     She -- her companion was using her travel pass for business

4     travel determined by Delta.

5          THE COURT:  I remember --

6               **(Unintelligible cross-talk)**

7          MR. STONE:  She lost control.  And in addition, she

8     was untruthful during the investigation.  Those were the three

9     determinations that Delta made that led to her termination.

10          THE COURT:  Okay.  But it wasn't -- she wasn't --

11     there was no allegation she was selling it -- selling her buddy

12     passes?

13          MR. STONE:  No, there was not -- there was not any

14     determination by Delta that there had been a sale of passes.

15     There was some evidence that arguably would have been

16     consistent with that.  But Delta did not make that

17     determination.

18          MS. THORPE:  There was no -- there was no evidence

19     consistent with the fact that she was selling anything.  There

20     was absolutely nothing in the record to suggest that.

21          THE COURT:  No.  I was just trying to make sure

22     that --

23          MS. THORPE:  I know.

24          THE COURT:  I just wanted to make sure that was --

25     that -- as I'm trying to see how we're going to proceed.

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 28 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 651 of 675

27

```
 1                    (Unintelligible cross-talk)

 2              THE COURT:  Mr. Johnson happens to be in Atlanta;

 3    correct?

 4              MR. STONE:  Mr. Johnson is in Atlanta.  That's

 5    correct, Your Honor.

 6              THE COURT:  Any other -- well, you may not know this.

 7              Any other individuals in the Atlanta market that

 8    you're aware of?

 9              MR. STONE:  There certainly would have been others in

10    Atlanta, Your Honor, who would have been investigated for the

11    same types of offenses that she was investigated for, yes.

12              THE COURT:  Actually, I am aware of that.  I say that

13    only because I have had a couple of criminal cases.

14              MR. STONE:  I hear you.  Yeah, Your Honor.  You are

15    exactly right.  There's sometimes -- you are right.  This

16    becomes relevant in criminal cases not infrequently.  I know

17    exactly what you are talking about.

18              THE COURT:  And my other concern is still we're three

19    years into the case too.  But I'm trying to save everybody some

20    time on issues that may come up later.

21              MR. STONE:  Yeah.

22              THE COURT:  Let's see.

23              MR. STONE:  Your Honor, in Delta's defense here, we

24    thought we were facing a very narrow -- after our summary

25    judgment and based on your order, a very narrow set of
```

Case 1:16-cv-02571-AT  Document 119  Filed 12/22/21  Page 29 of 51
USCA11 Case: 21-13814  Document: 20  Date Filed: 03/30/2022  Page: 652 of 675

28

```
 1   additional discovery, which we felt like we bent over backwards

 2   by producing spreadsheets and underlying documents and all that

 3   sort of stuff.

 4         We seem to have gotten back into a general discovery

 5   process here.  Obviously it is Your Honor's discretion.  But I

 6   did not think it was Your Honor's intent initially in your

 7   original order.

 8         THE COURT:  It wasn't.

 9         MS. THORPE:  I certainly -- and I certainly don't

10   think this is a general -- I don't think that this is a general

11   discovery process at all.

12         We were given one opportunity to depose -- I mean, I

13   came into the case -- you know, Ms. Stevenson was representing

14   herself pro se.  And we were granted one deposition of Delta,

15   which we received.

16         And in the course of document requests, which the

17   rules permit, the request for documents in conjunction with a

18   30(b)(6) deposition notice or any deposition notice, for that

19   matter, and the deposition -- in the deposition -- the document

20   requests are narrowly tailored.  And there was not, you know,

21   six and seven depositions going on or anything like that --

22   multiple persons have been requested or first and second

23   requests for interrogatories, and first, second, third request

24   for the documents.

25         And I thought you and I had worked very well in
```

```
 1   coming to meeting grounds on what to -- you know, what we were
 2   seeking.  However, Delta has not upheld their end of the
 3   bargain.  And because of, for example, the Johnson case, it
 4   appears that there are missing documents that are relevant.
 5            THE COURT:  Let me ask you a question -- and they
 6   have agreed to produce Johnson.
 7            Remind me of how you became aware of Mr. Johnson's
 8   case.  I'm assuming it was during a 30(b)(6) deposition that
 9   someone mentioned Mr. Johnson.
10            How did you become aware of Mr. Johnson again?
11            MS. THORPE:  It was through the Vendell Bailey --
12   hold on one second.  Let me pull it up.
13            MR. STONE:  I'm happy to answer the question.  I
14   think I know the answer.
15            THE COURT:  Okay.
16            MR. STONE:  The -- Ms. Thorpe is right.  The reason
17   that Ms. Stevenson was originally investigated was because she
18   had -- the way she got on the radar screen is that she had
19   shared passes with an individual named Vendell Bailey.
20            Delta had an objective process for deciding who
21   got -- who was going to be reviewed.  And one of the criteria
22   was if you had -- if there was one person who had received
23   passes from a bunch of different people.  Then the people who
24   gave them passes were investigated.  So that is how she came on
25   the screen.
```

```
1          There were five individuals who had shared passes
2   with Mr. -- I'm sorry -- with Ms. Bailey.  And that's how she
3   came on the radar screen.  The other individuals -- there are
4   four individuals.  One of them was Mr. Johnson -- Sidarious
5   Johnson.
6                    (Unintelligible cross-talk)
7          MR. STONE:  Delta investigated each of those
8   individuals.
9              Hang on a second, Charlena.
10             Delta investigated each of those individuals.  Some
11  were fired.  Some were not.  Some were -- received lesser forms
12  of discipline.  So it was -- it was a mix -- it was a mixed
13  bag.
14         MS. THORPE:  And, Your Honor, if I may add, what is
15  important with this as well with the V. Bailey investigation --
16  Mr. Johnson was swept up in that investigation as well as
17  Ms. Quaniah and four other individuals as well.
18             And out of the four or five others, not including
19  Ms. Quaniah, the vast majority of them kept their jobs in this.
20  I think maybe one other person lost their job.  But none of --
21         MR. STONE:  I think two were fired and two --
22                    (Unintelligible cross-talk)
23         MS. THORPE:  -- the recommendations --
24         THE COURT:  Go ahead, Ms. Thorpe.
25         MS. THORPE:  -- were not included in the document.
```

Case 1:16-cv-02571-AT Document 119 Filed 12/22/21 Page 32 of 51
USCA11 Case: 21-13814 Document: 20 Date Filed: 03/30/2022 Page: 655 of 675

31

1     The recommendations were not included in the production, which

2     is directly relevant to the Request for Production Number 8.

3               So none of the recommendations for any of the people

4     that were investigated via this V. Bailey -- none of them --

5     none of the recommendations were included.

6               But it was discovered during the deposition that

7     essentially Ms. -- Ms. Stevenson was the only one fired.  Maybe

8     one other person.  And everybody else was cleared or not

9     cleared.  No, I won't say cleared.  Because Mr. Johnson, he

10    clearly, if you look at the investigative summary, was not

11    cleared.  He was -- he did get some sort of disciplinary action

12    less than fired.  And so that is important too.

13              And I think maybe one other person in this

14    investigation was on the chart.  The other ones were not on the

15    chart at all either.  Those other three or four were not on the

16    chart either.

17              THE COURT:  Okay.

18              MR. STONE:  The -- go ahead.

19              THE COURT:  Go ahead.

20              MR. STONE:  I was going to say a couple of things in

21    response to that.  Yeah, there were a total of five

22    individuals.  Two were terminated.  Two were -- all were

23    African-American.  Two were terminated.  Two were not.

24              I think one was given a final -- a final warning

25    letter or what they call a final corrective action notice at

```
 1   Delta.
 2           The only one who was in plaintiff's department was
 3   plaintiff.  So she would have been the individual who have been
 4   identified and would have been given all the documents.
 5           If somebody is not terminated, there is not any --
 6   there is no recommendation.  There is no -- there is a
 7   discussion, and there is no recommendation for termination.
 8   You only get a recommendation for termination if you are
 9   recommended for termination.
10           The document request actually called for the
11   investigation documents.  And so we produced the investigation
12   documents.  The plaintiff has asked for the disciplinary
13   documents.  We're happy to do that.
14           THE COURT:  Okay.  For the other individuals?
15           But this is -- I mean, your client's case is a
16   disability case; correct?
17           MS. THORPE:  No.
18           THE COURT:  It is race?  It is just race?  Because I
19   mean, I'm looking at the docket.  I should have brought the
20   complaint with me into the courtroom.
21           MS. THORPE:  Uh-huh (affirmative).
22           THE COURT:  Because it is listed under Americans with
23   Disabilities Act case.
24           Okay.  I'm sorry.  Go ahead.
25           MS. THORPE:  She brought -- she brought this action
```

```
 1   for violations of the ADA race discrimination, gender

 2   discrimination, age discrimination, and retaliatory discharge.

 3          THE COURT:  Say that again.  I'm sorry.  Would you

 4   repeat that.

 5          MS. THORPE:  Uh-huh (affirmative).  It was for -- it

 6   was an action for violations of the ADA race discrimination,

 7   gender discrimination, age discrimination, and retaliatory

 8   discharge.

 9          THE COURT:  Okay.

10          MS. THORPE:  She asserts that she was harassed under

11   Title V, hostile work environment, and retaliation claims under

12   the ADA.

13          THE COURT:  Okay.  So some who were in there -- I'll

14   leave that for later.

15          Okay.  This is what I think that I'm going to do

16   based on what I have heard:  I'm going to deny the motion to

17   compel because I think that -- I understand it was prematurely

18   filed.  But I understand you did it because you were concerned

19   about reserving your rights.

20          What I will do is I will -- I am considering -- based

21   on the argument that is presented during this telephone

22   conference, the defendant has indicated they will provide to

23   you Mr. Bailey's -- I'm sorry -- Mr. Johnson's file.

24          Did you also say the other -- the rest of the

25   investigatory files were --
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 35 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 658 of 675

34

```
 1              (Unintelligible cross-talk)

 2              MR. STONE:  Sure, Your Honor.  Anybody -- if there is

 3   recommendations for termination or recommendations for

 4   discipline, we'll certainly -- I think it is only two other

 5   people.  We're certainly happy to give that.

 6              THE COURT:  Okay.  And what I also -- I'm going to

 7   ask you to also provide to the plaintiff would be the -- hold

 8   on.  Let me go back to the other place in my notes.

 9              I'm going to have you provide to the plaintiff --

10   and, again, we're talking between the years of -- was it 2013

11   through '15?  2013 through '15, I'm going to have you provide

12   to the plaintiff the -- the second part is easier than the

13   first.

14              I was considering any recommendation that was made to

15   the HR where the HR reversed the decision or made them go in a

16   different direction or do something differently.  However, I'm

17   not sure if you have different HRs that are -- different HR

18   departments.  So --

19              MR. STONE:  There -- there would be --

20              THE COURT:  -- that's my only hesitation.

21              MR. STONE:  -- different HR individuals who were

22   involved, Your Honor.  It would be -- it would depend on the

23   concourses.  It would depend on a lot of different things.

24   There are a lot of HR people.

25              THE COURT:  Yeah.  I just need you to confirm that
```

1    with the plaintiff first.  Confirm that you are talking about

2    two different HRs.

3           Now, so if it is two -- it makes sense it may be two

4    different HRs.  But I need you to have something to confirm

5    that with the plaintiff.

6           But then what is similar though is the EO level.

7    So -- and since plaintiff did appeal to the EO level, I would

8    like for you to have your client search and prepare a

9    spreadsheet and the -- with information including what the

10   recommendation was, particularly where the -- where the -- with

11   regard to this violations for loss of control and abusing

12   privilege where the EO recommendation over -- was -- I'm

13   sorry -- the EO overturned the manager's or HR's -- I'm not

14   sure which one you consider.

15          MR. STONE:  Yeah.  Yeah.

16          THE COURT:  -- overturned the recommendation.  So

17   if --

18          MR. STONE:  Okay.

19          THE COURT:  So if someone recommended discharge and

20   the EO said no, we're going to, you know, write them up or

21   suspend them for five days or what have you, during this time

22   frame, I think that would be relevant to the plaintiff's claim,

23   particularly with regard to retaliation or something of that --

24   it would be relevant to maybe one of the claims.

25          MR. STONE:  Understood.  Understood, Your Honor.  We

```
1    can -- we can certainly do any situation where EO overturned an

2    appeal.

3            On the -- on the -- on the middle one where the HR

4    reversed the decision, you are talking about with the HR

5    individuals -- I assume we're talking about the HR individuals

6    within Atlanta who would have been responsible for her review?

7            THE COURT:  Well, what I wanted to -- first, I wanted

8    to confirm that -- that HR -- that section 125 or department

9    125 where she worked, that they did not share the same HR

10   with -- right now we only know Mr. Stevenson.  That is why I

11   was asking you earlier, Ms. Thorpe, if you were aware of any

12   other circumstances.

13           I know you were saying that -- you are probably

14   arguing until your hands are kind of tied because you don't

15   know for sure what else is out there.

16           MR. STONE:  That's right, Your Honor.

17           THE COURT:  We can say -- let's just say for the

18   purposes of this 120 and 125 -- although 120 may have a

19   different HR person.

20           MR. STONE:  Sure.

21           MS. THORPE:  Your Honor --

22           MR. STONE:  Or it might --

23                 (Unintelligible cross-talk)

24           THE COURT:  One at a time.  One at a time.  Just a

25   second, Ms. Thorpe.
```

1          What were you going to say?  What were you saying in

2     response?

3          MR. STONE:  I was just going to say, Your Honor, it

4     is possible -- I don't know if there is any overlap between 120

5     and 125 HR people or not.  And it may be that there is overlap.

6          I'm speculating here, Your Honor.  I don't know.

7          THE COURT:  That's why --

8          MR. STONE:  But it may be that there is overlap

9     between the concourses.  So, for example, the same HR people

10    might have 120 and 125 but just in the A concourse at the

11    airport or just the B concourse.

12         THE COURT:  Yeah.  Whichever HR -- if it overlaps --

13    if her HR overlaps -- the reason I say that is because I was

14    looking at the letter or the information in the letters

15    provided by counsel -- plaintiff's counsel with regard to

16    Mr. Johnson.  And it had D -- it had 120 on it as well.  So if

17    there is an overlap with the HR --

18         MR. STONE:  I will -- I will check on that, Your

19    Honor.  And if there is the overlap, we will identify the

20    individuals who are included within the overlap.

21         THE COURT:  I'm sorry.  Ms. Thorpe, you were going to

22    say?  You were going to add something to that?

23         MS. THORPE:  No.  It would be the other individuals

24    investigated pursuant to Vendell.

25         THE COURT:  Yeah.  He's going to --

```
 1              (Unintelligible cross-talk)

 2         THE COURT:  He's going to give you that.  But that is

 3    where I got the 120 from because I'm looking at the paper that

 4    you provided.

 5         MR. STONE:  Yeah.

 6         THE COURT:  And so if there is overlap, even outside

 7    of the 120, 125 -- if there was like 130 or whatever, Mr. Stone

 8    is agreeing to -- well, he understands he has to provide

 9    whatever division concourse's terminals overlap.

10         MR. STONE:  Yeah.  Yeah.

11         THE COURT:  They have the same HR.

12         MR. STONE:  Anything that overlaps with hers, either

13    120 or 125 or 130 or anything else, yes, I understand, Your

14    Honor.  I understand your direction.

15         THE COURT:  Okay.  And, again, you're talking about

16    the time frame --

17         MS. THORPE:  Your Honor --

18              (Unintelligible cross-talk)

19         MS. THORPE:  Your Honor, does that mean that he will

20    provide the -- because we started out with the underlying

21    investigative summary -- the investigative summary report for

22    any individuals in her group, plus the summary report that

23    identifies all those other calculuses:  Age, date of birth,

24    race, gender, et cetera?

25         THE COURT:  Yeah.  You can still do that.  That's
```

```
 1    fine.  But we're -- but what I'm doing is, at the same time,
 2    I'm trying to -- I am agreeing to -- I am trying to limit it to
 3    what may be -- well, that is a difference too.
 4            I'm trying to limit the HR to the metropolitan
 5    Atlanta area.  EO is a different --
 6            MR. STONE:  Well, it is going to naturally be
 7    limited, Your Honor.
 8            THE COURT:  Okay.
 9            MR. STONE:  Because I'm quite confident that the HR
10    people in the Atlanta airport will not have responsibility
11    outside of Atlanta.
12            THE COURT:  But to answer your question, yes, the
13    summary reports will have the age, gender, race, and that on
14    it.  Then -- and then we'll have the files as well.
15            Correct, Mr. Stone?
16            MR. STONE:  Your Honor, we'll certainly get the
17    summaries.  If not -- I just don't know how many people we're
18    talking about.
19            My sense is it is not going to be a huge number.  But
20    I would like to reserve at least the right to revisit the issue
21    if it is a larger number than I expect, just because it will
22    be -- there will be some burden associated with that.
23            THE COURT:  Okay.
24            MR. STONE:  And we feel like we've already --
25                    (Unintelligible cross-talk)
```

| | |
|---|---|
| 1 | MS. THORPE:  So are we -- I want to make it clear. |
| 2 | So we are including the investigative report that's |
| 3 | similar to the one I attached to the email for Mr. Johnson and |
| 4 | Ms. Stevenson; correct? |
| 5 | MR. STONE:  Are you asking me that question? |
| 6 | MS. THORPE:  Yes, Mr. Stone. |
| 7 | MR. STONE:  Yeah.  The answer is, like I said a |
| 8 | moment ago, which is we will certainly include the spreadsheet. |
| 9 | If it is not burdensome to produce additional documents, if |
| 10 | there is not a large number of files we have to go digging |
| 11 | through, then yes. |
| 12 | If it is, then we'll meet and confer on the issue. |
| 13 | And if not, we can chat with the Judge further about it, if |
| 14 | that is okay. |
| 15 | MS. THORPE:  Right.  Yeah.  Because my concern is the |
| 16 | spreadsheet, if it is incomplete like what I have been getting, |
| 17 | is not helpful. |
| 18 | MR. STONE:  Well, it is whatever Delta has in the |
| 19 | database is what is on the spreadsheet.  I understand -- I |
| 20 | understand what you are -- |
| 21 | **(Unintelligible cross-talk)** |
| 22 | THE COURT:  Okay.  One at a time. |
| 23 | **(Unintelligible cross-talk)** |
| 24 | THE COURT:  Go ahead, Ms. Thorpe.  What were you |
| 25 | saying?  Then he will respond. |

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 42 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 665 of 675

41

 1          MS. THORPE:  I was just saying there is an

 2    investigative report that would just solve everything.  It has

 3    everything in there.

 4          MR. STONE:  I understand.  If it is not burdensome,

 5    the answer is absolutely.  If it is burdensome, then I'll meet

 6    and confer with you.  And if we can't reach agreement on some

 7    subset, then we can talk with the Court about it.

 8          My gut is we're going to work through this.  My gut

 9    is it is not going to be burdensome.  But since I'm -- as Judge

10    Walker said a moment ago, I'm sort of shooting in the dark a

11    little bit here because I haven't had a chance to ask Delta

12    exactly how big this group is.  I don't know -- I don't want to

13    overcommit.

14          THE COURT:  Okay.

15          MS. THORPE:  And if I may -- if I may, Your Honor,

16    that will include, for example, based on what you pulled

17    before, Mr. Johnson wasn't on that list.

18          So you are going to search for travel violations in

19    general?

20          MR. STONE:  Well, Your Honor, we would disagree with

21    that.  I mean, Delta codes these things in a particular way.

22    For us to have to go -- I would have to go and literally look

23    at every file and figure out whether or not -- and we probably

24    would have -- we might have some disagreement as to how things

25    are coded.

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 43 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 666 of 675

42

 1              I mean, Delta codes things the way they code things.

 2    I don't think we have got to go and begin investigating whether

 3    or not Delta codes them the way the plaintiff agrees they need

 4    to be coded.

 5              MS. THORPE:  Even if you were --

 6              THE COURT:  Okay.  One at a time again.

 7                   **(Unintelligible cross-talk)**

 8              MS. THORPE:  I'm sorry.

 9              THE COURT:  I'm sorry.  Go ahead.

10              MS. THORPE:  If you were to go back now and produce

11    the summary document, Mr. Johnson wouldn't be on it -- wouldn't

12    be on that document.

13              MR. STONE:  Well, that's -- that is -- we're

14    producing Mr. Johnson though.  We have already agreed to

15    produce the Vendell Bailey --

16              MS. THORPE:  I know.  But what if there is someone

17    else?  What if there is someone else?

18              MR. STONE:  I can't --

19                   **(Unintelligible cross-talk)**

20              MR. STONE:  You know, obviously, I'm not in a

21    position to guarantee --

22              THE COURT:  Okay.

23              MR. STONE:  -- that every single person is coded

24    exactly right.  It would be -- it would take months to figure

25    that out.

```
 1              THE COURT:  I think -- let's just -- let's do this.
 2    Let me say this, Ms. Thorpe.  How about this?  How about we try
 3    to find out why -- maybe it is pass protection.  If this came
 4    up -- maybe it came up on an audit.  Because I'm looking at the
 5    top of the document dated November 3rd, 2014.  It says pass
 6    protection group audit.  And so maybe because it came up as an
 7    audit as opposed to just -- I don't know.  I'm just surmising
 8    that --
 9              MR. STONE:  Yeah.
10              THE COURT:  -- that Delta -- and Ms. Thorpe makes a
11    good point.  It may need to expand their search terms.  And
12    maybe -- it may never come up on a buddy pass.  But maybe it
13    was a group audit.
14              And I don't know if Delta -- I'm assuming Delta does
15    an audit from time to time to time.  And maybe, like you said,
16    five come up.
17              Did she come up on an audit as well?
18              MR. STONE:  Yeah.  What ended up --
19              THE COURT:  Oh, she came up through him.  She came up
20    through him.
21              MR. STONE:  -- happening, Your Honor, is they did do
22    an audit of passes -- of passes.  It didn't necessary --
23    sometimes what happens is it starts in one area and bleeds over
24    into another area kind of thing.  I think that is what happened
25    with her.  But yeah, she showed up in an audit.
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 45 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 668 of 675

44

```
 1                THE COURT:  Okay.  So it is random --

 2                MR. STONE:  But there were thousands of people who

 3    showed up in that audit.  There were well over a thousand.

 4                THE COURT:  Okay.  So they -- I'm just curious now.

 5    So they randomly do audits or something may alert you --

 6                MR. STONE:  It was not -- it was not random, Your

 7    Honor, no.  What happened is they -- Delta realized that there

 8    was a problem with selling buddy passes, using buddy passes and

 9    travel passes for travel, et cetera.  And so they set some

10    criteria.

11                They said, okay, anybody whose companion used it more

12    than 100 times, anybody who is a part of a group that gives a

13    lot of buddy passes to a single individual.  There were some

14    specific objective criteria.  That is how you ended up on the

15    list.

16                And then Delta -- you know, if you were on the list,

17    Delta reviewed your past travel to see if there were issues.

18                THE COURT:  Okay.

19                MR. STONE:  So, you know, Your Honor, we certainly do

20    everybody who would be on the spreadsheet.  I don't know how

21    else I could do it other than relying on the categories that

22    Delta -- that Delta identifies.  There is no other way really

23    for me to do it rationally without going and literally looking

24    file by file by file through a thousand files.

25                THE COURT:  Well, let's do this.  How about this?
```

```
 1    Reveal to Ms. Thorpe what their search term was, whether it is
 2    like buddy passes or --
 3            MR. STONE:  Sure.
 4            THE COURT:  -- or buddy pass audit just so she will
 5    have some semblance of understanding as to how this one was
 6    over -- was missed.
 7            MR. STONE:  Absolutely.  I will tell her exactly what
 8    the search terms were.
 9            THE COURT:  Okay.
10            MR. STONE:  That's fine, Your Honor.
11            I guess the only issue that remains outstanding is --
12            THE COURT:  Discovery.
13            MR. STONE:  Yeah.  Exactly.  Summary judgment
14    deadlines.  I have got -- I think I have got a March -- end of
15    March deadline for summary judgment.  It will take me a little
16    bit of time to do all this.
17            THE COURT:  Right.  I'm going to have to -- we're
18    going to have -- I'm going to have to -- because some district
19    judge is going to kill me.  This case -- oh, Judge Totenberg.
20            So in any event, she's not going to want to go beyond
21    the three years either.  But that just pushes me up against --
22    makes things a little tighter on me.
23            MR. STONE:  Understood.
24            THE COURT:  So what I --
25            MR. STONE:  We can --
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 47 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 670 of 675

46

```
 1              THE COURT:  -- will do is --

 2              MR. STONE:  Yes.

 3              THE COURT:  What I would like for you to do, if the

 4  two of you can come up, which may not happen, with a -- I think

 5  I looked at that earlier, the three-year list.  So yeah.

 6              MR. STONE:  The case was administratively closed for

 7  a while, Your Honor.  I don't know if you get credit for that.

 8              THE COURT:  That's true too.  That's true.

 9              MR. STONE:  Because we went and tried unsuccessfully

10  to resolve it.

11              THE COURT:  Good point.  That is good.  So that's

12  very good.  Thank you.  That's a very good point.

13              So I want to -- my time won't be as compressed.  But

14  I do want to get us to where either party can file their

15  dispositive motions.

16              MR. STONE:  Yeah.

17              THE COURT:  So what I will do is I would look for the

18  two of you to come up with -- with an additional -- a

19  modification of the discovery schedule so I will know --

20              MR. STONE:  Yeah.

21              THE COURT:  Because I don't know how long it is going

22  to take you to get this information.  And my concern is

23  Ms. Thorpe is probably going to have some additional questions

24  once she gets the information.

25              So -- and I'm not knocking you, Ms. Thorpe.  I'm --
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 48 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 671 of 675

47

```
 1            MS. THORPE:  Uh-huh (affirmative).

 2            THE COURT:  So you are extremely thorough.

 3            MS. THORPE:  Uh-huh (affirmative).

 4            THE COURT:  In any event -- so I would like for you

 5   two to come up with -- if you find out from your client,

 6   Mr. Stone, how much time you need to produce the information to

 7   Ms. Thorpe and then give her adequate time to review it and --

 8            MR. STONE:  Sure.

 9            THE COURT:  And we'll see then from there if she has

10   her answers that she needs or her comparators.  I just don't

11   want to keep searching and expanding it beyond what may be

12   relevant to what happened in this case.  So --

13            MR. STONE:  We agree, Your Honor.

14            THE COURT:  So if you come up with a time frame for

15   me and then a filing of dispositive motions, hopefully we can

16   move from there.

17            So what I can do --

18            MR. STONE:  That's fine, Your Honor.  We, like you,

19   are anxious to get to the dispositive motion phase and get

20   these issues before the Court.

21            THE COURT:  Okay.  And if not, then we'll have

22   another telephone conference.  And I'll just have to schedule a

23   date to finish everything.  Okay?

24            MS. THORPE:  Uh-huh (affirmative).

25            MR. STONE:  That sounds perfect, Your Honor.  We
```

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 49 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 672 of 675

48

1  appreciate the time.

2         THE COURT:  Okay.  Anything else, Ms. Thorpe?

3         MS. THORPE:  Thank you very much.

4         THE COURT:  Anything else, Ms. Thorpe?

5         MS. THORPE:  No, not at all.  Thank you very much.

6         THE COURT:  Okay.  Do I need to -- let me see.  Okay.

7  I'll try to work up an order for you unless --

8         MR. STONE:  I think we've got the parameters, Your

9  Honor.  Let me see if we can -- let me see if we can get -- how

10 fast we can get the information.  I think Your Honor was very

11 clear.

12        THE COURT:  Or if you two want to do a consent order.

13             **(Unintelligible cross-talk)**

14        MS. THORPE:  Or would you like to hop on the phone

15 right after --

16        THE COURT:  If the two of you want to do a consent

17 order to the Court that outlines my rulings here because I have

18 my notes here -- to my rulings here as well as the discovery

19 conference so we're all on the same page as to what -- and if

20 not, you know, that is why I'm recording it so we will have a

21 record of it as well.

22        MR. STONE:  That's right.

23        THE COURT:  So if you want to present a consent

24 order, then --

25        MR. STONE:  Charlena, why don't I take a crack at

Case 1:16-cv-02571-AT   Document 119   Filed 12/22/21   Page 50 of 51
USCA11 Case: 21-13814   Document: 20   Date Filed: 03/30/2022   Page: 673 of 675

49

```
 1    putting together -- and I'll get it to you early next week -- a

 2    draft order that deals with all these issues?

 3            THE COURT:  Okay.  You are going to get it to

 4    Ms. Thorpe?

 5            MS. THORPE:  Do you mind if you and I talk right

 6    after this meeting?

 7            MR. STONE:  Sure.  That's fine.

 8            THE COURT:  Okay.  So you are going to send it to

 9    Ms. Thorpe, and then the two of you will present it to the

10    Court?

11            MR. STONE:  Yes, Your Honor.

12            THE COURT:  Okay.  Sounds good.

13            Anything else that I need address on behalf of either

14    party?

15            MR. STONE:  I think that is it.

16            MS. THORPE:  Thank you very much.

17            THE COURT:  You're welcome.  Have a good weekend.

18    Bye-bye.

19                    (The audio-recorded proceedings were thereby

20                     concluded at 4:06 P.M.)

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                      C E R T I F I C A T E

 2

 3     UNITED STATES OF AMERICA

 4     NORTHERN DISTRICT OF GEORGIA

 5

 6          I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7     the United States District Court, for the Northern District of

 8     Georgia, Atlanta Division, do hereby certify that the foregoing

 9     49 pages constitute a true transcript of proceedings had before

10     the said Court, held in the City of Atlanta, Georgia, in the

11     matter therein stated.

12          In testimony whereof, I hereunto set my hand on this, the

13     22nd day of December, 2021.

14

15

16

17                       _____
                         SHANNON R. WELCH, RMR, CRR
18                       OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have served **APPENDIX** via the Court's ECF system and on the Clerk of the U.S. Court Of Appeals For The Eleventh Circuit (two copies) and opposing counsel on the date below via first class mail and dispatch as follows:

David J. Smith
Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

Benjamin A. Stone, Esq.
999 Peachtree St., NE
Suite 2850
Atlanta, GA 30309

Dated: March 30, 2022        By: s/ Charlena Thorpe
                                    Charlena Thorpe